CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ERICA CHOI (Bar No. 302351)
(E-Mail: Erica_Choi@fd.org)
SHANNON COIT (Bar No. 298694)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
ASHLEIGH BROWN

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ASHLEIGH BROWN,<br><br>Defendant. | Case No. 2:25-CR-780-SVW-2<br><br>**ASHLEIGH BROWN'S BRIEF IN SUPPORT OF MOTION FOR BAIL REVIEW** |

Defendant Ashleigh Brown, through her counsel of record, Erica Choi and Shannon Coit, submits this brief in support of her motion for bail review (CR-88). The government opposes bond.

                                Respectfully submitted,

                                CUAUHTEMOC ORTEGA
                                Federal Public Defender

DATED: November 4, 2025        By  /s/ Erica Choi
                                ERICA CHOI
                                SHANNON COIT
                                Deputy Federal Public Defenders
                                Attorney for ASHLEIGH BROWN

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................1

II. RELEVANT BACKGROUND ..............................................................................2

    A.    Masked, Armed, and Unidentifiable Agents Have Created a Chaotic and Dangerous Environment in Los Angeles and Across the Country .......2

    B.    Citizens Are Documenting, Recording, and Sharing Information About ICE in Their Communities. ...............................................................3

    C.    Ms. Brown is a Community Organizer Accused of Following an ICE Officer Home and Publicly Disclosing His Home Address on Social Media. ..................................................................................................4

    D.    Ms. Brown was Ordered Detained. ............................................................5

III. ARGUMENT ........................................................................................................6

    A.    "Liberty is the Norm, and Detention Prior to Trial Is the Carefully Limited Exception." .................................................................................6

    B.    The Defense Proposes Comprehensive Conditions of Release. .................7

    C.    Ms. Brown Is Not a Danger to the Community. .........................................8

    D.    Ms. Brown is Not a Flight Risk. ..................................................................9

IV. CONCLUSION ..................................................................................................10

## I. INTRODUCTION

Ashleigh Brown is a college-educated woman with no prior criminal history. She is married and has two young children. She founded two non-profit organizations dedicated to Native American culture and life. Previously, she worked as a federal grant writer. She sits on numerous boards of directors in Colorado. She is a mother, a wife, a sister, a community organizer, a journalist, and a fashion designer.

Prior to August 2025, she had never been arrested or had negative contact with law enforcement. The instant charges stem from her documenting ICE enforcement in Los Angeles. Specifically, Ms. Brown is charged with conspiring to publicly disclose, and publicly disclosing, the personal information of a federal agent on August 28, 2025. Based on discovery produced by the government, two things appear to be true: (1) Ms. Brown accidentally followed an ICE officer to his personal residence while documenting and reporting on ICE enforcement, and (2) she never publicly disclosed the ICE officer's home address.

The magistrate judge previously denied bond largely due to perceived similarities between the alleged conduct in this case and an unrelated (now dismissed) alleged assault charge against Ms. Brown from August 2, 2025. The assault case was dismissed with prejudice last week. As explained below, the alleged assault should not be considered at all in the bond analysis.

Ms. Brown should be released on bond with conditions. She is not a flight risk nor a danger to the community. The Court can set bond conditions to mitigate any potential risk that Ms. Brown might pose to the community or for non-appearance. Given all of these facts and the factors the Court must consider under the Bail Reform Act, Ms. Brown respectfully requests that this Court set reasonable terms and conditions of release.

## II. RELEVANT BACKGROUND

Ms. Brown's case occurs against the backdrop of increased ICE arrests and enforcement in Los Angeles, and the aggressive tactics of federal officers in response to U.S. citizens and others who record ICE officers in the community. Documenting and monitoring ICE officers in public is not a crime. This background provides critical context. It shows that what Ms. Brown was doing, following and recording an unmarked ICE vehicle, is part of a larger movement of citizens across the country who are documenting and reporting when they see ICE in their communities. Of critical importance, Ms. Brown did not purposely follow an ICE officer home. And, contrary to what is suggested in the Complaint and Indictment, Ms. Brown never announced the ICE officer's home address on social media. These are important facts that—when considered with the Bail Reform Act's presumption of release—merit Ms. Brown's release with conditions pending trial.

