**GREGORY NICOLAYSEN (CA 98544)**
**27240 Turnberry Lane, Suite 200**
**Valencia, CA 91355**
**Phone: (818) 970-7247**
**Fax: (661) 252-6023**
**Email: gregnicolaysen@aol.com**

**Attorney For Defendant,**
**Cynthia Raygoza**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | **2:25-CR-00780-SVW-1** |
| ) | |
| ) | **NOTICE OF MOTION AND** |
| **Plaintiff,** ) | **MOTION BY DEFENDANT** |
| ) | **CYNTHIA RAYGOZA FOR** |
| ) | **POST-VERDICT JUDGMENT OF** |
| **v.** ) | **ACQUITTAL PURSUANT TO** |
| ) | **FEDERAL RULE OF CRIMINAL** |
| ) | **PROCEDURE 29(c) ;** |
| **CYNTHIA RAYGOZA, et al.,** ) | **ALTERNATIVE REQUEST FOR** |
| ) | **NEW TRIAL UNDER RULE 33** |
| **Defendants** ) | |
| ) | **DATE: [TO BE SET]** |
| ) | **TIME: 11:00 a.m.** |
| ) | **CTRM: Hon. Stephen V. Wilson** |
| ) | |
| _____ ) | |

Defendant Cynthia Raygoza, through her CJA counsel of record, Gregory Nicolaysen, hereby moves the Court for a post-verdict judgment of acquittal on Count Two of the First Superseding Indictment, pursuant to Federal Rule of Criminal Procedure 29(c).  Alternatively, Ms. Raygoza requests a new trial pursuant to Rule 33.

DATED:    March 13, 2026                    Respectfully Submitted,


                                           _____/S/_____
                                           **GREGORY NICOLAYSEN**
                                           **Attorney for Defendant,**
                                           **Cynthia Raygoza**

## TABLE OF CONTENTS

I.      THE COURT SHOULD SET ASIDE THE VERDICT ON
COUNT TWO BECAUSE THE GOVERNMENT'S ATTEMPT TO
RECHARACTERIZE A NINETY-MINUTE IMMIGRATION PROTEST
AS A FEDERAL STALKING OFFENSE IS A PROFOUND LEGAL
OVERREACH THAT FAILS  THE SUFFICIENCY STANDARDS UNDER
RULE 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A.      Rule 29(c) Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B.      The Elements Of 18 U.S.C. 2261A(2)(B)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

C.      The Jury Instruction Given On The Elements Of Stalking
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.      The Government's Decision To Charge The Brief, Ninety-
Minute Incident On A Single Day As Stalking Departs Radically
From Historical Charging Practices In This District. . . . . . . . 10

E.      The Government's Charging Decision Contradicts Congress's
Intent to Target Only Repetitive Predatory Behavior
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

F.      The Government's Application Of The Stalking Statute To This
Case Directly Contradicts Case Law . . . . . . . . . . . . . . . . . . . . . 17

II.     ALTERNATIVELY, THE COURT SHOULD GRANT A NEW TRIAL
UNDER RULE 33 BECAUSE THE JURY INSTRUCTION
ON "COURSE OF CONDUCT" CONSTITUTED REVERSIBLE ERROR
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.    UNDER FED.R.CRI.P. 29(d), THE COURT SHOULD
CONDITIONALLY DETERMINE WHETHER A MOTION
FOR A NEW TRIAL SHOULD BE GRANTED . . . . . . . . . . . . . . . . . . . . 26

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## THE COURT SHOULD SET ASIDE THE VERDICT ON COUNT TWO BECAUSE THE GOVERNMENT'S ATTEMPT TO RECHARACTERIZE A NINETY-MINUTE IMMIGRATION PROTEST AS A FEDERAL STALKING OFFENSE IS A PROFOUND LEGAL OVERREACH THAT FAILS THE SUFFICIENCY STANDARDS UNDER RULE 29

### A.    Rule 29(c) Standards

On February 27, 2026, the jury found defendant Cynthia Raygoza guilty on Count Two of the First Superseding Indictment, which charged her with stalking under 18 U.S.C. 2261A. (Pacer docket #178).  This motion seeks an order setting aside the verdict pursuant to Fed.R.Crim.P. 29(c), which provides in pertinent part as follows:

> (c) After Jury Verdict or Discharge.
>
> (1) Time for a Motion. A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.
>
> (2) Ruling on the Motion. If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

4

Rule 29 provides that, after a jury returns a guilty verdict, a "court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c). Courts reviewing a motion for judgment of acquittal under Rule 29(c) apply the same test as they do in evaluating a challenge to the sufficiency of the evidence. United States v. Ladum, 141 F.3d 1328, 1337 (9th Cir. 1998). When considering a motion for judgment of acquittal, courts must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Hursh, 217 F.3d. 761, 767 (9th Cir. 2000).

In ruling on a Rule 29 motion, the court must first consider the evidence presented at trial in the light most favorable to the United States. United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010). Then, the court must determine whether this evidence, so viewed, is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. Id. "The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." United States v. Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010). "[A]ny conflicts in the evidence are to be resolved in favor of the jury's verdict." United States v. Alvarez-Valenzuela, 231 F.3d 1198, 1201-02 (9th Cir. 2000).

The government need not provide direct evidence of all elements of the crime; circumstantial evidence and reasonable inferences drawn therefrom can be sufficient to sustain a conviction. *See,* United States v. Cordova Barajas, 360 F.3d

5

1037, 1041 (9th Cir. 2004). "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." United States v. Dinkane, 17 F.3d 1192, 1996 (9th Cir. 1994) (quotation omitted). It is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. United States v. Dreitzler, 577 F.2d 539, 545 (9th Cir. 1978) (quotation omitted). *See,* United States v. Becerril, 2026 U.S. Dist. LEXIS 48330, at \*2-3 (E.D. Wash. Mar. 9, 2026).

Based on the arguments presented herein, defendant Cynthia Raygoza respectfully contends that the jury could not reasonably arrive at its verdict of guilty on Count Two, specifically in regard to the element of "course of conduct" under the stalking statute. The guilty verdict should therefore be set aside.

B.    The Elements Of 18 U.S.C. 2261A(2)(B)

18 U.S.C.S. § 2261A(2)(B) states:

> Whoever—
> \*        \*        \*
> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce *to engage in a course of conduct* that—

                            \*       \*       \*

      **(B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A),**

      **shall be punished as provided in section 2261(b) or section 2261B [18 USCS § 2261(b) or 2261B], as the case may be.**
      **[Italics and Underlining Added]**

**The definition of "course of conduct" is found in 18 U.S.C.S. § 2266:**

      **(2) Course of conduct. The term "course of conduct" means a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose.**

**C.      The Jury Instruction Given On The Elements Of Stalking**

**On February 5, 2026, the parties filed two sets of disputed jury instructions, in which the government and defense set forth their respective positions on the disputed instructions.  The defense positions were submitted collectively on behalf of all three defendants to avoid separate filings by each defendant. (Pacer docket #142, 143).**

**The disputed instructions included Government's Proposed Instruction No. 4, which addressed the elements of stalking;[1] and Defendants' Proposed Instruction No. 6, which addressed the term, "two or more acts," within the element "course of**

---

[1]    **Pacer docket #142, at pages 16-17 of 26.  As a disputed instruction, the defense objection to Government's Instruction No. 4 preserves the issues in this motion for appeal.**

conduct."[2]

At trial, the Court gave the Government's Instruction No. 4 and did not give Defendants' Instruction No. 6.

Central to this motion is the government's definition of the stalking element, "course of conduct":

> A "course of conduct" is a pattern of conduct composed of two or more acts, evidencing a continuity of purpose. *You may consider each communication between the defendant and R.H. or his family members as a separate act.* You are not required to agree unanimously on which two or more acts constitute the course of conduct. Not all acts that constitute part of a course of conduct must involve the use of the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce.
> [Italics And Underlining Added]

As discussed below, defendant Raygoza contends that no rational trier of fact could find her guilty of stalking based on the government's trial evidence; and that the Court's adoption of the government's proposed instruction on "course of conduct" enabled the incorrect verdict. The Court should therefore set aside the guilty verdict and enter a not guilty verdict for defendant Raygoza on Count Two.

---

[2] Pacer docket #143, at page 5 of 12.

8

**D.** **The Government's Decision To Charge The Brief, Ninety-Minute Incident On A Single Day As Stalking Departs Radically From Historical Charging Practices In This District**

In support of a ruling that no rational trier of fact could find Ms. Raygoza guilty of stalking on Count Two, it is important to look comparatively at the way the U.S. Attorney's Office in the Central District of California has applied the stalking statute over the past twenty years.

Attached hereto as Exhibit A is a chart listing the stalking prosecutions filed in this district under the statute at issue here, 18 U.S.C. 2261A. As the chart shows, the prosecutions are consistently comprised of repetitive and persistent conduct of a clearly threatening and harassing (if not altogether frightening) nature, spread out over days and, in most cases, many months. The cases involve continual emails, text messages, social media posts, and the like, which taken as a whole over an extended period demonstrate a calculated scheme by the defendant in each case to threaten, intimidate and/or harass the victim(s).

The attached chart (Exhibit A) demonstrates that the U.S. Attorney's Office in this district has maintained a charging protocol aimed at applying the stalking statute to instances where a defendant's "course of conduct" consists of repetitive, persistent conduct over an extended period of time, thereby establishing the "pattern" and "continuity of purpose" required under the statutory definition in 18 U.S.C. 2262. The charging practices depicted in the chart are consistent with the

9

statutory standard.  The charging decision in this case is not.

Indeed, the prosecution of Ms. Raygoza under the stalking statute represents a radical aberration from established practices in this district.  The trial evidence here was confined to a single day and, within that day, to approximately an hour and a half, during which Ms. Raygoza and her two co-defendants, one of whom was acquitted of stalking, engaged in protest behavior against ICE.  The government's evidence showed a single, continuous event on August 28, 2025 that started at approximately 12:25 pm, when the three defendants observed a vehicle without a rear license plate near MDC-LA which they correctly believed was a vehicle of Immigration & Customs Enforcement ("ICE").  Together in one car, the defendants began following the vehicle onto the freeway, while live-streaming to the Instagram account of the organization, ICE-out-of-LA.

Approximately 15-20 minutes later, the vehicle pulled into a residential street in Baldwin Park, where the driver, who was in fact an ICE agent, parked the vehicle near his residence and proceeded to enter his family's vehicle where his wife was waiting with their two minor children.  The defendants proceeded to park further down the street.  What happened from that point on, until the agent and his family left the area at approximately 1:40 pm, was nothing more than a protest against ICE by the defendants.  This protest consisted of the three defendants continuing to live stream while Ms. Raygoza spoke out to residents on the street

that their neighbor is an ICE agent.

During this time, the agent and his wife exited their family vehicle to confront Ms. Raygoza in a face-to-face verbal exchange until Baldwin Park Police Dept officers arrived shortly after 1:00 pm.  The officers did not arrest any of the defendants for their live-streaming protest activity but did arrest Raygoza for misdemeanor battery based on the agent's false accusation that she had pushed him prior to the officers' arrival.

The government's trial exhibits include cell phone videos depicting the events described above, specifically Government Exhibits 6, 8 and 21.

Viewed in the context of the government's charging practices under the stalking statute, this case manifests serious over-reach by the U.S. Attorney's Office in its obvious effort to up the ante in its campaign against ICE protestors by applying the stalking statute to conduct that clearly falls far outside the parameters of the requisite "course of conduct" to support a conviction.

As discussed below, this case also directly contradicts Congressional intent in enacting the stalking statute and stands in sharp contrast to the circumstances addressed the case law addressing the stalking statute.

**E.      The Government's Charging Decision Contradicts Congress's Intent
to Target Only Repetitive Predatory Behavior**

The government's trial evidence sharply contradicts Congress' intent in enacting the Interstate Stalking Punishment and Prevention Act of 1996 ("1996 Act"), which was originally enacted as part of the Violence Against Women Act (VAWA).  Attached hereto as Exhibit B is the Report ("Report") accompanying (H.R. 2980) by which the stalking statute, 18 U.S.C. 2261A, was added to 18 U.S.C. 2261.

A critical focus underscoring the 1996 Act was Congress' intent to criminalize conduct that involves *pursuit* of a victim, primarily across state lines. While the jurisdictional component of the statute also includes the use of electronic transmissions – which was at issue in this trial through the use of cell phones to live stream the ICE protest activities – the heart of Congressional intent focuses squarely on conduct involving the pursuit of a victim.

In this context, the Report treats the stalker as a "tormentor" and recognizes that stalking may involve the victim having to relocate to a new residence, with the "tormentor" in pursuit:

> In some instances, the stalking victim has to move to a new residence, at times in a new state, to escape the tormentor. Yet moving does not guarantee an end to the victim's nightmare. Some victims have been followed by their stalkers to the new state.

12

Exhibit B (at page 2 of 7).

The Senate version of the bill was sponsored by Sen. Kay Bailey Hutchison [R-TX], who made the following observations about stalking in the Congressional record (Exhibit E):

> Stalking is threats. It is harassment. It is the constant terrorizing of a victim(.)

The government's evidence at trial contradicts the type of conduct Congress intended to criminalize.  At trial, the ICE agent and his wife testified that they moved to a new residence after the event on August 28, 2025.  However, they also admitted that none of the defendants had made any contact with them prior to after that date and that the conduct of the defendants was limited to that single day.

These admissions place the government's case squarely at odds with the legislative purpose, which is to criminalize *pursuit* of a victim by a "tormentor" who engages in the "constant terrorizing of a victim."  The legislative intent covers instances where relocating to a new residence is not effective because the stalker is relentless in finding the victim.  The case against Ms. Raygoza and the other defendants did not come anywhere close to the scenario contemplated by Congress.

The fundamental concepts of repetition and pursuit, which underscore Congress' objective in protecting victims, were likewise the focal points of research into stalking behavior that was conducted contemporaneously with Congressional

13

action.  For example, a research study on the extent of stalking nationwide was published jointly in 1998 by the National Institute of Justice (NIJ) and the National Center for Injury Prevention and Control (NCIPC), entitled, "Stalking in America: Findings From the National Violence Against Women Survey" (the "1998 Study"). A copy is attached hereto as Exhibit C.  The study collected data from 8,000 women and 8,000 men 18 years of age or older from November 1995 through May 1996, when the above-referenced House bill was introduced.

The data in the 1998 Study reveals that stalking involves pursuit characterized by repetitive behavior.  For example, the study found:

> Based on information provided by these victims, about two thirds of all stalking cases last a year or less, about a quarter last 2–5 years, and about a tenth last more than 5 years [exhibit reference omitted]. On average, stalking cases last 1.8 years.

(Exhibit C, at pages 11-12 of 20).  These findings segue with the definition of stalking on page 1 of the 1998 Study, which states in part:

> Stalking generally refers to harassing or threatening behavior that an *individual engages in repeatedly*, such as following a person, appearing at a person's home or place of business, making harassing phone calls, leaving written messages or objects, or vandalizing a person's property. [Italics and Underlining Added]

As the data for the 1998 Study was issued in May 1996, contemporaneously with the House Report, the fundamental premise of the Study, i.e., that stalking

14

involves repeated behavior, was undoubtedly incorporated into the legislative intent.  Further evidence that Congress intended to criminalize repeated behavior is demonstrated in a follow-up report submitted to the NIJ in 1999, entitled, "An Exploration of the Experiences and Needs of Former Intimate Stalking Victims."[3]  The introductory section of the 92-page report, attached as Exhibit D, expressly addresses the definition of "course of conduct" from the vantage point of repeated conduct over a period of time:[4]

> "Course of conduct" refers to behavior that occurs over some period of time (i.e. a series of acts). These acts may be the same or a variety of actions over time included repeated "following, nonconsensual communication, harassing, and trespassing," or certain other forms of physical contact (McAnaney et al., 1993: 894-895; U.S. Department of Justice, 1993: 44). The National Criminal Justice Association (NCJA) has developed a model anti-stalking code in which they define "course of conduct" as "repeatedly [on two or more occasions] maintaining a visual ac physical proximity to a person or repeatedly conveying verbal or written threats or threats implied by conduct or a combination thereof directed at or toward a person" (NCJA, 1993: 43).

