CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ERICA CHOI (Bar No. 302351)
(E-Mail: erica_choi@fd.org)
SHANNON COIT (Bar No. 298694)
(E-Mail: shannon_coit@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
ASHLEIGH BROWN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ASHLEIGH BROWN,<br><br>Defendant. | Case No. 2:25-CR-780-SVW-2<br><br>**DEFENDANT ASHLEIGH BROWN'S OMNIBUS MOTION FOR JUDGMENT OF ACQUITTAL, OR FOR A NEW TRIAL**<br><br>**Hearing: May 18, 2026, at 11:00 a.m.** |

The defendant Ashleigh Brown, by and through her attorneys Deputy Federal Public Defenders Erica Choi and Shannon Coit, hereby submits her Omnibus Motion for Judgment of Acquittal or for a New Trial.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: March 27, 2026      By  */s/ Erica Choi*

ERICA CHOI
SHANNON COIT
Deputy Federal Public Defenders
Attorney for ASHLEIGH BROWN

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................... 1

II. SUMMARY OF TRIAL EVIDENCE ...................................................................... 1

III. ARGUMENT ............................................................................................................ 4

    A.    Ms. Brown's Conduct Was Protected by the First Amendment .................. 4

        1.    The First Amendment Strongly Protects Filming and Speech on Matters of Public Concern, Including in Residential Neighborhoods ........................................................................................ 4

        2.    The Government Failed to Prove that Ms. Brown Engaged in Any Unprotected Speech or Conduct ................................................ 7

        3.    *Snyder v. Phelps* Makes Clear that a Judgment of Acquittal is Required ..................................................................................... 10

    B.    The Government Failed to Prove that Ms. Brown Engaged in a Course of Conduct Within the Meaning of the Cyberstalking Statute .................. 12

        1.    A Course of Conduct Requires "A Pattern of Conduct . . . Evidencing a Continuity of Purpose" .............................................. 12

        2.    The Government Repeatedly Misstated the Course-of-Conduct Element During Closing Arguments ................................................ 14

        3.    Under the Correct View of the Law, the Government Failed to Prove a Course of Conduct .............................................................. 15

    C.    Alternatively, the Court Should Grant a New Trial ................................... 17

        1.    The Cyberstalking Jury Instruction Misstated the Law .................. 18

            a.    The Instruction Allowed the Jury to Convict Ms. Brown for First Amendment Protected Activity ............................. 18

            b.    The Instruction Incorrectly Stated that "Each Communication" Constituted a Separate Act ........................ 22

            c.    The Instruction Failed to Distinguish Between Ordinary Emotional Distress and *Substantial* Emotional Distress ....... 23

        2.    The Government Repeatedly Misstated the Law During Closing Argument ....................................................................................... 24

IV. CONCLUSION ....................................................................................................... 27

i

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Askins v. U.S. Dep't of Homeland Sec.*,
  899 F.3d 1035 (9th Cir. 2018) ............................................................... 4, 7, 8, 9

*Connick v. Myers*,
  461 U.S. 138 (1983) ................................................................................ 4

*Counterman v. Colorado*,
  600 U.S. 66 (2023) ................................................................................ 18, 19

*Echevarria v. City of Santa Monica*,
  2022 WL 2903123 (C.D. Cal. May 26, 2022) .................................................... 5, 8

*Frisby v. Schultz*,
  487 U.S. 474 (1988) ................................................................................ 5, 6, 26

*Hunter v. Hughes*,
  794 F. App'x 654 (9th Cir. 2020) ................................................................. 7, 8, 9

*Matsumoto v. Labrador*,
  122 F.4th 787 (9th Cir. 2024) .................................................................... 21

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014) ............................................................................... 13, 15

*Project Veritas v. Schmidt*,
  125 F.4th 929 (9th Cir. 2025) (en banc) ........................................................ 8, 9

*Saxe v. State Coll. Area Sch. Dist.*,
  240 F.3d 200 (3d Cir. 2001) ...................................................................... 7

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ............................................................................... *passim*

*Hubbard v. City of San Diego*
  139 F.4th 843 (9th Cir. 2025) .................................................................... 9

*United States v. Ackell*,
  907 F.3d 67 (1st Cir. 2018) ....................................................................... 20

*United States v. Bell,*
  303 F.3d 1187 (9th Cir. 2002) .................................................................... 13, 23

*United States v. Cortes*,
  757 F.3d 850 (9th Cir. 2014) ..................................................................... 18

*United States v. Dennis*,
  132 F.4th 214 (2d Cir. 2025) ..................................................................... 20

*United States v. Hansen*,
  599 U.S. 762 (2023) ............................................................................... 21

*United States v. Johnson*,
  592 F.3d 749 (7th Cir. 2010) ..................................................................... 17

# TABLE OF AUTHORITIES

Page(s)

*United States v. Jubert*,
139 F.4th 484 (5th Cir. 2025) .............................................................. 12, 13, 15, 16

*United States v. Meredith*,
685 F.3d 814 (9th Cir. 2012) ...................................................................... 20, 21

*United States v. Osinger*,
753 F.3d 939 (9th Cir. 2014) ...................................................................... 20, 21

*United States v. Syrniawski*,
48 F.4th 583 (8th Cir. 2022) .......................................................................... *passim*

*United States v. Velazquez*,
1 F.4th 1132 (9th Cir. 2021) ........................................................................ 24, 27

*United States v. Woodberry*,
987 F.3d 1231 (9th Cir. 2021) ............................................................................ 18

*United States v. Yung*,
37 F.4th 70 (3d Cir. 2022) .................................................................... 6, 18, 19

**Federal Statutes**

18 U.S.C. § 2261A(2) ................................................................................. 1, 12, 23

18 U.S.C. § 2266(2) ........................................................................... 12, 15, 24, 25

18 U.S.C. §371 .................................................................................................... 1

18 U.S.C. §119 ..................................................................................................... 1

**Rules**

Fed. R. Crim. P. 29(c) ................................................................................. 4, 1, 13

Fed. R. Crim. P. 33 .................................................................................... 1, 3, 17

**Other Authorities**

*Continuity*, The Brittanica Dictionary,
https://www.britannica.com/dictionary/continuity (last visited Mar. 26, 2026). ...............................................................................................13, 15

*Pattern*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pattern (last visited Mar. 26, 2026)..................................................................................12

*Pattern*, The Brittanica Dictionary, https://www.britannica.com/dictionary/pattern (last visited Mar. 26, 2026) ....................................................................................12

## I. INTRODUCTION

Ashleigh Brown was charged in a Superseding Indictment with conspiracy to knowingly make public restricted personal information about a covered person publicly available under 18 U.S.C. §§ 371, 119 (Count One), and cyberstalking under 18 U.S.C. § 2261A(2) (Count Two). The jury acquitted Ms. Brown on Count One but convicted her on Count Two. Ms. Brown hereby moves for a judgment of acquittal after the verdict on Count Two pursuant to Fed. R. Crim. P. 29(c). In the alternative, Ms. Brown requests a new trial under Fed. R. Crim. P. 33, based on erroneous jury instructions on the cyberstalking charge and the government's repeated prejudicial misstatements of law during closing argument.

