# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:25-cr-00780-SVW |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| CYNTHIA RAYGOZA, | ) | Tuesday, February 24, 2026 |
| ASHLEIGH BROWN, | ) | |
| SANDRA CARMONA SAMANE, | ) | (9:28 a.m. to 10:54 a.m.) |
| | ) | (3:09 p.m. to  4:56 p.m.) |
| Defendants. | ) | |

** PARTIAL TRANSCRIPT OF JURY TRIAL - DAY 1 **

BEFORE THE HONORABLE STEPHEN V. WILSON,
UNITED STATES DISTRICT JUDGE

(JURY SELECTION UNDER SEPARATE COVER)

APPEARANCES:              SEE PAGE 2

Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Daniel Tamayo

Transcribed by:           Exceptional Reporting Services, Inc.
                          20079 Stone Oak Pkwy. Suite 1105-237
                          San Antonio, TX 78258
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

APPEARANCES:


For Plaintiff:              AUSA CLIFFORD MPARE
                            AUSA LAUREN E. BORDER
                            U.S. Attorney's Office
                            312 N. Spring St., 15th Floor
                            Los Angeles, CA 90012


For Cynthia Raygoza:        GREGORY NICOLAYSEN, ESQ.
                            Gregory Nicolaysen Law Offices
                            27240 Turnberry Lane
                            Suite 200
                            Valencia, CA 91355
                            818-970-7247


For Ashleigh Brown:         DFPD ERICA CHOI
                            DFPD SHANNON M. COIT
                            Federal Public Defender's Office
                            321 East 2nd Street
                            Los Angeles, CA 90012
                            213-894-2854


For Sandra Carmona          ROBERT M. BERNSTEIN, ESQ.
Samane:                     Law Offices of Robert M. Bernstein
                            9465 Wilshire Boulevard
                            Suite 300
                            Beverly Hills, CA 90212
                            310-477-1480

3

**INDEX**

| MODE | PAGE |
|---|---|
| COLLOQUY AND RULINGS BEFORE JURY SELECTION | 4 |

**OPENING STATEMENT**

| | |
|---|---|
| BY MS. BORDER | 25 |
| BY MR. NICOLAYSEN | 29 |
| BY MS. COIT | 36 |
| BY MR. BERNSTEIN | 41 |

| PLAINTIFFS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ROBERT KURTZ | 46/65 | -- | -- | -- |

| EXHIBIT | RECEIVED |
|---|---|
| 8 | 55 |

EXCEPTIONAL REPORTING SERVICES, INC

4

**Los Angeles, CA, Tuesday, February 24, 2026, 9:28 a.m.**

**(Call to Order)**

**(Jury venire not present)**

THE COURT:  Present with the parties and Counsel. I'm going to give you some further rulings.  We have a jury waiting, and we've had hours of debate on these Motions in Limine.  There's just a few matters that I need some further information on to make rulings.  I am going to let the Government read the indictment.  The transcripts have been translated.

Let me ask the Government this question.  With regard to the post, what is the term I use post, video, material, what was the --

MR. MPARE:  Evidence related to post incident and conduct?

THE COURT:  Yeah, right.  Are you referring in that regard to the gathering, 45 minutes or so after the contact at the location?

MR. MPARE:  Yes, Your Honor.

THE COURT:  And I may have misheard yesterday, the size of the crowd, was it -- how large was the crowd?

MR. MPARE:  I think it was roughly four people who came in one car.

THE COURT:  I see.  And at the scene, will the agent or his wife testify that they saw or heard that gathering?

EXCEPTIONAL REPORTING SERVICES, INC

**MR. MPARE:**  They'll testify that they saw the gathering.  That they observed some of the general happenings.  But that they were not involved in all of the engagement between --

**THE COURT:**  But they didn't hear the words they just saw.  They'll describe what they saw?

**MR. MPARE:**  Correct.

**THE COURT:**  And what generally did they see?

**MR. MPARE:**  I believe they just saw -- I think the testimony will come out that they saw one car arrive, and that they believed that they saw four or five people get out of that car.  That at that point, Defendants and the Reyes family had been separated, so the gathering was kind of around where Defendants were.  And the Reyes family was kind of a little distance away, but saw everything that kind of was occurring.

**THE COURT:**  Were they in their house or on the street?

**MR. MPARE:**  No, they were still on the scene, because Baldwin Park was there to collect statements from everyone.

**THE COURT:**  I see.  So they saw that some gathering occurred?

**MR. MPARE:**  Yes, Your Honor.

**THE COURT:**  I see, okay.  And when the agent's wife called the Baldwin Police Department, she did that -- what did she say in that -- what will she testify she said in that phone

call?

MR. MPARE:  Not only will she testify about this, but we have the 9-1-1 call recording.

THE COURT:  What did it contain?

MR. MPARE:  It contained statements from the wife that these three women had followed her husband home, and that they were outside wearing masks, and that she was concerned for her family's safety.

THE COURT:  Okay, I got it.  With regard to one of the Defendants, I guess it was Raygoza, I'm not clear about how the consciousness of guilt argument will be related to the jury.

This is what I have in mind, that may not be complete.  That she, at the time of the events in question, lived in Louisiana.  That the -- an arrest warrant was served on her -- executed on her at her house in Louisiana.  And during the search she attempted to evade or hide in the attic of her home.

What I want some further information about is whether she -- the Government's position is that when she went to Louisiana, she was fleeing or -- whether the fleeing was the hiding in the house.

MR. MPARE:  So Ms. Raygoza at the time of the incident was a California resident and she lived in Riverside.

THE COURT:  Oh, I see.

MR. MPARE:  After the incident, I'm not sure exactly about which amount of time, I can get that to Your Honor as soon as possible.  But after the incident and after learning that the other two Defendants in this case had been arrested, then Ms. Raygoza went to Louisiana where --

THE COURT:  In other words, you're saying, up to that point she didn't know that she was going to be charged?

MR. MPARE:  Correct.

THE COURT:  And so she went to Louisiana.  And where did she go?  To her house?

MR. MPARE:  Her boyfriend's home, yes.

THE COURT:  Being as -- and then when the arrest warrant was executed at that house what physically happened?  I mean --

MR. MPARE:  So law enforcement here corresponded with law enforcement in Louisiana.  And law enforcement here learned that during the execution of the arrest warrant the officers that went into Ms. Raygoza's boyfriend's house found her in the attic of the home hiding behind insulation.

THE COURT:  So in other words, the people who would testify to the execution of the warrant are not going to testify, or are they?

MR. MPARE:  About the specific execution, no, but the case agent who's involved in the investigation and coordinating the arrests will.

8

THE COURT:  All right.  I see.  And -- but regarding hiding in the attic, I mean was the attic secreted, was it walled off?  I mean in many homes the attic is accessible.

MR. MPARE:  I think the --

THE COURT:  It's like it's another room.

MR. MPARE:  -- I think the insulation of an attic is one not typically readily accessible.  It's something that you have to kind of dig into.  And I understand the testimony of the agent will be --

THE COURT:  You mean being an attic that is not a livable attic, you mean like a crawl attic, is that where she went?

MR. MPARE:  That's my understanding.  And also that she had to be forcibly removed from that space by law enforcement.

THE COURT:  Yeah.  Okay.

(Pause)

MR. NICOLAYSEN:  May I address the Court, Your Honor?

THE COURT:  No, no not now.

(Pause)

THE COURT:  Okay, I'm going to take five minutes, and then I'll resolve a few questions.

**(Recess taken at 9:39 a.m.; reconvened at 10:03 a.m.)**

//

//

9

**(Jury venire not present)**

**THE COURT:**  Back at it again.  Some more rulings. I'm not going to allow the flight consciousness of guilt evidence.

My understanding about the Government's evidence regarding the statements made by the four or five people who came to the location is that the statements made, even though not heard by the agent or his wife, constitute circumstantial evidence that the statements made, or the course of conduct of the Defendants, were a true threat because the communications that the Defendants made on the Instagram were, in terms of Instagram itself, it's primarily you use in terms of a select group.  They knew who their followers were or some of them.

And so they communicated with these people via the streaming.  And the fact that some people arrived and spoke as they did, it's not hearsay because the statements are not being offered for the truth of the matter, just the fact that they were made and heard by the agent.

Is that the way the Government analyzes it?

**MR. MPARE:**  Yes, Your Honor.

**THE COURT:**  With regard to the, I don't know how to express this.  The posts that were made by third parties after the event how does that become relevant to the case?  In other words the statute, the stalking statute, talks of a course of conduct.  But how does that -- I mean it's somewhat of the same

pattern as the Baldwin Park situation.  But when were those posts made?

MR. MPARE:  The posts were made essentially contemporaneously with the live stream within the next few hours of the live stream.

THE COURT:  And what did the post say?

MR. MPARE:  Among other things, one of the posts, for example, says:  "12837 is my favorite number.  Chelsfield Street is my favorite street.  Baldwin Park."

Another one has a screenshot of the video filmed by Ms. Raygoza capturing the officer in the screenshot, and the caption basically of the Instagram post is:  "18 -- 12837 Chelsfield Lane, this scum bag live -- stays in Baldwin Park."

THE COURT:  So the -- but in the Instagram I didn't see that full 30-minute surveillance.  What was said on the Instagram by the Defendants?  Can you give me some kind of context?

MR. MPARE:  Sure.  Specifically, Ms. Brown says two addresses.  She says 12833 and 12837 Chelsfield Street, Baldwin Park, California.  At one point on her live stream, she says: "Come on down."

Defendant Raygoza says throughout her video:  "Now everybody knows where you live.  Now everyone knows their neighbor is an ICE agent."

And just one more point about the post themselves.

11

While they do relate to Defendants' intent to harass and intimidate under the stalking statute, they also relate to a key element the Government must prove for conspiracy, specifically conspiracy to docs, which requires the Government to prove that Defendants intended for their information the disclosure to intimidate, harass, threaten, you know, those things.  But also to incite criminal conduct by other individuals.

