# EXHIBIT B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:25-cr-00780-SVW |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| CYNTHIA RAYGOZA, | ) | Wednesday, February 25, 2026 |
| ASHLEIGH BROWN, | ) | |
| SANDRA CARMONA SAMANE, | ) | (9:05 a.m. to 12:04 p.m.) |
| | ) | (1:00 p.m. to  5:04 p.m.) |
| Defendants. | ) | |

JURY TRIAL - DAY 2

BEFORE THE HONORABLE STEPHEN V. WILSON,
UNITED STATES DISTRICT JUDGE

APPEARANCES:              SEE PAGE 2

Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Daniel Tamayo

Transcribed by:          Exceptional Reporting Services, Inc.
                         20079 Stone Oak Pkwy. Suite 1105-237
                         San Antonio, TX 78258
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**

For Plaintiff:              AUSA CLIFFORD MPARE
                            AUSA LAUREN E. BORDER
                            U.S. Attorney's Office
                            312 N. Spring St., 15th Floor
                            Los Angeles, CA 90012

For Cynthia Raygoza:        GREGORY NICOLAYSEN, ESQ.
                            Gregory Nicolaysen Law Offices
                            27240 Turnberry Lane
                            Suite 200
                            Valencia, CA 91355
                            818-970-7247

For Ashleigh Brown:         DFPD ERICA CHOI
                            DFPD SHANNON M. COIT
                            Federal Public Defender's Office
                            321 East 2nd Street
                            Los Angeles, CA 90012
                            213-894-2854

For Sandra Carmona          ROBERT M. BERNSTEIN, ESQ.
Samane:                     Law Offices of Robert M. Bernstein
                            9465 Wilshire Boulevard
                            Suite 300
                            Beverly Hills, CA 90212
                            310-477-1480

3

**INDEX**

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ROBERT KURTZ | | | | |
| BY MR. MPARE | 5 | | 63 | |
| BY MR. BERNSTEIN | | 30 | | 76 |
| BY MS. CHOI | | 34 | | |
| BY MR. NICOLAYSEN | | 52 | | 77 |
| ROGELIO REYES HUITZILIN | | | | |
| BY MR. MPARE | 79/104 | | 203 | |
| BY MR. NICOLAYSEN | | 122 | | 211 |
| BY MS. COIT | | 172 | | |
| BY MR. BERNSTEIN | | 186 | | |
| JESSICA HERRERA | | | | |
| BY MS. BORDER | 212 | | | |
| BY MS. CHOI | | 238 | | |

| EXHIBITS | RECEIVED |
|---|---|
| 14, 15 | 17 |
| 16 | 117 |
| 27, 28, 29, 31 | 21 |
| 134 | 167 |
| 135 | 171 |
| 202 | 42 |
| 230 | 173 |

EXCEPTIONAL REPORTING SERVICES, INC

4

**Los Angeles, CA; Wednesday, February 25, 2026; 9:05 a.m.**

**(Call to Order)**

**(Outside the presence of the jury)**

THE COURT:  We're here with the parties and counsel.  We're awaiting two jurors, but I understand that there are some matters that need clarification.  First, the ruling on whether the statements to the pretrial services officer can be introduced.  My ruling is they cannot.  And the second ruling is with regard to a reconsideration of the prior ruling involving the posts.  And with regard to the post that the ICE agent saw, that can be introduced if he testifies that he saw it.  We're waiting for the jury.

THE CLERK:  All rise.  This Court is in recess.

**(Recessed at 9:06 a.m.; reconvened at 9:15 a.m.)**

THE CLERK:  Please be seated.

**(Jurors enter courtroom)**

THE CLERK:  Please be seated.

THE COURT:  We're here with the parties and counsel.  Good morning, members of the jury.  Thank you very much for making the extra effort to be here on time.  I know it's a burden, but it's appreciated.  We're ready to resume.

**ROBERT KURTZ, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

//

//

//

**DIRECT EXAMINATION (RESUMED)**

**BY MR. MPARE:**

Q    Good morning, Special Agent Kurtz.

A    Good morning.

Q    Before we broke, we were talking about your investigation into defendants; is that right?

A    That's correct.

Q    And after learning of the events of August 28th, you conducted an open-source review; is that right?

A    Yes.

Q    And as part of that review, you found digital files related to the incident?

A    Yes.

Q    You found digital files published on accounts both belonging to Ms. Raygoza and Ms. Brown; is that correct?

A    That's correct.

Q    And you also discussed that you obtained other videos from the Reyes family, is that right?

A    That's correct.

Q    Videos both from Mr. Reyes, the officer in the case, and his wife, Jessica Herrera, is that right?

A    Yes, and/or some combination of them, thereof.

Q    And we watched one of those videos yesterday, or at least started to, is that right?

A    That's correct.

Kurtz - Direct / By Mr. Mpare                                6

Q    Let's play that video again, Exhibit 19, and we'll play from the beginning to 12 seconds.

     **(Pause)**

          **MR. MPARE:**  Your Honor, for some reason, the audio is not working.

          **THE CLERK:**  The audio is on full volume on our end. It seems to be a connection issue.

     **(Pause)**

     **(Video played at 9:20 a.m.)**

**BY MR. MPARE:**

Q    And you said this was a video from Ms. Herrera's phone, is that right?

A    Yes, that is Jessica, a deportation officer, Reyes's wife.

Q    And in that video, she says, they just pulled into our neighbor's, did you hear that?

A    That's correct.

Q    And in this screenshot of the still that we have on the screen, you can, in fact, see a home in the background.  Do you see that?

A    Yes.

Q    And you see the number on the top of that, in the for -- background back there?

A    Yes, it reads 12833.

Q    And during your investigation, did you figure out what 12833 related to?

A    That did relate to the address that they parked at, the neighbor, and also it related to one of the posts that is later made in which they say 12833, as well as verbally 12833, I believe.

Q    And what street is this on?

A    That would be Chelsfield in what we know as Baldwin Park.

Q    You also see an individual, looks like she's filming with a mask and sunglasses on in the screenshot we have right now, do you see that?

A    I do.

Q    And who's that?

A    At the time, we didn't know right then, but we later knew her to be Ashleigh Brown, Defendant Brown.

Q    All right, let's play 10 more seconds to 22.

**(Video played at 9:21 a.m.)**

**BY MR. MPARE:**

Q    And that voice in the video saying, you don't have permission to record my kids, that's Ms. Herrera again?

A    That's correct.

Q    And she's speaking to Ms. Brown at this point, is that right?

A    That's correct.

Q    And Ms. Brown is saying, not you, we're following ICE, is that right?

A    That's correct.

Kurtz - Direct / By Mr. Mpare                                    8

Q    You also see a car license plate in this video, right?

A    That's correct.

Q    Did you investigate that car?

A    We did.

Q    What did you learn about that car?

A    That that car was registered to Defendant Brown's husband and that that was the vehicle that was primarily utilized by Defendant Brown.

Q    And that is, in fact, Defendant Brown, we just saw her in this clip kind of standing right next to this car, is that right?

A    That's correct.

Q    All right, let's play it to the end.

        **(Video played at 9:22 a.m.)**

**BY MR. MPARE:**

Q    In this, you hear Defendant Brown say something along the lines of there's like 10,000 people watching, did you hear that?

A    Yes.

Q    Based on your training and experience, what is she referring to in this instance?

A    She's referring --

        **MR. BERNSTEIN:**  Calls for speculation.

        **MR. NICOLAYSEN:**  Join, Your Honor.  Lack of foundation of personal knowledge --

**THE COURT:**  Overruled.  I mean, sustained.  I'm sorry.  I got confused.  Sustained.

**MR. BERNSTEIN:**  Thank you.

**MR. NICOLAYSEN:**  Thank you, Your Honor.

**BY MR. MPARE:**

Q    So in the video, she says there's like a thousand people watching; is that right?

A    That's correct.

Q    And she's holding her phone and filming during that time; is that right?

A    That is correct.

Q    So let's turn to Exhibit 21.  Play a few minutes from that.  And we talked about that there were other perspectives of the video.

A    We did.

**(Video played at 9:23 a.m.)**

**BY MR. MPARE:**

Q    Who's perspective is this from?

A    That appears to be from D.O. Reyes's perspective.

Q    And what do you see in the screen right now?  Is it kind of in the rearview mirror?  What's kind of hanging out of the window of the car?

A    That would be his arm.

Q    And you heard a voice in this video saying, again, they just pulled into the neighbors.  Did you hear that?

Kurtz - Direct / By Mr. Mpare                                   10

A     Uh-huh.

Q     And that's Ms. Herrera again; is that right?

A     Yes.

Q     And let's play until 14 seconds.

      **(Video played at 9:25 a.m.)**

**BY MR. MPARE:**

Q     Who's this?

A     We know her to be defendant Raygoza.

Q     And what's she standing by right now?

A     One of the neighbor's houses on the sidewalk.

Q     And at this point, it seems like Officer Reyes is out of his car; is that right?

A     That's correct.

Q     And let's play till 1:04.

      **(Video played at 9:25 a.m.)**

**BY MR. MPARE:**

Q     So who primarily is Mr. Reyes engaging with at this point?

A     Defendant Raygoza.

Q     And you hear a couple of things that he says.  He says, what are you doing and why are you hiding?  Both asking those questions to Defendant Raygoza; is that right?

A     That's correct.

Q     And defendants don't tell Mr. Reyes anything about why they're there, do they?

A     They do not.

Kurtz - Direct / By Mr. Mpare                                11

**MR. NICOLAYSEN:** Objection, Your Honor. The video speaks for itself.

**THE COURT:** What was that? What was the objection?

**MR. NICOLAYSEN:** The video speaks for itself.

**THE COURT:** Sustained.

**BY MR. MPARE:**

Q    You hear a couple of things the defendants do say. They say, get that face. Get that face. Did you hear that?

A    I did.

**MR. NICOLAYSEN:** Again, Your Honor, I object to the line.

**THE COURT:** Sustained. Objection sustained. The jury can watch the video. He doesn't have to narrate the video.

Q    Understood. Understood. Let's move on to Exhibit 6.4.

**(Video played at 9:27 a.m.)**

Q    So this is Officer Reyes and his wife in that video; is that right?

A    That's correct.

Q    And they passed back by that black Suburban during this clip; did you see that?

A    Yes.

Q    You -- during the course of your investigation learned about the other individuals who were in the car, didn't you?

A    I did.

Kurtz - Direct / By Mr. Mpare                              12

Q    And what did you learn about those people?

A    We know that both his children -- his two young sons were in the vehicle.

Q    Okay.  So I'd like to pull up a screenshot, that's 6.1.3 from Exhibit 6.  I know it's a bit a bit blurry, but who's that in this part of the video that was recorded by Defendant Raygoza?

A    You can clearly see one of the sons and it looks like the second son has a foot is protruding from the passenger seat.

Q    And around this time, it's Ms. Herrera who says to defendants, you don't have permission --

          MR. BERNSTEIN:  Objection, Your Honor.  This video speaks for itself.

          THE COURT:  Sustained.

          MR. MPARE:  Want to start the video at 6.4 from ten seconds.

          MR. BERNSTEIN:  And, Your Honor, again, we'd ask that there be no narrative.  The video speaks for itself.

          THE COURT:  I've said that several times.

          MR. BERNSTEIN:  I just don't want to keep objecting.

          THE COURT:  I mean a lawyer -- you should know that lawyers have a right to object when they think it's appropriate and the court rules, there's no inference that you should draw from my ruling or an objection by the Government or an objection by the defense that's part of the process.  Proceed.

(Video played at 9:29 a.m.)

BY MR. MPARE:

Q    The video livestream continues after this.  They don't stop recording after identifying both Mr. Reyes and his wife; is that correct?

A    They do not, even after they separate.

Q    All right, I'm going to play -- let's play Exhibit 6.5 until 14 seconds.

(Video played at 9:30 a.m.)

BY MR. MPARE:

Q    Who's this?

A    The video is depicting Jessica Herrera, D.O. Reyes's wife.

Q    Does she work for ICE?

A    She does not.

Q    I want to play just -- pull up two screenshots from the clips we just saw, which are screenshots 6.1.5 and 6.1.6, and you heard in the video, check the tattoos.  What are these?

A    The tattoos that are that are on D.O. Reyes?

Q    So we've seen this angle -- this video from this perspective, but also, I want to play from Officer Reyes's perspective at Exhibit 21.2.

(Video played at 9:31 a.m.)

Q    So you see all three defendants in this portion of the clip, correct?

A    That's correct.

Kurtz - Direct / By Mr. Mpare                              14

Q    And there are a couple of things that each of the defendants say during this clip.  Defendant Samame appears to say something about privacy, did you hear that?

MR. BERNSTEIN:  Objection, Your Honor.  Video speaks for itself.

MR. NICOLAYSEN:  Join, Your Honor.  Again, a narration.

THE COURT:  Sustained.  I'm not going to tell you again.

MR. MPARE:  Okay, Your Honor.  We'll move on.  Let's play Exhibit 6.6 for 38 seconds.

(Video played at 9:34 a.m.)

THE COURT:  Let me ask you -- stop that.  Stop it.  Do you expect Agent Herrera to testify?

MR. MPARE:  Officer Reyes?

THE COURT:  Yes.

MR. MPARE:  Yes.

THE COURT:  Do you expect his wife to testify?

MR. MPARE:  Yes.

THE COURT:  I mean, are you intending to show these videos again to them?

MR. MPARE:  Portions of them, yes, Your Honor.

THE COURT:  The same portions you're showing to him?

MR. MPARE:  Yes.

THE COURT:  Then why are you showing -- they can tell

Kurtz - Direct / By Mr. Mpare                          15

relate everything he's relating, can't they?

          MR. MPARE:  We're about to get a portion that they wouldn't be able to relate.

          THE COURT:  Well, then get to that portion.

          MR. MPARE:  Understood, Your Honor.  Let's just play the whole clip, 6.6.

     **(Video played at 9:35 a.m.)**

**BY MR. MPARE:**

Q    So around the time that this video is happening, does a neighbor call 911?

A    Yes.

          MR. BERNSTEIN:  Objection.  Lack of foundation.

          THE COURT:  Sustained.

Q    Did you obtain -- what other investigation did you do with respect to the day and learning how Baldwin Park arrived?

A    We learned that multiple 911 calls were placed during that day.  One from a neighbor and one from Jessica.

Q    And how did you learn about those 911 calls being placed?

A    Through Baldwin Park, they provided the recordings of them.

Q    So you obtained the 911 recordings from that day?

A    Yes.

Q    Did you listen to them?

A    Yes.

Q    Do you have -- did you store them in your own personal

Kurtz - Direct / By Mr. Mpare                    16

investigative file?

A    Yes.

Q    I want you to turn your attention to what's been marked for identification as Exhibits 14 and 15?

         MR. BERNSTEIN:  Your Honor, if this is a 911 call, I'm going to object, lack of foundation.

         THE COURT:  Well, I mean, he said that he obtained the recordings from the Baldwin Police Department.

         MR. BERNSTEIN:  I believe it requires more of a foundation.

         THE COURT:  I don't know that it does.  Is -- can you tell me more specifically what you did in that regard?  Did you personally go to the Baldwin Police Department?

         THE WITNESS:  I did not personally go there, but I obtained them directly from Baldwin Park and a representative of Baldwin Park.  And I also know that based on the --

         THE COURT:  Speak into the microphone.

         THE WITNESS:  I apologize.

         I did not personally go to the location of Baldwin Park, but I obtained them directly from a Baldwin Park representative that was able to give me the body cam and recordings.

         THE COURT:  You requested them from a Baldwin Park -- from the Baldwin Park Police Department?

         THE WITNESS:  Yes, sir.

Kurtz - Direct / By Mr. Mpare                              17

THE COURT:  And there is a foundation.  Go ahead.

BY MR. MPARE:

Q    Can you look at exhibits?  What have been marked for identification as Exhibits 14 and 15 in your binder?

A    Yes.  Give me one second.  Okay.

Q    What are these?

A    These are the disks that I put my signature on and dated.

Q    And what is on those disks?

A    Both disks hold perspective 911 clips that we obtained from Baldwin Park.

Q    How do you know that?

A    Because the disks have my signature and the tape on the back looks unbroken.

Q    So they're in the same or substantial condition as when you watch them?

A    That's correct.

Q    Or listened to them.  Sorry.

A    Yes.

MR. MPARE:  Your Honor, at this time, move to admit Exhibits 14 and 15.

THE COURT:  Received.  Received.

(Exhibits Numbers 14 and 15 received in evidence)

BY MR. MPARE:

Q    So at this time, neighbors have called Baldwin Park; is that right?

EXCEPTIONAL REPORTING SERVICES, INC

A     Yes.

Q     And I'm going to play Exhibit 6.8.  6.8.

      **(Video played at 9:40 a.m.)**

**BY MR. MPARE:**

Q     Is there the same portion of this clip from another defendant's perspective?

A     There is.

Q     From Defendant Samame's perspective?

A     That's correct.

Q     And you watched that video as well, is that correct?

A     I did.

        **MR. MPARE:**  I believe it's been admitted into evidence Exhibit 26, but if there's any objection, I'll lay foundation.

        **MR. BERNSTEIN:**  No objection.

        **MR. NICOLAYSEN:**  No, the videos are in.

        **MR. MPARE:**  All right.  Let's play that video.

      **(Video played at 9:42 a.m.)**

        **MR. MPARE:**  I'm going to play one more video from Defendant Samame's perspective.  That's Exhibit 12, but we're going to play clip 12.1.

        **(Video played at 9:43 a.m.)**

**BY MR. MPARE:**

Q     So 911 had been called at this point, is that right?

A     Yes.

Kurtz - Direct / By Mr. Mpare                    19

Q    And Baldwin Park Police arrived during the same time these videos were being filmed, is that correct?

A    That's correct.

Q    I'm going to play clip 6.9.

     **(Video played at 9:43 a.m.)**

**BY MR. MPARE:**

Q    And that's from Defendant Raygoza's perspective again; is that correct?

A    That's correct.

Q    So after Baldwin Park arrived, what happened?

A    After Baldwin Park arrived on the scene, they took immediate control of the area.

          **MR. BERNSTEIN:**  Objection.  Lack of foundation.

          **THE COURT:**  Sustained.

Q    How did you learn further -- during the course of your investigation, how did you learn about the events that happened after all the live streams stopped?

          **MS. CHOI:**  Objection.  This witness has no prior knowledge.

          **THE COURT:**  Sustained.

Q    Did you review body camera footage of Baldwin Park PD's interactions with defendants?

A    I did.

Q    How did you obtain that body worn footage?

          **MR. BERNSTEIN:**  Your Honor, may we go to sidebar on

Kurtz - Direct / By Mr. Mpare                    20

this?

THE COURT: Why? I mean, he's laying a foundation, are you not?

MR. MPARE: Correct.

THE COURT: Go ahead.

BY MR. MPARE:

Q    How did you obtain that body-worn footage?

A    That was obtained at the same time when I asked Baldwin Park for the for all elements that they had or all evidence that they had related to the specific police call.

Q    So you make records requests to Baldwin Park PD?

A    That's correct. I obtained 911 footage, the 911 recording, excuse me, as well as the body-worn camera footage from all the officers that were there and present that day.

Q    And did you watch that footage?

A    I did.

Q    And as a result of watching that footage, did you learn about the interactions that happened after some of defendants livestreams ended?

A    Yes.

Q    I would like for you to turn to what's been marked for identification as Exhibits 27, 28, 29, and 31 in your binder.

A    You said 27, 28, 29?

Q    And 31.

A    And 31. I see them.

Q     What are these?

A     These are the video clips that I have and the disks that I had put my signature and date on.

Q     And what is contained on these disks?

A     These are the Baldwin Park videos.

Q     How do you know that?

A     Because the disk looks unchanged and they should all still have the they should also have the tape on the back with my signature.

Q     So the discs are in the same or substantial condition as when you watched them?

A     That is correct.

Q     Watched the Baldwin Park body worn footage from August 28th, 2025?

A     Yes, sir.

        MR. MPARE:  Move to admit Exhibits --

        MS. CHOI:  Objection, Your Honor.  This is hours of videos and we object to all of these videos coming in at once.

        THE COURT:  Are you going to show hours of videos?

        MR. MPARE:  We're not, Your Honor.

        THE COURT:  Then objection is overruled.

        MR. MPARE:  That's 27, 28, 29, and 31.

     **(Exhibits Numbers 27, 28, 29, 31 received in evidence)**

        MS. CHOI:  Your Honor, again, we object to all of these videos.  We would not object to clips coming in to

Kurtz - Direct / By Mr. Mpare                    22

evidence under 403, but not -- 403 and 401, but not the full videos.  There's a lot of hearsay.  There's a lot of --

THE COURT:  I told you not to make speaking objections.  If you're objecting to the videos, you're going to show certain portions, correct?

MR. MPARE:  Yes, Your Honor.

THE COURT:  Well, show the portions and you can make objections as they come in.

BY MR. MPARE:

Q    You mentioned you took other steps in your investigation beyond learning about Baldwin Park PD's response; is that right?

A    That's correct.

Q    Specifically, you mentioned that you examined the social media accounts of defendants after the event; is that correct?

A    I did.

Q    And what, if anything, did you learn about the videos that we just watched and what happened to them?

A    I learned that the --

MR. BERNSTEIN:  Objection.  Lack of foundation.

THE COURT:  I mean, learned, he could have learned it by reading a book.  I mean, lay a foundation.

Q    Okay, and in that further investigation, what did you do in Defendant Brown and Defendant Raygoza's social media accounts?  What did you do?

EXCEPTIONAL REPORTING SERVICES, INC

Kurtz - Direct / By Mr. Mpare                               23

A      We had --

          MR. BERNSTEIN:  Your Honor, I'm going to object to we.  I don't know who we is.

          THE COURT:  Sustained.

BY MR. MPARE:

Q      What did you do?

A      I recorded and was able to snip clips.  I ultimately ended up serving a search warrant on Instagram, as well, for their various Instagram accounts as well.

Q      And in searching through that data, were you able to learn about the retention of some of these files?

A      Yes.

Q      What were you able to learn through searching of that data about the retention of some of these files?

          MR. NICOLAYSEN:  Objection to the form of the question.  Calls for testimony on hearsay, Your Honor.  What did you learn?

          THE COURT:  I mean, what is the point of the question?

          MR. MPARE:  That some of the files were not retained.

          THE COURT:   Well, why don't you just ask him that?

Q      Were some of the files deleted?

A      That's correct.

          MR. NICOLAYSEN:  Objection.  Calls for an opinion, Your Honor, lack of foundation.

Kurtz - Direct / By Mr. Mpare                    24

THE COURT:  Sustained.

Q    In reviewing the digital data, are you able to determine whether certain files still exist on a social media account?

A    Yes.

Q    How are you able to do that?

A    Both by open source, looking at the profiles themselves, as well as later you're able to see information contained within the search warrant that is provided to me from Instagram.

Q    So you can look at one time where there is data and one time where there isn't data?

A    That's correct.

Q    And based on that review, are you able to determine whether that data was removed?

A    Yes.

Q    And typically, is an individual who is not an owner or user of that account able to delete data?

A    No.

MR. NICOLAYSEN:  Lack of foundation of knowledge regarding the operation of the account.

THE COURT:  Sustained.  I thought he said that his area of expertise was in cybersecurity and things of that sort.  Did you say that?

THE WITNESS:  Yes, Your Honor.  It is, specifically digital media.

EXCEPTIONAL REPORTING SERVICES, INC

Kurtz - Direct / By Mr. Mpare                    25

THE COURT:  What experience do you have professionally in coming to the conclusion that you did?

THE WITNESS:  We've had --

THE COURT:  Speak into the microphone.

THE WITNESS:  I have conducted many investigations into areas that are that subject themselves on digital media. Anything from social investigations that involve social media, after I've identified individuals, to I've investigated anything like domains, which would be like websites, maybe they're fraudulent, what have you.  And I've had a myriad of those kinds of investigations.

THE COURT:  And you have special training in that area?

THE WITNESS:  We have -- I have done --

MR. BERNSTEIN:  Objection to we.

THE WITNESS:  have conducted training and I have different certifications.  For example, one of those certifications would be in the in the tracing of cryptocurrency, so I can follow its movements through, think of you have like a bank and a bank goes to move money to a different bank, similar in that nature, I can follow cryptocurrency and its transfer.

THE COURT:  But this case doesn't involve cryptocurrency.

THE WITNESS:  That is correct, but I have -- it was

**EXCEPTIONAL REPORTING SERVICES, INC**

Kurtz - Direct / By Mr. Mpare                    26

an example, I apologize.  I have conducted, though, investigations where I have looked into the social medias of people that I needed to identify and I've received instructions, for example, when I survey a search warrant on maybe Instagram or Facebook or what have you, they give you instructions and we also receive information as to what the information they provided pertains to.

THE COURT:  Go ahead.

BY MR. MPARE:

Q    How can you determine whether a file -- how can you determine how a file gets deleted off of a social media account?

MS. CHOI:  Your Honor, I'm going to object.  This is calling for unnoticed expert testimony.

THE COURT:  Overruled.

THE WITNESS:  We -- you can do it a couple different ways.  So, number one, you can look at the search warrant returns.  In this case, it was clearly evident when you can do it open source.  So open source would be anything that was publicly facing.  So if I go onto a website, they -- I can see everything that is considered open source.  So when I go onto their account, I was able to see videos and then at a later point in time, when I went to go approximately a week to two weeks later, the videos -- some of the videos were deleted.  Others were reposted with -- with audio overlaid over some of

Kurtz - Direct / By Mr. Mpare                    27

the videos.

**BY MR. MPARE:**

Q    So, based on that, were you able to identify that certain videos both on Defendant Brown and Defendant Raygoza's accounts had been removed?

A    Yes.

Q    I also heard some references in some of the videos to TikTok.  What's TikTok?

A    TikTok is another social media platform similar to Instagram.

Q    And you heard references to going live on TikTok.  What does that mean?

A    Going live is just a -- a common terminology when you are referring to somebody live streaming or broadcasting.

Q    And in your search -- your search was primarily of Instagram, though, is that right?

A    Primarily, yes.

Q    Why is that?

A    That was more easily accessible at that time and we were able to get more information on Instagram at that time.  I believe TikTok was -- we didn't -- we didn't get any evidence from TikTok at that time.

Q    You being you --

A    I apologize.  Me.  I keep referring to we.  That is referring to myself and I have an investigative analyst that

Kurtz - Direct / By Mr. Mpare                    28

assists me with the gathering of data.

Q    And so during this review of Instagram, did you also

obtain screenshots of other posts related to the content

defendants had posted?

A    Yes.

Q    How did you obtain those screenshots?

A    Again, partially open-source information.  It was open-

source information, as well as one from D.O. Reyes.

Q    So you mentioned you received one screenshot directly from

Officer Reyes?

A    That's correct.

Q    I'd like to turn your attention to what's been marked for

identification --

          MS. CHOI:  Objection.  Objection, the Court made a

ruling on this already.

          THE COURT:  I thought I allowed this one screenshot.

          MR. MPARE:  That's correct, Your Honor.

          MR. BERNSTEIN:  I believe it was going to come in

through Reyes, is what the Court ruled.

          THE COURT:  I didn't make it clear, but is Reyes

going to testify to this?

          MR. MPARE:  He is going to testify to it, but we're

just going to admit it now for streamlining purposes.

          MR. BERNSTEIN:  We would object.

          THE COURT:  I mean, this is just not to play it, but

Kurtz - Direct / By Mr. Mpare                    29

just to lay a foundation for it.

          MR. MPARE:  Correct.

          THE COURT:  But Reyes could lay a foundation for it

too.  Go ahead, lay the foundation.

          MR. MPARE:  Turn your attention to what's marked for

identification is Exhibit Number 16.

          THE WITNESS:  Okay, I see the exhibit.

BY MR. MPARE:

Q    What is it?

A    It is a picture of, or I should say a screen cap of

Instagram and a reel that is produced by a account named L.A.

Hoodlove.

Q    Do you recognize it?

A    I do.

Q    How do you recognize it?

A    Because this is the same screenshot that was sent to me by

Reyes.

Q    This is what you obtained from Officer Reyes?

A    That's correct.

          MR. MPARE:  Move to admit Exhibit Number 16.

          MS. CHOI:  Objection, hearsay, 403.

          THE COURT:  Well, I mean, he's going to testify to

it, right?

          MR. MPARE:  Yes, Your Honor.

          THE COURT:  I'll admit it when he testifies.

Kurtz - Cross / By Mr. Bernstein                    30

**MR. MPARE:**  Understood.  No further questions.

**THE COURT:**  Okay.  Cross-examination.

**MR. BERNSTEIN:**  May I, Your Honor?

**CROSS EXAMINATION**

**BY MR. BERNSTEIN:**

Q    Good morning, Agent Kurtz.

A    Good morning, sir.

Q    Agent Kurtz, when you started testifying, you stated that you work in the cyber finance unit, correct?

A    That's correct.

Q    So this is not a finance crime, correct?

A    It is not.

Q    And you're aware of the charges in this case, correct?

A    I am aware of the charges.

Q    And one of the charges is cyber-stalking, correct?

A    Yes, sir.

Q    How many investigations have you done in regards to this type of crime?

A    Into this type of crime, I have held multiple investigations, because I would think that it's fair to link cyber-stalking with doxxing.

Q    I'm sorry, could you stand to the microphone?  I can't hear you, sir.

A    I'll bring it a little bit closer.  Am I good?

Q    Thank you.

**EXCEPTIONAL REPORTING SERVICES, INC**

Kurtz - Cross / By Mr. Bernstein                    31

A    I've held multiple investigations into this area.  I would say that cyber-stalking and doxxing are fairly collinear.

Q    So you're familiar with the crimes?

A    I would say so.

Q    And what's required to prove these crimes, correct?

A    I would say so.

Q    And you know how to gather evidence to prove that, correct?

A    I would say that I have gathered evidence.

Q    And the crime of cyber-stalking requires that a threat was made by means of electronic communication, correct?

        MR. MPARE:  Objection.  Calls for legal conclusion.

        THE COURT:  Sustained.

BY MR. BERNSTEIN:

Q    You said that you investigated three Instagram accounts.  One was Ice Out of L.A., one was Mesoamerica, and what was the name of the third?

A    That would be, I think you're -- so Ice Out of L.A. and Mesoamerican Culture, just those two, those are Brown and Raygoza's account.  However, the third one was -- I'd have to refer to my notes real quick because -- and I apologize --

Q    Okay, the name's not important, let me move on.

A    Go ahead.

Q    Of these, were any of them owned or controlled by my client, Sandra Samame?

A    Not to my knowledge.

Q    So that's a no, correct?

A    No.

Q    And did you find any live streaming that Sandra Samame performed?

A    I did not find any live streaming of her, that she has created.

Q    So in the course of your investigation, you could not find any electronic communications made by Ms. Samame in relation to this alleged offense, correct?

A    No, that's incorrect.  We obtained electronic videotapes or video from her phone that she had shared with the other defendants.

Q    But she never aired anything herself, correct?

A    I did not observe anything from an account that I know to be run by Samame.

Q    We've seen several of these videos from several different angles of ICE Agent Reyes getting out of his vehicle and his wife getting out of the vehicle, is that correct?

A    That's correct.

Q    And Ms. Samame is standing in a public street, correct?

A    She is.

Q    And you've played it several times from different perspectives, is that correct?

A    Yes.

Kurtz - Cross / By Mr. Bernstein                              33

Q    Did you hear Ms. Samame ever make a threat against Agent
Reyes?

          THE COURT:  I mean, you're doing the same thing that
you objected to before.

          MR. BERNSTEIN:  Okay.

          THE COURT:  I mean, you're asking him for his view of
the case.  His view of the case is not what is important or
that important, it's what the jury thinks of the case.

          MR. BERNSTEIN:  I'll reframe the question.  I'll
reframe the question.

BY MR. BERNSTEIN:

Q    During the course of your investigation, were you able to
determine or locate any threats that Ms. Samame made?

          MR. MPARE:  Call us for legal conclusion.