### A. Masked, Armed, and Unidentifiable Agents Have Created a Chaotic and Dangerous Environment in Los Angeles and Across the Country

Over the past year, Americans have witnessed a disturbing yet increasingly familiar sight: heavily armed agents conducting immigration arrests have been concealing their faces, identities, and even which agency they work for from the public by hiding behind masks, gaiters, hats, and sunglasses.[1] Compounding this problem, officers regularly drive unmarked cars that appear to be civilian cars, with the only noticeable difference being that these cars have no license plates attached.[2] In recognition of the fact that the practice of masked, armed men springing from

---

[1] Leila Fadel, Masked Immigration Agents are Spurring Fear and Confusion Across the U.S., *Morning Edition,* (NPR Jul. 10, 2025), https://www.npr.org/2025/07/09/nx-s1-5440311/ice-raids-masked-agents#:~:text=%22When%20you%20have%20masks%20on,was%20targeted%20for%20speaking%20up.

[2] *Id.*; *See also* Chiara Eisner and Ximena Bustillo, *Camouflaging Cars and Swapping License Plates: How Agents Make Immigration Arrests*, NPR (Oct. 29, 2025), https://www.npr.org/2025/10/29/g-s1-95373/immigration-arrests-license-plates-conceal-federal-agents.

2

unmarked cars bears more resemblance to extrajudicial kidnapping than it does to legitimate law enforcement activity, dozens of jurisdictions now seek to ban masking of federal policing authorities in public places.[3] Making matters worse, federal officers have been engaging in increasingly reckless, dangerous tactics. For example, videos showing officers ramming their vehicles into civilian cars and employing excessive use of force capable of resulting in injury or death are legion.[4]

Ordinary citizens are doing by doing one of the few things they can do in response: recording and sharing when they witness federal agents in their cities.

### B. Citizens Are Documenting, Recording, and Sharing Information About ICE in Their Communities.

In cities across the country, people are monitoring and documenting ICE enforcement. In New York, the state's attorney general recently "urged the public to submit photos, videos and other documentation of federal immigration operations to her office for review, a day after a high-profile raid targeted Manhattan street vendors."[5] "Attorney General Letitia James said her office would review footage and other information from operations shared through a 'Federal Action Reporting Form,' saying in a statement that 'every New Yorker has the right to live without fear or intimidation.'"

In Chicago, community groups monitor their neighborhoods for ICE activity. "Residents in Chicago have begun forming volunteer groups to monitor their

---

[3] Martin Kaste, *Lawmakers Seek to Ban Federal Agents From Wearing Masks*, NPR (Jul. 25, 2025), https://www.npr.org/2025/07/25/nx-s1-5480219/lawmakers-ban-federal-immigration-agents-masked.

[4] Gustavo Arellano, *From L.A to New York, Bumbling, Aggressive ICE is Its Own Worst Enemy*, L.A. Times (Oct. 23, 2025), https://www.latimes.com/california/story/2025-10-23/ice-raids-dangerous (Reporting that body camera footage and court records show ICE agents lying about incidents and detaining U.S. citizens, contradicting claims the agency operates professionally).

[5] Ted Hesson and David Dee Delgado, *New York Attorney General Urges Public to Report ICE Activity After Raid Targets Vendors*, Reuters (Oct. 23, 2025), https://www.reuters.com/world/us/new-york-attorney-general-urges-public-report-ice-activity-after-raid-targets-2025-10-22/.

3

neighborhoods for federal immigration agents."[6] "Others honk their horns or blow whistles when they see agents nearby."[7]

And in Los Angeles, "[o]ne critical role community organizations and grassroots groups have taken on during heightened immigration enforcement activity in Los Angeles is the reporting, sharing and verification of ICE sightings."[8] By reporting events in real time, Angelenos are both documenting what is happening in the city and creating accountability for law enforcement. Ms. Brown is no different than these individuals.

**C.  Ms. Brown is a Community Organizer Accused of Following an ICE Officer Home and Publicly Disclosing His Home Address on Social Media.**

On August 28, 2025, Ms. Brown was driving in downtown Los Angeles. She noticed a vehicle with dark windows and no license plates. Believing this was ICE enforcement, Ms. Brown and the two other people in her car began to record and track the vehicle on the road. Importantly, it was around 12:30 p.m. and in the middle of a typical work day—not the time that people usually leave work to go home.

As they drove, they attempted to maintain a distance of over 100 feet.[9] They did not obstruct or impede the vehicle. Nor did they hide themselves. In fact, the ICE officer noticed Ms. Brown's car. (Complaint ¶ 5). They followed. They recorded. They

---

[6] Julie Bosman, *ICE Is Cracking Down on Chicago. Some Chicagoans Are Fighting Back*, N.Y. Times (Oct. 16, 2025), https://www.nytimes.com/2025/10/14/us/chicago-ice-trump.html

[7] *Id.*

[8] Alex Medina, *The Groups Sharing and Verifying ICE Sightings in L.A. and the Eastside*, Boyle Heights Beat (June 18, 2025), https://boyleheightsbeat.com/ice-agent-sighting-groups-eastside/

[9] At the time, Ms. Brown was on pretrial release on an unrelated (and now dismissed) case for simple assault on a federal officer. One of her bond conditions was to stay 100 feet away from federal officers, so she made every effort to do so. The assault case has been dismissed with prejudice.