Indeed, even the Office For Victims Of Crime, which is part of the U.S. Department of Justice, maintains a web page on the subject of stalking, which

---

[3]    The report is available on the NIJ web site at https://nij.ojp.gov/library/publications/stalking-america-findings-national-violence-against-women-survey

[4]    The report is available on the NIJ web site at https://nij.ojp.gov/topics/articles/information-stalking-victims

expressly recognizes repetitive behavior as an integral part of stalking conduct:[5]

> Stalking is a crime of power and control. It is a course of action directed at an individual that causes the victim to fear for their safety, and generally involves *repeated* visual or physical proximity, nonconsensual communication, and verbal, written, or implied threats. [Italics And Underlining Added)

For the reasons discussed above, it is clear that 18 U.S.C. § 2261A was not intended to criminalize isolated outbursts or brief encounters, which is precisely what the government's case here was comprised of.   Ms. Raygoza's conduct lacks the continuity or repetitive nature over time to qualify as the type of "course of conduct" that Congress envisioned.

The Court should therefore set aside the guilty verdict on Count Two.

### F.     The Government's Application Of The Stalking Statute To This Case Directly Contradicts Case Law

Beyond contradicting the charging practices of the U.S. Attorney's Office in this district for nearly twenty years, as well as the intent of Congress in enacting the stalking statute, the government's case at trial flies in the face of case law both in the Ninth Circuit and elsewhere that have addressed violations of 18 U.S.C. 2261A.

Stalking cases in the Ninth Circuit and elsewhere have consistently involved

---

[5]     https://ovc.ojp.gov/topics/stalking

16

multiple, distinct acts by a defendant that demonstrate repetition and persistence over a period of time, consistent with the "continuity of purpose" requirement under section 2266.

For example, in United States v. Osinger, 753 F.3d 939 (9th Cir. 2014), the Ninth Circuit rejected a constitutional challenge to section 2261A and in so doing, discussed in depth the ongoing, persistent conduct of the defendant that clearly satisfied the statute.  In that case, the indictment alleged that defendant Osinger had sent several threatening and sexually explicit text messages, emails, and photographs of V.B., a former girlfriend, to V.B., as well as to her co-workers and friends; and that Osinger had "used the Internet to create a Facebook page in a name close to V.B.'s name" to post "suggestive and explicit photos of V.B." and "demeaning statements, purportedly made by V.B."  753 F.3d at 941.  "V.B. told Osinger repeatedly that she no longer wanted to be contacted by him. Nonetheless, Osinger was unrelenting in his pursuit and harassment of her, including sending threatening text messages."  753 F.3d at 947.

Other circuits addressing 18 U.S.C. 2261A have likewise involved numerous, separate acts illustrated by repetitive, persistent behavior over a period of time that collectively formed a pattern, thereby demonstrating continuity of purpose, as required under section 2266 to establish "course of conduct."  E.g., United States v. Uhlenbrock, 125 F.4th 217, 221 (5th Cir. 2024)(defendant repeatedly posted nude

17

photos of victim online; defendant had previously pleaded guilty to violating the same statute); United States v. Sayer, 748 F.3d 425, 428 (1st Cir. 2014)("Sayer persistently stalked and harassed Jane Doe for over four years. At first, Sayer showed up at stores and other places where he knew that Jane Doe would be. In response, Jane Doe changed her routine and gave up activities she loved for fear of seeing Sayer. She also acquired a protection order against him in state court."); United States v. Petrovic, 701 F.3d 849, 853 (8th Cir. 2012)("Petrovic then began a campaign to carry out his threats. Over the course of the next few months, Petrovic mailed dozens of homemade postcards to addresses throughout M.B.'s community, including to M.B.'s workplace, M.B.'s family members, R.B.'s home, and local businesses like the neighborhood drugstore."); United States v. Shrader, 675 F.3d 300, 312 (4th Cir. 2012)(Defendant who pleaded guilty to murder persistently called victim's residence stating she was complicit in the murders, and wrote a manifesto containing threats to victim). *See also*, United States v. Lipman, 2024 U.S. Dist. LEXIS 158940, at *22 (C.D. Cal. Sep. 4, 2024)("the course of conduct charged involved sending repeated, threatening, and disturbing communications to an unwilling listener"); United States v. Matusiewicz, 84 F. Supp. 3d 363, 365 (D. Del. 2015)(Indictment alleged that defendants "engaged in a prolonged campaign to surveil and harass" the ex-wife of one of the defendants).

18

The Fourth Circuit's observations in <u>Shrader</u>, *supra*, are instructive in recognizing that persistent behavior comprises the cumulative effect of a defendant's actions that establish "course of conduct" under the statute:

> The statute defines the required "course of conduct" as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2). This latter part of the definition is significant. While the statute does not impose a requirement that the government prove that each act was intended in isolation to cause serious distress or fear of bodily injury to the victim, the government is required to show that the totality of the defendant's conduct "evidenc[ed] a continuity of purpose" to achieve the criminal end. The specific intent requirement thus modifies the cumulative course of conduct as a whole.
>
> This statutory scheme reflects a clear understanding on the part of Congress that while severe emotional distress can of course be the result of discrete traumatic acts, *<u>the persistent efforts of a disturbed harasser over a period of time—in this case, virtually D.S.'s entire adult life—can be equally or even more injurious</u>. <u>The cumulative effect of a course of stalking conduct may be greater than the sum of its individual parts</u>.* To read in a requirement that each act have its own specific intent element would undo the law's protection for victims whose anguish is the result of persistent or repetitive conduct on the part of a harasser. [Italics and Underlining Added]

<u>Shrader</u>, 675 F.3d at 311-12.

As shown in the citations above, the case law applying 18 U.S.C. 2261A directly contradicts the government's evidence at trial, specifically in regard to the

19

requisite conduct to satisfy the "course of conduct" element.

## II.

### ALTERNATIVELY, THE COURT SHOULD GRANT A NEW TRIAL UNDER RULE 33 BECAUSE THE JURY INSTRUCTION ON "COURSE OF CONDUCT" CONSTITUTED REVERSIBLE ERROR

The Court gave the jury Government's Proposed Instruction No. 4 which contained the following definition of "course of conduct":

> A "course of conduct" is a pattern of conduct composed of two or more acts, evidencing a continuity of purpose. *You may consider each communication between the defendant and R.H. or his family members as a separate act*. You are not required to agree unanimously on which two or more acts constitute the course of conduct.
> [Italics and Underlining Added]

In the context of the government's trial evidence, the instructional language highlighted above effectively reduces the "course of conduct" element to an absurdity. The heart of the August 28, 2025 incident consisted of the defendants live-streaming on the residential street where the ICE agent resided, which included the confrontation of Raygoza by the agent when he stepped out of his family vehicle. Government exhibits 6 and 21 are the cell phone videos of the confrontation taken by Raygoza and the agent, respectively. The confrontation consisted of back and forth conversation between Raygoza and the agent, as each was filming the other on their respective cell phones. The highlighted language

20

from the instruction allowed the jury to conclude that *the "two or more acts" requirement was satisfied within a matter of seconds in the course of the agent - Raygoza confrontation.*

The legislative intent is clear that this is not what Congress had in mind in enacting the "course of conduct" element within the statute.  The definition of "course of conduct" begins with the word "pattern and concludes with the phrase "continuity of purpose."  In between them is the phrase, "two or more acts."  This phrase only has value in the statutory scheme if it is comprised of repeated, persistent conduct.  Only then can the requisite "pattern" emerge from which the defendant's conduct manifests the "continuity of purpose" that can be dangerous to a victim and thus warrant criminal prosecution of that defendant in order to protect the victim.

But in this case, the instruction invited the jury to find that the two or more acts were satisfied within seconds during a back and forth conversation between Raygoza and the agent on the street, thus rendering the notion of "pattern" meaningless.  If a pattern can be established in such a short period of time, then "continuity of purpose" loses the protective purpose for which the stalking statute was enacted.  Both Congress and researchers compiling the studies discussed above focused squarely on circumstances involving repeated, persistent conduct over time that frightens and endangers victims – not two or more acts that occur in an instant

21

when the defendant and the alleged victim are talking to each other.

Thus, given the way "two or more acts" was defined for the jury, if this Court concludes that a rational jury could convict Ms. Raygoza under that standard, then the defect in the verdict lies in the instruction itself, which constitutes reversible error, thereby warranting a new trial.

None of the authorities cited by the government at the bottom of its proposed Instruction No. 4 support the *de minimis* language for "two or more acts" that was given to the jury here, namely, that "You may consider each communication between the defendant and R.H. or his family members as a separate act." This specific language is an invention by the government for this case that does not find support in any of the cited authorities. Each of those authorities is discussed below:

| | |
|---|---|
| **United States v. Pantchev, 2:21-CR-00050-JFW** | **Counsel for Ms. Raygoza was also counsel for defendant Pantchev at the trial before Judge John F. Walter in June 2022. Mr. Pantchev's offense conduct was the epitome of "course of conduct." By the time he was prosecuted in federal court, he had already been convicted in state court years earlier for prior stalking behavior. Upon release from state prison, he engaged in a long series of acts directed at female psychiatrists at the VA hospitals in this district, and his conduct included a large volume of emails to them, combined with personal appearances at the hospitals and at least one appearance a victim's residence. There is simply no comparison between the Pantchev case and the circumstances here in the Raygoza case.** |
| **United States v. Davis, 5:14-CR-00240-D (E.D.N.C.)** | **Defendant sent numerous threatening emails to multiple victims between February 2012 and August 2014.** |

| United States v. Ackell, 1:15-CR-123-JL (D.N.H.)<br><br>United States v. Ackell, 907 F.3d 67 (1st Cir. 2018) | Defendant engaged a female victim in an ongoing sexual relationship over the Internet; after she sought to end it, he threatened her and sent multiple text messages, digital images and other electronic communications between October 2012 and February 2014. |
|---|---|
| United States v. Osinger, 753 F.3d 939, 945 (9th Cir. 2014) | This case has been discussed earlier in this brief.  The offense conduct was extensive, including several threatening and sexually explicit text messages, emails, and photographs of V.B., a former girlfriend, to V.B., as well as to her co-workers and friends; and that using the Internet to create a Facebook page in a name close to V.B.'s name. |
| United States v. Shrader, 675 F.3d 300 (4th Cir. 2012) | This case has also been discussed earlier in this brief. The offense conduct was extensive. Defendant who pleaded guilty to murder persistently called victim's residence stating she was complicit in the murders, and wrote a manifesto containing threats to victim. |
| United States v. Gonzalez, 905 F.3d 165 (3d Cir. 2018) | Over a period of several years, a divorced husband entered into a scheme with several family members to threaten his ex-wife, who eventually died as a result, through various methods that included creating a web page, YouTube videos, and Facebook postings. |
| United States v. Bell, 303 F.3d 1187 (9th Cir. 2002) | Over a period of several years, defendant engaged in retaliatory behavior directed at the IRS and agents in response to enforcement action taken against his assets. |
| United States v. Bowker, 372 F.3d 365 (6th Cir. 2004) | Over a one year period, defendant sent numerous emails and letters to an employee at a television station and persisted when she relocated to another station.<br><br>[Opinion later vacated in Bowker v. United States, 543 U.S. 1182, 125 S. Ct. 1420 (2005) and remanded due to Booker opinion re: sentencing that was issued in 2005]. |

23

| United States v. Conlan, 786 F.3d 380 (5th Cir. 2015) | Similar to the <u>Bowker</u> case: defendant engaged in an escalating, year-long campaign of email, text-message, social-media, telephonic, and face-to-face contact with a television news reporter. |
|---|---|
| United States v. Lapine, 714 F.3d 641 (1st Cir. 2013) | This is a fraud case. No stalking charge. |
| United States v. Temkin, 797 F.3d 682 (9th Cir. 2015) | This is a Hobbs Act / murder for hire case. No stalking charge. |
| United States v. Barlow, 568 F.3d 215 (5th Cir. 2009) | This case charged offenses against children. No stalking charge. |
| | |

As shown in the chart above, none of the cases cited by the government for its proposed Instruction No. 4 support the language at issue here, that "You may consider each communication between the defendant and R.H. or his family members as a separate act." This language is truly an invention by the government for this case.

The government also cites the Fifth Circuit's Pattern Instruction for stalking (No. 2.86B). That instruction, however, provides only a generic statement of the elements of the stalking statute. The reference to "course of conduct" merely reiterates the statutory definition contained in 18 U.S.C. 2262.

For these reasons, if the Court finds that a rational jury could convict Ms. Raygoza based on the instruction as given, the Court should nonetheless grant Ms.

24

Raygoza a new trial under Rule 33 based on instructional error.

## III.

### <u>UNDER FED.R.CRI.P. 29(d), THE COURT SHOULD CONDITIONALLY DETERMINE WHETHER A MOTION FOR A NEW TRIAL SHOULD BE GRANTED</u>

Under Federal Rule of Criminal Procedure 29(d), "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed."

## IV.

### <u>CONCLUSION</u>

For the reasons discussed, defendant Cynthia Raygoza respectfully requests that the Court issue an order under Rule 29(d) that sets aside the guilty verdict on Count Two of the First Superseding Indictment and make the conditional determination under Rule 29(d).  Alternatively, Ms. Raygoza respectfully requests that the Court grant a new trial under Rule 33.

25

**DATED:    March 13, 2026**                    **Respectfully Submitted,**


_____/S_____
**GREGORY NICOLAYSEN**
**Attorney for Defendant,**
**Cynthia Raygoza**

# EXHIBIT A

| **U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1** |
|---|
| **Stalking prosecutions in Central District - California (2009 - 2025)** |
| [covers period beginning in 2009 when e-filing began] <br> sources of information: indictments and (where applicable) plea agreements on Pacer docket |

| **Title of Case** | **Stalking Conduct** |
|---|---|
| USA v. Barrett, 09-01215-R | Between January 28, 2008 and July 22, 2009: Conduct included numerous phone calls to various hotels in attempt to locate the victim; traveled interstate to locate and spy on victim. |
| USA v. Osinger, 10-00758-ODW | Between March 24, 2010 and March 29, 2010: Conduct included sending several threatening and sexually explicit text messages, emails, and photographs of victim, a former girlfriend, to her and to her co-workers and friends; as well as using the Internet to create a Facebook page to post "suggestive and explicit photos of " victim. The appeal is published as United States v. Osinger, 753 F.3d 939 (9th Cir. 2014) (conviction and sentence affirmed). |
| USA v. Cook, 11-00385-SVW | Between May 23, 2010 and May 28, 2010: Conduct included making multiple threatening phone calls to victim at her place of employment over several days. |
| USA v. Zapirain, 12-1107-JAK | Between September 2012 and October 2012: Conduct included a series of threats to the victim that included tweets, and traveled to Australia to place victim in reasonable fear of death, serous bodily injury, etc. (Counts in Indictment include threats under 18 USC 875 together with stalking under 18 U.S.C. 2261A). |