## II. SUMMARY OF TRIAL EVIDENCE

The trial evidence established that on August 28, 2025, Ms. Brown followed an ICE vehicle leaving an ICE building in the middle of the day. Exhibit A, Trial Tr. 54:4-7 (Feb. 24, 2026); Exhibit B, Trial Tr. 84:16-19, 176:1-13 (Feb. 25, 2026). As she drove, a video was livestreamed to the "ice_out_ofla" Instagram account. Exhibit G, Trial Ex. 8. That video showed the ICE vehicle as it drove on a public highway, and the video caption read: "Baldwin park rapid response be alert!! Share!!!" *Id.*[1] Ms. Brown observed on the video that the ICE vehicle was driving without license plates, in apparent violation of California law. Ex. G at 0:32-0:36, 1:16-1:33.

The ICE vehicle drove to 12847 Chelsfield Street in Baldwin Park. Ms. Brown parked her vehicle in the driveway of a different house down the street: 12833 Chelsfield Street. Exhibit H, Trial Ex. 19. She stayed by her vehicle and began recording the ICE vehicle. Ms. Herrera approached and accused Ms. Brown of

---

[1] "Rapid response are networks typically organized by advocacy groups and community organizations and are designed to monitor, verify, and respond to perceived immigration enforcement actions, including those involving ICE ERO personnel." Ex. B at 37:22-38:1-2, 39:9-11. Rapid response networks "generally rely on real-time alerts and volunteer mobilization and coordinated responses." Ex. A at 39:13-16.

1

recording her children. But Ms. Brown explained that that was not her intent, "Not you. We're following ICE. They're on the block right there. ICE. ICE is here. We followed ICE." Ex. H at 0:16-0:27; Ex. B at 239:18-240:8. When Ms. Herrera denied that her husband worked for ICE, Ms. Brown ended the video. Ex. B at 217:23-218:4, 240:1-3.

Much of the trial was spent on videos of Officer Huitzilin confronting and arguing with Cynthia Raygoza and Sandra Samane on the sidewalk. But the videos showed that Ms. Brown was not part of this confrontation. Exhibit F, Trial Ex. 6, 2:16-5:12; Exhibit K, Trial Ex. 21, *see also* Ex. B at 240:9-21. When the confrontation started, Ms. Brown was down the street, standing behind a fence in a driveway, having the above-described conversation with Ms. Herrera. *See* Ex. H; Ex. K at 0:53. After confronting Ms. Raygoza and Ms. Samane, Officer Huitzilin advanced toward Ms. Raygoza, who responded by walking backwards toward where Ms. Brown and Ms. Herrera were standing. Ex. F at 2:49-3:20; Ex. K at 0:45-1:13. This led to Ms. Herrera joining what became a four-person confrontation: Officer Huitzilin and Ms. Herrera arguing with Ms. Raygoza and Ms. Samane. Exhibit I, Trial Ex. 20, 0:00-1:37.

But Ms. Brown did not join this argument—she removed herself from it. As Officer Huitzilin approached, Ms. Brown walked backwards and went behind the driveway fence—several feet away from Officer Huitzilin, Ms. Herrera, Ms. Raygoza and Ms. Samane. Ex. I 0:00-0:05; Ex. K at 1:16-1:27. A few seconds later, she walked even further up the driveway and stood passively next to her car—a significant distance from the group on the sidewalk. *See* Ex. I at 0:44-49; Ex. K at 1:39-1:45, Exhibit J, Screenshot of Trial Ex. 20 at 0:44. While Officer Huitzilin and Ms. Herrera went back and forth with Ms. Raygoza and Ms. Samane, Ms. Brown largely stayed out of the discussion. The most she said, from a distance and in a calm tone, was that "The homeowner knows it's ICE. So they're all about us being here. Now they know ICE is on the block." Ex. I at 1:30-1:37; Ex. K at 2:45-2:55.

Ms. Herrera called 911. While on the phone with 911, Ms. Herrera reversed her vehicle to block Ms. Brown in the driveway. Ms. Brown called out, "Immigration!

2

Immigration on your street!" Ex. F at 9:23-9:25; Exhibit N, Trial Ex. 36. Officer Huitzilin exited his vehicle and stood in front of Ms. Brown's vehicle, further blocking her from leaving. Ms. Brown yelled, "Immigration! Immigration!" while honking her horn. Ex. F at 10:39-10:41; Exhibit O, Trial Ex. 37.

These few sentences were the sum total of Ms. Brown's discussion with Officer Huitzilin and Ms. Herrera. Baldwin Park Police Department (BPPD) officers arrived within minutes, separated Officer Huitzilin from Ms. Brown, and detained her pending an investigation. Her face-to-face contact with Officer Huitzilin lasted less than ten minutes. Ex. F at 2:09-11:48. The entire incident—from when Ms. Brown began following the ICE vehicle to when the Baldwin Park Police arrived—was over in less than 35 minutes (and would have been over more quickly had Ms. Herrera not blocked Ms. Brown with her vehicle to prevent her from leaving). Ex. B at 163:25-164:11. It was undisputed at trial that Ms. Brown never tried to contact Officer Huitzilin or his family again. Ex. B at 181:21-182:14; Exhibit C, Trial Tr. 9:22-10:11 (Feb. 26, 2026).

The Baldwin Park Police officers who detained Ms. Brown recognized that she had the right to record her interaction with them. Ex. C at 45:4-46:2. Accordingly, they allowed her to film as they searched her vehicle and detained her on the sidewalk. *Id.* at 55:7-12. At 1:11 p.m., while detained by four BPPD officers in front of 12833 Chelsfield Street, Ms. Brown announced her location without the street name: "So the address is 12833. We're in Baldwin Park. We're only armed with knowledge. That's it." Exhibit L, Trial Ex. 28.1, 0:40-0:50.

At 1:39 p.m., still detained on the street, Ms. Brown stated, "Uh, we are at, let me tell you. Oh no, I already have the witnesses, they were in that car, and they have video. 12837 Bald—uh, Chessfield Street." Exhibit M, Trial Ex. 28.2, 0:00-0:18. Baldwin Park Police Officer Zachary Goble corrected her, "Chelsfield." *Id.* at 0:18.

Officer Huitzilin testified that some of his family moved to a new residence after this date, though members of his family continue to live in the Chelsfield Street house. Ex. B at 120:1, 184:23-185:4. Ms. Herrera testified that as a result of the move, her

children had to travel further for school and services. Ex. B at 234:11-16, 235:17-19. She also testified that she felt more "worrisome" and was scared of being recognized, and that her mother-in-law changed the license plate on her personal vehicle. Ex. B at 232:18-20; Ex. C at 8:25-9:3. Both Officer Huitzilin and Ms. Herrera admitted they never saw or heard from Ms. Brown after that date. Ex. B at 181:21-182:14; Ex. C at 9:22-10:11.

### III. ARGUMENT[2]

**A.    Ms. Brown's Conduct Was Protected by the First Amendment**

**1.    The First Amendment Strongly Protects Filming and Speech on Matters of Public Concern, Including in Residential Neighborhoods**

The government failed to prove that the conduct of Ms. Brown, specifically, was not protected by the First Amendment. To the contrary, the evidence makes clear that everything Ms. Brown said and did was protected by long-settled First Amendment principles.