And so as part of the theory of conspiracy, the Government is saying, look at these disclosures.  They did exactly what Defendants intended for them to do, which is other people circulated, recirculated this information, and in fact through this recirculation and Defendants' conduct more people arrived to the exact location that they had provided to their viewers.

THE COURT:  Understood.

MS. CHOI:  Your Honor, may I respond?

THE COURT:  Who spoke there.

MS. CHOI:  Over here, Your Honor.

THE COURT:  Oh go ahead.

MS. CHOI:  Erica Choi on behalf Ashleigh Brown.

THE COURT:  Yeah.

MS. CHOI:  Your Honor, part of the problem is that the Government is saying that these comments were made contemporaneously.  But they don't know that.  There's a big

12

authentication issue here with these comments.  The Government simply wants to get in comments from essentially anonymous accounts.  There's no indication that these were real people that they were responding to any -- which part of the video they're responding to.

There's also a real concern that even if these are real --

THE COURT:  Well there's other circumstantial evidence.  And it's not the Court's job to weigh evidence just to see if the evidence could be reasonably understood to be relevant.  Here the posts are discussing the address of the agent at least one of the posts.  That would be circumstantial evidence that they were responding to the -- they were listening to the Instagram.

MS. CHOI:  It's not his address though, Your Honor.  They're not saying his address.

THE COURT:  I -- but I know throughout the case that they had an error, but it's the same street and it's a couple of doors down, so --

MS. CHOI:  And, Your Honor, because of this authentication problem we don't know who made these comments.  They could very well be supporters or coworkers of the agent trying to get other -- Ms. Brown in trouble.  This is the problem we have with not knowing that these are real accounts and what the motivation was of -- if they were in fact people

13

posting them, these comments.

THE COURT:  I see.

MR. BERNSTEIN:  And may I add one other thing, Your Honor?  Many of these comments may have been created by what are called bots.  They're not real people.  They are AI-generated responses to Instagram posts.  We have no way of knowing if these were even generated by real people or they were AI bots.

THE COURT:  Well I mean is that the world we're in now?

MR. BERNSTEIN:  It's very common --

THE COURT:  And --

MR. BERNSTEIN: -- on social media.

THE COURT:  -- so in other words, everything anyone does has to be screened for AI?

MR. BERNSTEIN:  Well posts in response to your social media posts, there are millions of bots that respond to people's Instagram posts that are not people.  They are bots, literally that.  And there's no way to authenticate that these posts were made by a person and not a bot.

THE COURT:  I understand.

MR. MPARE:  Your Honor, setting aside the questions about who posted the information, central is the fact that the information was posted.  The information that is disclosing or attempting to disclose the exact location of the agent's home.

14

That's a separate inquiry about who posted what.  There's no question about the fact that at the time that Officer Reyes saw these posts, he didn't know who these people were.  In fact, that adds to the emotional distress element because he sees now an address that's three doors down from his home that's posted broadly on various Instagram accounts.

THE COURT:  But he's -- the officer or the agent saw those posts, not that day, did he?

MR. MPARE:  He'll testify that essentially after the incident his daughter was able to look at some of the accounts and share with him those posts.  And that he saw them after his daughter looked up the accounts.

THE COURT:  So you're saying, I mean that it's relevant to emotional distress.  But the argument from the Defendants is not so much the relevance but the authentication question.  In other words, it could have come from these so-called bots or something else, or even more --

(Pause)

-- pointed.  They're saying that this could have been created by law enforcement to reinforce their case.  In other words, is there some way to tie at least some of these bots into a temporal connection to the Instagram surveillance?

MR. MPARE:  So yes.  I think generally we can get testimony elicited that typically when a story is posted on Instagram it expires within 24 hours such that the repost video

15

would have been viewed within the 24 hours after the incident.

Second, with response to Defense Counsel's arguments about bots, I think it kind of misapprehends what bots do.

THE COURT: Well tell me.

MR. MPARE: Typically, that's for engagement on posts to garner more views on a social media account. Bots don't typically repost things, they don't typically take things from the internet, right, take it -- take an arc -- an artifact from the internet, add it to an account and then redistribute it.

Typically, what bots are doing is, you know, we can -- let's take Defendants -- our arguments that their best case, there could be some comments on certain social media posts that are from bots. Certainly. That is a way that certain accounts, in fact, add engagement. But even in that scenario it's the account that attracts the bots to the account to increase engagement. And by increasing --

THE COURT: When you say the account, what do you mean, which account?

MR. MPARE: The user's account. So if there's a social media account, if I want to sell shoes and I want more people to come to my page to buy shoes, I can buy or spend money on bots to have those bots then come to my page and comment on my post saying, "he sells the best shoes, he has the best quality shoes. These shoes are really good. I got them so fast". And those things will be populated under the comment

16

of whatever post I put on.

So even in that scenario where we don't necessarily know if these people are real people or not, the point of bots is to increase engagement on a social media platform.

Which goes to the theory of the case which is, Defendants knew that they had a wide-ranging group of people involved in their accounts.  In fact, look at all these comments that are under these posts.  As such, they knew that their disclosure was more likely than not to arrive to people who can maybe do something with that information.

**THE COURT:**  How many of these posts are in your evidence?

**MR. MPARE:**  Just those four exhibits.

**THE COURT:**  I see.

**MR. MPARE:**  Exhibits 1, 2, 3 and 16.

**MS. CHOI:**  Your Honor, we -- I disagree with the Government's characterization of what bot accounts can do. They can leave comments and they're designed to mimic human behavior online, so they do leave comments.  And if we're going to go down this road, then we need experts to come and testify about -- like these are very technical issues.  If the Government wants to introduce this evidence without authentication and somehow show that these were real people as opposed to bots and the definition of bots, this is a whole other side issue that that they're injecting into this case.

**MR. MPARE:**  I don't think the issue is being injected by the Government, Your Honor.  I think we want to stay as far away from this as possible, and just say the posts were made and there were comments made under the post.  And those comments were publicly available to anyone who saw the posts.  That's what the testimony about the Instagram pages are going to be.

There's no need to get into who posted what or why they were posted, other than the fact that maybe these people saw 12837 Chelsfield Lane -- Street.  And the only way they could have seen that, ladies and gentlemen, is to use your common sense, because Defendant Brown said that address, because Defendant Raygoza live-streamed the entire street, including among other things, where her car was parked or where Defendant Brown's car was parked, namely, 12837 Chelsfield Street.

**THE COURT:** Understood.  Okay.  I'll take a few more minutes.  Let me make sure I covered everything.

**(Recess taken at 10:20 a.m.; reconvened at 10:41 a.m.)**

**(Jury venire not present)**

**THE COURT:**  During the recess I did do some research about the authentication issue.  And I did find some authorities that are persuasive, not the precise fact patterns here, but persuasive in terms of an evidentiary ruling.

One case is *U.S. versus Vayner*, V-a-y-n-e-r, 769

F.3d, 125 (2nd Circuit 2014), and another case from another judge, Judge Snyder in our District, *SIO Entertainment against Samsung Electronics*, 2023 Westlaw 209-07-03.  Those cases persuade me that there is an issue with authentication.  So those bots or those posts will not be received.

Regarding the question of the Baldwin -- the last issue is the Baldwin police officer, can he relate what the four or five people who gathered 45 minutes afterwards said?  My ruling is he can.  And I think that completes all the rulings.

There were some issues about the jury instructions and I have been attentive to that.  And I have reached some conclusions but it's not necessary to review those with you now because you're not going to tell the jury about jury instructions.

And I want to just say a few things about the trial.  Understanding that lawyers are advocates and not wooden soldiers but we have, you know, had peppered back and forth at the motion stage.  But when the trial starts it's more formal.

And so if there's an objection by either side to any question the proper procedure is to stand up, say objection and the legal basis for the objection without argument.  And if the Court doesn't comprehend the objection it will ask for further discussion.  Otherwise, the Court will rule.  And I think we've covered most of the issues.

In opening statements don't make any effort to be argumentative at all.  And I don't think in a case like this the opening statements ought to be very extensive, just inform the jury about what they expect the witnesses to say and what the video -- the Instagram shows and so forth.  You can argue to your heart's delight when its final argument.

**MS. CHOI:**  Your Honor?

**MR. NICOLAYSEN:**  May we be heard on any issues on the indictment, Your Honor.

**THE COURT:**  Yeah, or the indict -- no, I'm going to read --

**MR. NICOLAYSEN:**  No --

**THE COURT:**  -- have the Government read the indictment.  I read it and I don't think it has any language other than what is related to the statute.

**MR. NICOLAYSEN:**  The Defense believes that there's a misstatement of the statute.  That's the -- in count one, it refers to a federal agent as opposed to a covered person, which is the language in the statute.  So we would ask that that be changed, as long as the Court is allowing --

**THE COURT:**  Any objection to that?

**MR. MPARE:**  No Your Honor.

**THE COURT:**  All right then that will be modified.

**MR. NICOLAYSEN:**  So that would be, Your Honor, line six on page two of six.

THE COURT:  All right.  All right, then --

MS. CHOI:  Your Honor, I'm sorry, one more issue related to the indictment.  The Government mentioned today and also referenced yesterday as to count one that the -- they need to prove an element that there's -- there was a conspiracy to release the home address with the intent to incite the commission of a crime of violence.

That's actually not in the indictment.  That's a theory that the Government affirmatively abandoned in their pleadings in ECF number 98.

THE COURT:  Well does the Government intend to argue that?

MR. MPARE:  No, Your Honor.

THE COURT:  All right, then that's not an issue.

MS. CHOI:  Okay, just want to make sure that --

THE COURT:  Yeah.

MS. CHOI:  -- it's not really.