          THE COURT:  I mean, if there isn't a threat by your
client on the video, which is in evidence, whether he heard
something or didn't, you're arguing -- objection -- was there
an objection?

          MR. MPARE:  Yes, Your Honor.  Objection.

          THE COURT:  Sustained.  You can make these arguments
when you have the opportunity --

          MR. BERNSTEIN:  Understood, Your Honor.  One moment,
Your Honor.

          (Pause)

          MR. BERNSTEIN:  Nothing further, thank you, Your

Kurtz - Cross / By Ms. Choi                                    34

Honor.

THE COURT:  Okay, who's next?

CROSS EXAMINATION

BY MS. CHOI:

Q    Good morning, Agent Kurtz.

A    Morning, ma'am.

Q    I just need a moment to get set up here.  You were just testifying about Instagram and how videos can be deleted or removed, right?

A    Correct, there's other aspects to that, but for the most part, yes.

Q    You know what a live video is on Instagram?

A    I am aware that it is a live broadcast in which people are able to tune in and see real-time image.

Q    And the live disappears after 24 hours.

A    I wouldn't be sure to that.  I believe you can post it or you can retain the video.  I don't believe it necessarily disappears.

Q    A live video ends when the live stream ends.

A    The live video would conclude at that time if they hit the end live button, I believe.

Q    And then unless it's posted on the account, it doesn't stay on the account, right?

A    I mean, it depends on -- I can't give you a yes or no for that, I apologize.

Kurtz - Cross / By Ms. Choi                                    35

Q    Videos that are live streamed will go into the archives of that account, right?

A    It could potentially.

Q    Did you find the videos in this case that we've been talking about in the archives of ICE out of LA?

A    I don't recall seeing them in the, are you referring to the search warrant, ma'am?

Q    Yes.

A    Okay.  I don't recall seeing them there.  The primary location that I did see them was on each one of the defendant's phones.

Q    You saw them on the phones.  You also saw them while they were available right after they were live streamed, right?

A    That's correct.

Q    Okay.  I want to discuss Government Exhibit 6, which we've watched some clips of yesterday and today.  You, in fact, preserved a longer video.

A    I would need to see Exhibit 6, please.

          THE COURT:  Okay.  Just tell him what it is.

BY MS. CHOI:

Q    The video of the --

A    I recognize the video, ma'am.

Q    You recognize this.  Okay.

          MR. MPARE:  Just for the record, that's Exhibit 8, Your Honor.

Kurtz - Cross / By Ms. Choi                36

Q    Thank You.  Exhibit 8.  This is the video of the blue ICE vehicle on the freeway?

A    Yes, ma'am.

Q    Okay.  I want to play -- I want to go through it and I'm just going to ask you to identify, since you know the speakers by their voices.

A    Yes, ma'am.

     **(Video played at 10:05 a.m.)**

**BY MS. CHOI:**

Q    Who said that's them, no plates.  That's ICE.  No plates. Who's talking there?

A    Defendant Brown.

Q    Okay.  Let's play a little more.

     **(Video played at 10:06 a.m.)**

Q    This is 35 seconds in.  They came out of MDC, so we know they're heading into a city, who's talking there?

A    Unfortunately, that clip was really fast.  Can you do it one more time?

Q    We'll go back to 30 seconds.

     **(Video played at 10:07 a.m.)**

        **THE WITNESS:**  And again, just to clarify, your question was about who made the MDC statement?

Q    Yes.

A    That was Defendant Raygoza.

Q    I'm going to move forward to save some time to about two

**EXCEPTIONAL REPORTING SERVICES, INC**

minutes in

        **(Video played at 10:07 a.m.)**

**BY MS. CHOI:**

Q    Did you hear, there's Home Depot.  It's like within 15 minutes?

A    Yes, I believe that was Defendant Raygoza.

Q    Thank you, and then let's move to 3 minutes and 40 seconds.

        **(Video played at 10:08 a.m.)**

Q    You hear, Baldwin Park, share the live, get it out?

A    Yes, it seemed like both Defendant Brown and Raygoza were talking over each other.

Q    Okay.  The caption on this video is, Baldwin Park Rapid Response, Be Alert, Share, right?

A    It appears to be so, yes.

Q    Well, is that what it says?

A    Yes, ma'am.

Q    Do you know what rapid response is?

A    I do.

Q    You wrote a report in this case defining rapid response.

A    That's correct.

Q    Rapid response are networks typically organized by advocacy groups and community organizations and are designed to monitor, verify, and respond to perceived immigration enforcement actions, including those involving ICE ERO

Kurtz - Cross / By Ms. Choi                38

personnel.  That was your definition, right?

A    I would have to reference my report.

Q    If you look in front of you.  There's a black binder, defense exhibits volume -- there's two binders.  If you could look at binder two.

A    Binder two.  Volume two?

Q    Would it refresh your recollection to look at the report?

A    Volume two?

Q    Volume two.

A    Okay.  And which number am I reporting to?

        MS. MPARE:  Your Honor, could we get copies from defense counsel of the exhibits?

        THE COURT:  I mean, let him look at his -- look at your report and see if that's what -- you don't have the report?

        THE WITNESS:  I do not have -- I do not know where I'm going to in here.

        THE COURT:  Give him the report.  Do you have his report?

        MS. CHOI:  Yes, Your Honor.  Right here.  This is Defense Exhibit 286, if you could look in your binder, and I'll give a copy to the Government right now.

        (Pause)

        MS. CHOI:  Hold on.  That might be the wrong number.  One moment.

Kurtz - Cross / By Ms. Choi                39

**THE WITNESS:**  No, I believe you're correct actually. I'm looking at my agent note currently.  I believe you said 286.

(Pause)

**THE WITNESS:**  Should I read my entire agent note?

**MS. CHOI:**  No, just a moment.

**THE COURT:**  Just answer the question.  Is that what you wrote?  The question that was --

**THE WITNESS:**  That was a portion of what I wrote, yes.

**THE COURT:**  Yes, it was.  Next question.

BY MS. CHOI:

Q    You also defined rapid response networks and you said that they generally rely on real-time alerts and volunteer mobilization and coordinated responses.

A    Correct.

Q    You can close that binder.

**MR. MPARE:**  Your Honor, we would object for rule of completeness on that.

**THE COURT:**  Well, I mean you can -- on your redirect include anything that you think requires completeness.

Q    You said that you reviewed all the videos from August 28th.

A    I reviewed the videos that I had in my possession, yes.

Q    The videos from the various defendants' phones?

Kurtz - Cross / By Ms. Choi                40

A     Yes, ma'am.

Q     The videos from Baldwin Park Police?

A     Yes, ma'am.

Q     The videos posted on ICE Out of L.A. and Corn Maiden

Designs Instagram accounts?

A     Yes, ma'am.

Q     You've seen all the relevant video footage?

A     I have seen the video that I had access to, yes.

Q     Mr. Brown never said Officer Reyes's address?

        THE COURT:  I mean, you objected to his commentating

on the video, now you're doing it.  It is what it is, unless

you want his opinion about things.  You want him to give his

opinion about other things in the video?

        MS. CHOI:  No, Your Honor.

        THE COURT:  You want the Government to ask him about

what he thought about the video?

        MS. CHOI:  No, Your Honor.

        THE COURT:  Then don't you ask him.

BY MS. CHOI:

Q     You reviewed -- besides those videos, you reviewed the

Instagram accounts, the full Instagram accounts for ICE out of

LA?

A     Are you referring to the search warrant returns?

Q     Yes, and your open-source review.

A     Yes, ma'am.

Kurtz - Cross / By Ms. Choi                    41

Q    No one says Officer Reyes -- none of those contents say Officer Reyes's address?

            MR. MPARE:  Objection, Your Honor.

            THE COURT:  Sustained.

BY MS. CHOI:

Q    You're familiar with Chelsfield Street in Baldwin Park?

A    I am familiar with it.  Yes.

Q    Did you go there in person?

A    I did not go there in person.  No.

Q    Did you look at a map of the street?

A    I have looked at maps, images.  I've looked at, again, body-worn camera, anything -- any video of the area.  I have received information directly from the Baldwin Park officers, as well as the witnesses, both D.O. Reyes, as well as his wife.

Q    There's that same -- I'm sorry, look at the other defense binder in front of you, binder one, and look at Exhibit 202, please.

A    Okay.

Q    Is that a map of Chelsfield Street?

A    Yes, ma'am.

Q    The horizontal road on the map is Chelsfield?

A    The horizontal map on the Chelsfield -- the only contention I have with the map is that based on satellite imagery, it doesn't appear that these roads on the far right, it's more of a cul-de-sac.  It's not public use roads.

Kurtz - Cross / By Ms. Choi                               42

Q    Right.  It's cut off a little bit, but you can see that the line in the middle of that street is Chelsfield Street.

A    Yes, ma'am.

Q    And then to the west is going vertically as Barnes Avenue.

A    West would be Barnes.  Yes, ma'am.

Q    And then, like you just said, to the east, Chelsfield ends in a cul-de-sac.

A    Yes, ma'am.

Q    Does this map fairly and accurately depict the street we're talking about?

A    Minus the points I raised, yes.

Q    Okay.  And that's because the map appears to be cut off. You can't see that it's a cul-de-sac.

A    Yes.  It's hard to say, but for whatever reason, Chelsfield on the eastern portion of on the eastern portion of Chelsfield, it ends in a cul-de-sac.  That's all.

Q    And accepting that it ends in a cul-de-sac, does that map fairly and accurately depict what we're talking about, the street?

A    Yes, ma'am.

        MS. CHOI:  Your Honor, I move to admit Defense Exhibit 202.

        THE COURT:  Received.

    (Exhibit Number 202 received in evidence)

        MS. CHOI:  Can we publish it for the jury?

EXCEPTIONAL REPORTING SERVICES, INC

THE COURT:  Yes.

BY MS. CHOI:

Q    So you were discussing 12833 as the address where Ms. Brown was standing on direct, right?

A    Yes, ma'am.  That was the address that was on the image.

Q    Could you mark on the screen, if you know how, you can use your finger to click the top button on the right, and it should give you a cursor so you can make a few marks on this map.

A    Can I make some just to test it and figure out how it works?

Q    Yes.

A    All right.  I'm just going to pick over here.  Okay.  How do I go back now?

Q    You should be able to undo that.

A    I just want to make sure I understand how, though.

Q    Yes, thank you.  I just cleared it.  So could you circle 12833?  That's where you testified Ms. Brown was standing, right?

A    Yes, ma'am.

Q    In that video we saw earlier.

A    Yes, ma'am.

Q    Officer Reyes lives at 12847, right?

A    Yes.  Would you like me to mark that as well?

Q    Yes, please.  Mark that where he lives.  That's three houses down?

Kurtz - Cross / By Ms. Choi                                44

A     Yes, ma'am.

Q     Towards the end of the street where the cul-de-sac is.

A     Yes, ma'am.

Q     And then there's one more number address we've been talking about, 12837.  Could you mark that one as well?

A     Yes.  I'm just going to X to denote it differently.

Q     And that's just east of 12833.

A     That is just east.  Yes, ma'am.

Q     Thank you.  You can close that out.  You can close that.  Thank you.

A     The binder?

Q     The binder.  You swore out a complaint in this case.

A     I swore out multiple complaints.

Q     One of the complaints was in reference charging Ms. Brown.

A     Yes, ma'am.

Q     In that complaint, you stated that the three females shouted D.O. RR's personal home address.

A     I did.

Q     You said that they appeared to be filming and live streaming their actions on social media.

A     I did.

Q     And based on those facts, Ms. Brown and her co-defendants were charged with violating a federal doxxing statute.

A     That's correct.

Q     For making publicly available Officer Reyes' home address.

**EXCEPTIONAL REPORTING SERVICES, INC**

Kurtz - Cross / By Ms. Choi                          45

A      That's correct.

Q      The Government dismissed that charge.

A      We did.

Q      The U.S. Attorney's Office dismissed that charge?

A      Yes, ma'am.  The Government did.  Yes.

            **MR. MPARE:**  Your Honor, we object to this line of --

            **THE COURT:**  Sustained.  Why the Government dismissed or not is not relevant.

**BY MS. CHOI:**

Q      When you said in your affidavit that the defendant shouted D.O. RR's personal home address and live streamed it, that was false.

A      That was an incorrect statement on my behalf at that time because of the newness of the case.  I -- at that time, I had received, for example, the Baldwin Park police report.  I hadn't gotten the body cam or any of the other information yet, but I was operating under the assumption that the incident number was the 12847, and that was his home address.  And because the Baldwin Park police report, that incident report, it stated the incident address as 12847, we were operating under that that assumption.  It wasn't until later and it got  -- excuse me.  It wasn't until later and things were corrected that I -- that we adjusted and understood that we had made a mistake earlier on.  But it's very common for investigation to be fluid, especially in the early stages of

Kurtz - Cross / By Ms. Choi                46

investigation.

Q    Okay.  I want to -- you said that it was an incorrect statement in your affidavit in the complaint.

A    I that -- that statement in the complaint was --

Q    It was not true.

A    -- in error, I would say.

Q    It was not true.

A    It was in error, I would say.

Q    You made those statements under penalty of perjury.

A    I did.

Q    That was in September 2025.

A    Yes.

Q    Two months later, on November 7th, 2025, you applied for the Instagram search warrant that you talked about on direct.

A    I believe so.  Yes.

Q    And in support of that warrant, you swore out another affidavit.  November 2024.

A    That's correct.

Q    Again, under penalty of perjury.  Right?

A    Yes, ma'am.

Q    And in that affidavit, you again claimed that the three women shouted his address, the address of his home.

A    That's correct.

Q    You had the body on cameras by then.

A    I'm not sure what date we received that.  I would have to

EXCEPTIONAL REPORTING SERVICES, INC

Kurtz - Cross / By Ms. Choi                                    47

confirm, but I know that at that point I had several of the

defendants' phones that I was going through at that time.

Q    You had their phones.  Let's talk about that.  You saw the

videos on their phones.

A    Sure.

Q    You had the videos posted on social media that you had

reviewed by that point, and you claimed that they shouted the

address of his home.

          MR. MPARE:  Objection.  Relevance, Your Honor.

          THE COURT:  Overruled.

**BY MS. CHOI:**

Q    You can answer.

A    I'm sorry.  Restate the question.

Q    You said based on the videos that you had reviewed, which

may have included the Baldwin Park PD body cam, your review and

conclusion was that they shouted the address of Officer Reyes's

home, yes or no?

A    In the affidavit that was reported, I can't confirm based

on that timeline whether or not I knew at that time if that was

his address or not, but I do know that that that in the

affidavit that was reported, I would have to read the

affidavit, but --

Q    Would it refresh your recollection to look at the

affidavit?

A    Yes.

Kurtz - Cross / By Ms. Choi                48

Q    Could you turn to binder two in front of you, 283?

A    What number?  283?

Q    283.  Let me point you to page 15.  Is that your complaint?  I'm sorry.  Is that your search warrant that you applied for?

A    Yes, it appears to be.

Q    Okay.  Turn to page 15, please.

A    Okay.

Q    About the middle of the page, do you see where you say they shouted the address?

A    Yes.

Q    Of the home?

A    Yes.

Q    So those were your words?

A    Yes.

Q    Sworn under penalty of perjury.

A    Yes.

Q    November 2025.

A    Yes.

Q    You can close that, please.  You testified yesterday that your responsibilities are to extract any and all facts that pertain to a case.

A    Yes.

Q    This is a significant fact to get wrong, right?

A    I would agree with you.

EXCEPTIONAL REPORTING SERVICES, INC

Kurtz - Cross / By Ms. Choi                          49

Q    Eleven days after this warrant, you wrote a report dated November 18th?

A    Can I --

Q    Yes, if you could look in the same binder, Exhibit 282.

A    Exhibit what?

Q    282.

A    282.

Q    Is that your report?

A    Yes, it is.

Q    In this report, you finally admit they never said his address.

A    I would have to -- let me read it.

Q    I'm going to refer you to page 2.

A    Page 2.  Approximately how far down the page, ma'am?

Q    One moment.  Fourth paragraph from the bottom, if you could read that to yourself.  You said the subjects announced their location of 12837 Chelsfield.

A    Yes.

Q    You got something else wrong here.  You said which is the location of where the federal agent had parked his vehicle upon arrival to his residence.

A    It appears, if you were looking directly on the map that it would be one to two houses down from his --

Q    Okay.  So that was wrong.

A    -- from his address.  I would agree that it was wrong.

Kurtz - Cross / By Ms. Choi                50

Q    You can close that.  Did you go back and inform the federal judge who signed the warrant that you had made a big mistake?

A    I believe I had a verbal conversation with one of the AUSAs.

Q    When did you talk to the AUSAs?  When did you have that conversation?

MR. MPARE:  Objection, Your Honor.  Hearsay.

THE COURT:  He can answer.

THE WITNESS:  Approximately the time that we were doing the search warrant for the aforementioned affidavit.

BY MS. CHOI:

Q    So in November?

A    Approximately yes.

Q    Did you go and tell the judge who approved that search warrant?

A    I personally do not talk to the judges, minus swearing out the warrant.  So I did not inform --

MR. MPARE:  Objection, Your Honor.  We haven't discussed any of the search warrants in this case --

THE COURT:  Wait.  What was that?

MR. MPARE:  We haven't discussed any of the search warrants in this case.

THE COURT:  This is not related to the search warrant directly.  It's indirect, but in the federal system, agents

don't speak to judges.  Agents speak to Assistant U.S.

Attorneys, and you've made that point.  So he's not required to

speak to a judge.

**BY MS. CHOI:**

Q    Did you tell the AUSAs that that warrant had included a

false statement from you?

        **MR. MPARE:**  Objection, Your Honor.  Asked and

answered.

        **THE COURT:**  She can answer the last time.

        **MS. CHOI:**  I think this -- I'm trying to get out a

slightly different question.

        **THE COURT:**  It sounds like the same, but do you

understand the question?

        **THE WITNESS:**  Not quite.

        **THE COURT:** Then ask it again.

Q    While you were conducting this Instagram search warrant

that you were just talking about --

A    Yes.

Q    -- at that point, did you tell the Government, the AUSAs,

wait a minus, this search warrant is based on something that's

not true?  Did you tell them that?

A    I had confirmed with them that -- and it was neither of

them that were sitting here, but it was the AUSA a that I was

working with at the time, that that statement appeared to be

incorrect.

Q    Do you know if they did anything about it then?

A    I am unaware of their goings.

        MS. CHOI:  No further questions from me, Your Honor.

        THE COURT:  Next.

        MR. NICOLAYSEN:  If I may.

        THE COURT:  Mr. Nicolaysen.

                    **CROSS EXAMINATION**

**BY MR. NICOLAYSEN:**

Q    Agent Kurtz, did you testify in front of the grand jury in this case?

A    Did I testify before the grand jury?  No.

Q    Did not.  Now, are you aware that the indictment that has been read to this jury contains the same assertion that was covered with you in regard to the search warrants, that the personal address of the federal agent --

        MR. MPARE:  Objection.  Lack of foundation.  Personal knowledge.

        MR. NICOLAYSEN:  Your Honor, may I have the Court's permission to --

        THE COURT:  Just wait a minute now.  You're asking him, is he aware of what's in the indictment, correct?  That was generally the question.  What was the objection?

        MR. MPARE:  Well, now I'll say relevance, lack of foundation.

        THE COURT:  Sustained.

Kurtz - Cross / By Mr. Nicolaysen                        53

Q    Now, you know the indictment was read to the jury panel. You're aware of that, right?

A    I wasn't -- I'm sorry.  Just to confirm, I'm aware that the -- it -- that it was read to the jury panel like the grand jury panel or you're talking about this jury panel?

Q    No, this jury panel during jury selection.

A    Yes.

Q    All right.  Now, in the course of your investigation, did you obtain evidence to establish that the defendants would publicly disclose the personal address of the federal agent they followed on social media?

        MR. MPARE:  Objection.  Calls for legal conclusion.

        THE COURT:  Well, you're asking -- ask the question again.

        MR. NICOLAYSEN:  Legal?  Sure.

BY MR. NICOLAYSEN:

Q    In the course of your investigation of this case, did you obtain evidence establishing, and I'm reading from the indictment, that the defendants would --

        THE COURT:  Don't -- you don't have to read from the indictment.  Ask him the question.

Q    In the course of your investigation, did you obtain evidence establishing that the defendants would publicly disclose the personal address of the federal agent they followed on social media?

Kurtz - Cross / By Mr. Nicolaysen                            54

THE COURT:  The question was what?  Did he investigate that?

Q    Did you obtain evidence to establish that the defendants in this case publicly disclosed the personal address of the federal agent?

THE COURT:  Okay.  You can answer.

THE WITNESS:  I obtained evidence and I apologize because I was unsure what was going on.  Can we --

THE COURT:  Well, let me straighten it out.

THE WITNESS:  Yes, sir.

THE COURT:  Whatever is in the indictment is not a question for you.  The question is did you ever obtain evidence that on one of these platforms, the defendants related the correct address of the ICE issue.

THE WITNESS:  Okay.  I understand, sir.  Thank you.

I did not obtain evidence that stated his 12847 address.

BY MR. NICOLAYSEN:

Q    So you have no evidence that the defendants publicly disclosed the 12847 Chelsfield Street address, do you?

A    I -- no.

Q    Now on direct examination, you testified about search warrants on Instagram accounts, specifically in this investigation.  Do you recall that testimony?

A    Yes.

Kurtz - Cross / By Mr. Nicolaysen                    55

Q    All right.  And in your training and experience in cyber related matters, you're very familiar with the operation of online social media accounts such as Instagram, are you?

A    I would say fairly familiar.  Yes, sir.

Q    Account -- online platforms such as Facebook, Instagram, and the like, all have what are called terms of service.  Do they not?

A    They do.

Q    And included in terms of service would be rules by which the company itself could delete postings based on certain criteria that are set forth in the terms of service.

        MR. MPARE:  Objection.  Foundation.

        THE COURT:  Do you know what he's talking about?

        THE WITNESS:  I do, sir.

        THE COURT:  Okay.

        MR. MPARE:  Calls for speculation.

        THE COURT:  I don't know -- you can follow.

        MR. NICOLAYSEN:  Would you like me to ask it again? I'm happy to do so.

        THE COURT:  No, he understands the questions.

        MR. NICOLAYSEN:  Okay, very good.

        THE WITNESS:  I am aware the terms and conditions exist within every company.  By simply visiting a website, you are agreeing to terms and conditions by just utilizing a service.  What I can't speak to is the contents of those terms

and conditions because I don't know them.  I haven't read these specific terms and conditions for those websites.

**BY MR. NICOLAYSEN:**

Q    So would it be fair to say that with regard to your testimony pertaining to what you call deleted material from the Instagram account in this case, you don't know one way or the other whether those deletions might have been done by Instagram, the company pursuant to terms of service?

A    I do not know that they -- so when you get a search warrant, you are given a lot of files and we have to organize those files.

THE COURT:  Just answer the question.

THE WITNESS:  I'm trying.

THE COURT:  The question was --

MR. NICOLAYSEN:  The deletions that you referenced --

THE COURT:  In other words, you testified about deletions.  The question is you don't know what the terms of service are, but the question is could it be that the terms and service required the company to delete the messages and the question said you don't know what one way or the other, would that be correct?

THE WITNESS:  I would not be able to state whether or not it was deleted by the company that it held.

THE COURT:  Because you don't know the terms of service, correct?

THE WITNESS:  Partially because I don't know the terms of service but also because I haven't encountered that specific incident.

THE COURT:  All right.  Well, then the answer is he doesn't know.

BY MR. NICOLAYSEN:

Q    Very good.  Are you able to tell us whether any attempt was made through your investigation to recover deleted material?

A    Yes.

Q    And were you able to do so?

A    We -- if it was incorporated, Instagram did not denote the difference between deleted or the undeleted material that they would have given us at that time.

Q    In your answer that you just gave, are you telling us that you can't say with certainty that anything was, in fact, deleted?

A    No, I'm referring to the information that -- you asked me about whether or not Instagram would have deleted.  I'm saying that I wouldn't be able to determine if the Instagram deleted information would have returned.

Q    Are you able to tell this jury what specifically was deleted, assuming deletions were made?

A    Assuming deletions were made, we would most likely -- pending they gave us everything, yes.  We would be able to see

Kurtz - Cross / By Mr. Nicolaysen                    58

information that they denoted as deleted in those returns.

Q    And what did they denote as deleted?

A    I can't speak to that.  I would have to reassess the download of the Instagram warrants.

Q    Now, let's talk about dates.  You obtained from Instagram pursuant to your search warrants postings to the ICE out of L.A. Instagram account for August 28th, 2025, the date in question here, did you not?

A    We did.

Q    Did you likewise obtain postings to the account that my client Cynthia Raygoza operated, which is known as one word, DefendMesoAmericanCulture?

A    We did obtain a search warrant for that account, yes.

Q    And were the search warrants served?  In other words, executed on the companies?

A    Yes, sir.

Q    All right, and did Instagram produce documents or media files to you in response to the search warrant for the account DefendMesoAmericanCulture?

A    They did.

Q    And did you obtain materials for that account for any dates other than August 28th, 2025?

A    We obtained information related to the account and we -- the goal is to attribute it to the specific incident.  So we obtained information that was both from the 28th or otherwise.

Q    Did you obtain information about postings to the American -- MesoAmericanCulture account for the following day, August 29, 2025?

A    I know it would have been included.  Again, I would have to reference materials.

Q    Are you aware of any online account that the agent in this case, Mr. Reyes, has with Instagram?

A    I am not.

Q    Okay.  Are you aware of any posting by Mr. Reyes on August 29, the day after this episode?

A    No, sir.

Q    Let me just finish.  Are you aware of any posting by Mr. Reyes, through his account, onto Ms. Raygoza's American Culture account on the day after, on August 29?

        MR. MPARE:  Objection.  Relevance.

        THE COURT:  Overruled.

        THE WITNESS:  I'm unaware.

BY MR. NICOLAYSEN:

Q    Have you asked Agent Reyes whether he attempted to have any contact and that would include online contact with Ms. Raygoza after August 28, 2025?

A    During the course of interviews, we did ask him if he had been contacted or in contact with any of the -- these particular defendants, to which his answer was no.

Q    Okay.  But did you do anything of your own initiative to

Kurtz - Cross / By Mr. Nicolaysen                    60

investigate the accuracy of what he told you?

A    I would say that we didn't -- I did -- I know you're asking about a very specific question.  I didn't ask that specific question and nor did I see any reason to follow that particular part up.

Q    Okay.  I am going to -- again, asking the Court's permission, I'm going to display what's in evidence as Government's Exhibit 16.  This was shown to you on direct examination.  Do you see the screenshot?

            MR. MPARE:  Your Honor, this is on all the screens right now.

            THE COURT:  What was that?

            MR. MPARE:  This isn't admitted to evidence yet.

            MR. NICOLAYSEN:  I believe it is in evidence, Your Honor.

            MR. MPARE:  Not until you -- you said we would admit it through Officer Reyes.

            MR. NICOLAYSEN:  Because it was shown on direct.

            THE COURT:  Was this shown to you on direct, this picture?

            THE WITNESS:  It was shown, but you said you were going to later rule on it when --

            THE COURT:  That's right.  There has to be Reyes testifying about that first.

            MR. NICOLAYSEN:  Very well, Your Honor, but I'll ask

EXCEPTIONAL REPORTING SERVICES, INC

Kurtz - Cross / By Mr. Nicolaysen                61

you this question.

**BY MR. NICOLAYSEN:**

Q    Are you aware of a online account?  Are you aware of an

Instagram account known with the initial at Bikerhead89?

A    Outside of the image that we have not admitted currently,

no.

Q    Have you ever inquired as to whether, in fact, that

Instagram account which is on that screenshot belongs to Agent

Reyes?

A    I -- no, I was unaware of that account.

Q    And so if I asked when -- I'm asking whether you have any

knowledge of Agent Reyes posting to Ms. Raygoza's American

Culture account using this at Bikerhead account on August 29,

you have no knowledge?

A    No, sir.

Q    Now in the course of your investigation, I'd like to

direct your attention to dates prior to August 28, 2025 and

after August 28, 2025, and I want to streamline this so I know

this is going to be compound, but I want to get through this

quickly.  In the course of your investigation, did you identify

any videos, screenshots, or photos of Agent Reyes that You

determined were created by Ms. Raygoza on any date other than

August 28, 2025?

A    I did not see any evidence of D.O. Reyes appearing on her

account during the other dates specified, but -- or outside of

Kurtz - Cross / By Mr. Nicolaysen                    62

the videos that we've admitted like into evidence.

Q    Very good.  Well, let me turn to emails.  Are you aware in the course of your investigation, did you come across any emails that were sent by Cynthia Raygoza to Agent Reyes or his wife at any time?

A    No, sir.

Q    In the course of your investigation, did you identify any text messages that were sent by Cynthia Raygoza to Agent Reyes or his wife on any date?

A    I did not.

Q    In the course of your investigation, did you identify any occasion other than August 28, 2025, where Cynthia Raygoza was present at a location where the agent or his wife were also present, other than August 28?

A    I have not observed any such evidence.

Q    In the course of your investigation, have you determined whether Cynthia Raygoza was on Chelsfield Street on any date other than August 28, 2025?

A    I have not seen any evidence that Defendant Raygoza was on or about that street at a later point, minus, do we count, like, the city?  Because Baldwin Park's a very small city.

Q    Well, we're talking about Chelsfield Street, which is where the agent at that time resided, right?

A    Yes.

Q    My question is, putting aside August 28, 2025, in the

Kurtz - Redirect / By Mr. Mpare                    63

course of your investigation, have you come across any evidence

that would put Cynthia Raygoza on Chelsfield Street on any date

prior to or after August 28, 2025?

A    I have not.

MR. NICOLAYSEN:  Nothing further.  Thank you, Your

Honor.

THE COURT:  Redirect.  Redirect examination.

**REDIRECT EXAMINATION**

**BY MR. MPARE:**

Q    On cross-examination, we were talking about your expertise

into internet cybercrime; is that right?

A    That's correct.

Q    And we were talking about tracing of cryptocurrency and

how that relates to tracing of other digital data; isn't that

right?

A    Yes.

Q    And could you explain to the jury how examining digital

data is similar in all of your types of investigation?

MR. BERNSTEIN:  Objection.  This is beyond the scope

of any of our cross.

MR. NICOLAYSEN:  Join, Your Honor, it exceeds the

scope of cross.

THE COURT:  Overruled.

THE WITNESS:  So just to make sure I understand this,

you want me to sort of give some linkage on how they're similar

Kurtz - Redirect / By Mr. Mpare                    64

in nature?

**BY MR. MPARE:**

Q    And how that governs the investigation in these types of cases.

A    Absolutely.  So throughout, when I'm looking at crypto, for example, you're trying to ultimately determine who a person is.  You're trying to find that person.  Because, for example, a fraud investigation, I'm just trying to determine where those fraudulent funds have been sent.  I'm trying to find the criminal behind it.  The goal is to follow the funds to a particular location.  I'm supposed to figure out all the attributes.  So that would be maybe usernames or emails, things that I can link to people in that spread.  So I'm trying to ultimately get to the point where I've uncovered who the criminal is.

It's very similar in nature to if I were just doing maybe a social media investigation, where I would simply send a subpoena.  I can see things like the email address, the names that are associated with linked phone numbers, linked bank accounts.  Really quite anything that they input to create that account.  So all that to say is you start with a little, and the goal is to build and expand and uncover as much as you possibly can.  So it's very similar in nature that you start here and you end up finding the true person behind a username or an email or somebody that made a video.

Q    And on cross-examination we talked about Defendant Samame and how none of the videos you obtained on her phone were on social media or at least social media attributed to her.  Is that right?

A    That's correct.

Q    Then how did you attribute those videos to Defendant Samame on the other social media accounts in this case?