4

documented. As the ICE vehicle drove on the freeway, they wondered aloud which city ICE was heading to arrest immigrants in.

What happened after the ICE officer arrived in Baldwin Park is captured on cell phone videos and will be the subject of trial in this matter. But what bears emphasis at this point is this: Ms. Brown did not announce the ICE officer's address on social media. Based on the defense's review of the videos, Ms. Brown announced the address of *her* location, not the ICE officer's home address.

### D.   Ms. Brown was Ordered Detained.

Magistrate Judge Alka Sagar previously denied bond based on risk of non-appearance and danger to the community. The defense sought reconsideration of this decision providing new surety resources, proposing a $65,000 appearance bond secured by four affidavits of surety, home detention with GPS location monitoring, a special condition to stay away 1,000 feet (instead of 100 feet) from federal officers and buildings, travel restricted to C.D. Cal., and any other conditions deemed appropriate by the Court.[10] Judge Sagar denied bond then, noting the concern that Ms. Brown appeared to have engaged in behavior that was "similar to what she was charged with" in another case (simple assault) and "takes it to a whole other level."

To explain, Ms. Brown was separately charged with misdemeanor assault on a FPS Inspector Zachary Conte, during an ICE protest on August 2, 2025. *See* Information, Case No. 25-cr-00701-FMO, ECF No. 26. Days before trial, the defense learned Conte had an undisclosed criminal history, including an assault conviction from 2021. *See* Defense's MIL/MTC, Case No. 25-cr-00701-FMO, ECF No. 83 at 6:9-22. Conte had failed to disclose this conviction to the USAO,[11] and the USAO had failed to disclose it to the defense, in violation of the Court's orders to produce *Brady* and

---

[10] Defense counsel also offered orally that Ms. Brown could reside in Colorado if needed.

[11] It also appears Conte failed to disclose this information to his agency, the Federal Protective Services. *See* Gov't Non-Opposition at 4:14-21,

5

*Henthorn* materials by certain deadlines. *See id.* at 6:23-7:6; *see also* Gov't Non-Opposition to MIL/MTC ["Gov't Non-Opposition"], Case No. 25-cr-00701-FMO, ECF No. 87, at 4:4-22; 5:10-13. The government agreed it would not call Officer Conte in its case-in-chief at trial, and moved to dismiss the Information with prejudice. *See* Gov't Non-Opposition at 5:14-22; Motion to Dismiss With Prejudice, Case No. 25-cr-00701-FMO, ECF No. 86.

Nothing about the assault charge should be held against Ms. Brown. Not only has the case been dismissed with prejudice, the evidence was dubious from the start. For one, Conte's story kept changing. He initially omitted Ms. Brown from his initial victim statement (he claimed he was assaulted by another protestor that day as well). Later, he said Ms. Brown hit him in the left arm and torso. Then, he said Ms. Brown struck him "in the kidney area." Secondly, despite the alleged assault happening in broad daylight in front of dozens of people, with numerous civilians recording and posting on social media, no video evidence supported Conte's claims. Ms. Brown's release does not pose a risk to the community.

## III. ARGUMENT

The Court has authority to review the magistrate judge's detention order. 18 U.S.C. § 3145(b). A district court reviews such an order de novo. *See United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990).

### A. "Liberty is the Norm, and Detention Prior to Trial Is the Carefully Limited Exception."

"In our society liberty is the norm, and detention prior to trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). "[I]n a noncapital case the defendant will have the pretrial right to release on bail except in extreme and unusual circumstances." *Gavino v. MacMahon*, 499 F.2d 1191, 1195 (2d Cir. 1974) (per curiam). Under the Bail Reform Act, Congress "mandate[d the] release of a person facing trial under the least restrictive condition or combination of conditions." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). It also

requires courts to "dispose of every alternative before ordering pretrial incarceration under the Bail Reform Act." *United States v. Fernandez-Alfonso*, 816 F.2d 477, 478 (9th Cir. 1987).

Detention is authorized *only if* the government proves: (i) by clear and convincing evidence, that no set of conditions will reasonably assure the safety of any other person or the community; and (ii) by a preponderance, that no set of conditions will reasonably assure the defendant's appearance. 18 U.S.C. § 3142; *see also Salerno*, 481 U.S. at 741, 750-52; *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008); *Motamedi*, 767 F.2d at 1405. The Court must consider four factors in determining whether the government has made the standard for pretrial detention: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the person (including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, or record concerning appearance at court proceedings); and (4) the nature and seriousness of the danger to any person or the community posed by the person's release. 18 U.S.C. § 3142(g); *Motamedi*, 767 F.2d at 1407.