| | |
|---|---|
| **U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1**<br>**Stalking prosecutions in Central District - California (2009 - 2025)**<br><br>**[covers period beginning in 2009 when e-filing began]**<br>**sources of information: indictments and (where applicable) plea agreements on Pacer docket** | |
| USA v. White, 14-161-SVW | Between August 15, 2013 and February 12, 2014: Conduct included multiple emails to victim to harass and intimidate;  creating web sites with victim's name which had derogatory statements about the victim and demanded money to take down the web sites.  Defendant sent threatening messages of violence placing the victim in fear, and threatened the victim's minor child. |
| USA v. Khudagulyan, 16-770 VAP | Between April 2016 and October 2016: Conduct included continual communications with FBI agent in effort to separate him from his wife so that the two of them could be together; researching agent's information online and obtaining personal information of agent and wife which was used to, among other things, shut off utilities at agent's residence; contact agent's friends and associates; solicit business from individuals using the personal information. Defendant also sent text messages that were harassing and posted photos of victim and family online. |
| USA v. Bauer, 18-550 JFW | Between early 2015 and early 2018: Conduct included gaining access to social media accounts and email of computers of various women defendant knew; sent anonymous emails after obtaining information to harass victims to produce nude photos and then threatened  victims for more nude photos.  Defendant used a social engineering ploy and obtained victims passwords; created a survey to victims to obtain information for password reset questions.  Defendant also used malware to take over victim's computers. |
| USA v. Sanchez Ramos, 19-319 DMG | Between April 2016 and May 2018: Conduct included using social media accounts [Facebook] to create anonymous accounts to message victims to obtain nude photos from four women whom defendant knew, and threatening the victims that if they did not comply he would ruin their life. |

| | |
|---|---|
| **U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1**<br>**Stalking prosecutions in Central District - California (2009 - 2025)**<br><br>**[covers period beginning in 2009 when e-filing began]**<br>**sources of information: indictments and (where applicable) plea agreements on Pacer docket** | |
| USA v. Rogers 19-700 JAK | Between March 2, 2007 and November 7, 2019: Conduct included sending multiple threatening statements in the mail (e.g., "I am going to take my revenge upon you and your daughter"), and threatening voicemails (e.g., "This is the man who is gonna rape her, molest her, and kill her"). |
| USA v. Bennington, 20-255 DMG | Between January 2019 and March 2020: Conduct included creating new online accounts to send a series of online messages and social media posts; sent graphic messages and demanded defendant engage in sex acts with him, even after victim had previously blocked prior messages.  Defendant had for a number of years sent Victim 1 unsolicited online messages which Victim blocked prior to this.  Defenddant also used social media, Internet, and other devices to threaten Victim 2, demanding she have sex with him and threatened to kill her. |
| USA v. Hughes, 20-332 DSF | Between May 2019 and June 2020: Conduct included sending threats to various victims through email, cell phone, and social media; messages included graphic and disturbing threats to injure and/or rape.  Even after victims contacted law enforcement, defendant continued with death threats. |
| USA v. Roberts, 20-554 AB | Between July 29, 2020 and August 18, 2020: Conduct included electronic communications to victim threatening to send nude photos and kill her.  Defendant created fake website listing on Craig's list advertising a room for rent for Victim and disclosing victim personal information, including home address. |

| U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1 Stalking prosecutions in Central District - California (2009 - 2025) [covers period beginning in 2009 when e-filing began] sources of information: indictments and (where applicable) plea agreements on Pacer docket | |
|---|---|
| USA v. Pantchev, 21-50 JFW | Between July 26, 2019 and January 22, 2021: Conduct included large volume of harassing emails to multiple victims (female psychiatrists at VA hospitals) insulting them and accusing them of denying him healthcare as a veteran and using incoherent language in the emails that conveyed a threat; showing up at a victim's residence at night. |
| USA v. Chavarri, 22-69 MEMF | Between May 2019 and February 2021: Conduct included contacting multiple victims anonymously via social media (Instagram) and suggesting that he and victims have a relationship whereby he would pay the victims an allowance to send him photos/videos, which certain victims initially did; when they later refused, defendant sent communications threatening to publish the photos. |
| USA v. Lackner, 22-603 | Between June 2021 and October 17, 2022: Conduct included send phone and email messages asking the victim, who was Jewish, to meet him, and when rebuffed, sending threatening and derogatory emails that included anti-Semitic, pro-Nazi remarks about the Holocaust. |
| USA v. Lipman, 23-491 FLA | Between February 1, 2023 and September 22, 2023: Conduct included numerous emails threatening to harm victim, including threats included death; sending photos with a shotgun; praying that victim dies and gets sick; also contacting victim's neighbor. |

| U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1 Stalking prosecutions in Central District - California (2009 - 2025) [covers period beginning in 2009 when e-filing began] sources of information: indictments and (where applicable) plea agreements on Pacer docket | |
|---|---|
| USA v. Torres, 23-515 HDV | Between December 18, 2022 and October 20,2023: Conduct included leaving voice mails threatening to kill victim and family; obtaining victim's personal information, including victim's address, and continuing to threaten victim even after defendant had been served with a restraining order. |
| USA v. Nguyen, 24-70 | Between April 19, 2023 and February 2024: Conduct included targeting five government employees in Vietnam consulate by sending emails threatening to kill victims and family members, screenshots of a text conversation wherein defendant was paying a hitman to kill victim and/or victim's wife.  Defendant impersonated one victim and hacked into her personal email account; sent emails to U.S. officials posing as victim's wife and threatening explosions and violence. |
| USA v. Paris, 24-173 | Between September 2019 and October 2023: Conduct included using cell, email, social media, and Internet, to obtain victim's password, threatening victim that he had nude photos of victim, and wanted payment to delete the photos; threatened to kill victim, harm victim physicially. |
| USA v. Stewart, 24-450 SPG (case pending) | Between March 3, 2023, and June 25, 2024: Conduct included obtaining victim's personal information, including where victim worked, and left voicemails to the company stating that defendant would be coming after people working for the company; threatened to kill the victim and executives at company. |

| U.S. v. Raygoza, et. al., 2:25-CR-780-SVW-1 | |
|---|---|
| **Stalking prosecutions in Central District - California (2009 - 2025)**<br><br>[covers period beginning in 2009 when e-filing began]<br>sources of information: indictments and (where applicable) plea agreements on Pacer docket | |
| USA v. Scripnic, 25-667 MCS | Between March 24, 2024 and June 17, 2025: Conduct included sending hundreds of emails to multiple victims that contained threatening language, including threats to interfere with both victims employers, family, and business opportunities; threatened to post personal information containing derogatory comments. |
| USA v. Curcio, 25-811 MWC | Between February 2024 and September 2025: Conduct included contacting family members and their employers with derogatory comments; spraying pepper spray on victim's door, causing burning and skin irritation to victim; posting personal information of victim and family members online and inviting people to harass them.; posting social media messages asking employers to fire victim's family members. |
| | |

# EXHIBIT B

104TH CONGRESS ⎱
2d Session ⎰  HOUSE OF REPRESENTATIVES  ⎰ REPORT
⎱ 104–557

## INTERSTATE STALKING PUNISHMENT AND PREVENTION ACT OF 1996

MAY 6, 1996.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. McCOLLUM, from the Committee on the Judiciary, submitted the following

# R E P O R T

[To accompany H.R. 2980]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 2980) to amend title 18, United States Code, with respect to stalking, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Interstate Stalking Punishment and Prevention Act of 1996".

**SEC. 2. PUNISHMENT OF INTERSTATE STALKING.**

(a) IN GENERAL.—Title 18, United States Code, is amended by inserting after section 2261 the following:

**"§ 2261A. Interstate stalking**

"Whoever travels across a State line or within the special maritime and territorial jurisdiction of the United States with the intent to injure or harass another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury (as defined in section 1365(g)(3) of this title) to, that person or a member of that person's immediate family (as defined in section 115 of this title) shall be punished as provided in section 2261 of this title.".

(b) CONFORMING AMENDMENTS.—

(1) Section 2261(b) of title 18, United States Code, is amended by inserting "or section 2261A" after "this section".

(2) Sections 2261(b) and 2262(b) of title 18, United States Code, are each amended by striking "offender's spouse or intimate partner" each place it appears and inserting "victim".

29–006

2

(3) The chapter heading for chapter 110A of title 18, United States Code, is amended by inserting "**AND STALKING**" after "**VIOLENCE**".

(4) The table of chapters at the beginning of part I of title 18, United States Code, is amended by striking

**"110A.  Domestic violence** ............................................................................................................... **2261"**

and inserting:

**"110A.  Domestic violence and stalking** ....................................................................................... **2261".**

(c) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 110A of title 18, United States Code, is amended by inserting after the item relating to section 2261 the following new item:

"2261A. Interstate stalking.".

## PURPOSE AND SUMMARY

In the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), Congress established a new federal offense aimed at stalkers of current or former spouses or intimate partners. This offense did not address cases in which the victim was unrelated to the stalker. H.R. 2980, the "Interstate Stalking Punishment and Prevention Act of 1996" was introduced to address this insufficiency.

H.R. 2980 would establish a new federal crime for crossing a State line, or otherwise entering a federal jurisdiction for the purpose of injuring or harassing another person, when such action places the person in reasonable fear of bodily harm. The authorized penalties are the same as those provided for in the current interstate domestic violence offense.

## BACKGROUND AND NEED FOR THE LEGISLATION

Over the last few years, the problem of stalking has grown tremendously, plaguing law enforcement officials at all levels. Well-publicized cases involving celebrities has served to highlight the frightening dimensions of this crime.

In some instances, the stalking victim has to move to a new residence, at times in a new state, to escape the tormentor. Yet moving does not guarantee an end to the victim's nightmare. Some victims have been followed by their stalkers to the new state. This interstate stalking has made it increasingly difficult for law enforcement officials to investigate and prosecute the crime.

This bill establishes a new federal crime for crossing a State line, or otherwise entering federal jurisdiction, for the purpose of injuring or harassing another person. This bill does not generally federalize the offense of stalking. Rather, it ensures that this crime of stalking is given force and effect in all areas clearly within the responsibility of the federal government.

When a stalker operates across State lines, or travels in other areas within the jurisdiction of the federal government, it is very difficult for local law enforcement to conduct an effective investigation. In these instances, it is the proper role for federal law enforcement to investigate and prosecute the crime.

The federal government would only have jurisdiction in these limited interstate instances. There are tremendous stalking problems that local law enforcement can address. Congress encourages local police to enforce trespassing, harassment and threatening as a method of preventing the stalker from continuing the crime.

3

Stalking is a frightening and cowardly crime. Victims often feel trapped within their own homes. Family members and co-workers are also frequently threatened. Congress should do everything in its power to assist law enforcement in the apprehension and conviction of these predators.

The Justice Department is supportive of this legislation.

### HEARINGS

The Committee's Subcommittee on Crime held one day of hearings on H.R. 2980 on March 7, 1996. Testimony was received from two witnesses, Representative Edward R. Royce of California, and Mr. Kevin V. DiGregory, Deputy Assistant Attorney General, representing the Department of Justice. No additional material was submitted.

### COMMITTEE CONSIDERATION

On March 21, 1996, the Subcommittee on Crime met in open session and ordered reported favorably the bill H.R. 2980, as amended, by a voice vote, a quorum being present. On April 24, 1996, the Full Committee met in open session and ordered reported favorably the bill H.R. 2980 with amendment by voice vote, a quorum being present.

### VOTE OF THE COMMITTEE

There were no recorded votes.

### COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

### COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Reform and Oversight were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

### NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(C)(3) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to H.R. 2980, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

4

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, April 30, 1996.*

Hon. HENRY J. HYDE,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 2980, the Interstate Stalking Punishment and Prevention Act of 1996, as ordered reported by the House Committee on the Judiciary of April 24, 1996. CBO estimates that enacting the bill could lead to increases in both direct spending and receipts, but the amounts involved would be less than $500,000 a year. Because H.R. 2980 could affect direct spending and receipts, pay-as-you-go procedures would apply. The bill contains no mandates, as defined in Public Law 104–4, and would impose no direct costs on state, local, or tribal governments.

H.R. 2980 would establish a new federal crime related to interstate stalking. Violators of the bill's provisions would be subject to criminal fines and imprisonment. The imposition of new fines could cause governmental receipts to increase through greater penalty collections, but we estimate that any such increase would be less than $500,000 annually. Criminal fines would be deposited in the Crime Victims Fund and would be spent in the following year. Thus, direct spending from the fund would match the increase in revenues with a one-year lag.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are Mark Grabowicz and Stephanie Weiner.

Sincerely,

JAMES L. BLUM
(For June E. O'Neill, Director).

INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.J. Res. 1 will have no significant inflationary impact on prices and costs in the national economy.

SECTION-BY-SECTION ANALYSIS

Section 1. Short Title.—This section states that the short title of the bill is the "Interstate Stalking Punishment and Prevention Act of 1996."

Sec. 2. Punishment of Interstate Stalking.—This section amends title 18, United States Code, to establish a new federal offense for crossing a State line or otherwise entering Federal jurisdiction for the purpose of injuring or harassing another person, when such action places the person in reasonable fear of bodily harm.

The section also amends sections 2261(b) and 2262(b) of title 18, United States Code, by striking the language, "offender's spouse or intimate partner," and replacing it with the word "victim." These latter changes are necessary because the bill expands the application of these two sections to include conduct relating to the stalking of strangers.

5

AGENCY VIEWS

The Committee received a letter from the U.S. Department of Justice providing Administration views on H.R. 2980, and other bills. The letter addressed the issues presented in H.R. 2980, in pertinent part, as follows:

H.R. 2980—INTERSTATE STALKING PUNISHMENT AND PREVENTION ACT

The proposed Interstate Stalking Punishment and Prevention Act of 1996 would enact an interstate stalking offense (proposed 18 U.S.C. 2261A). The proposed offense is modeled on the existing interstate domestic violence offense, 18 U.S.C. 2261. It would specifically cover traveling across a state line or entering or leaving Indian country with the intent to injure or harass another person, where the actor in the course of, or as a result of, such travel places that person in reasonable fear of death or serious bodily injury to the person or an immediate family member. The authorized penalties would be the same as those provided in 18 U.S.C. 2261.

In addition to proposing the new interstate stalking offense, the bill corrects a drafting problem in 18 U.S.C. 2262 (relating to interstate violations of protection orders). As currently drafted, the penalty provisions in 18 U.S.C. 2262 are facially narrower than the scope of the offense it defines, since the penalty provisions refer to harm to the offender's spouse or intimate partner, but the offense defined in subsection (a) could be premised on violation of a protection order issued for the benefit of any person. The bill corrects this problem by substituting references to the "victim" in the penalty provisions for references to "spouse or intimate partner."

The Department of Justice supports the enactment of this legislation. In essence, it fills a gap in existing federal law, which reaches interstate domestic violence (under 18 U.S.C. 2261) and interstate violations of protection orders (under 18 U.S.C. 2262), but does not cover essentially similar types of conduct where the victim has not had an intimate relationship with the offender and has not obtained a protection order. Since the scope of the proposed offense is generally limited to cases involving interstate movement of the offender, we do not believe that it will result in an excessive extension of federal jurisdiction or undermine state responsibility. Rather, like the existing offenses in 18 U.S.C. 2261–62, it will provide a supplementary measure for cases where the interstate nature of the offense may create difficulties for effective state investigation and prosecution.

In terms of drafting, we suggest the following corrections or refinements: (1) It would be advisable to add to 18 U.S.C. 2266 a definition of "harass," a term that appears without definition in 18 U.S.C. 2261 and proposed 18 U.S.C. 2261A. We would be pleased to work with the sponsors to devise an appropriate definition. (2) For consistency with the corresponding language in 18 U.S.C. 2261 (a)(1), proposed 18 U.S.C. 2261A should say "with the intent to injure, harass, or intimidate" rather than "with the intent to injure or harass." (3) The term "serious bodily injury" should be defined. This is a term often used in title 18, and its existing definition could be incorporated by reference by adding "(as defined in section 1365(g)(3) of this title)" after "serious bodily injury" in proposed 18

6

U.S.C. 2261A. (4) The phrase "of this title" should be inserted after "section 115" in proposed 18 U.S.C. 2261A. (5) The item for chapter 110A in the table of chapters for title 18, United States Code, should be amended to reflect the change in the chapter heading proposed in the bill (from "domestic violence" to "domestic violence and stalking").

### CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### TITLE 18, UNITED STATES CODE

\*        \*        \*        \*        \*        \*        \*

# PART I—CRIMES

\*        \*        \*        \*        \*        \*        \*

| Chap. | | Sec. |
|---|---|---|
| 1. | **General provisions** ................................................................. | **1** |

\*        \*        \*        \*        \*        \*        \*

| | | |
|---|---|---|
| **[110A.** | **Domestic violence** ............................................................ | **2261]** |
| *110A.* | *Domestic violence and stalking* ......................................... | *2261* |

\*        \*        \*        \*        \*        \*        \*

## CHAPTER 110A—DOMESTIC VIOLENCE *AND STALKING*

Sec. 2261. Interstate domestic violence.

\*        \*        \*        \*        \*        \*        \*

*2261A. Interstate stalking*

\*        \*        \*        \*        \*        \*        \*

### § 2261. Interstate domestic violence

(a) \* \* \*

(b) PENALTIES.—A person who violates this section *or section 2261A* shall be fined under this title, imprisoned—

(1) for life or any term of years, if death of the [offender's spouse or intimate partner] *victim* results;

(2) for not more than 20 years if permanent disfigurement or life threatening bodily injury to the [offender's spouse or intimate partner] *victim* results;

(3) for not more than 10 years, if serious bodily injury to the [offender's spouse or intimate partner] *victim* results or if the offender uses a dangerous weapon during the offense;

(4) as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and

(5) for not more than 5 years, in any other case,

or both fined and imprisoned.

7

### § 2262. Interstate violation of protection order

(a) * * *

(b) PENALTIES.—A person who violates this section shall be fined under this title, imprisoned—

(1) for life or any term of years, if death of the ⟦offender's spouse or intimate partner⟧ *victim* results;

(2) for not more than 20 years if permanent disfigurement or life threatening bodily injury to the ⟦offender's spouse or intimate partner⟧ *victim* results;

(3) for not more than 10 years, if serious bodily injury to the ⟦offender's spouse or intimate partner⟧ *victim* results or if the offender uses a dangerous weapon during the offense;

(4) as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and

(5) for not more than 5 years, in any other case,

or both fined and imprisoned.

\*      \*      \*      \*      \*      \*      \*

### *§ 2261A. Interstate stalking*

*Whoever travels across a State line or enters or leaves Indian country with the intent to injure or harass another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to, that person or a member of that person's immediate family (as defined in section 115) shall be punished as provided in section 2261.*

\*      \*      \*      \*      \*      \*      \*

○

# EXHIBIT C

**U.S. Department of Justice**

Office of Justice Programs

*National Institute of Justice*



---

# National Institute of Justice
# Centers for Disease Control and Prevention

**R e s e a r c h  i n  B r i e f**

*April 1998*



Partners in Research on Violence Against Women

We are pleased to publish this first in a series of joint reports on violence against women.

When the National Institute of Justice (NIJ) and the National Center for Injury Prevention and Control (NCIPC) launched our partnership to study violence against women, there were no national data on stalking and its impact. This first-ever national survey has already made a major contribution. We eagerly await findings from other aspects of the study and anticipate reports on the incidence and prevalence of violence, partner violence, and rape.

This NIJ/NCIPC partnership to learn more about violence against women is based on a research agenda developed by the National Academy of Sciences, which was mandated by the Violence Against Women Act (Title IV of the Crime Act of 1994) and supported by NIJ and CDC.

Joint research initiatives stimulate a rich cross-fertilization of ideas and bring interdisciplinary perspectives to our knowledge base. The interests of both NCIPC and NIJ in this area are grounded in their common focus on social policy. NIJ brings a criminal justice perspective; NCIPC examines the issue from a public health and prevention perspective.

We hope the result will be a deeper and broader understanding of the implications of this violence and the effective policy response.

Jeremy Travis, Director
National Institute of Justice

Mark Rosenberg, Director
National Center for Injury Prevention and Control, Centers for Disease Control and Prevention

## Stalking in America: Findings From the National Violence Against Women Survey

*by Patricia Tjaden and Nancy Thoennes*

Unprecedented interest in stalking over the past decade has produced media accounts of stalking victims,[1] passage of antistalking laws in all 50 States and the District of Columbia,[2] and development of a model antistalking code.[3] Despite this interest, research on stalking has been limited to studies of small, unrepresentative, or clinical samples of known stalkers;[4] law journal reviews of the constitutionality and effectiveness of specific antistalking statutes;[5] and case studies of individual stalkers.[6] Thus, empirical data have been lacking on such fundamental questions about stalking as:

- How much stalking is there in the United States?
- Who stalks whom?
- How often do stalkers overtly threaten their victims?
- How often is stalking reported to the police?
- What are the psychological and social consequences of stalking?

This Research in Brief presents data from the first-ever national study on stalking and addresses these and related questions. Since the data show stalking to be much more prevalent than previously thought and include other findings of broad public concern, they have significance for legislators, policymakers, intervention planners, and researchers as well as the public health and criminal justice communities.

The data are from the National Violence Against Women (NVAW) Survey, a nationally representative telephone survey of 8,000 U.S. women and 8,000 U.S. men (see "Survey Methodology and Demographic Description of the Sample," page 15). The survey, which asked detailed questions about respondents' experiences with violence, including stalking, was sponsored jointly by the National Institute of Justice and the Centers for Disease Control and Prevention through a grant to the Center for Policy Research.

### What is stalking?

Stalking generally refers to harassing or threatening behavior that an individual engages in repeatedly, such as following a person, appearing at a person's home or place of business, making harassing phone calls, leaving written messages or objects, or vandalizing a person's property. These actions may or may not be accompanied by a credible threat of serious harm, and they may or may not be precursors to an assault or murder.[7]

Legal definitions of stalking vary widely from State to State. Though most States define stalking as the willful, malicious, and repeated following and harassing of another person, some States include in their definition such activities as lying-in-wait, surveillance, nonconsensual

**R e s e a r c h   i n   B r i e f**

## Issues and Findings

***Discussed in this Brief:*** Results of a nationally representative telephone survey of 8,000 women and 8,000 men about their experiences with stalking, cosponsored by the National Institute of Justice and the Centers for Disease Control and Prevention and conducted by the Center for Policy Research. The survey provides the first national data on stalking in the United States.

***Key issues:*** This study provides empirical data on the prevalence and characteristics of stalking in the general population: How much stalking is there in the United States? Who stalks whom? How often do stalkers overtly threaten their victims? How often is stalking reported to the police? What are the psychological and social consequences of stalking? Also considered in this report is the key issue of how to define stalking.

***Key findings and policy implications:*** Analysis of survey data produced the following results:

• Stalking is more prevalent than previously thought: 8 percent of women and 2 percent of men in the United States have been stalked at some time in their life; an estimated 1,006,970 women and 370,990 men are stalked annually. Given these findings, stalking should be treated as a legitimate criminal justice and public health concern.

• American Indian/Alaska Native women are significantly more likely to report being stalked than women of other racial or ethnic backgrounds. More research is needed to establish the degree of variance and determine how much of the variance may be explained by demographic, social, and environmental factors.

• Although stalking is a gender-neutral crime, most (78 percent) stalking victims are female and most (87 percent) stalking perpetrators are male.

• Adults between 18 and 29 years old are the primary targets of stalking, comprising 52 percent of all victims.

• Most stalking cases involve perpetrators and victims who know each other; 23 percent of all female victims and 36 percent of all male victims are stalked by strangers.

• Women are significantly more likely than men (59 percent and 30 percent, respectively) to be stalked by intimate partners, about half of whom stalk their partners while the relationship is intact. Since most stalking cases involve victims and perpetrators who know each other, future research should focus on intimate and acquaintance stalking, rather than "celebrity" stalking.

• There is a strong link between stalking and other forms of violence in intimate relationships: 81 percent of women who were stalked by a current or former husband or cohabiting partner were also physically assaulted by that partner and 31 percent were also sexually assaulted by that partner. It is imperative, therefore, that America's criminal justice community receive comprehensive training on the special safety needs of victims of intimate partner stalking.

• Less than half of all stalking victims are directly threatened by their stalkers, although the victims, by definition, experience a high level of fear. Thus, "credible threat" requirements should be eliminated from the definition of stalking in all State stalking statutes.

• About half of all stalking victims report their stalking to the police. About a quarter of stalking cases reported to the police result in suspects being arrested. While there is some evidence that antistalking laws have increased reports to the police, more research is needed to determine antistalking laws' full effect on reports to the police.

• About 12 percent of all stalking cases result in criminal prosecution, and about a quarter of female stalking victims and about a tenth of male stalking victims obtain restraining orders against their stalkers. Of all victims with restraining orders, 69 percent of the women and 81 percent of the men said their stalkers violated the order. More research is needed on the effectiveness of formal and informal justice system interventions in stalking cases.

• Thirty percent of female stalking victims and 20 percent of male stalking victims seek psychological counseling as a result of their victimization. Stalking victims are significantly more likely than nonstalking victims to live in fear for their personal safety and to carry something to defend themselves. To better meet the needs of stalking victims, the mental health community should receive comprehensive training on appropriate treatment of stalking victims.

• The average stalking case lasts 1.8 years. Since nearly a fifth of all stalking victims move to new locations to escape their stalkers, it is important that address confidentiality programs be made available to stalking victims.

***Target audience:*** Criminal justice and public health researchers and practitioners. Legislators, policymakers, and intervention planners at all levels of government.

---

communication, telephone harassment, and vandalism.[8] While most States require that the alleged stalker engage in a course of conduct showing that the crime was not an isolated event, some States specify how many acts (usually two or more) must occur before the conduct can be considered stalking.[9] State stalking laws also vary in their threat and fear requirements. Most stalking laws require that the perpetrator, to qualify as a stalker,

make a credible threat of violence against the victim; others include in their requirements threats against the victim's immediate family; and still others require only that the alleged stalker's course of conduct constitute an implied threat.[10]

The definition of stalking used in the NVAW Survey closely resembles the definition of stalking used in the model antistalking code for States

developed by the National Institute of Justice.[11] The survey defines stalking as "a course of conduct directed at a specific person that involves repeated visual or physical proximity, nonconsensual communication, or verbal, written or implied threats, or a combination thereof, that would cause a reasonable person fear," with *repeated* meaning on two or more occasions. The model antistalking code does not require

stalkers to make a credible threat of violence against victims, but it does require victims to feel a high level of fear ("fear of bodily harm"). Similarly, the definition of stalking used in the NVAW Survey does not require stalkers to make a credible threat against victims, but it does require victims to feel a high level of fear (see "Survey Screening Questions," page 17).

## How much stalking is there?

In the NVAW Survey, stalking victimization was measured in terms of lifetime prevalence and annual prevalence. *Lifetime prevalence* refers to the percentage of persons within a demographic group (e.g., male or female) who were stalked sometime in their lifetime. *Annual prevalence* refers to the percentage of persons within a demographic group who were stalked sometime in the 12 months preceding the survey.

Using a definition of stalking that requires victims to feel a high level of fear, the NVAW Survey found that 8 percent of women and 2 percent of men in the United States have been stalked at some time in their life.[12]

Based on U.S. Census estimates of the number of women and men in the country, one out of every 12 U.S. women (8.2 million) has been stalked at some time in her life, and one out of every 45 U.S. men (2 million) has been stalked at some time in his life (see exhibit 1).[13]

Ninety percent of the stalking victims identified by the survey were stalked by just one person during their life. Nine percent of female victims and 8 percent of male victims were stalked by two different persons, and 1 percent of female victims and 2

*Exhibit 1.* **Percentage and Estimated Number of Men and Women Stalked in Lifetime**

| Group | Persons Stalked in Lifetime | |
| --- | --- | --- |
| | Percentage[a] | Estimated Number[b] |
| Men (N = 8,000) | 2.2 | 2,040,460 |
| Women (N = 8,000) | 8.1 | 8,156,460 |

a. Differences between men and women are significant at ≤ .001.

b. Based on estimates of men and women aged 18 years and older, U.S. Bureau of the Census, Current Population Survey, 1995.

*Exhibit 2.* **Percentage and Estimated Number of Men and Women Stalked in Previous 12 Months**

| Group | Persons Stalked in Previous 12 Months | |
| --- | --- | --- |
| | Percentage[a] | Estimated Number[b] |
| Men (N = 8,000) | 0.4 | 370,990 |
| Women (N = 8,000) | 1.0 | 1,006,970 |

a. Differences between men and women are significant at ≤ .001.

b. Based on estimates of men and women aged 18 years and older, U.S. Bureau of the Census, Current Population Survey, 1995.

percent of male victims were stalked by three different persons.

The survey also found that 1 percent of all women surveyed and 0.4 percent of all men surveyed were stalked during the 12 months preceding the survey. These findings equate to an estimated 1,006,970 women and an estimated 370,990 men who are stalked annually in the United States (see exhibit 2).

The average *annual* estimates of stalking victimization generated by the survey are relatively high compared to the average *lifetime* estimates. Two factors account for this finding. The first has to do with the age of the population most at risk of being stalked. The survey found that 74 percent of stalking victims are between 18 and 39 years old. Since men and women between 18 and 39

years comprise nearly half (47 percent) the adult population from which the sample was drawn, a large proportion of men and women in the survey sample were at risk of being stalked in the 12 months preceding the interview. As the proportion of the U.S. population aged 18–39 years declines, so should the number of persons stalked annually. However, the lifetime estimates of stalking victimization should remain relatively constant.

Another reason annual estimates of stalking victimization are relatively high compared to lifetime rates is that stalking, by definition, involves repeated and ongoing victimization. Thus, some men and women are stalked for months or years on end. Because some men and women are stalked from one year to the next, the average annual estimates of stalking

**R e s e a r c h   i n   B r i e f**

victimization cannot be added to produce an estimate of the total number of men and women who will be stalked in two, three, or more years. Thus, average annual rates of stalking victimization will appear higher than expected when compared to lifetime rates of stalking victimization.

## Comparison with previous stalking estimates

Prior to this study, information on stalking prevalence was limited to guesses provided by mental health professionals based on their work with known stalkers. The most frequently cited "guesstimates" of stalking prevalence were made by forensic psychiatrist Park Dietz, who in 1992 reported that 5 percent of U.S. women are stalked at some time in their life and approximately 200,000 U.S. women are stalked each year.[14] Thus, the NVAW Survey's estimate that 8 percent of U.S. women have been stalked at some time in their life is 1.6 times greater than Dietz's guesstimate, and the survey's estimate that 1,006,970 U.S. women are stalked annually is five times greater than Deitz's guesstimate.

**How prevalent is stalking compared to other forms of violence against women in the United States?** The NVAW Survey found that 0.3 percent of all women surveyed experienced a completed or attempted rape in the 12 months preceding the survey, and 1.9 percent experienced a physical assault in the 12 months preceding the survey (see exhibit 3). Thus, in a 1-year period, women are three times more likely to be stalked than raped, but they are two times more likely to be physically assaulted than stalked.

Exhibit 3. *Percentage of Men and Women Victimized in Previous 12 Months, by Type of Violence*

| Type of Violence | Persons Victimized in Previous 12 Months (%) | |
|---|---|---|
| | **Men** (N = 8,000) | **Women** (N = 8,000) |
| Rape | <0.1[a] | 0.3 |
| Physical assault | 3.4 | 1.9 |
| Stalking | 0.4 | 1.0 |
| Any of the above | 3.9 | 3.0 |

a. Based on five or fewer cases.

**Stalking prevalence based on broader definition.** If a less stringent definition of stalking is used—one requiring victims to feel only somewhat frightened or a little frightened by their assailant's behavior—stalking prevalence rates rise dramatically. Specifically, the lifetime stalking prevalence rate increases from 8 percent to 12 percent for women and from 2 percent to 4 percent for men; and the annual stalking prevalence rate increases from 1 percent to 6 percent for women and from 0.4 percent to 1.5 percent for men. Based on these higher prevalence rates, an estimated 12.1 million U.S. women and 3.7 million U.S. men are stalked at some time in their life; and 6 million women and 1.4 million men are stalked annually in the United States. These results show how stalking prevalence varies with the level of fear included in the definition. A higher standard of fear produces lower prevalence rates, and a lower standard of fear produces higher prevalence rates.