*First*, "[t]he First Amendment protects the right to photograph and record matters of public interest." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018). Matters of public interest broadly include anything that "can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). These issues "occup[y] the highest rung in the hierarchy of First Amendment values, and [are] entitled to special protection." *Id.* at 452 (quoting *Connick*, 461 U.S. at 145). Thus, as even Officer Huitzilin acknowledged at trial, "[t]he right to film matters of public concern, including police activity, is firmly established."

---

[2] Ms. Brown renews her Rule 29 motion as to all elements of cyberstalking but uses this brief to focus the Court's attention on the First Amendment and course-of-conduct issues.

*Echevarria v. City of Santa Monica*, 2022 WL 2903123, at \*10 (C.D. Cal. May 26, 2022) (Wilson, J.); *see* Ex. B at 180:22-25.

*Second*, public streets—including residential streets—are the "archetype of a traditional public forum" and occupy a "special position in terms of First Amendment protection." *Snyder*, 562 U.S. at 456. At trial, the government repeatedly and erroneously claimed that Ms. Brown had lesser rights to film or protest on Chelsfield Street because it was in a residential neighborhood. *See, e.g.*, Ex. C at 178:21-179:2. Indeed, at one point the government explicitly told the jury that the sidewalk on Chelsfield Street was *not* a public forum where protest is permitted. Ex. C at 180:22-24 ("There are forums for this, public forums. The sidewalk two doors down from someone's home isn't that forum. That's harassment. That's intimidation.").

The government's statements to the jury were simply wrong. As the Supreme Court explained decades ago, "a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). Instead, "*all* public streets"—including Chelsfield Street—"are properly considered traditional public fora," *id.* at 481 (emphasis added), where the government may not constitutionally punish speech by members of the public who "ha[ve] the right to be where they were," *Snyder*, 562 U.S. at 457.[3]

*Third*, even offensive speech is fully protected by the First Amendment when it relates to matters of public concern. *Id.* at 451-52. "Such speech cannot be restricted

---

[3] The government may sometimes prohibit protest directed at a *particular house*, to uphold the right of individual to be free from unwanted speech "when within their own homes." *Frisby*, 487 U.S. at 485. But *Frisby* contrasted narrow house-specific restrictions with broader bans on "marching through residential neighborhoods" or "walking a route in front of an entire block of houses." *Id.* at 483. Here, there was no evidence that Ms. Brown's conduct was directed specifically at Officer Huitzilin's *house*—indeed there was no evidence that she even knew which house was his. And at no point during the incident was Officer Huitzilin *within* his house—the entire incident took place outside on a public street and sidewalk. That aspect of *Frisby* therefore has no application here.

simply because it is upsetting or arouses contempt." *Id.* at 458. That remains true even when the speech is delivered in sensitive or emotional settings. For example, in *Snyder*, the Supreme Court held that the First Amendment protected the right to protest outside the private funeral of a Marine killed in Iraq with signs containing inflammatory phrases like "Thank God for Dead Soldiers," "You're Going to Hell," "God Hates You," "Thank God for IEDs," "Semper Fi Fags," and "God Hates the USA/Thank God for 9/11." 562 U.S. at 454. The Court explained that although these signs "f[ell] short of refined social or political commentary," they "plainly relate[d] to broad issues of interest to society at large" and were therefore fully protected by the First Amendment. *Id.*

*Fourth*, and relatedly, speech does not lose its First Amendment protection because it causes substantial emotional distress. The reality is that "[t]he First Amendment protects lots of speech that is substantially emotionally distressing." *United States v. Yung*, 37 F.4th 70, 77 (3d Cir. 2022) (analyzing the cyberstalking statute). Although there is no doubt that "[s]peech is powerful" and can "inflict great pain," the First Amendment prohibits the government from "react[ing] to that pain by punishing the speaker." *Snyder*, 562 U.S. at 460-61.

*Finally*, the cyberstalking statute is subject to the limitations imposed by the First Amendment. As the Eighth Circuit recently explained, "[e]ven where emotional distress is reasonably expected to result, the First Amendment prohibits Congress from punishing political speech intended to harass or intimidate in the broad senses of those words." *United States v. Syrniawski*, 48 F.4th 583, 587 (8th Cir. 2022). That is because "[t]he Free Speech Clause protects a variety of speech that is intended to trouble or annoy, or to make another timid or fearful." *Id.* So although the cyberstalking statute uses the words "harass" and "intimidate," the Court cannot simply apply those terms in the abstract. Instead, it must determine whether the government proved that Ms. Brown "acted with intent to 'harass' or 'intimidate' <u>in a sense that is not protected under the First Amendment.</u>" *Id.* (emphasis added); *see also id.* ("There is no categorical

6

'harassment exception' to the First Amendment's free speech clause." (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.)).

### 2.    The Government Failed to Prove that Ms. Brown Engaged in Any Unprotected Speech or Conduct

In evaluating whether Ms. Brown's conduct was constitutionally protected, it is important to recognize that her interactions with Officer Huitzilin and Ms. Herrera were limited in comparison to the other defendants. Ms. Brown never confronted Officer Huitzilin and Ms. Herrera, she was not aggressive toward them, she did not raise her voice at at them, and she did not use profanities. *See* Section II, *supra*. When Officer Huitzilin walked toward her after confronting Ms. Raygoza and Ms. Samane, Ms. Brown did not engage—she instead walked backwards to create distance between herself and the confrontation on the sidewalk. *Id.* As detailed below, a careful examination of the evidence of *Ms. Brown's* conduct makes clear that everything she did was protected by the First Amendment.

The encounter with Officer Huitzilin began when Ms. Brown and the other defendants observed him leaving the ICE facility in the middle of the day, driving his official ICE vehicle on public streets and highways without license plates. Ex. A, 54:4-7, Ex. B at 84:16-19, 176:1-13; Ex. 8. The government did not dispute at trial that Ms. Brown reasonably believed Officer Huitizilin was headed to an ICE raid and that she began filming to document his conduct.[4] Observing and filming an official ICE vehicle on public streets was conduct protected by the First Amendment, *Askins*, 899 F.3d at 1044, particularly since the vehicle was driving without license plates, in apparent violation of California law, *Hunter v. Hughes*, 794 F. App'x 654, 654 (9th Cir. 2020) ("Matters of public concern include allegations of wrongdoing, misconduct, or illegal activity by government employees, the competency of the police force, . . . and issues

---

[4] *See* Ex. C at 171:20-23 (AUSA: "There's no dispute that at this point, Defendants might have thought they were following Mr. Reyes to an ICE operation. That's likely what they thought they were doing.").

'relevant to the public's evaluation of its police department.'" (citations omitted)). *See also Echevarria*, 2022 WL 2903123, at *10.