THE COURT:  All right.  Then we're now going to select the jury.  I had the proposed voir dire questions yesterday.  We had them here.  That's okay.  No, I mean it was -- no, it's okay.

When the jury is here, I'll question the jury rather than mention for cause or not for cause.  In a case that I had recently it also involves some issues of concern to seeking an impartial jury.  The Court on its own excused, I don't know, it

seems like 20 jurors for cause, just based upon the questions and answers.

So if at some point after I question the jurors and some juror gives a response that, you know, clearly indicates they can't be fair and impartial, I'll say I'm going to excuse that person.  It's understood that I'm excusing that person for cause.

Is that understood?  Yes?

**MR. MPARE:**  Yes, Your Honor.

**THE COURT:**  And peremptories are a different matter. I do intend to ask the jury my usual questions and then specific questions, some of which are in the proposed voir dire.  And I mean some of these people may give answers that they are -- they have experienced this or that.

The fact that someone had an experience, I mean let's say, for example, a prospective juror says -- I will ask them, has anyone had a personal experience with ICE.  And that I may ask, has anyone -- has someone in their family had an experience with ICE, or I may ask with immigration.  And they may give answers that would satisfy a for cause channel -- a challenge.  Or they may say I had this experience and, you know, I can still be fair and impartial.

But we'll have to see.  And if we run into that sort of thing I usually probe to make sure that they're giving a complete answer and a genuine answer.  Although there's not

much I can do if they don't give a genuine answer.

Okay, go ahead, you get the jury, yeah.

MS. BORDER:  Your Honor, if I may just raise one issue before we begin?  I believe the parties have agreed to excuse for cause one juror.  And I'm not quite sure --

THE COURT:  We did, 45.

MS. BORDER:  Oh, okay.  Thank you, Your Honor.

MS. CHOI:  And Your Honor, will the Court be providing for attorneys eyes only a list of the --

THE COURT:  No.

MS. CHOI:  -- jury pool?

THE COURT:  No.

MS. CHOI:  May I make a record, Your Honor, on that? First, Your Honor, I understand the Court intends to proceed with an anonymous jury where we would only be referencing the jurors by numbers as opposed to first and last -- as opposed to knowing their first and last names.

(Pause)

THE COURT:  Because I'm proceeding by numbers you won't know names.  And names could be relevant.

MS. CHOI:  Yes, to constitutional issues we might raise, Your Honor.

THE COURT:  Yes, that's a valid point.  I mean is there any concern about having the jury selection by names?  I don't see any problem.  Maybe we should.  I didn't think of

what you said, so I think that's a valid comment.

MS. CHOI:  That would be our request.

THE COURT:  Yeah, all right, then I'll do it that way.

MS. CHOI:  Thank you.  And I have just one more question, if I may.  We, the Defense for Ashleigh Brown, we have our investigator whose our case agent, present.  He's not at the table because there isn't room, but he is here.  And we would request that he be allowed to sit in the courtroom throughout the proceedings.

THE COURT:  Yes.

MS. CHOI:  Thank you.

THE COURT:  All right, look I spent hours and hours with you trying to resolve things.  I was told many years ago, when I became a judge by a judge who was much smarter than I am, to never start a trial with loose ends that are known, because every trial there are unknown loose ends.  So not wanting to sound like that former Secretary of Defense Rumsfeld, if you can remember, he was famous for knowns and unknowns and knowns of knowns and unknowns knowns.  But that's probably before your time.

So I think the trial should proceed.  If my rulings are incorrect and if there is a verdict you can appeal.  So it is what it is, as people call it.

**(Proceeding adjourned for jury selection at 10:55 a.m.)**

24

**(Proceeding reconvened after jury selection at 3:09 p.m.)**

**THE COURT:** Would the jury please stand to be sworn.

**THE CLERK:** Please raise your right hand. Your response will be "I do"..

**(Jurors sworn)**

**THE CLERK:** Please be seated.

**THE COURT:** We'll now begin the trial. For those who haven't been jurors before, the procedure is each side gets an opportunity to make an opening statement. It's not an opening argument. It's a statement. That is, they're allowed to essentially preview what they expect the evidence to be. They're not to argue it. And because at this point, there is no evidence. It's just a means of acquainting you with what they expect to happen so you can better follow it when it is introduced. Then the Government will call witnesses. There's a lot of movement here. Okay. Let's wait till all the movement settles down.

Okay. The Government will call witnesses. They'll be cross-examined by the defense. They'll introduce exhibits. The defendant may or may not produce any evidence. They're not required to. But if they do produce evidence, the Government has a right to cross-examine their witnesses. When all the evidence is complete, I will instruct you on the law which applies to the case. Then I'll give each side an opportunity to deliver the final argument.

25

At that point, they can argue what they think the reasonable inferences are from the evidence.  But ultimately, it's your call.  I mean, you should listen to what the lawyers say, but it can be helpful.  But ultimately, it's how you see it.  But in doing so, you must follow the law as I give it to you, whether you agree with it or not.

Having said that, I'll first call upon the Government to give their opening statement.

**OPENING STATEMENT ON BEHALF OF THE GOVERNMENT**

**BY MS. BORDER:**  Thank you, Your Honor.  This is a case about three people who crossed a line and how crossing that line impacted one family.  The evidence will show that on August 28th of last year, the defendants in this case waited outside a federal building right nearby.  They followed an ICE officer for almost 30 minutes to his home.  They filmed it.  And they shared it on social media to hundreds, if not thousands, of people who were following along live.

When at his home, they broadcasted that an ICE officer lived in the neighborhood, but they didn't just film the ICE officer.  They also filmed his wife and kids, and they screamed at them.  And they sent an address and told strangers on the internet to come down and join them.

Three months later, the family moved homes, 45 minutes away.  For their actions, defendants have been charged with two crimes.  The first is conspiracy to knowingly make

restricted personal information about the ICE officer publicly available.  In other words, to dox him.  The second charge is for stalking.

On August 28th, 2025, Rogelio Reyes Huitzilin left a federal building in his government car around lunchtime.  You'll learn that when Mr. Reyes left his workplace, he was targeted by the defendants because he works for ICE.  Defendants were waiting outside for him.  And he didn't know it, but they began to follow him.  You'll learn that they followed him for almost 30 minutes as he drove to his home in Baldwin Park, and they were careful to keep their distance.

And you won't just hear testimony about this pursuit.  You'll actually see it for yourselves.  And that's because they live-streamed it on the internet, all of their actions following Mr. Reyes' home.  Defendants speculated that Mr. Reyes could be heading to an ICE enforcement action.  But the evidence will show the reality, which is that Mr. Reyes was heading home alone to his wife and children to spend some family time.

After defendants followed Mr. Reyes home, they hid in a neighbor's driveway about 100 feet away.  The evidence will show that the defendants saw Mr. Reyes leave his government vehicle.  He was not in uniform.  He was not on duty.  He was with his wife, Jessica Herrera, and his two young sons, a 7-

27

year-old and a 3-year-old boy who's been diagnosed with autism.

**MR. BERNSTEIN:**  Objection, Your Honor.

**THE COURT:**  I mean --

**MS. BORDER:**  May I respond, Your Honor?

**THE COURT:**  Not now.  Oh, go ahead.

**MS. BORDER:**  I believe Your Honor had ruled on this.

**THE COURT:**  I didn't rule on the autism aspect, but keep going.

**MS. BORDER:**  The defendants saw Mr. Reyes get into his personal vehicle with his family, but the defendants didn't leave.  Instead, the defendants got out of their car.  All three were wearing black, and all three were wearing masks.  Defendants Raygoza and Samane surrounded Mr. Reyes, Ms. Herrera, and their children and began to scream.  They called Mr. Reyes a piece of shit and a race traitor, and Defendant Ray Goza threatened to pop him.  And they taunted Ms. Herrera, calling her a white bitch, even after she pleaded with them to stop recording because her kids were in the car.

You will hear that Defendant Samane circled the car where the kids were sitting and hit the window.  The evidence will show that the three-year-old began rocking back and forth, upset by defendants' yelling and loud noises, but the defendants didn't stop.  You will learn that defendants' actions caused both Ms. Herrera and a concerned neighbor to call 911.  The cops arrived, but the defendants didn't stop.

28

You'll learn that Defendant Brown live-streamed the address where she was standing multiple times and told strangers on the Internet to come on down.  And a few minutes later, several other individuals did in fact come on down to the Baldwin Park residential neighborhood.  The people who showed up outside Mr. Reyes' home in response to this live stream were also wearing masks, and you'll hear that they elevated the temperature in the room even more.  One of them even yelled, let's dox them.

The evidence will show that Mr. Reyes and his family feared for their lives on August 28th, but the damage lasted longer than just that one day.  They wondered if more people would turn up outside their home and what harm these people might inflict on them and their family.  And because of their lasting fear, about three months later, the family moved almost 45 minutes away from their neighborhood in Baldwin Park. Mr. Reyes' daughters now have to commute over an hour each way to get to school, whereas before August 28th, they just walked down the road.  And because of what defendants did, one of Mr. Reyes' sons chose to leave high school all together and be homeschooled instead.  And the three-year-old lost social and health care benefits that were tied to his former city.

In short, the evidence will show just how much defendants' actions that day on August 28th impacted Mr. Reyes and his family.  And at the end of this case, the Government

29

will ask you to return the only verdict that is consistent with the evidence and that is the verdict of guilty on both counts.

THE COURT:  Do defendants wish to make opening statements?

**OPENING STATEMENT ON BEHALF OF CYNTHIA RAYGOZA**

BY MR. NICOLAYSEN:  Yes, Your Honor.  Thank you.

Good morning to all of you.  My name is Greg Nicolaysen.  I represent Cynthia Raygosa -- Your Honor, may she just stand very briefly and acknowledge the jury?

THE COURT:  Yes.