A    So we ended up -- that Baldwin Park Police report that I referred to earlier, that listed all three names, so it made my job inherently easier just by having the names because it sort of gives you a jump off point that I wouldn't otherwise have. And by doing that, I was able to look up open-source intelligence and identify what this person's face looks like. And then you sort of branch out from there.  We have law enforcement databases that we have access to as well that we are able to see maybe biographics, for example.  You know, date of birth, addresses, phone numbers, stuff like that.

     And through all of that, I was able to sort of link it to this one person, that being, for example, Defendant Samame.  And I was able to take pictures that I had from open source, as well as pictures of her during the Baldwin Park altercation or the August 28th altercation, and using the videos that I had there, I was able to fairly recognize her even through the mask.  And the fact of having Samame also appearing on that report further corroborated everything.

MR. BERNSTEIN: Objection. Move to strike. Non-responsive to the entire question.

THE COURT: Overruled.

BY MR. MPARE:

Q   You also talked about live videos and how long they last after they're posted; is that right?

A   Yes.

Q   And you said it depends basically how long those videos last; is that right?

A   Yes.  It depends on how they're saved.

Q   But that data of that video, does that still get archived somewhere?

A   It can be, yes.

Q   For example, where?

A   It can be archived on the phone.  Sometimes it can be archived on Instagram servers.  It depends.  There's a lot of settings on social media platforms in general that depending on how you have things configured, it depends on how much or little is either saved or what is shown to the public, for example.

Q   And you also testified or we had, you know, there were some discussions on cross about terms of service.  Do you remember that discussion?

A   I do.

Q   And I think your testimony on cross was that you weren't

Kurtz - Redirect / By Mr. Mpare                    67

really familiar with --

MR. NICOLAYSEN:  Objection to counsel summarizing testimony, Your Honor.

THE COURT:  All right.  Start the question again.

BY MR. MPARE:

Q    What do you recall about that part of your cross-examination about the terms of service?

A    I recall that I couldn't speculate on what Instagram's particular terms of service or each social media's terms of service are.

Q    And that same conversation, there were questions about deletion of accounts or account posts kind of based on those terms of service?

A    That's correct.

Q    And you also testified that you have no idea what that relates to; is that right?

A    I would be unable to tell you without reading those terms of service.

Q    And how long after these posts, both by Defendants Brown and Raygoza, were they deleted?

MR. NICOLAYSEN:  Objection as to -- Your Honor, that assumes a fact not in evidence.

THE COURT:  Sustained.  I mean, is there data that would allow you to determine when those posts were deleted?

THE WITNESS:  In this particular case?

EXCEPTIONAL REPORTING SERVICES, INC

Kurtz - Redirect / By Mr. Mpare                68

THE COURT:  Yes, that's all I'm interested in.

THE WITNESS:  No.

THE COURT:  The answer is no?

THE WITNESS:  No, with a caveat.  There is evidence that I would be able to determine it based on open-source intelligence, meaning --

THE COURT:  Well, I mean --

MR. NICOLAYSEN:  May the witness speak into the microphone, Your Honor?

THE COURT:  Yes, you have to speak into the microphone.

THE WITNESS:  I apologize.

THE COURT:  Maybe the question is, in your investigation, through any technical means, were you able to determine the date that certain videos or streams were deleted?

THE WITNESS:  Yes, Your Honor.  We are able to --

THE COURT:  All right.  The answer is yes.  Ask another question.

BY MR. MPARE:

Q    You also watched clips from the car ride from Metropolitan Detention Center.  Do you remember that?

A    Yes.

Q    And during that discussion, there were some conversations about rapid response.  Besides what you talked about on cross, what else do you know about rapid response?

Kurtz - Redirect / By Mr. Mpare                                69

A    Rapid response networks -- am I allowed to read my report, actually?

Q    I mean, is there -- I mean, are you -- he was asked whether -- I forget now.  You asked a question.  Ms. Choi, she asked a question about rapid -- what did he say in his report about rapid response --

MR. MPARE:  And we --

THE COURT:  -- and so he gave -- he read his report and related what he said.  Is this something else in his report?

MR. MPARE:  This was related to our completeness objection to the --

THE COURT:  In other words, you're saying that as an investigator, he has more information about what rapid response is?

MR. MPARE:  Yes, Your Honor.

THE COURT:  I mean beyond what he said in his report?

MR. MPARE:  It's a contained within his report, but the testimony that was elicited was not the complete Statement that he --

THE COURT:  Well, I mean, ask the question.  I can't figure it out.  Ask the question.

BY MR. MPARE:

Q    Okay.  What else do you know about rapid response?

THE COURT:  He's now looking at his report.

EXCEPTIONAL REPORTING SERVICES, INC

**MR. BERNSTEIN:**  Objection, Your Honor.  The witness is --

**THE WITNESS:**  Am I able to reference my report?

**THE COURT:**  I mean, it's -- are you able to answer the question or what are you looking at in the exhibit binders?

**THE WITNESS:**  I was referencing my report in which I clearly state what I would like to say.

**MR. MPARE:**  Is there something --

**THE COURT:**  That's what I asked you whether things he stated in his report about this rapid response that he didn't relate in his answer to counsel's question.

**MR. MPARE:**  Yes.  They're in the report.

**THE COURT:**  Well, then look at your report and tell us what it is.

**MR. BERNSTEIN:**  So, Your Honor, I would object to the -- lack of foundation.

**THE COURT:**  Objection is overruled.  Overruled.

**(Pause)**

**THE WITNESS:**  So --

**THE COURT:**  You know, the two people in that front row, I don't know who you are, but you're very distracting.  You.  I don't know who you are.  That person in a pink shirt.  Yes, you.  You're moving and gesturing and I don't know who you are, but it's not helpful.  Go ahead.

//

Kurtz - Redirect / By Mr. Mpare                    71

**BY MR. MPARE:**

Q    Have you looked at your report?

A    I have looked at my report.

Q    All right.  Could you set it aside and then answer the question about --

A    Yes.

Q    -- what else do you know about rapid response?

A    So in addition to those groups being created for various purposes, open-source reporting, meaning like news sources, for example, they have many times documented the overextension of these rapid response networks and that they many times will attempt to impede law enforcement, obstruct their goings, try to follow them, and observe them beyond --

        **MS. CHOI:**  Objection.  Move to strike, hearsay.

        **THE COURT:**  Well --

        **MR. NICOLAYSEN:**  And lack of foundation of expertise, Your Honor.

        **THE COURT:**  There has to be a better foundation. Perhaps he can be recalled if further developments in the case warrant it.

        **MR. NICOLAYSEN:**  We move to strike the testimony given, Your Honor.

        **THE COURT:**  It is stricken as it stands now.

        **MR. MPARE:**  Understood, Your Honor.

//

Kurtz - Redirect / By Mr. Mpare                72

**BY MR. MPARE:**

Q    There was also conversations about the address that you included or information about the address and your sworn affidavits.  Do you remember that?

A    Yes.

Q    And you described investigations as fluid, what do you mean by that?

A    I mean, when I say fluid, it's a generic term that means our investigations change quite rapidly.  One simple fact can change really the direction of an entire investigation and when we're learning and for and going through an investigation, we have to react to information that we're being given and it's all that to say things -- things change quite frequently.  So we get a lot of information incoming and it depends on where we go with that information.

Q    And at some point, your understanding changed about the address belonging to Mr. Reyes and his family?

A    Yes.

Q    And the address that defendants announced on their live streams?

A    Yes.

Q    And why is that understanding -- how did that change?

A    That changed because at a later point in conversations with AUSAs, and my own investigations, we were -- we later had understood that the -- that D.O. Reyes and his family's address

Kurtz - Redirect / By Mr. Mpare                73

was not -- while it was the incident address, it was not where the police and the defendants and the witness or the victims had encountered each other.  That was actually -- which -- what we all know to be two to three doors down.

Q    You mentioned two or three doors down.  You looked at a map on cross-examination.  Do you remember that?

A    That's correct.

Q    And I think the addresses -- what are the addresses that defendants said in their live streams?

A    They stated 12833 and 12837.

Q    And then what's the Reyes family home?

A    It's only one digit different from -- it's 12847.

Q    And when you looked at the map, you can kind of see the distance between those homes at least on the map?

A    Yes.

Q    And did you do other investigating to determine how far away those homes were from one another?

A    Through our investigation, we were able to determine that it's approximately a hundred feet.  It's not far.

Q    There's also evidence of other disclosures of information about Mr. Reyes and his family; isn't that right?

A    Yes.

Q    What other things were captured on live stream that personally identify Mr. Reyes?

A    For example, his family's license plate.

Kurtz - Redirect / By Mr. Mpare                74

MS. CHOI:  Objection.  Outside the scope.

MR. NICOLAYSEN:  Objection.

THE COURT:  Sustained.

BY MR. MPARE:

Q    There was discussion about the length of interactions between Defendant Raygoza and the Reyes family.  Do you remember that?

A    Say that one more time.

Q    There was testimonies or discussions between you and Mr. Nicolaysen about whether Mr. Reyes and Ms. Raygoza interacted after August 28th, 2025; is that right?

A    That's correct.

Q    And you kind of described that you hadn't looked into that or you hadn't found anything related to that; is that right?

A    I hadn't -- correct.

Q    Were there several interactions between Defendant Raygoza and Mr. Reyes on August 28th, 2025.

A    Yes.

Q    What types of interactions were there that constitutes several different interactions?

MR. NICOLAYSEN:  Objection to the characterization of evidence, Your Honor.

THE COURT:  Sustained.

MR. NICOLAYSEN:  He's characterizing that he --

THE COURT:  Just make the objection.  Sustained.

EXCEPTIONAL REPORTING SERVICES, INC

Kurtz - Redirect / By Mr. Mpare                    75

**BY MR. MPARE:**

Q    How did Defendant Raygoza interact with Mr. Reyes on August 28th?

        **MR. NICOLAYSEN:**  Same objection, Your Honor.

        **THE COURT:**  Sustained.

**BY MR. MPARE:**

Q    Did Defendant Raygoza speak with Mr. Reyes multiple times on August 28th, 2025?

        **MR. NICOLAYSEN:**  Same objection, Your Honor.

        **THE COURT:**  Sustained.

        **MR. MPARE:**  One moment, Your Honor.

        **(Pause)**

Q    To your knowledge, did any of the defendants return to that Chelsfield Street neighborhood after August 28th, 2025?

A    To my knowledge, in Samame's phone on August 29th, her phone recognized what is called a significant location and --

        **MR. BERNSTEIN:**  Objection.  Lack of foundation and non-responsive.

        **THE COURT:**  Sustained.

        **MR. NICOLAYSEN:**  It's hearsay, Your Honor.

        **THE COURT:**  Sustained.

        **MR. BERNSTEIN:**  Move to strike.

        **MR. NICOLAYSEN:**  Move to strike the testimony.

        **THE COURT:**  Stricken.

        **MR. MPARE:**  No further questions.

Kurtz - Recross / By Mr. Bernstein                76

THE COURT:  I didn't hear anything -- before we begin here, I didn't hear anything on direct that wasn't addressed in in cross, any new matters.  So don't repeat what has already been --

MR. NICOLAYSEN:  Understood.

THE COURT:  If there's something you think was new and you want to ask about it, you can, but bear that in mind.

MR. BERNSTEIN:  I understand.  I just have one or two questions.

THE COURT:  Go ahead.

**RECROSS EXAMINATION**

BY MR. BERNSTEIN:

Q    Agent Kurtz, the prosecutor just asked you if you were able to determine if Ms. Samame actually livestreamed anything on that day.  Do you remember that question?

A    I did.

Q    And in fact, what you answered is you were able to identify her, not that she actually live-streamed anything, correct?

A    I was able to identify her and based on videos we have, I know that she recorded --

Q    Right, so identify who she was.

A    We were able to identify her through videos, yes.

Q    But you never were able to identify that she live-streamed anything from that day, correct?

Kurtz - Recross / By Mr. Nicolaysen                77

A    We were not able to identify if she broadcasted any live video.

Q    That's a no, right?

A    No.

Q    So you did not determine that, correct?

A    We did not determine that she live-streamed video.

Q    Thank you.

            THE COURT:  Okay.  It's a good time --

                    RECROSS EXAMINATION

BY MR. NICOLAYSEN:

Q    Agent Kurtz, on redirect, you address the numbering sequence from the agent's residence 12847 down to where the defendants' vehicle was parked, which you later determined was 12833.  Do you recall?

A    Yes, sir.

Q    And you said in between the two homes, the agent and when they were parked, it was 12837.  Remember that testimony?

A    That's correct.

Q    But there's also an additional house, 12843, that separates the locations of the residence of the agent at that time and the position of the defendant's vehicle.  You agree with me?

A    If I were to see the map, I'd be able to confirm with you, but I know that there is two residences in between D.O. Reyes's address and 12833.

EXCEPTIONAL REPORTING SERVICES, INC

Kurtz - Recross / By Mr. Nicolaysen                78

Q    Got it.  Thank you.

THE COURT:  Okay.  This may be a good time to take the morning recess for ten minutes or so, then we'll go on until lunch.

THE CLERK:  All rise for the jury.

**(Jurors exit courtroom)**

**(Recessed at 11:06 a.m.; reconvened at 11:22 a.m.)**

**(Jurors enter courtroom at 11:23 a.m.)**

THE CLERK:  Please be seated.

**(Pause)**

All rise.  This United States District Court is once again in session.

THE COURT:  Please be seated.  Who is the next witness?

MR. MPARE:  Government calls Mr. Rogelio Reyes.

THE COURT:  Okay.

We'll go to 12:00 o'clock and take an hour for lunch and come back.

**(Pause)**

**ROGELIO REYES HUITZILIN, GOVERNMENT'S WITNESS, SWORN**

THE CLERK:  Please take the stand.

Please state and spell your name for the record.

THE WITNESS:  Rogelio Huitzilin..

First name R-o-g-e-l-i-o.  Last name H-u-i-t-z-i-l-i-n.

//

Reyes Huitzilin - Direct / By Mr. Mpare                    79

**DIRECT EXAMINATION**

**BY MR. MPARE:**

Q    Good morning, Mr. Reyes.

A    Good morning.

Q    What's your current job?

A    Work for Department of Homeland Security, deportation officer.

Q    How long have you been a deportation officer?

A    About five years.

Q    How many other federal agencies have you worked for?

A    About two other ones.

Q    Which ones?

A    Oshey Cominstration (phonetic) and at the time Department of Defense.

        **MR. BERNSTEIN:**  I'm sorry, your Honor.  Could you ask the witness to talk into the microphone, please?

        **THE COURT:**  Yeah, try to talk (inaudible).

**BY MR. MPARE:**

Q    And how long have you been -- how long have you been working?

A    What was that?

Q    How long have you been working?

A    For the agency or federal government?

Q    How long -- your working career.

A    About 20 years with the federal government.

Reyes Huitzilin - Direct / By Mr. Mpare                    80

Q    Were you ever deployed?

A    Yes.

Q    Where?

A    Iraq.

        MR. BERNSTEIN:  Objection, relevance.

        THE COURT:  How is it relevant?  I mean just background?

        MR. MPARE:  Yes.

        THE COURT:  All right.

BY MR. MPARE:

Q    How long were you actively serving the United States?

A    I was credited with 13 years.

Q    Did you receive a bachelor's degree?

A    Correct.

Q    From where?

A    Cal State LA.

Q    How long have you lived in Los Angeles?

A    My whole life.

Q    So to your current role, what are your responsibilities?

A    I currently manage a docket of individuals who at one point or another have been arrested for aggravated crimes and who have received a final order from a judge or the Ninth Circuit Court for removal proceedings.

Q    Is there any particular focus that you have in that role?

A    Yes.  I focus on individuals with cases of child

EXCEPTIONAL REPORTING SERVICES, INC

Reyes Huitzilin - Direct / By Mr. Mpare                81

molesters, rapists, or sex trafficking.

Q    What does your typical work day look like?

A    Varies.  Sometimes I'm managing my case load, preparing a case.  Other times I'm in the field.

Q    And were you in the current -- the job that you have currently, were you doing that job in August 2025?

A    That is correct.

Q    Where were you working in August of 2025?

A    I was working at 300 North Los Angeles Street, the immigration building.

Q    Is that an office building setting?

A    That is correct.

Q    Downtown?

A    Correct.

Q    A federal building?

A    Correct.

Q    Does your workplace have an office space?

A    Yes.

Q    And how often do you go to the office?

A    Depending on my duties, anywhere from three to four times a week.

Q    In August 2025 where did you live?

A    I lived in Baldwin Park.

Q    Who else lived with you at that time?

A    My wife and my kids.

Reyes Huitzilin - Direct / By Mr. Mpare                    82

Q    What can you tell the jury about your family?

A    I've been married to my wife for about eight, nine years and I have five kids.

Q    What does your wife do?

A    She stays at home with my younger kids.

Q    So you're the primary earner for your family?

A    That's correct.

Q    How do you get to work or how did you get to work in August 2025?

A    I used the government vehicle that was assigned to me.

Q    What kind of car was it?

A    It was a blue Ford Explorer.

Q    How far is your office from where you worked in August 2025?

A    About 15, 16 miles.

Q    Sorry, from where you lived in August 2025.

A    About 15, 16 miles.

Q    And roughly how long did your commute take?

A    About 15, 20 minutes.

Q    Typically where did you go after work?

A    I usually go home.  When I've driving the vehicle I go straight home.

Q    You mentioned that when you're driving the vehicle, why is that where you go?

A    We're not allowed to use that vehicle other than for

EXCEPTIONAL REPORTING SERVICES, INC

Reyes Huitzilin - Direct / By Mr. Mpare                83

operational activities or work duties.

Q    So that car is just for work, is that right?

A    That's correct.

Q    What are your typical working hours?

A    It varies.  That day I was working from 6:00 to 2:00.

Q    Do you ever take half days or request time off?

A    Yes.

Q    For what reasons?

A    To spend time with the family.

Q    Does your boss or supervisor have to approve those
requests?

A    That's correct.

MR. BERNSTEIN:  Objection to the relevance.

THE COURT:  What was the question?

MR. MPARE:  Does he need approval to take time off.

THE COURT:  I don't know where it's going.  I mean he
can answer yes or no.

(To the Witness):  Do you?

THE WITNESS:  Yes.

BY MR. MPARE:

Q    In August 2025 how long had you lived in your Baldwin Park
home?

A    I was there for, I believe, 10 years.

Q    Were you working on August 28th, 2025?

A    Yes.

Reyes Huitzilin - Direct / By Mr. Mpare                84

Q    Do you remember that day?

A    Of course.

Q    What, if anything, sticks out in your mind about that day?

A    Me and my family had to endure harassment.

        MR. NICOLAYSEN:  Objection to legal conclusion, your Honor.

        THE COURT:  Well, it is and it isn't.  I mean he's describing what he felt that day so it can stand.

**BY MR. MPARE:**

Q    Let's talk about it in a little more detail.  Around what time did you get to work that day?

A    I believe I was there by 6:00 o'clock.

Q    And what were you doing generally just during the day?

A    If I can remember correctly, I was going through my docket.

Q    Around what time did you leave work that day?

A    About 12:00 o'clock, after 12:00.

Q    Where were you going?

A    I was going home.

Q    Why were you going home?

A    I had a prearranged meet --

        THE COURT:  Two minutes.  Everyone stay in place. Don't move.  Breathe but don't move.

        **(Long pause while Judge stepped away for a moment)**

        THE CLERK:  Please come to order.  This United States

District Court is once again in session.

THE COURT:  Sorry for the interruption.  Continue.

BY MR. MPARE:

Q    I think the question was where were you going that day?

MR. BERNSTEIN:  Objection, prior ruling on this.

THE COURT:  Where were you going?  Overruled.

BY MR. MPARE:

Q    Where were you going on that day?

A    I was going home.

Q    Did your work car have license plates on it at that time?

A    No.

Q    Why not?

A    I'm not sure.  The vehicle was assigned to me that way. The license plate issue was out of my control.

Q    And this was something that your supervisor knew about?

A    That's correct.

Q    And you were still allowed to drive that car, is that right?

A    That's correct.

Q    What route did you take home from work that day?

A    I took the 60 East.

Q    How do you know?

A    Excuse me, the 10 East.

Q    How do you know?

A    That's the freeway I take every day.

Q    I'm going to play for you Exhibit 8.2, which is some video from that drive home.

        **(Video played at 11:34 a.m.)**

**BY MR. MPARE:**

Q    I know it's a bit blurry, but is that your car in that video?

A    Yes.

Q    And do you see that -- did you see that exit in the video?

A    Yes.

Q    What exit is that?

A    That's Ramona Boulevard.

Q    How do you know that?

A    That's the exit I take every day.

Q    How far roughly is it from that exit home?

A    About half a mile.

Q    And so you're getting home shortly after this?

A    About a minute or two.

Q    Around this time did you notice anyone was driving behind you or following you?

A    Yes.  At this point I did.  I notice a vehicle, slightly concerning.  I make my first right here at Ramona, went to the second light, which I believe is Syracuse, and I continued on the street and because I noticed the vehicle making the same rights I purposely passed my residence street, Chelsfield.  I made a left on the following street.  When I made a left on

Reyes Huitzilin - Direct / By Mr. Mpare                87

that street I checked my rearview mirror to see if that vehicle was still behind me.  It wasn't.  So based on that I thought it was a coincidence that the vehicle made the two rights as I did so because I didn't see the vehicle when I made the left, I thought everything was normal and continued home.

Q    What happened when you got home?

A    I parked the vehicle.  My wife was already waiting.  We had a prearranged commitment so she was already waiting for me in the car with my kids.  Took all the stuff from the vehicle and I walked to my personal vehicle.

Q    Generally what were you planning to do with your family that day?

          MR. BERNSTEIN:  Objection, prior ruling on this.

          THE COURT:  Generally.

          THE WITNESS:  We had a surprise for my kids.

BY MR. MPARE:

Q    And who else was in the car with you at this time?

A    It would be my wife and my two younger kids.

Q    So just to make sure I'm clear, after you got out of your work car you got into the car your wife was driving, is that right?

A    That's correct.

Q    And what kind of car was that?

A    It's a black Suburban.

Q    Once you got in the car, what do you remember?

Reyes Huitzilin - Direct / By Mr. Mpare                88

A    I was putting the stuff away, my credentials and so forth, during this time my wife grabbed my attention.  When I looked up I saw the direction she was looking at and that's when I saw two individuals on the opposite side of the street walking towards us wearing ski masks.  At that moment, just based on that alone, I felt something was wrong so I automatically unholstered my weapon and I continued to observe them to see what they were doing and I saw they continued bypassing us.  I stated that I checked my surrounding and I saw what I believed was my neighbor standing in her front yard.  I checked the rearview mirror and I saw that the two individuals originally that I saw on the left side were recording in front of my house, were recording the vehicle.  At that point I asked my wife to move forward to my neighbor's house and when she got closer, that's when I saw person number three, which was odd because person number three was standing in my neighbor's front yard within a few feet from their home entrance wearing a ski mask.

Q    Why was this concerning to you?

A    It's not normal for people to walk around in day with ski masks and nothing about them said they were law enforcement.

Q    And you mentioned for a moment that you had your firearm, is that right?

A    That's correct.

Q    And what did you do with it?

Reyes Huitzilin - Direct / By Mr. Mpare                    89

A     I unholstered it because I thought -- when I first saw them I just thought it was an immediate threat.  I didn't know what was going on.  I don't know who they were.  I don't know is somebody getting robbed, am I getting robbed?  I didn't know who they were or why they were there.

Q     So basically at that point you'd just gotten home and didn't really know what was happening.

A     That's correct.

Q     And what happened after you kind of observed the situation a bit more?

A     We stayed put.  I holstered my weapon back.  My objective at that point was to assess the situation as best I can.  I was observing the individual that was inside my neighbor's front yard and that's when I saw Ms. Raygoza get close to the vehicle recording and then she made a comment look at his tattoos or look at those tattoos, which at that point I took it as me being targeted.

          **MR. MPARE:**  I want to play Exhibit 6.1 starting at about 50 seconds.

     **(Video played at 11:39 a.m.)**

BY MR. MPARE:

Q     Is this video taking place in your neighborhood?

A     Yes.

Q     And I think we saw a couple of things in this video that I want to call out to you specifically.

EXCEPTIONAL REPORTING SERVICES, INC

Reyes Huitzilin - Direct / By Mr. Mpare                90

        **MR. MPARE:**  Could we put up Exhibit 6.1.1 and then 6.1.2 side by side?

**BY MR. MPARE:**

Q    Do you see the picture on the left side of the screen?

A    Yes.

Q    What is that?

A    That's a picture of the vehicle, the government vehicle that I was driving that day, parked in front of my house.

Q    You mentioned your house, where in the picture is your house?

A    It would be to the left of the blue vehicle, the blue house behind it.

Q    And the picture on your right, what is that?

A    That's my family vehicle.

Q    What, if anything, is identifiable in that picture, that screenshot?

A    The vehicle on the right, I recognize the license plate, that's my vehicle, my family vehicle that I use.

Q    And back to the work car you said that's the car you parked --

A    In front of my house.

Q    -- at this time; is that right?  So around when did you park this car?

A    Right when I got -- right after work, right when I got there I parked, got my stuff and walked to my family car.

EXCEPTIONAL REPORTING SERVICES, INC

Q    And how far is the sidewalk of that car to your house?

A    I'm going to say about 20 feet.

Q    So it's very close to the front door of your home?

A    That's correct.

Q    Someone could easily get to your home from that car and that sidewalk?

A    Correct.

Q    So at some point you said that you noticed who you identified as Ms. Raygoza say something about your tattoos, is that right?

A    Correct.  She was standing closer to the vehicle and she was recording and she made the comment something along the lines of look at those tattoos or look at his tattoos.

Q    I want to play for you a clip from Exhibit 21.

         **MR. MPARE:**  That's 21.1.

     **(Video played at 11:43 a.m.)**

**BY MR. MPARE:**

Q    Who's filming this video?

A    I am.

Q    And why are you filming?

A    Again, prior to me getting out of the vehicle I don't know who they are, I don't know why they're there, I have zero clue. To make sense it would be easier for me to articulate and come to a conclusion with why they are there if at that time I was performing ICE duties.  But I wasn't, so I don't know why they

Reyes Huitzilin - Direct / By Mr. Mpare                    92

are there.  I got out of the vehicle because when she made that comment about look at his tattoos I took it as a direct threat, as in I'm being targeted.  And if that's the case, I don't who they are, I don't know if they have weapons, so I remove myself from the vehicle so if there's any violence that comes towards the vehicle it will hurt my kids so I move from the vehicle so they can focus on me if in case I was the target.

Q    And you said at some point that you heard and you said Ms. Raygoza.  How do you know it was Ms. Raygoza?

A    I recognized her voice.  I recognized her voice from their Instagram page that I viewed before.  I was able to recognize her voice.

Q    So after this incident you actually found --

A    Correct.

Q    -- their pages and you could identify the same person talking to you --

A    Correct.

Q    -- on August 28th as the person you identified as Ms. Raygoza?

A    That's correct.

Q    And was she the first person you interacted with that day?

A    If I remember correctly, yes.

Q    So you mentioned that you got out of the car to get more information about the interaction, is that correct?

A    Right.  At that point my objective was to establish

exactly why they are there and I'm trying to assess the level

of threat they're presenting at my house.

Q    What information did you think would be helpful at this

point?

A    If they would say why they were there.

Q    You also said, you mentioned that they were recording at

this point, is that right?

A    Correct

Q    And what, if anything, did you understand about what they

were recording?

A    When she first got to the car in front of my house she was

making it a point to say that this vehicle belongs to an

immigration officer, ICE.

          MR. MPARE:   Can we play Exhibit 6.2.   It's a clip

from Exhibit 6.

     **(Video played at 11:46 a.m.)**

**BY MR. MPARE:**

Q    So this clip you see yourself getting out of your car.

You see that?

A    Correct.

Q    What are you wearing?

A    Regular plaid shirt.

Q    Is that what you typically wear when you're at work?

A    At work, in the office, yes.

Q    Is that typically what you wear when you're doing

Reyes Huitzilin - Direct / By Mr. Mpare                94

enforcement operations?

A     Negative.

Q     What do you wear when you're doing enforcement operations?

A     I wear a vest that clearly says ICE Agent or ICE Officer or something to that nature.

Q     Are you in the car that you typically use when you're doing enforcement operations?

A     No.  I was in my family vehicle.

Q     Do you ever use your family car for enforcement operations?

A     Not at all.

Q     And so at this point you're primarily interacting with Ms. Raygoza, but I think we see another woman in this video. Is that right?

A     I see another woman in the background walking towards our direction.  And then, again, there was a third individual that was standing inside my neighbor's property.

Q     And what are you thinking at this point?

A     I'm thinking there's a threat and I need to assess the level of threat as soon as I can so I can determine how to react to it.

          **MR. MPARE:**  Can we play clip 21.2?

          **(Video played at 11:48 a.m.)**

//

//

Reyes Huitzilin - Direct / By Mr. Mpare                    95

BY MR. MPARE:

Q    So I can hear -- you hear yourself asking several questions back to the Defendants at this point.  Did you hear that?

A    Correct.

Q    Why are you repeating those questions?

A    At this point I'm developing two theories.  They either followed me home or they've been waiting for me.  Again, because of the way that car is parked in my neighbor's property I was also -- I also believed that they were waiting for me, they were already waiting for me and I'm trying to come to a conclusion if they followed me there or they didn't follow me there.  I'm asking questions and making statements to try to get an answer out of them.

Q    And you make some comments about their faces being covered up.

A    Correct.

Q    What, if anything, did you feel when you saw their faces being covered?

A    I mean that's not normal.  I saw nothing about them that said that they were law enforcement, so regular people don't just wear masks unless they have wrong intent.

Q    Were you wearing a mask?

A    No, I was not.

Q    Your face is open and available?

Reyes Huitzilin - Direct / By Mr. Mpare                96

A    That's correct.

Q    In fact, they were recording you, is that right?

A    That's correct.

Q    At this time what did you understand about the nature of those recordings and how they were being disseminated?

        MR. NICOLAYSEN:  Objection, calls for an opinion, your Honor

        THE COURT:  Sustained.

        THE WITNESS:  I was able --

        MR. MPARE:  Wait.

        THE COURT:  Wait.

BY MR. MPARE:

Q    Did you hear Defendant Raygoza speaking to her phone during that video?

A    I did.

Q    And what did that mean to you?

A    I was able to pinpoint right away that she was using plural sentences, she was talking to an audience.  She wasn't talking to one person; she was talking to an audience.  So it led me to believe that this was being live streamed.

Q    And you're outside of your car at this point, right?

A    That's correct.

Q    And can you kind of -- based on the video we just watched, where is this interaction happening?

A    About two houses from my home.

EXCEPTIONAL REPORTING SERVICES, INC

Q    And you mentioned that the car was parked in your neighbor's home, is that right?

A    Yes.

Q    And why did you stop kind of before just leaving for the day with your family after you noticed I think you said the third woman in your neighbor's driveway?

A    I think because everything that I was looking at just wasn't adding up as far as why they were there.  Again, like I said earlier, if I was acting within the scope of my duties I could understand why they were there, but I was not working.  I was trying to enjoy the rest of my day with my family.  I was able to determine that -- most likely determined that I was being the target and if that was the case this wasn't going to be a one-time thing.  I had every reason to believe that they would come back later that day --

        MR. BERNSTEIN:  Objection, speculation.

        THE COURT:  That's sort of a narrative, so it's sustained.

        Ask other questions.

BY MR. MPARE:

Q    After initially deciding not to leave, what concern did you have for what could happen while you were gone for the day?

A    That they would come back.  The fact that she was talking to an audience made me believe that this is -- this was not venting, this is going to be whoever she was showing that to.

Reyes Huitzilin - Direct / By Mr. Mpare                98

MR. MPARE:   I want to play a clip, Exhibit 6.3.

(Video played at 11:54 a.m.)

BY MR. MPARE:

Q    So this is kind of part of that same interaction on the sidewalk.  A couple of things.  Who else is in this video with you?

A    My wife.

Q    And while you're walking with Defendant Raygoza I think she -- you can hear her say something like don't fucking touch me.  Did you hear that?