**B.     The Defense Proposes Comprehensive Conditions of Release.**

Detention is appropriate only if, after considering every possible combination of conditions, the government proves that none can sufficiently mitigate (but not eliminate) the risk of nonappearance or danger. *United States v. Orta*, 760 F.2d 887, 890-91 (8th Cir. 1985) ("The judicial officer must . . . consider whether one of the codified conditions or any combination of the conditions will 'reasonably assure' the defendant's appearance and the safety of the community. The wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention.").

There is a set of bond conditions that will reasonably assure Ms. Brown is not a danger to the community and that she will appear in this case. Those conditions include:

- $65,000 unsecured bond signed by four affidavits of surety
    - $20,000.00 signed by Nick Souksavath (Ms. Brown's husband and father of their two minor children, ages two and thirteen);
    - $20,000.00 signed by Laurel Gord (friend residing with Ms. Brown);
    - $20,000.00 signed by John Gord (friend residing with Ms. Brown);
    - $5,000.00 signed by Leila Brown (Ms. Brown's sister)
- Home detention at an approved residence with location monitoring, with standard exceptions including for employment;
- Special condition to stay 1,000 away from federal buildings and federal officers and agents;
- A prohibition against possessing firearms and other dangerous items, with compliance searches;
- A prohibition against using or possessing drugs, including marijuana, with drug testing and compliance searches;
- A prohibition against using or possessing controlled substance analogues, with drug testing and compliance searches;
- Mental health assessment and psychological counseling;
- Surrender all passports and travel documents and certify that Ms. Brown will not apply for any additional travel documents;
- Travel restrictions to the Central District of California;
- Requirement to maintain approved employment;
- A prohibition on contacting any known witnesses and victims;
- A prohibition on communicating with any co-defendants without counsel present;
- Submit to Pretrial Services supervision;
- Any other conditions that the Court deems appropriate.

### C. Ms. Brown Is Not a Danger to the Community.

The defense's bond package more than reasonably assures Ms. Brown will not be a danger to the community. The government cannot meet its heavy burden to show, by clear and convincing evidence, otherwise. Discovery produced by the government

8

shows that Ms. Brown remained in or near her car, which was parked several houses away from the ICE officer's home. Significantly, the discovery shows that Ms. Brown did *not* announce the ICE officer's home address on social media. She announced *her* location on social media, which was a different address. And, contrary to what is suggested in the Indictment, she did not tell people to "come on down" to the ICE officer's house. Her words on the livestream were, "come on down *to support the people*" (emphasis added)—in response to the ICE officer's actions towards her, which included blocking her car in so she could not leave and calling the Baldwin Park Police Department. This is a very different factual scenario than what is suggested in the Indictment and Complaint, and what the government suggested at her bond hearing.

Ms. Brown has a long history of peaceful leadership and community organizing. *See* Exhibit A, Letters of Support. She is a native Angeleno, with longstanding roots in this city. She has a stable residence in Venice, where she can reside with friends, during the pendency of this case. Alternatively, she can return to Aurora, Colorado, to her permanent address, where her husband and children currently reside. Ms. Brown's lack of criminal history, lack of prior failures to appear, good character, financial resources, employment history, and letters, of support sufficiently mitigate any real or perceived risk of danger to the community.

### D. Ms. Brown is Not a Flight Risk.

Ms. Brown's longstanding ties to the Los Angeles community cut against any finding she is a flight risk. She is a native Angeleno. She has a sister here, who has agreed to be a surety. If released, Ms. Brown can return to her residence Venice, where she was previously living with friends at a home approved by Pretrial Services. Alternatively, she can return to Aurora, Colorado, to her permanent address with her

9

husband and daughters.[12] Ms. Brown's passport has already been surrendered to Pretrial Services.

Ms. Brown's lack of prior failures to appear, good character, financial resources, letters of support, and community ties, mitigate against any risk of flight in this case.

## IV. CONCLUSION

For all of these reasons, the Court should order Ms. Brown's release on bond with conditions.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: November 4, 2025    By  /s/ Erica Choi
ERICA CHOI
SHANNON COIT
Deputy Federal Public Defenders
Attorney for ASHLEIGH BROWN

---

[12] Ms. Brown and her husband have been going through a separation for the past several months. Nonetheless, they remain friends and are on good terms while co-parenting their children. Ms. Brown could and would return to the residence in Colorado if ordered by the Court.

10