## Stalking risk for racial and ethnic minorities

Information from the NVAW Survey presents a complex picture of stalking, race, and ethnicity. When data on African-American, American Indian/Alaska Native, Asian/Pacific Islander, and mixed race women are combined, there is no difference in stalking prevalence between white women and minority women: 8.2 percent of white women (see exhibit 4) and 8.2 percent of nonwhite women (not shown) reported ever being stalked in their lifetime. However, a comparison of stalking prevalence across specific racial and ethnic groupings shows that American Indian/Alaska Native women report significantly more stalking victimization than women of other racial and ethnic backgrounds (see exhibit 4). This finding should be viewed with caution, however, given the small number of American Indian/Alaska Native women in the sample. This finding also underscores the need for specificity when comparing prevalence rates among women of different racial or ethnic backgrounds.

Since information on violence against American Indian and Alaska Native women is limited, it is difficult to explain why they report more stalking victimization. A previous study found that the overall homicide rates for Native Americans were about two times greater than U.S. national rates.[15] Thus, there is some evidence that Native Americans are at signifi-

**R e s e a r c h   i n   B r i e f**

cantly greater risk of violence—fatal and nonfatal—than other Americans. How much of the variance in stalking prevalence may be explained by demographic, social, and environmental factors remains unclear and requires further study. Moreover, there may be significant differences in stalking prevalence among women of diverse American Indian tribes and Alaska Native communities that cannot be determined from the survey, since data on all Native Americans were combined.

There is some evidence that Asian and Pacific Islander women are at significantly less risk of being stalked than women of other racial and ethnic backgrounds (see exhibit 4). Again, however, given the small number of Asian/Pacific Islander women in the sample, this finding must be viewed with caution. It has been suggested that traditional Asian values emphasizing close family ties and harmony may discourage Asian women from disclosing physical and emotional abuse by intimate partners.[16] Thus, the smaller stalking prevalence rate found among Asian/Pacific Islander women may be, at least in part, an artifact of underreporting. There may also be a significant difference in stalking prevalence between Asian women and Pacific Islander women that cannot be determined from the survey, since data on these two groups were combined.

The survey found no significant difference in stalking prevalence among men of different racial and ethnic backgrounds. This finding must also be viewed with caution given the sample's small number of male victims falling into specific racial and ethnic groupings. A larger sample of male stalking victims is needed to produce more reliable information on the relative risk of stalking among men of different racial and ethnic backgrounds.

Exhibit 4. *Percentage of Men and Women Stalked in Lifetime, by Race and Ethnicity of Victim*

| Group | Persons Stalked in Lifetime (%) | | | | | |
|---|---|---|---|---|---|---|
| | Total | White | African-American | Asian/Pacific Islander | American Indian/Alaska Native | Mixed Race |
| Men | (N=7,759) 2.3 | (N=6,424) 2.1 | (N=659) 2.4 | (N=165) 1.8[a] | (N=105) 4.8 | (N=406) 3.9 |
| Women[b] | (N=7,850) 8.2 | (N=6,452) 8.2 | (N=780) 6.5 | (N=133) 4.5 | (N=88) 17.0 | (N=397) 10.6 |

a. Based on five or fewer cases.
b. Differences between racial and ethnic groups are significant at ≤ .05.

Exhibit 5. *Percentage of Men and Women Stalked in Lifetime, by Hispanic/Non-Hispanic Origin of Victim*

| Group | Persons Stalked in Lifetime (%) | | |
|---|---|---|---|
| | Total | Hispanic[a] | Non-Hispanic |
| Men | (N=7,916) 2.2 | (N=581) 3.3 | (N=7,335) 2.1 |
| Women | (N=7,945) 8.1 | (N=628) 7.6 | (N=7,317) 8.2 |

a. Persons of Hispanic origin may be of any race.

The survey found no significant difference in stalking prevalence among men and women of Hispanic and non-Hispanic origin (see exhibit 5). Since previous studies comparing the prevalence of violence among Hispanic and non-Hispanic women have produced contradictory conclusions,[17] these findings neither confirm nor contradict earlier findings.

## Who stalks whom?

Though stalking is a gender-neutral crime, women are the primary victims of stalking and men are the primary perpetrators. Seventy-eight percent of the stalking victims identified by the survey were women, and 22 percent were men. Thus, four out of five stalking victims are women. By comparison, 94 percent of the stalkers identified by female victims and 60 percent of the stalkers identified by male victims were male. Overall, 87 percent of the stalkers identified by victims were male.

Young adults are also the primary targets of stalkers. Fifty-two percent of the stalking victims were 18–29 years old and 22 percent were 30–39 years old when the stalking started (see exhibit 6). On average, victims were 28 years old when the stalking started.

The survey confirms previous reports that most victims know their stalker.[18] Only 23 percent of female stalking victims and 36 percent of male stalking victims were stalked by strangers. The survey also shows that

R e s e a r c h   i n   B r i e f

## Exhibit 6. *Victim's Age When First Stalked*[a]



18–29 Years
52%

<18 Years
12%

≥40 Years
15%

30–39 Years
22%

a. N=797 male and female victims. Percentages do not total 100 due to rounding.

women tend to be stalked by intimate partners, defined as current or former spouses, current or former cohabitants (of the same or opposite sex), or current or former boyfriends or girlfriends. Thirty-eight percent of female stalking victims were stalked by current or former husbands, 10 percent by current or former cohabiting partners, and 14 percent by

current or former dates or boyfriends. Overall, 59 percent of female victims, compared with 30 percent of male victims, were stalked by some type of intimate partner (see exhibit 7).

It has been reported previously that when women are stalked by intimate partners, the stalking typically occurs after the woman attempts to leave the relationship.[19] To test this assumption, the NVAW Survey asked women who had been stalked by former husbands or partners when in the relationship the stalking occurred. Twenty-one percent of these victims said the stalking occurred before the relationship ended, 43 percent said it occurred after the relationship ended, and 36 percent said it occurred both before and after the relationship ended (see exhibit 8). Thus, contrary to popular opinion, women are often stalked by intimate partners while the relationship is still intact.

The survey found that men tend to be stalked by strangers and acquaintances

## Exhibit 8. *Point in Intimate Relationship When Stalking of Women[a] Occurs*



Before Relationship Ends
21%

After Relationship Ends
43%

Both Before and After Relationship Ends
36%

a. N=263 female victims.

(see exhibit 7), 90 percent of whom are male. It is unclear from the survey data why men are stalked by male strangers and male acquaintances. There is some evidence that homosexual men are at greater risk of being stalked than heterosexual men: Stalking prevalence was significantly greater among men who had ever lived with a man as a couple compared with men who had never lived with a man as a couple (see exhibit 9). Thus, in some stalking cases involving male victims and stranger or acquaintance perpetrators, the perpetrator may be motivated by hatred toward homosexuals, while in others the perpetrator may be motivated by sexual attraction. It is also possible that some men are stalked by male strangers and male acquaintances in the context of inter- or intra-group gang rivalries. Clearly, more research is needed to determine under what circumstances men are stalked by male strangers and male acquaintances.

Although men tend to be stalked by strangers and acquaintances, women are at significantly greater risk of

## Exhibit 7. *Relationship Between Victim and Offender*



Percentage of Cases[a]

| | Male victims | Female victims |
|---|---|---|
| Spouse/Ex-spouse[b] | 13 | 38 |
| Cohabiting Partner/Ex-partner | 9 | 10 |
| Date/Former Date | 10 | 14 |
| Relative Other Than Spouse | 2 | 4 |
| Acquaintance[b] | 34 | 19 |
| Stranger[b] | 36 | 23 |

■ Male victims (N=179)    ■ Female victims (N=650)

a. Percentages exceed 100% because some victims had more than one stalker.
b. Differences between males and females are significant at ≤.05.

**R e s e a r c h    i n    B r i e f**

being stalked by strangers and acquaintances than men. A comparison of stalking prevalence among women and men by victim-offender relationship shows that 1.8 percent of all U.S. women, compared with 0.8 percent of all U.S. men, have been stalked by strangers; and 1.6 percent of all U.S. women, compared with 0.8 percent of all U.S. men, have been stalked by acquaintances (see exhibit 10).

## How do stalkers harass and terrorize?

When asked to describe specific activities their stalkers engaged in to harass and terrorize them, women were significantly more likely than men to report that their stalkers followed them, spied on them, or stood outside their home or place of work or recreation (see exhibit 11). Women were also significantly more likely to report that their stalkers made unsolicited phone calls. About equal percentages of female and male victims reported that their stalkers sent them unwanted letters or items, vandalized their property, or killed or threatened to kill a family pet (see exhibit 11).

## How often do stalkers threaten overtly?

Many State antistalking laws include in their definition of stalking a requirement that stalkers make an overt threat of violence against their victim.[20] Survey findings suggest that this requirement may be ill-advised. By definition, stalking victims in this survey were either very frightened of their assailant's behavior or feared their assailant would seriously harm or kill them or someone close to them. Despite the high level of fear required, the survey found that less

Exhibit 9. *Percentage of Men Stalked in Lifetime, by Whether They Ever Cohabited with a Man*

| Men Stalked/ Not Stalked in Lifetime[a] | Cohabitation Experience | |
|---|---|---|
| | Cohabited with a Man (N=65) % | Never Cohabited with a Man (N=7,935) % |
| Stalked | 7.7[b] | 2.2 |
| Not stalked | 92.3 | 97.8 |

a. Differences between men who "cohabited" and "never cohabited" are significant at < .01.
b. Based on five or fewer cases.

Exhibit 10. *Percentage of Men and Women Stalked in Lifetime, by Victim-Offender Relationship*

| Victim-Offender Relationship | Persons Stalked in Lifetime (%) | |
|---|---|---|
| | Men (N=8,000) | Women (N=8,000) |
| Intimate[a] | 0.6 | 4.8 |
| Relative | 0.1[b] | 0.3 |
| Acquaintance[a] | 0.8 | 1.6 |
| Stranger[a] | 0.8 | 1.8 |

a. Differences between men and women are significant at ≤ .05.
b. Based on five or fewer cases.

Exhibit 11. *Stalking Activities Engaged in by Stalkers*



a. Differences between males and females are significant at ≤.05.
b. Differences between males and females are significant at ≤.001.
c. Percentages exceed 100% because the question had multiple responses.

**R e s e a r c h   i n   B r i e f**

than half the victims—both male and female—were directly threatened by their stalker (see exhibit 12). This finding shows that stalkers do not always threaten their victim verbally or in writing; more often they engage in a course of conduct that, taken in context, causes a reasonable person to feel fearful. The model anti-stalking code reflects this reality by not including in its definition of stalking a requirement that the stalker make a credible threat of violence against the victim.[21]

## Why stalkers stalk their victims

To generate information on motivations for stalking, the survey asked victims why they thought they had been stalked. Since stalking occurs in a variety of situations and between people who have various relationships, it is not surprising that responses to this question varied. Based on victims' perceptions of why they were stalked, it appears that much stalking is motivated by stalkers' desire to control, or instill fear in, their victim (see exhibit 13). The survey results dispel the myth that most stalkers are psychotic or delusional. Only 7 percent of the victims said they were stalked because their stalkers were mentally ill or abusing drugs or alcohol.

## Relationship between stalking and other forms of violence

The National Violence Against Women Survey provides compelling evidence of the link between stalking and other forms of violence in intimate relationships. Eighty-one percent of the women who were stalked by a current or former husband or cohabiting partner were also physically assaulted by the same partner, and 31 percent of

the women who were stalked by a current or former husband or cohabiting partner were also sexually assaulted by the same partner. By comparison, 20 percent of the women who were ever married or ever lived with a man were physically assaulted by a current or former husband or partner, and 5 percent of women who were ever married or ever lived with a man were sexually assaulted by a current or former husband or partner. Thus, husbands or partners who stalk their partners are four times more likely than husbands or partners in the general population to physically assault their partners, and they are six times more likely than husbands and partners in the general population to sexually assault their partners.

The survey also provides compelling evidence of the link between stalking and controlling and emotionally abusive behavior in intimate relationships. To provide a context for violence occurring between intimate partners, respondents to the survey were asked a series of questions about controlling and emotionally



Exhibit 12. **Percentage of Victims Who Were Overtly Threatened by Their Stalkers**

abusive behavior they experienced at the hands of their current or former spouses or cohabiting partners. The survey found that ex-husbands who stalked (either before or after the relationship ended) were significantly more likely than ex-husbands who did not stalk to engage in emotionally abusive and controlling behavior toward their wife (see exhibit 14 for details).



Exhibit 13. **Victims' Perceptions of Why They Were Stalked**[a]

a. N=624 male and female victims.

 **R e s e a r c h   i n   B r i e f**

## How often is stalking reported to police?

Fifty-five percent of female victims and 48 percent of male victims said their stalking was reported to the police.  In most of these cases, the victims made the report (see exhibit 15).  The percentage of women reporting stalking is identical to the percentage of female victims report-ing lone-offender violent crimes to police during 1987–89, as measured by the National Crime Victimization Survey.[22]

Police responses to stalking cases involving male victims and female victims were virtually identical, with two notable exceptions: Police were significantly more likely to arrest or detain a suspect in cases involving female victims, and they were signifi-cantly more likely to refer female victims to services (see exhibit 15).

There is some evidence that stalking reports to the police by victims have increased since passage of anti-stalking laws.  According to informa-tion from the survey, stalking cases occurring before 1990—the year California passed the Nation's first antistalking law—were significantly less likely to be reported to the police than stalking cases occurring after 1995, the year all 50 States and the District of Columbia had laws proscribing stalking.  There was no significant difference, however, in the number of arrests made in stalking cases that occurred before 1990 and those that occurred after 1995.

When asked why they chose not to report their stalking to the police, victims were most likely to state that their stalking was not a police matter, they thought the police would not be able to do anything, or they

Exhibit 14.  **Percentage of Ex-Husbands Who Engaged in Emotionally Abusive or Controlling Behavior, by Whether They Stalked**[a]

| Types of Emotionally Abusive/ Controlling Behavior[b] | Ex-Husbands Who Stalked (%) (N=166) | Ex-Husbands Who Did Not Stalk (%) (N=2,645) |
|---|---|---|
| Had a hard time seeing things from her point of view | 87.7 | 57.8 |
| Was jealous or possessive | 83.7 | 46.3 |
| Tried to provoke arguments | 90.3 | 45.3 |
| Tried to limit her contact with family and friends | 77.1 | 32.3 |
| Insisted on knowing where she was at all times | 80.7 | 34.4 |
| Made her feel inadequate | 85.5 | 40.9 |
| Shouted or swore at her | 88.0 | 44.5 |
| Frightened her | 92.2 | 33.1 |
| Prevented her from knowing about or having access to family income | 59.6 | 20.8 |
| Prevented her from working outside the home | 30.7 | 13.0 |
| Insisted on changing residences even when she didn't need or want to | 33.9 | 11.9 |

a. Based on responses for first ex-husbands only.
b. Differences between ex-husbands who stalked and ex-husbands who did not stalk are significant at ≤ .001.

Exhibit 15.  **Percentage and Characteristics of Stalking Cases Reported to the Police, by Sex of Victim**

| Reported to Police/Response | Stalking Victims (%) | | |
| | Male | Female | Total |
|---|---|---|---|
| Was case reported to the police? | (N=178) | (N=641) | (N=819) |
| Yes | 47.7 | 54.6 | 53.1 |
| No | 52.3 | 45.4 | 46.9 |
| Who reported the case?[a] | (N=84) | (N=350) | (N=434) |
| Victim | 75.0 | 84.0 | 82.3 |
| Other | 25.0 | 16.0 | 17.7 |
| Police Response[a,b] | (N=84) | (N=350) | (N=434) |
| Took report | 66.7 | 68.6 | 68.0 |
| Arrested or detained perpetrator[c] | 16.7 | 25.1 | 23.5 |
| Referred to prosecutor or court | 19.0 | 24.3 | 23.3 |
| Referred to victim services[c] | 8.3 | 15.1 | 13.8 |
| Gave advice on self-protective measures | 29.8 | 34.0 | 33.2 |
| Did nothing | 16.7 | 19.4 | 18.9 |

a. Based on responses from victims whose stalking was reported to the police.
b. Percentages exceed 100 percent because of multiple responses.
c. Differences between males and females are significant at ≤ .05.