Still believing an ICE raid was imminent, Ms. Brown parked in a neighbor's driveway at 12833 Chelsfield Street. Ex. B at 7:1-3. Ms. Brown stood in the driveway and passively filmed the ICE vehicle. *See* Ex. H at 0:37; Exhibit D, Screenshot of Trial Ex. 19. Again, this conduct was protected by the First Amendment. *Askins*, 899 F.3d at 1044; *Echevarria*, 2022 WL 2903123, at *10.

Ms. Herrera then approached Ms. Brown. Ms. Brown explained to Ms. Herrera that her intent was to film ICE, and she promptly ended the video when Ms. Herrera falsely said that her husband did not work for ICE. Ex. B at 217:23-218:4, 240:1-3. Ms. Brown's brief, non-threatening conversation with Ms. Herrera, which concerned ICE's activities, was protected by the First Amendment. *See Project Veritas v. Schmidt*, 125 F.4th 929, 944-45 (9th Cir. 2025) (en banc).

When Officer Huitzilin, Ms. Raygoza, and Ms. Samane moved toward where Ms. Brown was standing, she stepped back from the situation and stood several feet away by her car. Ex. J; Ex. K at 1:16-2:22; Ex. I at 0:44-0:49. Ms. Brown did not yell at, curse at, or confront Officer Huitzilin or Ms. Herrera. The most she said, from a distance and in a calm tone, was that the homeowner "knows it's ICE," was "all about us being here" and now "kn[ew] ICE is on the block." Ex. I at 1:30-1:37; Ex. K at 2:45-2:5. These factual assertions were protected by the First Amendment. *Project Veritas*, 125 F.4th at 944 ("The First Amendment embraces at least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." (cleaned up)).

A few minutes later, Ms. Brown was attempting to leave the scene but was blocked by Ms. Herrera's car. She responded by honking her horn and yelling "Immigration! Immigration on your street!" Ex. F at 9:23-9:24; Ex. 36. Again, this was all protected by the First Amendment. The fact that an ICE agent lived on the street easily clears the low bar of being a "matter of public concern," because it could be

"fairly considered as relating to *any* matter of political, social, or other concern to the community," or was "a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 452 (emphasis added). Ms. Brown's sharing of truthful, publicly observable information of public concern was core First Amendment protected speech. *Project Veritas*, 125 F.4th at 944.

At that point, Baldwin Park Police arrived and Ms. Brown's interaction with Officer Huitzilin ended. Ms. Brown was detained by BPPD officers on Chelsfield Street. Ms. Brown filmed and broadcast her detention by BPPD, as the First Amendment entitled her to do. *Askins*, 899 F.3d at 1044.

Ms. Brown also discussed her belief that Officer Huitzilin had falsely reported to the Baldwin Park Police that the women were armed with a gun. *E.g.*, Ex. L at 0:00-0:19. This, too, was protected speech on a matter of public concern. *Hunter*, 794 F. App'x at 654.

Finally, at two points during the more-than-30-minute long detention, Ms. Brown stated the locations where she was being detained by BPPD: 12833 and then 12837 Chelsfield Street. Ex. L at 0:40-0:51; Ex. M at 0:00-0:21. Again, the sharing of truthful information about where Ms. Brown was being detained was pure speech protected by the First Amendment. *Hubbard v. City of San Diego*, 139 F.4th 843, 850 (9th Cir. 2025). Indeed, the sharing of the address was so obviously not unlawful or threatening that Officer Goble of the BPPD jumped in to correct the name of Chelsfield Street when Ms. Brown misstated it. Ex. M at 0:17-0:18.

To convict Ms. Brown of cyberstalking, the government had to prove beyond any reasonable doubt that she "acted . . . in a sense that is not protected under the First Amendment." *Syrniawski*, 48 F.4th at 587. The evidence detailed above makes clear that the government failed to do so. Ms. Brown's actions—which occurred against the backdrop of widespread public interest about ICE's activities in Los Angeles— consisted solely of protected speech and conduct. A judgment of acquittal is therefore

required. *See id.* at 587-89 (reversing a cyberstalking conviction when the government failed to prove that the defendant engaged in any unprotected speech or conduct).

### 3. *Snyder v. Phelps* Makes Clear that a Judgment of Acquittal is Required

That Ms. Brown is entitled to a judgment of acquittal is equally clear from comparing her conduct to conduct the Supreme Court held in *Snyder v. Phelps* was constitutionally protected. *See* 562 U.S. 443.

Recall that the defendants in *Snyder* intentionally sought out and targeted the private Catholic funeral of a Marine who was killed in Iraq. 562 U.S. at 448. They picketed on public land next to the funeral with signs containing extraordinarily inflammatory messages: "Thank God for Dead Soldiers," "Thank God for IEDs," "You're Going to Hell," "God Hates You," "Semper Fi Fags," "Fag Troops," "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," and many others. *Id.* at 448, 454. This was not a one-off occurrence—the defendants had conducted similar picketing at more than 600 funerals, often targeting military funerals. *Id.* at 448.

The protest caused severe emotional distress to the Marine's family. His father testified that he could not separate the thought of his son from his thoughts of the picketing, and that he often became "tearful, angry, and physically ill when he t[hought] about it." *Id.* at 450. He presented expert evidence that his "emotional anguish had resulted in severe depression and had exacerbated pre-existing health conditions." *Id.* A jury found the defendants' picketing was "outrageous" and intentionally inflicted emotional distress *Id.* at 450, 458.

Despite these extreme facts, the Supreme Court held that the defendants' speech and conduct was protected by the First Amendment. *Id.* at 460-61. Although the defendants' messages were inflammatory, they "plainly relate[d] to broad issues of interest to society at large, rather than matters of 'purely private concern.'" *Id.* at 454. And although there was "no doubt" that the defendants "exploited the funeral" to

10

"increase publicity for [their] views," they picketed peacefully "at a public place adjacent to a public street"—the "archetype of a traditional public forum" where speech is given "a special position in terms of First Amendment protection." *Id.* at 455-56. As for the finding of "outrageousness," the Court held that outrageousness was too malleable of a standard that created an "unacceptable" risk that jury's decision would fail to "provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Id.* at 458.

The Court also noted another problem with the verdict: the emotional distress that gave rise to liability turned on "the content and the viewpoint of the message conveyed." *Id.* at 457. Had a group of *supporters* stood in the same location with signs that said "God Bless America" or "God Loves You," there would have been no issue. *Id.* It was "what the [defendants] *said*" that exposed them to liability, resulting in unlawful content-based discrimination in violation of the First Amendment. *Id.* (emphasis added).

Consider, now, Ms. Brown's conduct. Unlike the defendants in *Snyder*, Ms. Brown did not intentionally target the street where Officer Huitzilin lived—she ended up there accidentally while intending to document an ICE raid. And once there, Ms. Brown did very little beyond peacefully filming. She did not engage in violence or use profanity toward Officer Huitzilin or his family. She kept a distance from the confrontation between Officer Huitzilin and the other women. Her single face-to-face interaction with Officer Huitzilin lasted only a few minutes. And the limited statements she made were far less offensive or inflammatory than the signs in *Snyder*. *Snyder*'s holding that the First Amendment protected *those* defendants' conduct necessarily means that Ms. Brown's much-tamer conduct was constitutionally protected too.