MR. NICOLAYSEN:  Just stand for a moment, Ms. Raygoza.  Thank you.

The Court has told you that an indictment is not evidence of anything and likewise an opening statement is not evidence of anything.  It's nothing more than the statement of an expectation.  That's all it is.  The prosecutor has given you her expectation of what she believes the evidence will show and now I will give you mine.

We have very different views on how the evidence will present itself.  Much of it will be in the form of videos, which is great because you will be in a position to judge for yourself.  There will be testimony I expect from the agent and his wife.  They will be the primary witnesses but the dynamics of what this case is really all about will be depicted visually for you on video.

30

A key point to keep in mind in this case, particularly because the second of the two charges is stalking, is that everything involved occurred on a single day, and that day is August 28th, 2025.  And not just on a single day, but literally within two hours of that day.

Now at that time, my client Cynthia Raygoza was associated with an ICE protest group and there are a number of them we know, called ICE out of LA.  And you will learn in this trial that that group, ICE out of LA, had an Instagram account. The evidence in this case will involve live streaming of cell phone video, including video that Ms. Raygoza herself created to the ICE out of LA Instagram account.

So, here is how the events of August 28, 2025 began. At about 12:25 in the afternoon, I expect the agent to acknowledge this, the agent was leaving the downtown area right around here Alameda, where the freeway is.  There's a side street known as Commercial and that street runs parallel to where the 101 and the 5 freeway interact.  Ms. Raygoza and these other two defendants in this case, Ms. Brown and Ms. Samane, they were together in one vehicle and they noticed a vehicle that looked like a government vehicle that had no rear license plate and they thought, that's indicative.  We think that it's an ICE vehicle, and they turned out to be right.

Now, they had no idea who was driving that vehicle,

31

but they thought, you know what, whoever's driving that vehicle might be an ICE agent, and they turned out to be right. He might be going to an ICE raid. Let's follow the vehicle.

They were not following him personally. They had no idea where he was going, but they followed the vehicle and you will see video of part of the drive on the freeway from their vantage point from inside their car livestreaming to the ICE out of LA Instagram account with the agent's vehicle in front of them on the freeway.

Now, the agent continued driving, turns on the 10 freeway east, and ends up getting off at Baldwin Park. And they are livestreaming this entire drive. The agent eventually, within 20 minutes or so from leaving downtown, arrives on a residential street in Baldwin Park And you'll learn that that's a street where he lives. And the name of that street is Chelsfield. It's a street made up of single-family residences.

Now, the vehicle that they followed, the agent's vehicle, parks on the street, not in his driveway, on the street alongside the curb, where any member of the public can park and with regard to Count 1, it's important to point out that the evidence will show you that the defendants had no idea whether any of those houses was his house. Maybe there was a house that was his. They didn't know if he parked in front of his house, but they parked on the street and you'll

32

see on the video the address where they parked which was 12837 and you'll see references to the house right next to it, which is 12833 Chelsfield, and that's where Ms. Raygoza and the others who were together in their car, parked their car, and they were continuing to livestream.

The defendants did livestream the 12837 address where they were parked and they allowed followers of that Instagram account of ICE out of LA to know that they were parked there. The evidence in this case will make it very clear that neither Ms. Raygoza or the others here ever livestreamed the agent's residence or that they even knew which house he lived in. And what you'll see from this -- from the videos is that publicizing the agent's residence was not why they were there. They were there to protest, and protest they did.

And you'll see my client, Ms. Raygoza, both in English and in Spanish and you'll have some translations, use some rather harsh language criticizing ICE.  She's loud.  She's angry.  She's an ICE protester.  You'll see that on the videos. It's very clear.  And to imitate ICE, you'll see her on the videos with a hood with a mask imitating ICE, and you'll hear remarks and some of them the prosecutor has already commented on, and as she's making these statements protesting ICE, it'll -- it is being livestreamed to the Instagram account.

And the comment, let's dox them, whoever made that

was not made by anyone here.  That was made by some other member of the crowd and you will learn in this trial that that comment was directed actually at the Baldwin Park Police who came after a certain amount of time.  It was not directed at the agent or his wife.

There was nothing verbal.  Excuse me.  I meant to say there was nothing thrown at the agent or his wife.  There was no physical violence.  This case does not involve that.  This case did not involve personal injury to anybody.  This case does not involve property damage.

What you will see is a lot of harsh verbal language directed at the agent and so for purposes of Count 1, we believe the evidence will be very clear that the Government simply cannot meet its burden.

Now turning to the stalking charge, which we'll present you as jurors with a very different perspective of the very same set of events.  You're looking at the exact same conduct, but at the end of the trial, the Court will give you instructions in this opening statement.  We don't talk about the law.  I won't argue the instructions.  They're not yet before you.  But you will be asked to look at that same evidence and apply it to criteria that are very different from the criteria for Count 1, which is as we say the doxing count. And in the context of Count 2, among the things the evidence will show you is number one, duration, in regard to stalking.

34

As I said before, you're going to learn that the events of this case are comprised of a single continuous episode lasting between an hour-and-a-half and two hours.  Keeping in mind stalking and remembering you will be instructed on what that means legally, the evidence in this case will not show any repetition, no pattern.  You're not dealing with a case where the defendants came before August 28th or after.

THE COURT:  You're starting to argue.

MR. NICOLAYSEN:  Okay, the evidence will show it all happened on one day.

You've heard the prosecutor mention to you that from their perspective, the evidence will show that the agent and his wife suffered some degree of emotional distress and we believe the evidence will show something very different.  And so among the things that you will see on the video is that when the agent arrived on Chelsfield Street and parked the government vehicle alongside the curb, he got out and went into the family vehicle where his wife and two children were.  And I think you'll hear testimony that they had plans to go somewhere, and they were certainly free to go.  The evidence will show that the street was not blocked.  They were in no way impeded.  They could have gone.

But what you're going to see on the videos is that instead of leaving the area, the agent gets out of the family vehicle.  They didn't drive away and what happens next is

you're going see the agent going on the offensive, confronting Cynthia Raygoza. And he does so with his cellphone right up here, right in front of his face. He's filming her. And she's filming him.

And the exhibits in this trial will include both her cell phone video footage and his cell phone video footage of the exact same thing, the confrontation. And I ask you as jurors to look very closely at that and ask yourself as you see his behavior, as you listen to his comments on the video, I ask you to think, is this someone who is suffering emotional distress or is this agent someone who appears quite comfortable in his own skin confronting Ms. Raygoza and now wants to be perceived as a victim? That's a question I ask you to consider as you're reviewing the evidence. I believe the evidence will show you the latter.

One more example of what the evidence will show that challenges stalking would be on video, the agent's wife, who is in the driver's seat of their car, slowly backing it backwards towards one of the other defendants here, and most importantly, backing it up so that the family vehicle blocks the vehicle driven by the defendants who wanted to leave, but were now prevented from doing so by the agent's and his wife's actions.

So this is sort of a highlight, an overview that allows you to see as we begin the trial that the defense and

36

the prosecution look at the same body of evidence from very different perspectives, and I look forward to addressing you again at the end of the trial, which will not be long from now, and at that time, I will discuss the evidence specifically in relation to the jury instructions that give you the elements of the offense.  I ask you to keep an open mind as you observe both the testimony and the videos.  Adding closing argument, I will be asking you to give the only just verdict, which is not guilty for Ms. Raygoza, and I thank you all for your jury service.

**THE COURT:**  Do the other defendants wish to make opening statements?

**MS. COIT:**  Yes, Your Honor.

**THE COURT:**  Go ahead.

**OPENING STATEMENT ON BEHALF OF ASHLEIGH BROWN**

**BY MS. COIT:**  Good afternoon.  My name is Shannon Coit, and I represent Ashleigh Brown, who is also one of the three women in front of you today.  Not one of these three women said his address.  Not Cynthia Raygoza, not Sandra Samane, and not Ashleigh Brown.  Not one of them said his address because that's not why they were there.

You will hear that they were there to document an immigration raid.  You will hear that they're three women, they're mothers, and they care deeply about their community, and the evidence will show that in the middle of the day of

August 28th, 2025, these three women thought they were going to film, document an immigration raid.  You will hear that from what they said.  You will see what they saw, and that's because it's all on tape, because they were there to film.

They didn't cyberstalk anybody, they never said his address, and there's no plan to do either of those things. Ashleigh Brown is not guilty.

Now, you'll hear about Ms. Brown during this trial. You will hear from witnesses that she's a mother, that she's the wife of a U.S. combat veteran, and that she's a Native American woman who was in the foster care system here in L.A. with immigrant parents.  You will hear about her activism and dedication to documenting immigration enforcement, and to the resistance to that enforcement in Los Angeles.  You will hear about her involvement in rapid response networks.  Rapid response is a community movement that's dedicated to filming, documenting immigration enforcement.  And you'll hear that the events in this case started with rapid response.  That's because the evidence will show that on August 28th, these three women believed they were following an ICE vehicle on its way to an immigration raid.  That's the ICE vehicle that belongs to Officer Huitzilin Reyes.  He's the ICE agent in this case.  And you'll hear about the ICE vehicle.  It's an SUV.  It has blacked out windows from front to back, and those back windows, you cannot see into them.  It has no license plate.

38

And when Ms. Brown is first following that ICE vehicle, it's coming out from where ICE vehicles lead to go on raids every day.

Now, as you've heard, you will see the women filming the ICE vehicle on their way. On that film, you will hear Ms. Brown say, that's them. No plates. That's ICE. No plates. And the video caption is, rapid response, be alert. Rapid response. They think they're going to an ICE raid. They don't realize there's only one agent in the car, heading to his house. Again, the evidence will show the ICE vehicle is leaving from where ICE vehicles leave every day. The windows are tinted black. You can't see into them, and it's the middle of the day, 12:30 p.m. That's when ICE agents are usually working.