A    Correct.

Q    Did you ever touch Defendant Raygoza?

A    Never.

Q    Did you ever touch any of the Defendants in this case?

A    Never.

Q    Why were you with them?

A    Why was I with…?

Q    Why were you engaging with them?

A    I'm still trying to develop an opinion of why they are there and I'm trying to assess the level of threat that they're presenting and I'm trying to get information that I can then use with management or what have you.

Q    You mentioned you were with your wife at this point in time.  Were you also with any of your other family members?

A    Yes.

Reyes Huitzilin - Direct / By Mr. Mpare                99

Q    Who else were you with?

A    My two, my two young boys.

Q    I want to show a screenshot of Exhibit 6.1.3.  It's blurry, I know that, but who is in this screenshot?

A    That's my oldest boy.

Q    What's his name?

A    Anthony.

Q    And I think you can kind of see a foot sticking out there too.  Can you see that?

A    Yes.

Q    Who is that?

A    My younger boy.

Q    What's his name?

A    James.

Q    How old are your sons during this interaction?

A    Seven and three.

Q    And how did they react to this interaction?

A    My oldest son was angry, he was upset, and my younger son was stimming (phonetic).

Q    What's that mean?

A    He was reacting as to a lot of noise.  He has autism.

        MR. BERNSTEIN:  Objection, move to strike.

        THE COURT:  Overruled.

//

//

EXCEPTIONAL REPORTING SERVICES, INC

Reyes Huitzilin - Direct / By Mr. Mpare              100

BY MR. MPARE:

Q    And so your two children are in the back seat of the car while this interaction is happening?

A    Correct.

Q    Is that part of the reason you continued to interact with Defendants?

A    Right.  As I said earlier, I don't know who they are, I don't know what their intent is.  She made the comment where I thought I was a target, so at that point I don't know to what extent or what level of violence they were willing to do, so I removed myself from the vehicle.

Q    You want to keep your family safe.

A    Correct.

        MR. MPARE:  Can we show Exhibit 6.1.4?

BY MR. MPARE:

Q    And we talked about his woman already, but who is this?

A    That's my wife.

Q    And in the video we just listened to did you hear Defendant Raygoza say anything about your wife?

A    Yes.

Q    What did she say?

A    Called her --

        MR. NICOLAYSEN:  Objection, the video speaks for itself, your Honor.

        THE COURT:  I mean did you hear what was on the

video?

THE WITNESS:  Yes.

THE COURT:  All right, then it's overruled.

BY MR. MPARE:

Q    What did she say?  What did Defendant Raygoza say about your wife?

A    Called her a white bitch.

Q    How'd that make you feel?

A    In the context of how she was using it, I was disgusted that my wife and I were being exposed to that level of racism.

Q    And you mentioned earlier that you were hearing Defendant Raygoza say check the tattoos.  Do you remember that?

A    Yeah, I caught onto that as well.  Again, just I mean I didn't even know that -- she was identifying us to her audience and I don't know who that was.

Q    And with us you mean plural, is that right?

A    Right, me and my wife.

Q    And at some point she was actually just filming your wife, isn't that right?

A    Correct.

Q    And just capturing your wife's tattoos?

A    Correct.

Q    Does your wife work for ICE?

A    No, she does not.

Q    I'm going to play another clip for you.  Exhibit 6.5  It's

102

a little bit later in the day.

THE COURT:  Maybe it's a good time to break.  It's 12:00 o'clock.

MR. MPARE:  Okay.

THE COURT:  Take a lunch break.

Again, the admonition don't talk to each other about the case, don't make any effort to access any media, electronic device, Internet, Google, AI, anything.  As I have said frequently, the only evidence that matters is what you hear in the court and the Court's instructions.

So with that, we'll resume at 1:00 o'clock.

THE CLERK:  All rise for the jury.

THE COURT:  Let the jury go.  You stay here.

**(Jurors exit courtroom at 12:00 p.m.)**

THE COURT:  You may be seated.

**(Court confers with Clerk)**

The gentlemen on the far right on the first row with the scar, would you please take the lectern, come forward.

**(Pause)**

Would you please give us your name.

MR. SPEAKER:  Montana.

THE COURT:  What's your real name?

MR. SPEAKER:  Soloman.

THE COURT:  Soloman?

MR. SPEAKER:  Soloman Montana (phonetic).

103

THE COURT:  Soloman Montana?  Is that your true name?

MR. SPEAKER:  Yes, sir.

THE COURT:  I've been informed that at some point earlier today you made some contact with a juror, Juror Number 1.  She reported that you said something to her.  And you're not to contact any juror with any message, friendly or unfriendly.  Do you understand?

MR. SPEAKER:  I understand.  I don't remember speaking to anybody --

THE COURT:  Well, she --

MR. SPEAKER:  -- especially a juror.

THE COURT:  She remembers it.  But I'm just telling you that what you said was not threatening but it was a contact and you're not to make any contact.

And I notice that we have a number of people in the spectator part who are listening to the case and that's all to the good because this is a public courtroom and --

You may be seated.  You may go back to your seat.

COURTROOM SECURITY OFFICER:  Do you want me to escort him out, your Honor?

THE COURT:  This is a public -- what?

COURTROOM SECURITY OFFICER:  Do you want me to escort him out, your Honor?

THE COURT:  No.  No.

This is a public courtroom and everyone is welcome,

especially if you have an interest in the case.  But if anyone who is interested in the case makes any contact whatsoever, even saying good morning to a juror, it will be dealt with severely.  Underscore severely.

Have a nice lunch.

**MS. BORDER:**  Your Honor, the Government was wondering if we can inquire into what exactly was said to the juror perhaps at sidebar?

**THE COURT:**  It wasn't anything threatening.

**MS. BORDER:**  Thank you, your Honor.

**THE CLERK:**  All rise.  This court is in recess.

**(Recess taken at 12:04 p.m.; reconvened at 1:00 p.m.)**

**(Jurors enter courtroom)**

**THE CLERK:**  Please be seated.

**(Pause)**

**THE COURT:**  Please be seated.  We're ready to resume.

**DIRECT EXAMINATION (CONTINUED)**

**BY MR. MPARE:**

Q    Before we broke, Mr. Reyes, we were talking about the point of the situation when you and your wife encountered defendants by the neighborhood -- by the neighbor's driveway; is that right?

A    Correct.

Q    And I think I asked you whether you were concerned during that period of time.

Reyes Huitzilin - Direct / By Mr. Mpare          105

A     I was.

          **MR. MPARE:**  Can we play Exhibit 6.3 again and I'm going to ask you to stop it at some point.

     **(Video played at 1:04 p.m.)**

Q     So you heard this part of the exchange a couple of times, defendant Raygoza asked you if you're scared keep going.  You hear that?

A     Right.

Q     Were you scared during this period of time?

A     Of course.

Q     But you say in the video I'm not scared, don't you?

A     Correct.

Q     Why did you say that?

A     To get them -- to keep them talking.  My objection was to continue to get information as to why they're there.

Q     And you can also see this portion in the video that you are walking away from your car, why were you doing that?

A     Again I don't know if they have any weapons.  I don't know the level of violence they are willing to do, per the comment that she made Raygoza that made me get out of the car, if indeed I am the target, then I don't want any harm done to my kids because I'm in the car, so I'm moving away from the vehicle to keep them safe.

Q     And that initial comment you mean when you first arrived at your car.

Reyes Huitzilin - Direct / By Mr. Mpare                106

A    Correct.

Q    And what did you hear her say at that point?

A    She was highlighting and pinpointing my tattoos.

          MR. MPARE:  Could you play Exhibit 6.5?

          (Video played at 1:06 p.m.)

Q    So we see a couple of things in this video.  First at some
point the video pans to your arm.  Did you see that?

A    Yes.

Q    And what's on your arm?

A    Tattoos.

          MR. MPARE:  Can we pull up Exhibit 6.1.5 and 6.1.6?

Q    Are these those tattoos?

A    That's correct.

Q    And I think you said you heard defendant Raygoza when you
were in the car reference one tattoo.  Which tattoo is that?

A    My wife's name.

Q    And that's Jessica?

A    That's correct.

Q    And did you also hear in the defendant Raygoza say Jessica
on his arm?

A    That's correct.

Q    What did you take that to mean?

A    I took it as a threat.

Q    Why?

A    Because again she's sharing this with an unknown platform,

I don't know who she's sharing this with.

Q    So at some point do you feel that you've got enough information about why defendants are in your neighborhood?

A    I'm starting to develop --

MR. NICOLAYSEN:  Speculation, Your Honor.

THE COURT:  What was that?

BY MR. MPARE:

Q    At some point, do you feel you've got enough information as to why defendants are in your neighborhood?

THE COURT:  There was an objection?

MR. MPARE:  Yeah.

THE COURT:  Overruled.

THE WITNESS:  I'm starting to develop an opinion of why they're there.

BY MR. MPARE:

Q    And do you develop that opinion?

A    At the moment, yes.

Q    And what do you do after you kind of figure out why defendants are in your neighborhood?

A    Try to deescalate the situation, I think they made additional comments, my wife made a comment and we tried to deescalate the situation by denying what they are insinuating, which is that I'm ICE.

Q    But at some point you just say, let them think what they want to think; is that right?

Reyes Huitzilin - Direct / By Mr. Mpare          108

A     That's correct.

Q     And what did you mean by that?

A     I was hoping that that would deescalate the situation, that would essentially just stop everything from their point and our point.

Q     Did you eventually stop interacting with defendants?

A     Yes, eventually I got in the car.

Q     So you left the interaction.

A     Correct.

Q     And where did you go?

A     I got back in the car.

Q     And what were you doing in the car?

A     I was still assessing the situation and I was waiting for them to do the same thing, to get in the car and leave.

          **MR. MPARE:**  Can you play Exhibit 6.6?

          **(Video played at 1:08 p.m.)**

Q     So you just said you went back in your car and were assessing the situation; is that right?

A     Right.

Q     Was this part of the video happening while you were in your car?

A     That's correct.

Q     So you're no longer engaging with defendant at this time.

A     Not at all.

Q     In fact, all of the defendants are still kind of walking

Reyes Huitzilin - Direct / By Mr. Mpare                     109

around the neighborhood or otherwise yelling at this time; is that right?

A    Right.  As soon as I got in the car, they started yelling, started to tell the whole block.

Q    And how long did you live in that neighborhood?

A    I've been there for about seven to eight years.

Q    Did you know your neighbors?

A    Yeah, normal conversations, hi and bye, things of that nature.

Q    But your neighbors didn't have intimate information about what you did for work or anything like that?

A    Not -- one of my neighbors knew who I worked for.

Q    So this was a revelation that defendants were now spreading to your entire neighborhood --

        MS. COIT:  Objection, Your Honor, leading.

        THE COURT:  It is leading.  Ask non-leading questions.

BY MR. MPARE:

Q    So what did your neighbors learn from defendant's actions on that day?

A    That day when they were screaming that I was an ICE agent.

Q    And is your understanding that this video was still livestreaming?

A    That is correct.

Q    So what is your understanding about how the information

Reyes Huitzilin - Direct / By Mr. Mpare                 110

could have been used for anyone watching livestream?

A     Not only --

          MS. COIT:  Objection, Your Honor, speculation.

          THE COURT:  Overruled.

          THE WITNESS:  Not only my neighbors were learning as of that moment that I worked for ICE, but to whoever she was sharing this information with, now they knew that an ICE agent lived on that block as I said.

BY MR. MPARE:

Q     What else is happening, what else is your family doing while you're in the car?

A     I think at this point my wife was calling local PD.

Q     Why?

A     At that point I established that a crime was committed, so she felt comfortable, she felt the need to call local PD.

          MR. NICOLAYSEN:  Objection, calls for legal conclusion, move to strike.

          THE COURT:  Overruled.

BY MR. MPARE:

Q     And --

          THE COURT:  That was his opinion, go ahead.

Q     And in the video we just watched I think you also hear defendant Raygoza say something like he just left MDC, he was going to snatch people up.  Did you hear that?

A     I did.

Reyes Huitzilin - Direct / By Mr. Mpare          111

Q    So --

          MS. COIT:  Objection, Your Honor, this is something
he heard, lacks foundation, specified he was in the car when
this was being said.

          THE COURT:  I mean, are you asking did he hear this
statement, is that what you're asking?

          MR. MPARE:  Yes.

          THE COURT:  All right.  Then you can ask it.

          The objection is overruled.

Q    Is that what you do in your job?

A    No, actually that comment does bother me because it's a
false narrative.  It's just a misleading narrative in the sense
that it clearly shows that in this case, this individual like
many others don't understand or don't know what to do.  I think
that comment --

          MR. BERNSTEIN:  Objection, Your Honor, this is just a
narrative.

          THE COURT:  Well, I mean, the questions are being
allowed at this point for the effect they had on him, correct?

          MR. MPARE:  Yes, Your Honor.

          THE COURT:  So it's for the jury to decide, but I
think you're asking questions about how he felt the defendants
were describing his job; is that it?

          MR. MPARE:  Yes, Your Honor.

          THE COURT:  All right.  He can answer briefly.

EXCEPTIONAL REPORTING SERVICES, INC

**THE WITNESS:** So, yeah, I believe in my opinion that statement is based on of the other people that have been grabbed at Home Depots and car washes, that's not ICE, that's not what we do. We do target enforcement. So that statement is false and upsetting.

BY MR. MPARE:

Q    So that was offensive to you?

A    It is.

Q    In this clip and others you hear defendant Raygoza say he's free to go. Did you hear that?

A    I did.

Q    Did you feel free to go at this point?

A    Not at all.

Q    Why not?

A    I had developed -- I had assessed that the threat was there and as I mentioned at that point my wife had called local PD. So we felt we needed to stay to ensure that local PD got the reasoning of why we called them.

Q    Did you do anything else to make sure defendants didn't leave at this point?

A    I believe when I got out of the car.

Q    And what did you do?

A    I believe I got out of the car and I stood at my neighbor's driveway.

Q    And why did you drive that?

Reyes Huitzilin - Direct / By Mr. Mpare                113

A     To prevent them from leaving.

Q     And why didn't you want them to leave?

A     Because I believed that the threat that they possessed or the threat they displayed had to be addressed.

Q     And what were you waiting for?

A     Local PD to show up.

        **MR. MPARE:**  I'm going to play Exhibit 6.8.

        **(Video played at 1:16 p.m.)**

Q     So what's happening at this point?

A     I'm on the phone with management reporting the incident so they're aware of it and keeping an eye on Raygoza because I noticed that she went to the car, so that itself escalated the situation again.

Q     And are the other defendants kind of around too at this point?

A     That's correct.

Q     And you're still get recorded at this moment; is that right?

A     That's correct.

Q     I think you notice in this clip your car in the background; is that right?

A     That's correct.

Q     At some point before this did you -- did your wife back your car up slightly?

A     I think she did back up the car to get the address of my

Reyes Huitzilin - Direct / By Mr. Mpare                114

neighbor's home.

MR. MPARE:  I'm going to play one more clip from this video, 6.9.

**(Video played at 1:18 p.m.)**

Q    And I want to play one more video 12.1 sorry.

**(Video played at 1:18 p.m.)**

Q    So in both those clips did you hear defendant Raygoza say anything in particular?

A    Correct.

Q    What'd you hear?

A    She said I will pop you.

Q    And what do you take that to mean?

A    I took that as a direct threat as she was going to shoot me, which is why I positioned myself facing her directly.

Q    And you see in this second clip you kind of react.

A    Yeah.

MR. MPARE:  Let's play that back.  Can we play that last six seconds of that clip?

**(Video played at 1:19 p.m.)**

Q    So after you heard that, you kind of visually and physically responded; is that right?

A    Correct.  I put myself in a position to respond accordingly.

Q    Because you viewed those words as meaning what?

A    She was going to shoot me.

Q    And I think you can see this video also at the same time Baldwin Park police officers -- sorry, Baldwin Park PD is arriving; is that correct?

A    That's correct.

Q    So this is all basically happening within a short amount of time after you got out of the car and stood by the hood?

A    Correct.

Q    Not a lot of time passes between that.

A    Not at all.

Q    And it's at this point that you --

A    I remove myself from that situation, no longer my show.

Q    So after this, what happens with your interactions with Baldwin Park PD?

A    I wait for them to approach me so they can take my statement.

Q    And after you gave your statement or during the time that you were waiting, did other people arrive in your neighborhood?

A    Yes, there was another vehicle that showed up, about five -- four or five individuals all wearing ski masks.

Q    And what did you see them there?

A    They went straight to the location where Raygoza and the other two individuals were at.

Q    And did you see any of the interactions that these individuals had?

A    They started to give the local PD a hard time.  They also

Reyes Huitzilin - Direct / By Mr. Mpare            116

continued to scream ICE is here, things of that nature.

Q    After this -- you know, after you finished with Baldwin Park PD did you and your family go about your day?

A    Yeah.  We tried to do our best to continue our day.

Q    Did you still get to do that surprise for your kids?

A    We did.

Q    And after that day, did you ever see any other -- did you ever see any of the social meeting postings surrounding this incident?

A    My daughter's more social media savvy, so they saw some stuff.

Q    So your daughters learned about the event.

A    Yes.

Q    And shared information about it with you?

A    Correct.

Q    There's a binder up there, it should say -- to your left I think -- that big one to your left.

A    Yes.

Q    Can you turn to what's been marked for identification as Exhibit 16?

A    Exhibit what I'm sorry?

Q    16.  Do you see it?

A    Yes.

Q    What is it?

A    It's a picture of me with an address.

Q    Where does it appear it comes from?

A    It's directly from one of their websites, one of their platforms.

Q    So have you seen this picture before?

A    No.

Q    You haven't seen this --

A    No, I seen this picture before, yeah, my daughters showed me this picture.

Q    And you actually, in fact, shared this with the Government before this case; is that correct?

A    Correct.

Q    So you know what this is?

A    Correct.

        MR. MPARE:  Your Honor, move to admit Exhibit No. 16.

        THE COURT:  Received.

    **(Exhibit Number 16 received in evidence)**

        MS. COIT:  Renew our objections just on 403 and hearsay.

        THE COURT:  Overruled.

        MR. MPARE:  I'm going to show Exhibit 16.

BY MR. MPARE:

Q    So I want to call out a couple of things.

        MR. MPARE:  Can we just like highlight that top half, including his face?

Q    So this screenshot has 12837 Chelsfield Street, Baldwin

Reyes Huitzilin - Direct / By Mr. Mpare          118

Park, CA this succumb and then it has some at by grade 89 and an emoji that seems to be the middle finger.  Do you see all that?

A    Yes.

Q    What's 12837 Chelsfield Street?

A    That's an address that's off by one digit that would be my home address.

Q    And what's your understanding of where this image comes from?

A    That address would, if I remember correctly, would put someone directly in front of my house.

        MR. BERNSTEIN:  Objection, that wasn't responsive to the question.

        MR. NICOLAYSEN:  Opinion, Your Honor.

        THE COURT:  Ask the question again.

BY MR. MPARE:

Q    Where this image came from?

A    It came from the social media account.

Q    Okay.  And it also says ICE agent stays in Baldwin Park. Do you see that?

A    Yes.

Q    How do you interpret that?

A    Doxxing.

        MR. NICOLAYSEN:  Objection, argumentative, move to strike.

**THE COURT:**  Well, it's being offered for the effect it had on him, so overruled.

Q    Mr. Reyes, you're used to people interacting with you about the nature of your job; isn't that right?

A    Yes, on occasions.

Q    Have you had people express discontent to you about your job before?

A    Yes.

Q    Have you ever called law enforcement or felt personally threatened by those engagements with people?

A    Never.

Q    Why were the events of August 28th, 2025 different?

A    In my opinion, that day the interaction was more hostile. I was targeted and there was a level of threat that presented itself to me and my family.

Q    What changed after August 28th, 2025?

A    I'd been at that address for about seven years.  I know what cars my neighbors have, in fact, I live in a dead end, at that time, I lived in a dead end, so I know what vehicles belong there and what vehicles don't belong there.

After that day there was a lot more vehicle traffic, unidentified vehicles.  There was a lot more vehicles coming in and out, vehicles that would drive by my house slowly, to the extent all my kids felt uncomfortable, including my wife.

Q    And did you do anything as a result of that?

Reyes Huitzilin - Direct / By Mr. Mpare                120

A    Yeah, we had to move.

Q    How long after the incident did you decide to move?

A    Maybe about a month or two.

Q    How far away did you move?

A    Far enough and close enough for my family to feel safe.

Q    What about your -- the rest of your family, how were their lives impacted?

A    My daughters their commute to school is longer.  The school that they were attending or attending they're about to graduate, so moving them school would be an inconvenience to them, an unfair inconvenience to them.  So now they have to travel further just to go to school and my wife her emotional state was agitated or has made it worse because of this incident.

Q    You've seen a lot of video today and it seems to be impacting even the courtroom today; is that accurate?

A    Correct.

        MR. NICOLAYSEN:  Objection, Your Honor, argumentative.

        THE COURT:  He can answer the question, overruled.

BY MR. MPARE:

Q    Is that accurate?

A    Yes.

Q    Why is it impacting you?

A    Because we didn't want to move.  That house had a lot of

sentimental value.

Q    What do you mean?

A    So my kids and I we did a lot of work on that house, especially my oldest son.  July 2024 --

MS. COIT:  Objection, Your Honor, prior ruling.

THE COURT:  I'm not following, he's just saying why he moved, correct?

MR. MPARE:  That's correct, Your Honor.

MR. NICOLAYSEN:  No, that's not what he's --

MS. COIT:  Can we sidebar, Your Honor?

THE COURT:  I mean he's not -- don't talk about your particular son's illness, okay.  All right.  Mr. -- don't talk about that in the course of answering the question, just leave that out, go ahead, you can answer the question.

THE WITNESS:  So again the house had a lot of sentimental value.  Me and my oldest son worked on the house a lot.

MS. COIT:  Objection, Your Honor, prior ruling.

THE COURT:  Overruled.

BY MR. MPARE:

Q    Would you change anything you did that day?

A    I don't know that I had a choice.

Q    Why do you say that?

A    The threat was always there and I had every reason to believe that it wasn't going to be a long time thing.  I had

Reyes Huitzilin - Cross / By Mr. Nicolaysen          122

every reason to believe that the threat would continue the following day, the next week, the next month, my home, my block was compromised.

MR. MPARE:  No further questions.

THE COURT:  Cross-examination.

**CROSS EXAMINATION**

**BY MR. NICOLAYSEN:**

Q    Agent Reyes, I'm going to direct your attention to the date in question which is August 28th, 2025.  And I'd like to begin by discussing the fact your testimony on direct that you were going home and you were not performing your official duties at that time.  Do you remember giving us that testimony?

A    Yes.

Q    Okay.  And you explained with the video on the screen the shirt you were wearing that this is an indicative of being off duty.  Do you remember that?

A    Yes.

Q    That if you were on duty carrying out your official duties you would have a specific attire that ICE uses, fair enough?

A    Sure.

Q    Okay.  And so the events that you have described that occurred on this single day August 28th, 2025 are events that covered, let's give it a time frame.  If I say an hour and a half to two hours from the time you left downtown to the time you left the area with your family, you drove away, would an

hour and a half to two hours be a fair estimate?

A    Sure.

Q    And during that one and a half to two hours you were not engaged in any official duties, fair enough?

A    Correct.

Q    All right.  Now, from your direct examination it appears that something that did upset you as a result of the events of August 28th is the exposure to your neighbors in particular of the fact that you are an ICE agent, true?

A    Uh-huh, yes.

Q    Yes?  Okay.  The fact that you were an ICE agent at that time and I understand you still are is an employment that you wanted to keep private, true?

A    Correct.

Q    You didn't want people to know and certainly not the people who lived in your immediate area, fair enough?

A    Sure.

Q    So what happened on that day was the exposure of your anonymity in that regard, fair enough?

A    Yes.

Q    Yes?  And with the Court's permission I'll just ask please if you could speak just a little closer to the mic.

Now, your wife called 911.  Do you recall?

A    Yes.

Q    And have you by any chance listened to the 911 recording?

A     I believe so.

Q     Okay.  And do you recall she told the 911 discharge operator you work for Homeland Security.

A     I don't know the conversation exactly but.

Q     Fair enough, I'm not going to push that.

        **MR. MPARE:**  Objection, calls for hearsay.

        **MR. NICOLAYSEN:**  That's fine.  I'm just asking if he remembered.

Q     But this is my question, on August 28, 2025 your wife knew you worked for Department of Homeland Security, did she not?

A     Of course.

Q     Did she know you were an ICE agent?

A     Of course.

Q     Now, as a result of the exposure of anonymity resulting from the events of August 28th were other people informed in your family that you were an ICE agent that caused some friction within the family?

A     I'm not sure what you mean by that.

Q     Any people in your family who stopped talking to you?

A     No.

Q     Okay.  You had your firearm with you, did you not, when you left downtown?

A     I did.

Q     And it would be customary for you in your employment capacity to have a firearm, would it not?

A    Correct.

Q    Including when you're off duty, correct?

A    Correct.

Q    All right.  So when you were not carrying out your official duties, you would still nonetheless have a firearm, similar to what an FBI agent or a police officer, true?

A    Correct.

Q    Now, when you pulled into your street Chelsfield Street on August 28th, 2025 where was your gun?

A    It was on me, my body.

Q    Okay.  And was it holstered somewhere on your body?

A    Correct.

Q    Tell us please where?

A    On the right side.

Q    Shoulder holster, ankle holster, what was it?

A    The right side on my waist.

Q    On your waist, very good.

     I'm not going to spend time on this, but just so we have an idea what type of firearm did you have?

A    8320.

Q    Is that a 9 millimeter?

A    Correct.

Q    Did you have any extra ammunition clips?

          **MR. MPARE:**  Objection, relevance.

          **THE COURT:**  Overruled.

Reyes Huitzilin - Cross / By Mr. Nicolaysen          126

THE WITNESS:  No.

BY MR. NICOLAYSEN:

Q    Okay.  You had a loaded clip?

A    Yes.

Q    Did you have a bullet in the chamber?

A    I did.

Q    So to use common language among people who use guns, you had a chambered loaded 9 millimeter pistol on your waistband, right?

A    That's correct.

Q    You testified on direct that there was a moment in the events of August 28th when you took the gun out of your holster; is that true?

A    Correct.

Q    When did that happen, in relation to the events, before you got out of the vehicle?

A    No, when I was inside the vehicle.

Q    Okay.  Is this before you exited the vehicle on your phone?

A    Correct.

Q    And when you removed the loaded chambered firearm from your waistband when you were inside the vehicle, where did you put it?

A    What do you mean, when I removed it?

Q    When you removed the gun from its holster on your

Reyes Huitzilin - Cross / By Mr. Nicolaysen          127

waistband on this day --

A    I kept it to my chest facing down safely.

Q    Okay.  You put the gun on safety.

A    No.  I kept it near my body facing down, where it was safely pointing down.

Q    Okay.  So you removed the gun from your holster facing the ground, the floor of the vehicle, yes?

A    Correct.

Q    And you had it on safety for safety purposes, yes?

A    Correct.

Q    And you did that because you didn't know if you might need the gun.

A    Correct.

Q    Okay.  Did you observe any firearms on the persons of any one here in this room, in this courtroom?

A    At that moment I couldn't tell.

Q    On the day, on August 28th.  I represent Cynthia Raygoza, so let me be specific to her.

A    Uh-huh.

Q    And we've seen the videos and it's not the last time we'll look at them, the two of you got face to face, did you not?

A    Right.

Q    Did you observe any type of a weapon on her?

A    I couldn't tell.  I knew she had something in her hand, but I couldn't tell.

Reyes Huitzilin - Cross / By Mr. Nicolaysen                128

Q    She had a cup of coffee in her hand, don't you remember?

A    Are you referring when she first -- inside the vehicle, the first time I seen them?

Q    Yes, that's right.  Well, let's do it in sequence.  When you were looking at Cynthia Raygoza as she's walking up the street and we're going to start playing this video, so if I could have just a moment.

         **MR. NICOLAYSEN:**  I'm going to play Government's Exhibit 6 which is my 24, Your Honor.  May I have just a moment to set it up?

         Okay.  Give me one second.

Q    Now, Agent Reyes, I know you've seen this video and I'm going to show it to you with the Court's permission of course.  And I'd like you to stop me at any moment where you believe you see Cynthia Raygoza or anybody armed.  Will you do that for us?

A    I couldn't say that they were armed, but at the same time I don't know what they have underneath their clothes.

Q    All right.  Did you ever see a bulge consistent with a firearm?

A    From the distance that I was at inside my vehicle that's hard to tell.

Q    Okay.  I'll cut you that slack, but we saw the video, you got pretty close face to face, didn't you?

A    You're talking two -- about two different times.

Q    Very good.  So we're going to do the sequence.

**MR. NICOLAYSEN:**  So with the Court's permission I'm now going to start playing Government's Exhibit 6 which is my Exhibit -- just one second.  I need to get -- yep.

**(Video played at 1:38 p.m.)**

Q    Do you know whose white vehicle is passing?

A    I believe that's my neighbor.

Q    I'm going to fast forward a little bit and save some time.

And I'm now going to pause.

Is the video now capturing the rear part of your family vehicle?

A    Correct.

Q    And at this moment, to the best of your recollection, are you still inside the vehicle?

A    Yes.

Q    Your wife is in the driver's seat.

A    Correct.

Q    And your two children are in the back.

A    Correct.

Q    Tell us please their ages at that time?

A    Seven and three.

Q    Say it again please.

A    Seven and three.

Q    Are either of them in a car seat?

A    Of course.

Q    Both?

Reyes Huitzilin - Cross / By Mr. Nicolaysen          130

A      Yes.

Q      Now, do you see your arm there on the open passenger window?

A      Correct.

Q      Now, you've told us, don't get into any specifics, but you told us that you had been already arranging with your wife to take the children to a certain place, yes?

A      Correct.

Q      And you got in the vehicle as soon as you parked the government vehicle for that very purpose, you were about to go somewhere.

A      Correct.

Q      When you parked the government vehicle, was it on a public street, on Chelsfield?

A      Yes.

Q      So just to confirm for the sake of clarity, you did not pull the government vehicle into your driveway, did you?

A      I did for a period so I can park.

Q      You pulled it and you parked on the public street.

A      In front of my house, yes.

Q      You didn't go into your house, did you?

A      No, I did not.

Q      And as soon as you parked the car on the public street, you went directly to the wife's car which -- or the family car which we see here, correct?

Reyes Huitzilin - Cross / By Mr. Nicolaysen          131

A     Correct.

Q     And would you agree with me that what we're looking at here is within a minute or so after you parked.

A     Just about.

Q     Now, was the street blocked?

A     Blocked?

Q     Yes.

A     No, not that I know of.

Q     We just watched a white pick-up truck which you've referenced as one of your neighbor's cars going by, didn't we?

A     Correct.

Q     Okay.  So the street was open.

A     Correct.

Q     So you and your wife could have, if you wanted to, simply driven off and gone wherever you had planned to go.

A     Not under the circumstances, no.

Q     Well, you didn't know what the circumstances were at that point in time, did you?

A     I knew enough that there was a threat that existed against me or my family.

Q     A threat that you couldn't just drive away from?

A     Why would I -- if I believe the threat is against me, at that time that didn't make any sense for me to leave.

Q     At this moment, at this early moment --

A     At that moment.

Reyes Huitzilin - Cross / By Mr. Nicolaysen           132

Q    Just a minute.  At this early moment, this is before you got out and had the face to face confrontations with Cynthia Raygoza, right?

A    Correct.

Q    What was exactly the threat that kept you from simply driving off?

A    At that very moment that you have on the screen she made the statement of look at his tattoos.

Q    Okay.  So she says look at his tattoos, got it.  That is such a threat that you as a federal agent armed with a 9 millimeter that's chambered couldn't just say to your wife, let's go?

A    No, because at that time I felt I was being targeted and I was trying to determine was I followed or were they waiting for me.