**R e s e a r c h   i n   B r i e f**

feared reprisals from their stalkers (see exhibit 16).

Overall, stalking victims gave police a 50/50 approval rating (see exhibit 17). Respondents who said their stalkers were arrested were significantly more likely to be satisfied with the way the police handled their case than respondents who said their stalkers were not arrested (76 percent versus 42 percent).

Victims who thought the police "should have done more" in their case were asked to describe what specific actions they thought the police should have taken.  Forty-two percent thought the police should have put their assailant in jail, 20 percent said the police should have taken their situation more seriously, and 16 percent said the police should have done more to protect them (see exhibit 18).

## How often are stalkers criminally prosecuted?

Overall, 13 percent of female victims and 9 percent of male victims reported that their stalkers were criminally prosecuted (see exhibit 19). These figures increase to 24 percent and 19 percent, respectively, when only those cases with police reports are considered.  The stalkers were charged with a wide variety of crimes, including stalking, harassment, menacing or threatening, vandalism, trespassing, breaking and entering, robbery, disorderly conduct, intimidation, and simple and aggravated assault.  Survey participants reported that about half the stalkers (54 percent) who had criminal charges filed against them were convicted of a crime.  Of those convicted, nearly two-thirds (63 percent) were believed to have been sent to jail or prison.

*Exhibit 16.* **Victims' Reasons for Not Reporting Stalking to Police**[a]



a. N=348 male and female victims.

*Exhibit 17.* **Victims' Satisfaction With the Police**[a]



a. N = 435 male and female victims.

## Obtaining protective or restraining orders against stalkers

Results from the survey also indicate that female victims were significantly more likely than male victims (28 percent and 10 percent) to obtain a protective or restraining order against their stalker (see exhibit 20). This finding is expected since women are significantly more likely

**R e s e a r c h   i n   B r i e f**

than men to be stalked by intimate partners who have a history of being violent toward them. Of those who obtained restraining orders, 69 percent of the women and 81 percent of the men said their stalker violated the order.

## What are psychological and social consequences of stalking?

The survey produced strong confirmation of the negative mental health impact of stalking. About a third of the women (30 percent) and a fifth of the men (20 percent) said they sought psychological counseling as a result of their stalking victimization. In addition, stalking victims were significantly more likely than nonstalking victims to be very concerned about their personal safety and about being stalked, to carry something on their person to defend themselves, and to think personal safety for men and women had gotten worse in recent years (see exhibit 21).

Over a quarter (26 percent) of the stalking victims said their victimization caused them to lose time from work. While the survey did not query victims about why they lost time from work, it can be assumed they missed work for a variety of reasons—to attend court hearings, to meet with a psychologist or other mental health professional, to avoid contact with their assailant, and to consult with an attorney. When asked how many days of work they lost, 7 percent of these victims said they never returned to work. On average, however, victims who lost time from and returned to work missed 11 days.

Exhibit 18. **Victims' View of Other Actions Police Should Have Taken[a]**



Percentage of Victims

a. N=201 male and female victims who thought police should have done more.

Exhibit 19. **Percentage and Outcomes of Criminal Prosecutions in Stalking Cases, by Sex of Victim**

| Outcome | Stalking Victims (%) | | |
|---|---|---|---|
| | **Male** | **Female** | **Total** |
| **Was perpetrator prosecuted?** | (N=178) | (N=645) | (N=823) |
| Yes | 9.0 | 13.1 | 12.1 |
| No | 91.0 | 86.9 | 87.9 |
| **Was perpetrator convicted?[a]** | (N=15) | (N=72) | (N=87) |
| Yes | 60.0 | 52.8 | 54.0 |
| No | 40.0 | 47.2 | 46.0 |
| **Was perpetrator sentenced to jail or prison?[b]** | (N=9) | (N=37) | (N=46) |
| Yes | 77.8 | 59.5 | 63.0 |
| No | 22.2[c] | 40.5 | 37.0 |

a. Based on responses from victims whose perpetrator was prosecuted.
b. Based on responses from victims whose perpetrator was convicted.
c. Based on five or fewer sample cases.

Stalking victims were asked whether they took any measures (other than reporting their victimization to the police or obtaining a protective order) to protect themselves from their stalker. Fifty-six percent of the women and 51 percent of the men reported taking some type of self-protective measure (see exhibit 22).

## When and why does stalking stop?

At the time of the interview, 92 percent of the victims were no longer being stalked. Based on information provided by these victims, about two-thirds of all stalking cases last a year or less, about a quarter last 2–5 years,

**R e s e a r c h   i n   B r i e f**

*Exhibit 20.* **Percentage and Outcomes of Protective Orders in Stalking Cases, by Sex of Victim**

| Outcome | Stalking Victims (%) | | |
| --- | --- | --- | --- |
| | Male | Female | Total |
| **Did victim obtain a protective or restraining order?[a]** | (N=175) | (N=597) | (N=772) |
| Yes | 9.7 | 28.0 | 23.8 |
| No | 90.3 | 72.0 | 76.2 |
| **Was the order violated?[a,b]** | (N=16) | (N=166) | (N=182) |
| Yes | 81.3 | 68.7 | 69.8 |
| No | 18.7 | 31.3 | 30.2 |

a.  Differences between males and females are significant at ≤ .05.
b.  Based on responses from victims who obtained a restraining order.

*Exhibit 21.* **Fear for Personal Safety Among Victims and Nonvictims of Stalking**



a. Differences between victims and nonvictims are significant at ≤.01.
b. Differences between victims and nonvictims are significant at ≤.001.

and about a tenth last more than 5 years (see exhibit 23).  On average, stalking cases last 1.8 years.  However, stalking cases involving intimates or former intimates last, on average, significantly longer than stalking cases involving nonintimates (2.2 years and 1.1 years, respectively).

Victims who were no longer being stalked at the time of interview were asked why they thought their stalk-ing had ceased; 19 percent said the stalking stopped because they (the victims) moved away (see exhibit 24).  These findings suggest that address confidentiality programs may be an effective means of com-bating stalking. These programs encourage victims who face contin-ued pursuit and unusual safety risks to develop a personal safety plan that includes relocating as far from their assailant as possible and securing a confidential mailing address that provides mail forwarding service but does not reveal their new location.[23]

Some stalking cases are resolved when the perpetrator gets a new love interest. Eighteen percent of the victims said the stalking stopped because their assailant got a new spouse, partner, or boyfriend/girlfriend.

It has been reported previously that informal law enforcement interven-tions, such as detective contacts, can be an effective means of deterring stalkers, particularly in cases where the victim and the suspect had some prior relationship and where the stalker is not suffering from mental illness.[24]   Findings from the NVAW Survey provide some support for this theory.  Victims were more likely to credit informal, rather than formal, justice system interventions for the cessation of their stalking.  For example, 15 percent of victims said their stalking stopped after their assailants received a warning from the police.  By comparison, only 9 percent of victims said their stalking ceased because their stalker was arrested, 1 percent said their stalk-ing stopped because their stalker was convicted of a crime, and less than 1 percent said the stalking stopped because they obtained a restraining order against their

**R e s e a r c h   i n   B r i e f**

*Exhibit 22.* ***Self-Protective Measures Undertaken by Stalking Victims*[a]**



| | Percentage of Victims |
|---|---|
| Took "extra" precautions | 22 |
| Enlisted help of family and friends | 18 |
| Got a gun | 17 |
| Changed address | 11 |
| Moved out of town | 11 |
| Avoided perpetrator | 7 |
| Talked to an attorney | 5 |
| Varied driving habits | 5 |
| Moved to a shelter | 4 |
| Stopped going to work, school, out | 4 |
| Got public records sealed | 1 |
| Hired a private investigator | 1 |

a. N=440 male and female victims who took self-protective measures.

*Exhibit 24.* ***Victims' Perception of Why Stalking Stopped*[a]**



| | Percentage of Cases |
|---|---|
| Victim moved | 19 |
| Stalker got new love interest | 18 |
| Police warned stalker | 15 |
| Victim talked to stalker | 10 |
| Stalker was arrested | 9 |
| Stalker moved | 7 |
| Stalker got help | 6 |
| Victim got new love interest | 4 |
| Stalker died | 4 |
| It just stopped | 3 |
| Stalker was convicted of a crime[b] | 1 |

a. N=665 cases.
b. Based on 5 or fewer cases.

*Exhibit 23.* ***Distribution of Cases by Number of Years Stalking Lasted*[a]**



1 Year 16%
2–5 Years 23%
5+ Years 9%
< 1 Year 52%

a. N=759 cases.

stalker. The fact that so few victims credited formal justice system interventions is not surprising given the paucity of arrests, criminal prosecutions, and restraining orders in stalking cases.

## Policy implications

Prior to this study, empirical data on the prevalence and characteristics of stalking in the general population were virtually nonexistent. Therefore, information provided in this report can help inform policy and interventions directed at stalking. Based on findings from the National Violence Against Women Survey, the Center for Policy Research offers the following conclusions:

**1. Stalking should be treated as a significant social problem.** The survey found that stalking is much more prevalent than previously thought, affecting an estimated 1.4 million adults per year in the United States. Since this figure does not include cases involving victims under the age of 18, nor victims who are homeless or living in homes

**R e s e a r c h   i n   B r i e f**

without telephones, the estimate is probably an undercount of the true number of persons stalked each year. Given the scope of the stalking problem revealed by this survey, it is imperative that stalking be treated as a legitimate criminal justice problem and public health concern.

**2.  Credible threat requirements should be eliminated from antistalking statutes.**  Some State statutes include in their definition of stalking a requirement that stalkers make a credible threat of violence against their victims.  Since stalking is often a "crime of deeds" rather than a "crime of words," this requirement makes it more difficult to prosecute stalkers.  Findings from the survey show that stalkers often do not threaten their victims verbally or in writing but instead engage in a course of conduct that, taken in context, causes a reasonable person to feel fearful.  Despite being very frightened or fearing bodily harm or death, less than half of the stalking victims identified by the survey were directly threatened by their stalkers. This finding supports the view of many stalking experts that language which might be construed as requiring an actual verbal or written threat should be eliminated from all State antistalking statutes.

**3.  Research on stalking should move beyond "celebrity stalking" and focus on acquaintance and intimate partner stalking.**  Prior to this study, most stalking research focused on celebrity or political stalking.  Findings from the survey show that the vast majority of stalking cases involve people who know each other, with fully half of all stalking cases arising in the context of current or former intimate relationships. Therefore, future research should

focus on stalking occurring between intimates and acquaintances.

**4.  The Nation's criminal justice community should receive comprehensive training on the particular safety needs of stalking victims.**  The survey produced dramatic confirmation of the link between stalking and physical violence in intimate relationships. Fully 81 percent of the women who were stalked by an intimate partner (either before or after the relationship ended) were also physically assaulted by that partner, and 31 percent were also sexually assaulted by that partner.  To help law enforcement officers, prosecutors, and defense attorneys make appropriate case processing and management decisions, they must be made aware of the very real safety risks faced by these stalking victims.

**5.  More research must be conducted on the effectiveness of formal and informal law enforcement interventions.**  The survey found that 70 percent of all restraining orders obtained against stalkers were violated.  The survey also found that stalking victims were more likely to credit the cessation of their stalking to informal police interventions, such as police warnings, than to formal justice system interventions, such as arrests or restraining orders.  More research is needed to determine under what situations various law enforcement interventions are most effective.

**6.  The mental health community should receive comprehensive training on the appropriate treatment of stalking victims.** The survey found that about a quarter of all stalking victims seek psychological counseling as a result

of their victimization.  In addition, stalking victims are significantly more likely than nonstalking victims to be very fearful for their personal safety, to carry something on their person to protect themselves, and to think personal safety for men and women has declined in recent years. To better meet the needs of stalking victims, mental health professionals need additional information about the characteristics of stalking, the mental health impact of stalking, and the mental health needs of stalking victims.

**7.  Stalking intervention strategies should include address confidentiality programs.**  Survey data indicate that about a fifth of all stalking victims move to a new location to escape their stalker. Given these findings, it is important that address confidentiality programs be made available to stalking victims.  These programs encourage victims who face continued pursuit and unusual safety risks to develop a personal safety plan that includes relocating as far from their offender as possible and securing a confidential mailing address that provides mail forwarding service without revealing their new location.  Because these measures focus on the behavior of the victim rather than the perpetrator, they may be perceived as unfair and unjust; but they may be the most effective way some victims can elude their stalkers.

## R e s e a r c h    i n    B r i e f

## Survey Methodology and Demographic Description of the Sample

The National Violence Against Women Survey was conducted during November 1995–May 1996 by interviewers at Schulman, Ronca, Bucuvalas, Inc. (SRBI), a national survey research organization in New York City, under the direction of Dr. John Boyle. Survey design and data analysis were conducted by the authors of this report.

The sample was drawn as a national, random-digit-dialing (RDD) sample of telephone households in the United States. The sample was stratified by U.S. Census region to control for differential response rates by region. Within regional strata, a simple random sample of working, residential, "hundreds banks" phone numbers was drawn. A hundreds bank is the first eight digits of any 10-digit telephone number (e.g., 301–608–38XX). A randomly generated two-digit number was appended to each randomly sampled hundreds bank to produce the full 10-digit, random-digit number. The random-digit numbers were called by SRBI interviewers from their central telephone interviewing facility. Nonworking and nonresidential numbers were screened out. Once a residential household was reached, eligible adults in each household were identified. In households with multiple eligibles, the most-recent-birthday method was used to systematically select the designated respondent. The household participation rate was 72 percent for females and 69 percent for males.[25] Of the eligible respondents who started the interview, 97 percent of the women and 98 percent of the men followed through to completion.

Table 1. **Comparison of Demographic Characteristics of Men and Women in National Violence Against Women Survey (NVAWS) and U.S. Population**

| Demographic Characteristics | Men (%)[a] | | Women (%)[a] | |
| --- | --- | --- | --- | --- |
| | NVAWS | U.S. Population[b] | NVAWS | U.S. Population[b] |
| Age | (N=7,920) | (N=92,748,000) | (N=7,856) | (N=100,679,000) |
| 18–24 | 11.4 | 13.0 | 9.8 | 11.9 |
| 25–29 | 10.4 | 10.2 | 9.6 | 9.4 |
| 30–39 | 25.4 | 23.8 | 24.6 | 21.9 |
| 40–49 | 24.0 | 20.0 | 22.5 | 18.9 |
| 50–59 | 13.5 | 13.0 | 14.4 | 12.9 |
| 60–69 | 8.8 | 10.1 | 9.9 | 10.7 |
| 70–79 | 5.2 | 7.0 | 6.8 | 8.9 |
| 80+ | 1.5 | 2.9 | 2.5 | 5.5 |
| Race/Ethnicity | (N=7,353) | (N=93,282,000) | (N=7,453) | (N=101,117,000) |
| White | 87.4 | 84.8 | 86.6 | 83.7 |
| African-American | 9.0 | 10.9 | 10.5 | 12.0 |
| American Indian/Alaska Native | 1.4 | 0.7 | 1.2 | 0.7 |
| Asian/Pacific Islander | 2.2 | 3.5 | 1.8 | 3.6 |
| Hispanic Origin[c] | (N=7,916) | (N=93,282,000) | (N=7,945) | (N=101,117,000) |
| Hispanic | 7.3 | 9.4 | 7.9 | 8.5 |
| Non-Hispanic | 92.7 | 90.6 | 92.1 | 91.5 |
| Marital Status | (N=7,928) | (N=92,007,000) | (N=7,921) | (N=99,588,000) |
| Never married | 21.2 | 26.8 | 15.5 | 19.4 |
| Currently married | 66.8 | 62.7 | 62.7 | 59.2 |
| Divorced, separated | 10.2 | 8.3 | 13.3 | 10.3 |
| Widowed | 1.9 | 2.5 | 8.6 | 11.1 |
| Education[d] | (N=7,010) | (N=79,463,000) | (N=7,068) | (N=86,975,000) |
| Less than high school | 9.4 | 18.3 | 10.7 | 18.4 |
| High school and equivalent | 29.3 | 31.9 | 34.6 | 35.7 |
| Any college | 48.3 | 40.4 | 45.7 | 39.7 |
| Advanced degree | 13.0 | 9.4 | 9.0 | 6.2 |

a. Percentages may not total 100 due to rounding.
b. Based on U.S. Bureau of the Census estimates, Current Population Survey, 1995.
c. Persons of Hispanic origin may be of any race.
d. For persons aged 25 years and older.