Moreover, the charge here suffers from the same content-discrimination problem the Supreme Court identified in *Snyder*. 562 U.S. at 457. There is no question that Ms. Brown would not have been charged with cyberstalking if she had delivered *pro*-ICE messages on Chelsfield Street. The emotional distress Officer Huitzilin and Ms.

11

Herrera claimed to have suffered was rooted in the fact that Ms. Brown and the other women held an *anti*-ICE viewpoint—they vigorously opposed work that Officer Huitzilin and Ms. Herrera took pride in. *See* Ex. B at 213:14-15. Because any emotional distress "turned on the content and viewpoint of the message conveyed," it cannot be the basis for a criminal charge. *See Snyder*, 562 U.S. at 457; *see also id.* at 460-61 (explaining that although speech can "inflict great pain," "we cannot react to that pain by punishing the speaker").

Because the government failed to prove that Ms. Brown did anything that was not protected by the First Amendment, the Court should enter a judgment of acquittal.

**B.    The Government Failed to Prove that Ms. Brown Engaged in a Course of Conduct Within the Meaning of the Cyberstalking Statute**

Ms. Brown is separately entitled to a judgment of acquittal because the government failed to prove beyond a reasonable doubt that she engaged in the type of "course of conduct" that is an essential element of cyberstalking. *See* 18 U.S.C. § 2261A(2).

**1.    A Course of Conduct Requires "A Pattern of Conduct . . . Evidencing a Continuity of Purpose"**

The cyberstalking statute defines "course of conduct" to mean "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2). By wording the definition this way, Congress "exclude[d] isolated statements" and instead focused the statute on "persistent behavior." *United States v. Jubert*, 139 F.4th 484, 494 (5th Cir. 2025).

The ordinary meaning of the statutory terms makes this clear. A "pattern" requires "frequent or widespread incidence"—that is, a pattern is something that happens in a "regular and repeated way." *Pattern*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pattern (last visited Mar. 26, 2026); *Pattern*, The Brittanica Dictionary, https://www.britannica.com/dictionary/pattern (last visited Mar. 26, 2026). And a "continuity of purpose" is a *consistent* purpose that "does

not change or stop as time passes." *Continuity*, The Brittanica Dictionary, https://www.britannica.com/dictionary/continuity (last visited Mar. 26, 2026). The cyberstalking statute therefore criminalizes conduct that persists over an appreciable period of time. *Accord Jubert*, 139 F.4th at 494. Nothing in the language Congress chose suggests that the crime of cyberstalking could be committed in less than an hour.

That is precisely how the Ninth Circuit has applied the statute in the past. In *United States v. Bell*, the Court held that the course-of-conduct element was satisfied for a man who engaged in a "continuum" of conduct spanning years that "began with thinly veiled Internet threats and ended with [a] threatening fax." 303 F.3d 1187, 1192 (9th Cir. 2002); *see id.* at 1188-90 (detailing the defendant's "long and troubled history" with the IRS between 1996 and 2000). But it made equally clear that the preparation and sending of the threatening fax could not be subdivided into "separate acts" for purposes of establishing the "pattern of conduct" requirement. *Id.* at 1192. This was obvious to the Ninth Circuit, even though the process of coming up with the message for the fax, preparing the necessary fax materials, locating the correct fax number, and transmitting the fax may well have taken as long—or longer—than the short interaction Ms. Brown had with Officer Huitzilin.

The Ninth Circuit's approach in *Bell*—which looked to the defendant's conduct over the course of days, weeks, months, and years—is how the government has always charged cyberstalking in the past. As Exhibit A to Ms. Raygoza's Rule 29 motion illustrates, cyberstalking charges in this district have invariably been predicated on persistent conduct that spans at least several days, and often much longer. ECF 188, Ex. A. To date, the government has not identified *any* case in which the cyberstalking statute was applied to an hour-long interaction between individuals who had never previously met—a strong indication that the statute does not cover that conduct. *See NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) ("[T]he longstanding practice of the government . . . can inform our determination of what the law is." (cleaned up)).

**2.**      **The Government Repeatedly Misstated the Course-of-Conduct Element During Closing Arguments**

Rather than explaining at trial why the evidence proved a "pattern of conduct" evidencing "a continuity of purpose," the government tried to erase those requirements from the statute. It wrongly argued to the jury that *all* it needed to show were *any* two acts, with each "communication" between the defendants and Officer Huitzilin or his family constituting a separate act. Ex. C at 173:18-174:15.

The government made these incorrect statements consistently and repeatedly. When describing the elements of cyberstalking, the government told the jury that the course-of-conduct element "*just* means defendants took two or more steps." Ex. C at 105:12-16 (emphasis added). It repeated that erroneous claim seconds later, telling the jury that "*all* we're talking about is whether they took two or more steps in this first element." Ex. C at 105:18-19 (emphasis added).

After the defendants attempted to correct the government's misstatements of the law in their own closings, Ex. C at 150:2-151:8, 162:9-24, the government doubled down on these mischaracterizations in rebuttal. Referencing the defense argument on course of conduct, the government told the jury: "You heard some things about the time it took. *That's not what matters.*" Ex. C at 174:16-17. The government left no doubt about the sweeping breadth of its argument: it told the jury that the acts constituting the course of conduct could occur within as little as "five minutes." Ex. C at 174:19-20 ("All that matters is the steps taken, the distinct set of acts. It could have been five minutes, it could have been five years."). And it specifically argued that the course-of-conduct element was satisfied for Ms. Brown based on statements she made within *90 seconds* about immigration being on Chelsfield Street.  Ex. C at 174:8-9; *see* Ex. F at 9:23-24 ("Immigration! Immigration on your street!"), 10:39-10:41 ("Immigration! Immigration!"). Each of these statements, the government told the jury, "is a separate act." Ex. C at 174:12-13. And it argued that the jury "*only*" needed to find "that there

14

were two acts by each of these Defendants that intimidated or harassed during that course of conduct." *Id.* at 174:13-15.

### 3. Under the Correct View of the Law, the Government Failed to Prove a Course of Conduct

Contrary to what the government repeatedly argued, the cyberstalking statute requires far more than just two acts alone. Specifically, it requires that those two acts constitute a *pattern* of conduct that evidences a *continuity of purpose*. 18 U.S.C. § 2266(2). In other words, the acts have to provide evidence of a purpose that "does not change or stop as time passes."[5]

Under the ordinary meaning of the term "continuity," it is inconceivable that a continuity of purpose could be established within as little as "five minutes." *But see* Ex. C at 174:19-20 (government arguing to the contrary). And the government's specific argument that Ms. Brown's statements within 90 *seconds* satisfied the course-of-conduct element, Ex. C at 174:8-15, would render the continuity-of-purpose requirement essentially meaningless—neutering a requirement whose very purpose was to exclude fleeting intents from the statute's reach. *Jubert*, 139 F.4th at 494

As explained in more detail below, the government's repeated misstatements of the law on course of conduct require at least a new trial. *See infra* Section III.C.1. But they also betray the fundamental problem with this case. The government did not attempt to explain to the jury how Ms. Brown's conduct over less than an hour could constitute a "pattern of conduct" "evidencing a continuity of purpose" because *it couldn't*—the evidence did not support it. Even viewed in the light most favorable to the government,[6] the most the evidence showed was that:

---

[5] *Continuity*, The Brittanica Dictionary, https://www.britannica.com/dictionary/continuity (last visited Mar. 26, 2026).