And in fact, you'll learn that Officer Reyes left work early that day. You'll hear that he drives to his house, parks his ICE vehicle on the street, and immediately gets into another SUV, and then starts to drive down the block, away from his house. That SUV, which you learn is driven by Officer Reyes' wife, then stops at where Ms. Brown is. She's parked in a neighbor's driveway a few houses down. Now, you'll hear that the women do not understand what's going on when Officer Reyes is switching between the two cars. You'll hear, or you'll see a video, how Officer Reyes, when they stop the car, his wife gets out of the car and goes up to film Ms. Brown. Ms. Brown

39

does not know that this woman is Officer Reyes' wife.

You will hear Ms. Brown tell the women, that woman, we're following ICE. They're on the block right there. ICE. ICE is here. At some point, Ms. Brown realizes this is Officer Reyes and his wife, and now everyone is filming everyone. Nothing is missed. It's all on tape.

And you will see that Officer Reyes and his wife get within inches of the women, and that they stay there. And then eventually, they go back to their car. And you will hear that whole time that they're within inches of the women, Officer Reyes has his service weapon, a gun. The women, they only have their phones.

So you will see that Officer Reyes and his wife, once they get back in the car, they don't leave. They stay there. The wife, she calls 911. She reports a few things. One, that her husband works for Homeland Security, which is true. She also says that she was trying to leave, and that people had surrounded her car, that they're stopping her from moving her car, and that they're grabbing at their waistbands. None of that is true. Remember, this is all recorded, and the video captures what happened.

And the videos will show what happens after that 911 call is made. The agent's wife moves her SUV back to block in Ms. Brown's car from that driveway where she is. And then Officer Reyes gets out of the SUV, walks up to Ms. Brown's car,

40

and stands directly in front of it.  She can't get out.  She can't leave.  And that's when the Baldwin Park Police show up.  There are multiple officers, and they come out with their guns out, all because of that 911 call.

Now, you will see after they arrive, the Baldwin Park Police detain Ms. Brown.  She is not free to go.  But you will see when she's detained, she's not in handcuffs or in a cop car.  They allow her just to stand on the public street.  She's still filming.  She's still live streaming.  And you will hear her tell the Baldwin Park Police this.  And the police never tell her to stop recording them.  They never tell her to put her phone down, to stop recording, or to stop streaming.  They also allow her to keep her mask on.

Now, the evidence will show it's when Ms. Brown is filling the Baldwin Park Police that she says the address of where she's standing.  It's the address of where she is being detained.  She wants people to come down and film what's happening.  She wants them to do the very thing that she was trying to do, document law enforcement.  And the evidence will show that she's not at the ICE agent's address, and she knows that.

You will see that video of this moment, because it's captured on her livestream, and it's titled Baldwin PD Targets Protester.  She wants other people to come down and film her detention.  That's what rapid response does.  They film law

41

enforcement, and the law enforcement that she wants filmed is Baldwin Park PD.  Again, not one of them say Officer Reyes's address.  And the evidence will show that there was no plan to get his address.  This wasn't a plan interrupted.  That wasn't why they were there, because the evidence will show that they were there to document ICE, not to harass him, or scare him, or cyber stalk him.  They were there to film, and that's what they did.

So I'll end with this.  You will see that the women film when they follow the ICE vehicle.  They film when they're confronted by Officer Reyes and his wife.  They film when they're trying to leave.  They film while they get detained.  And they film when they're trying to get help, because that's what they were there to do, to film, because that's what rapid response does, because when you film, you capture the truth.  And the truth is, Ms. Brown is not guilty.

THE COURT:  Does the remaining defendant wish to make opening statement?

**OPENING STATEMENT ON BEHALF OF SANDRA SAMANE**

MR. BERNSTEIN:  Thank you, Your Honor.  Good afternoon, everyone.  My name is Robert Bernstein, and I represent Sandra Samane, who's sitting here.  And let me just make it clear, her name is not defendant.  Her name is Sandra Samane.  She has a name.  Let's use it.

On the day that this happened, you're going to hear

42

that my client, Sandra, and these two other young women were in downtown.

THE COURT:  Use their surname or complete name.

MR. BERNSTEIN:  Okay.  Ms. Brown and Ms. Raygoza were downtown, exercising their First Amendment right, protesting immigration activity.  There was no crime occurring.  At some point, they were going to leave downtown.  My client, Ms. Samane, got in a car driven by Ms. Brown.  They were going home.  On their way home, as you heard, they saw an ICE vehicle leaving the federal building and getting on the freeway.  They was able to identify it as a government vehicle, as you've already heard, and the videos will show.  No license plates, blacked out windows.  They knew it was a government vehicle leaving the ICE building.

Again, as you've already heard, and the video will show, they thought they were following this ICE vehicle to an ICE raid.  They had no idea who was in the vehicle.  They did not know Agent Reyes.  They did not know how many people were in the vehicle.  They ultimately ended up in this residential area in Baldwin Park.  At that point, they did not know that the agent lived there.  They did not know that it was his residence.  All they knew is they thought they were going to an ICE raid.

They see ICE Agent Reyes park his vehicle on the side of the road, get out of the vehicle, get into a vehicle that

EXCEPTIONAL REPORTING SERVICES, INC

turned out to be his own SUV, a black SUV that they later found out was being driven by his wife.  But here's the interesting thing.  He gets in the vehicle with his wife and his family, but he doesn't drive away.  Instead, Officer Reyes and his wife then are the ones that get out of their vehicle and confront first Ms. Raygoza and Ms. Brown, and then later Ms. Samane. They get out with their phones.  They get out with their phones, get in their faces, and start filming them.

Now, the government has told you that these people were terrified and afraid.  They didn't drive away.  They weren't in fear.  They got out and confronted these women.

You also heard, the government told you that my client, Ms. Samane, made a statement.  They said she called him a piece of shit and banged on the car window.  You're going to see the video.  That's not what happened here.  You're going to see, after Agent Reyes' wife got back in the car, she started backing the vehicle up to block in Ms. Brown's car.  While she was doing that, Ms. Samane was in the middle of the street.  She backed the car right up into my client.  Ms. Samane said, you hit me, you piece of shit.  It wasn't meant as a threat.  It wasn't anything.  She was angry because Agent Reyes' wife backed her vehicle directly into her.

As you've heard, the first charge here is that all three of these women conspired to disclose Agent Reyes' home address.  There's no evidence to support that.  You will see

44

the video.  After they arrived on the situation, as you heard already, at some point, the police detained Ms. Brown.  Ms. Brown, who was live streaming, stayed at where she was, again, to say she was being detained at this address.  My client, Ms. Samane, had no idea that Ms. Brown was going to state where she was.  But there was nothing wrong with Ms. Brown stating that, but there was no agreement between any of these three women to give out a home address.  You also hear that Ms. Samane was very calm in dealing with this agent.  She did not intimidate him.  She did not harass him.  She did not threaten him in any way.  Also, she never live streamed anything.  She does not run any of these Instagram accounts.  She merely was witnessing.  That's all she was doing.  She was bearing witness to what she thought was an ICE raid.

She never sent messages.  She never livestreamed anything herself.  She never conspired with anybody, and she never stalked anybody.  She never threatened.  She never intimidated, and she never harassed.

And you're not just going to have to believe the witnesses and the video.  You're going to hear that when Baldwin Park PD arrived on the scene to investigate this case, that they reached a conclusion here.  You're going to hear that Officer Moreno, one of the investigating officers that arrived on the situation, concluded the cause of this incident was Agent Reyes and his wife getting out of their car and

45

confronting the women, not the way the government told you it happened.  If Officer Reyes and his wife had simply just driven away, not confronted the women, and not blocked their car in, none of this would have occurred.  That is the police officers that are going to tell you that.

The evidence in this case is not that complicated. It's very unusual that most of it is caught on video, so you will be able to see it yourself.  You will see that my client, Ms. Samane, never entered into any type of criminal conspiracy to dox this agent, and she never stalked or harassed anybody. The evidence in this case is overwhelmingly simple and clear, and I'm going to ask you to return the only verdict you can, which is not guilty.  Thank you for your time.

THE COURT:  Will the Government call its first witness?

MR. MPARE:  Government calls Special Agent Robert Kurtz.

THE CLERK:  Please raise your right hand.  Your response will be, I do.

ROBERT KURTZ, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Please take the stand.  Please state and spell your name for the record.

THE WITNESS:  My name is Robert Kurtz.  That is R-O-B-E-R-T, K-U-R-T-Z.

//

Kurtz - Direct / By Mr. Mpare                          46

**DIRECT EXAMINATION**

**BY MR. MPARE:**

Q    Good afternoon, Agent Kurtz.  What's your current job?

A    I am a Homeland Security special agent.

Q    Is that also referred to as HSI?

A    That is correct.

Q    And how long have you been a Special Agent with HSI?

A    I entered onto duty in 2019, and I've been an agent after training for multiple years.

Q    What'd you do before being a special agent?

A    I was private security.

Q    What are your responsibilities as a special agent?

A    My responsibilities are to take a lead or a case that I've been given, and try to extract any and all facts that pertain to that case.

Q    Are you assigned to any particular group within HSI?

A    Yes, I'm assigned to the Cyber Financial Group.

Q    And what duties do you have in that role?

A    So again, excuse me, I work many cases.  Typically, we focus on the cyber financial aspect, so that would be anything that is of digital nature and then we -- typically, we'll look into a financial burden whether that's cryptocurrency.  I specialize in that specifically actually or whether it's a banking related stuff like Cash App or traditional banking

Q    And what, if any, training have you undertaken to assist

EXCEPTIONAL REPORTING SERVICES, INC

Kurtz - Direct / By Mr. Mpare                    47

in your responsibilities on that cybercrime team?