Q    So if you drove off, you felt that that would continue some kind of risk to you and your family?

A    100 percent.

Q    What was the risk?

A    Then coming back later that day.

Q    You could have driven directly to the Baldwin Park Police Department, couldn't you?

A    How would that help the situation to determine who was at my home.

Q    The Baldwin Park Police station house is just a few blocks

from your house, isn't?

A    A couple of miles.

Q    Okay.  If you drove directly there and informed the officers of the situation that was an option available to you, wasn't it?

A    Potentially.

Q    Okay.  And instead of driving off and driving to the Baldwin Park Police station, you as a federal agent, you chose to get out of your car and have the various confrontations that we have seen on the video so far; is that right?

A    The threat existed to my family and I thought that was necessary.

Q    So you felt that you were protecting your family by not driving away as an armed federal agent and instead getting out of the car and having these face to face confrontations, is that your testimony?

A    I'm saying that there was a threat that existed, I needed to know what level of threat it presented to me and my family.

        **(Video played at 1:44 p.m.)**

Q    And we see you filming, don't we, from the passenger seat.

A    Correct.

Q    And we know you're getting out of the car filming.

A    Correct.

Q    And you feel that somehow you are managing what you consider to be a threat to the safety of your family as an

Reyes Huitzilin - Cross / By Mr. Nicolaysen                 134

armed federal agent by getting out of and filming, is that your

testimony?

A    I'm investigating why they are there.

Q    So that's how you manage the threat to your family as an

armed federal agent by getting out and filming and conducting

your own investigation?

          MR. MPARE:  Objection, asked and answered.

          THE COURT:  It's not asked and answered, but the

questioner is inflecting the questioner's view about the

questions and that should be toned down.

          MR. NICOLAYSEN:  Understood, Your Honor, thank you.

          THE COURT:  Get the point.

BY MR. NICOLAYSEN:

Q    You observed as you got out of your vehicle where the

vehicle that the three individuals here had traveled in, where

it was positioned on Chelsfield, correct?

A    Correct.

Q    And you know certainly now that you are a witness, that

they were at the location 12833, correct?

A    I don't remember the address of that location so I can't

confirm that.

Q    All right.  And if I were to say 12837 you wouldn't know?

A    I don't remember the address to be my neighbor's.

Q    Okay.  Would you be able to recall that 12837 and 12833

are several houses down from yours.

A    Potentially, yes.

Q    Now so we are at the point, and this is the beginning of this whole occasion where you have gotten out of the vehicle and you're now filming walking towards Ms. Raygoza; is that correct?

A    That's correct.

Q    To do what you called an investigation; is that right?

A    That's correct.

Q    Your wife is still in the car?

A    I don't remember.  At that moment I wasn't sure.

Q    And your car is literally on the street where moving traffic would go back and forth, right?

A    It's closer to the curb.

Q    Your wife is still in the driver seat?

A    At that moment when I recorded my assumption is yes.

Q    Now, there's a point where you're on the phone, true?

A    Recording, yes.

Q    And you had two phones, didn't you?

A    No, I had one phone.

Q    You were recording and you were also speaking with somebody, were you not?

A    No, I was not.

Q    You were never speaking with anyone?

A    At that moment, no, I was not.

Q    There did come a moment where you, in fact, did make a

phone call, true?

A     Afterwards, long after that.

Q     Who did you call?

A     Management.

Q     And who did you speak to in management?

A     I believe it was my supervisor.

Q     And you informed your supervisor of the situation.

A     Correct.

Q     Did they give you advice?

          MR. MPARE:  Objection, hearsay.

          THE COURT:  Overruled.

BY MR. NICOLAYSEN:

Q     Were you given any guidance or advice on how to handle the situation?

A     They just told me to keep them posted and that they were going to get back to me.

Q     They told you to do what?

A     They told me to keep them posted or keep her posted and she would call me back.

Q     So you call and tell them about this situation and they tell you, ah, keep us posted and call us back later; is that it?

A     No, no.  She said, keep me posted, anything else happens, I'll call you back, something along those lines.

Q     Did they offer to send any agents or assistance of any

kind?

A     After the fact.

Q     And, in fact, you were taking some guidance from somebody who was suggesting that you film the situation; isn't that true?

A     No.

Q     You're telling the jury that this was entirely your decision to get out of the vehicle and film?

A     Yes.

Q     So you made this decision instead of driving, you're going to just take it upon yourself to conduct an investigation, is that your testimony?

A     Again, it was a threat and I needed to assess the situation and conclude what level of threat was presented at my home and my block.

Q     Okay.  And so now we're going to watch a little bit more and that will include some things we've already seen and then I have some more questions for you.

        **(Video played at 1:49 p.m.)**

Q     Do you see that outstretched hand?

A     Yes.

Q     This is -- the timestamp is 2 minutes and 30 seconds of Government Exhibit 6.  Would you agree with me that that outstretched hand is my client, Ms. Raygoza?

A     Yes.

Reyes Huitzilin - Cross / By Mr. Nicolaysen                138

Q    Okay.  She's telling you not to get to close to her, that's exactly what we hear, true?

A    Correct.

Q    Because you were, in fact, approaching her, weren't you?

A    I was.

Q    Why?  Why didn't you just stand still and talk to her?

    MR. MPARE:  Asked and answered, Your Honor, objection.

    THE COURT:  Overruled.

    THE WITNESS:  At that moment, as I mentioned before I understood my family was threatened and as a protector of my family I had every right to confront that threat.

BY MR. NICOLAYSEN:

Q    So your way of conducting this investigation as you call it, to manage this threat that you're saying, was to walk up to Cynthia Raygoza and approach her in the way that we see on the video, is that your testimony?

A    Right.

Q    And she's extending her hand telling you not to get too close, right, you see that?

A    Correct.

Q    She doesn't touch you, does she?

A    At that moment, no.

Q    And you continue walking up to her, don't you?

A    Yes.

**(Video played at 1:50 p.m.)**

Q    So we watched from 2 minutes and 30 seconds to 3 minutes and 17 seconds, not quite but almost a minute in which my client Ms. Raygoza repeatedly says you're getting too close to me.  Do you hear that?

A    Yes.

Q    And, in fact, you continued walking up towards her while you were recording her with your cell phone, true?

A    I'm walking to that direction, yes.

Q    Well, you're saying you're walking in that direction.

A    Right.

Q    The direction you're walking in is where she's standing, right?

A    The direction she was walking to was my family vehicle.

Q    And Ms. Raygoza was backing off from you?

A    I was walking in that direction.

Q    You were walking in the direction where she was standing, correct?

A    Correct.

Q    And as you did so, you got closer to her, did you not?

A    Correct.

Q    And as you got closer to her, she was backing off from you and making the statements that we just heard, true?

A    At the beginning, yes.

Q    And you were recording exactly what I just said, weren't

Reyes Huitzilin - Cross / By Mr. Nicolaysen                    140

you?

A    I believe so.

Q    And this is, in fact, on cell phone video that you provided to the Government, true?

A    I believe so.

Q    Okay.  Now, we're going to play a little more.

**(Video played at 1:52 p.m.)**

Q    So what we're watching now and we just went from 3:17 to 3:53 on Government Exhibit 6, we're watching you conducting this investigation for the safety of your family, is that what we're watching?

A    Correct.

Q    And you feel somehow that you are managing the safety of your family by having this type of confrontation that we're looking at?

A    I'm close to the threat, I'm away from my car.

Q    At this -- you're away from your car where your children are, right?

A    Right.

Q    And again you just didn't think at any point in time while all of this is going on that maybe the best thing to do is just get in the car and drive off?

A    No, because I don't know if they have a gun or not.

Q    So you got so close to Ms. Raygoza but you didn't know she had a gun, so you -- but you still got that close to her

EXCEPTIONAL REPORTING SERVICES, INC

Reyes Huitzilin - Cross / By Mr. Nicolaysen          141

anyway, is that your testimony?

A    If she has a gun or anybody else have a gun, I can react quicker if I'm closer to them.

Q    Well, you knew perfectly well she didn't have a gun.

A    I don't know that.

Q    Then why did you get so close to her.

A    Because I'm trying to assess the situation.

Q    You're assessing the situation by doing the things that we're watching but you don't know if she has a gun.

        MR. MPARE:  Objection, asked and answered, Your Honor.

        THE COURT:  Overruled.

BY MR. NICOLAYSEN:

Q    Is that your testimony?

A    Say that one more time.

Q    You're a law enforcement officer, so you would have the right to frisk her, wouldn't you?

A    Not at that time, no.

Q    Of course you do, you felt a crime had been committed --

        MR. MPARE:  Objection, relevance, Your Honor.

        THE COURT:  Overruled.

Q    You testified on direct that you felt a crime had been committed.

A    When --

Q    Did you remember -- do you remember giving that testimony?

Reyes Huitzilin - Cross / By Mr. Nicolaysen                142

A    When I got in the car, I determined a crime had been committed.  At this point, no, not yet.

Q    But in terms of you were trained in stop and frisk rules, right?

A    Yes, when a crime has been committed and we have probable cause.

Q    Really?  You don't think that if a law enforcement officer has reasonable --

        THE COURT:  Wait a minute, what's the really about?  What's the really?

        MR. NICOLAYSEN:  I'm sorry, Your Honor.

        THE COURT:  I mean --

BY MR. NICOLAYSEN:

Q    So you didn't feel that in the circumstance at hand where you got out of the car because you felt threatened and you decided to go up to Ms. Raygoza you didn't know if she had a gun, you didn't think you had the legal authority to frisk her?

A    No, not at that time, no.

Q    Okay.  Now, you're this close to Ms. Raygoza we see it on the video.  Do you see any indication of a firearm or any other kind of weapon?

A    I couldn't tell, I still couldn't tell.

Q    She had coffee in her hand at one point, didn't she?

A    This is after -- that's a whole separate -- you're talking two different situations, two different timelines, sir.

Q    We'll get to that.  But now she threatened to throw coffee at you, do you remember that?

A    That's what she said, was inside that, coffee, I don't know if that was coffee in there.

Q    A cup of coffee in her hand, do you recall that on the video.

A    Correct.  She had a cup of something there.

Q    What do you think was in there?

A    I don't know, sir.  I couldn't tell you.  She says it's coffee, but I don't know it to be a fact.

Q    She threw nothing at you, did she?

A    She threatened to throw coffee at me.

Q    She said I'll throw my coffee at you and never did; isn't that correct?

A    She said, I'll throw my coffee at you, she make a jerking motion that she was going to throw it and I felt she was going to throw it.

Q    She made a gesture, I'm going to throw my coffee and she never did, correct?

A    No, she never did.

Q    I'm right, right, she never did.

A    Yes.  She never threw it, yeah, she never threw the coffee, but she threatened to throw coffee.

Q    And she never threatened to do anything like shoot you, did she?

A    Yes, she did.  She made a statement I'll pop you.

Q    Pop you.  You took that to mean shoot you?

A    Yes.

Q    Was there a point in time where you did see a firearm?

A    Again, I don't know what she had on her.

Q    Really?

A    Right.

Q    Did you see a gun in the presence --

          THE COURT:  Cut the really out.

Q    Did you --

          THE COURT:  Just ask questions.

          MR. NICOLAYSEN:  I understand, Your Honor.

          THE COURT:  And don't indicate what you believe or disbelieve in your questions, that's for the jury.  You're to ask questions.  They decide what they believe and what the inferences are.

BY MR. NICOLAYSEN:

Q    Did you see any firearm in the presence or on the person of anyone else among the people who came later or anyone other than the police officers and yourself?

A    Are you asking if I saw any of the other masked individuals with a handgun, clearly showing a handgun on them, is that what you're asking?

Q    Well, let's start with the masked people.  Do you see a handgun?

A     Not in their hand, no.

Q     Okay.  The people who came later, had any indication of a weapon, a gun?

A     On their hand, no, but did they have one on their body, maybe.

Q     No firearm was ever displayed, true?

A     Not by them, no.

Q     By anyone?

A     Not by me either.

Q     So no weapon was displayed, true?

A     Correct.

Q     The Baldwin Park Police when they first arrived did display a taser just as an initial gesture and they put that away.  Do you recall?

A     Yes, when Baldwin Park Police showed up, they had their guns out.

Q     Now, I'm going to continue playing this.  This is Government Exhibit 6.  And we're beginning at 3:53.

        **(Video played at 1:58 p.m.)**

Q     So we are now at timestamp 4:58 on Government Exhibit 6.  Are we observing what you called this investigation that you were conducting which is the reason you got out of the vehicle?

A     That's correct.

Q     I am now going to fast forward on the same exhibit.

        **(Video played at 2:00 p.m.)**

Q    I'm just pausing here at 10:37.  Is the video showing your family vehicle?

A    Correct.

Q    Are your children in the back seat?

A    Correct.

Q    We're at 10:37 so they've been sitting there in the back seat this entire time since you got out of the vehicle, true?

A    That's about right.

Q    Did your wife ever take the children back in the house?

A    Did my wife go back to my house when --

Q    Did your wife ever take the children back into the house?

A    With all this going on?  No, why would she do that.

Q    Did you consider asking your wife to drive your family vehicle into your driveway and put the kids in the house while this incident was going on?

A    And show these individuals exactly where I live?

Q    Okay.  So once again, you're deciding to simply leave the children in the car this entire time, correct?

A    True.

Q    Now we just saw a portion of the video that displayed both you and your wife on the sidewalk.

A    Correct.

Q    Okay.  So the children are being left unattended in the car, are they not?

A    We're like five feet away from them.

Reyes Huitzilin - Cross / By Mr. Nicolaysen            147

Q    You're five feet away?

A    Five, ten feet away from them.

**(Video played at 2:01 p.m.)**

Q    Is your vehicle -- let's look back here.

So now we see a timestamp 3:18 on Government Exhibit 6 you and your wife together outside the vehicle, children unattended with the passenger door open.  Do you see that?

A    Right.

Q    One of your children, and I say this respectfully, has had certain special needs, true?

A    Correct.

Q    Autistic.

A    Correct.

Q    Did you have any concerns at that time that maybe leaving your autistic child unattended under these circumstances with the sounds on the street might cause some distress?

           **MR. MPARE:**  Objection, argumentative.

           **THE COURT:**  Overruled.

**BY MR. NICOLAYSEN:**

Q    Did you consider that?

A    Say that -- what was your question again?

Q    Did you consider at the time that leaving your two children, one of who was autistic at the -- a 3-year old unattended on an August date with just the passenger door opened might cause the children a lot of distress?

A    Again, we were more than five, ten feet away from the vehicle, you mentioned August date.  It was not hot that day. The day was opened and the whole time I'm there, both me and my wife, we're continuously looking at the vehicle.

Q    So that is your explanation as to why you left you left the children unattended, is it?

A    Those are the facts.

Q    Okay.  Now, I'm going to go back to -- this is 10 --

**(Video played at 2:03 p.m.)**

Q    And we're stopping at 11:38 on Government Exhibit 6.  So there came a moment during this episode where you or it looks like your wife backed your family vehicle, true?

A    Correct.

Q    It was your wife who did so.

A    Correct.

Q    Did she do so at your direction?

A    No.  She did it on her own.

Q    She made the decision on her own, true?

A    I believe so.

Q    Okay.  And as we see here in the vehicle Ms. Raygoza is upset because the family vehicle is now blocking the vehicle of these three individuals, correct?

A    Correct.

Q    And Ms. Raygoza was making it very clear to you, was she not, that they wanted to leave, but they couldn't get out

because your vehicle was blocking them, right?

A    I believe she mentioned that at some point.

Q    Okay.  So why did you block her?

A    Well, the best way I can describe the situation is we've all seen incidents where a crime has been committed and then there will be a good Samaritan or two that stop the individual who committed the crime from leaving and holding that individual till the police arrive.  I believe I was doing the same thing.

Q    It was at this point when you decided or your wife decided to block their vehicle that my client threatened to throw the coffee at you, right?

A    Sure.

Q    And at this point, you had somehow determined in your mind that a crime had been committed; is that so?

A    That's correct.

Q    And going back to your earlier testimony based on your training and experience, you would have the authority as you understood it to frisk my client or anyone else if you felt there was reasonable suspicion that a firearm might be possessed, correct?

A    If I did that, how would that deescalate the situation, sir?

Q    So you had no concern?

A    That wasn't your question.

Q    Do you see how close you were to Ms. Raygoza?

A    Are you asking me a different question?

Q    Yeah, let's shift gears.

A    Okay.

Q    Do you see how close in the video you were --

A    No, I only see my shirt there --

Q    -- to Ms. Raygoza.

A    -- so I don't know what you're talking about.

Q    Let's back up.

     **(Video played at 2:07 p.m.)**

Q    Now we see you on the phone.

A    Correct.

Q    You're on the phone with your office?

A    Correct.  That is the moment I'm on the phone with my office.

Q    What are you discussing?

A    Letting them know, reporting the incident.

Q    Okay.  And are you having your wife back up the vehicle based on any direction from your office?

A    No.

Q    Okay.  Now, the Baldwin Park Police arrive in just a moment or so after what we're watching here.

A    That's correct.

     **(Video played at 2:08 p.m.)**

Q    Now in this moment in the video you're within a foot or

Reyes Huitzilin - Cross / By Mr. Nicolaysen                151

two of my client, aren't you?

A    Your client is within a foot from me, yes.

Q    Well, you and Ms. Raygoza are within a foot or two of each other, fair enough?

A    I was in front of the vehicle, she was in the back the whole time.  Now, you're showing a video of when she came to the front.

Q    I'll play it again.

     **(Video played at 2:08 p.m.)**

Q    So my client walked up to where you were on the phone and as we're watching here, the two of you are within a foot or two of each other.

A    Sure.

Q    And we heard she was going to throw her coffee at you, although she never does, I'll pop you, you heard that, right?

A    Correct.

Q    And you felt at that time a crime had been committed, didn't you?

A    No, prior to that.

Q    Okay.  So by this point in time you had already formed the opinion that a crime had been committed.

A    That is correct.

Q    Now, are you telling this jury that when you heard the word pop you thought that might be a gun.

A    Yes.

Reyes Huitzilin - Cross / By Mr. Nicolaysen                152

Q    Then you absolutely had the right to stop and frisk at least Ms. Raygoza, didn't you?

A    No, sir.  My objective the whole time was to deescalate. Doing that would not do that.

Q    So you thought when she says I'll pop you and you're that close to each other and you've already formed the opinion as a federal law enforcement officer that a crime had been committed and you think maybe the word pop involves a gun?

A    Yes.

Q    You felt that it's not appropriate to take action and pat her down, even detain her?

A    If I did that, what do you think the other two would have done, sir.

Q    Well, you didn't exactly walk away either, did you?

A    I didn't -- they didn't leave either.

Q    Let's watch the rest of the video until -- when the --

     **(Video played at 2:10 p.m.)**

Q    And here are the Baldwin Park Police, right?

A    That's correct.

Q    Did you -- now -- okay.  That's a taser in the officer's hand, is it not?

A    Correct.

Q    They never pulled their guns, did they?

A    They did.

Q    And they put --

Reyes Huitzilin - Cross / By Mr. Nicolaysen          153

(Video played at 2:11 p.m.)

Q    Did you ever inform a Baldwin Park police officer that you heard someone say I'll pop you and you thought they might shoot you?

A    No, I didn't mention that to them, no.

Q    No, that's right.  You did not mention that.  Okay.

Now, what you did mention, however, you were interviewed by the police, weren't you?

A    Briefly at that moment, yes.

Q    And you stated to the Baldwin Park police, did you not, that my client had pushed you.

MR. MPARE:  Objection, Your Honor.

THE COURT:  I made a ruling on that issue.  My view was that the -- how that's resolved is not important, but I think you can ask the question.

MR. NICOLAYSEN:  All right.  Thank you, Your Honor.

BY MR. NICOLAYSEN:

Q    So I take it --

THE COURT:  In other words, that is not going to become in and of itself an issue, but it can be discussed.

MR. NICOLAYSEN:  Okay.

Q    You told one of the Baldwin Park police officers that my client, Ms. Raygoza, had pushed you, do you recall you gave that statement?

A    That's correct.

Reyes Huitzilin - Cross / By Mr. Nicolaysen          154

Q    And that would be a misdemeanor battery?

MR. MPARE:  Objection, Your Honor, relevance.

THE COURT:  Overruled.

Q    Yes?

A    Sure.

Q    The Baldwin Park Police Department --

A    Well, hold on.

Q    I'm sorry.

A    It could be something else, because if we're looking at that, she did that on the strong belief that I was a federal law enforcement, so it's more than just battery, now she's assaulting a federal law enforcement officer.

Q    So the Baldwin Park police officer arrested Ms. Raygoza, do you recall?

A    Yes.

Q    For misdemeanor battery, do you recall?

A    I don't know what the charge was.

Q    And do you recall that based on what you told the Baldwin Park police officer Ms. Raygoza was detained and put in the police car, do you recall?

MR. MPARE:  Objection, lacks foundation, Your Honor.

THE COURT:  I mean, do you know firsthand regarding the question, do you know what happened?

THE WITNESS:  No, not after the fact, no.

THE COURT:  All right.  Then objection sustained.

EXCEPTIONAL REPORTING SERVICES, INC

MR. NICOLAYSEN:  All right.

BY MR. NICOLAYSEN:

Q    Do you recall being interviewed by a police officer from the Baldwin Park Police Department named -- by the last name of Moreno, Officer Moreno?

A    I was interviewed shortly by an officer, I don't know what her last name was.

Q    Do you recall giving a statement to the effect that while you were recording, we've seen you recording on your cell phone Ms. Raygoza pushed you?

A    I think I mentioned that to the first officer, I don't remember mentioning that to the female officer whatsoever.

Q    Well, without specifying which officer you made the statement to, do you recall that in an interview with the Baldwin Park police office, some officer, you stated that while you were recording Ms. Raygoza she pushed you.  Do you remember making that statement?

A    I don't remember the exact statement.  I know that an assault happened, but I don't remember what I said in that statement, I don't recall the details of my statement.

Q    Well, if that statement attributed to you is in a police report, the statement being that while you were recording Ms. Raygoza pushed you, would that be a false statement?

A    Again, I don't remember what I said, sir.

Q    So are you claiming that my client pushed you while you

were recording?

        **MR. MPARE:**  Objection, Your Honor.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I'm saying that she assaulted me. Whether I was recording or not, I don't remember, but I know it happened.

**BY MR. NICOLAYSEN:**

Q    Well, we've seen the video --

A    We've seen some video.

Q    Okay.  We've seen you videoing from the moment you got out of your family vehicle, true?

A    Correct.

Q    And you continued to video continuously during the confrontation that you had with my client face to face, true?

A    The first time I got out of the vehicle, yes, a portion of it.

Q    Do you have a specific recollection --

A    Of what?

Q    -- of the moment in time where you claim she pushed you?

A    It was -- I believe it was before I got in the vehicle.

Q    It was before you got in the vehicle.  What vehicle?

A    The family vehicle.

Q    She pushed you before you entered your family vehicle?

A    I believe, if I remember correctly.

Q    Well, you just told us today that you parked the

government vehicle on the street.

A    No, excuse me, my family vehicle.

Q    Yes.

A    Right.

Q    You told us on direct examination and again on this cross-examination that as soon as you parked the government vehicle on the street, you walked to the family vehicle and got inside.

A    Correct.

Q    And then you got out and started recording, right?

A    Correct.

Q    Are you telling this jury that --

        THE COURT:  Just hold on.  You know, you're -- it doesn't come through on a cold transcript, but you're signaling to the jury how you feel about his testimony.  I want you to stop that.  And I asked you a couple of times to do that.  And hear me clearly --

        MR. NICOLAYSEN:  I do, Your Honor.

        THE COURT:  -- stop it.  Just ask as many questions as you think relevant but ask them without your intonation.

        MR. NICOLAYSEN:  Understood, I thank Your Honor.

BY MR. NICOLAYSEN:

Q    Is it your testimony to the jury that my client came up to you during the period of time when you -- after you parked the government vehicle on the street and started walking to your family vehicle that she came up to you and pushed you?

Reyes Huitzilin - Cross / By Mr. Nicolaysen          158

A    I never said that, sir.

Q    Okay.  So tell the jury if you would, please, at what
point in time are you claiming my client pushed you?

A    I got out of the vehicle between the first encounter and
the second encounter, that's when that happened.

Q    The first encounter and the second encounter.

A    Right.  There was two encounters.  The first encounter
there was the assault and then the second encounter where she
therefore again assaulted me with the threat of throwing her
coffee and again assaulted by trying to shoot me.

Q    What I'm going to do now with the Court's permission is
I'm going to play your view and I would like -- this is
Government Exhibit 21 I believe and I'm going to ask you to
tell me to stop playing if we see any moment during this video
that you were making when my client pushed you.

A    It's not recorded.

Q    And I'm asking you to do that for us because I have asked
whether it was while you were recording that she pushed you and
if I heard correctly, you don't remember.

A    That's correct.

Q    Okay.  Fair enough.  So let's look at your video with the
Court's permission and give me just one second please.

     Now I am not getting sound at this time, do you recall if
there's sound on your video?

A    Are you talking to me?

Reyes Huitzilin - Cross / By Mr. Nicolaysen          159

Q    I am, yes.  Do you recall whether your cell phone video

had sound?

A    I don't remember.

Q    Okay.  Do you recognize what we are looking right now as

your video?

A    I don't see anything.

Q    And that's right, it is my mistake because I am not

hitting the right button.  Thank you by the way for telling me

that.  So let me go back to the beginning.

I was convinced it had sound and I didn't push the right

button.  Oh, I see.

**MR. NICOLAYSEN:**  Your Honor, I need just a moment

because I know there's sound but for some reason it's not

coming through.

**(Video played at 2:20 p.m.)**

Q    So, Mr. Reyes, I will begin asking if you recognize what

we are looking at as your video on August 28th, 2025.

A    Correct.

Q    I'm pausing at :21 seconds into the video and we see my

client Cynthia Raygoza with her cell phone.  Would this be

consistent with your recollection that what we are looking at

now is your vantage point from your cell phone of the same

encounter with Ms. Raygoza that we had finished looking at from

her cell phone vantage point?

A    Sure.

Reyes Huitzilin - Cross / By Mr. Nicolaysen                160

Q    Okay.

          **(Video played at 2:21 p.m.)**

Q    Now please raise your hand with the Court's permission and tell me to stop if there's a moment while you're recording and she pushes you.

          **(Video played at 2:21 p.m.)**

Q    Agent Reyes, we have now viewed the entire Government Exhibit 21 which runs 3 minutes and 5 seconds.  You recognize it as your cell phone video?

A    That's correct.

Q    Is this the one and only cell phone video that you took on August 28th, 2025 in this incident?

A    I believe so.

Q    I asked if you would raise your hand and indicate to us any moment where my client pushes you while you are recording, I didn't see a hand.  Can you direct us to any moment in this video when she does that?

A    Sir, I never made the statement to Baldwin Park PD that the incident happened while I was recording.  I think you made that up.

Q    Okay.  Fair enough.

     So your position is you never told the Baldwin Park Police --

          **THE COURT:**  He answered the question.

Q    Now, you sent the text message the following day August

Reyes Huitzilin - Cross / By Mr. Nicolaysen          161

29 -- let's back up.  Let's keep the same day, August 28th.

And you sent a text to an address all capital letter S-D-D-O  G-A-E-T-A.  Can you tell us what that address is or who that person is?

A    That's my supervisor at the time.

Q    Mr. -- Ms. Gaeta?

A    Correct.

Q    And do you recall giving the prosecutors a copy of a text --

A    Yes.

Q    -- that has to do with the subject we are discussing now?

A    That's correct.

        MR. NICOLAYSEN:  May I ask Your Honor's clerk to present the witness with Defense Exhibit 134, which has been marked for identification --

        THE COURT:  Yes.

        MR. NICOLAYSEN:  -- previously?

        (Pause)

BY MR. NICOLAYSEN:

Q    Agent Reyes, you have Defense Exhibit 134 in front of you, yes?

A    Correct.

Q    Do you recognize this document?

A    Yes.

Q    What is it?

Reyes Huitzilin - Cross / By Mr. Nicolaysen          162

A     It's a text, a picture of a text, conversation between me and my supervisor.

Q     I direct your attention to the date just above the yellow image of the thumbs up which says Thursday, August 28 at 1:11 p.m.  Do you see where I'm reading?

A     Yes.

Q     Would that date and time apply to the text message towards the bottom?

A     Correct.

Q     Now, do you recall giving a memo in which you outlined the time period between when you left downtown and when you left the Chelsfield Street area on August 28th?

A     Giving a memo?

Q     Writing an e-mail or a memo to the file summarizing the events.

A     No.

Q     Do you remember stating in a memo that you left downtown at approximately 12:25 heading home --

A     I never made a memo in reference to this.  I'm not sure what you're talking about.

Q     Do you recall writing any type of document that summarized the events of August 28th?

A     To who?

Q     I'm asking you.

A     No.

Reyes Huitzilin - Cross / By Mr. Nicolaysen          163

Q    To your office.

A    No, I don't remember.

         MR. NICOLAYSEN:  Your Honor, I have not previously
marked this for identification but I'd ask that it be marked as
defense next in order --

         THE COURT:  Has the Government seen it?

         MR. NICOLAYSEN:  -- 136.

         THE COURT:  Has the Government seen it?

         MR. MPARE:  We don't have a copy of it, Your Honor.

         THE COURT:  Before you question, show it to them.

         MR. NICOLAYSEN:  Let me show it to the Government.

    (Pause)

         MR. NICOLAYSEN:  May I approach, Your Honor?

         THE COURT:  Yeah.

BY MR. NICOLAYSEN:

Q    Agent Reyes, you're being presented with what has now been
marked for identification as Defense Exhibit 136.  Do you
recognize this document?

A    An e-mail, yes.

Q    Okay.  So it's an e-mail internal within your agency,
true?

A    Yes.

Q    That you authored.

A    Yeah, it appears to be, yes.

Q    And part of it gives time frames, you left downtown at

Reyes Huitzilin - Cross / By Mr. Nicolaysen          164

approximately 12:25 p.m. --

A     That's correct.

Q     -- you wrote that?

A     That's correct.

Q     Is that your best recollection?

A     Correct.

Q     And at approximately 1:10 or so towards the bottom of the first page Baldwin Park police arrived.

A     Correct.

Q     Is that your best recollection?

A     Correct.

Q     And turn to the next page towards the end of the e-mail, at approximately 1:40 p.m. you and your family left the area.

A     Correct.

Q     Is that your best recollection?

A     Correct.

Q     Okay.  So when we established earlier today on cross that the entire episode that -- of this day was an hour and a half or so, that's consistent with your memo, right?

A     That's about right, my e-mail, not memo.  This is different, sir.

Q     Very good, your e-mail.  So I will rephrase the question, thank you.

      So when I stated, at least I asked you earlier today that the events of this case occurred on August 28th within an

Reyes Huitzilin - Cross / By Mr. Nicolaysen                165

approximately an hour and a half.  That's consistent with your e-mail, would you agree?

A    Sounds about right.

Q    Okay.  Now, let's go back --

MR. NICOLAYSEN:  Your Honor --

Q    Let's go back to Exhibit 134 and the text messages.  And it has Thursday, August 28th at 1:11 p.m.  Do you see that?

A    Correct.

Q    And you're sending this text at just about the time that the Baldwin Park police are arriving, yes?

A    I don't remember.  It sounds about right.

Q    Well, if you would please go back to Exhibit 136, the e-mail that we just covered and look at the bottom of the first page please, this is your e-mail and it'll give a statement as to approximately when the Baldwin Park police arrived.  Do you see that in your e-mail?

A    Correct.

Q    Exhibit 136.

A    Correct.

Q    And what is the time that you write in your e-mail when Baldwin Park police arrive?

A    I gave an approximate time.

Q    Yes.  Of?

A    1:05.

Q    1:05.  Now, we go back to Exhibit 134, the text message.

A     Okay.

Q     Thursday, August 28th at 1:11 p.m.  So we agree this is approximation but would you agree with me that the text message that you're sending that we see on Exhibit 134 is contemporaneous, it's happening roughly at the same time that the Baldwin Park police are arriving.