**R e s e a r c h   i n   B r i e f**

## Survey Methodology and Demographic Description of the Sample (Continued)

*Table 2.* **Comparison of Demographic Characteristics of Men and Women in Weighted and Unweighted National Violence Against Women (NVAW) Survey Sample**

| Demographic Characteristics | NVAW Survey Sample | | | |
| | Men (%)[a] | | Women (%)[a] | |
| | Weighted[b] | Unweighted | Weighted[b] | Unweighted |
|---|---|---|---|---|
| Age | (N=7,920) | (N=7,920) | (N=7,856) | (N=7,856) |
| 18–24 | 11.2 | 11.4 | 9.6 | 9.8 |
| 25–29 | 10.5 | 10.4 | 9.8 | 9.6 |
| 30–39 | 25.7 | 25.4 | 24.6 | 24.6 |
| 40–49 | 23.6 | 24.0 | 22.1 | 22.5 |
| 50–59 | 13.3 | 13.5 | 14.4 | 14.4 |
| 60–69 | 8.9 | 8.8 | 10.0 | 9.9 |
| 70–79 | 5.3 | 5.2 | 6.9 | 6.8 |
| 80+ | 1.5 | 1.5 | 2.5 | 2.5 |
| Race/Ethnicity | (N=7,353) | (N=7,353) | (N=7,453) | (N=7,453) |
| White | 87.4 | 87.4 | 86.6 | 86.6 |
| African-American | 9.0 | 9.0 | 10.5 | 10.5 |
| American Indian/Alaska Native | 2.2 | 1.4 | 1.8 | 0.7 |
| Asian/Pacific Islander | 1.4 | 2.2 | 1.2 | 1.8 |
| Hispanic Origin[c] | (N=7,916) | (N=7,916) | (N=7,945) | (N=7,945) |
| Hispanic | 7.4 | 7.3 | 8.0 | 7.9 |
| Non-Hispanic | 92.6 | 92.7 | 92.0 | 92.1 |

a. Percentages may not total 100 due to rounding.
b. Weighted for number of telephone lines per household.
c.  Persons of Hispanic origin may be of any race.

A total of 8,000 women and 8,000 men 18 years and older were interviewed using a computer-assisted interviewing system. Only female interviewers were used to interview women.  For male respondents, approximately half of the interviews were conducted by female interviewers and half by male interviewers.  A Spanish language translation was administered by bilingual interviewers for Spanish-speaking respondents. A technical report describing the survey methods in more detail is forthcoming.*

**Sample weighting.**  A completed sample in a social survey will be subject to certain selection biases that may introduce sampling errors, in addition to sampling variability, into sample estimates.  These potential sources of sample bias may be addressed by sample weighting.  Unless there is a considerable bias in the achieved sample, however, many researchers prefer to leave the achieved sample unweighted to avoid the complexities of statistical tests with weighted samples.

The unweighted sample of the National Violence Against Women Survey, when compared with the Census Bureau's 1995 Current Population Survey of adult men and adult women, was remarkably similar to the general population from which it was drawn (see Table 1, page 15).  Weighting was considered to correct for possible biases introduced by the fact that some households had multiple phone lines.  Since such weighting had a negligible effect on the demographic composition of the sample (see Table 2), weights were not used in this data analysis.

**Precision of sample estimates.**  The results presented in this report were tested to determine whether observed differences between groups (e.g., men/women) were statistically significant.  Only comparisons that passed a hypothesis test at the 95 percent confidence level ($p \leq .05$ ) were considered statistically significant and were discussed in this report.

By its nature, a telephone survey is limited to the population living in households with telephones.  Thus, the survey does not reflect the experiences of men and women living in phoneless households, group facilities or institutions, or on the streets.  The absence of interviews with phoneless households results in an underrepresentation of certain demographic characteristics typical of households that lack telephone service (e.g., poor, headed by a single adult, located in a rural or inner-city area, renters).  However, since approximately 94 percent of the American population live in households with telephones, this underrepresentation is small.

*To obtain copies of the technical report, call or write to the Center for Policy Research, 1570 Emerson St., Denver CO 80218, 303–837–1555.

## Survey Screening Questions

Because much confusion exists about what it means to be stalked, the National Violence Against Women Survey did not use the word "stalking" in its screening questions. Including the word would have assumed that victimized persons knew how to define stalking and perceived what happened to them as stalking. Instead, the survey used the following behaviorally-specific questions to screen respondents for stalking victimization:

Not including bill collectors, telephone solicitors, or other sales people, has anyone, male or female, ever...

- Followed or spied on you?
- Sent you unsolicited letters or written correspondence?
- Made unsolicited phone calls to you?
- Stood outside your home, school, or workplace?
- Showed up at places you were even though he or she had no business being there?
- Left unwanted items for you to find?
- Tried to communicate in other ways against your will?
- Vandalized your property or destroyed something you loved?

Respondents who answered yes to one or more of these questions were asked whether anyone had ever done any of these things to them on more than one occasion. Because stalking involves repeated behaviors, only respondents who said yes were considered possible stalking victims. Respondents who reported being victimized on more than one occasion were subsequently asked how frightened their assailant's behavior made them feel and whether they feared their assailant would seriously harm them or someone close to them. Only respondents who were very frightened or feared bodily harm were counted as stalking victims.

## Notes

1. See, for example: Ellement, John, "Police Arrest Boston Man, 18, for Violating State Stalking Law," *Boston Globe*, May 28, 1992; Sullivan, Kristin N., "Woman's Case Illustrates Need for State Stalking Law, Some Say," *Houston Chronicle*, April 19, 1992; Meyer, Josh, "Man Held in Stalking of Pop Singer Janet Jackson," *Los Angeles Times*, June 25, 1992; Lardner, George, "The Stalking of Kristin: The Law Made It Easy for My Daughter's Killer," *Washington Post*, November 22, 1992; Puente, Maria, "Legislators Tackling the Terror of Stalking: But Some Experts Say Measures are Vague," *USA Today*, July 21, 1992; Tharp, Mike, "In the Mind of a Stalker," *U.S. News and World Report*, February 17, 1992.

2. Hunzeker, Donna, "Stalking Laws," *State Legislative Report*, Denver, Col.: National Conference of State Legislatures, 17(19):1–6, October 1992.

3. National Criminal Justice Association, *Project to Develop a Model Anti-Stalking Code for States*, Washington, D.C.: U.S. Department of Justice, National Institute of Justice, October 1993.

4. See, for example: Dietz, Park, and Martell, Daniell, "Threatening and Otherwise Inappropriate Letters to Members of the United States Congress," *Journal of Forensic Sciences*, 36(5), 1991; Holmes, Ronald, "Stalking in America: Types and Methods of Criminal Stalkers," *Journal of Contemporary Criminal Justice*, 9(4), December 1993; Zona, M.A., et al., "Comparative Study of Erotomanic and Obsessional Subjects in a Forensic Sample," *Journal of Forensic Sciences*, 38(4), July 1993; Rudden, M., et al., "Diagnosis and Clinical Course of Erotomania and Other Delusional Patients," *American Journal of Psychiatry*, 147(5):625–628, 1990.

5. See, for example: Bernstein, Susan E., "Living Under Siege: Do Stalking Laws Protect Domestic Violence Victims?", *Cardoza Law Review*, 15(1993):525–529; Boychuk, Katherine M., "Are Stalking Laws Unconstitutionally Vague or Overbroad?" *Northwestern University Law Review*, 88(2):769–802, 1994; Guy, Robert A., Jr., "Nature and Constitutionality of Stalking Laws," *Vanderbilt Law Review*, 46(4):991–1029, 1993; Gilligan, Mattlaw, "Stalking the Stalker: Developing New Laws to Thwart Those Who Terrorize Others," *Georgia Law Review*, 27(1992):285–342; Harmon, Brenda K., "Illinois' Newly Amended Stalking Law: Are All the Problems Solved?" *Southern Illinois University Law Journal*, 19(1994):165–198; Lingg, Richard A., "Stopping Stalkers: A Critical Examination of Anti-Stalking Legislation," *Saint John's Law Review*, 67(2):347–381, 1993; McAnaney, Kathleen G., et al., "From Impudence to Crime: Anti-Stalking Laws," *Notre Dame Law Review*,

68(1993):819–909; Morin, K.S., "The Phenomenon of Stalking: Do Existing State Statutes Provide Adequate Protection?" *San Diego Justice Journal*, 1(1):123–162, 1993; Sohn, Ellen, "Antistalking Statutes: Do They Actually Protect Victims?" *Criminal Law Bulletin*, 30(3):203–241, 1994; Strikis, Silvija, "Stopping Stalking," Note, *Georgetown Law Journal*, 81(1993):2772–2813; Thomas, Kenneth R., "How to Stop the Stalker: State Anti-Stalking Laws," *Criminal Law Bulletin*, 29(2):124–136, 1992; Walker, Julie Miles, "Anti-Stalking Legislation: Does It Protect the Victim Without Violating the Rights of the Accused?" *Denver University of Law Review*, 71(2):273–302, 1993.

6.  Lardner, George, *The Stalking of Kristin: A Father Investigates the Murder of His Daughter*, New York: Atlantic Monthly Press, 1995; Orion, Doreen, *I Know You Really Love Me: A Psychiatrist's Journal of Erotomania, Stalking, and Obsessive Love*, New York: Macmillan, 1997.

7.  Thomas, "How to Stop the Stalker: State Anti-Stalking Laws" (note 5).

8.  Hunzeker, "Stalking Laws" (note 2).

9.  National Institute of Justice, *Domestic Violence, Stalking, and Antistalking Legislation: An Annual Report to Congress under the Violence Against Women Act*, Washington, D.C.: U.S. Department of Justice, National Institute of Justice, April 1996.

10.  Ibid.

11.  National Criminal Justice Association, *Project to Develop a Model Anti-Stalking Code for States* (note 3).

12.  The findings of the survey, as in any sample survey, are subject to sample fluctuations or sampling error.  Using the sampling methods described in this report (see "Survey Methodology"), the maximum sampling error at the 95 confidence level for a sample of 8,000 is plus or minus 1.1 percentage points if the response distribution on a categorical variable is a 50/50 split.

13.  According to U.S. Bureau of the Census estimates, there were 100,697,000 women and 92,748,000 men aged 18 years and older residing in the United States in 1995.

14.  While testimony provided at a September 29, 1992, Senate Judiciary Committee Hearing on S.B. 2922 (Violence Against Women) is generally cited as the source for these estimates, the figures first appeared in a *USA Today* article on stalking (see Puente in note 1). The statistics contained in the article were attributed to "guesses" provided by Dr. Park Dietz, a Los Angeles-based forensic psychiatrist, presumably on the basis of his research on a nonrepresentative sample of known celebrity stalkers (see Dietz in note 4).

15.  Wallace, L.J.D., Calhoun, A.D., Powell, K.E., O'Neill, J., and James, S.P., *Homicide and Suicide Among Native Americans, 1979–1992*, Violence Surveillance Summary Series, No. 2, Atlanta, Ga.: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, 1996.

16.  National Research Council, *Understanding Violence Against Women*, Washington D.C.: National Academy Press, 1996:40–41.

17.  Sorenson, S.B., Stein, J.A., Siegel, J.M., Golding, J.M., and Burnam, M.A., "The Prevalence of Adult Sexual Assault: The Los Angeles Epidemiologic Catchment Area Project," *American Journal of Epidemiology*, 126:154–1164, 1987; Sorenson, S.B., and Tells, C.A., "Self-Reports of Spousal Violence in a Mexican American and a Non-Hispanic White Population, *Violence and Victims*, 6(1991):3–16.

18.  A survey of 90 Florida law enforcement agencies reported that in most stalking cases the victim knew the offender. See Tucker, J.T., "The Effectiveness of Florida Stalking Statutes Section 784,048," *Florida Law Review*, 45(4):609–707, 1993.

19.  See National Institute of Justice, *Domestic Violence, Stalking, and Antistalking Legislation:* 1 (note 9).

20.  Ibid.

21.  See National Criminal Justice Association, *Project to Develop a Model Anti-Stalking Code for States* (note 3).

22.  Bachman, Ronet, *Violence Against Women: A National Crime Victimization Survey Report*, Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, January 1993.

23.  See, for example, the Address Confidentiality Program, Post Office Box 69, Olympia, Washington, 98507-0069, (360) 753-2971.

24. Williams, W.L., Lane, J.C.D., and Zona, M.A., "Stalking: Successful Intervention Strategies," *The Police Chief*, (February 1996):24–26; and Zona, M.A., Sharma, K.K., and Lane, J.C., "A Comparative Study of Erotomanic and Obsessional Subjects in a Forensic Sample," *Journal of Forensic Sciences,* 38(4):894–903, July 1993.

25. The participation rate for the survey was determined using the industry standard advocated by the Council of Applied Survey Research Organizations, which calculates the rate as the number of completed interviews, including those that are screened out as ineligible, divided by the total number of completed interviews, screened-out interviews, refusals, and terminated interviews. Using this standard, the participation rate for women was $(8000 + 4829) \div (8000 + 4829 + 4608 + 352) = .72$ and the participation rate for men was $(8005 + 8828) \div (8005 + 8828 + 7552 + 65) = .69$.

Patricia Tjaden, Ph.D., and Nancy Thoennes, Ph.D., are with the Center for Policy Research.

This research was supported by grant number 93-IJ-CX-0012, awarded to the the Denver-based Center for Policy Research by the National Institute of Justice (NIJ) and sponsored jointly by NIJ and the Centers for Disease Control and Prevention. The opinions and conclusions expressed in this document are solely those of the authors and do not necessarily reflect the views of the funding agencies. The authors thank Lois Mock at the National Institute of Justice and Linda Saltzman at the Centers for Disease Control and Prevention for their advice and support in completing this project. The authors also thank anonymous reviewers who provided helpful comments on an earlier draft of this report.

*The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime.*

**NCJ 169592**

## Quick Access to Information About Violence Against Women

For news about NIJ and CDC's most recent publications and activities related to violence against women and family violence, go to the World Wide Web pages:

- NIJ's address is: **http://www.ojp.usdoj.gov/nij.** Click on "Programs" for a description of the agency's violence against women and family violence program.

- CDC's National Center for Injury Prevention and Control's address is: **http://www.cdc.gov/ncipc.** Click on "Violence Prevention" for the broad range of violence activity undertaken by the National Center for Injury Prevention and Control. The direct address to CDC's Family and Intimate Violence Prevention Team is: **http://www.cdc.gov/ncipc/dvp/fivpt.**

And check out the "What's New" section on each agency's home page.

**U.S. Department of Justice**

Office of Justice Programs

*National Institute of Justice*

*Washington, DC 20531*

Official Business
Penalty for Private Use $300

BULK RATE
U.S. POSTAGE PAID
DOJ/NIJ
Permit No. G–91

# EXHIBIT D

The author(s) shown below used Federal funds provided by the U.S. Department of Justice and prepared the following final report:

| | |
|---|---|
| **Document Title:** | **Exploration of the Experiences and Needs of Former Intimate Stalking Victims** |
| **Author(s):** | **Mary P. Brewster** |
| **Document No.:** | **175475** |
| **Date Received:** | **May 1999** |
| **Award Number:** | **95-WT-NX-0002** |

This report has not been published by the U.S. Department of Justice. To provide better customer service, NCJRS has made this Federally-funded grant final report available electronically in addition to traditional paper copies.