[6] Ms. Brown maintains her position that only acts involving the use of interstate commerce facilities can be used to satisfy the course-of-conduct element. ECF 142 at 15:11-14, 16:14-19. But even if other acts can be considered, the government still failed to prove that Ms. Brown engaged in a course of conduct.

- Ms. Brown's face-to-face interaction with Officer Huitzilin lasted less than ten minutes, Ex. F at 2:09-11:48, and the entire incident was over in less than 35 minutes. Ex. B at 163:25-164:11.

- When confronted by Ms. Herrera, Ms. Brown told her that she was following ICE, and that she was not interested in recording civilians. Ex. H at 0:16-0:38.

- Ms. Brown yelled, "Immigration! Immigration on your street!" and "Immigration! "Immigration!" while blocked in by Ms. Herrera and Officer Huitzilin. Ex. F at 9:23-9:24, 10:39-10:41; Ex. N; Ex. O.

- Ms. Brown livestreamed her detention by BPPD and announced her location on a video captioned "Baldwin PD Targets Protestor." Exhibit E, Trial Ex. 5; Ex. L; Ex. M.

- Ms. Brown never tried to contact Officer Huitzilin or his wife again in person, telephonically, or electronically. Ex. B at 181:21-182:14; Ex. C at 9:22-10:11. Ms. Herrera and Officer Huitzilin never heard from Ms. Brown again. *Id.*; *see also* Ex. C at 150:17-25, 159:11-14.

- Ms. Brown did not re-post any videos or discuss Officer Huitzilin online or in public again. Ex. C at 162:22-24.

In short, Ms. Brown's entire interaction with Officer Huitzilin and Jessica Herrera lasted only a few minutes. She did not call them names. She did not make threats. She did not attempt to learn any personal information about them. To the contrary, the evidence at trial showed that she stopped recording soon after realizing that no ICE raid was occurring, tried to leave, and would have done so very quickly had she not been blocked in by Ms. Herrera. Significantly, Ms. Brown did not re-post the videos from this date, publicly discuss Officer Huitzilin, or attempt to contact him or Ms. Herrera, directly or indirectly, in any way whatsoever.

Ms. Brown's actions simply do not amount to cyber*stalking*. Nothing about them suggested that she had any continuity of purpose toward Office Huitzilin. To the contrary, the most natural inference from the trial evidence is that whatever intent Ms.

16

Brown had toward Officer Huitzilin lasted at most an hour, and she moved on with her life after that. At the very least, there was ample reasonable doubt on that point that compels a judgment of acquittal. *See United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010) (When the evidence is at best "in equipoise," "the jury necessarily would have to entertain a reasonable doubt . . . .") (collecting similar cases).

### C.  Alternatively, the Court Should Grant a New Trial

If the Court does not grant the motion for judgment of acquittal, it should at least grant a new trial under Federal Rule of Criminal Procedure 33. While preserving all objections that have been previously raised, Ms. Brown directs the Court below to two significant errors that merit a new trial.

First, the cyberstalking jury instruction incorrectly stated the law in multiple respects. The instruction contained broad language that allowed the jury to convict Ms. Brown of conduct protected by the First Amendment. It failed to distinguish *substantial* emotional distress from less-severe distress by defining the term to include minor emotions like worry, embarrassment, and nervousness. And it incorrectly told the jury that each "communication" between the defendants and Officer Huitzilin or his family constituted separate acts—an assertion that appears nowhere in the statute and was extraordinarily misleading under the circumstances of this case.

Second, the government repeatedly and prejudicially misstated the law during closing argument. It wrongly told the jury that *any* two acts—indeed, any two *statements*—were enough to establish a course of conduct, regardless of whether they constituted a "pattern" or evidenced "a continuity of purpose." And it also erroneously argued that the sidewalk on Chelsfield Street was not a public forum where protest was permitted—part of a series of improper arguments by the government about what does, and does not, constitute a "proper" protest.

Each of these errors separately and collectively require a new trial.

17

### 1.     The Cyberstalking Jury Instruction Misstated the Law

"An error in criminal jury instructions requires [a new trial] unless there is no reasonable possibility that the error materially affected the verdict . . . ." *United States v. Cortes*, 757 F.3d 850, 857 (9th Cir. 2014). A jury instruction is erroneous when it "misstates the law [or] an element of the crime." *United States v. Woodberry*, 987 F.3d 1231, 1234 (9th Cir. 2021).

Three separate errors in the cyberstalking instruction require a new trial.

### a.     The Instruction Allowed the Jury to Convict Ms. Brown for First Amendment Protected Activity

This case implicated significant First Amendment issues. Because "[t]he First Amendment protects lots of speech that is substantially emotionally distressing," *Yung*, 37 F.4th at 77, it was critical to instruct the jury in a way that would not allow it to convict Ms. Brown for engaging in speech or conduct protected by the First Amendment. But the instruction given at trial failed to do so. *See* ECF 209 (Instruction 12).

The cyberstalking instruction used at trial required the jury to find that Ms. Brown had the "intent to harass or intimidate R.H., or place him under surveillance with the intent to harass or intimidate him." *Id.* Critically, however, the instruction defined the terms "harass" and "intimidate" in a way that expanded them well beyond the narrow unprotected category of true threats of violence. *See Counterman v. Colorado*, 600 U.S. 66, 75 (2023). "Harass" was defined to mean "repeatedly or persistently us[ing] words, conduct or action that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose." ECF 209 (Instruction 12). "Intimidate" was defined to mean "to make timid or fill with fear." *Id.* Accordingly, under the instruction, a mere intent to "annoy" was enough to satisfy the first element of the offense.

Compounding this problem, on the third element, the jury was told that it had to find that Ms. Brown's course of conduct "caused, attempted to cause, or would be

reasonably expected to cause emotional distress." *Id.* But "substantial emotional distress" was defined extraordinarily broadly to include any "mental distress, mental suffering, or mental anguish, and includes depression, dejection, shame, humiliation, mortification, shock, indignity, embarrassment, grief, anxiety, worry, fright, disappointment, nausea, and nervousness, as well as physical pain." *Id.*

Together, these broadly worded instructions allowed the jury to convict Ms. Brown for a wide spectrum of conduct protected by the First Amendment. As only one example, the instruction allowed the jury to convict Ms. Brown for "annoy[ing]" Officer Huitzilin with non-threatening speech that caused him to feel "disappointment," "embarrassment," "dejection," or "shame" about his work as an ICE agent. *See id.* But trying to influence someone's conduct by causing them to feel shame or embarrassment about their conduct is squarely protected by the First Amendment, even when done with speech that could be described as annoying. *See Snyder*, 562 U.S. at 451-58. Indeed, "annoying" a government official into feeling "shame" about what they have done is a description that could be applied to any number of legitimate protests.