A     So every HSI special agent goes through what is called a
flexi the federal law enforcement training center and everyone
has to graduate to be a special agent and then on top of that,
I've attended multiple trainings and obtained multiple
certifications in that realm of investigative work that I do.

Q     Roughly how many investigations have you been involved in?

A     I would say dozens.

Q     Did there come a time that you began an investigation into
potential criminal conduct by Ms. Samane, Raygoza, and Brown.

A     Yes.

Q     How did you become aware of this conduct?

A     We became aware when we got notice -- I can't remember if
it came from my group supervisor or how exactly it got to us
but we were given facts that an enforcement removal operations
deportation officer, whom everyone here knows as Mr. Reyes or
D.O. Reyes, we were told that he had been followed home and
that he had potentially been doxed, and his family --

          MR. NICOLAYSEN:  Your Honor, I'd move to strike and I
object.  Hearsay.

          THE COURT:  I mean, why he was told -- I mean, it's
just --

          MR. NICOLAYSEN:  Yeah, and irrelevant.

          THE COURT:  Well, that's a different objection.  I
mean, he began the investigation at the request of someone of a

Kurtz - Direct / By Mr. Mpare                    48

higher authority, correct?

          MR. MPARE:  Yes, Your Honor.

          THE COURT:  I mean is that -- is what you're asking

him necessary for him to give the next answer?

          MR. MPARE:  We can keep moving.

          THE COURT:  I mean -- all right.

BY MR. MPARE:

Q    So you mentioned a deportation officer, is that right?

A    Yes, sir.

Q    Who was that deportation officer?

A    Deportation Officer Reyes.

Q    And what exactly did you learn about what defendants did

with respect to that deportation officer?

A    We had learned --

          MS. CHOI:  Objection.  Hearsay.

          MR. NICOLAYSEN:  Joined, Your Honor.

          THE COURT:  What is it -- is there a reason that he

has to know what was told to him as the basis for getting him

involved or is that just background?

          MR. MPARE:  It's just background, Your Honor.

          THE COURT:  Then the objection is sustained.

BY MR. MPARE:

Q    During the course of your investigation, did you review

videos in this case?

A    Yes, many multiple videos.

EXCEPTIONAL REPORTING SERVICES, INC

Q    And we mentioned previously that part of your role in the cybercrime team is to conduct those investigations; is that right?

A    That's correct.

Q    How do you obtain videos during the course of your investigation?

A    There's a myriad of ways that we can obtain videos.  In this case, we obtained many of the videos via social media that were previously streamed and posted on various Instagram accounts and then there's other ways of obtaining media.  That would be via phones maybe, stuff like that.

Q    And you mentioned social media accounts.  What are those?

A    Social media accounts are accounts that people typically utilize.  It's somewhat of an online persona that they can go by a moniker, which would be like a username or just a particular name that you prefer to be called online, and you are able to interact with others online on various social media.  I know many people are familiar with Facebook or Instagram.  Those would be perfect examples.

Q    Was there a particular social media application in particular that you reviewed?

A    Instagram.

Q    And what did you learn about defendants' social media accounts on Instagram?

A    We had learned --

**MR. NICOLAYSEN:**  Your Honor, objection to defendants.

**MR. BERNSTEIN:**  I'm going to object to defendants. There needs to be specificity as to who he's regarding.

**THE COURT:**  Well, I mean --

**MR. NICOLAYSEN:**  Lack of foundation, Your Honor.

**THE COURT:**  -- if you're referring to the defendants, are you referring to each of them or are you referring to all of them or just some of them?

**THE WITNESS:**  I am referring to some of them.

**THE COURT:**  Then be specific.

**THE WITNESS:**  Understood.  We observed three Instagram accounts, that would be ICE out of LA, Corn Maiden Designs, both of which are operated by Brown and also Defend Meso American culture which was Raygoza's account.

**BY MS. MPARE:**

Q    And how do you know who operated these accounts?

A    Through various investigative activities that we were able to conduct.

Q    So you mentioned Ms. Brown operated two of these social media handles, is that right?

A    That's correct.

Q    And what were the names of those again?

A    Brown's accounts were ICE Out of LA and then Corn Maiden Designs.

Q    And in your -- did you review the content of these

Kurtz - Direct / By Mr. Mpare                          51

accounts during your investigation?

A    I did.

Q    And what generally were you able to learn about the
content of Ms. Brown's accounts?

A    That the content of her accounts centered primarily around
protest related activities anti-ICE sentiments and various
topics like indigenous movements and such.

Q    What about Defendant Raygoza's social media account?  What
was that called?

A    Defendant Raygoza's account is Defend Mesoamerican
Culture --

        THE COURT:  What did you say?  What did you say?

        THE WITNESS:  Defend Mesoamerican Culture.  It's
written as one word.  So the content of her account would be
much more of the same as Brown's accounts, but it does have a
lot more art on it, which could be derived from her directly or
someone else.

        MR. NICOLAYSEN:  Objection.  Move to strike.
Speculation, lack of foundation, and the characterization.

        THE COURT:  Overruled.

BY MR. MPARE:

Q    In your review of these social media accounts, were you
able to learn what Defendants Brown and Raygoza looked like?

A    Yes.

Q    How are you able to do that?

Kurtz - Direct / By Mr. Mpare                                    52

A    We were able to confirm Brown's accounts very very easily. She posted herself with both her face with mask and without mask.  Raygoza was a little bit different, but we still get her information and then further corroborate it.  For example, the Baldwin Park police report assisted in that information because we knew the three defendants who are here today that were listed on the Baldwin Park police report.

Q    And what about Defendant Samane, what did you do to identify her in relation to these social media accounts?

A    In relation to the social media accounts, I know that she appeared on several of the videos and --

MR. BERNSTEIN:  Objection.  Non-responsive.

THE COURT:  Overruled.

THE WITNESS:  I know that she appeared on several of the videos that were posted on the accounts and again, I'm going to reference the Baldwin Park police report.  We were able to ascertain her identity and then match up identifiers for them.

BY MR. MPARE:

Q    So essentially you viewed social media content both from Defendants Brown and Raygoza, and then also that contained Defendant Samane as well; is that correct?

A    That is correct.

Q    And what did you learn about defendants and their appearances based on the review of that content?

EXCEPTIONAL REPORTING SERVICES, INC

A    Based on the content of those videos, they were all wearing black.  Defendant Raygoza was wearing all black. Defendant Samane was wearing black shirt and gray pants, and Defendant Brown was wearing black as well.  All of them had either a mask or a full head covering.

Q    How were you able to identify defendants if they're wearing masks?

A    Again, the Baldwin Park police report really assisted with some of that information, and then further investigative work of looking at the social media accounts helped corroborate everything.

Q    So do you recognize defendants in court today?

A    I do.

Q    Could you describe defendants each by name and an article of clothing they're wearing?

        MR. NICOLAYSEN:  Your Honor, I will stipulate the agent can identify Cynthia Raygoza to save some time.

        MR. BERNSTEIN:  I will do the same, Your Honor.

        MS. COIT:  Same, Your Honor.

        THE COURT:  Okay, the witness has identified the defendants.

BY MR. MPARE:

Q    So we're talking about certain content that you reviewed on social media from these accounts.  Did you learn anything about this -- these accounts that they were involved in

Kurtz - Direct / By Mr. Mpare                          54

particular activity on August 28th, 2025?

A     I did.

Q     And what did you learn?

A     I learned that they had followed a suspected ICE vehicle at that time to -- from MDC, which is the Metropolitan Detention Center.  That's our federal building downtown.  It's right next to Roy Ball, it's a big complex basically.

          MR. NICOLAYSEN:  Your Honor, I object and move to strike.  Lack of foundation of personal knowledge, Your Honor.

          THE COURT:  I mean, he's really discussing what the videos show, correct?

          MR. MPARE:  He's discussing his review of the videos during the investigation.

          THE COURT:  But I mean, why is his review relevant unless it's foundational for something else?  If he's just taking us through what his investigation is.

          MR. MPARE:  To establish the foundation of the videos, which would be admitted.

          THE COURT:  But there is a foundation for the videos.  They're all authentic and admitted.

          MR. MPARE:  We haven't --

          THE COURT:  They're admissible, are they not?  Anyone object?

          MR. NICOLAYSEN:  No objection, Your Honor.

          MR. BERNSTEIN:  We all agree to the authentication.

THE COURT:  Any objection?

MS. CHOI:  No objection to the authentication.

THE COURT:  All right, then the videos are admitted.

(Exhibit Number 8 received in evidence)

MR. MPARE:  Okay, I want to play for the jury what's now been admitted as Exhibit 8, and that's clip 8.1.

MR. NICOLAYSEN:  Can you say the exhibit number again, please?

MR. MPARE:  Exhibit 8.

MR. NICOLAYSEN:  8, sure.

THE WITNESS:  Will I see that here on the screen?

(Pause)

(Video played at 4:01 p.m.)

BY MR. MPARE:

Q    Is that from one of the defendant's social media accounts?

A    That's correct.  That's from Brown's Ice Out of LA account.

Q    And they seem to be driving in this video; is that correct?

A    That's correct.

Q    And do you know where they're driving?

A    They're --

MR. BERNSTEIN:  Objection.  Lack of foundation.

THE COURT:  Sustained.

Q    Do you see a car in this video?

Kurtz - Direct / By Mr. Mpare                          56

A     Yes.

        MR. BERNSTEIN:  Objection.  The video speaks for

itself.

        THE COURT:  It does, unless he has percipient

knowledge of it.

        MR. MPARE:  He independently reviewed.

        THE COURT:  In other words, will he say that he

retraced the steps in the video?

        MR. MPARE:  Yes, Your Honor.

        THE COURT:  Well, ask him that.

BY MR. MPARE:

Q     So there's a car in this video.  You see that car, right?

A     I do.

Q     And besides this video, were you able to identify that

car?

A     Yes.