A     The information in the text, yes, sounds about right.

Q     Okay.  Now, you're writing to your supervisor, is it a Mr. or Ms. Geata?

A     Miss.

Q     Ms. Geata, okay.  And at the bottom in the blue box with white lettering you make a reference to the subject that I had covered with you about my client pushing you, do you not?

A     Correct.

Q     And you state in your text that one of them, quote/unquote, assaulted me on the basis of me being an ICE agent, you wrote that.

          **MR. MPARE:**  Your Honor, we're going to object again on the basis of a motion in limine which the Court already ruled on.

          **THE COURT:**  I'm going to allow it.  He can ask the question.

**BY MR. NICOLAYSEN:**

Q     Do you see that?

A     Yes.

Reyes Huitzilin - Cross / By Mr. Nicolaysen              167

Q    And when you wrote one of them quote, assaulted, unquote me -- assaulted me, unquote, on the basis of me being an ICE agent, you knew the assault never actually occurred and that's why you put the quotes; isn't that right?

A    No, sir, the assault happened, if I put the quotation, it's just to clarify to my supervisor that no weapon was used, but the assault happened, sir.

Q    Is that your -- so your explanation is that the quotes behind -- around the word assault mean that no weapon was used, is that your testimony?

A    That is the fact, sir.

        MR. NICOLAYSEN:  Your Honor, I move Exhibit 134 into evidence.

        THE COURT:  Received.

    **(Exhibit Number 134 received in evidence)**

**BY MR. NICOLAYSEN:**

Q    Now, let's turn our attention to the period of time after August 28th.  Do you have an Instagram account?

A    I do.

Q    What's the name of it?

A    I'm not sure I should disclose that.

        MR. MPARE:  Objection, Your Honor, we'd rather that not be disclosed in court.

        THE COURT:  Well, I mean, is it relevant to know the exact name of it?

Reyes Huitzilin - Cross / By Mr. Nicolaysen           168

**MR. NICOLAYSEN:**  I'm happy to make a proffer at sidebar, but let me approach it this way.  I understand, so let me do it this way.

Q    Are you familiar, Agent Reyes, with an Instagram account under the name @bikerhead89?

A    Yes, I am familiar with that.

Q    And what is your familiarity with that Instagram address.

A    That I was accused of being that person.

Q    Okay.  You're not that person?

A    Of course not.

Q    Okay.  Are you suggesting that Ms. Raygoza accused you of that?

A    I didn't say that.

Q    Have you ever posted anything on a social media account using the address @bikerhead89?

A    Sir, that's not my account.

Q    So is the answer no?

A    Of course not.

Q    Now, continuing with the time period after August 28, 2025, did you ever post anything on an Instagram account specifically in regard to what happened on August 28, 2025?

A    No, sir.

Q    Okay.  Now, you were asked questions on direct exam about the effects of that day, I'm sure you gave some testimony on that, you moved to a new location.  Did you ever reach out to

your agency for any type of counseling or therapy?

A    No.

Q    You work for the Department of Homeland Security they have a healthcare program for employees, do they?

A    A healthcare program?

Q    Yes, you have healthcare coverage.

A    I mean, are you asking do I have medical insurance?

Q    Do you have healthcare coverage as part of your employment?

A    Yes.

Q    And did you ever inquire after August 28th, 2025 as to whether any form of therapy or counseling might be available to you and your wife?

A    I did inquire about that.

Q    And what were you told?

A    To talk to my health benefit representative.

Q    Okay.  And did you do so?

A    I believe I talked to my wife about it and she followed up.

Q    And did there come a point in time where either or both of you undertook any type of therapy or counseling specifically in regard to the events of August 28th?

A    I believe my wife did.

Q    Where did she do that?

A    You'll have to ask her, I don't know, sir.

Reyes Huitzilin - Cross / By Mr. Nicolaysen            170

Q    Did you participate?

A    No.

Q    Why not?

A    What do you mean why not?

Q    Well, if the effects of August 28th were what you were described, why didn't you take advantage of your agency's healthcare plan that includes therapy?

A    I deal with stress differently, sir.  Talking to someone is not.

Q    So the bottom line is, you never talked to any type of counselor or therapist; is that correct?

A    I talked to my wife.

Q    I understand, but you never talked to any professional counselor or therapist; is that correct?

A    I didn't, no.

Q    Okay.  Now, do you recall having made any comments to your supervisor Ms. Geata about how you're doing the day after the event?

A    I believe you're referring to a text where I'm asking for a day off, but I won't be in there.

        **MR. NICOLAYSEN:**  Your Honor, if the Court please, I would ask that the witness be shown what's been marked for identification as Defense Exhibit 135.

        **THE COURT:**  Okay.

//

Reyes Huitzilin - Cross / By Mr. Nicolaysen                171

BY MR. NICOLAYSEN:

Q    Do you recognize Defense Exhibit 135?

A    Correct.

Q    What is it?

A    It's a text between me and my supervisor.

Q    So we're looking at a text exchange between you and your supervisor Ms. Geata the following day, August 29, 2025, are we not?

A    Correct.

Q    Okay.  And Ms. Geata is saying to you, hello, checking up on you and the family, is that her writing to you?

A    Correct.

Q    And you are writing in the blue box with the white lettering, hey, we're good, thank you.  Is that what you wrote?

A    Sure.

Q    And then she writes back, good to hear, please let us know if you need anything.  Do you see her writing that?

A    Yes.

Q    Okay.  And this exhibit is a true and accurate copy of the text exchange?

A    That is correct.

        MR. NICOLAYSEN:  Okay.  Your Honor, I move Exhibit 135 into evidence.

        THE COURT:  Received.

        (Exhibit Number 135 received in evidence)

EXCEPTIONAL REPORTING SERVICES, INC

**BY MR. NICOLAYSEN:**

Q    Now, when your supervisor said, please let us know if you need anything, did you ever follow up with your supervisor and tell her that, yes, I do need certain things?

A    What exactly are you referring to?

        **MR. NICOLAYSEN:**  That concludes cross, Your Honor, thank you.

        **THE COURT:**  Okay.  Who was next?

        **MS. COIT:**  I am, Your Honor.

        **THE COURT:**  Okay.  Try not to go over the same round unless it's necessary.

        **MS. COIT:**  Yes, Your Honor.

                    **CROSS EXAMINATION**

**BY MS. COIT:**

Q    Good afternoon, Officer Reyes.

A    Good afternoon.

Q    Just wanting to clear up, when you started your testimony you said your last name is Huitzilin; is that right?

A    That's correct.

Q    The Government has been referring to you today as Reyes.

A    Sure.

Q    That's your former last name?

A    That's my middle name, easier to pronounce.

Q    It was also your former last name.

A    Correct.

Q    You had changed it -- your last name from Reyes to Huitzilin.

A    That's correct.

Q    But that was before this case.

A    Correct.

Q    I'm going to pull back up Exhibit 134.  Which has been admitted into evidence.

I'm going to go ahead and pick up, just for ease, Defendant's Exhibit 230.  Oh, and I'm going to have you -- for the record, it's the same set of text messages that's in Exhibit 134.

Do you have those in front of you?

A    Yes.

Q    And you recognize those as your text messages to your supervisor Geata.

A    That's correct.

MS. COIT:  I'd like to move Defendant Exhibit 230 into evidence.

THE COURT:  Received.

(Exhibit Number 230 received in evidence)

BY MS. COIT:

Q    This is a set of texts that you sent to your supervisor on August 28th, 2025.

A    Correct.

Q    At 1:11.

Reyes Huitzilin - Cross / By Ms. Coit                    174

A     Sounds about right.

Q     Okay.  And the first thing that you send to your supervisor at 1:11 is pressing charges.

A     Correct.

Q     And then this is where you look down on the bottom, you say one of them quote, assaulted me, unquote.

A     Correct.

Q     There's no pending charge for any kind of -- sorry. There's no pending state charge against Ms. Raygoza for assault, is there?

        THE COURT:  You know my ruling was that each side can ask about it, but the question of this resolution I'm ruling is not pertinent.  So stay away from that.

        MS. COIT:  I'll move on, Your Honor, I'll get that down.

BY MS. COIT:

Q     So let's talk about your job as an ICE agent.  You stated on direct that you wear a vest.

A     When I'm in the field and making arrests, yes.

Q     When you're in the field.  And under the vest though you have plain clothes on.

A     Usually something of solid color, yes, plain clothes.

Q     Okay.  You're not wearing a uniform underneath that vest.

A     We don't have uniforms, no.

Q     You said usually solid colors.

EXCEPTIONAL REPORTING SERVICES, INC

Reyes Huitzilin - Cross / By Ms. Coit                    175

A    Right, so it wouldn't be a patterned shirt or nothing like that.

Q    Other ICE agents though you've seen wear plaid shirts.

A    I haven't seen it.  I don't know.

Q    You've never seen one.  Okay.  You also wear a mask when you are in the field.

A    Correct.

Q    And you do that so people will not see your identity.

A    To avoid this.

Q    You don't -- you wear a mask to hide your identity.

           MR. MPARE:  Objection, relevance.

           THE COURT:  Yeah, what's the relevance of it?

           MS. COIT:  There's relevance about that the --
Ms. Raygoza, Ms. Samane and Ms. Brown were imitating ICE agents by wearing masks.

           THE COURT:  Are they going to testify to that?  Are they going to testify to that?

           MR. NICOLAYSEN:  Your Honor, that decision has not been made.

           MS. COIT:  Yeah, it hasn't been made.

           THE COURT:  Then the objection is sustained.

BY MS. COIT:

Q    So you discussed that you -- when you're working as a deportation officer you're based in the 300 federal building; is that right?

Reyes Huitzilin - Cross / By Ms. Coit            176

A      Yes, I have a cubicle in that building.

Q      And that is where the ICE facilities are.

A      What do you mean by ICE facilities?

Q      Where ICE detains individuals.

A      Yes, there's a portion of that building.

Q      And that's located next to the Metropolitan Detention Center.

A      That's correct.

Q      I refer to as MDC.

A      Correct.

Q      And when you are driving your ICE vehicle you exit out the ramp that's next to MDC.

A      Correct.

        MS. COIT:  I'm just making sure that I'm not repeating anything that we've gone over before.

        THE COURT:  Well, I mean, if you overlap somewhat, it's understandable, but just try to not do it to the point that whatever points have been made have been made.

BY MS. COIT:

Q      So in August 2025 you were living in Baldwin Park and doing immigration enforcement in the LA area.

A      When, what day?

Q      In August 2025.

A      I was doing what now?

Q      You were living in Baldwin Park and doing immigration

Reyes Huitzilin - Cross / By Ms. Coit                    177

enforcement in the Los Angeles area.

A    Yes, I lived in Baldwin Park and worked for ICE.

Q    But not all deportation officers working in LA at that time were from LA.

A    You're asking a broad question.  A lot of the people that I work with are from LA, LA County.

Q    But you work with deportation officers that are not from LA.

A    As in they live in a different county?

Q    The deportation officers are deployed -- were deployed to LA to do immigration enforcement last summer.

A    No, we live here, why would we deploy?  That doesn't -- I think you're talking about border patrol.

Q    Have you been deployed to other states for immigration enforcement?

A    Yes.

Q    And have you been deployed as a deportation officer.

A    Correct.

Q    And you take your ICE vehicle to those states, right?

        MR. MPARE:  Objection, relevance, Your Honor.

        THE COURT:  I don't know where it's going, just some preliminary questions.

BY MS. COIT:

Q    Deportation officers do live in other areas than Los Angeles.

Reyes Huitzilin - Cross / By Ms. Coit                178

A    We're federal, so we live all over the country.

Q    Federal, okay.

    So this ICE vehicle that you drive, it's a specific
vehicle that's assigned to you, right?

A    If you're referring to the blue Ford Explorer on that day?

Q    Yes.

A    Yes.

Q    And that's the car that you use when you go out in the
field for immigration enforcement.

A    Correct.

Q    It's not your personal vehicle, correct?

A    No.

Q    You only use it for work.

A    Correct.

Q    We talked, it's an SUV.

A    Is it an SUV?

Q    Yes.

A    I don't know, I guess.

Q    It's a Ford Explorer.

A    Correct.

Q    Seats five people?

A    I've not counted how many --

Q    You haven't counted how many seats are in your car?

A    No, it's not -- no.

Q    It has tinted windows in the trunk.

Reyes Huitzilin - Cross / By Ms. Coit                179

A     Yes.

Q     It has tinted windows on the side passenger, on the back area.

A     Correct.

Q     And you can't see through those from the outside, those windows.

A     Right, it's tinted.

Q     It's tinted.  Same thing with the passenger windows, right, those are also tinted.

A     The whole vehicle is tinted, even the front.

Q     The whole vehicle, even the front.  You cannot see inside it.

A     No.

Q     And there's no license plates on it, right?

A     At that time, no.

Q     On the front.

A     At that time, on that day, no.

Q     Yeah, and at that time, not on the back, right?

A     Right.

Q     Now, I want to talk about when the Baldwin Park police arrive, you're outside of the car.

A     Yes.

Q     You're actually standing directly in front of Ms. Brown's car, right?

A     Correct.

Reyes Huitzilin - Cross / By Ms. Coit                    180

Q    And even after the Baldwin Park police you don't leave the area where Ms. Brown's car is, correct?

A    I believe eventually we move out of that area, yes.

Q    Okay.  But you stand there for a while, right, watching them?

A    No.  My wife moves the car and then I follow the car and I move out of the area.

        MS. COIT:  I'm going to pull up what's been marked as Defense Exhibit 251 for --

Q    Actually I'll go ahead and move on.  Now, when the women were filming you they were on the street, right?

A    Yes.

Q    They weren't at your home, right?

A    At one point they were at my home, yes.

Q    When they were filming you, they were not at your home.

A    They were two houses from my house.

Q    Okay.  When they were filming you, they were not at your home.

A    No.

Q    They were not on your property.

A    No.

Q    You knew that people are allowed to film in public.

A    Yes, of course.

Q    There is a First Amendment right to film.

A    Correct.

Reyes Huitzilin - Cross / By Ms. Coit                181

Q    And one of the Baldwin Park police officers says that to you, right?

A    I'm not sure what you're referring to.

THE COURT:  Why are you getting into First Amendment and what a police officer told him?  He said you have a right to film in public and that's established.  Ask another question.

MS. COIT:  Yes, Your Honor.

BY MS. COIT:

Q    When you -- after August 28th, 2025 you never saw Ms. Brown on your street again.

A    I don't know.

Q    You don't know if you saw Ms. Brown on your street?

A    After that day?

Q    Yes.

A    Yeah, I don't know.  I don't know if she came back.  I don't know if she came back in another car, I don't know.

Q    You don't know, but you never saw her as far as you know.

A    I cannot confirm that she wasn't there and I can't confirm that she was there.

Q    That's not my question.  My question is, did you ever see Ms. Brown on your street again.

A    After that day?

Q    After that day.

A    No.

Q    She never called you.

A    No.

Q    She never called your wife.

A    I hope not, no.

Q    She never posted about you after the incident.

A    I don't know.  I don't know her account.

Q    But as far as you know, she never posted about you again.

A    I don't know.

Q    As far as you know, she never posted about you again.

A    Sure, no.

Q    She never sent anything to your house.

A    No.

Q    To your work.

A    No.

Q    You never heard from her again.

A    No.

Q    So you were talking about that there was traffic coming in and out of your cul-de-sac and it was your testimony it was more than before August 28th, correct?

A    Correct.

Q    You have no idea who was in those vehicles, right?

A    I do not.

Q    There was a special detail that was sent out to your home to watch your street following August 28th, 2025, right?

A    That's correct.

Q    And it was sent by your agency.

A    That's correct.

Q    And they came for a few days.

A    That's correct.

Q    And they didn't come back out after those few days, right?

A    Correct.

Q    And you didn't request for them to come back, right?

A    No, I did not request.

Q    You never requested them to come back.

A    No, because something else was placed.

Q    So let's talk about the move.  Your move was an upgrade, right?

A    My move was an upgrade?

Q    You upgraded your home when you moved.

A    Sure.

Q    It was a nicer neighborhood.

A    Potentially, yes.

Q    It's not as densely populated.

        MR. MPARE:  Your Honor, relevance objection.

        THE COURT:  Overruled.

        THE WITNESS:  It's not what?

BY MS. COIT:

Q    As densely populated.

A    I guess.

Q    It's more in the suburbs.

Reyes Huitzilin - Cross / By Ms. Coit                    184

A    I don't know, I guess.

Q    Your house is twice as big.

A    Potentially.

Q    Potentially.  You don't know if your house is twice as big as the house in Baldwin Park.

A    I mean, I'm not understanding why you're asking these questions.

Q    Is the house that you live in now bigger than your house in Baldwin Park?

A    Sure.

Q    Is it worth twice as much?

A    Sure.

Q    You didn't use victim location fees to buy your current home, right?

A    That was never offered to me.

Q    You inquired though about victim relocation funds, right?

A    I don't remember that I did.

Q    It's your testimony that you never --

A    I don't remember that I did.  I don't remember asking for that.

Q    You never received them, right?

A    No.

Q    Okay.  You moved, but you didn't sell the house in Baldwin Park, right?

A    Correct.

Q    You still own it.

A    That's correct.

Q    Members of your family still live there, right?

A    That's correct.

Q    You knew that your personal address was never posted on social media on August 28th, 2025, right?

A    My personal address, I never seen it, but I seen other addresses near my home.

Q    Your personal address was never posted on social media on August 25th -- 28th, 2025?

A    I never saw it.  I don't know that it was or wasn't.

Q    It wasn't posted by Ms. Raygoza.

A    I don't know.

Q    It wasn't posted by Ms. Samane.

A    I have no idea.

Q    It wasn't posted by Ms. Brown.

A    I have no idea.

        MS. COIT:  Nothing further.

        THE COURT:  Okay.  I think it's 2:55 now.  Before we hear the -- how long will your cross be?

        MR. BERNSTEIN:  It'll be less than ten minutes, Your Honor.

        THE COURT:  All right.  Then why don't you do it and then we can take a recess.

//

Reyes Huitzilin - Cross / By Mr. Bernstein          186

**CROSS EXAMINATION**

**BY MR. BERNSTEIN:**

Q    Good afternoon, Agent Reyes.

A    Good afternoon.

Q    I represent Ms. Sandra Samane who's sitting here at the end of the table.  Do you see her there?

A    Yes.

Q    On this date in August that we're talking about, you had told Mr. Nicolaysen from the time you left downtown until Baldwin Park arrived it was approximately an hour and a half, correct?

A    I don't remember the exact time, but that sounds about right.

Q    But approximately.

A    Right.

Q    But the actual interaction with these three women was less than 15 minutes, wasn't it?

A    No, I don't think so.  I think it was more than 15 minutes.

Q    What time did you get home from downtown that day?

A    I don't remember, sir.

Q    Well, you left at 12:25 you said.

A    That sounds about right.

Q    And Baldwin Park Police arrived at 1:40 you said, right?

A    Right.

EXCEPTIONAL REPORTING SERVICES, INC

Reyes Huitzilin - Cross / By Mr. Bernstein          187

Q    So that's an hour.  So if you left at 12:25 and you got home at 1 p.m.

A    No.  I originally said it takes me about 20 minutes to get home, so that means I would have been home by 1:40.

Q    So you park your --

A    12:40, correction.

Q    So you park your -- the police arrived at 1 o'clock, correct?

A    I don't remember what time they arrived.

Q    So -- but if their records show they arrived at 1 o'clock from the time you got home, it was only 20 minutes, correct?

A    Oh, I would have been home at 12:40.

Q    Right.

A    Okay.

Q    And 12:40 to 1 o'clock is 20 minutes, correct?

A    Sounds about right.

Q    Sounds about right?

A    Right.

Q    You don't know that that's right?

A    I don't remember the exact time frame.

Q    I'm asking you if you got home at 12:40 and the police arrived at 1 o'clock, that is 20 minutes, correct?

A    Sure.

Q    Now some of that time was you parking your car and going towards your wife's vehicle, correct?

EXCEPTIONAL REPORTING SERVICES, INC

Reyes Huitzilin - Cross / By Mr. Bernstein            188

A    Yes.

Q    In fact, we saw from the video that was played, Ms. Raygoza it was 2 minutes and 7 seconds that she was walking the street before she even came into contact with you, correct?

A    Sure.

Q    So again the entire incident was approximately 15 minutes, correct?

A    Sure.

Q    Now during that incident did my client Ms. Samane ever make a direct threat to you?

A    No, not her.

Q    I also just want to ask you, you kept saying that you were trying to deescalate.

A    Correct.

Q    What does that mean deescalate?

A    To alleviate the problem.

Q    I'm sorry?

A    Alleviate the problem.

Q    So you're in the car with your wife and two children and rather than drive up the street, you think it's more deescalatory to exit the vehicle and approach Ms. Raygoza?

A    If I would have left, that would have left the question of will they come back, will they come back later that night, will they come back tomorrow, I understood --

Q    That's not what I asked you though, sir.

Reyes Huitzilin - Cross / By Mr. Bernstein          189

A       -- there was a threat.

Q       I asked you, you're trained in de-escalation tactics, correct?

A       That's correct.

Q       Isn't leaving a situation deescalating more than leaving a vehicle and approaching the people.

A       No, not at that time, sir, no.  My decision at the time was to investigate the issue, investigate why I was being targeted.

Q       And you're trained in investigations.

A       To an extent, yes.

Q       As a law enforcement officer.

A       To an extent.

Q       And what part of your training involves your wife and children as part of your investigation?

         **MR. MPARE:**  Objection, Your Honor, relevance.

         **THE COURT:**  Sustained.

**BY MR. BERNSTEIN:**

Q       Your wife got out of the vehicle the same time you did, didn't she?

A       I seen the videos afterwards, yes.

Q       And you two left your children alone in the vehicle, correct?

A       Within five feet from us, yes.

Q       And then your wife used her car to back up and block the

Reyes Huitzilin - Cross / By Mr. Bernstein          190

car in, correct?

A    She backed up to look at the address of the house.

Q    You're standing there in front of the car as they're honking the car saying move the car, correct?

A    Yes.

Q    And you blocked them in.

A    Correct.

Q    And you said that you had a son with special needs that is triggered by loud noises.

A    Correct.

Q    And yet you used him as a wedge while they're honking the car and making loud noises.

A    I did not use him.

MR. MPARE:  Objection, Your Honor, argumentative.

THE COURT:  Overruled.

BY MR. BERNSTEIN:

Q    You had your wife position your two children between a car and somebody you claimed you thought might be armed and they're honking the horn repeatedly --

MR. MPARE:  Objection, Your Honor, misstates testimony.

THE COURT:  Well, I mean, I don't know that it misstated the testimony but it's for the jury, but maybe ask the question again a little more clearly.

Q    Okay.  I can play the video.  Do you remember standing --

Reyes Huitzilin - Cross / By Mr. Bernstein          191

THE COURT:  Let's not play that video again if we don't have to.

MR. BERNSTEIN:  I'm not.  I'm asking him.

Q   Do you remember the video?  You're standing in front of Ms. Brown's car in the street.

A   Correct.

Q   At the end of the driveway.

A   Right.

Q   Your wife's car is parked across that driveway so they couldn't get out, do you remember that?

A   Correct.

Q   And do you remember Ms. Brown honking the car repeatedly?

A   Sure.

Q   And do you remember Ms. Raygoza saying move the car, move the car, I'm going to throw coffee at you?

A   Sure.

Q   And you're sitting there talking on the phone.

A   Correct.

Q   And your wife and you were using your special needs child --

A   We were not using the special needs --

Q   -- to block it.

A   We were not using my special needs child.

Q   But you blocked the car up --

A   We used the truck to back up, yes.

Reyes Huitzilin - Cross / By Mr. Bernstein                192

Q    -- in front of the -- to block the vehicle in.

A    Correct, sure.

Q    And the horn blaring the whole time.

A    Not the whole time, no.  But, yeah, I understand what you're saying, yes.

Q    And is that part of your training to use your wife and children?

A    I was not using my wife and children.  What --

Q    And you were deescalating.

A    At that point I was waiting for local PD to show up, sir.

Q    So at the very beginning before you even heard Ms. Raygoza say anything about your tattoos, we saw in the video there was at least 2 minutes and 7 seconds before you heard that, correct?

A    Sure.

Q    Why didn't you just drive to the end of your street and call Baldwin Park PD and say, you know what I've got my wife and children in the car, there's some people on my street that I'm concerned about?

A    And what information am I giving them?

Q    Right.

A    If I leave, sir, what information would I provide local PD?

Q    So instead you chose to deescalate by approaching and confronting them.

Reyes Huitzilin - Cross / By Mr. Bernstein          193

A     I got out of the car to investigate why they were there.

Q     Investigate.

A     Right.

Q     So it wasn't de-escalation.

A     It was both.  Two things can happen at the same time, sir, I was doing both.

Q     And you incorporated your children and your wife in this investigation.

A     If that's what you want to say.

Q     I'm just saying what the video shows, sir.

A     That's what you're highlighting.  That's what you're highlighting.

Q     That's what happened, sir.

A     You're overlooking at the --

THE COURT:  The video shows what the jury concludes it shows.  You're allowed to ask questions.  The video may show that or may show something else, that's why we have the jury.

BY MR. BERNSTEIN:

Q     If not Baldwin Park PD, why didn't you call federal officers if you felt there was some danger?

MR. MPARE:  Objection, relevance, Your Honor.

THE COURT:  The question is why didn't he call --

MR. BERNSTEIN:  His federal agency if he felt there was some danger.

THE COURT:  He can ask the question.

MR. BERNSTEIN:  That's what I did ask him.

THE COURT:  All right.  Ask him.  Answer.

MR. BERNSTEIN:  They objected.

THE WITNESS:  Because --

THE COURT:  You can answer.

BY MR. BERNSTEIN:

Q    Why didn't you call one of your federal agencies if you felt there was some danger to you or your family?

A    Because it would take longer for them to get to my location than local PD, sir.

Q    But it was quicker for you to stage this intervention yourself and just drive a block away and call the police, correct?

A    Leaving the area will not help me conclude and assess the situation, sir.

Q    And exactly.  And if you left the area, none of this would have even happened.

A    If they didn't show up to my block, none of this would have happened.

Q    And if you didn't get out of your vehicle, none of this would have happened.

A    And they wouldn't have kept recording, none of this would have happened.

Q    And if you didn't block them in, none of this would have happened.

A     Sir, I got in my car --

THE COURT:  One minute here.  The questions have to be clear, none of what would have happened.

Q    If you never got out of your vehicle this confrontation with these women would have happened, correct?

MR. MPARE:  Objection, calls for speculation.

THE COURT:  He's asking the question, he can answer yes or no, I don't know.

THE WITNESS:  Sir, there was at one point after the first encounter when I got back in my car for the purpose of de-escalation.  And at that very moment instead of them getting in their car, they decided to scream that I was ICE agent.  Ms. Raygoza decided to go back to my house and record.  So there was never a de-escalation on their part.

When I tried to deescalate when I got out of my car the second time, I realized that they were not going to deescalate.

BY MR. BERNSTEIN:

Q    Okay.  Now, let me ask my same question again that you didn't answer.

A    I answered, you're just not accepting my answer, sir.

Q    If you had never got into the car that first time that we saw in the video with your gun and kept getting in Ms. Raygoza's face --

A    Say that one more time.

Q    With your camera, with your phone, when you got out of the car and you said you heard her say something about your tattoos and got in her face, if you had never gotten out, there would never have been a confrontation, correct?

A    If they never showed up, sir, there wouldn't have been a confrontation.

Q    And if you never got out of your car and drove away, there never would have been one, too, right?

A    No, there could have been one.  Because again I don't know if they're going to show up later that day, later tomorrow, again the threat was there.

          MR. BERNSTEIN:  I have nothing further, thank you, Your Honor.

          THE COURT:  All right.  Let's take the afternoon recess, come back at a quarter after 3 and go on till 5.

          THE CLERK:  All rise for the jury.

     **(Jurors exit courtroom at 3:03 p.m.)**

          THE COURT:  Everybody may be seated.  Let me ask the Government, after the cross-examination and direct of the officer is complete, the next witness you have is his wife, correct?

          MR. MPARE:  Yes, Your Honor.

          THE COURT:  She will be briefer I think or?

          MR. MPARE:  Yes, Your Honor.

          THE COURT:  Yeah.  And then you have a list of

197

Baldwin police officer Zachary --

MR. MPARE:  Goble.

THE COURT:  -- Goble.  What is he going to say?

MR. MPARE:  I believe this was the subject of the motion in limine about the post livestream conduct, so he's going to testify about the arrival of the individuals --

THE COURT:  Well, in other words, the four or five people that arrived some 45 minutes later or something like that and he's --

MR. MPARE:  Yes.

THE COURT:  -- going to say what he heard them say.

MR. MPARE:  Yes.

THE COURT:  Anything else?

MR. MPARE:  His testimony will be 15, 20 minutes.

THE COURT:  Yeah.  And my ruling was that the parties can ask questions about the situation where the officer and some of the defendants are talking and filming each other, but because the resolution of whether there was a touching or not would essentially be a mini trial, the jury can determine that if they can, but I don't want Goble to testify if he has some determination as to what he thinks occurred.

MR. MPARE:  There won't be any of that testimony from him, Your Honor.

THE COURT:  And I expect none from the defense.

MR. NICOLAYSEN:  No, Your Honor.  From the defense

198

perspective Officer Goble would establish, based on his report, that the statement quote/unquote let's doxx him or them was actually directed at the Baldwin Park police, not at the agent.

THE COURT:  All right.  If that's what it shows.

MR. MPARE:  There is also Officer Moreno is the other Baldwin Park police department officer and I'm not sure whether --

THE COURT:  I don't see him on the witness list.

MR. NICOLAYSEN:  Your Honor, we have subpoenaed Officer Moreno --

THE COURT:  What is he going to say?

MR. NICOLAYSEN:  It'll be very brief, it's to contradict Agent Reyes.

THE COURT:  About what?

MR. MPARE:  We believe it is about the subject of the assault, Your Honor.

MR. NICOLAYSEN:  Your Honor, he's on the witness stand.

THE COURT:  I know, but -- so you want him off to --

MR. NICOLAYSEN:  I would prefer that.

THE COURT:  Would you, Officer, would you maybe leave, take a recess break and I can go through this with you.

MR. NICOLAYSEN:  Because --

THE COURT:  Wait till he leaves.

MR. NICOLAYSEN:  Thank you, Your Honor, appreciate

it.

MS. CHOI:  Your Honor, actually before he leaves could the Court admonish Officer Reyes not to discuss his testimony with his wife --

THE COURT:  Yes.

MS. CHOI:  -- who's going to testify next?

THE COURT:  Yes, yes, okay.  Admonish.  Wait till he goes.

So wait a minute, he's almost -- he's gone.  Go ahead.

MR. NICOLAYSEN:  Thank you, Your Honor.  On cross-examination I asked Agent Reyes whether he made a statement to the Baldwin Park police to the effect that while he was recording Ms. Raygoza she pushed him.  He not only denied making the statement, he literally said today that he believed I made that up, I fabricated it.  And Officer Moreno will testify that, in fact, Agent Reyes made exactly that statement.

THE COURT:  I didn't hear him say that you made that up.  And that is --

MR. NICOLAYSEN:  I think you made it up.

THE COURT:  Well, I don't think he said that in reference to what comment you're now referencing, but I don't think it changes my view that whatever Moreno thought happened was based upon Moreno listening to some conflicting testimony and making some judgment.  And I think that's beyond the scope

200

of the case.  I think the jury can assess that issue by looking at the video.  So he won't testify.

MR. NICOLAYSEN:  Your Honor, I just want Moreno to testify that Agent Reyes made the statement during the interview.

THE COURT:  Made what statement?

MR. NICOLAYSEN:  That while he, Agent Reyes was recording my client, my client pushed him.