> **Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.**

# AN EXPLORATION OF THE EXPERIENCES AND NEEDS OF FORMER INTIMATE STALKING VICTIMS

Final Report Submitted to the National Institute of Justice*

Mary P. Brewster
Department of Criminal Justice
West Chester University
West Chester, PA 19383

June 12, 1998

*This project was supported under award number 95-WT-NX-0002 from the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice. Points of view in this document are those of the author and do not necessarily represent the official position of the U.S. Department of Justice.

PROPERTY OF
National Criminal Justice Reference Service (NCJRS)
Box 6000
Rockville, MD 20849-6000

This document is a research report submitted to the U.S. Department of Justice.
This report has not been published by the Department. Opinions or points of view
expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

# EXECUTIVE SUMMARY

The problem of stalking has only received widespread recognition during the present decade following the media coverage of a few "high profile" cases involving celebrities such as actresses Teresa Saldana, Rebecca Schaffer, and Jodie Foster, talk-show host David Letterman (see Perez, 1993: 268-270), and most recently, Nicole Simpson, ex-wife of O.J. Simpson. The result of increased public awareness of this type of behavior has resulted in the passage of anti-stalking laws during the past seven years in every state, beginning with California in 1990 (Cal. Penal Code, Section 646.9).[1]

## Anti-Stalking Legislation

Current anti-stalking legislation varies from state to state in terms of substantive, or legal, definitions as well as the seriousness of the crime (and corresponding sanctions). Several authors have written comprehensive overviews of the content of anti-stalking legislation throughout the United States (e.g. Hunzeker, 1992; McAnaney, Curliss, & Abeyta-Price, 1993; Sohn, 1994; Thomas, 1993). While there is no universally accepted definition of stalking, it is generally "associated with pursuit or harassment rather than actual physical harm" (Sohn, 1994: 207). Common elements in stalking statutes are references to "repeated following," "harassing," "course of conduct," "harm to victim," and "credible threat" (McAnaney, 1993: 894-897; see also National Criminal Justice Association, 1993).

"Course of conduct" refers to behavior that occurs over some period of time (i.e. a series of acts). These acts may be the same or a variety of actions over time included repeated "following, nonconsensual communication, harassing, and trespassing," or certain other forms of physical contact (McAnaney et al., 1993: 894-895; U.S. Department of Justice, 1993: 44). The National Criminal Justice Association (NCJA) has

1

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

developed a model anti-stalking code in which they define "course of conduct" as "repeatedly [on two or more occasions] maintaining a visual or physical proximity to a person or repeatedly conveying verbal or written threats or threats implied by conduct or a combination thereof directed at or toward a person" (NCJA, 1993: 43). Some statutes specify the intended, while others specify the actual, effect that the behavior must have on the victim in order to constitute stalking. This may include the intent to place the person in fear of physical injury or to cause emotional distress (McAnaney et al., 1993: 896). Finally, in some states the anti-stalking statutes make reference to "credible threat." In essence this means that the victim must actually believe that the stalker has the capacity to carry out a threat (e.g. "that would cause an individual to reasonably fear for [his/her safety or] the safety of another individual" (McAnaney et al., 1993: 896-897)).

In addition to substantive variations in stalking laws, the classification of the crime according to seriousness (and resulting sanctions) also varies from state to state. Typically, stalking is classified as a misdemeanor, however several states have provisions in their statutes whereby certain aggravating circumstances can result in the behavior being classified a felony. For example, if a stalker is violating a temporary restraining order or an order of protection, or if a convicted stalker commits subsequent stalking behavior, the individual can receive a harsher sentence (McAnaney et al., 1993: 900-901).

**Extent of the Stalking Problem**

Although only a handful of highly-publicized cases (and the resultant public pressure) appears to have been the impetus for anti-stalking statutes, a recent national

2

This document is a research report submitted to the U.S. Department of Justice.
This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# EXHIBIT E

floor, and he certainly has been persistent, and today at least he has taken the floor criticizing the President for what he has not done.

The minority leader just finished reading the statement in the Chamber that describes accurately the circumstances of the filing on behalf of the President, and it categorically rejects the assertions just made by the Senator from Iowa. But it is an even-numbered year. We all know what that means. And being President certainly means you are subject to criticism. I understand that, as do others who serve in public office. I believe the American people understand all of us have things about us that are positive, things that are not so positive perhaps. None of us are perfect.

This President, like President Bush and President Reagan, President Carter and others before them, I suspect, resides in the White House trying to figure out how to do the best job he can to move this country forward and serve the best interests of this country.

It is easy to be critical. I hope all of us would understand that the job of the President of the United States is a tough job. It is tough for Republicans and tough for Democrats. This is a country with a lot of good and a lot of opportunity, and I hope all of us can work together to help this President and future Presidents realize that opportunity.

---

### NATIONAL MISSILE DEFENSE

Mr. DORGAN. Mr. President, I take the floor to say that it appears to me we may be talking about National Missile Defense or the Defend America Act very soon. Perhaps it will even be laid down before we finish tonight so there is a cloture vote when we come back. I am not sure.

I want to observe—and I have done this for years that I have been in Congress—that we just finished a budget in which there was a lot of talk about reducing the Federal deficit, the need to reduce Federal spending, and the Defend America Act, or the National Missile Defense Program, is a program, according to the Congressional Budget Office, that just to build—not to operate, just to build—will cost between $30 billion and $60 billion. Now, the operational costs will be much, much greater than that.

It seems to me the funding question ought to be posed and ought to be answered by those who bring a spending program to the floor of the Senate that says let us spend up to an additional $60 billion more on a program that I do not think this country needs because the National Missile Defense Program, or the Defend America Act, will not truly be an astrodome over our country that will defend us against incoming missiles. It presumes that we should build a defense against ICBM's in the event a rogue nation would launch an ICBM with a nuclear tip against our country, or in the event there is an ac-cidental nuclear launch against our country.

Of course, a nuclear device might very likely come from a less sophisticated missile like a cruise missile. We have thousands and thousands and thousands of cruise missiles proliferating this world. They are much easier to get access to. A nuclear-tipped cruise missile is a much more likely threat to this country than the ICBM, or perhaps a suitcase and 20 pounds of plutonium and the opportunity to turn it into a nuclear device, or perhaps a glass vile no larger than this with the most deadly biological agents to mankind.

Of course, we will spend $60 billion on a star wars program, at the end of which it will be obsolete and will not protect this country against that which we advertise we need protection.

We had an ABM system built in North Dakota. Billions and billions of dollars in today's money went into that in northeastern North Dakota. It was declared mothballed the same month it was declared operational. In other words, the same month they declared operational a system which they said we desperately needed they decided would no longer be needed, and it sits up there as a concrete monument to bad planning. It was an expenditure of the taxpayers' money that, in my judgment, need not have been made.

Now we are told that we have the need for a national defense program, or Defend America Act, of some type that will defend us only against a very narrow, limited threat, not a full-scale nuclear attack from an adversary, because it will not defend us against that, will not defend us against a nuclear attack of cruise missiles. It cannot do that. It will not defend us against a nuclear attack by a terrorist nation putting a nuclear bomb in a suitcase in the trunk of a Yugo car, a rusty old Yugo at a dock in New York City. But we are told $60 billion to build and how many tens of billions of dollars to operate is what is necessary.

I say to those who will bring that to the floor, while you do that, please bring us a plan telling us who is going to pay the tax to build it. Where are you going to get the money? Who is going to pay the tax? And then describe why that is necessary and the fact when you get done you have not created the defense for America you say you are going to create.

There are many needs that we have in this country in defense. Many remain unmet. This kind of proposal ranks well down, in my judgment, in the order of priorities. If it is technologically feasible to be built to protect this country, it ranks well down in the order of priorities. My hope is that we will have a full, aggressive, interesting debate on this because it is not a debate about pennies. It is a debate about a major, sizable spending program, new spending program at a time when we are trying to downsize and at a time when we are talking about the need to control Federal spending.

Those who bring this to the floor of the Senate have an obligation to tell us how it is going to be paid for. The announcement of this so-called Defend America Act was made at a press conference recently, and the question was asked: Where do you get the money for this? And the answer at the press conference by Members of the Senate was: Well, we will leave that to the experts.

No, it will not be left to the experts. This Congress will have to decide who pays for a new Federal spending program that will cost $60 billion plus and after being built will not in fact defend this country against a nuclear attack.

There are many needs that we have in our defense system in this country. Some worry that we are in a circumstance where we will decide to downsize in defense too much: We will be unprepared to meet an adversary; we will be unprepared to meet a threat.

I understand that. I understand this country has gone through this in previous periods, and I do not want us to be in that position. But I also understand that in every area of the armed services there are weapons programs that simply seem to have a life of their own and they tend to build and build, and they become not so much a justifiable program that is necessary to defend our country, but they become a program that is supported by a range of politicians and corporations and other interests that give it a life of its own, even when it becomes unnecessary or when the science and the technology demonstrate it is not needed.

I hope we will have an aggressive discussion about this, about the threat and about the amount of proposed expenditure, and about who is going to come up with the money, and especially about whether, in fact, this is needed for this country's defense.

Mr. President, I thank you for your indulgence. I yield the floor, and I make a point of order that a quorum is not present.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mrs. HUTCHISON. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

### THE INTERSTATE STALKING ACT

Mrs. HUTCHISON. Mr. President, I want to talk about a bill that I hope we can clear tonight in the Senate because it is a very important bill that will begin to protect the victims of stalking all over this country. You know, we did not really know much about stalking until the last few years. That is because it was a hard crime to pin down. Stalking is threats. It is harassment. It is the constant terrorizing of a victim, whether the act that is said would be done is actually perpetrated or if, sometimes, it is not. But whether it is or is not, it is a very tough thing for a

Case 2:25-cr-00780-SVW Document 188 Filed 03/13/26 Page 70 of 70 Page ID #:1118

victim to continue to be in fear, to wonder, ''Am I going to have someone stick a knife in my back? Am I going to be able to walk in my neighborhood without fear? Am I going to be able to go to sleep at night without fear?''

Then, in fact, we have found that the victims of this stalking actually become victims sometimes. When Congressman ED ROYCE and I started working on this we had a press conference in which we had some incredible stories of stalking victims. A woman from California who was constantly threatened, who moved to Florida to escape this stalking from this person that she really did not know and who was clearly demented—she moved to Florida and one night did become a victim. The person broke into her home and threatened her with a knife. She did get away without injury.

But then there was the stalking victim whose husband was outside with his wife and she was shot to death, he was shot, and this was from a person who had constantly threatened his wife. So they could have prevented it if there had been some way to do it, but, in fact, there was no way to do it because stalking was not a crime until recently.

Now we have the situation in which you have the stalking in one State, the person moves to another State, and they do not have the coverage in the other State because the actual harassment was in the first State and when it happened in the second State you had to establish it. The Interstate Stalking Act will make it a Federal crime to cross State lines to do the State crime of stalking. It does not make stalking a Federal crime, but it does make crossing State lines to do it, when it is a crime, a crime. That would give protection to the woman who moved from California to Florida. It will give protection to more of the people who have had the terrorizing experience of being constantly barraged by threats from another person. Many people in public life have had this experience. It is a scary thing to happen. To live in fear most of the time, or some of the time, is something we do not have to put up with in our society.

This is a bill that passed unanimously in the House a couple of weeks ago. It was passed out of the Judiciary Committee today on a very bipartisan basis. I thank Senator HATCH and Senator BIDEN for expeditiously having hearings on this bill and putting it through the committee. Now I am very concerned because I thought this would be a bill that would not cause any problem and I would, of course, like to see it go through tonight because I think the President will sign this bill. I think the President is going to see the need for this bill. I think if he can sign it before we come back from the Memorial Day recess, that that might save a life. It might save a victim from being harassed. It really might help a victim. If it helps one victim in this country, then why not do it?

If we pass it tonight, it will go straight to the President because the bill is in the form that it passed the House. This should not be a tough bill.

I am asking my colleagues on the Democratic side to clear this bill. We thought that it was cleared. Perhaps it was not. Perhaps they can make a phone call, if someone has a concern on their side. I think we ought to be able to do what is right. This is a bill that ought to pass. It is a bill that has merit. It is a bill that is not controversial or it would have been stopped before now.

So I hope my colleagues on the other side of the aisle will see fit to find out if there is a real problem with this bill. Or if it is a problem with something else, perhaps they will clear this bill, because it might save one life. It might save one person from being victimized and it would be worth it if we could do that.

This is a bill that passed along with Megan's law on the House of Representative's side. Megan's law has already been signed by the President. This will allow victims of any kind of domestic violence harassment or if it is not a domestic partner or a spouse but a stranger who is doing the harassment, it will also provide protection if a person crosses State lines to do that.

Mr. President, I hope it is not too late tonight. I would like to see this bill cleared because it is important. It is the right thing. It is bipartisan and I think there may be something on the other side that could easily be worked out.

I just ask my colleagues on the Democratic side of the aisle to expedite this. We might save a life and it would be worth it.

The PRESIDING OFFICER. The majority leader.

---

## DEFEND AMERICA ACT

Mr. DOLE. Mr. President, yesterday President Clinton acknowledged—belatedly—that the post-cold-war era presents us with new national security challenges. He stated, ''The end of communism has opened the door to the spread of weapons of mass destruction * * *.'' Unfortunately, while the President is finally willing to recognize the threat posed by the proliferation of weapons of mass destruction, he remains unwilling to seriously respond to it—with progress, as opposed to pronouncements—on national missile defense.

Most Americans do not know—let me underscore—most Americans do not know that the United States has no defense against ballistic missiles. If you were to ask the average American, in fact to ask anybody in this Chamber unless they are on the Armed Services Committee, they might not know. If you were asked a question, ''If a missile, an incoming missile was headed toward Chicago, what should the President of the United States do?'' and the people will tell you in these little focus groups, ''Shoot it down''—we can't. We don't have a defense. So, if a rogue state such as North Korea launched a single missile at the United States, we could do nothing to stop its deadly flight towards an American town or city.

In his speech yesterday President Clinton pointed to his $3 billion budget request for missile defense programs as evidence of a ''strong, sensible national missile defense program.'' This happens to be 21 percent less than the President's own national security advisers proposed in their Bottom-Up review of U.S. defense needs. It is also 30 percent less than what the Senate Armed Services Committee provides in this year's defense authorization bill. In short, it is not enough for a determined and effective effort to defend the American people from the threat of ballistic missiles.

President Clinton attacked the Defend America Act, which I introduced 2 months ago, claiming:

They have a plan that Congress will take up this week that would force us to choose now a costly missile defense system that could be obsolete tomorrow.

This is simply not true. The Defend America Act only forces to commit now to deploy a national missile defense system by the year 2003. The choice of what type of system is left up to the Secretary of Defense who will report back to the Congress on the requirements for an effective ballistic missile defense system. And making a decision to go forward with missile defense now will not, as the President argued yesterday, lead to America deploying an obsolete system.

The programs we currently have in development can serve as the building blocks for a system that meets the missile threat as it emerges. Furthermore, as with the procurement of any weapons system, moving from development to deployment requires lead time. You cannot do it in a week or a year or 18 months. It does not happen overnight. The President's assertions contradict those of his own Secretary of Defense, who recently stated that these technologies ''would be quite capable of defending against the much smaller and relatively unsophisticated ICBM threat that a rogue or a terrorist could mount any time in the foreseeable future.''

That is the Secretary of Defense.

I would like to address the issue of cost. There has been quite an uproar about a Congressional Budget Office estimate of the cost of deploying a national missile defense system pursuant to the Defend America Act. The CBO stated that total acquisition costs for the year 2010 would range from $31 billion to $60 billion, if such a system largely consists of advanced space-based components. However, the Defend America Act does not specify any required components of a national missile defense system to include space-based components. On the other hand, the CBO says that a ground-based system with upgraded space-based sensors