In an effort to avoid this problem, Ms. Brown objected before trial to the expansive definitions of "harass," "intimidate," and "substantial emotional distress," proposed by the government. ECF 142 (Objections to Government's Proposed Instruction 4). She instead requested that the jury be instructed that it had to find that Ms. Brown's speech constituted a "true threat of violence" or "incitement" under *Brandenburg*—categories of speech that have no First Amendment protection. ECF 143 (Defendants' Proposed Instruction 6).

Four courts of appeals have agreed that a jury must be instructed this way. In *Yung*, the Third Circuit recognized that construing the words "intimidate" and "harass" broadly would "raise constitutional problems" because they "can describe nonviolent, nonthreatening speech." 37 F.4th at 77-78. It thus read the terms "narrowly" to cover only "putting the victim in fear of death or injury" or "distress[ing] the victim by threatening, intimidating, or the like." *Id.* at 80. The Eighth Circuit adopted similar

19

reasoning, holding that to "harass" or "intimidate" under the cyberstalking statute, the defendant must have "acted . . . in a sense that is not protected under the First Amendment." *Syrniawski*, 48 F.4th at 587. It then reversed a defendant's conviction because his conduct did not fall within any of the categories of unprotected activity the government identified: speech integral to criminal conduct, defamation, and obscenity. *Id.* at 588-89.

Similarly, the Second Circuit reversed a conviction when there was insufficient evidence the defendant made a true threat, in the process holding that the district court erred by failing to instruct the jury on that point. *United States v. Dennis*, 132 F.4th 214, 233-37 (2d Cir. 2025). Likewise, the First Circuit held it "must read 'intent to . . . harass' as referring to criminal harassment . . . which is unprotected because it constitutes true threats or speech that is integral to proscribable criminal conduct," and "this logic would also apply to the term 'intimidate' in the statute. *United States v. Ackell*, 907 F.3d 67, 76 (1st Cir. 2018). The *Ackell* court "acknowledg[ed] that § 2261A(2)(B) could have an unconstitutional application" and was "cognizant of the chilling-effect-related concerns [of] a statute that can be applied to violate the First Amendment." *Id.*at 77. Ms. Brown's case presents the same potential for chilling effects that the First, Second, Third, and Eighth Circuits recognized must be avoided.

The government claimed that its proposed instruction was supported by the Ninth Circuit's pre-*Counterman* decision in *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014). But *Osinger* did not hold that a defendant who engaged solely in First Amendment protected activity could be convicted of cyberstalking. *See id.* at 954 (Watford, J., concurring). Instead, the Ninth Circuit held that the First Amendment was not implicated for the specific defendant before it because that defendant's conduct fell within "the First Amendment exception that allows the government to regulate speech that is integral to criminal conduct." *Osinger*, 753 F.3d at 946 (quoting *United States v. Meredith*, 685 F.3d 814, 819 (9th Cir. 2012)).

20

Critically, *Osinger* involved several instances of independent non-protected criminal conduct that were very different than anything that occurred in this case. The defendant's actions included, among other things, (1) creating a fake Facebook page to impersonate his former girlfriend, which he used to post explicit photos of her and demeaning statements purportedly made by her, (2) knocking on her door and windows at early hours of the morning, (3) coming to her place of employment, and (4) sending nude photos of her to her coworkers. *Id.* at 941-42. Nothing in *Osinger* contradicted the established rule that the speech-incident-to-criminal-conduct exception extends only to speech done in furtherance of *independent* criminal conduct. *United States v. Hansen*, 599 U.S. 762, 783-84 (2023); *see also Matsumoto v. Labrador*, 122 F.4th 787, 814 (9th Cir. 2024) ("[S]peech may be criminalized where it is 'intended to induce or commence illegal activities'—that is *independent* activities that are illegal."). Instead, the First Amendment challenge failed there because the defendant had actually engaged in independent criminal conduct.

In short, the *Osinger* defendant's repeated *non*-speech harassment of his victim was the reason that his as-applied challenge failed. *Osinger*, 753 F.3d at 941, 947; *Syrniawski*, 48 F.4th at 588 (identifying "in-person harassment" as the independent non-protected conduct in *Osinger*). And the Ninth Circuit made clear in that case that it was not deciding whether the cyberstalking statute could be constitutionally applied to "protected speech." *Osinger*, 753 F.3d at 947 n.6. Judge Watford, who joined the *Osinger* opinion, explained persuasively why it cannot. *Id.* at 954 ("If a defendant is doing nothing but exercising a right of free speech, without engaging in any non-speech conduct, the exception for speech integral to criminal conduct shouldn't apply.").

But not every case will involve independent non-protected criminal conduct, and this case does not. "[T]o qualify as speech integral to criminal conduct, the speech must be integral to conduct that constitutes another offense that *does not* involve protected speech, such as antitrust conspiracy." *Syrniawski*, 48 F.4th at 588 (emphasis added). Here, there is no allegation of criminal conduct independent of Ms. Brown's protected

activity. Indeed, the jury *acquitted* Ms. Brown of the only other crime with which she was charged: conspiracy to doxx. *Osinger* therefore does not support an instruction that allowed for conviction based solely on First Amendment protected activity.

### b.    The Instruction Incorrectly Stated that "Each Communication" Constituted a Separate Act

The cyberstalking instruction also incorrectly told the jury that it could "consider each communication between defendant and R.H. as a separate act," in deciding whether Ms. Brown had engaged in the required course of conduct. ECF 209 (Instruction 12). It is unclear where this language came from—the government proposed it, ECF 142, but it appears nowhere in the statute. And it was incorrect and extraordinarily misleading in the context of this case, where the only communications between the defendants and Officer Huitzilin and his family occurred during a face-to-face conversation that lasted only a few minutes.

The government exploited this erroneous instruction to its fullest extent during closing argument. It argued that essentially every single phrase each defendant spoke constituted a separate "act" for purpose of establishing a course of conduct:

> You may consider each communication between the Defendant and Mr. Reyes or his family members as a separate act. There are several communications between each Defendant and Mr. Reyes. In fact, not just the videos, but you will have the evidence in front of you about the language the Defendants used in Spanish . . . Exhibit-33: Asshole; remember those tattoos; have a good look at the asshole. Exhibit-34: an ICE agent lives here. The family is ICE. He has a Gringo wife and is a traitor. Exhibit-35: This motherfucker is immigration. The one in the black truck is immigration. He's immigration, the mother fucker. Shut your mouth, shut your mouth. Hiding behind your wife and son, you fucking bastard. All the neighbors know what you are. All the neighbors know what you are, motherfucker. Let everyone know. Let everyone know. Defendant Brown: Immigration on your street. Defendant Brown: Immigration, immigration in the neighborhood. Defendant Raygoza: Get the fuck out of our way, faggot. And Defendant Samane, calling Mr. Reyes an idiot. Not just these exhibits; you can look at all of the videos.

22

*Each of those* is a separate act. And you only need to find that there were two acts by each of these Defendants that intimidated or harassed during that course of conduct.

Ex. C at 173:18-174:15 (emphasis added).