Q     How were you able to do that?

A     Through further videos afterwards, as well as images of

D.O. Reyes's vehicle.  We also ended up doing a vehicle

inspection.  So I know that to be the blue Ford Explorer.

Q     Whose car is that?

A     D.O. Reyes.

Q     That's the officer in this case?

A     That's correct.

Q     And what did you learn about the lack of license plate on

that car?

A    I learned that the lack of license plate, that it can be common for law enforcement agents to utilize no plates in an effort to try and remain undetected.  And also, by a -- what's the word I'm looking for?  It's used as a manner to try and obfuscate themselves at times, because nowadays there are -- earlier we heard things like such as a rapid response group.  They also many times have --

MR. BERNSTEIN:  Objection, Your Honor.  Lack of foundation.  And this is a narrative.

THE COURT:  It is a narrative.  I mean --

MR. MPARE:  I can ask another question.

THE COURT:  I don't -- I mean, let me ask the defendants and you don't have to give me any answer, but is there going to be any dispute, and if there is, we'll surely hear it about whether this was the agent's car and whether the car that followed it was, I guess it was Raygoza's car; is that right?

MR. BERNSTEIN:  It's Brown's, I believe.

THE COURT:  Brown's car.

MR. NICOLAYSEN:  And they were all together.

THE COURT:  Is there any dispute about that?

MR. BERNSTEIN:  No dispute at all, Your Honor.

THE COURT:  And is there any dispute that they traveled from the MDC downtown to this location in Baldwin

Kurtz - Direct / By Mr. Mpare                    58

Park?

        MR. NICOLAYSEN:  No, Your Honor.

        MR. BERNSTEIN:  No dispute.

        THE COURT:  And that what is said on the exhibit is going to be stipulated as to which defendant said what or is that not?

        MR. BERNSTEIN:  That I don't believe we've been able to establish.

        THE COURT:  I see.  So will he be helpful in that regard?

        MR. MPARE:  Yes, Your Honor.

        THE COURT:  You'll have to lay a foundation as to why he can't distinguish one voice from another.

        MR. MPARE:  Understood, Your Honor.

BY MR. MPARE:

Q    In your review of these various social media accounts we talked about earlier, you said you watched videos; is that right?

A    That's correct.

Q    And what about -- what if anything about Defendant Brown's voice did you learn in your review of her social media accounts?

A    I was able to learn her voice so I can identify it.  Is that what you're asking?

Q    You watched videos of her?

A     That's correct.  I watched many videos of her.

Q     Did you watch videos including her face?

A     Yes.

Q     And in those videos, including her face, was she speaking?

A     Yes.

Q     And in those videos, which include her face, you saw what she was saying and understood it, correct?

A     That's correct.

Q     And based on all that review, you were able to identify her voice; is that right?

A     That's correct.

Q     What about defendant Samane, or Raygoza, what were you able to do to ascertain her voice?

A     I was able to recognize her voice based on the videos that we were able to ascertain as well because, again, we were -- we identified them independent of the voices, utilizing them --

        MR. BERNSTEIN:  Actually, Your Honor, this is going outside the scope of the question.

        MR. NICOLAYSEN:  Calls for an opinion that lacks proper foundation.

        THE COURT:  Objection is overruled.  He's laying a foundation for why he can identify the voices.  He can answer.

        THE WITNESS:  So I was able to identify the individuals, the defendants, independently, for example, using that Baldwin Park police report.  And when I was able to do

that, I was also able to hear different voices in the videos of the Baldwin Park incident. I'm going to refer to all of them as the total incident, I guess. And I was able to ascertain each voice from each person, that being Samane's voice, Raygoza's voice, and Brown's voice.

**BY MR. MPARE:**

Q   So it's safe to say in this video you hear voices, is that right?

A   That's correct.

Q   And let's play that clip again.

    **(Video played at 4:07 p.m.)**

Q   Did you hear the voices in that video?

A   I do.

Q   Whose voices do you recognize in that video?

A   Clearly recognizable is both Brown's and Raygoza's voice and Samane's voice for a very brief period.

Q   And it's kind of interspersed, but at some point, you hear one of the individuals say, that's them, no plates. That's ICE, no plates; is that correct?

A   That is correct, and that is Defendant Brown.

Q   And you also hear kind of an exchange between Ms. Brown and one other individual about the direction of travel they're going in. Did you hear that?

A   That's correct.

Q   And who is that?

A     The other person other than Defendant Brown was Defendant Raygoza.

          MR. MPARE:  I want to play one more clip from this 8.2.

          UNIDENTIFIED SPEAKER:  What's the exhibit number?

          MR. MPARE:  It's still 8.  It's just a different clip.

     (Video played at 4:09 p.m.)

BY MR. MPARE:

Q     Do you hear Defendant Raygoza in that clip say, stay a good distance, a good distance?

A     That's correct.

Q     And also, that way they don't see us, did you hear that?

A     That's correct.

Q     Three car spaces so they don't see us, is that what you heard?

A     Yes, that's correct.

Q     And what do you take that to mean?

A     That means for them to remain undetected, they're trying to continue their surveillance of D.O. Reyes.

Q     And you also heard Defendant Brown in this clip, correct?

A     Yes.

Q     And she mentions, this is Baldwin Park, essentially.

A     Yes.

Q     And we mentioned earlier that you identified all of this

social media.  Were these actually posted online?

A    Yes, there was a variation of posts and live streaming.

Q    So other people on the internet can see these posts at the time they were active, is that right?

A    That's correct.

Q    And so, for example, if someone heard the video where Ms. Brown says, Baldwin Park, they would know where this car was going, is that correct?

A    Absolutely.

        MR. BERNSTEIN:  Objection.  Calls for speculation.

        THE COURT:  I mean, you can establish that other people heard what was said, but the objection is proper.  Sustained.

BY MR. MPARE

Q    So what, if anything, does it mean that this internet, this video was published on the internet?

        MR. BERNSTEIN:  Objection, vague.

        MR. NICOLAYSEN:  Joined.

        THE COURT:  I mean, what does it mean?  Calls for more than I think --

Q    Who could hear this video after watching it?

A    Anybody that listens to the post or watches the post.

Q    So at some point after this livestream, what happens?

A    After this livestream, they had made a few turns with the vehicle and ultimately ended up driving down the residential

street that we all know as Chelsfield to the D.O.'s residential area.

Q    And did you find video of --

MS. CHOI:  Objection.  Foundation.

THE COURT:  I mean, what -- is the foundation for what you just said, the video that we're watching or something else?  I'm asking you.

THE WITNESS:  I'm sorry, restate, sir.

THE COURT:  Is your answer based upon your review of the video or is it based upon something that you investigated independently?

THE WITNESS:  It is based on this video, as well as the other videos that are to follow.

THE COURT:  So, I mean, he's identified voices.  He's identified what the posts or streaming does.  Doesn't the video speak for itself?

MR. MPARE:  We're going to another video, Your Honor.

THE COURT:  Well, then let's get to it.

MR. MPARE:  We were with this question, Your Honor.

THE COURT:  Well, what is the question?

MR. MPARE:  Where were they going after this?

THE COURT:  But if he's just looking at the videos, unless he retraced all these steps, he's just narrating the video.  The jury can determine what was on the video.

THE COURT:  Understood, Your Honor.

Kurtz - Direct / By Mr. Mpare                    64

**BY MR. MPARE:**

Q    After this video, was there another video published?

A    Yes.

Q    And that's one of the other videos you reviewed in this case; is that correct?

A    That is correct.

     **MR. MPARE:**  All right.  Let's play Exhibit 6.1.

     **MR. NICOLAYSEN:**  Did you say 6.1?

     **MR. MPARE:**  Yeah.

     **(Video played at 4:13 p.m.)**

     **THE COURT:**  Oh, just one minute.  Members, stop.  I forgot to advise you that there's some Spanish language being spoken in some of these videos.  And it's not extensive, but there is some Spanish language.  Some of you may know the Spanish language.  Some of you may not.  But under the law, the only meaning to the words is the translation of those words by a court-certified translator.

     So those snippets of Spanish have been translated to English by a court-certified translator.  And the parties have agreed that it's a correct copy.  So for those -- excuse me, for those who know the Spanish language, whether you agree or disagree with the translation, that's the translation you must use and only that.  Do you have copies of the --

     **MR. MPARE:**  I believe your courtroom deputy has the copies.

Kurtz - Direct / By Mr. Mpare                    65

THE COURT:  Oh, okay.

(Pause)

MS. CHOI:  Your Honor, could we take a brief recess for a restroom break?  I don't know if other people feel that way.

THE COURT:  Well, it doesn't make a difference if other people need it.  If one person does, I think that's adequate.  Wouldn't you think?  Who asked?

MS. CHOI:  I did, Your Honor, and I was just raising it.  It's been a couple --

THE COURT:  Oh, well, I mean, that's enough.  We don't need a vote on that.  So let's take a bathroom break and come back.

THE CLERK:  All rise.

(Jurors exit courtroom)

(Recess taken at 4:17 p.m.; reconvened at 4:35 p.m.)

(Jurors enter courtroom)

THE CLERK:  Please be seated.

THE COURT:  Okay, we'll continue.  We'll go on till 5 o'clock and then we'll recess.  Go ahead.

DIRECT EXAMINATION (CONTINUED)

BY MR. MPARE:

Q    Before the break, we testified that defendants at this point followed Officer Reyes's car back to a neighborhood; is that right?

EXCEPTIONAL REPORTING SERVICES, INC

Kurtz - Direct / By Mr. Mpare                    66

A    That is correct.  Before you ask your question or we finish this, this laptop over here is playing sound through the headphones.  I don't know who put this here.

THE COURT:  I don't know.  I don't know about technical matters.

MR. BERNSTEIN:  I don't know whose laptop.

MR. MPARE:  That's not our laptop.