THE COURT:  No, I --

MR. NICOLAYSEN:  I need that one --

THE COURT:  No, you don't need it because it's already in the evidence.  I mean, he -- is there -- wasn't there some witness who already said that or maybe not?

MR. NICOLAYSEN:  No, no, it's not.  I need that impeachment.  It's very important because the agent today is trying to avoid --

THE COURT:  I know, but maybe I misunderstood.  Maybe there isn't anyone who actually said that.  I guess the questions were was it in Baldwin Park police report but -- and I think the answer was, he didn't know what was in their report, is that --

MR. NICOLAYSEN:  No, but he became --

THE COURT:  No, let's just skip the -- I mean, wasn't his testimony --

MR. NICOLAYSEN:  He said that he never made the

201

statement.

THE COURT:  You know something, you just keep talking.  He didn't say that he knew what was in the report.  So --

MR. NICOLAYSEN:  He thought --

THE COURT:  Where did he say in the testimony -- so far he said that he's -- that she pushed him.

MR. NICOLAYSEN:  Agent Reyes denied having said to Officer Moreno that while I Agent Reyes was recording Ms. Raygoza she pushed me and I confronted --

THE COURT:  One second, I may have misunderstood.  He said, Officer Reyes, that she pushed him and you're saying Moreno will say in a statement to him that the -- that Reyes said she didn't push him, is that what you're saying?

MR. NICOLAYSEN:  No.  Allow me please.  So today on cross, I asked Reyes did you ever tell Officer Moreno in an interview that my client pushed you, Agent Reyes, while you were recording.  And he said, I never made that statement to Officer Moreno, in fact, it is in --

MS. BORDER:  Your Honor --

THE COURT:  One second.

MR. NICOLAYSEN:  It is in Moreno's report and it's very important --

THE COURT:  Don't tell me how important things are.  Let's first get the relevance and the record squared away then

EXCEPTIONAL REPORTING SERVICES, INC

202

you can tell me how important it was.  Wait one minute.

MR. NICOLAYSEN:  Sure.

THE COURT:  What were you going to say?

MS. BORDER:  Your Honor, I believe the witness testified that he didn't remember, he didn't recall and this is precisely the mini trial that we did not want to have.

THE COURT:  He said he didn't remember whether he --

MS. BORDER:  Whether he had told law enforcement that.

MR. NICOLAYSEN:  Initially, initially --

THE COURT:  Just -- you're talking over her.

MS. BORDER:  And, Your Honor, this is -- I think it's incredibly improper for the defense to call a witness just entirely on this one issue, which was the subject of a motion in limine that we specifically sought to avoid for the mini trial.

THE COURT:  But the officer is not being called for the purpose of saying whether there was a push or there wasn't a push.

MR. NICOLAYSEN:  Right.

THE COURT:  The offer of proof is that he's just being called for the purpose of having him say that Reyes told him that he wasn't pushed during --

MR. NICOLAYSEN:  No, Reyes told Moreno that while he, Reyes, was recording my client, she pushed him.  I asked

Reyes Huitzilin - Redirect / By Mr. Mpare          203

Reyes -- Government counsel is not wrong.  Initially Reyes said I don't recall, but I revisited that issue later and when I did, Reyes said I never made that statement, I think you're making it up.  And that created the opening for the prior inconsistent statement.  Because --

THE COURT:  I'll think about it and give you a ruling before we --

MR. NICOLAYSEN:  I just want to say because the video doesn't support the agent on that.

THE CLERK:  All rise.  This court is in recess.

MR. NICOLAYSEN:  What time are we starting?

THE CLERK:  We're going to do ten minutes, so be back at 3:23.

**(Recess taken at 3:13 p.m.; reconvened at 3:33 p.m.)**

**(Jurors enter courtroom)**

THE CLERK:  Please be seated.

All rise.  United States District Court is once again in session.

THE COURT:  Please be seated.

This is redirect?

MR. MPARE:  Redirect, Your Honor.

**REDIRECT EXAMINATION**

BY MR. MPARE:

Q    You were asked a lot of questions on cross examination.  I want to walk you through the timeline just a little bit more to

Reyes Huitzilin - Redirect / By Mr. Mpare                    204

reorient ourselves.  So you got to work around 6:00 a.m. that day; is that right?

A     That's correct.

Q     And this is on August 28th, 2025, right?

A     Yes.

Q     And you went downtown to work at the federal building there; is that right?

A     Correct.

Q     And what time did you leave?

A     About 12:00 o'clock, --

        THE COURT:  You know something, --

A     -- if I remember correctly.

        THE COURT:  -- we've gone through this so many times. We just can't go over the same thing all the time.

        MR. MPARE:  Just --

        THE COURT:  And that goes for both sides.  Get to the point.  I mean, --

        MR. MPARE:  Okay.

        THE COURT:  -- we know when he left.

        MR. MPARE:  Okay.

        THE COURT:  Okay.

        MR. MPARE:  Okay.

BY MR. MPARE:

Q     Once you got home, there was some questions on cross examination about what you were wearing; do you remember that?

Reyes Huitzilin - Redirect / By Mr. Mpare        205

A    Yes.

Q    And you were wearing just plain clothes; is that correct?

A    That's correct.

Q    And there were questions about what you did when you got into the car with your family; is that right?

A    Correct.

Q    And the first thing that you did when you got in the car was your wife told you that she saw someone, correct?

A    Correct.

Q    And when she told you that she saw someone, what did you begin to do with your -- how -- what did that make you feel with respect to your family's safety?

        MR. NICOLAYSEN:  Asked and answered, Your Honor.

        MR. BERNSTEIN:  It's not redirect.

        THE COURT:  I mean, I thought this was gone over on direct testimony.  If it wasn't, it's a new matter.  I mean, isn't that what you asked on direct?

        MR. MPARE:  It is, Your Honor.  But there were questions on cross about his initial reactions in the car, and so just trying to clarify that timeline, Your Honor.

        THE COURT:  All right.  Go ahead.

        THE WITNESS:  Can you repeat the question?  Sorry.

BY MR. MPARE:

Q    When -- after your wife told you about these women, what did it make you feel?

EXCEPTIONAL REPORTING SERVICES, INC

A    It made me feel uncomfortable and unsafe for my family.

Q    And you described at that point that you did unholster your gun, correct?

A    I did.

Q    You never took your gun out of your car unholstered; is that right?

A    Never.

Q    Never showed your firearm to any of the Defendants; is that right?

A    Never.

THE COURT:  This is not redirect.  You went over this on direct or it was -- he spoke about it on --

MR. MPARE:  Okay.

THE COURT:  -- cross.  Let's get to some things that need --

MR. MPARE:  Understood, Your Honor.

THE COURT:  -- clarification.

BY MR. MPARE:

Q    So at some point in the incident you called your supervisor, right?

A    Correct.

Q    And there were questions about why you called your supervisor and didn't ask for more assistance, right?

A    Yes.

Q    And you explained that it's because you already had nine,

Reyes Huitzilin - Redirect / By Mr. Mpare          207

one, one on the way; is that right?

        MR. BERNSTEIN:  Objection, leading.

        MR. NICOLAYSEN:  And, Your Honor, the counsel is

testifying by summarizing testimony.

        THE COURT:  Well, you are summarizing testimony, so

if there's an objection, sustained.

BY MR. MPARE:

Q    Why didn't you ask your supervisor for any additional help

at the time you made the phone call?

A    Additional help from our agency?

Q    Generally.

A    That's just not the way it works.

Q    What do you mean?

A    I couldn't call my agency for a local issue.

Q    And there was also questions on cross examination about

the recording and whether or not an assault was captured on

your phone; is that right?

A    Correct.

Q    Your recording is roughly three minutes long; isn't that

right?

A    Correct.

Q    And you stopped recording after the initial interaction

you had with Defendants; is that correct?

A    Correct.

Q    Did you start recording after you got back out of the car?

Reyes Huitzilin - Redirect / By Mr. Mpare          208

A     No.  I don't remember doing so.

Q     So the only videos we have from your vantage point is that three-minute video; is that right?

A     Correct.

Q     And if we're taking defense's characterization of the event, it was 15 minutes or so.

A     Correct.

Q     So that means there's 12 minutes or so that weren't captured on any video you made; is that right?

          MR. NICOLAYSEN:  Objection, argumentative, Your Honor.

          THE COURT:  Well, it's not argumentative.  It's just trying to establish some timeline.  But why don't you -- you can argue that.  Go ahead.

     (Pause)

BY MR. MPARE:

Q     At the time that the car horn was honking and your children were in the car, Baldwin Park was on the way, correct?

A     Yes.

Q     Who was honking the car at that time?

A     I believe it was Brown.

Q     And that noise, if any noise was disturbing your children, it was that car horn honking; is that right?

A     Correct.

Q     They were observing this incident and the noise that was

EXCEPTIONAL REPORTING SERVICES, INC

Reyes Huitzilin - Redirect / By Mr. Mpare                 209

being created by Defendants; is that correct?

A     Correct.

Q     And when the car -- your family car was backed up, you weren't driving; is that right?

A     I was not.

Q     And when Defendant Samane was standing behind the car, the street was unimpeded; is that right?

A     Correct.

          MR. BERNSTEIN:  Objection, this is not redirect, Your Honor.

          MR. NICOLAYSEN:  And leading, Your Honor.

          THE COURT:  Well, it is leading.  You're leading all the time.  I mean, very few nonleading questions.  Ask the last question again.

BY MR. MPARE:

Q     Was there anything in the road obstructing Defendant Samane from moving?

A     No.

          THE COURT:  When?

          MR. MPARE:  The question before that was when his wife had backed the car out.

          MR. BERNSTEIN:  Your Honor, there was nothing asked about this on cross.

          THE COURT:  Well, if it's --

          MR. MPARE:  There was literally video played.

EXCEPTIONAL REPORTING SERVICES, INC

Reyes Huitzilin - Redirect / By Mr. Mpare                210

THE COURT:  Don't argue with each other.  If it's a new matter, you can recross him on it.  So go ahead.

BY MR. MPARE:

Q    Did you answer that question?

A    Yeah.  There was nothing blocking.

Q    There was also some testimony about text messages to your supervisor; do you remember that?

A    Yes.

Q    And that you told your supervisor that you were good, your family was okay.

A    Right.

Q    How much information about your personal life do you share with your supervisor?

A    Very little.

(Pause)

Q    There was also some discussions about your new house and how it's different than your old house; is that right?

A    Correct.

Q    What are some of the downsides about the move?

A    The fact of the matter is we never wanted to move.  We were forced to move because of this incident.  So I don't care that the house is on ten acres, that doesn't matter.  We never wanted to move.  That was not part of our plan.  We were forced to move.

MR. MPARE:  Nothing further, Your Honor.

THE COURT:  Okay.  Anything --

MR. NICOLAYSEN:  Very briefly.

THE COURT:  -- that you want to recross on?

**RECROSS EXAMINATION**

BY MR. NICOLAYSEN:

Q    Agent Reyes, after the August 28 episode, did you take any type of leave of absence from work such as stress leave?

A    No, sir.

MR. NICOLAYSEN:  Nothing further.

THE COURT:  Okay.  Thank you, Agent Reyes.  You can step down.  Now who's the next witness?

**(Witness steps down.)**

MS. BORDER:  The Government calls Jessica Herrera.

THE COURT:  Okay.

**(Pause)**

THE CLERK:  Please raise your right hand.  Your response will be I do.

**JESSICA HERRERA, GOVERNMENT'S WITNESS, SWORN**

THE CLERK:  Please take the stand.  Please state and spell your name for the record.

THE WITNESS:  My name is Jessica Herrera.  First name is J-E-S-S-I-C-A, last name, H-E-R-R-E-R-A.

//

//

//

Herrera - Direct / By Ms. Border                        212

DIRECT EXAMINATION

BY MS. BORDER:

Q    Ms. Herrera, where are you from?

A    Los Angeles, California.

Q    How long have you lived in LA?

A    My whole life.

Q    Are you currently employed?

A    No.

Q    So how do you spend your time?

A    I'm a stay-at-home mother.

Q    Are you married?

A    Yes.

Q    To whom?

A    I'm married to Rojelio Reyes Huitzilin.

Q    How long have you been married?

A    Eight years.

Q    And what does your husband do for work?

A    He's an ICE officer.

Q    What do you know about what your husband does day to day in his job?

A    I know what he does and doesn't do.

Q    Do you know if he specializes in anything?

A    He does.

Q    What's that?

A    Two weeks before this incident he was involved in a sex

Herrera - Direct / By Ms. Border                213

trafficking operation.

MS. CHOI:  Objection, relevance.

MR. NICOLAYSEN:  We'll join, Your Honor.

THE COURT:  Sustained.

MR. BERNSTEIN:  Move to strike.

THE COURT:  Stricken.

BY MS. BORDER:

Q    Do you have pride in what your husband does for work?

MR. BERNSTEIN:  Objection, relevance.

THE COURT:  It may have some relevance, I don't know. Continue.

MS. BORDER:  I'll re-ask the question.

BY MS. BORDER:

Q    Do you have pride in what your husband does for work?

A    I do.

Q    Do you have kids?

A    I do.

Q    As of August of last year, how many kids were in the home with you?

A    Five.

Q    What are their names and ages as of August of last year?

A    My second oldest, Ariceli (phonetic), was 18.  My daughter Dahlia (phonetic) was 16.  My son Jaden (phonetic), was 14.  My son Anthony was eight.  And James, my youngest, is three.

Q    So I'd like to turn to the events of August 28th, 2025.

EXCEPTIONAL REPORTING SERVICES, INC

Herrera - Direct / By Ms. Border                    214

Did you have plans with your husband that day for when he returned home from work?

A    Yes, I did.

Q    At a high level, what were those plans?

A    We were going to do something special for our boys.

Q    Did you do anything to get your family ready for that special trip with your boys for when your husband got home?

A    Yes, I did.  He called me and told me to be waiting in my vehicle.

Q    So did you do that?

A    Yes.

Q    And where was your vehicle?

A    I believe it was double-parked and I was blocking my neighbor's driveway.

Q    Why did you park it outside your neighbor's driveway?

A    I moved my truck from the front of my home so that my husband can park his car there.

Q    So your husband would park his government vehicle in front of your home.

A    Yes.

Q    And what is your home address at that time?

A    One, two, eight, four, seven, Chelsfield Street.

Q    What type of car do you drive?

A    I drive a black Chevy Suburban.

Q    And when you said that you moved the car to get ready for

Herrera - Direct / By Ms. Border                    215

when your husband came home, did you also prepare your kids for that trip?

A     Yes, I did.

Q     What did you do?

A     I had picked up my son from school, and they were sitting in the back of my vehicle.

Q     Which sons?

A     My son Anthony and my son James.

Q     That's the seven-year-old and the three-year-old.

A     Yes.

Q     And where were your three-year-old and seven-year-olds physically located in the car?

A     They were in the backseat in their car seats.

Q     And when your husband arrived home from work, what did he do?

A     He entered my vehicle.

Q     And so your husband was in the passenger seat.

A     Yes, he was.

Q     And where were you located?

A     I was in the driver's seat.

Q     Was your husband ever in the driver's seat that day?

A     No.

Q     What happened next after your husband entered your car?

A     We were discussing our plans.  And I looked up and I noticed two individuals in ski mask.

EXCEPTIONAL REPORTING SERVICES, INC

Herrera - Direct / By Ms. Border                216

Q    What were these two individuals doing?

A    They were recording.

Q    Were they saying anything?

A    At one point they did.  The individual in all black started screaming (Spanish; not interpreted) pretty much saying ICE is here.

Q    When you first saw these two individuals, I noticed you referred to them as individuals; could you tell if they were men or women?

A    I could not.

Q    And what were they wearing?

A    One of the individuals was wearing all black with a ski mask.  The second individual was wearing gray sweats, black long-sleeve, and a ski mask.

Q    Ms. Herrera, how did you feel when you saw these two people wearing masks approach your car with your kids in it?

A    My first reaction was I was scared.

Q    Why were you scared?

A    Because that's not normal to see in my neighborhood.

Q    Was there also a third individual that day in your neighborhood?

A    There was.

Q    Where was that third individual located?

A    She was in my neighbor's driveway.

Q    Was she near car?

Herrera - Direct / By Ms. Border                    217

A    Yes, she was.

Q    Did you get out of your personal car at any point on August 28th?

A    I did.

Q    Why?

A    Initially I got off in hopes of trying to deescalate the situation and to get the plates of the vehicle.

Q    And why did you want the plates?

A    In the event of anything happened I would have a plate to a vehicle.

Q    To report to law enforcement.

A    Yes.

Q    So you testified earlier that you were scared.  So just for the jury's understanding, if you were scared, why did you make the decision to get out of the car?

A    I had the right to know who was in my neighborhood.  You know, again, I've lived there many years, never seen that.

     And plus like that's where my kids walk, that's where my kids play.  You know, they come in and out of there for school.  So I had the right to know who was in my neighborhood.

Q    And you mentioned earlier the concept of de-escalation.  What do you mean by deescalate?

A    I spoke with the third individual that was in my neighbor's driveway.  And she said, tell us he's -- they said that they were following ICE.  And she said, tell us he's not

Herrera - Direct / By Ms. Border                    218

ICE and we'll leave.

So I said, well, just because he works in that building doesn't mean he's ICE, in hopes of deescalating the situation. She stopped recording.  But by then it was already hectic.

Q    So when you got out of your car, were you recording with your phone?

A    I was.

MS. BORDER:  Mr. Flores, can we please play what has been admitted as Government Exhibit 19, clip one, which for the record is from the beginning to ten seconds into Exhibit 19.

(Video played at 3:50 p.m.)

BY MS. BORDER:

Q    So did you take this video?

A    Yes, I did.

Q    And is that the car and woman in your neighbor's driveway that you described earlier?

A    Yes.

MS. BORDER:  Mr. Flores, can we please play what has been admitted as Government Exhibit 19, clip two, which for the record is from 11 seconds until the end of Government Exhibit 19.

(Video played at 3:51 p.m.)

BY MS. BORDER:

Q    Ms. Herrera, why was the first thing you said when you got out of the car that your kids were in the car?

Herrera - Direct / By Ms. Border                              219

A     To let them know that there were small children present in the hopes of that, you know, maybe they're mothers and they wouldn't want this type of animosity and chaos in front of their kids.

Q     Was it concerning to you when the woman that you approached said there's like 1,000 people watching live?

A     Yes, it was.

        MS. CHOI:  Objection, leading.

        THE COURT:  What was that question again?

        MS. BORDER:  Was it concerning when the woman who you approached said there's like 1,000 people watching live.

        THE COURT:  Overruled.

BY MS. BORDER:

Q     You can answer.

A     Yeah, it was concerning to hear.

Q     What did you interpret that to mean?

A     That she was broadcasting it on social media live for a thousand people to see.

Q     And why would that be concerning?

A     With the climate, I was scared that more people would show up to my home.

Q     What do you mean by climate?

A     The riots, the protesting, the assaulting federal officers.

Q     Has the climate always been this way?

Herrera - Direct / By Ms. Border                    220

A     No.

Q     Was your husband employed by ICE before the climate changed this way?

A     He was.

Q     So this was a new experience for you.

A     It was.

Q     Were you able to zoom in on the back license plate of the car that the woman in black was standing next to?

A     Yes.

Q     Were you able to see the front license plate of that car at any time?

A     At one point I was.

Q     At the front license plate?

A     There was no front license plate.

Q     There was no front -- how do you know there was no front license plate?

A     At one point the vehicle was moved to where I can see the front of the vehicle.  There was no front plate.

        MS. BORDER:  Mr. Flores, can you please play what has been admitted as Government Exhibit 20, clip one, which for the record is from the beginning to 16 seconds in?

        (Video played at 3:53 p.m.)

BY MS. BORDER:

Q     Why did you say just because he works in the building that doesn't mean he's ICE?

Herrera - Direct / By Ms. Border                    221

A     From my knowledge it's a federal building, it's not strictly -- it's not ICE, it's a federal building.  So there's a lot of other federal agencies that work out of there.

Q     And what did you mean by they're invading the privacy of my children?

A     They were recording so I was scared that they were zooming in and were able to see my children.  I didn't want my children's faces being plastered all over social media.

Q     You also said, don't be invading people's homes.

A     Correct.

Q     And what did you mean by that?

A     To my knowledge of what they do, it is to report ICE --

        MR. BERNSTEIN:  Your Honor, --

A     -- activity.

        MR. BERNSTEIN:  -- objection.

A     There was --

        THE COURT:  What was the objection?

        MR. NICOLAYSEN:  Lack of personal --

        MR. BERNSTEIN:  Lack of --

        MR. NICOLAYSEN:  -- knowledge as to --

        THE COURT:  Well, she's --

        MR. BERNSTEIN:  Lack of foundation.

        THE COURT:  She's talking about her state of mind.  Over --

        MR. BERNSTEIN:  No, she's asking what other --

Herrera - Direct / By Ms. Border                    222

THE COURT:  I'll -- don't argue.  Objection's overruled.  You can answer.

THE WITNESS:  I'm sorry, what was the question?

BY MS. BORDER:

Q    What did you mean by don't be invading people's homes?

A    Due to from what I'm -- what they post, it is to report ICE activity.  There was no ICE activity going on that day.  He was leaving work, going home.  And, again, I felt like my -- mine and my children's privacy was being invaded.

Q    At some point did you go back into your personal vehicle where your children were?

A    I did.

Q    Did you get in your car and just drive away?

A    No, I did not.

Q    Why?

A    My husband was not in the vehicle.  And at that point, I felt like it wasn't safe to leave because, again, they were broadcasting where there was a thousand people watching, so I didn't feel that it was safe to leave at that point.  I didn't want to risk being chased in my vehicle.

Q    Did any of these masked individuals threaten you or your husband?

A    The individual in all black, that was wearing all black, was yelling at my husband that she would fucking pop him.

Q    What did you take that to mean?

A    A threat, shoot him, hit him.

Q    Did any of the individuals in black masks verbally attack you personally?

A    On multiple occasions I was called a White bitch or gringa.

Q    Do you take offense to that?

A    I do.

Q    Why do you take offense to that?

A    Because it's very racist.

Q    Do you identify as White?

A    I do not.

Q    What is your family background?

A    On my mother's side I'm told she's Native American.  And then my father's side, I am Mexican.

Q    Did any of the masked individuals ever touch your personal vehicle?

A    At one point the individual wearing gray sweats, black long sleeves, with glasses, she did tap the back of the vehicle window.

Q    What do you mean by tapped?

A    She had her -- she was recording and she walked up and she was trying to see into the backseat.  And she kind of tapped the window with her hand.

Q    How did your three-year-old, James, react to that?

A    He started stimming.  He yelled, no.  He started like

Herrera - Direct / By Ms. Border                                    224

whaling his legs, covering his ears, covering his face, stimming per se.

Q    Can you explain to the jury what stimming is?

A    He was -- at that time he had just been recently diagnosed with autism.  And he doesn't like when it's very loud.  When it's real loud, it's like very overstimulating for him, so he'll have behaviors.  I'm sorry.

Q    And how did your seven-year-olds Anthony react?

A    He was crying.  He had tears coming down his face.  He was trying to console his little brother, asking me why were they doing this.

Q    What did consoling his brother look like?

A    He was trying to get -- getting his attention and telling him to look at him and making funny faces, trying to play like hand games with him, anything that would kind of get him to calm down.  But he was already overstimulated.

Q    Does your seven-year-old, Anthony, know what your husband does for work?

A    Yes.

Q    Why?

A    Back in June when the riots had broke out -- I'm not sure of the date -- my husband had to come home in his bulletproof vest because of the climate.

Q    So you had to have a conversation about personal safety.

         MS. CHOI:  Objection, relevance, move to strike.

A     Yeah, we did.

            THE COURT:  Sustained.  Stricken.

BY MS. BORDER:

Q    Ms. Herrera, did you call nine, one, one at any point?

A    I did.

Q    Why did you call nine, one, one?

A    The individual wearing all black was getting very aggressive.  And I didn't want things to escalate, I didn't want anybody getting assaulted.

Q    Where were you when you called nine, one, one?

A    I was in my vehicle.

            MS. BORDER:  Mr. Flores, can we please play what has been admitted as Government Exhibit 14, clip one, which is from the beginning to 35 seconds in?

       (Ms. Border/Mr. Speaker confer.)

       (Video played at 4:00 p.m.)

       (Pause)

       (Resume playing video))

            MR. SPEAKER:  Sorry, Your Honor, (inaudible).

            MS. BORDER:  Apologies --

       (Resume playing video)

BY MS. BORDER:

Q    So as you're calling nine, one, one, you mentioned your children to the operator.

A    Yes.

Q    Why'd you do that?

A    To let them know the urgency, that I had small children present in the event of anything happened.

Q    Why might that be useful for them to know?

MR. BERNSTEIN:  Objection, calls for --

THE COURT:  Sustained.

BY MS. BORDER:

Q    You also said that your address was -- you also said 12847 Chelsfield Street.

A    Yes.

Q    And you said earlier that's the address where you lived at the time.

A    Yes.

MS. BORDER:  Can we play Government clip two from Exhibit 14, which is from 36 seconds to two minutes and 34 seconds?

(Video played from 4:02 p.m. to 4:04 p.m.)

Q    So you told nine, one, one that you didn't see any weapons.

A    Correct.

Q    But you saw the woman in all black reaching for her waistband.

A    Yes, she did.

Q    Can you demonstrate to the jury what that looked like?

A    Yeah.  So she was like -- she had her phone up recording

EXCEPTIONAL REPORTING SERVICES, INC

Herrera - Direct / By Ms. Border                 227

and she grabbed at her pants, like she like pulled them up.

MS. BORDER:  Thank you.

THE WITNESS:  You're welcome.

BY MS. BORDER:

Q    So what is the significance of reaching for a waistband to you?

MR. BERNSTEIN:  Objection, --

MR. NICOLAYSEN:  Objection, calls for an improper opinion, Your Honor, argumentative.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry.

BY MS. BORDER:

Q    What is the significance of reaching for a waistband to you?

A    To me, a possible weapon.

MS. BORDER:  Let's continue with Government Exhibit 14, clip three, which is from three minutes, 57 seconds to four minutes and 15 seconds.

(Video played at 4:05 p.m.)

BY MS. BORDER:

Q    So can you tell us what you were observing as you were speaking to the nine, one, one operator just then?

A    The individual wearing the gray shorts, the black shirt, was attempting it looked like to pull the plates off.  But they couldn't so they took out like a black cloth and they covered

Herrera - Direct / By Ms. Border                    228

the plates.

Q    So how did you feel when they were trying to cover up the only visible license plate?

A    It upset me.  It led me to believe that what they were -- they knew what they were doing was wrong.

        **(Ms. Border/Mr. Speaker confer.)**

            **MS. BORDER:**  We're going to play Government Exhibit 14, clip four, from four minutes, 46 seconds to five minutes and 29 seconds.  Sorry, from four minutes, 46 seconds, and it's going to run to five minutes, 29.

        **(Video played at 4:07 p.m.)**

**BY MS. BORDER:**

Q    Did you see your husband pull out his firearm at any point that day?

A    No, he did not.

Q    And when you said you had two small children in the car, could you hear noise in the background?

A    I did.

Q    And who was that, to your knowledge?

A    That was my three-year-old, James.

Q    Can you describe what was happening when we heard the honking at the end?

A    They were yelling at my husband.  That's when I heard the individual in all black tell my husband to get the fuck out of the way or she would pop him.

Herrera - Direct / By Ms. Border                    229

Q    Did you move your vehicle at any point while on the phone to nine, one, one?

A    I did.  I had realized that I had given my home address, and I wanted to give them the exact address of where I was at, so I was trying to reverse to see the address.  But it was just too hectic.

Q    And when you were reversing, did you see anyone behind you?

A    No.

        MS. BORDER:  Can we please continue with Government Exhibit 14, clip five, which is from six minutes, 37 to six minutes, 48?

        (Video played at 4:09 p.m.)

BY MS. BORDER:

Q    What did the police do when they arrived?

A    One of the police officers stopped in front of my vehicle. And he exited his vehicle with his taser in hand.

Q    And when we heard the honking, about how long passed between the honking and the officer arriving, to your recollection?

A    Probably minutes.

Q    Did anyone else arrive in your neighborhood after the police showed up that day?

A    Yes.

Q    How many people?

A     Five.

Q     And what were they wearing?

A     Ski masks.

Q     What were those individuals doing?

A     They were recording, they were yelling, they were getting confrontational with the police.

Q     How far from your house were they?

A     Probably about three doors down.

Q     And where was your family while this was going on?

A     We were in the vehicle.

Q     How far away was the vehicle?

A     About three, four houses down.

Q     Did you fear that more individuals could arrive outside your home?

A     I was.

Q     So I want to shift gears and talk about the impact of these events on you and your family now.  Were you able to confirm after the fact that the masked individuals were livestreaming?

A     Yes, I was.

Q     How were you able to do that?

A     My daughters saw -- well, I had family members and my daughters who saw the videos on social media.

Q     Was your face shown in these videos that you saw?

A     My face was shown, my tattoos were shown.  The plates to

Herrera - Direct / By Ms. Border                    231

my personal vehicle were shown.  My home was shown in those videos.

Q    And how did it feel to have your daughters find those videos of you and your husband on the internet?

A    Very upsetting.

Q    Did you fear violence that day?

A    I did.

Q    Were you in fear for your physical safety at any point?

A    I was.

Q    Were you in fear for the safety of your kids?

A    I was.

Q    Why?

A    Because I didn't know what type of individuals were going to show up, who -- they were livestreaming, too, who was watching, who would show up after.

Q    Did you notice any unusual activity in your neighborhood after August 28th?

A    We did.

Q    Can you explain that to the jury?

A    So I live -- my home is in a -- located in a dead-end, very quiet neighborhood.  Right at the beginning of the block it tells you it's a dead-end.

     We noticed a lot more vehicle traffic.  I've lived there for eight years so I'm aware of what vehicles are there, when the neighbors get a new car, when they're having -- like I'm

Herrera - Direct / By Ms. Border                    232

aware of the cars coming in and out of there.  And there was a lot more vehicle traffic.

One evening I was standing out on my porch, I couldn't sleep.  And a car drove by, did a U-turn, stopped about a house over, and a individual exited the vehicle and just kind of stood there.

Q    Was that unusual to you?

A    Very unusual.

Q    Were you scared?

A    I was.  Yeah, I was nervous.  I was scared, nervous.  I was angry.

Q    So I know this might be difficult to talk about, but is your emotional state different now than it was before August 28th of last year?

A    It is.

Q    Can you tell the jury a little bit about why it's different and how it's different?

A    I don't sleep much.  I'm more worrisome.  I try not to leave my house without wearing a long sleeve because I'm scared that I'm going to be recognized.  So now I'm constantly having to cover up my tattoos.

I try to change my appearance as much as I can.  I try not to take my kids with me unless my husband is with me so that way I'm not alone with my two small children.

Q    Did you try to seek therapy in the wake of these events?

EXCEPTIONAL REPORTING SERVICES, INC

A    I did.

Q    When did you try to seek therapy?

A    September 18th.

Q    So just a few weeks later.

A    Yes.

Q    And what happened at the therapy intake appointment?

A    I spoke to them about the events that had occurred.  But because of my emotional state and trying to navigate the Kaiser system, since I have Kaiser, it's different, it was a little difficult to get services.

Q    Are you in therapy now?

A    I am in therapy now.

Q    Have you altered your personal car in any way since August?

A    I had to get new license plates.

Q    And did you move homes after August of 2025?

A    I did move.

Q    When did you move?

A    November of 2025.

Q    Approximately three months later.

A    Yes.

Q    And about how far away did your family move from your residence in Baldwin Park?

A    It's about a 35-minute drive without traffic; with traffic, about an hour.

Q    Do any of your children have to attend new schools because of the move?

A    Yes.

Q    How about let's start with your daughters?

A    So my daughter -- my oldest daughter's close to graduating, so it would be detrimental to -- well, for both of them.

They are pretty ahead of schedule so it would have been detrimental to pull them out and have them start elsewhere being so close to graduating and finishing school.