The instruction, and how the government exploited it, is directly contrary to the Ninth Circuit's reasoning in *Bell*. *Bell* explained that sending a threatening fax—something most naturally viewed as a single act—could not be artificially subdivided into separate actions of sending the fax and *preparing* to send the fax to create multiple "acts" to satisfy the course-of-conduct requirement. 303 F.3d at 1192. For the same reason, a face-to-face conversation that lasted only minutes—something most naturally viewed as a single act—cannot be artificially subdivided by treating each phrase or sentence as a separate "act."

The jury instruction incorrectly stated otherwise. Because the government grounded nearly its entire course-of-conduct argument on this erroneous statement of law, a new trial is required.

### c. The Instruction Failed to Distinguish Between Ordinary Emotional Distress and *Substantial* Emotional Distress

The jury instructions were further flawed because they set an erroneously low bar for emotional distress. The cyberstalking statute requires *substantial* emotional distress. 18 U.S.C. § 2661A(2)(B). By inserting the word "substantial," Congress made clear that *ordinary* emotional distress was not enough.

Ms. Brown requested that the Court give an instruction based on the Fifth Circuit's model instruction, which did not define "substantial emotional distress" and would therefore have allowed the parties to argue based on the term's ordinary meaning. ECF 142 (Defense Proposed Alternative Instruction 4). Instead, the Court adopted the government's proposed definition, which defined substantial distress to mean any "mental distress, mental suffering, or mental anguish, and includes depression, dejection, shame, humiliation, mortification, shock, indignity,

23

embarrassment, grief, anxiety, worry, fright, disappointment, nausea, and nervousness, as well as physical pain." ECF 209 (Instruction 12).

This broad definition, which swept in minor forms of distress like "dejection," "shame," "embarrassment," "worry," and "nervousness," stripped the word "substantial" of any meaning. It is difficult to imagine *any* variety of emotional distress that would not covered by the instruction's broad definition. That is problematic, because the word "substantial" was included in the statute for the evident purpose of distinguishing "substantial" emotional distress from distress that was less severe. Because the instruction allowed the jury to convict based on essentially any type of emotional distress—even distress that could not reasonably be described as substantial—a new trial is required.

### 2. The Government Repeatedly Misstated the Law During Closing Argument

"A prosecutor's misstatements of law during closing argument provide grounds for [a new trial]." *United States v. Velazquez*, 1 F.4th 1132, 1136 (9th Cir. 2021). A new trial is warranted if the misstatements "are so gross as to probably prejudice the defendant, and the prejudice has not been neutralized by the trial judge." *Id.* In "close cases," the Ninth Circuit has "not hesitate[d] to reverse a conviction on the basis of a prosecutor's misstatement of the law, even when reviewing for plain error." *Id.* The government's closing argument misstated the law in at least two material and grossly prejudicial respects, each of which require a new trial.

*First,* as detailed at length above, the government repeatedly misstated the course-of-conduct element by claiming that it required nothing more than two acts, with each communication constituting a separate act. This mischaracterization completely erased the additional statutory requirements that the two acts constitute a "pattern" and that they "evidenc[e] a continuity of purpose." *See* Section III.B.2, *supra*; 18 U.S.C. § 2266(2).

This was not one fleeting misstatement—the government hammered this misinterpretation repeatedly. It told the jury that a course of conduct "*just* means that defendants took two or more steps" and that "*all* we're talking about is whether they took two or more steps in this first element." Ex. C at 105:12-19. After the defendants tried to correct these misstatements by pointing the jury to the actual language of the instructions—including the "continuity of purpose" requirement, Ex. C at 150:2-151:8, 162:9-24,—the government used its rebuttal to accuse *the defense* of being wrong: "You heard some things about the time it took. *That's not what matters* . . . . All that matters is the steps taken, the distinct set of acts. It could have been *five minutes*, it could have been five years." *Id.* at 174:16-20.

The government made this last misstatement immediately after listing out more than a dozen statements made within a matter of minutes and telling the jury that each constituted a separate act. Its argument thus clearly—and wrongly—conveyed to the jury that *all* it needed to consider was whether each defendant spoke multiple phrases aloud, and not whether those statements constituted a "pattern" or evidenced a "continuity of purpose," as the cyberstalking statute requires. This gross mischaracterization of the law went to one of the key components of Ms. Brown's defense and was extraordinarily prejudicial.

*Second,* the government incorrectly stated the law about the First Amendment right to protest on public residential streets. It bears emphasizing that the government should never have broached the subject of "correct" ways to protest. The entire point of the First Amendment is that it is generally not the government's place to tell its citizens how they are allowed to make their opinions known in public places—particularly when speaking on matters of public concern. *See Snyder*, 562 U.S. at 458. But having started down this road, the government seriously erred by repeatedly misstating the law.

Most obviously, the government told the jury that the sidewalk on Chelsfield Street was not a "public forum" and that by protesting in an impermissible location, the defendants were engaging in unlawful harassment and intimidation:

25

There are forums for this, public forums. The sidewalk two doors down from someone's house *isn't that forum*. That's harassment. That's intimidation.

Ex. C at 180:22-24 (emphasis added). But the law is exactly *the opposite*: all public streets and sidewalks, including residential streets, are traditional public fora where the First Amendment provides the strongest possible protection for public assembly and debate. *Frisby*, 487 U.S. at 480; *Snyder*, 562 U.S. at 456.

The government made additional misstatements along these lines. It argued that it was not a valid form of protest to yell to neighbors from a public street, even though the Supreme Court has described similar conduct as the "archetype" of permissible protesting. *Snyder*, 562 U.S. at 456; *but see* Ex. C at 172:10-13 (AUSA: "Both Defendants Raygoza and Samane walk down Mr. Reyes's street yelling to neighbors that they have an ICE agent as a neighbor. This isn't about a protest at this point."). And it made other statements that wrongly suggested both that a neighborhood was not the proper location for protest and that the only legitimate way to exercise First Amendment rights was with signs, picketing, bullhorns, parades, and the like. Ex. C at 178:23-179:6 (AUSA: "[T]he word protest has come up a lot. Use your common sense. What protest involves three people targeting a wife, a husband, and his two children on a neighborhood where no one else is? No signs, no picketing, no bullhorns, no parade. Three women, two parents, and their two children. You heard about some of the good work Defendants do in expressing their speech . . . . But this wasn't that.").

The government's argument contained several obvious misstatements of the law regarding protests in residential neighborhoods. And the misstatements prejudiced Ms. Brown by inviting the jury to conclude that she was acting unlawfully merely by standing where she was, when in reality, the First Amendment protected her right to voice her views from the sidewalk on Chelsfield Street.

The government's repeated misstatements of law on multiple material points created an unacceptable risk of misleading the jury in what the lengthy deliberations

26

and split verdict make clear was a very "close case." *Velazquez*, 1 F.4th at 1136. A new trial is required. *Id.*

### IV. CONCLUSION

For all these reasons, the Court should enter a judgment of acquittal on Count Two. In the alternative, the Court should grant a new trial based on the erroneous jury instruction and government's repeated misstatements of the law.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  March 27, 2026          By   */s/ Erica Choi*

ERICA CHOI
SHANNON COIT
Deputy Federal Public Defenders
Attorney for ASHLEIGH BROWN