MR. BERNSTEIN:  Not my laptop.

THE WITNESS:  It was placed up here in the time that I was gone.  It sounds like it's just replaying a video over and over again.  I do not know.  I just wanted to draw attention to it.

BY MR. MPARE:

Q    Do you want me to re-ask the question?

A    Please do.

Q    Okay.  Before the break, we were discussing defendants at this point had followed Officer Reyes back to Baldwin Park; is that right?

A    That's correct.

Q    And we discussed that they were live streaming it, right?

A    That's correct.

Q    And we're about to play this video and I'll just play it for you now.

    (Counsel confers)

//

Kurtz - Direct / By Mr. Mpare                          67

**(Video played at 4:37 p.m.)**

**BY MR. MPARE:**

Q    So this is part of that separate live stream we just talked about, right?

A    That's correct.  This is another live stream.

Q    And whose voice is that in the video?

A    That is Raygoza's voice.

Q    What does the neighborhood appear to look like?

A    It --

THE COURT:  You're asking him to narrate the video.

MR. MPARE:  Not narrate, Your Honor, but the Government does have the ability to give context to the jury about what is happening.

THE COURT:  I'll tell you what you have the ability to do.  Ask the next question.

Q    Okay.  You see two cars in this video; is that right?

A    I do.

Q    I'm going to show you clips from this video.  Still Exhibit 6, 6AA and 6AB.

**(Counsel confers)**

Q    Whose car is on the left?

MR. BERNSTEIN:  Objection.  Lack of foundation.

THE COURT:  Sustained.

Q    You testified earlier that you engage in an investigation in this case; is that correct?

Kurtz - Direct / By Mr. Mpare                                68

A    That's correct.

Q    And as part of your investigation, did you conduct further research in the cars that are shown in the social media video we just viewed?

A    Absolutely.

Q    The video from the Baldwin Park, from the Interstate 10 East?

A    That's correct.

Q    And in that video, there's a blue car; is that right?

A    That's correct.

Q    And in reviewing the other videos in this case, were you able, through your independent investigation, to ascertain whether that car in the video is the same as the car in other videos?

A    That is correct.

Q    So based on that investigation --

        MR. BERNSTEIN:  Objection.  Still lack of foundation.

        THE COURT:  I mean, it's not for me to understand, but for sake of making a ruling, what you're trying to establish is that the blue car was a car that looks like the car that the witness observed in other videos.  Is that what you're saying?

        MR. MPARE:  And that he has knowledge of who the blue car belongs to.

        THE COURT:  Well, I mean, can you tell us the basis

EXCEPTIONAL REPORTING SERVICES, INC

Kurtz - Direct / By Mr. Mpare                    69

of your conclusion that the blue car belongs to some specific person?  What did you do?  Did you look at the license plate or --

THE WITNESS:  We have watched multiple videos and we were able to ascertain that this particular vehicle --

THE COURT:  I mean, when you watch these other vehicles, were there voices in those vehicles?

THE WITNESS:  Were there voices?

THE COURT:  Voices in the videos?

THE WITNESS:  Yes.

THE COURT:  And I think you previously said that part of your basis for ascertaining what you said was the voice of the various defendants was based upon hearing voices in other videos, correct?

THE WITNESS:  That's correct.

THE COURT:  And in the other videos, did you hear the voices that appeared to be related to this blue car?

THE WITNESS:  Yes.

THE COURT:  And that, in your view, at least, is a car that looks like the blue car in this audio?

THE WITNESS:  It does appear to match, yes.

THE COURT:  I see.  Well, I think he's laid an adequate foundation.

//

//

**BY MR. MPARE:**

Q    Whose car is that?

A    Deportation Officer Reyes.

Q    Okay.  And do you see this black car on the right side of the screen?

A    That's correct.

Q    You also watched videos in other vantage points related to this black car; is that correct?

A    That's correct.

Q    And did you hear voices of individuals in that black car?

A    Yes.

Q    Did you see faces of individuals in that black car?

A    Yes.

Q    Did you see interactions from those social media videos with the people in that black car from the other vantage points?

A    Yes.

Q    What generally were you able to learn about that black car?

A    That that is D.O. Reyes and his family's personal vehicle.

Q    Did you also look at the license plate of that car to independently confirm that?

A    Yes.

          **THE COURT:**  Is that the vehicle on the left side of this picture or the right?

MR. MPARE:  The vehicle on the right side.

THE COURT:  The right side.

MR. MPARE:  Okay.  So we're going to move on to another --

THE COURT:  Weren't we talking about the blue car before or did I misunderstand?

MR. MPARE:  We're talking about both the blue car, which belongs to Officer Reyes, and the black car, which belongs to Officer Reyes.

THE COURT:  All right.

MS. CHOI:  And, Your Honor, just this still that's being displayed to the jury is, I don't believe it's been marked as an exhibit separately.

THE COURT:  I mean --

MR. MPARE:  It's a screenshot from Exhibit 6.

THE COURT:  Then I think it's a screenshot, but I think maybe you should identify it by a timestamp.

MR. MPARE:  So -- yes, Your Honor.  The parties agreed in the break that after the presentation of evidence, we would put together a stipulation of all the clips that were called out, including the timestamps for both the videos and the screens.

THE COURT:  All right.  In light of that, you can proceed.

MS. CHOI:  But --

Kurtz - Direct / By Mr. Mpare                                72

THE COURT:  Proceed.  Counsel, don't look at her. Proceed.

BY MS. MPARE:

Q    So I'm going to play you another part of this video.  So this video continues after we stopped the video, is that right?

A    Yes, sir.

Q    So we're going to look at still Exhibit 6, Exhibit 6.2, or clip 6.2.

**(Video played at 4:45 p.m.)**

BY MR. MPARE:

Q    So we talked about earlier the review of social media and your ability to identify people in those videos; is that right?

A    That's correct.

Q    And we talked about earlier your investigation into the deportation officer in this case; is that right?

A    That's correct.

Q    And were you able to identify that individual in any of those videos?

A    Yes.

Q    And what generally did you do to identify him?

A    To identify Mr. Reyes --

THE COURT:  Is there any dispute about this being Reyes?

MR. BERNSTEIN:  Not at all.

Kurtz - Direct / By Mr. Mpare                                    73

THE COURT:  All right.  It's Reyes.

Q    Who's in that clip we just saw besides Defendant Raygoza?
From the vantage point, who's in that clip?

A    From the vantage point would be the voice of Defendant
Raygoza.

Q    And who is being filmed in that clip?

A    Deportation Officer Reyes.

Q    All right.  So, going to turn to Exhibit 21.2 -- Clip 21.2
from Exhibit 21.

     **(Video played at 4:48 p.m.)**

**BY MR. MPARE:**

Q    Who do you see in that video?

A    At the beginning portions of the video, I do see all three
defendants, but primarily towards the latter portion of the
video, I see Defendants Raygoza and Defendant Samane.

Q    Can you pull up images 21.1 and 1.2, still from the clip
from Exhibit 21?  And can you just identify who these people
are?

A    The left side of the screen depicts Defendant Raygoza, and
the right side of the screen depicts Defendant Samane.

Q    And you testified earlier that they were wearing
masks when they were following Officer Reyes; is that right?

A    That's correct.

Q    You also testified that you saw another defendant in this
case, in this video, is that right?

Kurtz - Direct / By Mr. Mpare                        74

A    That's correct.

Q    And who was that?

A    Defendant Brown.

Q    Were you able to obtain videos from other perspectives of this incident?

A    Yes.

Q    Whose videos were you able to obtain?

A    We have videos from almost all of their perspectives. That would include, obviously, Defendant Raygoza, Defendant Samane, Defendant Brown, and D.O. Reyes, as well as his wife, Jessica.

Q    And who's Jessica?

A    Jessica is D.O. Reyes' wife.

Q    And so you obtained phone videos from both Officer Reyes and his wife; is that right?

A    That's correct.

Q    Okay, I want to play a clip from Exhibit 19, 19.2.

     **(Video played at 4:51 p.m.)**

**BY MR. MPARE:**

Q    So who is that third woman there?

A    The van --

Q    The one in video.

A    The individual in the video is Defendant Brown.

Q    And you also heard a voice in that video, a separate voice from Defendant Brown's; is that right?

A      That's correct.

Q      Whose voice is that?

A      That would be Jessica's voice.

Q      And that's Officer Reyes' wife; is that right?

A      That's correct.

Q      I'm going to play Exhibit 6 again, 6.4.

       **(Video played at 4:53 p.m.)**

**BY MR. MPARE:**

Q      This is back to Defendant Raygoza's perspective; is that correct?

A      That is correct.

Q      And I want to show you a couple of other images.

       **THE COURT:**  Let's break, five to 5:00.  It's a long day, okay?  We'll start again tomorrow at 9 o'clock.  If you're not all here at 9 o'clock, we can't begin.  If just one of you gets stuck, we have to wait until everyone's here.  So please, I know that freeways are very unpredictable.  I travel also, but anticipate a bad freeway day and try to be here on time.

       Don't talk to each other about the case.  Don't talk to anyone else at home.  Don't access any media, third party, internet, Google, any electronic device.  It's only what you hear here that matters.  So we'll start at 9 o'clock.  Oh, and if you run -- I mean, if you run into the attorneys, which you probably won't, but if you do, don't engage them.  They won't engage you.  And don't think if you sort of walk by them,

you're being impolite.  They understand, okay?  See you tomorrow.

THE CLERK:  All rise for the jury.

(Jurors exit courtroom)

(Proceeding concluded at 4:56 p.m.)

EXCEPTIONAL REPORTING SERVICES, INC

77

## CERTIFICATION

I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.


_____                    <u>March 16, 2026</u>

   **Signed**                                       **Dated**


*TONI HUDSON, TRANSCRIBER*

EXCEPTIONAL REPORTING SERVICES, INC