Q    And so they decided to stay at your old school.

A    Their -- at their old school, yes.

Q    How long was the commute after you moved for your daughters?

A    Depending on the route and the schedule, sometimes it's about two hours.

Q    And how long did it take for them to get to school before August 28th, 2025?

A    Minutes.  It was walking distance.

Q    How about your 15-year-old son, has he been impacted school-wise?

A    He has.  When we moved, he told me that he didn't want to go to public school.

Q    Did he explain why?

A    In his words, --

MR. BERNSTEIN:  Objection, hearsay.

THE COURT:  What was that now?  What the son said to his -- the mother?

MR. BERNSTEIN:  Yes.

THE COURT:  Overruled.

BY MS. BORDER:

A    He said he didn't want to go back to public school.

Q    Why?

A    He was worried that I would be recognized and with the climate, you know, with the anti-ICE stuff, those, you know, schools has walkouts and things like that.  He didn't want no part of it.  So he's doing online schooling now.

Q    And so he's homeschooled.

A    He's homeschooled.

Q    And how is your child who has autism, James, affected by the move, if at all?

A    He wasn't able to get services.  I had to transfer everything over, so these past couple months he hasn't received any services.

Q    What kind of services was he receiving before August, 2025?

A    He was getting occupational therapy, speech.  He was supposed to start ABA services.

Q    What was the last part?

A    ABA services.

Herrera - Direct / By Ms. Border                    236

Q     What does that mean?

A     For like behavioral -- behaviors where they would help me and help him I guess have -- I'm sorry, I'm new to all this stuff -- where they would have pretty much help him with his behaviors, tantruming, things like -- things of that nature.

Q     Does your -- does James have difficulty speaking?

          THE COURT:  Let's move on from this.

          MS. BORDER:  If I could just ask one more question about how --

          THE COURT:  No.

          MS. BORDER:  -- the move impacted how she was able to receive those benefits.

          THE COURT:  All right.

BY MS. BORDER:

Q     So why were those benefits and services lost once you moved?

A     Because I had to change counties so they had to transfer everything to a new county.  I pretty much had to start over.

Q     So, Ms. Herrera, why did your family move?

A     I didn't want to.  But I felt that it was no longer safe for me and my children to be there.

Q     How long had you been living in your home in Baldwin Park?

A     Eight years.

Q     And how hard was it for your family to leave that home?

A     Very hard.  I -- that home holds a lot of sentimental

Herrera - Direct / By Ms. Border                    237

value to me.

Q    Why does it hold so much sentimental value?

A    That is the home where I shared a few of my last memories with my oldest --

        MS. CHOI:  Objection, --

A    -- child.

        MS. CHOI:  -- Your Honor, --

        MR. BERNSTEIN:  Objection, Your Honor.

        THE COURT:  That's something I gave --

        MS. BORDER:  At a high level --

        THE COURT:  -- a ruling on.  Not a high level.  No level, zero level.

        **(Pause)**

**BY MS. BORDER:**

Q    Does your -- does that home in Baldwin Park remind you of memories with your kids?

        MR. BERNSTEIN:  Objection, Your Honor.

        THE COURT:  Well, she said memories of her --

        MS. BORDER:  Of her kids.

        THE COURT:  -- kids, kids meaning children, right?

        MS. BORDER:  Yes.

        THE COURT:  Okay.  She can answer that question generally.

        THE WITNESS:  I'm sorry, what was the question?

//

**EXCEPTIONAL REPORTING SERVICES, INC**

**BY MS. BORDER:**

Q    Did your house in Baldwin Park, was it sentimental because it held memories of your children?

A    It did.

MS. BORDER:  Thank you.  No further questions.

THE COURT:  Okay.  Cross examination.

**(Pause)**

MS. CHOI:  Can I request the Court just ask the witness move over slightly so I can -- so we can see each other a little better?

THE COURT:  Which way do you want her to move?

MS. CHOI:  This way just a little bit.

THE COURT:  To the right?

MS. CHOI:  To her right, thank you.

THE COURT:  Okay, if you can -- see her now?

MS. CHOI:  Yes, thank you.

Ms. Herrera, you were asked -- I would like to pull up Government Exhibit 19 and just pull up that first frame of the video, pause it.

**CROSS EXAMINATION**

**BY MS. CHOI:**

Q    You testified that you saw the individual wearing shorts in your neighbor's driveway, right?

A    Right.

Q    She's standing right there.

A    Right.

MS. CHOI:  Do you need a moment before we start?  I -- we can --

THE COURT:  Well, let's wait a few minutes and see if the witness can feel comfortable continuing.

MS. CHOI:  Your Honor, I would request just a ten-minute break.

THE COURT:  Well, let's see.  Can you take a few minutes or do you --

THE WITNESS:  No, I'm okay.  I'm okay.

THE COURT:  Yeah.  She's okay.

THE WITNESS:  No, I'm okay.

THE COURT:  Go ahead.

MS. CHOI:  Thank you, Your Honor.

Please let us know if you would like a break.

THE WITNESS:  Fine.

BY MS. CHOI:

Q    This individual did not approach you, right?

A    No.

Q    You approached her.

A    Correct.

Q    And she was standing in the driveway of 12833.

A    Yes, she was.

Q    She told you we're following ICE, not you.

A    Correct.

Herrera - Cross / By Ms. Choi                    240

Q    And when you said it's just because he worked in the building, she stopped recording.

A    Yes.

Q    And she stayed in the driveway, she didn't come out to you.

A    No, not then, no.

Q    Okay.  So, yes, she stayed in the driveway.

A    Yes.  She stayed in the driveway.

Q    Okay.  Meanwhile, your husband had approached the other individual wearing all black at the same time.  You both got out of the car at the same time, --

A    Correct.

Q    -- right?  Okay.  Your husband approached the other individual in all black.

A    Correct.

Q    They were on the sidewalk.

A    Yes.

Q    A few feet away from you.

A    Yes.

Q    And those people start arguing.

A    Yes.

Q    Your husband was accused of being an ICE officer.

A    Yes.

Q    He denied it.

A    I didn't hear him deny it.

Q    Did he say he was an ICE officer?

A    Not that I could hear, no.

Q    He did not say, I'm home right now.

A    Not that I could hear, no.

Q    He didn't say, I'm off the clock, you guys have it wrong.

A    I didn't hear him.

Q    And you denied that he was ICE.

A    Yes, again, to deescalate --

Q    To deescalate.

A    -- the situation.

Q    And Ms. Brown, the individual wearing shorts, said, if you're not ICE, then get out of here.

A    No, she did not.

        **MS. CHOI:**  Okay.  Can we play Government Exhibit 19? This is already in evidence.

    **(Video played at 4:24 p.m.)**

**BY MS. CHOI:**

Q    Okay.  In this video she said, if you're not ICE, then tell us that.

A    Correct.

Q    You started calling nine, one, one.  You testified about how you called nine, one, one.

A    Correct.

Q    When you started dialing, you were still standing on the sidewalk, right?

Herrera - Cross / By Ms. Choi                              242

A    I might have been.  I'm not too sure.  I don't remember.

Q    Would it refresh your recollection to listen to the nine, one, one call and watch a video that lines up with that nine, one, one call?

A    No.

Q    It would not refresh your recollection?

A    I might have been dialing.  But when I spoke to nine, one, one, I was in my vehicle.

Q    When you spoke to nine, one, one you were.  But when you started the nine, one, one call, you were still standing on the sidewalk.

A    I might have been, yes.

Q    You told nine, one, one, we have people surrounding my vehicle.  That was one of the first things you said, right?

A    Yes.

Q    Okay.  But that wasn't true when you said that.  No one was surrounding your vehicle.

A    At that time, no.  But at first they had approached my vehicle.  They were flanking my vehicle.

Q    That was before you started driving down the street.  When were they flanking your vehicle?

A    Before I moved my vehicle from the front of my home.

Q    But when you were saying to nine, one, one, we have people surrounding my vehicle, that was not true.

A    It was.  They had approached my vehicle before I had

called nine, one, one.

Q    That had happened before.

A    Yes.

Q    But it wasn't true when you said it at the time.  They were no longer surrounding your vehicle.

A    No.

Q    You also told nine, one, one, they're swapping out their license plate, right?

A    Yes.

Q    Your husband told you to say that.

A    No.

        **MS. CHOI:**  Can we play the nine, one, one call, Government Exhibit 14 that's already in evidence, at the four minute mark?

        **(Exhibit 14 played at 4:27 p.m.)**

**BY MS. CHOI:**

Q    Did you hear a male voice right before --

A    Yes.

Q    -- you said that.  So your husband said that.

A    Yes.

Q    And then you said it to nine, one, one.

A    Yes.  But I had seen -- I was looking out and I had seen the individual tug at the plates.  And they had -- the other individual in all black cover -- handed her something and they covered the plates.  And she was squatting, blocking the plates

from being seen.

Q    Nobody swapped out license plates.

A    They attempted to.

Q    There were no other license plates put on the car.

A    No.  But they attempted to.

Q    That's your belief.

A    That's what I saw.

Q    They had the same plates when they left.  You saw them leave eventually, right?

A    No.

Q    You did not see them leave.

A    No.

Q    You were in your car while Baldwin Park Police were detaining everybody, all the three people here today, right?

A    Yes.

Q    Okay.  And you stayed there until the street was cleared.

A    No.  The police told me to leave.

Q    You gave the number of the license plates that was on the car to nine, one, one.

A    Yes.

Q    That was the same plate that was still on there when the police arrived.

A    Yes.

Q    As far as you know, no other plates were put on that car.

A    No.

Q    While you're on the phone with nine, one, one, the nine, one, one operator asked you, are they getting back inside their car now, what are they doing, right?

A    Right.

Q    And you said, they're trying to leave.

A    Correct.

Q    You didn't tell them that you had blocked them in by that point.  You didn't tell nine, one, one.

        MS. BORDER:  Objection, misstates the evidence.

        THE COURT:  Well, I mean, maybe ask the question did she block them in.

BY MS. CHOI:

Q    Did you block them in?

A    No.

Q    Your testimony is that while you were on the phone with nine, one, one, you did not move your car and block in Ms. Brown's vehicle?

A    No.  I was backing up to try to get the address because I had realized I gave my home address.

Q    Okay.  Did you give them that address?

A    No.

Q    But you reversed your car, for whatever reason you reversed your car, right?

A    Right.

Q    And then you blocked the driveway of 12833.

Herrera - Cross / By Ms. Choi                                246

A    I did not block the driveway.

     **(Pause)**

         **MS. CHOI:**  Can you pull up Government Exhibit 6,

please?  At nine minutes and 58 seconds.

     **(Ms. Choi/unknown speaker confer.)**

         **MS. CHOI:**  This is Government clip six -- Government

Exhibit 6.9, which is a clip.  Just going to -- it's very

short.  Just going to play a few seconds of it.

     **(Video played at 4:33 p.m.)**

**BY MS. CHOI:**

Q    Did you see your car parked?

A    Yes.

Q    And your husband standing in the driveway.

A    Correct.

Q    And you are blocking that driveway.

A    At the time I didn't realize I was blocking the driveway.

     **(Pause)**

Q    You heard the car honking, the other car, Ms. Brown's car,

you heard her honking.

A    Correct.

Q    She was trying to leave.

         **MS. BORDER:**  Objection, calls for speculation.

         **THE COURT:**  Overruled.

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Herrera - Cross / By Ms. Choi                                247

BY MS. CHOI:

Q    She was trying to leave.

A    Maybe, or she was honking for our neighbors to come out for attention.

Q    You heard -- you said that you heard Ms. Raygoza telling your husband saying -- shouting at your husband while he was standing in front of Ms. Brown's car, right?

A    Right.

Q    Was she -- you heard what she was saying to him.

A    Right.

Q    She said, move, right?

A    Right.

Q    She kept yelling at him to move.  And when you watched that video we just saw, is there room for Ms. Brown's vehicle to get out?

A    No.

Q    Because you're blocking the driveway.

A    Again, I didn't realize that I was blocking --

Q    But looking at it --

A    -- the driveway.

Q    -- now you see you're blocking the driveway.

A    Looking at that video, yeah.

Q    You told nine, one, one, they're trying to leave.

A    Correct.

Q    So you knew they were trying to leave, they wanted to

leave, right?

A    I guess.  I assumed they wanted to leave.

Q    That's why you said that.  You told them again -- the nine, one, one operator asks you, let me know if that vehicle starts to take off because that way I can let my officers know.  And you said, yeah, they're trying to.

A    They were not in the vehicle.  I only assumed because she moved -- the vehicle was facing my husband.  So I had assumed that they were trying to flee the scene.

Q    Right.  They were trying to leave.  They don't want to stay, they want to leave, right?  That's fair to say.

A    After they showed all my residence, yeah.

Q    That's not what I'm talking about.  I'm talking about the moment your husband gets out of the car and you're blocking the driveway, clearly they want to leave.  That's what you told nine, one, one.

A    Correct.

Q    You also said they're getting very close to my husband.

A    Yes.

Q    You didn't tell her, my husband got out of the car and is getting close to them.

A    He was standing there so he didn't -- he wasn't like -- I didn't see him doing anything.  He was just standing there on the phone.

Q    The words that you used were, they are getting close, very

close to my husband.

A    Yes.

Q    But they weren't coming up to your husband in that moment. He went up to them.

MS. BORDER:  Objection, misstates the evidence.

THE COURT:  I mean, there's -- there was some moving moments here.  I don't know at what moment in the scenario we're referring to.  So I really can't make a ruling unless you make the question a little more clear.

BY MS. CHOI:

Q    So five minutes into the nine, one, one call, okay, this is five and a half minutes into the call that we were listening to parts of, you said, they're getting very close to my husband.

A    Yes.

Q    You remember saying that.

A    Yes.

Q    Okay.  At that point your husband had exited the car and was standing in front of Ms. Brown's vehicle.

A    Yes.

Q    Okay.

A    But at that point, that's when Ms. Raygoza approached him and told him that she would fucking pop him.

Q    And she had an iced coffee in her hand when she said that.

A    She did.

Herrera - Cross / By Ms. Choi                    250

Q    And her phone in the other hand, recording.

A    Yes.

Q    And also at that time is when Baldwin Park Police arrived.

A    Yes.

**(Pause)**

Q    You also told nine, one, one, we were trying to leave and they jumped out of nowhere in front of my vehicle, right?

A    Right.

Q    No one jumped in front of your vehicle, right?

A    No, not when I called nine, one, one, no.  It was --

Q    At any --

A    -- prior.

Q    -- point no one jumped in front of your vehicle.

A    Correct.

Q    No one stopped you from leaving.

A    No.

Q    It was the opposite.  You stopped them from leaving.

A    Again, I did not see how far I was backed up.

Q    That wasn't my question.  You stopped them from leaving --

A    No.

Q    -- right?

        **MS. BORDER:**  Objection, asked and answered.

        **THE COURT:**  I mean, what was her answer when you -- what to the question?

        **MS. CHOI:**  The question was that you stopped them

EXCEPTIONAL REPORTING SERVICES, INC

from leaving --

          MS. BORDER:  And --

          MS. CHOI:  -- because of your vehicle and where it was parked.

BY MS. CHOI:

A    Again, I didn't realize how far I was backed up at that moment.

Q    I'm not asking what you realized in the moment.  I'm asking what happened.  Your car was blocking them and you stopped them from leaving, right?

A    No.

Q    Would you like to watch the clip again?

          THE COURT:  I mean, you're asking her two different things.  I mean, it's for the jury.  You're asking her whether she intended to stop them from leaving or whether the video shows that they were stopped from leaving.

          So if you want to separate the questions, that's the way I think it's being asked.  If I'm wrong, ask it your way. But that's what I think is going on.

          MS. CHOI:  I'll move on.

          THE COURT:  Yeah.

BY MS. CHOI:

Q    After Baldwin Park Police arrived, you were interviewed, right?

A    Right.

Q    By Officer Moreno.

A    Yes.

Q    You remember that.  You told Officer Moreno that you had reversed the car a little bit to get out of the way.

A    (No audible response.)

Q    She asked you about did you reverse the car at all.

A    Correct.

Q    And you said a little bit, to get out of the way.

A    Yes.

Q    Nobody was in front of you when you reversed the car, right?

A    Right.

Q    So that wasn't true.

A    No, again, there was a lot going on.

Q    Was it true or not true?

A    I'm sorry, repeat the question.  I'm sorry.

Q    When you told Officer Moreno that you had reversed your car a little bit to get out of the way, that was not true.

A    No, I don't remember telling her that.  Again, there was a lot going on.  I was very distraught.

    (Ms. Choi confers)

    (Video played at 4:42 p.m.)

BY MS. CHOI:

Q    You -- we just -- you just testified that you --

        MS. BORDER:  Objection, Your Honor.  This is not in

Herrera - Cross / By Ms. Choi                              253

evidence.

THE COURT:  I don't know what that -- I mean, the fact that it's not in evidence doesn't mean it can't be used. What are you using now?

MS. CHOI:  It's the video depicting what we're just talking about.

THE COURT:  Okay.

MS. CHOI:  So I'm going to be --

(Video played at 4:42 p.m.)

MS. CHOI:  Go ahead and play.

(Video resumed)

(Pause from 4:42 p.m. to 4:44 p.m.)

(Video resumed)

BY MS. CHOI:

Q   So you told Officer Moreno you reversed the car a little bit to get out of the way.

A   Correct.

Q   That wasn't true.  That was not true, right?

A   Again, I don't remember that.  At that point, there was a lot going on.

I know I was blocking the driveway of the neighbor, and I was just trying to move, I'm trying to see the address, I'm trying to keep an eye on my husband.

It's, you know, my baby's crying.  There's just a lot of moving pieces.  You know, they're screaming --

Herrera - Cross / By Ms. Choi                         254

Q    I understand it was a chaotic situation.  But I just want to focus on the words and what you said.  So it was not true, no one was in your way when you reversed, right?

A    No.

MS. BORDER:  Objection, misstates the evidence.

THE COURT:  Overruled.

You know, I want -- some things I want to take up with the lawyers.  Do you mind if we end a little early today, a quarter to 5:00; is that okay?

(No audible response.)

Generally speaking it's okay.  And then we'll pick up tomorrow at 9:00 o'clock.  Again, the admonition, don't speak to each other or anyone at home, no Google, electronic materials and so forth.

And I appreciate the effort you all made to get here on time.  Let's see if we can do it tomorrow.  Hopefully we'll finish the case tomorrow.  Okay.  Thank you.

THE CLERK:  All rise for the jury.

**(Jurors exit courtroom at 4:45 p.m.)**

THE COURT:  You can step down.

MR. BERNSTEIN:  Your Honor, we would ask that you admonish the witness not to discuss her testimony --

THE COURT:  Okay.  Don't --

MR. BERNSTEIN:  -- with her husband or anybody else.

THE COURT:  She's admonished not to do that.

EXCEPTIONAL REPORTING SERVICES, INC

255

Okay.  Everyone can be seated.

Let me ask, what -- it -- what is the defense plan? I mean, we're almost at the end of the Government's case.  What is coming up?

MR. NICOLAYSEN:  Your Honor, on behalf of Defendant Raygoza, I do want to call Officer Moreno for the issue --

THE COURT:  Well, I know that.

MR. NICOLAYSEN:  -- we discussed.

THE COURT:  But beyond that.

MR. NICOLAYSEN:  And then I will rest.

THE COURT:  Okay.  What about the other Defendants?

MR. BERNSTEIN:  On behalf of Ms. Samane, we will not be putting forward a defense.

THE COURT:  I see.  What about Brown?

MS. CHOI:  Your Honor, we have likely a short testimony from an investigator and then one other percipient witness.

THE COURT:  What will the investigator say, just generally?

**(Pause)**

MS. CHOI:  Well, there are two issues, Your Honor. One would be our investigator's inspection of the ICE vehicle and why it would be impossible for anyone to look through and see who -- how many officers are inside.

THE COURT:  The tinted window aspect.  But why is

256

that in dispute?  I mean, doesn't everybody know when windows are heavily tinted, you can't see inside?

MS. CHOI:  I think there's a suggestion here that they should have known because he was wearing plainclothes and because he was alone, they should have known he was not headed to an ICE raid.  And so we want to rebut that suggestion.

THE COURT:  I don't see how -- I'm not getting the connection.  Can you tell that to me a different way?

MS. CHOI:  Yes, Your Honor.  The ICE officer, it's undisputed that he left the -- this area and went home, and that the Defendants followed him in their vehicle.

There were some questions that came up about, you know, what was he wearing, that he was in plainclothes, that he wasn't wearing a police vest, and the fact that he was alone should have signaled to the Defendants that this was not someone going on an ICE raid, that they knew or should have known he was --

THE COURT:  Oh.  So you're saying --

MS. CHOI:  -- actually going home.

THE COURT:  -- that tinted windows are associated with ICE cars?

MS. CHOI:  No, Your Honor.  Just that if you can see through them, that you should know that this is not an ICE -- a raid, that it's not heading to an ICE raid.

THE COURT:  I never thought that was an argument the

257

Government was going to make.

MS. BORDER:  It's not, Your Honor.  The Government won't be making that argument.

And I don't think it's contested that the entire car, as Mr. Reyes testified today, was tinted, and that Defendants potentially couldn't have seen inside.

And I believe that the comment about --

THE COURT:  My understanding of the evidence -- and, of course, again, it's not for me to determine -- but that in this incident where the officer was followed, the officer said that he was followed to a point when there were some cars making consecutive right turns.

And he thought he was being followed.  Then he went on his way.  And it would seem that from that, then on until he got to his home, he was not -- he didn't think he was being followed.

But maybe he will -- maybe the argument will be that when he got to his home, remembering the earlier incident, he put two and two together and thought he was being -- he -- now he thought they were the ones who were following him.  I don't know.

But it's unclear to me from the officer's standpoint how he knew that he was being followed.  Clearly he was being followed because the Defendants don't deny that.  But they said they followed him for other reasons.

258

But, anyway, the -- you're not going to make the argument -- I mean, it's clear the argument's going to be that they thought it was an ICE operation, he was in a car that didn't have license plates, he left the federal building, they associate ICE cars with plates that don't have license plates, and that when they arrived at the destination, I mean, this is just me speaking, it would appear that he got out of his car.

At that time he had a holstered weapon.  And they thought, well, yes, he is an ICE officer, and so forth.  And even though he is wearing the checkered shirt.

So, I mean, whether or not the Defendants thought he was an ICE officer in the course of his operation is really only a part of the case.

I mean, let's assume they thought that.  So that's not game over.  I mean, the argument is that -- your argument is that even if they knew he was an ICE officer, what they did was what is charged, right; isn't that the way you see it?

MS. BORDER:  Yes, Your Honor.  Even if they believed that they were initially following the ICE officer to an ICE raid --

THE COURT:  But when they got there, --

MS. BORDER:  It was very clear --

THE COURT:  Well, when they got there, I mean, he -- I don't know whether he's said he's an ICE officer or not.  But he did get out of the car and he did have the gun, so, I mean,

259

I don't know --

MS. BORDER:  Your Honor, just for the record, I'm not sure there was any testimony that the Defendants knew that he was armed.  I just wanted to clarify that for the record.

THE COURT:  But -- all right.  But I thought he said that he had a gun on him.

MS. BORDER:  Correct, Your Honor.  But it was concealed the entire time.

THE COURT:  Oh, it was?  Oh, I see.

MS. BORDER:  Yeah.

MR. BERNSTEIN:  He did not say that.  He said it was in his pant holstered to his side of his pants.

THE COURT:  Well, I mean, I thought he said something about the gun being holstered.  I don't know whether it was holstered in his pocket or holstered on a --

MR. BERNSTEIN:  On his waistband, exactly, on the waistband.

THE COURT:  Well, if he said that then you can argue that.

Anyway, okay, what else -- who else is going to testify?

MS. CHOI:  The same investigator, so that would be very brief.

THE COURT:  Yeah.  I don't know if that's relevant, okay.

260

MS. CHOI:  The --

THE COURT:  Or sufficiently relevant.

MS. CHOI:  One of the -- well, the Government's overts (sic) acts includes that they followed this ICE officer home, specifically they followed this single ICE officer home. So --

THE COURT:  Well, they did.

MS. CHOI:  Yes.  And we want to present the defense that they did not know they were following a single ICE officer.

THE COURT:  Well, I mean, but the tint in the windows, in my view, or the investigator's report about that, I mean, they didn't -- they're not -- there's no evidence in the case -- or maybe I'm -- I missed something.

But they're not -- there's no evidence by anyone so far that when they were pursuing the ICE officer's car, they were close enough to see into it or that they could identify who was in the car; isn't that true?

MS. BORDER:  That is correct, Your Honor.

THE COURT:  Yeah.

MS. BORDER:  There -- I don't believe there's a dispute here.

THE COURT:  Yeah.

MS. CHOI:  But --

THE COURT:  Anyway, what -- who else is going to

261

testify?

MS. CHOI:  That same investigator would also testify one of the elements of Count One is that they knowingly made publicly available his personal home address.  So we would introduce evidence to establish that his personal home address was already publicly available.

THE COURT:  I see.  Is that -- could that be stipulated to?

MS. BORDER:  Your Honor, I believe it's legally irrelevant.  And that's actually a jury instruction question.  And I believe that with the Court's ruling having denied the motion to dismiss Count One, that was actually one of the arguments the defense --

THE COURT:  Okay.

MS. BORDER:  -- was making.

THE COURT:  I'll research that overnight and give you a ruling in the morning.

MS. BORDER:  And just for clarity, the Government's perspective is that as a matter of law, it does not matter if the information was already publicly available.

THE COURT:  Okay.  I understand the argument.

And so that's the evidence, right?  So it should be over pretty quickly.

MS. BORDER:  Correct, Your Honor.  I don't believe there are any disputes regarding the topics that the

262

investigator would testify to.

THE COURT: And then there's the jury instructions. And I've been working on those. And hopefully we can have a discussion about those before I finalize them. And, I mean, there are just a few that are more important or at least disputed.

So, all right, then I'll give you rulings tomorrow on these things.

MS. CHOI: And, Your Honor, if I may raise just one more issue about logistics for tomorrow.

THE COURT: Yes.

MS. CHOI: There -- I understand the Government is calling Officer Goble, who's one of the Baldwin Park Police Department --

THE COURT: Right.

MS. CHOI: -- officers. And then two of the Defendants have another officer under subpoena.

We learned today that their --

THE COURT: Oh, you didn't mention that other officer. No one mentions -- is that Moreno?

MR. SPEAKER: Yes.

MS. CHOI: Moreno.

THE COURT: Okay. I got it. I'll make a ruling.

MS. CHOI: Oh, I'm sorry, Your Honor. I -- and if I may just, we learned that one of their colleagues or

263

supervisors --

THE COURT:  Going to his funeral.

MS. CHOI:  Yes.  So we would ask -- request a late start just so they can attend it.

THE COURT:  Understood (inaudible) --

MS. CHOI:  A later start in the morning.  Their service or the -- it starts at 9:00 o'clock, --

THE COURT:  I'm --

MS. CHOI:  And they said they could get --

THE COURT:  (Inaudible) because Mister -- what's his name?  Nicolaysen asked the officer if he told agent -- the police officer, Moreno, that -- what did he say again?

MR. NICOLAYSEN:  Yes, Your Honor.

THE COURT:  What was the question?  Whether he told --

MR. NICOLAYSEN:  The --

THE COURT:  -- Moreno what?  Just simply what did he say?

MR. NICOLAYSEN:  Moreno's report says that during the interview with the agent, the agent stated to Moreno that while the agent was filming with his camera, my client pushed him.

THE COURT:  Understood.  Okay.

And the officer has said that the Defendant did push him.  So whether or not the officer -- the officer is clearly on record as saying that she -- the Defendant pushed him.

264

Then the question was asked and he said, I really don't remember what I said to Moreno. And then the question was asked I think later on, at which point maybe the witness said something, I think you're making something up, or something like that.

MR. NICOLAYSEN: Yes. He accused --

THE COURT: And --

MR. NICOLAYSEN: -- me of fabricating.

THE COURT: -- that is what the record shows. So in my view, Moreno's testimony is not sufficiently relevant, and he won't testify.

So tomorrow we'll hear from -- who will they hear from tomorrow? Just the cross --

MS. BORDER: I believe we will finish up Ms. Herrera. And then we will have a very short about 15 to 20-minute direct of Officer Goble.

THE COURT: And Goble is going to say what he heard at the --

MS. BORDER: Correct, Your Honor, and the comment like let's dox them.

THE COURT: Okay. Well, every -- we all know, the jury knows generally what all these things are about. So just get right to the point.

MS. BORDER: Understood, Your Honor.

THE COURT: And so the case should be over, well, I

265

mean, it should be over in the morning.  I don't know how long further examination of Mrs. Herrera will be.

And how long will the redirect be?

MS. BORDER:  I'm not quite sure who will be also cross examining Ms. Herrera.

THE COURT:  Oh, there more cross -- I'm sure there'll be more cross examination

MR. BERNSTEIN:  Yes, Your Honor.

THE COURT:  Okay.  So it may take a while.

And then we'll have to take a recess and iron out the jury instructions.  And then we'll -- for sure you'll argue the case.

MR. NICOLAYSEN:  And, Your Honor, I'm going to submit a special instruction on covered person.  Your Honor will recall that --

THE COURT:  Did you submit it?

MR. NICOLAYSEN:  I'm doing that this evening.  I --

THE COURT:  All right.  Well, --

MR. NICOLAYSEN:  My office -- it's very short.

THE COURT:  Well, --

MR. NICOLAYSEN:  It goes to Count One.

THE COURT:  -- what is it going to say so I have it in mind?

MR. NICOLAYSEN:  It borrows from the statutory definition of 18 USC 119, sub "A," two.

266

THE COURT:  And what is it going to say?

MR. NICOLAYSEN:  That a covered person has certain criteria.  The only one that would apply here would be the criteria that cross-references to 18 USC 1114, which speaks of an employee, a federal employee, who was engaged in their official duties.

And I think that in this case, my argument would be it was very clear that he was not engaged in his official duties.  They -- and so he does not qualify as a covered person.

THE COURT:  I see.

MR. NICOLAYSEN:  And so it's not -- the object of the conspiracy cannot be achieved as a matter of law.

THE COURT:  All right.  What is the Government's response?

MS. BORDER:  Your Honor, I think that would basically make the doxing statute nonexistent.  It would --

THE COURT:  Well --

MS. BORDER:  -- mean that any judge --

THE COURT:  I know.  But specifically the argument is that covered person has this definition.  The officer said that he was -- well, I mean, not on official duties, I mean, he went home early, correct?

MS. BORDER:  That's correct.

THE COURT:  Does that -- I mean, what does official

267

duty mean?  If you go -- official duty meaning you'll have to actually be on the ready in your active job --

MS. BORDER:  No, Your Honor.  I don't believe the case law interprets that at all that way.  That --

THE COURT:  I know that in police work, police officers, at least in some jurisdictions, are on duty 24 hours.

MS. BORDER:  Understood.

THE COURT:  I mean, --

MS. BORDER:  And that's definitely not an argument that the Government would anticipate making.

THE COURT:  Well, but I don't know.  I mean, you have case authority on that point?

MR. NICOLAYSEN:  I haven't researched the case law. I just saw the -- that the indictment did not mention covered person.

It mentioned federal agent, which I believe is a defect in the indictment.  So I feel we have to have an instruction on covered person.

And, you know, the agent himself admitted today he was not carrying out his official duties.  He was going home. So I think it's really a black and white issue that there is no gray area here as to whether he might or might not have been on call or --

THE COURT:  All right.  I'll --

MR. NICOLAYSEN:  So I --

268

THE COURT:  -- give you a ruling.  I'll research it. Thank you.

MR. NICOLAYSEN:  Thank you.

THE CLERK:  All rise.  This court is adjourned.

(Proceeding adjourned at 5:04 p.m.)

269

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **March 17, 2026**

            **Signed**                                    **Dated**


                *TONI HUDSON, TRANSCRIBER*