# EXHIBIT C

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:25-cr-00780-SVW |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| CYNTHIA RAYGOZA, | ) | Thursday, February 26, 2026 |
| ASHLEIGH BROWN, | ) | |
| SANDRA CARMONA SAMANE, | ) | (9:08 a.m. to 2:42 p.m.) |
| | ) | (2:58 p.m. to 5:14 p.m.) |
| Defendants. | ) | |

JURY TRIAL - DAY 3

BEFORE THE HONORABLE STEPHEN V. WILSON,
UNITED STATES DISTRICT JUDGE

APPEARANCES:                SEE PAGE 2

Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Daniel Tamayo

Transcribed by:           Exceptional Reporting Services, Inc.
                          20079 Stone Oak Pkwy. Suite 1105-237
                          San Antonio, TX 78258
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

**APPEARANCES:**

For Plaintiff:                    AUSA CLIFFORD MPARE
                                  AUSA LAUREN E. BORDER
                                  AUSA NEIL THAKOR
                                  U.S. Attorney's Office
                                  312 N. Spring St., 15th Floor
                                  Los Angeles, CA 90012


For Cynthia Raygoza:              GREGORY NICOLAYSEN, ESQ.
                                  Gregory Nicolaysen Law Offices
                                  27240 Turnberry Lane
                                  Suite 200
                                  Valencia, CA 91355
                                  818-970-7247


For Ashleigh Brown:               DFPD ERICA CHOI
                                  DFPD SHANNON M. COIT
                                  Federal Public Defender's Office
                                  321 East 2nd Street
                                  Los Angeles, CA 90012
                                  213-894-2854


For Sandra Carmona                ROBERT M. BERNSTEIN, ESQ.
Samane:                           Law Offices of Robert M. Bernstein
                                  9465 Wilshire Boulevard
                                  Suite 300
                                  Beverly Hills, CA 90212
                                  310-477-1480

3

**INDEX**

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JESSICA HERRERA | | | | |
|   BY MS. CHOI | | 4 | | 15 |
|   BY MS. BORDER | | | 11 | |
| ZACHARY GOBLE | | | | |
|   BY MS. BORDER | 35 | | 65 | |
|   BY MS. COIT | | 43 | | |
|   BY MR. NICOLAYSEN | | 63 | | |
| DEFENSE WITNESS | | | | |
| DOLORES OSUNA | | | | |
|   BY MS. CHOI | 72 | | | |
|   BY MR. MPARE | | 80 | | |

| EXHIBIT | RECEIVED |
|---|---|
| 5 | 63 |

| JURY INSTRUCTIONS | 93/181 |
|---|---|

| CLOSING ARGUMENT | |
|---|---|
|   BY MR. MPARE | 104 |
|   BY MR. NICOLAYSEN | 124 |
|   BY MS. CHOI | 156 |
|   BY MR. BERNSTEIN | 165 |
|   BY MR. MPARE | 171 |

**Los Angeles, CA, Thursday, February 26, 2026, 9:08 a.m.**

**(Call to Order)**

THE CLERK:  Please be seated.

THE COURT:  Good morning members of the jury.

THE CLERK:  All rise for the jury.

**(Jurors enter courtroom)**

THE CLERK:  Please be seated.

**(Pause)**

THE CLERK:  All rise.  The United States District Court is now in session, the Honorable Stephen V. Wilson U.S. District Judge presiding.  Please be seated.

THE COURT:  Good morning, members of the jury.  Thank you very much, once again, for being so prompt and being here. We're ready to resume.

**JESSICA HERRERA, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN**

**CROSS EXAMINATION (CONTINUED)**

BY MS. CHOI:

Q   Good morning, Ms. Herrera.

A   Good morning.

Q   I have just a few more questions for you.  Yesterday, you said that you heard Ms. Raygoza say, "I'll pop you," do you remember her saying that?

A   Yes.

Q   And you explained how you interpreted that statement in that moment, remember that?

A    Yes.

Q    Yeah.  "I'll pop you."  That can mean different things, right?

A    Right.

Q    It can mean, "I'll hit you in the face?"

A    Yes.

Q    It can mean different things?

A    Yes.

Q    Now, this incident that we've been talking about, that happened on August 28th, 2025, right?

A    Right.

Q    Two weeks prior to this incident, you had called the police.

A    I don't recall.

Q    You don't recall?  Do you recall telling Officer Marino that two weeks prior to this, you had called the police?

        MS. BORDER:  Objection, relevance.

        THE COURT:  I don't know where it's going.  I mean, it's a preliminary question.  Do you have further questions about this?

        MS. CHOI:  I do, Your Honor.

        THE COURT:  Then go ahead.

        MS. CHOI:  Okay.

//

//

**BY MS. CHOI:**

Q    You told Officer Marino that you had called 911 about a car parked outside your house and that you thought it was suspicious because your husband works for DHS?

A    I don't recall.

Q    Would it refresh your recollection to just watch that part of the body-worn camera of your conversation with Officer Marino?

        **MS. BORDER:**  Objection, Your Honor.  I'm going to renew the relevance objection.

        **THE COURT:**  Overruled on relevance.

**BY MS. CHOI:**

Q    So would it refresh your recollection to just watch that little clip of your conversation with her?

A    I don't see how it's relevant, but --

        **THE COURT:**  I can't hear your answer.  Can you answer?

A    I don't see how it's relevant.

        **THE COURT:**  I mean, that's not your call, Ms. Marino {sic}.  The question is, if you don't remember and something is shown to you, would that help you remember it?

A    Maybe.

        **THE COURT:**  Okay.

        **MS. CHOI:**  I'm going to play what's been pre-marked as Defense Exhibit-289.

     (Video played)

BY MS. CHOI:

Q    Do you remember now that conversation?

A    Yes.

Q    Yes, okay.  And --

A    Can I respond to that?

Q    You'll have a chance to respond after this.  So two weeks prior to this incident, you had called 911 about a suspicious vehicle outside your house --

A    Yes.

Q    Right?  Okay.  You testified yesterday that you had to change your license plate because of what happened --

A    Yes.

Q    -- on your -- on the Suburban?

A    Yes.

Q    Okay.  But you didn't get the license plate changed, right?

A    Yes, I got the license plate changed.  I --

Q    You got the license plate changed?

A    Yes.  I went to the DMV to change the license plates.

Q    Okay.  Can you look in the Defense exhibit binder in front of you, volume two?  Do you -- it's, like, a bigger one.  Do you see that?

A    Hmm.

Q    It's a white larger binder right on the front.  It says -- is that volume two?  That looks like it might be volume one.

A    No.

Q    Okay, I think that's the right one.  Could you open that and then open to Exhibit-298 that's tabbed?

        MS. CHOI:  I'll give a copy to the Government.

**MS. CHOI:**

Q    Let me know when you're there.

A    Yes.

Q    If you could turn to Page 4 of that document.

A    Yes.

Q    That's a DMV application for replacement plates, stickers, and documents, right?

A    Yes.

Q    And it lists a Chevy vehicle with a license plate -- with a specific license plate.  Do you recognize that license plate?

A    In the upper-right hand, correct?  Yes.

Q    The license plate is on the left, on the upper-left.

A    Yes.  Yes, I see it.

Q    And it's for the vehicle we're just talking about, right?  The Chevy --

A    Yes.

Q    -- Suburban?  This application was made by Marie Felix Rodriguez, right?

A    Yes.

Q    Not you?

A    No, that is my mother-in-law.  I was with her.

Herrera - Cross / By Ms. Choi                    9

Q    Okay.  But you didn't apply to the DMV?  It was Maria Felix Rodriguez?

A    Correct.

Q    And she's the registered owner of that vehicle?

A    Yes.

Q    You see in Section 3, it says, "The item requested was" -- and you see the different boxes, the different choices for the reason for this request?

A    Correct.

Q    It says it was lost, right?

A    Right.  Yes.

Q    So your mother-in-law went to the DMV and claimed that the license plate needed to be replaced because it was lost?

          **MS. BORDER:**  Objection, relevance.

          **THE COURT:**  Overruled.

**BY MS. CHOI:**

Q    Is that right?

A    Correct.  That's what it says there.

Q    Okay.  And you were with her?

A    Yes.

Q    Okay.  You can close that now.  Thank you.  You can close the binder.  Thank you very much.  After August 28th, 2025, you never saw my client, Ms. Brown, again, right?

A    Right.

Q    You never saw any of the women here?

A    No.

Q    They didn't come to your neighborhood again?

A    No.

Q    They didn't call you on the phone?

A    No.

Q    They didn't e-mail you?

A    No.

Q    They didn't try to contact you online on social media?

A    (No verbal response).

Q    Is that a "no?"

A    No.

Q    Okay.  And DHS had sent a special response team after this to stay in your neighborhood, right?

A    Right.

Q    They were there for a few days?

A    I believe so, yes.

Q    And after that, they left?

A    Correct.

         MS. CHOI:  I have no further questions.

         THE COURT:  Okay.  Does someone else have (inaudible)?

         MR. BERNSTEIN:  No cross examination, Your Honor.

         THE COURT:  Okay.

         MR. NICOLAYSEN:  Nothing, Your Honor.  Thank you.

         THE COURT:  Or redirect examination?

Herrera - Redirect / By Ms. Border                    11

MS. BORDER:  Thank you.

REDIRECT EXAMINATION

BY MS. BORDER:

Q   Ms. Herrera, on cross, there were some questions about your car blocking Defendants from leaving.  Do you remember that?

A   Yes.

Q   And you only saw one video on cross of your car potentially blocking their car, is that right?

A   Correct.

MS. BORDER:  Mr. Flores (phonetic), can you please play Government Exhibit-26?

(Video played)

BY MS. BORDER:

Q   So did you hear a woman say, "You'll fit through here. You'll fit through here?"

A   Yes.

Q   And what do you interpret that to mean?

A   They were able to leave.

Q   And then did you see the woman near the car get something out of the trunk or attempt to get something out of the trunk?

A   Yes, I did.

Q   And did you also personally witness that?

A   Yes, I did.

Q   And what was she doing?

A   She was trying to cover the plates.

Herrera - Redirect / By Ms. Border                    12

Q   So instead of leaving, they were trying to cover the plates?

A   Yes.

Q   You stated on cross that the woman that was near the car stopped filming for a bit once you confronted her, is that --

A   Yes.

Q   -- right?  Do you know whether she live streamed again later that day?

A   I don't know.

Q   So it's possible that she could've picked up her phone again and started streaming?

        MS. CHOI:  Objection, asked and answered.

        THE COURT:  The objection is sustained.

BY MS. BORDER:

Q   On cross, we also watched a video where you told a Baldwin Park police officer that you backed up your car to get out of the way?

A   Correct.

Q   What did you mean by "get out of the way," if you can remember?

A   I was trying to reverse to get a better view of the address 'cause I had realized I had given my home address, and I didn't want it on record.  But, again, it was just a lot going on, my son crying, my baby crying, and all the hostile environment. It was just too much.

Herrera - Redirect / By Ms. Border                    13

Q    And what was your emotional state at the time that you were speaking with that officer?

A    I was under a lot of emotional distress.

Q    Were the Defendants still in your neighborhood during this interview?

A    Yes.

Q    We also discussed a prior 911 call that you made about two weeks prior about a car that made you nervous outside your home.

A    Yes.

Q    So how did you feel on August 28th when people with masks actually showed up outside your home?

A    It made me wonder if it was related.  I had called because it had been there -- I think my husband said he checked the cameras, and it had been there.  I had parked there at a certain time.  And then he was leaving for work, and he told me like, "There's a car there."  So I called it in.  At that time, I had a friend staying with me that had fled a DV case.  She needed a place to crash.  And it was a lot of -- it was weird to see, you know, to know that there was the car there.  There was someone sleeping in the car.  So, again, I didn't know how long it had been there, what their intent was.  It was out of the ordinary to have people sleeping in their vehicles.

Q    And after seeing that, you didn't feel the need to move your family, did you?

Herrera - Redirect / By Ms. Border                    14

A    No.

Q    It was only after August 28th, 2025?

A    Correct.

Q    We also -- just my last couple of questions for you, Ms. Herrera.  We had this discussion about the license plate and this DMV form.  Did you fill out that DMV form?

A    No, it was my mother-in-law.

Q    And why did you -- who made the decision to change the plate?

A    My husband, for my safety.

Q    Okay.  And why did you decide to change the plates together as a family?

A    Because I drive that vehicle, and I'm alone most of the day with my kids.  So we felt that it would be safe to try to alter the vehicle in any way.

        MS. BORDER:  May I have one second, Your Honor?

        THE COURT:  (No verbal response).

    (Pause)

BY MS. BORDER:

Q    And is that because you now knew that the information of your license plate was in public?

A    Yes.

Q    Okay, thank you.

        MS. BORDER:  No further questions, Your Honor.

        THE COURT:  Anything further?

MS. CHOI:  Just briefly, Your Honor.

THE COURT:  Okay.

### RECROSS EXAMINATION

BY MS. CHOI:

Q   You said that the 911 call that you made two weeks prior to this incident, you did it because you thought it was weird that someone was parked outside and sleeping in their car?

A   Yes.

Q   The police did not come based on your call, right?

A   Right.

Q   And you called two times about it?

A   Correct.

Q   And they said to you, "Well, maybe they're just parked there?"

A   Yes, the first time, yes.

Q   But they didn't come and respond --

A   No.

Q   -- based on what you are reporting?  Okay.

A   No.

Q   You were just asked about -- by Government counsel about the license plate and the DMV form.  And you said that your husband made the decision to change the plate?

A   Yes.

Q   The form that you -- your mother-in-law submitted, we are talking about that section where you can check off the reason

Herrera - Recross / By Ms. Choi                    16

you're changing -- you're asking for a new plate, right --

A    Correct.

Q    -- where she had checked "lost?"  There's another section on that form where you can check, "Per CVC Section 4467, copy of a police report, court documentation, or other law enforcement documentation required, right?  That's an option?

MS. BORDER:  Objection, lack of foundation.

THE COURT:  Well, I mean, she looked at the form. You've established that, so you can ask the question.

MS. BORDER:  Your Honor, I don't believe we established that she --

THE COURT:  Well, ask --

MS. BORDER:  -- even looked at the form.

THE COURT:  -- ask her whether she --

MS. CHOI:  Okay.

THE COURT:  -- looked at the form.

BY MS. CHOI:

Q    Could you open the binder and look at the form again?

THE COURT:  Well, not now when she asked that.  At the time, did she read the form?  You can ask her that.

BY MS. CHOI:

Q    When you were with your mother-in-law at the DMV, did you see the form that she should fill out for the application for a new -- for a replacement plate?

A    I had glanced at it, but I wasn't looking at it.  The DMV

said that she had to do it, since she was a registered owner.

Q   Okay.  But you were with her, right?

A   Right.

Q   And you knew that she was signing this form, and she was filling it out on you and your husband's request, right?

A   Right.  She had to.  She's the registered owner.

Q   She had to as the registered owner.  And she had to sign this form under penalty of perjury, right?

A   Okay.

        MS. BORDER:  Objection, foundation again, Your Honor.

        THE COURT:  Well, I don't know.  I mean, you have to establish what she did or paid attention to at the time they were at the DMV.  So far, she said her mother-in-law owned the vehicle.  Her husband requested that the plate be changed, and that's all we know so far.  I mean, did she tell the mother-in-law what box she should sign.  Did the mother-in-law do it on her own?  Did she guide the mother-in-law?  I don't know these things.  If you -- if -- I think you want to first establish those before you ask the question.

        MS. CHOI:  Yes, Your Honor.

BY MS. CHOI:

Q   Did you tell your mother-in-law the reason you were going to the DMV with her and applying for new plates?

A   My husband had spoken to her, that she had to come.  She had prior arrangements.  So it was -- we had to pick her up.

Herrera - Recross / By Ms. Choi                    18

We went to the DMV, and then she left.

Q    Did you tell her what happened on August 28th, this incident outside your house?

A    Just not in detail, just that he was followed home and that the plates were posted.  So it was concerning for her as well.

Q    Okay.  So she knew?

MS. BORDER:  Objection, relevance.

THE COURT:  I mean, you've established that the mother -- I don't know what -- it's for the jury.  But you have to show that she told the mother or looked at the form if you want to get this statute in.

BY MS. CHOI:

Q    Did you see -- did you look at this form when you were with your mother-in-law?

A    I had glanced at it, but I wasn't looking at it.

Q    Okay.  When you glanced at it, did you see the section I'm asking you about about the reason for the name -- for the new plates?

A    No.  I was just giving her the VIN number.

Q    Okay.

A    That was it.

Q    But you were with her when she did this?

MS. BORDER:  Objection, asked and answered.

THE COURT:  It has been, but she won't ask it again.

A    Yes.

19

MS. CHOI:  Okay.  No further questions.  Thank you.

THE COURT:  Anything further?

ALL:  (No verbal response).

THE COURT:  In light of my rulings, I think that completes the evidence in the case, doesn't it?

MS. BORDER:  We have one more witness, Your Honor, Zachary Goble, who we anticipate --

THE COURT:  Oh, that's right, yes.  I forgot that. Go ahead.

MS. BORDER:  So the Government will call Zachary --

THE COURT:  Yes.

MS. BORDER:  -- Goble.

THE COURT:  Okay.

MS. COIT:  Your Honor, may we have a sidebar before this witness begins?

THE COURT:  Okay.

**(Begin sidebar)**

MS. COIT:  So I want to make a record on two issues. First is that the Government moved in --

THE COURT:  I can't hear you.  I'm sorry.

MS. COIT:  Okay.  The Government moved in four body-worn cameras yesterday -- or, yeah, on Tuesday with the agent. And when we made objections to the body-worn camera, they had said that they would play clips at trial and so that we would have an ability to make objections.  One of the exhibits does

relate to the body-worn camera of the agent who is supposed to testify.  I have additional issues with -- or I'm going to raise that three of the other body-worn cameras -- I'm sorry, two are body-worn cameras, one is a video of the cruiser. These have never -- the clips haven't been played.

THE COURT:  What cruiser?

MS. COIT:  Of the -- it's one of the Baldwin Park police officer's cars, and it's an hour and 26 minutes of Ms. Raygoza sitting in the back of the car in handcuffs.  And --

THE COURT:  Well, they're not going to use that.

MR. MPARE:  Yeah.  We agree --

MS. BORDER:  We have no Objection.

MR. MPARE:  -- with all these exhibits --

THE COURT:  Yes.

MR. MPARE:  -- (inaudible).

MS. COIT:  Your Honor, I want to be clear for the record that Exhibit-27, 29, and 31 are not admitted into evidence.

THE COURT:  What are those exhibits?  What are they?

MR. MPARE:  Those are body-worn camera that we're not using.

THE COURT:  They're not going to use those?

MR. MPARE:  We're only using 28 as (inaudible).

THE COURT:  Is that okay?

MR. MPARE: Yeah, (inaudible).

MS. COIT: Yes, this is what -- I just -- I didn't have a chance to  make my record, Your Honor.  As you know --

THE COURT: Right.

MS. COIT: -- I have to make things clear.

THE COURT: Yes, yes.

MS. COIT: Okay.  And then as to Exhibit-28, this is a full video of the body-worn camera of Officer Globle {sic}. It is 53 minutes long.  As we know -- so what we --

THE COURT: Are you going to play the whole thing?

MR. MPARE: No, Your Honor.

THE COURT: How much of it are you going to play?

MS. BORDER: Four clips, that it'll come out to --

MR. MPARE: A few minutes.

MS. BORDER: -- three minutes.

THE COURT: A few minutes.

MS. COIT: So what I suggest, Your Honor, is that the Government plays its exhibits and only omits the clips that they play.  The Defense can then also -- I have clips.  The -- I provided them to the Government.  We can play those clips as well and that those clips will be admitted to --

THE COURT: Okay.

MS. COIT: -- evidence.  But the full Exhibit-28 is not coming into evidence.

THE COURT: Well, that sounds fair.

22

**MS. BORDER:** And the Government, of course, will be objecting --

**MS. COIT:** This is --

**MS. BORDER:** -- on hearsay grounds likely, depending on what's in the clips.

**THE COURT:** What are the -- well, I have to see them anyways.

**MS. BORDER:** If -- yeah, if they're opposing --

**THE COURT:** Okay.

**MS. COIT:** We've provided them ahead of time.

**THE COURT:** Yes.

**MS. BORDER:** Okay.

**MS. COIT:** And then, Your Honor, I just need to make a record. We want to renew our hearsay objections to -- as Your Honor is aware, at the end of the incident here, four individuals show up and make some statements.

**THE COURT:** Right.

**MS. COIT:** This is the alleged dox. I want to renew our hearsay objections as to those statements, given the evidence that's come in now. They're hearsay. Again, we have no idea who these people are, what their connection is to the Defendants, that the Government has not tried to identify them or provide any connection to them. They're -- the Government is essentially treating these as coconspirator statements, even though, again, there's no evidence that the Defendants knew

23

these people or that any kind of conspiracy or an agreement exits with these people.

And they seem to say they're admitting it for the effect, right, on ICE Agent Reyes.  But there are two issues with this.  One, Officer Reyes did not testify, or he -- when he testified, he stated he didn't hear them, right?  There's no testimony saying he could hear what they were saying, maybe that they were yelling or that they were there, but nothing about the words that they had said.

And then, secondly, and probably more importantly, what they're saying is not relevant to the emotional distress, right?  That's been the Government's focus with these comments.  It is all about emotional distress.  And so it's not relevant because he didn't hear them.  The Government could've charged those people, could've put them in this case.  They didn't do that.  It's extraordinary prejudicial what they're saying, right, the "let's dox them" and all that stuff.

And so they're basically trying to convict, like, the Defendants based on what these unknown individuals are saying when, again, we don't know who they are or what their connection is to our clients.  And, again, the statements aren't even being made to him.  They're being made to the Baldwin Park Police Department.  It is very clear from the video that's what's happening.  Officer Reyes is not there.

And, again, these are statements not made to Reyes.  The

24

Government has not tried to find out who these people are, and it's not to the Baldwin Park Police.  It's textbook hearsay, and this should be excluded.  There's been some connection, right, that maybe they're connected to the Defendants because they do show up where they are.  But this is a public Instagram.  Anyone could've watched it, as we know.  And just because people follow you do not mean that you have a connection that's enough to establish, you know, the coconspirator type of agreement, that relationship.  It's not enough.  Just all of your followers on Instagram cannot be potential coconspirators.  That would just make no sense.  I'm almost done.

So, again, we actually don't even know if they're following her.  They're watching a live.  So that is -- the Government has not established that.

THE COURT:  They can hear.

MS. COIT:  Oh.  And so the Government --

THE COURT:  They can hear you.

MS. COIT:  Oh, okay.  Sorry.  (Inaudible).  That's --

THE COURT:  Anything else?

MS. COIT:  That is our record.  Thank you, Your Honor.

MR. NICOLAYSEN:  And, Your Honor, the stalking charge.  Count 2 is a substantive charge, not a conspiracy

25

charge.  So to the degree the Government wants evidence regarding the crowd to prove emotional distress, it's outside the scope of that substantive charge.  There are no unindicted coconspirators in connection with the stalking charge.

          MR. BERNSTEIN:  And on behalf of --

          THE COURT:  So --

          MR. BERNSTEIN:  -- (inaudible).

          THE COURT:  (Inaudible).  Count 1 is the conspiracy to doxing.

          MS. COIT:  Correct.

          THE COURT:  And Count 2 is the stalking.  And let me think about that for a few minutes.

          MS. BORDER:  May I be heard briefly, Your Honor?

          THE COURT:  What's that?

          MS. BORDER:  May I be heard briefly?

          THE COURT:  I know what you're --

          MS. BORDER:  Okay.  And we would also add --

          THE COURT:  -- (inaudible) --

          MS. BORDER:  -- that there are coconspirator --

          THE COURT:  -- contends strongly to show that it was a true threat?

          MS. BORDER:  Correct, Your Honor.

          THE COURT:  And that it's circumstantial evidence that they attempted or intended to do what they did, correct?

          MS. BORDER:  Correct, Your Honor.  And the Government

EXCEPTIONAL REPORTING SERVICES, INC

26

does take the position that these are --

THE COURT:  And that, also, the temporal relationship --

MS. BORDER:  Correct, in minutes.

THE COURT:  -- from when they came and the events in question, and one of them was (indiscern.).

MS. BORDER:  Correct.  And if I --

THE COURT:  Those are your arguments?

MS. COIT:  And if I may, Your Honor, we've looked at the body-worn camera.  The first time she says the address, 12833, it's 1:12 p.m.  And then the individuals don't show up until -- I think it's about 1:50.  And that shows clearly from the body-worn camera --

MS. BORDER:  She also says it twice --

MS. COIT:  No, she (inaudible) --

MS. BORDER:  -- at two different steps.

THE COURT:  Okay.

MS. COIT:  Yeah, yeah.  But the first time --

THE COURT:  What did you say?

MS. COIT:  So the temporal aspect, Your Honor --

THE COURT:  Yes.

MS. COIT:  -- the first time she says the address of where she's standing, it's 1:12 p.m.

THE COURT:  Right.

MS. COIT:  The individuals, the protestors, show up.

It's about 1:50 p.m.

THE COURT:  Right.

MS. COIT:  The Government is saying, "Yeah.  She says the time multiple times -- says the address multiple times later in the video."  But, again, the Government hasn't shown, and there's no evidence, when these individuals heard it.  So it could've been a 40-minute delay.

THE COURT:  Yes.  Anything could've happened.  The question is, is it a reasonable and plausible connection?  A lot of things could've happened, and they can be argued.  But --

MS. COIT:  Yeah.

THE COURT:  -- that doesn't necessarily shape the ruling.  Okay.  I got the (inaudible).

MS. COIT:  Okay.  (Inaudible) we're raising it again because of how evidence is coming.

**(End sidebar)**

THE COURT:  Okay.  I have to consult with the lawyers about some things.  And something has arisen where I want to make sure that I'm on -- that I make the right ruling.  So I hate to have you march back and forth, but you -- could you give me about five minutes to get my thoughts together and then come back?

THE CLERK:  All rise for the jury.

THE COURT:  Thanks.

28

**(Jurors exit courtroom)**

**(Recess taken at 9:40 a.m.; reconvened at 9:51 a.m.)**

**(Outside the presence of the jury)**

THE CLERK:  Please be seated.

THE COURT:  Would the woman in the white blouse come forward with the glasses.  What is your name, ma'am?

MS. SAUNDERS:  Hi, good morning.  Sandra Saunders (phonetic).

THE COURT:  And I have a picture of you along with another male, another man -- with another person, taken yesterday, and the marshals informed me that when one of the defendants was being transported back to the MDC, this other man and you and maybe others were banging on the car.  What exactly was it?  Can you tell me what it was?  Identify yourself, sir.

DEPUTY STALLING:  Good morning, Your Honor.  Deputy Stalling (phonetic) with the marshals.

THE COURT:  And what did you see?

DEPUTY STALLING:  I did not physically do the transport, but I was -- I received a call from the two people that did do the transport that they were concerned that two people jumped out at them when they opened the door to take her back to MDC and --

THE COURT:  Opened what door?

DEPUTY STALLING:  The garage door, the Sallie Court

EXCEPTIONAL REPORTING SERVICES, INC

door, and went to leave in the white van containing the defendant.

THE COURT:  Was she -- was the defendant in the van at the time?

DEPUTY STALLING:  Yes, Your Honor.  And from the -- then I talked to the court security officers that watched the cameras and they were able to get me pictures of both of them.  And the court security officers identified them as the two individuals that did this.  And the court security officers on the video said they have video of at least one of them making contact with the van and saying things and then running down the street after the van.

THE COURT:  I see.  I mean, you don't have to answer because that could be incriminating.  Do you want to answer?  You don't have to.  In any event, I want her barred from the courtroom.

MR. BERNSTEIN:  Your Honor, this is my client's mother.  May I speak to her for a moment?

THE COURT:  Yes.  But I may inquire further because I can't have someone who is potentially disruptive of that kind sitting here.  She poses a threat.

(Pause)

MR. BERNSTEIN:  So, Your Honor, my understanding is that when the van pulled out, she was on the sidewalk and she shouted, I love you.  She never contacted the van.  She did not

try to intercede with the van in any way. There were other people there, but she does not know what they may or may not have done. But they didn't do it at her direction.

THE COURT: All right. I see. Well, I'll allow her to remain.

MR. BERNSTEIN: Thank you. She's been well-behaved in court. She's not trying to --

THE COURT: Well, I have noticed that she has behaved in court, but she can be seated.

MR. BERNSTEIN: Thank you, Your Honor.

THE COURT: Okay. With regard to the issue that we discussed, in these clips that the Government intends to play, what do people in the small crowd say? Take the lectern, if you would, and give me the bullet points here.

MS. BORDER: I actually have them right here, Your Honor. And none of this, of course, would be for the truth of the matter asserted. It would be, you need to shut the fuck up. Go gobble some dick, bitch.

THE COURT: But who are these things said to? The Baldwin Police Department?

MS. BORDER: They're shouting these words while the Baldwin Park PD is there and Mr. Reyes (phonetic) and his family is in the vicinity.

THE COURT: Okay. Go ahead. What else did they say?

MS. BORDER: They call -- we expect that Officer

31

Goble will say that they called him a faggot, and that is also captured on film.

THE COURT:  Well, I mean, he's a police officer.

MS. BORDER:  Correct.  And they also yell, let's dox them.

THE COURT:  Dox them, meaning the police department or the --

MS. BORDER:  The Government would argue that that's not clear whether it's just police --

THE COURT:  Okay.  Anything else?  Is that the gist of it?

MS. BORDER:  Oh, they also said we need the first name and last name of everyone here.

THE COURT:  Okay.  Then my ruling is going to be as -- you can be seated.  My ruling is going to be as follows.  I'm not going to allow the clips to be played, but I will allow officer -- what is his name?  What is his name?

MS. BORDER:  Goble, Your Honor.

THE COURT:  Goble to say that -- did he arrive at -- did he arrive at -- was he already there or when these four or five people came or did they come after he arrived?

MS. BORDER:  He arrived and then the four to five people came, Your Honor.

THE COURT:  I see.  So he can say that he -- the jury already knows about the call.  He arrived pursuant to a call at

the location.  Whatever time he arrived at, whatever time the four or five people came.  He can say that these four or five people came to whatever in front of whatever address it is.  I don't know.  There's been a bunch of addresses mentioned either the defendant's house or I mean -- the officer's house or the adjoining house or wherever.  And these four or five people were vocal and spoke in and used.  What will be the right word for vile language maybe something -- they used profanities -- used profanities, and that would be it.  If the defendants want to cross-examine the agent and with regard to whether profanities directed at the Baldwin Police Department or the officer and his family, they can do that, but I think that's a fair compromise because it does -- the fact that a crowd gathered is evidence that they were true threats and attempted to -- and that the consent -- and for other reasons.  So I think that's going to be the ruling limited to that.

          MS. BORDER:  And just to clarify, Your Honor, would Officer Goble be able to testify about how he heard someone exclaim, let's dox them?

          THE COURT:  What?  What?  But what they say, stalk them.  I don't know what --

          MS. BORDER:  Let's dox them, which is what this entire case from the Government's perspective is about.

          THE COURT:  Well, I mean, dox them.  Was it clear?  They were already doxed, weren't they?

33

MS. BORDER:  Well, they attempted to, Your Honor.

THE COURT:  Well, I mean, your theory is they were already doxed, so.

MS. BORDER:  But we do believe this goes to, again, the conspiracy, the agreement, others came.

THE COURT:  Well, I -- understood.  But under your theory of the case, they were already doxed and the them puts an ambiguity into it.  No, I'm not going to allow that.  Okay.

MS. BORDER:  And just to clarify, Your Honor, there are in other clips that are not portraying these people that are just portraying Ms. Brown speaking, which I don't believe that there is any of these 403 issues.

THE COURT:  What does she say in those --

MS. BORDER:  This is when she says the address, Your Honor.  The 12833 and 12837 Chelsfield.

THE COURT:  All right.  Well, if she says it, that's a different matter.  That's the ruling.  You can get the jury back.

MR. BERNSTEIN:  Your Honor, can we just have a moment so that we don't have an error where the officer says something, so that --

THE COURT:  Yes.  You want me to lead --

MR. BERNSTEIN:  The prosecutor is going to explain --

THE COURT:  You want me to leave the bench?

34

MR. BERNSTEIN: No. Just so that the prosecutor can explain to the officer your ruling so he doesn't mistakenly say something.

THE COURT: Oh, okay. Okay.

MR. BERNSTEIN: What do you need a moment just to do that?

MS. BORDER: Yes. Just one minute, Your Honor.

THE COURT: Okay.

MR. BERNSTEIN: I just don't want to end up, we'd moved to strike and it's already said. Thank you.

(Pause)

THE COURT: Earlier, I thought that the officer did hear these things, so that's why I'm tailoring my ruling. He never said he heard these things.

MR. BERNSTEIN: No, he actually said he did not hear them.

THE COURT: He did not. That's what I meant. I earlier thought he did, but he did not. So he just saw the crowd and heard the loud speaking.

(Pause)

THE COURT: Okay. Is everything squared away? You can take the stand, Officer, or wait until the jury gets back. You can be seated if you like. You can be seated if you like. Thank you. Let's get the jury, Daniel.

(Pause)

Goble - Direct / By Ms. Border                    35

THE CLERK:  All rise for the jury.

(Jurors enter courtroom at 10:06 a.m.)

THE CLERK:  Please be seated.  Officer, you can remain standing.

THE COURT:  Thank you, members of the jury, for your patience.  Appreciate it.  Go ahead.

THE CLERK:  Please raise your hand.  Your response will be, I do.

ZACHARY GOBLE, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Please take the seat.  Please state and spell your name for the record.

THE WITNESS:  Zachary Goble, Z-A-C-H-A-R-Y, G-O-B-L-E.

DIRECT EXAMINATION

BY MS. BORDER:

Q   Good morning.  What is your title?

A   Police officer.

Q   Where do you work?

A   Baldwin Park.

Q   How long have you been a police officer at Baldwin Park?

A   Approximately three years.

Q   What did you do before that?

A   I was a police officer.

Q   Where?

A   The city of La Palma.

EXCEPTIONAL REPORTING SERVICES, INC

Goble - Direct / By Ms. Border                          36

Q    What are your duties as a Baldwin Park police officer?

A    Enforce local and state laws.

Q    How about federal law?

A    No.

Q    Do you recall getting a call for service to a residential area in Baldwin Park around 1:00 p.m. on August 28th, 2025?

A    Yes.

Q    Before you arrived on scene, what did you know about why you were being called that day?

A    From my recollection, it was in regards to an ICE agent that arrived home and was reportedly being followed.

Q    And who was on scene when you arrived?

A    Other officers, three females, and the ICE agent and a vehicle.  I didn't see his family.

Q    Do you recall what the three females were wearing?

A    Their clothing, no.

Q    Do you recall anything else about their appearance?

A    Masks.

Q    What kind of masks?

A    I don't remember what kind of masks.

Q    Were they covering their faces?

A    Yes.

Q    From a law enforcement perspective, do masks make it more difficult to identify someone?

A    Yes.

Q   What was your duty or role while you were on scene for the call on August 28th?

A   After one of the females were detained and placed in the back of a patrol unit, our main motive at that point was just to make sure the scene was secure.

Q   What were the two masked women who were not in the back of the police vehicle doing?

A   They were recording us.

Q   Were they saying anything?

A   They were telling us we were being live-streamed.

Q   And what did you take that to mean?

A   That we were being recorded on the internet.

Q   And how would you describe the demeanor of these women?

A   Agitated.

Q   What do you mean by that?

A   They were just upset that we were there, saying we were helping ICE.

Q   Do you recall hearing one of the masked women say an address while she was streaming?

A   Yes.

        MS. BORDER:  Mr. Flores, can we please pull up, but not hit play yet, on what has been admitted as Government Exhibit 3, Clip 1, which is from the beginning through 53 seconds of Exhibit 3?

        (Pause)

**BY MS. BORDER:**

Q    Officer Goble, is that you in the sunglasses?

A    Yes.

Q    Please play the clip.

        **(Video played at 10:10 a.m.)**

**BY MS. BORDER:**

Q    So we heard the woman say the address is 12833 and we're in Baldwin Park.  Did you hear that?

A    Correct.

Q    About how many seconds after saying that address did you hear her refuse to state her name to your colleague?

A    Ten, fifteen seconds.

Q    In your personal experience as a law enforcement officer, why would it be uncomfortable to share even just a name while live streaming on social media?

        **MR. BERNSTEIN:**  Objection.

        **MR. NICOLAYSEN:**  Lack of foundation, Your Honor. Calls for an expert opinion.

        **THE COURT:**  Sustained.  Sustained.

**BY MS. BORDER:**

Q    Would you be uncomfortable if your name was streamed on social media?

        **MR. BERNSTEIN:**  Objection.

        **MR. NICOLAYSEN:**  Relevance, Your Honor.

        **THE COURT:**  Sustained.

Goble - Direct / By Ms. Border                    39

MS. BORDER:  Could we please play up -- pull up,
Mr. Flores, but not play what has been admitted as Government
Exhibit 28.  Clip one, which is from 9 minutes 24 to 10 minutes
and 30 seconds.

BY MS. BORDER:

Q   Does this appear to be from the perspective of your body
worn camera on August 28th?

A   Yes.

MS. BORDER:  Okay, Mr. Flores.  Can you please play
the clip?

(Video played at 10:12 a.m.)

BY MS. BORDER:

Q   Did you hear the woman in the black shorts say the whole
neighborhood is coming because we are live?

A   Yes.

Q   How did you interpret that statement?

A   That more people are going to show up.

Q   How often are there ice protests in Baldwin Park
neighborhoods to your knowledge?

A   Not often.

Q   And from your knowledge and evaluating the scene, was this
an ICE enforcement action?

MR. BERNSTEIN:  Objection.

MR. NICOLAYSEN:  Objection.  Characterization, Your
Honor.

Goble - Direct / By Ms. Border                    40

THE COURT:  Sustained.

BY MS. BORDER:

Q   The woman in the black shorts says in the clip we just saw that she's showing how Baldwin Park PD supports ICE.  Did you hear that?

A   Yes.

Q   Does Baldwin Park PD support ICE as a matter of policy?

MR. BERNSTEIN:  Objection.  Relevance.

THE COURT:  Sustained.

BY MS. BORDER:

Q   You later said that if people showed up in masks to your house, you'd be a little concerned.

MR. BERNSTEIN:  Objection.

MR. NICOLAYSEN:  Relevance, Your Honor.

THE COURT:  Sustained.

BY MS. BORDER:

Q   Officer Goble, would you be concerned if people showed up to your house wearing masks?

MR. BERNSTEIN:  Objection.

MR. NICOLAYSEN:  Same objection, Your Honor.

BY MS. BORDER:

Q   To your recollection, did the woman who was live-streaming say an address more than once?

A   I don't recall.

MS. BORDER:  Could we please play, Mr. Flores,

Goble - Direct / By Ms. Border                                41

Government Exhibit 28, clip 2, which is from 38 minutes and one second to 38 minutes and 20 seconds.

     **(Video played at 10:14 a.m.)**

**BY MS. BORDER:**

Q   So did you hear the woman in the shorts say 12837 Chelsfield?

A   Yes.

Q   And to your knowledge is 12837 Chelsfield close to 12847 Chelsfield.

A   Yes.

Q   It's on the same Street?

A   Yes.

Q   It's one digit off.

A   Correct.

Q   Did more people who are not law enforcement show up on the street after the woman in the black shorts live streamed the address?

A   Yes.

Q   Do you recall about how long after?

A   Approximately 10 to 15 minutes.

Q   And about how many people showed up?

A   I think about eight.

Q   What did the neighborhood look like when you arrived?

A   There wasn't really anybody on the streets.

Q   Were there public crowds around?

Goble - Direct / By Ms. Border                    42

A    Crowds?

Q    Crowds.

A    No.

Q    And then about 10 to -- you said, sorry, 15 to 20 minutes later after the stream?

A    Yes.

Q    And about how many people showed up?

A    I remember about eight.

Q    And what were these people wearing?

A    They were also wearing masks.

Q    And before this address was announced on the live stream, were there other masked people there?

A    No.

Q    Besides the three women.

A    Yeah, no.

Q    So what did these people who showed up in response to the live stream do?

A    They were also filming us.

Q    And can you describe in a general way what they were doing?

A    They walked up to us, yelling profanities, and again accusing us of helping out ICE.

Q    What was their demeanor?

A    Agitated.

Q    Have you as a law enforcement officer been confronted with this type of language and I think you use the word profanities

Goble - Cross / By Ms. Coit                               43

while on duty?

      **MR. NICOLAYSEN:**  Objection.  Relevance, Your Honor.

      **THE COURT:**  Sustained.

**BY MS. BORDER:**

Q   In your opinion, were these people who arrived on scene trying to make the situation more intimidating?

      **MR. BERNSTEIN:**  Objection.  Calls for speculation.

      **MR. NICOLAYSEN:**  Objection.  Lack of foundation.  Calls for an expert opinion.

      **THE COURT:**  Sustained.

      **MS. BORDER:**  Your Honor, I'm asking for his personal opinion.

      **THE COURT:**  Sustained.

**BY MS. BORDER:**

Q   So before this address was announced on what you believe to be streaming on social media, just to recap, there were no other masked individuals in the neighborhood?

A   No.

      **MS. BORDER:**  Okay, no further questions.

      **THE COURT:**  Cross examination.

                    **CROSS EXAMINATION**

**BY MS. COIT:**

Q   Good morning, Officer Goble.

A   Good morning.

Q   So I'm going to talk about when the individuals had shown

Goble - Cross / By Ms. Coit                    44

up after the address is announced.  You had testified it was about eight people.

A    From what I remember.

Q    They only came in one car.  Is that right?

A    I don't remember.

Q    Okay, you don't remember.  When the individuals arrive, you're standing there with your fellow Baldwin Park police officers.  Is that right?

A    Correct.

Q    Officer Reyes is not with you in that proximity.

A    Oh, no.  No.

Q    Right?  And the individuals you stated, they're saying some things.  Those things were rude.

A    Yes.

Q    But they weren't violent, right?

A    No.

Q    And during -- and when those individuals arrived, they had their phones up filming.  Is that right?

A    Correct.

Q    And they filmed the entire time that you were around them. Is that right?

A    From what I remember.

Q    You never detained these individuals, right?

A    No.

Q    You never arrested them?

Goble - Cross / By Ms. Coit                                     45

A    No.

Q    They weren't charged with any crime?

A    No.

Q    They were protesting and recording?

A    Yes.

Q    And they were allowed to do that?

A    Yes.

Q    Now, we saw some of your body cam footage.  As a Baldwin Park police officer, you're used to being filmed.

A    Yes.

Q    By people in the public.

A    Yes.

Q    You're filmed all the time.

A    Yes.

Q    And as we stated, you're filming all the time, right?

A    Correct.

Q    Because you have your body-worn camera.

A    Yes.

Q    And you assume, for the most part, while you're working, what you're doing is going to be filmed.

A    Yes.

Q    You have no issue with that?

A    No.

Q    Sometimes it's better to have things filmed, right?

A    Correct.

Goble - Cross / By Ms. Coit                          46

Q    Yeah, because then you know exactly what happened.

A    Yes.

Q    So we talked about the events of this case.  You're filming on the body cam and then you're also being filmed by Ms. Brown.

A    Yes.

Q    And as you testified, she told you she was live streaming, right?

A    Yes.

Q    On Instagram, at one point, she tells you that?

A    Yes.

Q    And so you told -- she was filming, she's live streaming. You don't tell her to stop, right?

A    No.

Q    None of the officers tell her to stop, right?

A    Not from what I remember.

Q    Okay.  You never told her to put her phone down?

A    No.

Q    You never told her to stop filming?

A    No.

Q    You also allowed her to keep her mask on, right?

A    Yes.

Q    There was some testimony about her not wanting to say her name at a certain point during your investigation, while you were detaining her.  Do you remember that?

A    I didn't detain her.

**EXCEPTIONAL REPORTING SERVICES, INC**

Goble - Cross / By Ms. Coit                    47

Q   Okay.  But while she's with you, she -- yeah.  So she's not detained and she didn't identify herself at that point?

A   For my purpose, while I was there, I was not detaining anybody.

Q   Okay.  But you know that she identified herself to the Baldwin Park Police at some point during the investigation.

A   Yes.

Q   So you never arrested Ms. Brown, right?

A   No.

Q   You never arrested her, that's correct?

A   Correct.

Q   You're saying that you didn't detain her?

A   No.

Q   Do you -- you told her, though, that you were detaining her.  Do you remember that -- saying that?

A   No.

Q   Okay.  I'm going to pull up what's been marked as Exhibit -- Defense Exhibit 261.  Okay.  This is a clip from your body-worn camera that we have watched before.

        MS. COIT:  I'm going to move Defense Exhibit 261 into evidence.

        MS. BORDER:  Objection, Your Honor.  I don't know what this clip is.  It could contain hearsay.

        MS. COIT:  I provided this to the Government in advance, Your Honor.

EXCEPTIONAL REPORTING SERVICES, INC

Goble - Cross / By Ms. Coit                    48

**MS. BORDER:**  Your Honor, she did not identify which clip she was going to play until five minutes before this examination started.

**THE COURT:**  Well, I don't know what 261 shows. I mean, if it simply shows that he said that he detained her, then if that's all there is, is that the part you want to show?

**MS. COIT:**  Correct, Your Honor.  She asked if she's been detained --

**THE COURT:**  That's all?

**MS. COIT:**  -- and if she's free to leave.

**THE COURT:**  I mean, did he say --

**MS. COIT:**  He says, yes, you are detained.

**THE COURT:**  All right.  I mean, you can play that clip.

**MS. BORDER:**  Your Honor, the objection is hearsay, though.  The Government still maintains that that is hearsay.

**THE COURT:**  But I mean, he doesn't -- did you say you didn't detain her or you did detain her?

**THE WITNESS:**  I didn't remember that, Your Honor.

**THE COURT:**  He doesn't remember.  So I mean, could you have detained her?

**THE WITNESS:**  It's possible.

**THE COURT:**  Possible.  Okay, let us stand at that. Don't play the clip.

//

Goble - Cross / By Ms. Coit                                    49

**BY MS. COIT:**

Q   Don't need to play the clip.  Okay.  Well, she wasn't free to leave, right, when she was standing with you?

A   Not to my knowledge.

Q   Not to your knowledge.  So let me say it again, just so the record's clear.  Ms. Brown was not free to leave when she was standing with you, correct?

A   No.

Q   That's not correct?

A   No.  As of right now, being told that she was detained and that I told her that, then no, she was not free to leave.

Q   Okay.  Thank you.  And when Ms. Brown is standing around you with the other officers when she's being detained, she's not in handcuffs, correct?

A   No.

Q   She's allowed to stand on the public street, right?

A   Yes.

Q   And we can see there's multiple officers there, right?

A   Yes.

Q   Do you remember you had detained them for about 45 minutes, does that sound right?

A   I don't really remember.

Q   More than a half hour?

A   Yes.

Q   Okay.  Do you need to look at the time -- do you think 30

Goble - Cross / By Ms. Coit                    50

minutes sounds about right?

A    Yeah, I think that's fine.

Q    All right, I can also show you the timestamps.

          THE COURT:  Let's move on.

          MS. COIT:  Okay.

BY MS. COIT:

Q    So you testified that -- or I believe you testified that one of the officers did pull out a gun, right, on Ms. Brown and Ms. Samane?

A    I wasn't there when that happened.

Q    But you learned that later, right?

A    Yes.

Q    And you know that Ms. Brown's car was searched, right?

A    Yes.

Q    And there was no weapon found in the car?

A    Not from what I remember.

Q    And there were no weapons found on Ms. Brown, right?

A    Not from what I remember.

Q    Or anyone else?

A    Correct.

Q    Okay.  So we saw a clip where you're speaking to Officer Moreno, do you remember that part?

A    Yes.

Q    And she was the investigating officer in the incident?

A    Yes.

Goble - Cross / By Ms. Coit                    51

Q   She had come over to you.  She's like, you know, what do we have here?  You respond, just disrespectful.  Do you remember?

A   Yes.

Q   You didn't say that there was any crime being committed?

A   Not from what I saw.

Q   And there was no threatening behavior?

A   No.

Q   They weren't a danger to you or anyone else?

A   At that time, no.

        THE COURT:  Who's they?

BY MS. COIT:

Q   Oh, Ms. Samane and Ms. Brown?

A   No.

Q   They are just disrespectful, right?

A   Yes.

Q   So at some point when Ms. Brown is being detained, she says the ICE agent's address, right?

A   Yes.

Q   And you -- okay.  I'm going to pull up Defense Exhibit 220.  This is part of your body cam, I believe.

        MS. BORDER:  Objection, Your Honor.  Hearsay.  It's the same issue as before.

        THE COURT:  I don't know what 220 is.

        MS. COIT:  If I can -- I believe, Your Honor, this clip is contained within portions of Defense Exhibits 28.1, I

Goble - Cross / By Ms. Coit                    52

can look at the timestamps.

THE COURT:  I mean, was that the exhibit that you --

MS. BORDER:  I'm not sure, Your Honor.  It sounds like they are trying to introduce statements from Ms. Brown.

THE COURT:  Let's not argue in front of the jury.  I don't want to have more interruptions if I can avoid it, but I don't know what is in that clip, so I can't make a ruling.

MS. BORDER:  The Government would be happy to replay Exhibit 28.1 if that is helpful, which is already in evidence.

THE COURT:  I mean, can you replay it?  Don't we have the technology to block out the screens of the jurors and allow me to see it?

MS. COIT:  Yes, Your Honor.

THE COURT:  Maybe we can do it that way, so they don't have to go back and forth.

MS. COIT:  Okay.  One moment.

MS. BORDER:  The Government would request to hear the audio as well.

THE COURT:  Well, I mean, I don't know how I can do that.  Can we pass on that for the moment, or is that important at this moment?

MS. COIT:  This is my last section, Your Honor. There are about, I will say probably there's four defense exhibits that relate to the body-worn camera that I'll be moving into evidence.

Goble - Cross / By Ms. Coit                53

THE CLERK:  Your Honor, I believe they have a laptop, and they have headphones, and we have headphones.

THE COURT:  Oh, give me the headphone, then I can do it here.  You say, okay, I haven't been using headphones, but I don't want you to have to shuttle back and forth unless necessary.

(Pause)

THE COURT:  Tell me which exhibit I'm watching as you play them.

MS. COIT:  Okay, so this one is Defense Exhibit 220, which is the first one I'm moving to admit.

THE COURT:  Okay.

(Pause)

THE COURT:  I've looked at each of the videos, none of them can be used, and I'll give you reasons outside the presence of the jury.  But the jury can accept that at some point the defendants or one of them were said to be detained. You can ask any other questions you have.

MS. COIT:  May I have one moment, Your Honor.

THE COURT:  Yes.

(Pause)

MS. COIT:  Just for the record, Your Honor --

THE COURT:  You can make a record outside the presence of the jury.

MS. COIT:  Okay.

THE COURT:  That's my ruling.

MS. COIT:  Okay.  Then I'll pull up Government Exhibit 28.1.  I'm going to go to about the 30-second mark. This is an exhibit that's already been admitted to evidence, 28.1.

BY MS. COIT:

Q   Do you see, Officer Goble, the top of the body cam footage in the right-hand corner?  It says --

THE COURT:  I don't see anything on my screen.

A   I don't have anything.

BY MS. COIT:

Q   In the top right corner, it has the time from your body cam, right?

A   Yes.

Q   And it says 13:11, and 40 seconds, right?

A   Yes.

Q   That's 1:11 in the p.m., correct?

A   Yes.

Q   I'm going to go ahead and play the video from this point, and then I'm going to say when to stop.

     (Video played at 10:37 a.m.)

BY MS. COIT:

Q   You heard Ms. Brown announce the address in that clip?

A   Yes.

Q   And you don't tell her after that to stop saying the

address?

A    No.

Q    At no point during the time that you are detaining Ms. Brown, do you tell her to stop saying the address of where she's standing?

A    No.

Q    And you never told her to stop recording?

A    No.

Q    You never told her to stop live streaming?

A    No.

Q    And none of your other officers do either, right?

A    Not from what I know.

Q    And when this is being said, I think we established before, the ICE Agent Reyes, he's not in this interaction, is he?

A    No.

Q    I'm not going to play the video, but I'm going to pull up a still from one of the exhibits.  One moment.

        **(Pause)**

            **MS. COIT:**  I'm going to pull up Defense Exhibit 262. And, Your Honor, I just want to show a still from the body-worn camera to show how many officers are at the interaction with --

            **THE COURT:**  That's already -- it doesn't make a difference, at least in my view, in terms of relevancy.  So I'm not going to allow you to show the clip from 262.

            **MS. COIT:**  Okay.

EXCEPTIONAL REPORTING SERVICES, INC

Goble - Cross / By Ms. Coit                 56

THE COURT:  Anything else?

MS. COIT:  Yes, Your Honor.

THE COURT:  Then ask it.

BY MS. COIT:

Q    There are about six officers, including yourself, with
Ms. Brown and Ms. Samane during the interaction, right?

A    Yes.

Q    One moment.  So you've testified that you knew that
Ms. Brown was filming you during the interaction, right?

A    Yes.

Q    And that she was live streaming?

A    Yes.

Q    Okay.  I'm going to pull up what's been marked as
Government Exhibit 5.

MS. COIT:  And, Your Honor, this is one of the
Government's exhibits, and I'm going to be moving it into
evidence.

THE COURT:  Okay.

MS. BORDER:  Objection.  There has been no foundation
laid for this --

THE COURT:  I'm not following the colloquy here.  Is
this Government's 5 in evidence now?

MS. BORDER:  No, Your Honor.

THE COURT:  So I haven't seen this exhibit either.

MS. BORDER:  Correct, Your Honor.

57

THE COURT:  And is this part of a video?  This is an isolated part of a video?

MS. BORDER:  It appears to be Defendant Brown's video, and I'm not sure if the witness has any personal knowledge.

THE COURT:  Can you -- just to see if we can expedite things, can you approach the bench and tell me what it's about?  Maybe I can make a ruling.

MS. COIT:  Yes, Your Honor.

     **(Begin sidebar at 10:41 a.m.)**

THE COURT:  Who's the officer in the picture?

MS. COIT:  This is Officer Goble, the gentleman in the sun --

THE COURT:  What is the point of it?

MS. COIT:  The point is to show -- it goes to state of mind.  The relevancy is this is the live streaming video that he's talking about, and it states on there Baldwin Park PD targets protester.  So that the focus of the video is what the live stream is.

THE COURT:  But doesn't that -- isn't there that Baldwin Park protesting on another video in evidence?

MS. COIT:  No, Your Honor.  So the Government already laid foundation --

MS. BORDER:  If this is being published to the jury, we would ask that it be taken down right now.

EXCEPTIONAL REPORTING SERVICES, INC

58

THE COURT:  What's that?

MS. BORDER:  If this is being published to the jury right now, we would ask that it be taken down while we have this conversation, I believe.

THE COURT:  Has the jury hearing what we're saying?

MS. BORDER:  The image was published to the jury.

THE COURT:  What was published to the jury?

MS. BORDER:  The image.

THE COURT:  This image?

UNIDENTIFIED SPEAKER:  Yes.

MS. BORDER:  Without being admitted into evidence, correct.

THE COURT:  So, I mean, can it be stipulated that the video clip says that?  Or is that?

MS. BORDER:  No, Your Honor, the Government would object to it as hearsay.

THE COURT:  Who put that clip on it?

MS. BORDER:  The defense did.

THE COURT:  You put that big clip on it?

MS. COIT:  Just right now -- inadvertently, Your Honor.  It's a Government exhibit.

THE COURT:  Did you put that description on it?

MS. COIT:  Oh, no, no, Your Honor.  It has been --

THE COURT:  The point is, the video says Baldwin Park something protest.  Is that something a Baldwin Police

59

Department did?

MS. COIT: If I can clarify, there was testimony -- excuse me. There is testimony. Oh, who wrote the --

THE COURT: Who did that?

MS. COIT: Ms. Brown.

THE COURT: Ms. Brown?

MS. COIT: Ms. Brown wrote that when she posted it live on August 28th.

THE COURT: So basically in her view, it's a protest. Is that the point?

MS. COIT: Correct, Your Honor. And the Government has already made.

THE COURT: But -- so this is a video that she took, Brown took?

MS. COIT: Yeah, that she took and posted on that day and put her own caption. The case agent has testified and laid foundation that he found these videos. We, of course, in our case-in-chief --

THE COURT: What significance does it have? You're going to argue that in your argument, that I'm sure, and that from her standpoint, it was a protest and that she had, she was protesting her unhappiness with the current condition. So why does the label on the video make a difference?

MS. COIT: Because when she's announcing the address of where she's saying, standing and asking people to come on

down to film, it relates to Baldwin Park Police.  It does not relate to the ICE agent.  And that's key, because the Government has made issue that people come down later, right? He testified eight people, and they're coming down for Baldwin Park Police.

THE COURT:  Then it can be stipulated.

MS. COIT:  Okay, thank you.

THE COURT:  That in the video where she was -- you've already played a video of her live stream, right?

MS. BORDER:  Portions, correct, but not with the caption, which is hearsay, Your Honor.

MS. COIT:  They have played it in Exhibit 8.

THE COURT:  But that -- don't interrupt me.

MS. COIT:  I'm sorry, Your Honor.

THE COURT:  But the video that you played, was this the -- was that when -- at the same moment when she was live streaming?  In other words, was she live streaming one time or twice?  She was live streaming before the police got there, wasn't she?

MS. BORDER:  Yes, Your Honor.

THE COURT:  So in that live streaming, which is in evidence, that video was taken by whom?

MS. BORDER:  We've got defendants Raygoza and Brown, I believe, Your Honor.

THE COURT:  Who?

MS. BORDER:  Raygoza and Brown.

THE COURT:  So in other words, in the earlier live stream, Brown was live streaming without the caption?

MS. BORDER:  Yes, Your Honor.

THE COURT:  I see.  Okay.  I'm going to -- it's not going to be in.

MS. COIT:  Your Honor, we are going to call Case Agent Kurtz for our case in chief for 30 seconds to get this video in.  He has already laid a foundation.

MS. BORDER:  Your Honor, it's still hearsay.

MS. COIT:  Again --

THE COURT:  One moment.  Don't argue with each other. I'm not going to allow this video.  It's not sufficiently relevant.  Thank you.

MS. COIT:  Your Honor, if I may again -- okay.

    (End sidebar)

THE COURT:  Wait a minute now, you didn't make a point that -- (indiscern.) is with me now.  Come back again.

    (Resume sidebar)

THE COURT:  If you both listen more and not talk, it would be helpful.  Okay, here's the point which you didn't make.  I think this is the point you're trying to make, that when the -- you're trying to say, I think, but you didn't say, that the crowd came down in relation to that second -- see, you didn't say that.  It would have been helpful if you --

62

**MS. COIT:**  I thought I did, Your Honor.

**THE COURT:**  No, no, you say all these things and --

**MS. COIT:**  I thought I did.

**THE COURT:**  -- you get so excited you don't make the point.  And that so when the crowd came down, they were coming down in reference to this.

**MS. COIT:**  Correct.

**THE COURT:**  If you make that clear instead of getting so excited, I would understand it.  But I -- thankfully I did understand it.  So I will allow the video.

**MS. COIT:**  Okay, thank you, Your Honor.

**(End sidebar)**

**THE COURT:**  Briefly, get to it.

**MS. COIT:**  The defense moves Exhibit -- Government Exhibit #5 into evidence.

**THE COURT:**  Okay.  That's that image, right?

**MS. COIT:**  It's a video, Your Honor.

**THE COURT:**  And, I mean, it says what it says, okay? So it's in evidence.  That's it.

**MS. COIT:**  Yep, I'm going to play the video.  I'm going to identify who Mr. -- who Officer Goble is.

**THE COURT:**  No, it's understood --

**MS. COIT:**  Okay.

**THE COURT:**  -- that at the time of Brown videoing the Baldwin Police Department, she made a video and the caption on

Goble - Cross / By Mr. Nicolaysen                63

the video, as here shown, is Baldwin PD targets protester.

MS. COIT:  Correct.  When she says the address, this is what she's live streaming, Your Honor.

THE COURT:  Yes, okay.  That's in evidence.  Done.

(Government's Exhibit Number 5 received in evidence)

MS. COIT:  No further questions.  Thank you.

THE COURT:  Okay.

MR. NICOLAYSEN:  Your Honor, briefly.

**CROSS EXAMINATION**

**BY MR. NICOLAYSEN:**

Q   Good morning, Officer Goble.  I represent Defendant Cynthia Raygoza.  On the date in question, August 28th, 2025, you testified that your police department received a call for this location at approximately 1 p.m., is that your best recollection?

A   Yes.

Q   And can you give us your best recollection as to when you personally arrived at the scene?

A   Of what I saw, or --

Q   Of when you arrived at the Chelsfield location on that day.

A   I don't remember the exact time I showed up.

Q   Okay, so if I were to say 1:10 p.m., that would not necessarily refresh your memory?

A   That would be approximate.

Q   Okay.  And you did prepare a report, did you not?

Goble - Cross / By Mr. Nicolaysen                64

A    No.

Q    Did you give an interview?

A    No.

Q    Okay.  Do you remember interviewing with the case agent in this case, Agent Robert Kurtz?

A    With him, yes.

Q    Very good, and you gave your recollection of the events that are the subject of your testimony today?

A    Yes.

Q    Okay.  If you need to see that report, please let me know and I'll ask the Court's permission.  Is it your recollection that approximately 30 minutes or so after you had arrived, some additional people showed up?

A    Yes.

Q    Does that sound --

A    Yes.

Q    -- right to you?  Okay.  And could you tell us that by -- whether by the time those people arrived the agent in this case, the ICE agent and his family had already left the location.

A    I believe they left already.

Q    Okay.  Before people arrived?

A    I don't remember exactly.

Q    Okay.  Now when you arrived, would you recall whether Ms. Raygoza had already been placed in a patrol car?

Goble - Redirect / By Ms. Border                              65

A    I believe she was.

Q    Okay, and that she had -- at some point, while you were there at the scene, was placed under arrest for battery?

A    Yes.

Q    You yourself did not witness any battery, did you?

A    No.

Q    Are you aware of any of your colleagues from the police department witnessing one?

        MS. BORDER:  Objection, relevance.

        THE COURT:  Sustained.

        MR. NICOLAYSEN:  Very good.

Q    Thank you, sir.  Nothing further.

A    Yes, sir.

        MR. BERNSTEIN:  Nothing from Ms. Samane.

        THE COURT:  Okay.  Anything further?

                    **REDIRECT EXAMINATION**

**BY MS. BORDER:**

Q    I believe you testified on cross examination, Officer Goble, that the women were being disrespectful at the time they were there -- at the time you were there?

A    Yes.

Q    Do you have knowledge of all the events that happened before you got on the scene?

A    I have very minimal knowledge.

Q    Whose neighborhood were you in, to your knowledge?

EXCEPTIONAL REPORTING SERVICES, INC

Goble - Redirect / By Ms. Border                66

MR. BERNSTEIN:  Objection.  This is not --

THE COURT:  Sustained.

BY MS. BORDER:

Q    What did you know about the Defendant's interactions with
the ICE agent?

MR. BERNSTEIN:  Objection.

MS. COIT:  Objection, hearsay.

THE COURT:  It's not hearsay.

MS. COIT:  Beyond the scope.

THE COURT:  I mean, he said he had minimal knowledge.
He's a police officer reporting to a call.  That's what he did.

BY MS. BORDER:

Q    Did you interview Officer Reyes?

A    No.

MS. COIT:  Same objection.

THE COURT:  Overruled.

MS. COIT:  Beyond the scope.

BY MS. BORDER:

Q    Did you interview his wife?

A    No.

THE COURT:  I mean, it's understood.  Let's move on.

BY MS. BORDER:

Q    When you were filmed by the Defendants on August 28th, were
you on duty?

A    Yes.

Q   And you were in uniform?

A   Yes.

THE COURT:  You asked that of him.

BY MS. BORDER:

Q   Have you been around protests before in your law enforcement capacity?

MR. BERNSTEIN:  Objection, relevance.

THE COURT:  I think I'm going to -- you're going to have to end this.

MS. BORDER:  Your Honor, that went to -- he made a comment that it was a protest, and --

THE COURT:  I think you've come to the end of your examination, at least I think so, but --

MS. BORDER:  May I ask just one more question, Your Honor?

THE COURT:  Go ahead.

BY MS. BORDER:

Q   How often have you -- you mentioned earlier that there were profanities used.  How often have you been live streamed with the level of hostility, profanity --

MR. BERNSTEIN:  Objection.

THE COURT:  Sustained.

MS. BORDER:  Your Honor, this is going to -- I believe he said that --

THE COURT:  That's it.

68

**MS. BORDER:** -- the words were not violent.

**THE COURT:** You've now completed your investigation. Anything further?

**MS. COIT:** No, Your Honor.

**THE COURT:** Anything further by either side?

**MR. BERNSTEIN:** No, Your Honor.

**MR. NICOLAYSEN:** No, Your Honor.

**THE COURT:** Does the Government rest?

**MR. MPARE:** Yes, Your Honor.

**THE COURT:** Defense rest?

**MR. BERNSTEIN:** Yes, Your Honor.

**MS. COIT:** No --

**MR. NICOLAYSEN:** Your Honor, I would like to just have a moment to move exhibits into evidence. I just want to make sure the record is clear.

**THE COURT:** Well --

**MR. NICOLAYSEN:** Then I will rest.

**THE COURT:** Well, I mean, why should it be unclear? Exhibits are being moved in contemporaneously with their usage.

**MR. NICOLAYSEN:** Well, it's the videos, Your Honor. I just want -- I know Your Honor has said that the --

**THE COURT:** Well, then whatever ruling I have to make on the videos can be made outside the presence of -- I don't want to waste their time.

**MS. CHOI:** And Your Honor, the defense -- outside the

69

Jury's presence, we would like to make a Rule 29 motion.

THE COURT:  I understood all of that.  Okay.

MS. CHOI:  And we have a witness, which I'm happy to discuss afterwards.

THE COURT:  Well, I'm asking you if you rested.  I've made all my rulings.  You know what my rulings are.  In light of my rulings, do you rest?

MS. CHOI:  Your Honor --

THE COURT:  Yes or no?

MS. CHOI:  No.  There was a percipient --

THE COURT:  If you have another witness, you can use it but I thought the evidence was complete.  If I was wrong, I haven't heard about another witness.

MS. CHOI:  Yesterday I mentioned it --

THE COURT:  I know that witness won't be called.

MS. CHOI:  The percipient witness.

THE COURT:  That witness won't be called.  Was that your investigator?

MS. CHOI:  No, Your Honor, the neighbor who's --

THE COURT:  But you never mentioned that to me. We've been talking so often here.  Approach the bench again. Sorry, members of the Jury.

(Begin sidebar)

MS. CHOI:  Hi, Your Honor, I'm sorry if I was unclear yesterday.  I said that there was a percipient witness who is a

70

neighbor who witnessed this entire event.

THE COURT:  What is she going to say?

MS. CHOI:  She's going to say two things.  1) She took a video of -- before the police arrived, of the car reversing and just the general scene from another point of view.  Second thing is that she heard that Officer Reyes said to her that they're going to find out when you mess with a federal agent.

THE COURT:  What was that?

MS. CHOI:  That she -- Officer Reyes, the ICE officer, said to her and other neighbors, now they're going to find out what happens when you mess with a federal agent.

THE COURT:  So --

MS. BORDER:  Oh, that's hearsay.

THE COURT:  Federal -- but I mean, Reyes said that. How is that helpful to you?  I'm not putting it together.

MS. CHOI:  He -- so he went -- remember, he reported various things had happened, that -- you know, that there was this assault, that a crime happened, and so it goes to his bias and credibility.

THE COURT:  Well, if you want to say that, I think it's more helpful to the Government because he's basically saying this is disruption you'll have when you have an ICE agent.  I don't get the point, but if you want to do it, do it.

MS. BORDER:  I would raise an objection on hearsay

grounds, Your Honor.

THE COURT:  Why?  That's what Reyes said.  Reyes said that.  I mean, it's Reyes' opinion.  Why is Reyes' opinion --

MS. BORDER:  Right.

THE COURT:  -- it's not a percipient comment.

MS. BORDER:  Plus irrelevant.

THE COURT:  Yeah, what was the other thing you said this neighbor was going to say about the backup?

MS. CHOI:  She has a video --

THE COURT:  Okay, I'll hold onto that part of it, nothing else.

MS. CHOI:  Not his statement?

THE COURT:  Yeah.  Okay.  Is that it?  Is that the --

MS. CHOI:  Yes, that's it, it will be short.

**(End sidebar)**

THE COURT:  Oh, Officer, you can step down.

MR. GOBLE:  Yes, Sir.

THE COURT:  Thank you.

MR. GOBLE:  Thank you, Your Honor.

**(Witness steps down)**

**(Pause)**

MS. CHOI:  Your Honor, the defense calls Dolores Osuna.  The defense for Ms. Brown calls Dolores Osuna.

THE CLERK:  Please raise your right hand.  Your

Osuna - Direct / By Ms. Choi                    72

response will be I do.

**DOLORES OSUNA, DEFENDANT'S WITNESS, SWORN**

THE CLERK:  Please take the stand.  Please state --

**DIRECT EXAMINATION**

BY MS. CHOI:

Q   Hi, Ms. Osuna.  Oh, sorry.

THE CLERK:  Please state and spell your name for the record.

MS. OSUNA:  Dolores Osuna, D-O-L-O-R-E-S, O-S-U-N-A.

BY MS. CHOI:

Q   Ms. Osuna, where do you live?

A   Baldwin Park.

Q   Generally?  What street do you live on?

A   On Chelsfield.

Q   I'm going to pull up a map of Chelsfield Street that's already in evidence, Defense Exhibit-202.  Do you see the map in front of you?

A   Yes.

Q   Just to streamline things, the Jury has heard some testimony about an incident that occurred around 12833 Chelsfield Street.  Do you see that on the map?

A   Yes.

Q   And on this map, can you mark where you live and say the number?

A   It's 12817.

Q   Okay.  I'm just going to try to streamline things, so I'm drawing a circle around 12817.  Is that your address?

A   Yes, it is.

Q   Okay.  And I'm drawing another circle around 12833.  On August 28th, 2025, around 12:50 p.m., were you outside your home?

A   Yes, I was.

Q   And looking on this map, can you mark -- you can just use your finger and mark where you were standing.  If you put your finger on the screen.  Thank you.  Did you see a black suburban on the street?

A   Yes, I did.

Q   And you were about four houses down if we look at the map, is that right?

A   That's right.

Q   Okay.  And can you just tell us, what did you hear or see with respect to 12833?

A   I just heard loud yelling and I saw the SUV and it was blocking the driveway at that address, at the 12833 address.  I saw two females and a male come out of his car, the black suburban.

Q   And at some point did you start recording these events?

A   Yeah, I immediately started recording.

Q   Why?

A   Well, because they were yelling and somebody was blocking

somebody in.  I kept hearing "you're blocking me in," so I just decided to record.

Q   And --

        MS. CHOI:  Do we have a laptop up there?

BY MS. CHOI:

Q   I'm going to show you just the beginning part of what's pre-marked as Defense Exhibit-268, which is a video.  We'll bring it up to you in just a minute.

        MS. CHOI:  May we approach, Your Honor, with the video so she can identify it?

        THE COURT:  Are you saying this is not in evidence?

        MS. CHOI:  No, Your Honor, it's not yet.  I'm going to try to --

        THE COURT:  I see.

        MS. CHOI:  -- move it in now.

        THE COURT:  Have you -- has the Government seen it?

        MR. MPARE:  Can I see it?

        MS. CHOI:  Oh, sure.  May we approach with --

        THE COURT:  Yes.

        MS. CHOI:  -- to the witness?  Thank you.

BY MS. CHOI:

Q   And you don't have to watch the whole thing right now, but can you just watch enough to confirm if this is the video that you took, a true and accurate copy?

        (Video played)

Osuna - Direct / By Ms. Choi                          75

MR. NICOLAYSEN:  Your Honor, can Mr. Bernstein and I also see the video?

THE COURT:  Oh, you haven't seen the video?

MR. BERNSTEIN:  We have not.

MR. NICOLAYSEN:  We cannot see it here.

THE COURT:  Let her answer the question first.

A    Yeah, this is the video.

BY MS. CHOI:

Q    That's the video you took?

A    Yes.

Q    And it's a fair and accurate copy?

A    Yes, I believe it is.

MS. CHOI:  Your Honor, at this time we -- I move to admit this video exhibit.

MR. BERNSTEIN:  Your Honor, we would like to see it.

MR. NICOLAYSEN:  Likewise, Your Honor.

MR. BERNSTEIN:  To see if we have any objections.

MR. NICOLAYSEN:  Objection.

THE COURT:  Then --

MS. CHOI:  I can walk through it with her, perhaps, and then try again to move it in.

THE COURT:  Well, you haven't seen it at all?

MR. BERNSTEIN:  We have not seen or heard it.

THE COURT:  Then Daniel, can you show it to the lawyers outside -- I mean, I'm not going to ask the Jury to

EXCEPTIONAL REPORTING SERVICES, INC

Osuna - Direct / By Ms. Choi                    76

walk back, just if you can go to a neutral place and watch it together.  I'll watch it, too.

**(Pause)**

**(Begin sidebar)**

THE COURT:  Then how am I going to hear it?  Can the Jury hear anything from here?  Can you hear it?

UNIDENTIFIED SPEAKER:  Would this be sidebar?

THE COURT:  Oh, you can't hear me?

THE CLERK:  No, the Jury won't hear it.

THE COURT:  Oh, the Jury won't hear it.  Okay.

THE CLERK:  It's just loud enough for -- to hear it play.

UNIDENTIFIED SPEAKER:  (indiscern.)

THE COURT:  Okay, good.  I can't hear (indiscern.).

UNIDENTIFIED SPEAKER:  Hearsay.

UNIDENTIFIED SPEAKER:  (indiscern.) a member of the Jury is asking for a restroom break.

THE CLERK:  Hey, Judge?  Judge?  One of the jurors said they want to go to the restroom.

THE COURT:  Oh, one of the jurors wants to take a restroom break?  Yeah.  No, you can all -- do you all want to go, or -- you -- okay, thank you.  Go ahead.  Thank you very much.  I'm sorry.  Anytime you have to -- you feel you have to go, go.

**(Video played)**

EXCEPTIONAL REPORTING SERVICES, INC

Osuna - Direct / By Ms. Choi                    77

MR. NICOLAYSEN:  Is that a hearsay objection.

THE COURT:  But this -- I can't hear it.

MR. BERNSTEIN:  This is the (indiscern.) --

MR. NICOLAYSEN:  She's speaking, but she's talking to someone else, and Defendants can be heard on the video, so that's tricky.

UNIDENTIFIED SPEAKER:  I would have an objection to playing it without sound.

THE COURT:  There's something about blocking the driveway.  Where is that?

MR. NICOLAYSEN:  We can't see it at all, Your Honor.

MR. BERNSTEIN:  What about that?

THE COURT:  One second, I can't --

MR. NICOLAYSEN:  It would have already happened.

THE COURT:  Okay, the video can't be used.

MR. NICOLAYSEN:  They'll make their -- they might want to make their --

(End sidebar)

THE COURT:  All right, we need the juror back here before I make a ruling.  Everyone stay here put.

(Pause)

THE COURT:  Generally when we have a break it's the entire break.  This is slightly awkward, I didn't mean it to be.  Sorry.  All right, the juror is back.  We have the full complement of the Jury.  I'm excluding the offer -- the video.

EXCEPTIONAL REPORTING SERVICES, INC

Osuna - Direct / By Ms. Choi                                    78

The Jury has already heard evidence and seen videos of the driveway and the SU -- the -- I forget what kind of car it was. What was it -- what was the name of the car?  It was some kind of Chevrolet car, SUV of some kind.  And they can make their determination whether the driveway was blocked in whole or part.  They heard the testimony of the witness.  So in any event, the video is not sufficiently pertinent.  Are there any other witnesses?

         **MS. CHOI:**  No, Your Honor.  May I ask just two or three questions of this witness?

         **THE COURT:**  All right.

**BY MS. CHOI:**

Q    Ms. Osuna, did you see the SUV reverse --

A    Yes, I did.

Q    -- at any point?

A    I did.

Q    Was there anyone or anything blocking that suburban from moving forward?

A    Nothing at all.

Q    Did you see anyone tap with their hand, that suburban?

A    Yeah, there was somebody standing behind it and the -- then the suburban reversed twice.

Q    The suburban reversed twice, into that person?

A    Yes.

Q    And at any point did anyone hit the suburban with their

Osuna - Direct / By Ms. Choi                        79

hand?

A    I don't think I saw them hit that with their hand, no.

Q    You didn't see anyone hit the suburban?

A    No.

Q    Okay.

          MR. MPARE:   Your Honor, I think then viewing the
video lacks foundation.

          THE COURT:   She's testifying now, I assume, from what
your memory was, correct?

A    Right, correct.

          THE COURT:   Okay.

BY MS. CHOI:

Q    Did you call 9-1-1 at any point on this day?

A    No, I did not.

Q    Why not?

A    I think the -- I was recording first of all.  Everything
happened so fast, the police were there like within seconds.
I'm pretty sure that the gentleman was saying it's all right,
the cops are going to be here.

Q    And the gentleman, you mean the man on the street --

A    Yeah.

Q    -- that you saw?

A    Yeah.

Q    Okay.

A    That's what he was telling the girls.

Osuna - Cross / By Mr. Mpare                          80

MS. CHOI:  No further --

A   Because then I could hear him, so I figured they were coming already.

MS. CHOI:  No further questions from me, Your Honor.

THE COURT:  Anything further from the Government?

MR. MPARE:  Like three questions, Your Honor.

THE COURT:  Okay.

CROSS EXAMINATION

BY MR. MPARE:

Q   Good morning.

A   Good morning.

Q   Was your testimony that you came outside because you heard noises outside?

A   At first I was already outside.  I had an issue with my car parked across the street, that I was talking to a parking officer in my city.

Q   And then you started filming because you heard noises?

A   No, actually I went inside the house after I was speaking to the parking police enforcement, and I was -- I heard a commotion outside and I came as it was right outside my house.

Q   So you went back outside after you heard noise, is that --

A   Right.

Q   Okay, and did you see what the women were wearing?

A   They were wearing -- they were dressed in black.

Q   Did you see anything on their faces?

EXCEPTIONAL REPORTING SERVICES, INC

A    They had masks on.

Q    And how common is it for people to be walking around your neighborhood in all black masks?

        MS. CHOI:   Objection, relevance.

        THE COURT:   They've gone through this.

A    Nowadays they -- I see --

        THE COURT:   Anything else?

A    -- I see it in my city all the time.

        MR. MPARE:   No further questions.

        THE COURT:   All right.  Okay, members of the Jury, it's a quarter after 11.  The Court has to confer with the parties about jury instructions.  I'll give you the jury instructions before you hear the arguments, which may help you understand the arguments.  Timing wise I want to ask you, and be candid with me.  I don't want to be forceful about it.  It would be preferable if you could take an early lunch.  If you took an early lunch, then we could come back, I could instruct you, which takes about 15, 20 minutes, then the lawyers give their final arguments and then you have the case for decision. Otherwise it may sort of, you know, get past the lunch hour.  I don't know.  Would you prefer that?  Or can you sort of maybe chat among yourselves and see what you think?  I don't know.

        MS. CHOI:   May the witness be excused, Your Honor?

        THE COURT:   Yes.  What?

        THE CLERK:   They'll take early lunch.

EXCEPTIONAL REPORTING SERVICES, INC

82

THE COURT:  If -- early lunch is okay?  All right, then my suggestion is we come back at 12 o'clock, okay?  Can you do that, 12 o'clock?  And then we'll just finish the case.  Thank you.  Don't talk to each other, don't access any electronic media, Google, anything, okay?  Thank you.

THE CLERK:  All rise for the Jury.

**(Jurors exit courtroom)**

**(Pause)**

THE COURT:  The parties can take about ten minutes, and then I'll give you a copy of what the jury instructions that I propose are.  So ten minutes and then I'll give you a copy of the jury instructions I propose, and before I go back there, do any of the Defendants want to make the usual motions at the end of the case?

MR. BERNSTEIN:  Yes, Your Honor.

MR. NICOLAYSEN:  Yes.

THE COURT:  All the Defendants have made their motions.  The record shows that.

MR. NICOLAYSEN:  And Your Honor, not to take up time now, but just for the Court, I need to make a record for the Ninth Circuit on the issue of the testimony of Officer Moreno.  I know now is not the time but --

THE COURT:  No, no, I know.

MR. NICOLAYSEN:  -- would you give me time at the end of the day?

THE COURT:  Yes, I will, yes, yes.

MR. NICOLAYSEN:  Thank you.

THE COURT:  Thank you.  Okay.  Then --

THE CLERK:  This Court is in recess.

MR. MPARE:  Are the Rule 29s denied, Your Honor?  Are they being made?

THE COURT:  Yes.  Rule 29s are denied.

THE CLERK:  The Rule 29s are denied.

Counsel, Government counsel?  Government counsel?  Government counsel, if I can have one of you -- I need both of you -- and one from PD, we can start the exhibits, going through them and verifying everything.

**(Recess taken at 11:18 a.m.; reconvened at 12:17 p.m.)**

**(Outside the presence of the jury)**

THE CLERK:  Please be seated.

THE COURT:  The Court has given the parties the instructions that the Court intends to give.  With regard to the parties' objections, they've all been noted for the record in the earlier submissions regarding the proposed instructions, and the parties' objections to each other's objections, so the record in that regard is made.  The only new thing that has been incorporated is the -- #11 -- is in proposed -- is in Jury Instruction 11.  The statute does use covered persons, so I have included that.  And I have used the definition from the Supreme Court of what "on account of" means, and I have adopted

84

the threat definition more in line with the Defendants' proposal. The cover -- or what is restricted information is in the statute. I've used those words so that the fact that information may have been publicly known is not relevant to this charge and can't be argued. So I think we have it all. I mean, the Government may disagree, the defense may disagree, but the record -- I think each side has its record, and I think we should go forward, okay. Let's get the Jury.

MS. BORDER: Agreed, Your Honor. There is just one typo on page 14.

THE COURT: Page 14.

MS. BORDER: It says perceived to be an authentic treat, which the Government is fine with, but I imagine the defense might have an objection to that.

THE COURT: Let me see, where --

MR. BERNSTEIN: What line?

MS. BORDER: 20 -- between 25 and 26.

THE COURT: 25.

MS. BORDER: It says perceived to be an authentic treat instead of threat.

MR. BERNSTEIN: Right.

THE COURT: Okay, I'll change that.

MS. CHOI: And Your Honor, we need an instruction on the Defendants not testifying, and --

THE COURT: Oh, I did -- I have that in here.

85

MR. BERNSTEIN:  It's in there.

MS. CHOI:  It's in there?  Oh, I guess I missed it.

THE COURT:  Yeah, yes, I have that, yes, yes.  All right, then let's get the Jury.

MR. MPARE:  Your Honor, do you need to include the foreign language one again?  I know you instructed on it --

THE COURT:  No, I think that's adequate.  Okay, let's get the Jury.

MS. COIT:  And Your Honor -- sorry.  There's an issue of the verdict form.  I don't know if the Government is going to show it during the closing.

THE COURT:  What's wrong with it?  Before the Jury comes back.  Hold them up.  What is that?

MS. COIT:  There's several things.  Their objections are listed from the Defendants, this is jointly, things like -- they say -- 1) we think there should be separate forms for each Defendant.

THE COURT:  Okay, what else is there?

MS. COIT:  It states the crime wrong.  It says that it's a --

THE COURT:  Okay, we -- I'll deal -- I'll make it more simple.  We the jury find Defendant -- I would say count 1 -- the heading says count 1.  We the Jury find, and then take out everything -- all of the language about it.  We the Jury find Brown guilty/not guilty, take out all that language.  We

the Jury find -- okay, it's all out.  Just plain vanilla verdict form.  And count 2, we the Jury find -- they'll have a copy of the Indictment, so I'll say count 2, count -- take out all the language.  It's just -- now it's just plain, just guilty/not guilty on the counts.

MR. BERNSTEIN:  Your Honor, also we believe it should be not guilty followed by guilty.

THE COURT:  All right.  It doesn't make a difference, okay.

MS. COIT:  And just -- the titles are going to be removed as well, under count 1 and count 2?

THE COURT:  Count --

MS. COIT:  Yeah, it's just like --

THE COURT:  Oh, yeah, yeah, oh, count -- yeah, count --

MS. COIT:  It will say count 1 and then go right into count 1.

THE COURT:  Yeah, those titles are all -- are taken out also, yeah.

MS. COIT:  And we also object to the first superseding Indictment going back with the Jury.

THE COURT:  Okay, thank you.  All right, get the Jury.  How long do you think the arguments are going to be?  The trial didn't take that long, but how --

MR. MPARE:  An hour between closing and rebuttal.

87

THE COURT:  An hour?

MR. MPARE:  Yeah.

THE COURT:  All right.  What about the defense?  Gee, an hour?

MR. NICOLAYSEN:  Well, Your Honor --

MR. MPARE:  There are a lot of clips, Your Honor, there's --

MR. NICOLAYSEN:  -- it's the playing of the videos.

MR. MPARE:  Yeah.

MR. NICOLAYSEN:  It's not so much --

THE COURT:  Oh, I see.

MR. MPARE:  There's a lot of videos.

MR. NICOLAYSEN:  I would say a half hour --

THE COURT:  Whatever you want.

MR. NICOLAYSEN:  -- because of the videos.

THE COURT:  I'm just getting an estimate.

MR. NICOLAYSEN:  Sure.

THE COURT:  I'm not restricting you, but boy, sounded like a long time.

MR. BERNSTEIN:  I'll be less than 30 minutes.

THE COURT:  Yes.  What about the -- what did you say?

MS. CHOI:  I'll be less than 30 from --

THE COURT:  Yeah, yeah, I mean, gosh.  Gosh, I mean, you know --

MR. BERNSTEIN:  Well, you know the Government has to

EXCEPTIONAL REPORTING SERVICES, INC

overdo everything.

THE COURT:  I mean, the Jury tunes you out after a while.  I mean, like anything else, I mean, everyone ought to be like that singer, Carly -- what was her name, the singer years ago --

MR. NICOLAYSEN:  Pat Benetar, Hit Me With Your Best Shot.

THE COURT:  Pat Benetar.  Hit Me With Your Best Shot.

MR. NICOLAYSEN:  We used to say that in the 1990s, Your Honor.

THE COURT:  Yeah, well, I still --

MR. NICOLAYSEN:  And I borrowed your expression.

THE COURT:  I still believe in Pat Benetar, if she's around.  She knew how -- she probably was a hell of a lawyer, but she was a rock singer.

MR. BERNSTEIN:  Well, first thing, we're dating ourselves.  I doubt most of the people know who that she is.

THE COURT:  My law clerks don't know who Joe DiMaggio was, so --

MS. CHOI:  Oh, no.

MS. BORDER:  And Your Honor, I'm sorry, to just raise one last question that the parties had, the Government just wanted to confirm that the Court would be okay with the jury receiving copies on a USB drive of the clips that were played in addition to the videos.

89

THE COURT:  No, I -- only the clips that were played, not the whole videos.

MS. BORDER:  Okay, thank you, Your Honor.  And then just to confirm, the Government also believed that the second 9-1-1 phone call from the neighbor had been admitted into evidence through Special Agent Kurtz.  The defense, I think, disputes that.

THE COURT:  I don't think it was admitted.

MS. BORDER:  Okay.

THE COURT:  So --

MS. BORDER:  It was -- the Government's position, Your Honor, is that it was admitted, it was just not played or used.

THE COURT:  Then her 9-1-1 call is not part of the record.

MS. BORDER:  Understood.  Thank you, Your Honor.

THE COURT:  Okay.

MS. COIT:  And Your Honor, to clarify, for Exhibit 5, which was the video from Instagram with that caption on it, was it the full video or just a screenshot of it?

THE COURT:  Just a screenshot.

MS. COIT:  And then just to clarify on this clips issue, because there are full -- some full videos that were admitted that have clips that the Government played.

THE COURT:  Daniel, would you hold the Jury if

they're back there, because everything comes up at the last minute.

MS. COIT:  So Your Honor, there's actually one exhibit that has a special circumstance and then there's the rest of the videos.  So we agree that full videos came in except for Exhibit-28, which was the body-worn camera of the last witness.  For all the other videos except 28, we agreed to put all of the video into evidence.

THE COURT:  In other words, some of the videos that were not played for the Jury?

MS. COIT:  Correct, Your Honor.  That group of videos, we think, yes, the full videos should go back for the jury.  But the Jury should not also get separate clips from the Government that they played.  1) They didn't move those clips into evidence.  So the full video is in evidence, but those individual clips are not in evidence.

THE COURT:  But is the full video in evidence?

MS. BORDER:  Yes, Your Honor.

THE COURT:  Well, then if the full video is in evidence, then why shouldn't the Jury consider it?

MS. BORDER:  Precisely.  We just wanted to make it easy for the Jury to replay the clips we played.

THE COURT:  All right then, I'll give the Jury the full video.

MS. BORDER:  Thank you, Your Honor.

91

THE COURT:  Okay.

MS. COIT:  Yeah, they're getting the full video --

THE COURT:  Yes.

MS. COIT:  -- not the clips.

THE COURT:  Whatever is in evidence, they'll get.

MS. COIT:  And the only thing that's in evidence are the full videos for that group of exhibits.  The individual clips are not in evidence.  They did not move --

MS. BORDER:  Your Honor, the Government disputes that.

THE COURT:  Well, but I mean, are the individual clips made as separate exhibits in evidence?  I don't know.

MS. COIT:  They were not moved into evidence.

THE COURT:  I just don't -- let me ask.  Were they?

MR. MPARE:  Your Honor, we moved the full clips -- we moved the full clips into evidence.  We started to play clips -- or, sorry.  We moved the full video into evidence.  We started to play clips.  At a certain point Your Honor asked, are the parties going to stipulate to all of these videos coming in, and Your Honor said yes.  So the Government's position was that the clips independently were included both as independent exhibits and the full video.

THE COURT:  Well, why can't you, as I have been accustomed to hearing, just tell the Jury on the time stamp on the videos where the clips you played.

92

MR. MPARE:  The concern is then the Jury has to manually scroll through and they could --

THE COURT:  Well, they -- maybe they have to. Otherwise they're getting your points emphasized with the clips.  So, I mean --

MR. MPARE:  It also helps for ease of reference --

THE COURT:  Well, I mean, I --

MR. MPARE:  -- to go back to the portions of the videos that they've --

THE COURT:  Ease of reference is secondary to fairness.  So it seems to me that if you make separate exhibits parts of the principal exhibit, you're in effect arguing what parts of the exhibit you think are more important.  You can argue that, and just tell the jury you played -- you remember you played this clip, or play it for them in closing argument. I don't know.

MR. MPARE:  Understood, Your Honor.

THE COURT:  Okay.  Where's Daniel?  Daniel, go get -- he's getting the Jury?  Tell him to get the Jury.

MS. COIT:  And while they're getting the Jury, Your Honor, the Government had ruled about excluding Victor Gomez. The defense is just going to file the exhibits we would have used with him for the record.

THE COURT:  All right, well, you can do that.  Okay.

MS. COIT:  Yeah, Exhibit-273.

93

THE COURT:  Well, let's deal with that at a later point.

**(Pause)**

THE CLERK:  All rise for the Jury.

**(Jurors enter courtroom)**

THE CLERK:  Please be seated.

**JURY INSTRUCTIONS**

THE COURT:  Again, thank you, members of the Jury, for your patience.  Members of the Jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be available in the jury room for you to consult.  It is your duty to weigh and evaluate all the evidence received in the case, and in that process decide the facts.  It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.  You must decide the case solely on the evidence and the law.  Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you.  You should also not be influenced by a person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, biases, including unbiases.  The Indictment is not evidence.  The Defendant has pleaded not

94

guilty to the charges.  The Defendants are -- if I say Defendant, I'm referring at all times to all the Defendants. The Defendant is presumed to be innocent unless and until the Government proves Defendant beyond a reasonable doubt.  In addition, the Defendant does not have to testify or present any evidence.  The Defendant does not have to prove innocence; the Government has the burden of proving every element of the charges beyond a reasonable doubt.  A Defendant in a criminal case has a constitutional right not to testify.  You will not draw any inference of any kind from the fact that a Defendant did not testify.  Proof beyond a reasonable --

**UNIDENTIFIED SPEAKER:**  We've blocked your microphone, Your Honor.

**THE COURT:**  Microphone was off?  Was -- did everybody hear what I said before?  Okay.  Proof beyond a reasonable doubt is proof that leaves you firmly convinced Defendant is guilty, and it is not required that the Government prove guilt beyond all possible doubt.  A reasonable doubt is a doubt based upon reason and common sense, and it's not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence or from lack of evidence.  If after a careful and impartial consideration of all the evidence you are not convinced beyond a reasonable doubt that Defendant is guilty, it is your duty to find Defendant not guilty.  On the other hand, and after a careful and impartial consideration

of all the evidence you are convinced beyond a reasonable doubt that Defendant is guilty, it is your duty to find Defendant guilty.

The evidence you are to consider in deciding what the facts are, consists of 1) the sworn testimony of any witness; the exhibits received in evidence; and any facts to which the lawyers have agreed or stipulated.  In reaching your verdict you may only consider the testimony and exhibits received in evidence.  The following things are not evidence and you may not consider them in deciding what the facts are.  Questions, statements, objections and arguments by lawyers are not evidence.  The lawyers are not witnesses.  Although you must consider a lawyer's questions to understand the answer of a witness, the lawyers' questions are not evidence.  What the lawyers have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.  Any testimony that I have excluded, stricken, or instructed you to disregard is not evidence.  In addition, some evidence, if it was for a limited purpose, may only consider it in that way.  Anything you may have seen or heard when the Court was not in session is not evidence.  You are to decide the case solely on the evidence received at trial.  Evidence may be direct or circumstantial.  Direct

evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts on which you could find another fact.  You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact; the law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.  In considering the testimony of any witness, you may take into account the following:  the witness' opportunity and ability to see or hear or know the things testified to; the witness' memory; the witness' manner while testifying; the witness' interest in the outcome of the case, if any; the witness' bias or prejudice, if any; whether other evidence contradicted the witness' testimony; the reasonableness of the witness' testimony in light of all the evidence; and any other factors that bear on believability.  Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes of what they remember.  Also, two people may see the

97

same event but remember it differently.  You may consider these differences, but do not decide that a testimony is untrue just because it differs from other testimony.  However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.  The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testified.  What is important is how believable the witnesses were and how much weight you think their testimony deserves.  A separate crime is charged against one or more of the Defendants in each count.  The charges have been joined for trial.  You must decide the case of each Defendant on each crime charged against that Defendant separately.  Your verdict on any count as to any Defendant should not control your verdict on any other count or as to any other Defendant.  All the instructions apply to each Defendant as to each count.

     The Defendants are charged in count 1 of the Indictment with conspiracy to make publicly available the restricted personal information of RH -- I think now we know who RH is, so -- that's Herrera, right?  I mean, what's his name --

          **MR. BERNSTEIN:**  Reyes.

          **MR. NICOLAYSEN:**  Reyes (indiscern.).

**THE COURT:** Reyes. Reyes. Information of Reyes in violation of §119A of Title 18 of the United States Code. For Defendants to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt: First, beginning on a date unknown and continuing on or about August 28th, 2025, there was an agreement between two or more persons to publicly disclose the personal information of a covered person; and second, Defendants became members of the conspiracy, knowing of its purpose and intending to help accomplish that person -- that purpose. And third, one or more of the members performed at least one overt act for the purpose of carrying out the conspiracy. A conspiracy is a kind of criminal partnership, an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful. It does not matter whether the crime agreed upon was committed. For a conspiracy to have existed, it is necessary that the conspirators made -- it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find there was a plan to commit the crime alleged in the Indictment as an object or purpose of the conspiracy, with all of you agreeing as to the particular crime which the conspirators agreed to commit. One becomes a member

99

of a conspiracy by knowingly participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who knowingly joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy but happens to act in a way that furthers some object or purpose of the conspiracy does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists. An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. The Government is not required to prove that the Defendant personally did one of the overt acts. To make publicly available the restricted information of -- I just had a mental block on the name, as --

**MR. BERNSTEIN:** Reyes.

**THE COURT:** Reyes. I'm sorry -- of Office Reyes in violation of §119A of Title 18 of the United States, all the following must be true. First the Defendant made publicly available the restricted personal information of a covered person or a member of the immediate family of that covered person. Second, the act of making the restricted personal

100

information publicly available was a threat.  And third, the person did so with the intent to threaten or intimidate that covered person or a member of the immediate family of that covered person, or with the intent and knowledge that the personal information would be used to threaten or intimidate that covered person or a member of the immediate family of that covered person.  Restricted public -- personal information means the Social Security number, the home address, the home phone number, mobile phone number, personal email or home fax number of and identifiable to that individual.  Covered person means any officer or employee of the United States or of any agency in any branch of the United States Government, including any member of the Uniformed Services, while such officer or employee is engaged in or on account of the performance of official duties.  On account of means because of.  Threat in this context means a serious expression of intent to inflict bodily harm on a particular person or group of persons that a reasonable observer would perceive to be an authentic threat. To threaten or intimidate in this context means directing a threat to a person or a group of persons with the intent of placing the victim in fear of bodily harm or death.  To convict on counts 1 -- to convict Defendants on count 1 of the Indictment, the Government need not prove the Defendants actually violated §119 of Title 18 of the United States Code. It is sufficient for the Government to prove beyond a

101

reasonable doubt that Defendants conspired to do so.  The Defendants are charged in count 2 of the Indictment with stalking in violation of Title 18 United States Code §2261A(2)(B).  For each Defendant to be found guilty of that charge, the Government must prove the following elements beyond a reasonable doubt:  First, that the Defendant possessed the intent to harass or intimidate Reyes -- Officer Reyes, or place him under surveillance with the intent to harass or intimidate him.  Second, that Defendant pursued that intention through a course of conduct that made use of an interactive computer service or electronic communication service of interstate commerce, interstate wires, the internet, or any other facility of interstate or foreign commerce.  And third, that the Defendants' course of conduct caused, attempted to cause, or were reasonably expected to cause substantial emotional distress to Officer Reyes, Reyes' spouse, or a member of Officer Reyes' immediate family.  Harass means to repeatedly or persistently use words, conduct or actions that being directed at a specific person, annoys, alarms or causes substantial emotional distress in that person, and serves no legitimate purpose.  Intimidate in this context means to make timid or fill with fear.  Substantial emotional distress means mental distress, mental suffering, or mental anguish, includes depression, dejection, shame, humiliation, mortification, shock, indignity, embarrassment, grief, anxiety, worry, fright,

102

disappointment, nausea, nervousness, as well as physical pain. When considering whether the intended course of conduct would be reasonably expected to cause substantial emotional distress, you must consider whether in light of the evidence presented in this case a reasonable person in the same or similar circumstances as the victim would suffer substantial emotional distress as a result of the intended course of action as defined in these instructions.  A course of conduct is a pattern of conduct composed of two or more acts evidencing a continued -- a continuity of purpose.  You may consider each communication between Defendant and Officer Reyes and his family members as a separate act.  You are not required to agree unanimously on which two or more acts constituted the course of conduct.  Not all acts that constitute part of a course of conduct must be -- must involve the use of an interactive computer service, an electronic communications system of interstate commerce, interstate wires, the internet, or any other facility of interstate or foreign commerce.  A mobile phone and the internet are each facilities of interstate commerce.  A defendant may be guilty of stalking even if the defendant personally does not commit the act or acts constituting the crime but aided and abetted in his commission.

To aid and abet means intentionally to help someone else commit a crime.  To prove a defendant guilty of

103

stalking by aiding and abetting, the Government must prove each of the following beyond a reasonable doubt.  First someone, else committed stalking.  Second, defendant aided, counseled, commanded, induced, or procured that person with respect to at least one element of stalking.  Third, defendant acted with the intent to facilitate stalking.  And fourth, the defendant acted before the crime was completed.  It is not enough that defendants merely associated with a person committing the crime or knowingly or unintentionally did things that were helpful to that person or was present at the scene of the crime.  The evidence must show beyond a reasonable doubt that each of the defendants committed with the knowledge and intention -- acted with the knowledge and intention of helping that person commit stalking.

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advanced knowledge of the crime and having acquired that knowledge when defendants still had a realistic opportunity to withdraw from the crime.  The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.

I have some closing instructions to give to you as to how you organize yourselves, communicate with me, and so forth.  And I'll await giving you those few instructions until

104

after the lawyers have delivered their closing arguments.

So first, we'll hear from the Government.

**CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT**

**BY MR. MPARE:**  For most people, coming home after work is a relief and the thought of being followed home from work is unsettling, even frightening.  And for most people, to learn that after being followed home you were harassed by unknown people wearing black masks, that information about you, your family, and where you live, and what you do for work is now public knowledge, well, that's life-changing.  That isn't just a thought for Rogelio Reyes and his family.  It's their reality.

Defendants made that their reality when they made their personal views on a public issue of significant value a private encounter with one family.  Defendants picked out one ICE officer, followed him home from work for nearly half an hour, approached him and his family in black masks, harassed them, threatened them, called them disparaging names, all while publishing information about Mr. Reyes, his wife, and their children on the internet.  And the videos show this, that defendants harassed, intimidated, and threatened, that they shared information about the neighborhood they were in, that they publicized an address just doors down from the Reyes family home.  They encouraged their viewers to use that information.

105

This is the government's summation.  During this course in trial, I'll walk you through the evidence that was presented during trial, the law which governs that evidence, and how the evidence and the law prove beyond a reasonable doubt defendants' guilt.

Now further conduct, defendants are charged with two crimes: stalking, conspiracy to dox a federal law enforcement officer or covered person.

I want to walk you through the elements of both those and let's start with stalking, which is Count 2.  For the Government to prove beyond a reasonable doubt the defendants are guilty of stalking, they must prove three elements.  First, defendants engaged in a course of conduct using facilities of interstate commerce.  That just means defendants took two or more steps and that those steps used facilities of interstate commerce.  The internet is a facility of interstate commerce. The interstate 10 East, which defendants drove down, is a facility of interstate commerce.  So all we're talking about is whether they took two or more steps in this first element.

The second element is whether defendants had the intent to harass or intimidate Mr. Reyes and his family, and this deals with what defendants are thinking, what they thought their conduct was doing to Mr. Reyes and his family.  And the third element relates to whether that course of conduct, which defendants intended to engage in that intimidated and harassed,

106

caused, attempted to cause, or would reasonably be expected to cause substantial emotional distress.  Now, this deals with the victims, what they felt, or what they could have felt, or what someone else in their shoes would have been understandable in feeling.

So let's talk about the first element: the course of conduct.  Well, you heard testimony during trial that on August 28th, 2025, defendants waited at a federal building.  They waited until Mr. Reyes left work for the day.  You heard from Mr. Reyes that he takes the same route home every day.  He travels east on interstate 10 to his home in Baldwin Park and defendants followed him.  He said it's about 16 miles.  He said it takes about 25 to 30 minutes to get there.  Never do defendants stop, not when they get off the interstate, not when they turn into a residential neighborhood.

And you saw Exhibit 8, which is this pursuit.

**(Video played at 12:55 p.m.)**

**MR. MPARE:**  Watch this video for yourselves, but there's a couple of things I want to point out to you.  Mostly you hear Defendant Brown and Defendant Raygoza talking about the pursuit.  That's ICE, no plates.  They knew what they were following.  Baldwin Park for sure.  They knew where they were going.  Let them think we're not going to follow them.  They knew they shouldn't be seen, and stay a good distance a good distance, three feet because you can't be near them.  I mean,

**EXCEPTIONAL REPORTING SERVICES, INC**

three car spaces that way they don't see us.  Defendants clearly knew what they were doing.

They were following Mr. Reyes, and they might not have known at this exact moment where they were following them. In fact, I think that they might have thought at this moment they were going to do something righteous, but they learned pretty soon that they weren't going there.  They were following him home.

This sleepy Baldwin Park neighborhood.  The neighborhood where Mr. Reyes and his family lived.  The neighborhood that was quiet when defendants arrived.  No law enforcement activities.  No significant foot or car traffic. Just a neighbor's car passing by and the ring of a tow truck.

If at this point defendants believed they were somewhere of public significance, surely, they would realize they were somewhere else.  Surely, they would turn around.

Your testimony that instead defendants parked in one of the neighbors' homes and that defendants Samame and Raygoza began to walk down the street, flanking the victim's car.  That they walked back down the street towards the car that the victims were in.  And that during that walk back, Defendant Raygoza announced, while live streaming, this is his car, and be on the lookout for this car in Baldwin Park.

And what they knew at this time, they'd seen Officer Reyes get out of his work car.  That car without license

108

plates.  They'd seen that when Officer Reyes got out of his work car, he was wearing a checkered shirt and jeans.  He wasn't wearing any law enforcement gear.  He wasn't with anyone else from law enforcement.  And they saw that he walked from that car to another car and sat in the passenger seat.  That's all they knew.  And they still live streamed.  They shared that information on social media.  And you'll remember this is from Defendant Raygoza's live stream.

**(Video played at 12:58 p.m.)**

**MR. MPARE:**  So a couple of things you can see clearly in this clip.  Mr. Reyes' work car.  The mailbox right in front of Mr. Reyes' house.  And your testimony that from that work car to the family home door, about 10, 20 feet, the family's car, clear as day.  And what does Defendant Raygoza say?  Be on the lookout for this car.  And that Mr. Reyes looks like he's going out for the day with his family.

Please, please look at the video.  Look at the entire thing.  Find for yourself where this man looks like he's doing anything related to enforcement.  You won't.  You won't hear from defense counsel that he was doing that, and defendants know that by now.  You also heard, take note of the tattoos.  Defendant Raygoza.  Remember this time, Mr. Reyes is kind of chilling in the car.  He's got his elbow out the window.  And he's got a tattoo on his arm.  First thing she says about Mr. Reyes, check out the tattoo.  Why?  Not it's a super cool

109

tattoo.  Why?  Because she's live streaming.  She's talking to people right then and telling them that they need to be aware of who this person is.  They need to know where he lives.  And they need to know what kind of car he drives with his family.

You also heard testimony that Mr. Reyes got out of the car.  And you're going to hear from defense counsel fighting it out, right?  He could have just left.  He could have just driven away.  Could have gone down the cul-de-sac and called 911.

Does that make sense?  Does that really make sense?  You have three masked people, right?  Two walking right around your car, and one that you've just seen in a neighbor's driveway.  At this point, and you'll remember, Mr. Reyes testified to this, that when he was driving home, he noticed a car, right?  He noticed the car behind him, but he took a couple right turns.  And at some point, he decided not to go directly to the route he takes home, and that defendant's kind of peeled off.  At that point, he thought it must have been nothing.  And you heard testimony, both from Mr. Reyes and his wife, Jessica Herrera, that at that point, she said, there's somebody in the driveway.  It looks like they've been following you.  And at that point, he put two and two together.  And you remember what he said.  He said, either they followed me home for something, or it was a setup.

Remember testimony from him, which was, at this

110

point, I did fear for my safety.  I was concerned about my family.  In fact, I considered, while in the safety of my car, whether I needed my firearm.  I considered whether there was a real danger, but then I saw that defendants were recording. They weren't drawing weapons.  So I decided to get out and figure out why they were there.  I needed to understand why they were in my neighborhood.

And you heard testimony about the other vantage points that this incident happened from.  You're not just going to have to see defendants' clips and what they recorded, because the family did the same thing.  Why did they do this? It was concerning.  Why were these people here?  There's no protesting.  There's no ICE enforcement.  We're going out with our kids to surprise them.

**(Video played at 1:03 p.m.)**

**MR. MPARE:**  That's Ms. Brown, standing in a neighbor's driveway, right by the car which all three defendants drove to Baldwin Park for 30 minutes, following Mr. Reyes.  And what are the first words out of Ms. Herrera's mouth when she talks to Ms. Brown?  You don't have permission to film my kids.  And what is Defendant Brown's response?  ICE is here, we followed him here, right?  In case there was any doubt, right, that they knew what Mr. Reyes did for work at this point, well, she tells Jessica, because at that point she didn't know that they were related, right?  She figures that

111

out in a minute, right?  Right after this, actually, Ms. Herrera says, you know, I live here, this is my neighborhood.  And Ms. Brown says, in fact, tipping off to Jessica, that she was right, that her kids might be being recorded right now.  There's like a thousand people watching right now.  There's like a thousand people figuring out right now where you live, what your kids look like, what kind of car you drive, where your husband parks when he comes home from work, how your cousin gets home from work, right?  What tattoo he has on his right arm.  Jessica, I think it says, right?  All of this.  And what does she say?  If you guys aren't ICE, then tell us.  They're there to follow an ICE officer home.

You also heard that it didn't stop there.  About the same time that this is happening, where Jessica, you know, gets out of the car and approaches Defendant Brown, Mr. Reyes has gotten out of the car to approach Defendants Raygoza and Samame.  And just a reminder, they're all wearing masks, right?  We know who they are here in court today.  But when Mr. Reyes is dealing with them, he has no clue.  He doesn't know them from Adam or Eve.  And he walks up to them, trying to figure out why they were there.  Right, why didn't he leave?  Well, he told you.  You know, I have training experience.  I'm in my neighborhood.  If I leave, they could be here.  I know they're live streaming.  So if I leave, I might not see who else rolls up.  They could walk right into the gate of my home, be

112

chilling in the trees.  Right, in fact, don't you remember the clip, kind of the beginning when Mr. Reyes is filming, Defendant Raygoza takes a couple steps back and she kind of positions herself right by a tree?  More people could do that if he went home, or if he left home.  He had to stay there.  Use your reason and common sense.

**(Video played at 1:07 p.m.)**

**MR. MPARE:**  Does that sound like someone trying to de-escalate?  Defendant Raygoza isn't trying to de-escalate.  Watch the video.  Mr. Reyes never says anything incendiary.  What are you doing?  Why are you here?  Why are you wearing masks?  This keeps going on, and there's a back and forth.  And you're going to hear defense counsel say, well, he's still asking questions.  He's still out on the street.  His children are in the car.  Why isn't he in the car with his children?  Well, I just told you why.  Because his children are in the car, his testimony was I had to get out.  I had to remove defendants from where my car was.  I had to make sure that this incident happened away from where my children were.

You heard testimony from both Ms. Herrera and Mr. Reyes that that was their primary concern, safety.  Not just for themselves, but for defendants.  I'm trying to de-escalate.  Defendants didn't want to de-escalate.  They wanted to share information about him.  They wanted to call him names, pendejo, race traitor, just because of what he does for work.

113

Right?  Not because he's at an enforcement operation.  Not because he's quote, unquote, snatched people up.

In fact, you heard from Mr. Reyes, he takes pride in his work.  He goes after previously convicted individuals who engaged in sex trafficking and human trafficking and child crimes.  Ms. Herrera testified that their little boy thinks he's a hero because he had to come home from one of the riots, right, about ICE, and some of the discontent our society feels about them, with a bulletproof vest on.  He wasn't in a bulletproof vest today, though.  He didn't deserve this today.  He might not ever have deserved it, right, as an individual.  And recall, at this point, defendants are still in masks.

**(Video played at 1:09 p.m.)**

**MR. MPARE:**  Does that seem like productive, engaging conversation or conduct with a person that they're trying to suggest was doing an ICE operation at that time?  Is garbing yourself in all black and pulling down a mask across your entire face, while not answering any questions or saying, yeah, we did follow you here.  You're an ICE officer.  And some of this is upsetting to us.  Let's talk about it.  Did they even admit at this point that they were following him?

You heard Officer Reyes.  He said, you followed me here.  You followed me here.  These are the responses.  He's with a white bitch.  When Ms. Herrera just asked, don't be recording our kids.  If you're scared, keep going, bitch.  When

114

Mr. Reyes was saying, stop.  They can think what they want to think.  They can think I'm an ICE officer.  They probably can even think that I'm not doing the things that they like.

Ms. Samame saying, well, we can't have been following you or offending you because we're not in your car or your home.  Following someone, 25, 30 minutes, black masks, parking in a neighbor's driveway, walking down the street.  La migra's here.  Your neighbor's an ICE agent.  That's not invading someone's privacy?  That's not allowing Mr. Reyes the right as a citizen of the United States to keep to himself when he goes home?

Defendant Brown.  Now they know ICE is on the block again.  This is what they're here for.  They got the thousands, maybe, you know, multiple thousands of people watching at this point.  They want them to know.  You thought you were sneaky, pendejo?  They want them to know.  This is where he lives.  Ask yourselves, when defense counsel gets up here and says, we all have a right to express ourselves, sure, there are bounds.  And the expression here crosses that bound.

Mr. Reyes' face plastered on the internet, his tattoos, his wife's tattoos.  Remember, she's not an ICE officer.  She's at home with her kids every day.  She's proud of her husband because he brings home the bacon, proverbial old school, but that's how they do it.  The other tattoo, right?  Check the tattoos while he's out the window, but you'll

115

remember in videos when you watch them, she says, you know, check the tattoos. Check the tattoos. In fact, Defendant Raygoza pans kind of away from Mr. Reyes' body and kind of follows his arm. Watch it. Watch it. You'll see. You'll see.

His wife, again, same thing. Check the tattoos. You know, they're going to get up here and say, this is rapid response. We need to know what these ICE officers look like when they're in the field. Jessica's not an ICE officer. She's not doing anything and neither are their kids. Now, look, it's not the best shot of their kids, sure. It's a fleeting moment, but it's on the internet. And you heard testimony from our special agent that this was up for 24 hours. You heard testimony, in fact, that people came later. You heard testimony that this was reposted and recirculated. So people saw all of this. That's what defendants wanted.

And you heard testimony that at a certain point, after Mr. Reyes figured out why they were there, he and his wife went back to their car, right? They didn't leave because, again, it doesn't make sense. It doesn't. But they got in the car, and Jessica called 911.

It's about two-and-a-half minutes that I'm going to play for you, so bear with me. But this is immediately, while the incident is happening, what Jessica is saying. And you

116

don't have to take her word for it on the stand, right? Remember, defense counsel is going to get up here and say, well, she changed her plates because she said it was lost, not that it was, you know, not because there was some kind of crime. She backed up a little bit, but she told this other officer that she was trying to get out of the way, and now she's saying that she wanted to see the address.

Well, here's the 911 call from seconds after this is happening, and here's what she says then.

**(Audio played at 1:17 p.m.)**

**MR. MPARE:** That's sum and substance what happens. You're going to hear defense counsel get up here and say, nobody saw any weapons. Everybody agrees. Everyone agrees. Nobody saw weapons, but the damage had already been done. They followed a man home. They were being aggressive. Their kids were in the car. They're circling around it. They're recording my kids. And she didn't even have the whole sum of it, right? They're live streaming. They're posting this information about my husband to the internet. Right?

You're going to hear that she says on the 911 call, he works for DHS. Yeah, well, that's significant. That's why we're here. Yeah. That's why we're here. He works for DHS. That's it, right? That's the case. They followed him home. They harassed his family. They live streamed him because he

117

works for DHS.  Not that he's doing something they disagree with.  Not because he's doing something in the moment that they feel is unconstitutional or unlawful.  He's going home for the day.

And recall what defendants are doing here.  Right?  You're going to hear that they couldn't leave.  Right?  The car was blocked in.  We'll get to that in a second.  But the family's in the car.  The kids are distressed.  Ms. Herrera is agitated.  Mr. Reyes is trying to protect his family.  And defendants are doing this.

**(Video played at 1:20 p.m.)**

**MR. MPARE:**  There was no reason for defendants to linger at this point other than to intimidate, harass, distress, and cause agitation to the Reyes family.  They'd already made their point, right?  We know you're an ICE agent.  Right?  Now they're parading around the neighborhood.  Well, now the neighbors know who this guy is.  Why?  Why?  To make it uncomfortable for the Reyes family to stay there.  To make them fear that something would happen to them just because of what Mr. Reyes does for work.  Right, and it doesn't end there, right?  You're going to hear again that, you know, they couldn't leave.  Parading around the block, filming into Mr. Reyes's work car.  And, you know, you got to use your deductive reasoning here.  You guys have to do that.  That's your job.  But why would you look into the window of a work car

118

and say to your live audience, could somebody, you know, you know what to do.  You know what to do.  To the thousands of viewers out there.

And at this point, defendants have done what they wanted to do.  They've gotten the information out.  They've distressed and harassed the family such that they had to call 911.  And, you know, at this point, they kind of get smart that the cops are going to come, and so they make this plan to leave.  And we introduced this video from Defendant Samame's phone, which you heard from the special agent that he was able to extract and pull this video, and just watch it.

**(Video played at 1:25 p.m.)**

**MR. MPARE:**  So you heard a couple of things here.  You hear Defendant Brown in the background, listen to the video.  You hear Defendant Brown, we need to leave.  We're stuck, the cops are coming.

Now there is going to be some testimony that at a certain point, Ms. Herrera backed up her car.  I'm arguing, defense counsel is going to argue, Ms. Herrera testified that she backed it up to see what the proper address was.

**MS. CHOI:**  Objection, denigrating defense counsel, predicting what we'll say in our closings.

**THE COURT:**  I mean, when he's saying -- when you're saying this, I'm interpreting it to be with regard to how the parties see the evidence, correct?

119

**MR. MPARE:**  Yes, Your Honor.

**THE COURT:**  I mean, lawyers are to be respectful of each other.  And the case is not about lawyers in the sense of who you like better or who's a better lawyer, or in your view.  But I guess when -- well, I know when you're making that reference, you're just focusing on evidence and not the lawyer, correct?

**MR. MPARE:**  That's correct, Your Honor.

**THE COURT:**  All right, then go ahead.

**MR. MPARE:**  Also in this clip, you hear Defendant Samame say something in Spanish.  So those parts are also important.  And we introduced as evidence exhibits for those translations.  Read them for yourselves.  The same way there is nothing of value, the defendants were saying in English just look at the transcripts.  And we're almost done with what happens that day.

**(Video played at 1:28 p.m.)**

**MR. MPARE:**  You heard testimony from Mr. Reyes that when he heard defendant Raygoza say, you know I'll pop you, he thought worst-case scenario.  He thought she could shoot him.  And in fact, he testified, you know, she went back to the car.  I don't know what they have in the car.  Maybe at the time that I was interacting with her, I didn't see a firearm, but I don't know what's in the car.  And in my training and experience, pop can mean a few things.  Jessica says the same thing.  And just

**EXCEPTIONAL REPORTING SERVICES, INC**

120

a different --

       **(Video played at 1:29 p.m.)**

           **MR. MPARE:**  After this, Baldwin Park P.D. arrives, the parties get separated.  That's the day, that's the course of conduct.  I won't belabor the point.  This is what happened during the day.  Dressed in black masks, followed Mr. Reyes, Baldwin Park, they live stream it.  They park in his neighborhood.  They start live streaming information about him and his family.  They share information through the neighborhood.  They share information online and they conceal their identities, and then they try to run, all after threatening Mr. Reyes.  That's the course of conduct.  That's all the Government has to prove for element one of stalking.

           The second one deals with intent, and this is the definitions that you have in your jury instructions.  Harassment, the repeated or persistent use of words, conduct, or action towards someone which annoys, alarms, distresses without a legitimate purpose.  (Indiscernible - 1:30:45) talked about that.  The repeated, persistent use of words: pendejo, asshole, when you look at the transcripts, motherfucker, you know, faggot, you know, persistent use of words towards someone which annoys, alarms, distresses with no legitimate purpose; and to intimidate, to make timid or fill with fear.

           You saw Ms. Herrera on the stand.  You heard her

121

testimony.  Just recall back to it.  That's all the Government has to prove for intimidation and harassment, that defendants intended for this to do what it did to have its desired effect.

And the last one is bundled with that, that these intimidating and harassing actions caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress.  Again, remember what Ms. Herrera said.  The family moved out of their home where they lived for eight years some 45 minutes away.  Their daughters still go to school in Baldwin Park.  Right?  Their daughters still go to school in Baldwin Park.  They moved their three-year-old, or now four-year-old with disabilities lost his care.  Their eldest son decided he'd rather go to school virtually based on the things that now were out about his family.

Ms. Herrera got therapy.  She testified she doesn't like to leave her home without long sleeves on.  She testified she wanted to change the car plate because she's at home with her kids most the time.

Those are the elements the Government has to prove beyond a reasonable doubt for stalking.

Now the other charge is conspiracy and I'll try and break this down simply.  Conspiracy is an agreement.  An agreement between two or more people, knowing what the purpose of that agreement is, and taking steps to accomplish that purpose.

122

So in this case, the agreement would have had to been between defendants and the intent was to dox Mr. Reyes, and that they had to know the attempt, right, doxing disclosure publicly of otherwise you know restricted or private information, and they took steps to accomplish that purpose. The course of conduct from stalking covers that. I want to save you guys some time so you can deliberate reasonably and with enough discussion amongst yourself. That's the agreement, right? That's what the Government has to prove.

And how did we prove that? Well, at some point before the day started, defendants got dressed, right? They wore black clothing and had their black masks. At some point, they waited at the federal building where they knew ICE officers worked and decided to be there. They hid their identities because they knew public disclosure of information could be concerning. They started live streaming. They live streamed his face, his home, his cars, the facade to his home, the address to a neighbor's home, a second address to a neighbor's home. They didn't say his address, right? That's why it's the conspiracy, that's why they're agreeing to do this. That's -- it didn't happen, right? They didn't say 12847. They said 12837 and 12833, right? They didn't say the address, and we would have needed that address to be said for a completed conspiracy, right, but they conspired to do -- or complete doxing. They conspired to dox, and they coordinated

123

their efforts.  Course of conduct, walking around the neighborhood, Ms. Brown by the car, waiting, right?  Ms. Samame telling Ms. Brown to cover the plates, right, because they want to conceal their identities.  It's all in there.

And the intended disclosures just these are the videos that relate to this.

**(Video played at 1:35 p.m.)**

**MR. MPARE:**  That's the disclosure.  And it does happen after this interaction with Mr. Reyes, but circumstantial evidence is one of the things that jurors can use in coming to their decision, and the circumstances prove beyond a reasonable doubt that this disclosure, this reading of the address was intended to provide that personal information about Mr. Reyes.  And you know how we know the defendants find this concerning?  Well, Ms. Brown tells you

**(Video played at 1:36 p.m.)**

**MR. MPARE:**  It's uncomfortable to say your first name on a live where a hundred or a thousand people are watching. What's more uncomfortable?  People knowing exactly where you live, what your house looks like, what your wife looks like, what your kids look like, what kind of car you drive, or your first name?  And we know this information got out.  We know that the Instagram posts we're seeing 12837 Chelsfield Street. ICE agent stays in Baldwin Park.  Defendants followed him home. That's all the Government has to prove for the conspiracy

124

count.  There was an agreement.  Defendants took steps in an agreement.  They intended to succeed in the agreement to dox. And, you know, they intended to join in the conspiracy.

So the Government's proven a course of conduct, that that course of conduct intimidated and harassed and that course of conduct distressed, stalking.  And the Government also proved the defendants made an agreement to dox Mr. Reyes, conspiracy.  The case will be yours in just a matter of moments.  Deliberate amongst yourselves, weigh the evidence, and at the end of the case and your deliberations, come back with the only verdict that is consistent with the facts and the law.  Defendants are guilty of both counts.

**THE COURT:**  Which defendant wishes to go first?

**MR. NICOLAYSEN:**  I will go first, Your Honor.  Thank you.  I'll need just a moment, Your Honor.

**(Pause)**

**CLOSING ARGUMENT ON BEHALF OF CYNTHIA RAYGOZA**

*       **MR. NICOLAYSEN:**  Good afternoon.  And now we look at the evidence from an entirely different perspective.

Has the Government proven each and every element of the two crimes charged in this case beyond a reasonable doubt and the answer is no and I'm going to go step-by-step through the analysis as to why.

In order to find the reasonable doubt that makes all the difference in the world in this case where passions run so

125

high on this national subject of ICE enforcement, which is not a subject for us to discuss, but it permeates the mood of this trial.

Okay.  We have to be critical thinkers.  We have to have the discipline to look at the evidence methodically in relation to each and every element of the offense.  And when we do that, we see something very different from this kind of broad based impressionistic view which I think the Government just gave you.

We see distinctions.  In a criminal trial, reasonable doubt lives in the distinctions.  That's the discipline of the analysis in a criminal case.  And what I ask of each of you as jurors is to take the time in your deliberations to appreciate the many distinctions that the evidence invites us to recognize and I will list just some of them to sort of stimulate the thinking process, but there are certainly more.

The distinction between behavior that's kind of obnoxious, that you might not want your own kids to do necessarily or you wouldn't do yourself versus behavior that rises to the level of actually constituting a criminal offense. That's a very important distinction in this case.

The distinction between information about a person generally versus information that rises to the level legally to qualify as restricted personal information, which is what the law in this case requires.

126

The distinction between following an individual home, which has the flavor of a home invasion robbery and it's sort of the flavor that the prosecution has been suggesting versus what really happened here, which is following a vehicle that you believe correctly is an ICE vehicle and you're following it wherever it takes you.

The distinction between investigating a situation as a law enforcement officer, which is what the agent wants you to think he was doing, versus engaging in a street confrontation that has absolutely no investigative value at all, which is what the videos teach us.

The distinction between having an intention and the word intention is so important in criminal law, it's an important element of the conspiracy statute.  The distinction between the intention to publicly disclose restricted personal information of a covered person and the Government says the ICE agent in this case, versus the intention to do something very different, which is to attract public attention to the presence of an ICE agent in your community.

Which is what this case is about and why the passions have run so strongly and my client Cynthia Raygoza first and foremost is on those videos, both in Spanish and English speaking with incredible indignation and passion about what's been happening.  And again, we're not here to discuss government policy, but we have to recognize the passions.

127

And so what this case is about are the passions and the desire that just runs so deeply to let people know. There's an ICE agent in your community and you have a right to know that and we're here to tell you that and that's all we're doing.  We have no weapons, we're not using any physical force, we're just filming, but we want you to know.  And the filming is to spread the word.

This case is all about the distinctions and the distinctions make a difference and there's one more distinction which goes to the heart of the stalking and that's the distinction between a one time incident, which is exactly what this case is, and behavior that has a pattern to it and I ask you as jurors to write that down, it's in the instructions.

One of the core ingredients of the law in stalking is a pattern.  It's part of the definition of course of conduct, pattern.

Pattern of two or more acts that are part of a course of a continuity of purpose, pattern continuity, pattern continuity.  The distinction between that type of behavior which readily implies persistence, repetition, and what happened here.  Which is a single continuous event on one day that lasted in the neighborhood of an hour, hour and a half and that's it.  Never happened again.  Nobody came back.  Key distinction.

So I ask you to think about the distinctions because

128

we can look at videos all day long and you've been watching them all day long, but now it's time to look at them with these distinctions in mind and as we do, we start to appreciate you know what, these distinctions give rise to reasonable doubt about the elements.

Now, we're thinking critically.  We're engaging the same videos from a different perspective.  I'm applying the elements.  I'm appreciating distinctions and you know what, there is an enormous amount of reasonable doubt here.

Because the first thing I'm going to tell you about my client's conduct is it was a little obnoxious, the yelling, the screaming, you know, and the Spanish words and the English words that, you know, are a little vulgar.  But there was nothing criminal about it.  Nothing that she did satisfies the elements of these federal charges.  And that's an important distinction.

So with these distinctions in mind, let's now go back over some of the videos and I know you've seen them.  But let's do it with a fresh eye or a fresh set of eyes if you will.  And I'd like to begin with Government's Exhibit No. 8 and let's begin at the beginning.

These are the defendants.  The defendants. Ms. Raygoza, Ms. Brown, Ms. Samane, they all have names.  In this trial they are defendants, but they're individuals, passionately speaking out against ICE.

129

And they begin on August 28th in the morning, they're parked downtown and they happened to see this vehicle go by. Yeah, I was about to do that, yeah, no, thank you, I appreciate.  I really do appreciate you doing that.

And they think it's a government vehicle, it looks like one and they're right, they're not wrong.  My client was affiliated, associated with this group ICE out of LA, what does that mean?  ICE out of LA.  She was carrying in her heart the anger that so many people have about what's been going on, and speaking of that.

We had testimony from the agent, he used a fancy word, a little sanctimonious, if you don't mind me using that word, he wants you to think that he's a unique kind of ICE agent.  He is involved in dealing with people convicted of sex trafficking crimes and they're ready for deportation.  That sounds a little bit about the Trump policy and that we're just getting rid of worst of the worst, a little oblivious as to why a group like ICE out of LA exists in the first place.

THE COURT:  What did you say about the Trump policy?

MR. NICOLAYSEN:  The notion --

THE COURT:  What did you --

MR. NICOLAYSEN:  -- the ICE agent's testimony that he --

THE COURT:  Why did you make it Trump policy?

MR. NICOLAYSEN:  Well, I'm just making the comment

130

that --

THE COURT:  Why did you mention Trump?

MR. NICOLAYSEN:  Our federal government policy.
It's --

THE COURT:  Well, I mean --

MR. NICOLAYSEN:  -- the testimony --

THE COURT:  -- it was unnecessary for you to mention
Trump.  Trump is not the issue in this case.

MR. NICOLAYSEN:  Well, I agree with that.  It's about
the context --

THE COURT:  And the policy, one way or the other, if
people think it's good or bad is not the issue.  What the
defendants felt about ICE may be relevant in your argument, but
not Trump or the policy.  Trump is a buzz word, don't use that.

MR. NICOLAYSEN:  The agent's testimony about what he
does at ICE I think is a matter worthy of your careful review
as jurors.  Because he painted himself in a light that seems to
be very appealing.  He deals with the so-called worst of the
worst, individuals already convicted of these horrible sex
trafficking crimes and we don't have evidence in this case one
way or the other about the actual nature of his day-to-day
work.

But I ask you as jurors who have every right to
accept or reject the testimony of any witness to consider
whether or not that characterization of his work is a little

131

self-serving, whether it in fact, it's correct.

Because I think there has been an effort here by both the agent and his wife to portray themselves in an overly positive light as victims, without appreciating what this case speaks to, which is the anger of people in the community against ICE, the passions that run strong, and a group like ICE out of LA that has the Instagram account, so there is already an established movement, an organization that rallies public indignation against this institutional practice.

And we see the focus in this video, Government No. 8 is directed at ICE. They don't know who's driving this vehicle, they don't know if there's one person or multiple people, they have no idea. This is not a targeting of this Agent Reyes, his identity, that would all come out later, but they are definitely looking at this vehicle as an ICE vehicle, he has no rear license plate, they think of that, and they're right as characteristic and so they decide to follow the vehicle wherever it takes them.

And let's listen to what they say. And I'm going to need to get this here. I'm going to stop recording (sic) for just a moment and then I'm going to go back. Hold on, just one second. Okay.

Would you be kind enough, you said this yesterday, what is the sound activation feature on this, if you know?

**(Pause)**

MR. NICOLAYSEN:  Your Honor, I'm just trying to activate the audio.  For some reason it doesn't want to act --

THE COURT:  Daniel, can you help him?

MR. NICOLAYSEN:  That should work.

(Pause)

MR. NICOLAYSEN:  Your Honor, it's just the matter of the audio.

THE COURT:  My --

MR. NICOLAYSEN:  Give me a moment, if I may please.

THE COURT:  -- deputy is pretty technically able, maybe he can help.

MR. NICOLAYSEN:  Sure.  And I was using it just fine during the trial, but for some reason it doesn't want to cooperate.  It doesn't want to work.

(Pause)

(Video played at 1:53 p.m.)

MR. NICOLAYSEN:  I am playing Government's Exhibit No. 8.

THE COURT:  Okay.

(Video played at 1:53 p.m.)

MR. NICOLAYSEN:  I'm going to ask you to listen for a reference to Home Depot.

As we listen to this video what we notice is there's nothing about the person driving this being discussed.  The individual who is driving the vehicle is in no way at all a

133

target of what they're doing.  This has nothing to do with the driver.  This has to do with ICE.  Comments like how are these vehicles allowed to drive without license plates, with -- the perception is that that's a characteristic of an ICE vehicle.

So as the case begins as the story of August 28, 2025 begins, it's a story directed entirely at the agency, not at the individual and that's critical, both for purposes of assessing an intention to quote/unquote doxx, which is a public word, not a legal term, publicly disclose restricted personal information about an individual or to stalk an individual.

The focus is not on the individual except to the degree of his relationship with the agency.  It's all about the agency and that's why this video was so instructive as it begins our story.

**(Video played at 1:56 p.m.)**

**MR. NICOLAYSEN:**  Now, we hear the comment, they don't see us.  So our three individual defendants here have absolutely no idea if it's one driver or a group of ICE agent, they're following an ICE vehicle wherever it's taking them.

And they are livestreaming pointing out to followers, this is where the ICE vehicle was going, okay.  But the comment, so they don't know we're following.  That's critical in this case because this case is about a so-called conspiracy to disclose the information about this one person and to stalk to this one person and his wife, but it's really a story about

134

following an ICE vehicle with an expectation that it's probably going to go to a raid, some ICE related event.

**(Video played at 1:58 p.m.)**

**MR. NICOLAYSEN:**  ICE is in Baldwin Park, we hear that repeatedly on this video.  That's how the story of this case begins.  It's not, let's follow this guy home or wherever he's -- it has nothing to do with the person or the people if there are more than one in the car.  It's ICE.  ICE is in Baldwin Park.

This ICE vehicle are going somewhere and we are part of a group, ICE out of LA, streaming to their Instagram account and we want people to know so there could be a protest against whatever ICE is going to do in Baldwin Park.

Now, what we see happening in this case is the vehicle of the agent coming to his street and interesting things happen that are directly relevant to the elements charged.

The agent drives down the Chelsfield Street cul-de-sac, parks his car at the curb, a public spot, where anybody could park, he doesn't park in his driveway, it's clearly established, he doesn't go into his home.  He doesn't do anything that flags his actual address.

Anybody can park wherever he parked.  He claimed I think he said, well, I pulled in my driveway to turn my car around.  We can do that with anybody's driveway if we just need

EXCEPTIONAL REPORTING SERVICES, INC

135

to turn the car around and we're just going to take a quick second and pull in and turn.

He doesn't pull into his driveway and so there is no behavior by the agent that discloses where he lives.  And what's important is that our three individuals here don't care because they're following the vehicle and at that point, they have no way of knowing if there are going to be other ICE vehicles coming and there might be some deportation event on that street.  Who knows.

But then the agent gets out of his car and he goes directly into the family vehicle where his wife is waiting with the two children in the back seat, minor children.  And they apparently had some plans and they were going to go somewhere.

None of the three individuals here do anything to block the car.  There was some suggestion, and I think it was in my opinion, it was very misleading testimony to give you jurors the idea that maybe the defendants were surrounding their car.  That's nonsense.  That's not on any of the videos, it didn't happen.

So once the ICE agent, Mr. Reyes get into the family vehicle, they had every opportunity to simply go.  And he's law enforcement.  So he knows that he could just drive to the Baldwin Park Police Station if, in fact, he thinks they're going to follow him, he can easily do that.  And, in fact, that would be the smart thing to do.

136

But he chooses to do something very different, which I think directly contradicts any suggestion that he or his wife are victims in this case. He chooses to get out of his car and confront Cynthia Raygoza and turn this into a face-to-face street confrontation.

But what's interesting this about street confrontation, not only does it directly contradict stalking, but it also creates a certain level of humor, while there's nothing funny about this trial, there is a certain element of humor that we can't overlook. Because what we're going to see in this next video, which I know we've seen, but I want to play these portions again is the agent basically mocks Cynthia Raygoza and the others. He plays along.

They're filming him, my client Cynthia Raygoza is definitely filming him and he does the same thing. All right. I'm going to film you too. There's no substantial emotional distress in that and there's no stalking event.

And all the while my client in particular is the one yelling, there's an ICE agent who's on your street. The address is never stated. They don't even know the address. They're saying he's here on the street. Is that enough for restricted personal information? And I say the answer is no.

The instruction that gives the definitional standards for Count 1, which is what we would call the doxxing charge, the conspiracy to publicly disclose restricted personal

137

information about a covered person has some definitions in it. This is Instruction No. 11.  Every instruction is equally important and the Court will tell you that, but as a defense attorney I ask you to give a particular attention to certain ones that I believe are worthy of special consideration and Instruction 11 defines restricted personal information as the social security number, that's not this case.

The home address, that's the issue in this case. Home phone number, not an issue.  Mobile phone number, not an issue.  Personal e-mail not an issue or home fax number of an identifiable to that individual, not an issue.  So in order to convict my client or any of these individuals on Count 1, you would need to find that there was a conspiracy to publicly disclose the home address, that ingredient of the term restricted personal information that applies particularly to this case and there was no agreement to do that, that wasn't even their intention.

Their intention was my client -- speaking specifically for my client, Cynthia Raygoza to attract attention and bring people down who came later after the agent and his wife had already left, the police were there by that time, but to tell them, look, there's an ICE agent here in Baldwin Park on this street.  That's not a conspiracy to publicly disclose the home address.

Another element is covered person.  Was the agent a

138

covered person?  Sort of an interesting issue and something worth considering.  Covered person is also defined in Instruction 11, it means any officer or employee of the U.S. or any agency of the U.S., fair enough.  Mr. Reyes is an employee of a federal agency.

While such officer or employee is engaged in or on account of the performance of official duties.  On account of means because of, so there are two pieces to that definition and it's clear from Mr. Reyes' testimony that when all of this was happening, he was going home, he's in an informal dress shirt.  He's clearly not engaged in the performance of official duties, I think the Government agrees with that.

So then the question is, okay, are the events of this case the type that involve Mr. Reyes as a covered person in the sense that the defendant's behavior applies on account of the performance of his -- the defendants are behaving because of his official duties.

And the answer is the defendants went to that street to protest the presence of ICE.  It is so important to look at that video and I'm going to go into Exhibit -- Government's Exhibit 6 and show this face-to-face confrontation because the instruction is all about an individual, but in fact, they weren't there to confront him individually, they were there to sound the alarm in general terms.  They never mentioned him by name, they didn't know his name.

139

They didn't mention his address, they didn't know his address. The defendant -- I keep saying the defendants, because we're here in a criminal trial. Ms. Raygoza is out there saying there's an ICE agent here on the street, speaking in generalities.

He is the one who makes it a confrontation particularly with her and that actually has some value in the question of covered person, because we know for a fact he's not engaged in his official duties, but are these individuals undertaking this protest behavior because of his official duties, and the answer is no.

He, the agent, made this whole incident about him through his confrontational behavior, getting out of the vehicle and going up to Cynthia and just hanging out filming Cynthia and his wife joined him as well and we'll do this on the video.

So there's an issue here as to whether he even qualifies as a covered person. So there's no restricted personal information that any of these three individuals are agreeing to disclose because they only speak about the presence of ICE on the street and there is reasonable doubt as to whether the agent under these unique circumstances even qualifies as a covered person.

And please allow me to emphasize the importance of thinking along the lines of reasonable doubt, because and I'll

140

speak for myself too, we go through life, black and white, it either is or it's not, I have to make decisions and there's an easy tendency to live in a kind of an either or way of approach things. So either it is restricted or it's not restricted personal or either he is a covered person or he's not.

That's actually not the analysis. The analysis is whether there's reasonable doubt in this unique case as to whether or not what was being disclosed qualifies as restricted personal information. There's reasonable doubt as to whether in this unique circumstance his position being off work and dressed, were they behaving in a way that is because of his official duties. And I say for those reasons, the verdict has to be not guilty on Count 1 for sure.

But let's now look more closely at the way the agent himself went on the offensive. Engaged in confrontational behavior that was totally avoidable. And now he wants to be a victim. And that is indicative of someone who is not stalked and clearly was not in any way experiencing any type of emotional distress, although he would want you to think to the contrary.

So let's go through this and this is Government Exhibit 6. And I am going to fast forward. Yeah, I've got to lock it in, you're right. And this one I'm going to fast forward.

**(Video played at 2:11 p.m.)**

141

**MR. NICOLAYSEN:** So this is my client walking up the street speaking about ICE, not mentioning any address, not mentioning any name and filming and this case is all about filming.

And so for those who don't know Spanish, she's saying immigration authorities are here.

So now we see the agent in the passenger seat, this is Government Exhibit 6, at timestamp 2:09. He's in the passenger seat, he's next to his wife who's driving, we know the kids are in the back seat, there's no obstruction. Nobody is standing in front of the vehicle trying to block them. No one is coming up to them and trying to frighten them, they could leave, they could speed away, Ms. Raygoza is on the sidewalk, we've seen her walking up the street, we just saw a little bit of that, but when you look at the video in your deliberations, you'll see, she's been walking way up the street and it would take quite a while for the three of them to get back to their vehicle if they wanted to actually speed after the agent's vehicle.

So the agent and his wife could just -- he could say to her, hit the gas pedal and let's go. And they're gone. Very doable. It was their choice to stay. This is really important because this trial puts all the responsibility on each of these three defendants here. When, in fact, we see right now at this point in the video, he's deciding to come

142

out.

But what did we learn during cross-examination about his equipment.  He has his 9 millimeter, it was loaded and it was chambered, he felt very secure.  And so he knew he could come out with his gun under the shirt, I'm sure that's where he had it, and the kind of calmness, what I would argue to you is cockiness is very reflective of being armed and up against three women who are armed with cameras, cell phone cameras.  They are there to film, that's all they're doing.

And so here we now see him get out and let's remember that's his choice.  He's doing --

**(Video played at 2:14 p.m.)**

**MR. NICOLAYSEN:**  And there is Cynthia Raygoza extending her hand telling him don't touch me.  And she's backing off from him.  She is in no way whatsoever an aggressor, he's an aggressor.  He is instigating a confrontation.  He is imitating what they do.  That's the sort of ironic aspect to this case, that he gets out and says, he knows they're not threatening.  They're getting on his nerves, they annoy him and they irritate him.  Those are not the charges before you.

So he says, okay, I'm going to do to them what they're doing to me.  And so out he comes with his camera and we have this almost absurd confrontation where they're both filming each other and we have this video as well, but he is

143

actually intimidating her and she's backing up and backing up and backing up and that's why I did take a moment during the trial to bring out this completely fallacious allegation that he made that got her arrested that she pushed him, because it couldn't be further from the truth.

He was the aggressor towards her.  She's extending out her hand and saying, this is not about anything physical, we are not here to do anything physical, there will be no injuries, there will be no property damage, we are here to film, that's what we do.  And neither stalking or the so called doxxing is established by that behavior and by that intention.

Her outstretched hand here at 2 minutes and 30 seconds --

**(Video played at 2:16 p.m.)**

**MR. NICOLAYSEN:**  And I'm pausing at 3 minutes and 17 seconds, again Government Exhibit 6.

So we see the agent being the aggressor, if anyone is trying to intimidate anyone, it's him towards her and she is backing up, clearly showing she has no intention to do anything more on that occasion than to record.

Now, the agent wanted to legitimize his behavior.  So the way he described it on the witness stand was to say, well I got out of the car to conduct an investigation.  And I ask you as jurors to reject that completely, that's just a lot of self-serving nonsense.

144

Again, he could have just said to his wife, hit the gas pedal, let's get the hell out of here.  That would have been the right thing to do.  But instead, he wanted to go on the offensive as an ICE agent and so he does this, tries to intimidate her.

She backs off and what we see is that there is a prolonged stand off on the sidewalk where he exhibits a very cocky, very self-confident air about himself, as he continues to film her, my client.

Let's remember he's armed.  He's not afraid of anything.  And he has no reason to be afraid.  These are three women who are there with cameras, but observe his demeanor and one of the most important parts of a juror is to assess demeanor for credibility on the witness stand but also demeanor on the videos as to what his state of mind is, because there is a claim that they suffered substantial distress which I think is completely unsustainable.

And as we watch this next section starting at 3:17 on Government Exhibit 6 observe the wife.  She's standing there next to him.  And ask yourself, what is she doing getting out of the vehicle, what purpose does that serve?  Is she there to conduct an investigation as well?  She certainly doesn't fit into his rationale?  And oh, by the way, there are two kids in the back.

One of is a three year old autistic child, this is

145

the end of August, they're being left unattended.  What does that tell us?  How responsible is she being if she wants to be perceived as a victim?

So let's look at this segment of the video.

**(Video played at 2:19 p.m.)**

**MR. NICOLAYSEN:**  Now, one of the things that makes the case a little bit of a challenge is that my client is vulgar.  She uses insulting language.  It is what it is.  But that's not what she's charged with.  It reflects the passions that can sometimes, you know, cross the line of social decency, but crossing the line of social decency is not the crime what she's charged with.

And so as her counsel, when I play this, and my goodness, I'm letting my client's vulgarity be played yet again, it's because that's not what she's charged with.  And that's once again the distinctions, we must appreciate distinctions between vulgarity on the one hand that may be indecent conduct versus the type of conduct that she specifically -- each of them is specifically charged with.  This is not stalking behavior.  This is just a face to face free confrontation that does not track the elements of the stalking statute.

Are they getting into each other's face?  Well, he's certainly getting into her face and they're both standing their ground.  But let us not forget that what matters here is not

146

what's coming out of her mouth, but the elements of the offenses.

And so we must sort of go past this --

**(Video played at 2:21 p.m.)**

**MR. NICOLAYSEN:** So we see both the agent and his wife here filming, she's filming, he's doing just fine. As an ICE agent, he's having no trouble whatsoever, getting in my client's face and having this stand off. I think he's even enjoying it, but of course, at a trial it has to be presented very differently, he has to be a victim.

I ask you to look at these videos again with the distinctions, look at the behavior, look at the demeanor, this is not someone who is being stalked, this is someone who is engaging in a face-to-face confrontation and the wife, here she is filming calmly, calmly next to her husband who has a gun. And yet here on the witness stand she cries.

So the videos directly contradict the type of impression that she has tried to convey at this trial, that we have to look at these videos with a critical eye and see that.

**(Video played at 2:23 p.m.)**

**MR. NICOLAYSEN:** Okay. Now, I'm going to fast forward to minute 10:30 and this is later in the episode where Agent Reyes's wife's Jessica --

**(Video played at 2:24 p.m.)**

**MR. NICOLAYSEN:** -- gets out of the car.

147

So the wife is in the driver seat, and she's going to back up into one of our defendants here.  And again, going on the offensive.  It's all about them going on the offensive.  While the videos show each of them and my clients included, what they're doing is filming, video after video they're filming, they're not do any property damage, no vandalism, nothing physical, it's all filming.

And this is why the presence of the Baldwin Park police department is actually very constructive because the three individual defendants here continued to do exactly that when the police arrived, they didn't stop filming.  They didn't say, oh, we've got to put our cameras away, the cops are here.  Not at all, they continued filming.

And guess what?  The police did not arrest them.  The police recognized that the defendants were within their legal rights to film.  That's very interesting.  There's no stalking here and there was never a mention of the agent's name or his actual address and the prosecution said, well, they livestreamed one digit away from his address, 12837, he's 12847, you know, that -- that's just a street position, that's the house where they gathered and put their car, 12833 and 12837, you'll see on the map that's in evidence or adjacent to each other, that's where the defendants parked and then the next house up is 12843 and then you get 12847.

So the fact that there's a one digit difference

148

between the address livestreamed and the agent's address has no relationship to what the individual defendants intended or, you know, there's no conspiracy, it's just where they parked.  So they're letting people know this is the house.

And what we see in this shot here at 10:31 which is really all over the place on many videos is one of the women holding a camera and that's what they did for the entire event.  But the agent and his wife nonetheless went on the offensive and as we see in this episode --

**(Video played at 2:26 p.m.)**

**MR. NICOLAYSEN:**  -- show up (inaudible).

The three defendants were ready to go.  This is 10:43 of Government Exhibit 6.  Defendants wanted to leave, they wanted to get out of there.  It was the agent and his wife who prohibited them from leaving.  Just as the agent and his wife prolonged the entire street encounter by getting out of their car instead of driving away and having this face-to-face confrontation.  And so the agents --

**(Video played at 2:27 p.m.)**

**MR. NICOLAYSEN:**  Now we see the agent, this is 10:53 leaning against the defendant's vehicle, leaning against it very calmly on the phone presumably with his office, he's on the phone quite a bit and he has his back to at least one of the defendants.  He's not paying attention to the defendants and it's very important, and as you go over these videos, it's

149

like he doesn't seem to have his eye on where these three people are.  He doesn't care.  He knows they're not a threat. they're not a threat, although he wants to portray it, and he's blocking them from getting out and then the police arrive.

Not a victim.  The stalking statute has a particular standard that must be met.  And one of the parts of that standard is a phrase and I ask you as jurors to pay particular attention to and it is Instruction No. 12.

The phrase is, quote, course of conduct, unquote. I'll read just a piece of the instruction, one of the elements is that the defendant pursued an intention through a course of conduct that made use of an interactive computer service, another element.  The defendant's course of conduct caused, attempted to cause or would reasonably be expected to cause substantial emotional distress to the agent, the wife, or a member of the family.

Course of conduct is a very important component here. Why is that?  Well, on the second page of Instruction 12, there's a definition of course of conduct.

Now, in your average stalking case, it wouldn't be so much of an issue, because as we tend to think of stalking, we think of it as persistent, repetitive, a person doesn't know when to quit --

**THE COURT:**  I don't know what an average stalking case is.  There's no evidence about that.

150

**MR. NICOLAYSEN:** All right. Understood.

So what the law here requires is the following. A quote, course of conduct, unquote, is a pattern of conduct composed of two or more acts evidencing a continuity of purpose.

Pattern, continuity of purpose. Now, I argue to you as jurors, that one would reasonably be expected to find evidence of repetition and persistence. We would look for that kind of evidence. But this type of evidence does not exist in this case.

This is not a case that presents evidence of a pattern or continuity of purpose and I think we established that very clearly on cross-examination. This case is isolated to August 28, 2025 within a one and a half hour approximate time period on that one day. There was no interaction between any of these defendants and the agent or his wife before that date or after that date. No evidence at this trial presented by the Government, because it didn't exist, that any of these three women ever even knew who the agent was or his wife, certainly didn't go to that Chelsfield Street location before the date or after that date, did not try in any way whatsoever to reach out to them, didn't make any social media postings about them. Didn't try to get their e-mail address, didn't contact them electronically, didn't show up at any locations where the agent or his wife were present. Nothing like that.

151

This case is August 28, 2025.  There's no pattern. And there's no continuity of purpose.  On that basis alone, this critical element of the stalking statute has not been satisfied.  And I ask you again as jurors, let's not do either/or, yes it does, it doesn't, it's is there reasonable doubt as to whether the circumstances here establish the required pattern, the required continuity of purpose and the answer is, there is a lot of reasonable doubt in that regard.

I submit to you, ladies and gentlemen, that when you look at all of the evidence, and I've only played portions, it's very important to appreciate the issue of credibility. And as I move now towards the conclusion of my discussion with you, there are just a couple of more exhibits that I would like to share with you from the trial.

And, Your Honor, I'm going to need just a moment.

**(Pause)**

**MR. NICOLAYSEN:**  Okay.  I don't have them on the screen here.  So the first is going to be Exhibit 134 that I will ask you to look at in the jury room, it is in evidence. I'm going to just take one more moment.  I thought I had it here.

And here it is.  I'm showing you Exhibit 134 in evidence.  This is the first of two text messages that I will show you that I covered with Agent Reyes during cross-examination.

152

On August 28th at 1:11 p.m., which is the time in which these events are happening. He sent text messages to his supervisor and one of those text messages says in regard to this episode on the street, one of them quote/unquote assaulted me on the basis of me being an ICE agent.

Now, I'm not going to take up time in this closing argument to play the agent's video. I know that we lawyers take a lot of time, but I'm going to ask you please to make a note of Government Exhibit 21 which is the counterpart to Government Exhibit 8.

I did play Government Exhibit 21 during my cross-examination and it is the agent's own video. He's filming Cynthia Raygoza, while she's filming him. Her filming him, Government Exhibit 8. Him filming her, Government Exhibit 21. They are both filming the same street confrontation from opposite angles because they're both filming each other.

We don't see any indication on any video of any quote/unquote assault, but we do know from the trial that she was arrested for battery and he even claimed it. And here he is saying to his supervisor, while this episode is underway, one of them quote/unquote assaulted me and he put quote marks.

And I confronted him on that he knew it was coming so he had an answer. He had an answer for everything. He had an answer for why I got out of the vehicle and didn't drive way, conducting an investigation and we see on the video some

153

investigation he's conducting.

And I asked him about the quotation marks and his answer made absolutely no sense because the quotation marks are part of that little private world of texting where if he was there in the same room with his supervisor, it would be wink/wink one of them assaulted me.  Got back at her.  Got her arrested.

Okay.  And now he's at the trial wanting to be perceived as a victim.  You know, it's amazing what text messages can do.  They can tell a very different story.  I'd also like to share as I conclude my remarks one more text message and that is Defense Exhibit 135 in evidence.

And now we have once again the agent texting with his same supervisor, this is the next morning August 29 at 11:51 a.m., and the supervisor is saying, hello, checking up on you and the family.  And the agent says, hey, we're good, thank you.

The supervisor says good to hear, please let us know if you need anything, certainly no indication of any distress.  And I asked the agent, you know, Department of Homeland Security, a federal agency has got a health insurance policy, did you seek any counseling.  He told me to ask his wife.

He didn't seek any counseling.  He was fine.  There was emotional distress here.  When we look at the videos, Government's 6 and 21 I played 6 just now, but 21 is the

154

agent's video, you see the agent has no stress during this incident, in fact, he had an enjoyable confrontation with Ms. Raygoza, armed, he knew these three young ladies would never hurt them, never tried to, it was nothing and he could easily just get one of them arrested, which is what he did.

And so despite his efforts to be a victim here at trial, once again the text messages tell the true story. DHS, government agency, we have resources, I asked the agent, did you ever ask for stress leave. You know, it's nice to work for a government agency sometimes, they have these policies, you can take time off, disability, you know, someone stressing you out because they came to your street, I need a little time off.

I asked him, any stress leave. No. His testimony was exactly what he says here in the text message, hey, we're good, thank you. And that text speaks volumes about the reality of this case.

So, ladies and gentlemen, I ask you all to take the time, review the videos and the other evidence before you, and as you do, please think as critical thinkers as you evaluate the evidence specifically in relation to the elements of the offenses. Look for course of conduct, pattern, course of continuity of purpose, it doesn't exist. Look for restricted personal information, it doesn't exist.

Is the agent a covered person? There's reasonable doubt, it could be argued both ways. But reasonable doubt.

155

What was the intention of the defendants?  Were they really conspiring to publicly disclose a home address?  No, for the reasons I discussed.

But there's reasonable doubt as to all of the arguments the prosecution is making to you.  And I ask you to take the time to think this through and to render not guilty verdicts for my client Cynthia Raygoza and I thank you all for your service.  Your Honor, that concludes.

THE COURT:  It's 20 to 3.  We've been at this for a while.  There are three more arguments, both two more defendants can make arguments and the Government has a right to make a rebuttal argument.  I don't know how long that will take.

I'm just mentioning that because, you don't have to raise your hand if anyone thinks you want a recess, a bathroom break, this may be a good time.  So let's do that, okay?  And we'll finish the argument.

THE CLERK:  All rise for the jury.

**(Jurors exit courtroom)**

**(Recessed at 2:42 p.m.; reconvened at 2:58 p.m.)**

**(Jurors present)**

THE CLERK:  Please be seated.

THE COURT:  What person will argue next?  Okay.

//

//

156

**CLOSING ARGUMENT ON BEHALF OF ASHLEIGH BROWN**

**BY MS. CHOI:**  Good afternoon.  My name is Erica Choi and I along with Shannon Coit, have the honor of representing Ashleigh Brown.  This is the first and last time I get to talk to you, so I want to thank you for your attention and your focus and your service the last three days.  We've played a lot of video for you and I won't make you watch it again.  You'll have them with you.  You can refer to them if you want to while you're deliberating.  But now, I get to tell you why Ashleigh Brown is not guilty.

This is a case of Government trying to fit a square peg into a round hole.  They're trying to say that certain crimes happened, but the facts just don't line up with what they're saying.  Thank goodness everything was recorded because the truth is in the tapes.  Let's go through the evidence.  We know Ms. Brown was in downtown Los Angeles.  She saw the ICE vehicle leaving the ICE detention facility area at 12:30 p.m.  The vehicle had no license plates, dark tinted windows, that's ICE.  And believing that this was an ICE raid, Ms. Brown, along with her friends, Ms. Raygoza and Ms. Samane, decided to do rapid response.  You saw the video on the freeway.  They stayed a solid distance behind, and you heard what they were saying.  "That's ice.  No plates.  That's them, no plates.  There's Home Depots within 15 minutes.  There's a car wash here."  And the video caption also says, "Baldwin Park rapid response be

157

alert."

They followed this car to a residential street.  Ms. Brown parks her car in the driveway of 12833 Shellsfield Street.  And Officer Reyes gets into his Suburban where his wife and children are waiting.  And the Reyes family starts driving down and then they notice the masked women and they stop and both Officer Reyes and his wife, Jessica Herrera, simultaneously get out of the car to confront these women.  Ms. Herrera approaches Ms. Brown, who's in the driveway.  And Ms. Brown says, "We're not here to film you.  ICE.  Not you.  ICE is here."  And Ms. Herrera says, "Just -- my husband works in the building.  He -- he's not ice."  And Ms. Brown stops recording when she hears that.

Officer Reyes testified, "If I was acting in the scope of my duties, I would understand why they were there, why these masked protestors would be there."  But that's exactly why they were there.  They thought this was an ICE raid about to happen.  Government Council suggested they should have realized sooner because they -- this is a residential area and not a Home Depot, but ICE raids happen in neighborhoods too.  Ms. Brown had no intention of following an ICE officer home, and it's her intent that matters in this case.  Jessica Herrera told you that once the two of them, like, talked, Ms. Brown stopped recording.  Okay, that's -- we -- maybe we have it wrong.  What's going on here?  And Ms. Brown tried to leave, but she

158

couldn't because Ms. Herrera had moved her car and was blocking the driveway.  And then Officer Reyes got out of the car and physically was standing in front of Ms. Brown's car.  And Ms. Brown is in her car honking repeatedly.  We heard that over and over, and she physically could not leave.

Ms. Herrera called 911 and she told them, "My husband works for a Department of Homeland Security.  People are surrounding my vehicle.  We were trying to leave and they jumped out of nowhere in front of my vehicle."  And she also said they keep grabbing at their waist.  And because of what she told 911, Baldwin Park police arrive quickly with their guns out and their tasers out and they point them at Ms. Brown.  They detain Ms. Brown, they search her vehicle, and they keep her standing on the sidewalk for almost an hour -- 45 minutes, almost an hour.  And Ms. Brown has her phone and she films this entire interaction with the police.  She's live streaming.  The police never tell her to stop recording.  They never tell her remove her mask.  But she's surrounded by police and she's not free to go.  She is free to film.  And while Ms. Brown is being detained unfairly in her point of view, she calls for rapid response.  She wants witnesses to come, record, see what's happening.  That's what this shows.  This was what she posted on ICE out of LA  Baldwin PD targets protestor.  And you'll see that she was -- you can see in this video, there's at least four police officers in front of you -- her and she can't

159

leave.

And while live streaming surrounded by all of these police officers, she announced her location.  Ms. Brown is in the moment.  She didn't plan for any of this to happen.  There was no Agreement.  This is just happening in real time.  And she announces her location and she calls for rapid responders to come support her -- to come support her unfair detention by Baldwin Park PD.  And people do come to that location.  A few -- I think it was sometime later.  They arrive and they start recording the Baldwin Park PD too, and they say some rude things to the police.  And then everyone leaves.  Ms. Brown is -- once she's free to go, she leaves and she never contacts ICE Officer Reyes or his wife.  They never hear from her again.  You would have heard about it if she had done something.

You may not like the language that you heard on the videos.  People sometimes say mean things when they're protesting.  Things that are offensive, things that we all would disagree with and say, that's mean, that's rude.  But protests can be uncomfortable.  That's the nature of a protest.  One of the founding principles of our country is that we have the right to say things and not be charged with a crime.  And that right to protest in public does not end on a particular street on Google Maps.  If you see ICE in the grocery store, on the street, you're allowed to tell them what you think about ICE.  That's not a crime.  That's your right.  So why are we

160

here?  We're here because the federal government has charged Ms. Brown with two federal crimes, and they have the burden of proving each element beyond a reasonable doubt.  This is the highest standard of proof in our legal system.  It's higher than the standard in civil trials.

THE COURT:  Okay.  Just read the instruction, I give it.  Don't talk about other instructions.  You could take the instruction that I gave, use the whole instruction or part of it, and blend it to the evidence that don't go on as you have.

MS. CHOI:  Understood, Your Honor.

THE COURT:  Yes.

MS. CHOI:  You'll have the instruction for beyond a reasonable doubt.  Ms. Brown has no burden to disprove the charges.  I want to make that really clear.  She has a constitutional right not to testify, and she doesn't have to say anything in her own defense.  But you actually did hear from her a lot on the tapes.  You hear what her intent was that day.

And for Count 1, the Government must prove that there was an Agreement that's in the jury instruction, that Ms. Brown agreed with Ms. Samane and Ms. Raygoza to make publicly available the restricted personal information about Officer Reyes.  Restricted personal information has a definition, that's in the jury instructions.  And that's not his face.  It's not his tattoos.  It's not his personal license plate or

the city he lives in.  And it's not his occupation.  It's not illegal to disclose the fact that he's an ICE agent.  So look closely at that jury instruction.  The Government must prove that Ms. Brown entered into an Agreement to make Officer Reyes's home address publicly available.  And you heard no evidence about any Agreement to say his address, because there never was an Agreement to do that.  The Government also has to prove that Ms. Brown entered this Agreement with a certain intent.  The intent to threaten or intimidate Officer Reyes or his family, and this is key.  Here, threaten and intimidate have specific meanings that are going to be in -- the Court instructed you.  It's the intent -- it's directing a threat to a person with the intent of placing that person in fear of bodily harm or death.  Not the fear that somebody might drive by or show up outside on your street.  It's the fear of bodily harm or death.  There was no such intent.  Ms. Brown was calling for rapid response for herself, and that's it.  You can trust the tapes.

For Count 2 this is also defined in the jury instructions that the Court gave.  And I want to focus on, again, in two things.  Again, intent.  Ms. Brown had no intent to harass Officer Reyes or his family.  No intent to intimidate them. She followed and recorded because she thought this was an ICE raid.  Ms. Brown did call out at one point to his neighbors, an ICE officer lives on this street.  And again, that's perfectly

162

legal.  That's not harassment or intimidation.  He does work for ICE.  He is (indiscern.).  And that's what this is really about.  ICE deportation Officer Reyes didn't want his neighbors to know that he's ICE.  He doesn't like being protested, but it's completely legal to film and protest ICE on the public street.  And it's legal to tell his neighbors what he does.  Ms. Brown didn't cyber stalk him.  She wanted to leave, and she tried to leave.  As soon as she was allowed to, she left.

The Government must also prove a course of conduct of cyber stalking.  And that's defined as well, and you should look closely at the jury instruction.  The Government, in its argument, said it's just two steps.  It's not two steps.  It's a pattern of conduct composed of two or more acts evidencing a continuity of purpose -- continuous purpose.  There was no continuity of purpose here.  Ms. Brown recorded on the public street, which is her right.  Even ICE Officer Reyes said that.  Ms. Brown was detained and searched and questioned, and as soon as she was free to go, she did, and she never came back.  If the Government had any evidence that any of these three women went back there or caused somebody to go there, you would have heard it in the last three days because it's their burden.  Ms. Brown did not repost this video.  She didn't try to contact Officer Reyes or his family.  There's no pattern of stalking here.

Officer Reyes talked about seeing a video that his

163

daughter showed him of Ms. Brown's video that was reposted onto multiple other accounts with, like, text and comments from other people on it.  Those comments have nothing to do with Ms. Brown and has nothing to do with her intent specifically. Her intent is what matters.  What strangers said behind their keyboards about what they saw online, that cannot be imputed onto Ms. Brown.  Those were not her words.  Jessica Herrera came and told you how this event on that afternoon affected her, and she has a lot going on.  She has a lot on her plate, but Ms. Brown did not stalk her or her family.

So look at the tapes.  What happened on Chelsfield between Officer Reyes, his wife, Ms. Brown, and her friends only lasted a few minutes.  There was a lot of confusion, yelling, clearly a lot of misunderstanding between everybody, but there was no crime.  Officer Reyes was upset and he reacted aggressively because he thought he had been intentionally followed home, or his other theory, somebody had been waiting for him.  We know Ms. Brown didn't do that.  That was never her intent, but that's what he thought, and that's why he reacted the way he did.  Ms. Brown thought she was following a car full of ICE agents going to do enforcement, and she was going to do rapid response.  Now we know that it was just Officer Reyes and he was going home.  Ms. Herrera was emotional because she thought people were filming her children.  We know that that wasn't true, but that's what she thought in the moment.  Each side

164

made mistakes, but mistakes are not crimes.  Perhaps the biggest mistake of all though, has been committed by the federal government.

The prosecution's case agent, Special Agent Kurtz, watched the same videos you've seen, and for months, repeatedly, he asserted that Ms. Brown had doxed Officer Reyes.  He said in September in a sworn Complaint to have her arrested that she had said his home address and livestreamed it.  And he swore it again in November to get a search warrant for all of her Instagram data.  He and his analysts had months to review these videos, the same ones you've been watching, and somehow they didn't correct their mistake.  And for the past six months, the prosecution has used all the resources of the federal government, everything they have, to gather evidence from open sources, Ms. Brown's Instagram accounts, all the data, everything in her phone, to find anything else to support these charges.  They have nothing else to show you.  The Government rushed to judgement.

Officer Reyes, contrary to any of the video evidence, claimed that Ms. Raygoza had pushed him.  He knew filming is not illegal, and so he said -- and he told his boss at work that one of the women had assaulted him.  From the beginning, the federal government has tried to create a crime out of something that was not a crime.  They rushed to find a way to prosecute Ms. Brown.  They got basic facts wrong.  And now

165

they're here asking you to find Ms. Brown guilty of crimes that just do not fit these facts.  The Government got it wrong.  You, the jury, have the power to check their mistakes.  This has gone far enough.  Stop their mistakes once and for all.  You have the legal duty to do that.  There was no conspiracy to stay at Officer Reyes' home address.  There was no stalking, and the truth is all in the tapes.  Thank you.

MR. BERNSTEIN:  May I, Your Honor?

THE COURT:  Mr. Bernstein.

CLOSING ARGUMENT ON BEHALF OF SANDRA SAMANE

BY MR. BERNSTEIN:  All right.  Good afternoon, ladies and gentlemen.  Again, my name is Robert Bernstein, and I represent Ms. Sandra Samane, seating at the end.  You haven't heard much about Ms. Samane in this trial.  You've heard a lot about Ms. Brown and Ms. Raygoza, but you've heard very little about Ms. Samane.  There's a reason for that.  She didn't do much.  In fact, she did nothing.  She did not commit a crime.  She was present in a situation.  And what this case comes down to is exactly what did Sandra Samane do.  And has the Government proven the elements of the crime to you beyond a reasonable doubt.  All Sandra Samane was doing was exercising her constitutional right to political speech.  To let people know she disapproves of ICE activities and that ICE was present and that ICE was going to be in Baldwin Park that day.  There was no Agreement to commit a crime.

166

These three women were following an ICE vehicle on what they thought was going to be an ICE raid.  They were going to follow it, and they were going to document it with their phones, and they were going to let the citizens of our country know about it.  Regardless of your feelings or what your positions are in ICE activities, Sandra and her friends have a right to their opinion and a right to express it.  That is not a crime.  Even if these prosecutors want to criminalize her speech, it doesn't make it a crime.  They have to prove beyond a reasonable doubt that she committed a crime, and she did not.

I told you at the beginning of this entire case, you were going to basically see everything that happened here because you did.  In fact, you've probably seen it more than you want to see it.  We've seen these videos over and over again.  The entire interaction was about 10 to 12 minutes.  Almost all of it was recorded.  These women were on their way to an ICE raid.  Ultimately, they found themselves in a residential neighborhood, although they thought they were probably going to a Home Depot.

Now, the Government stated in their closing argument, once they got in a residential neighborhood, you knew that they intended to dox somebody.  That's not true.  Because ICE doesn't just arrest people at Home Depots or car washes.  We know, we watch the news, we watch social media.  They go into residential neighborhoods and arrest people.  That's what ICE

deportation officers do, like Mr. Reyes. So they did not know they were following an individual. They thought they were following a patrol, an ICE raid, and they were going to document it. But it ended in a residential neighborhood, but it had nothing to do with doxing. Ultimately, they didn't even know Agent Reyes existed until he got out of his car and confronted them. They're walking around the street wondering what's going on, saying, "Is ICE happening here?"

The entire confrontation starts when ICE Agent Reyes gets out of his vehicle and confronts Ms. Raygoza. There was no reason to do that. He and his family were in no danger and there was no fear. They were sitting in their car with their children in their car seats ready to leave. We know they waited somewhere between two and five minutes before they left. Why did they do that? Agent Reyes told you he called his wife on his way home, said, "Be ready to go, have the kids in the car." He gets home, he gets out of his ICE vehicle. He gets in the car with his wife and children, and they don't leave. We know from the video it was at least two minutes and seven seconds. It was probably closer to four or five minutes. They wait and they're watching what these people are doing. They could have left. They were in no danger. There was no fear. There was nothing for them to fear. At that point, ICE Agent Reyes steps out of the car and confronts Ms. Raygoza.

Now, my client, Sandra Samane, was standing nearby. Do I

168

approve of everything that these women did that day and the language they used?  No.  I think it was distasteful, it was obnoxious, and it was rude.  But that doesn't make it criminal.  Speech may be ugly, but it's free.  Freedom of speech in this country is the most important thing we cherish.  Even as Ms. Raygoza said these things, you never heard Sandra Samane say anything.  She never adopted the statements Ms. Raygoza said.  She never repeated them.  She never endorsed them, and she never encouraged them.  She merely was witnessing and filming on her phone.  She merely was bearing witness to what was going on.  She said almost nothing in this entire interaction.  The law does not allow you to find guilt simply by association, simply by her mere presence at this scene.

The Government must prove through the evidence that she committed these crimes beyond a reasonable doubt.  And you must consider that evidence independent to each of these three ladies.  So in regards to my client, Sandra Samane, you must weigh the evidence and determine, did they prove the case against her separately from the other two?  And if you do that, I submit to you, you will have no choice but return a verdict of not guilty.

Let's talk about the two charges here.  I'm going to do them in reverse order because I'm going to start with the count of stalking.  We're saying stalking, but as you read the instruction, it's actually a crime of cyber stalking because it

169

requires that this course of conduct happen.  It requires that they prove that my client, Sandra Samane, harassed, threatened, or intimidated Agent Reyes by means of electronic communication or the internet.  Again, she did a course of conduct resulting in harassment, intimidation, or threats by electronic communication.

Now, I don't even have to argue this because the Government cleared her of this charge.  Agent Kurtz told you he did a complete examination.  Sandra never live-streamed.  Sandra never posted anything on social media.  Sandra never used the internet.  Therefore, one of the key elements of the crime is gone.  The fact that she did not use the internet or electronic communications means you must find her not guilty.  But let's take it a step further.  Agent Reyes told you.  I asked him, "Did Sandra ever threaten or harass you?"  He said no.  So the two elements of the crime of stalking are gone from the Government's own case.  She -- the victim says he was never harassed or threatened by her.  And Agent Kurtz said she never live-streamed.  She never posted anything on the internet or on social media.  Therefore, for the crime of stalking, you must return a verdict of not guilty.  The second charge is conspiracy to disclose the information of Agent Reyes or doxing, as it's called, more commonly.  As you've heard from the judge's instructions and from both other Defense attorneys, there's a lot the Government has to prove here.  They must

170

prove that Sandra reached an Agreement with one or both of these to dox Agent Reyes.  Where is the proof of that Agreement?  There's none.  It doesn't exist.  We saw the video of their entire drive.  There was never any discussion about doxing anybody because there was no Agreement to do it.  They were going to document an ICE raid.  Had nothing to do with Agent Reyes.  They didn't know he existed.

If there's no Agreement, there's no conspiracy.  If you want to say that there was anything that they did wrong, it was their attitudes when they got there.  But again, political speech is not a crime.  Nothing was directed against Agent Reyes.  This was about ICE in general.  They had no evidence that they intended to -- where's the Agreement?  Where's the proof of the coordination?  Where did any of them -- and all these recordings say, "You know what?  We're going to dox him.  We're going to let everybody know his home address."  You never heard that once in any of these recordings.  And that's a required element and proof which the Government must do.  And they didn't prove it here because it didn't exist.  No Agreement to do this existed, and you must return a verdict of not guilty.  Now, ultimately, after this interaction was over and Baldwin Park Police showed up, Ms. Brown was detained.  And while live streaming, she did say the location she was.  She wanted her followers to know where she was.  But that had nothing to do with doxing Agent Reyes.  And Ms. Samane had no

idea she was going to do it because there was no Agreement there.  There was no coordination.  They weren't working together to commit a crime.  These were three women exercising their political speech and their First Amendment right.  Whether you agree with it or not, it is protected speech.  It is not a crime.  And these prosecutors are trying to criminalize their speech, and it is your duty to say no and find them not guilty.  It is a lack of evidence and it's disgraceful what our federal government is doing.  And based on all of this, I'm asking you to do the only thing you can do here, which is to return a verdict of not guilty.  Thank you.

**THE COURT:**  The Government has an opportunity to make a rebuttal argument.

**REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT**

**BY MR. MPARE:**  Nothing that you heard during this phase of trial is evidence.  These are all arguments by myself, Government Counsel, and Defense Counsel.  The evidence shows that Defendants followed Mr. Reyes home.  You'll recall Exhibit-8, that's the video of them following Mr. Reyes home.  Watch the video.  There's no dispute that at this point, Defendants might have thought they were following Mr. Reyes to an ICE operation.  That's likely what they thought they were doing.

But Exhibit-6 shows you, at a certain point, Defendants got not only to Mr. Reyes' neighborhood, but filmed him in his

172

family car with his wife and kids.  And the first thing they do when they film him is describe his tattoos.  Not he's going to an ICE operation, not anything about the status of the neighborhood and the concern that something is happening there. The evidence is that Defendants were live streaming and spoke to their followers.  That they described who Mr. Reyes was. Defendant Raygoza said, "Get that face, get that face." Defendant Brown says, "The neighbors didn't know," Oh, sorry, what is -- she says, this is an ICE agent.  This is where he lives, apparently.  They're both live streaming this.  Both Defendants Raygoza and Samane walk down Mr. Reyes' street yelling to the neighbors that they have an ICE agent as a neighbor.  This isn't about a protest at this point.

The evidence shows that Defendants acknowledge that they follow ICE officers.  Both Defendants Samane and Brown tell respectively Mr. Reyes and Ms. Herrera that that's what they do.  They followed one ICE officer home.  Exhibit-6 shows you that Defendants knew that he was home, that he came home to quote, "hide behind his wife and child."  That now neighbors quote, "Know he's ice."  That quote, "Everyone knows who you are."  And it's everyone, because Defendants are live streaming.  They're talking to their viewers, the hundreds or thousands that Ms. Brown told Mr. Reyes about -- or Ms. Herrera about.  They spread the information, both online and in Mr. Reyes' neighborhood.  Both Defendants Samane and Raygoza

173

were walking through the neighborhood.  Both of them were announcing what Mr. Reyes does for work.  And this information didn't just stay in the neighborhood.

Now, you've heard a lot about the address, that it wasn't actually Mr. Reyes' address, that Defendants never actually disclosed that address, and as such, there could not have been a conspiracy to dox Mr. Reyes.  But what the evidence actually showed was, despite not naming that address, which in fact isn't a required element that we must prove beyond a reasonable doubt, the internet knows where Mr. Reyes lives.  And in fact, the internet attributes this knowledge to ICE out of LA, Defendant Brown's social media account.

Now, there are a couple of other points that I want to address from defense counsels' arguments.  So you heard a lot about the course of conduct, and you'll have these jury instructions with you, but a course of conduct in your instructions is defined as a pattern of conduct composed of two or more acts evidencing a continuity of purpose.  You may consider each communication between the Defendant and Mr. Reyes or his family members as a separate act.  There are several communications between each Defendant and Mr. Reyes.  In fact, not just the videos, but you will have the evidence in front of you about the language the Defendants used in Spanish, Exhibits 32 to 41.  Exhibit-33:  Asshole; remember those tattoos; have a good look at the asshole.  Exhibit-34:  an ICE agent lives

174

here.  The family is ICE.  He has a Gringo wife and is a traitor.  Exhibit-35:  This motherfucker is immigration.  The one in the black truck is immigration.  He's immigration, the motherfucker.  Shut your mouth, shut your mouth.  Hiding behind your wife and son, you fucking bastard.  All the neighbors know what you are.  All the neighbors know what you are, motherfucker.  Let everyone know.  Let everyone know. Defendant Brown:  Immigration on your street.  Defendant Brown: Immigration, immigration in the neighborhood.  Defendant Raygoza:  Get the fuck out of our way, faggot.  And Defendant Samane, calling Mr. Reyes an idiot.  Not just these exhibits; you can look at all of the videos.  Each of those is a separate act.  And you only need to find that there were two acts by each of these Defendants that intimidated or harassed during that course of conduct.

Now back to that course of conduct.  You heard some things about the time it took.  That's not what matters.  Look at the instructions for stalking.  All that matters is the steps taken, the distinct set of acts.  It could have been five minutes, it could have been five years.  The steps taken are what matter.  And consider the steps taken.  Defendants wore masks.  Defendants drove for 30  minutes to Mr. Reyes' neighborhood.  They started live streaming in his neighborhood, and they started sharing information about his homes -- his home and his car and his appearance after starting those live

streams.  They harassed with language; they harassed with the suggestion that they were going to disclose this information on the internet; they intimidated; they made them feel fear.

Now you also heard that Mr. Reyes didn't feel any fear, but that's not what he testified to.  He said the first thing he thought was that there could be danger for his family.  He said the first thing he thought was do I need my firearm.  He didn't draw it outside of the car, because he realized that there was no immediate danger.  But his first thought was fear.  Fear for his bodily safety.  Fear for his family's safety.  And it doesn't have to be just Mr. Reyes.  If you for one reason or another believe based on the videos that he wasn't scared, Ms. Herrera clearly testified about her fear.  And not just fear about her being recorded, but also the current fear she has.  That she doesn't leave her house without long sleeves on.  That her children are fearful.  That her son no longer goes to school in person because of these incidents.  That they moved from their neighborhood because of these incidents.

Now there were a couple discussions about technical terms for the doxing statute, and again, the instructions as you have them control.  But I'm just going to show them to you.  So restricted personal information, this section right here, one piece of restricted personal information, the home address.  The covered person, this right here, just relates to Officer Reyes, because that officer was targeted on account of the

176

performance of official duties, and "on account of" means "because of".  Officer Reyes was targeted because of his job as an ICE officer.

You hear a lot about the agreement and how there was no evidence that there was an agreement.  Well, consider all of the steps Defendants had to take in their agreement to disclose or try to disclose the personal information of Mr. Reyes.  They had to go to his home, they had to get out of their cars, they had to find where his car was parked, they had to record his car, they had to approach his family car, zoom in on his face, and try and find out as much information as they could about him and his family.  They had to survey the neighborhood and find addresses that they could read out --

MS. CHOI:  Objection, not in evidence.

THE COURT:  I think there was some evidence about moving around the neighborhood.  That's my recollection; it's the jurors' recollection that controls.

MR. MPARE:  And said different addresses in the neighborhood.  You also heard about Mr. Reyes' demeanor, that he was aggressive, and that he and his family should have left. Recall testimony from Mr. Reyes about the incident, that it didn't make sense to leave for a couple of reasons.  1) Because he didn't know who these people were and whether they were the only people who were still there; 2) because if he left, he would have no idea what was happening at his home; and 3)

177

because he didn't know if there were any other pieces of information that Defendants had about them.  Because remember, this incident didn't start because Mr. Reyes got out of the car, this incident started because Defendants followed Mr. Reyes home and once they got to his home, walked to his personal car and announced to the internet what his tattoo looked like.  And you heard testimony that Mr. Reyes heard that, and that's why he got out of the car, coupled with the fact that his wife told him, "I think these people are following you," and coupled with the fact that he remembered that he had seen in his rearview mirror this same car, this same four-door black sedan that is registered to Ms. Brown's husband.  He had seen that car.  So those were the pieces of information he was putting together.  You're supposed to use your lived experience to come to conclusions about what the evidence shows.  Mr. Reyes had all of those pieces of information and made the right choice, in his opinion, the one that he said he would do all over again, to get out and find out what these women wanted with him.  And if he hadn't done that, he wouldn't have found out.  He wouldn't have found out that these women wanted to do exactly what they did.  They wanted to engage in a course of conduct to intimidate or harass Mr. Reyes or his family that caused emotional distress, and they wanted to disclose information about Mr. Reyes on the internet.  If he hadn't gotten out of the car to figure that

178

out, if he had just gone about his merry way, he has no idea -- he would have had no idea what could have happened next.

There's been a lot of talk about reasonable doubt, and there are two things that are very special about the United States Criminal Justice System.  The first is that a jury of the Defendants' peers gets to decide the case.  The second is that the Government owns the burden.  Defendants have no obligation to do anything because they're presumed innocent.  The Government must affirmatively make its case.  Yes, that's important.  And as you read the instruction, you'll hear that what the Government has to prove is that you're firmly convinced of Defendants' guilt.  Review the evidence.  Recall the testimony of Mr. Reyes and Ms. Herrera.  Recall the evidence that was introduced about what happened once this information was disseminated, that people in fact did come to the family's neighborhood, that the Reyes family did in fact move.  There may not have been any further contact with these Defendants, but the damage had already been done.  They had already gotten the information out.  Get it out, get it out, that's what Defendants consistently encouraged their viewers to do.  They meant for their words to harass and intimidate.  Now there's been a lot in this trial about what Defendants can and can't do.  And the word protest has come up a lot.  Use your common sense.  What protest involves three people targeting a wife, a husband, and his two children, on a neighborhood where

179

no one else is?  No signs, no picketing, no bullhorns, no parade.  Three women, two parents and their two children.  You heard about some of the good work Defendants do in expressing their speech.  You heard about their social media followings and the information they spread about people's rights.  But this wasn't that.  Watch the videos.  There's no discussion of what's happening.  There's no discussion, and in fact there is no enforcement operation happening doors down from Mr. Reyes' home.  No.  That information was shared for something much more dangerous, so that someone else knew exactly where Mr. Reyes and his family lived, exactly what his face looked like, the exact route he takes home from work, the exact tattoos that he and his wife have, the exact car they drive around when Mr. Reyes is not in his work car, and they suggested -- do with this what you will.  They didn't head back from Baldwin Park to another location that their rapid response team had shared with them, or --

            MS. CHOI:  Objection, facts not in evidence.

            THE COURT:  I don't remember anything about what the rapid response team shared with them.  Are you sure of that?

            MR. MPARE:  They didn't leave after realizing there was no ICE operation in the neighborhood.  This case isn't about ICE.  It's about Mr. Reyes.  It's about what Defendants did to Mr. Reyes at home, away from his place of work and away from anything the Defendants disagreed with about Mr. Reyes'

180

work.  Defendants are well within their rights to speak, to post.  They're not on trial for any of the other hundreds of social media posts that their accounts have published.  They're on trial for following a man home, for intimidating him, for harassing him, and for inviting others to do the same by sharing information with him online.  It can't be the case that simply because of someone's profession they should be followed home, harassed, threatened and intimidated; that their entire family is subject to that same treatment; that they should have all their information about their homes, their cars, and their jobs, their kids online for anyone to see.  Think about a few other situations.  The doctor who works in an abortion clinic.

MR. BERNSTEIN:  Objection, Your Honor, this is improper argument.

THE COURT:  Sustained.

MR. MPARE:  Think about what that would mean for anyone who does work that is controversial to people in society.

MR. BERNSTEIN:  Again, it's improper argument.

THE COURT:  I think a controversial position is neutral.  He can make that argument.

MR. MPARE:  There are forums for this, public forums. The sidewalk two doors down from someone's home isn't that forum.  That's harassment.  That's intimidation.  Defendants engaged in this course of conduct to intimidate and harass.

181

They did it by posting on the internet and they did it by driving on the highways directly to Mr. Reyes' home, and they did it in a way that distressed, depressed, scared, and agitated the Reyes family.  They did it knowing that if they disclosed this information, Mr. Reyes and his family would feel threatened.  They did feel threatened.  And they did it knowing that once that information was out, it could never be returned to the privacy and sanctity of a family's home.

### FURTHER INSTRUCTIONS TO JURORS

**THE COURT:**  When you begin your deliberations, elect one member of the Jury as your foreperson who will preside over the deliberations and speak for you here in Court.  You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict whether guilty or not guilty must be unanimous.  Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.  Do not be afraid to change your opinion if the discussion persuades you that you should.  Do not come to a decision simply because other jurors think it is right.  It is attempt -- it is important that you attempt to reach a unanimous verdict, but of course only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and the effect of the evidence simply to reach a

182

verdict.  As I told you before about not being influenced by race, color, or religious beliefs, national ancestry, sexual orientation, gender, economic circumstances, don't be influenced by personal likes, dislikes, sympathy, prejudice, fear, public opinion, or unconscious biases.  It is your duty as jurors to consult with one another and to deliberate with one another with a view toward reaching agreement.  If you can do so during your deliberations, you should not hesitate to re-examine your own views and change your opinion if it become -- if you become persuaded that you should.  I've already given you an instruction about not communicating with anyone or any third party, internet, electronic means, media.  I have an instruction which you'll read which mirrors what I've already said to you.  Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory, what was said.  Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.  The punishment provided by law for this crime is for the Court to decide.  You may not consider punishment in deciding whether the Government has proved its case against Defendant beyond a reasonable doubt.  A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the clerk that you are ready to return

to the courtroom.  If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk, signed by any one or more of you.  No member of the Jury should ever attempt to communicate with me except by a signed writing, and I will respond to the Jury concerning the case, only in writing or here in Court.  If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone, including me, how the Jury stands, numerically or otherwise, on any question submitted to you, including the question of the guilt of the Defendant, until after you have reached a unanimous verdict or have been discharged.  Will the Bailiff come forward?

          **THE CLERK:**  Please raise your right hand and state your name.

          **MR. MADRID:**  David Madrid.

                    **DAVID MADRID, BAILIFF, SWORN**

          **THE CLERK:**  Thank you.

          **THE COURT:**  Okay, regarding Mr. Malar and Mr. Day, you have performed your duties very ably, you've been here punctually.  I've noticed that you've paid close attention to the case.  Unfortunately, the rules only require -- allow 12 jurors to deliberate.  So don't think for a minute that your service was for nought, because it happens more than I like to

184

remember, that something happens to one of the jurors, and if they can't continue on, the trial becomes a nullity.  So you were our safety valves, but -- and performed an important function.  I appreciate your willingness to serve and your service.  So you're discharged with the Court's thanks and appreciation.  Do you have any things in the jury room, you both?  Well, if you don't, would you kindly, Mr. Day, leave through that way.  Thank you again, sir.  And Mr. Malar, would you leave first, get your belongings, and then go home.  Thank you, sir.  I'll give them a few minutes to clear out.

**(Pause)**

**THE CLERK:**  All rise for the Jury.

**THE COURT:**  Okay, the Jury can now decide the case.

**(Jurors exit courtroom)**

**THE COURT:**  Okay, there were a few matters the Defendants wanted to put on the record.  I think Mr. --

**MR. NICOLAYSEN:**  Nicolaysen, Your Honor.

**THE COURT:**  -- Nicolaysen --

**MR. NICOLAYSEN:**  Yes.

**THE COURT:**  -- you wanted to make a record about Moreno.

**MR. NICOLAYSEN:**  Your Honor, I thank you for the Court's time on this.  Should --

**THE COURT:**  I understand your argument.  If you want to make it again, you can.

185

**MR. NICOLAYSEN:** I was also -- Your Honor has already ruled that my subpoena to Officer Moreno would not entitle me to call her as a rebuttal witness against Agent Reyes. This morning I had asked if the Court would consider allowing me to read into the record, if called as a witness, the one statement from her report that rebuts Agent Reyes, and I respect and understand if Your Honor said no, but I would like to read into the record that one sentence from her report.

**THE COURT:** Yeah, go ahead.

**MR. NICOLAYSEN:** So it is Officer Moreno's report at Bate #USAO_00000010, and the statement is {quote} "redacted", which is Agent Reyes, "told me as he was recording the females, one later identified as Cynthia Curiel {in parentheses} (S1) {close parentheses} pushed him" unquote. That's the statement. Thank you, Your Honor.

**THE COURT:** Okay, and the reason that I -- you made your record. The reason that I rejected that offer of proof was I ruled pretrial that the issue of whether or not Defendant Raygoza pushed Officer Reyes was a collateral to this case. And looking at the video, it would be difficult to determine and it would be, in effect, another trial. And I did that in considering 403, there -- in terms of what preceded the offer of proof, Moreno was asked first whether he remembered that he told Moreno that he was pushed by Defendant Raygoza, he said he couldn't remember. He was asked that question again and then

186

said -- his answer was "you're making it up," or something like that, which seemed more of a no.  But he had used that term with regard to other questions, too.  In any event, I think it was too collateral, there's also a question of whether or not Moreno recorded the statement correctly or not, and that would inject more of a side issue.  And further, I thought that you had the opportunity to argue regarding that, and I listened to your argument, and I thought, notwithstanding my ruling on Moreno, you got your point across.  So that's -- that was my reaction.  I think Ms. -- someone else had an offer of proof. Did you -- what --

MS. COIT:  Ms. Coit.

THE COURT:  Yeah, that would be with Defendant Brown, right?

MS. COIT:  Yes, for Defendant Brown.  I just wanted to put on the record the Court had ruled that one of our witnesses, our investigator, could not testify.  I wanted to put on the record that he would have introduced Exhibits 273 to 277, so that is known for the appellate record.  I also want to raise --

THE COURT:  Well, what are those exhibits?  I mean --

MS. COIT:  Oh.

THE COURT:  -- I -- are those the window tinting?

MS. COIT:  No, Your Honor, this was the issue about

187

whether Officer Reyes' information was public and not, so therefore them, you know, publishing even, you know, any information about him.

THE COURT: Yeah, I know --

MS. COIT: Okay.

THE COURT: -- I've ruled about that as a matter of law. So if I'm wrong, I'll be corrected. In other words, the way I read the statute, the statute can be accomplished whether it was in the phone book or not.

MS. COIT: Yes, Your Honor, I just wanted to make --

THE COURT: Oh, you made a record.

MS. COIT: I just make -- one additional thing is that I didn't object during closings -- during -- I'm sorry, during the Government's opening or rebuttal. They had -- the Government had argued that -- you know, about Officer Reyes being affected because his information had been made public, and so I just want to put on the record that --

THE COURT: Well, I missed that part. Would you explain that again?

MS. COIT: Yes, Your Honor. During the Government's opening and rebuttal, it made arguments that -- I have -- you know, that once your -- you know, your private information is out there and that's affecting him, this would be both for the doxing and for the stalking statute, and, you know, how would it make you feel to know your information became public. So

188

the -- what we were -- the defense had planned to do was show that his information actually was public, including through a name change application.  That would have been -- I believe it's Exhibit-34, that states the names of his children and his address.

THE COURT:  So your position is that someone could have researched that name change.

MS. COIT:  Correct, Your Honor.  It had already been out in the public.

THE COURT:  All right.

MS. COIT:  Not his name change, but yes, his personal information.

THE COURT:  I understand, okay.

MS. COIT:  Okay, thank you.

THE COURT:  You've made a record.  All right.  So --

MS. CHOI:  Just one question, if I may, Your Honor. The two alternates were -- I believe they were discharged and I -- maybe I'm just not thinking this through, but if something happens with the jury --

THE COURT:  Well, you know, I used the wrong term. They should have been dismissed, but we can get them back anyway, okay?  Is that all right?

MS. CHOI:  Thank you.  Just wanted to make sure.

THE COURT:  Yeah, I probably should have used a better term of art.  All right, it's 7 after 4.  I generally,

189

when they're deliberating, I go as long as they want, I mean, within reason.  I mean, I do remember -- of course, this was a long time ago, when I was trying one of my early cases with the Department of Justice.  I hate to say what year it was, because in case my appearance don't give me -- don't give it away, I'm not 25.  But I remember I tried a case in Baltimore and the Judge told the jury to stay as long as they want.  They came back 11:30.

MR. BERNSTEIN:  Your Honor, what time -- should we wait until Daniel tells us that they've left, before we leave tonight?  Should we wait until we're informed that the jury has left before we leave later?

THE CLERK:  Exactly.  I'm going to take down your contact information right now.

MR. BERNSTEIN:  Thank you.

THE COURT:  Oh, by the way, I did change the verdict form, so it's now simple.  You can give them the verdict form and the jury instructions.

MR. BERNSTEIN:  Good.

(Court in recess from 4:08 p.m. to 5:03 p.m.)

(Outside the presence of the jury)

THE CLERK:  All rise.  Please be seated.

MR. NICOLAYSEN:  Your Honor, my client had gone downstairs.  She's on her way up.

THE COURT:  (Inaudible).

190

MR. NICOLAYSEN:  I understand.  I do.

THE COURT:  Okay.

(Pause)

MR. NICOLAYSEN:  Your Honor, we are here.  My apologies for the delay.

THE COURT:  Okay.

(Pause)

THE CLERK:  All rise for the jury.

(Jurors entering the courtroom)

THE CLERK:  Please be seated.

THE COURT:  Its -- we're present with the parties, counsel, and the jury.  I'm informed that the jury -- it's five after 5:00 -- would like to recess for the evening and continue their deliberations tomorrow.  That's fine with the Court. Again, the admonition, don't talk to each other.  Don't talk to anyone at home or anyone about the case.  Don't make any effort to access anything about the case in any media, electronic communication, Google, Facebook.  You know what I'm referring to.  As I've said continuously throughout, it's your view of the evidence, as guided my instructions, that counts.

If you -- when you come back tomorrow at 9:00 o'clock, some -- hopefully, you all come back timely.  But if some come back -- return at five to 9:00, ten to 9:00, different times, and there are just a few of you there, don't begin your discussions about the case.  You can only discuss the case when

EXCEPTIONAL REPORTING SERVICES, INC

all 12 of you are together as a jury, okay?  Yes.  And, with that, have a pleasant evening, and we'll see you tomorrow. Thank you.

THE CLERK:  All rise for the jury.

**(Jurors exit courtroom)**

**(The Court speaking off microphone)**

THE COURT:  So when I exit here, not I can't -- it's far away enough I can't hear or see them.  But when they file out, if I leave at the same time, we meet.  And so I have to wait until -- and there's a little corner that I --

UNIDENTIFIED SPEAKER:  You're hiding.

THE COURT:  -- hide in a corner, and I wait until they leave.

**(Laughter)**

THE COURT:  And, I mean, it's very awkward.  The problem is that this building -- I keep saying that.  It's a broken record -- was designed by an architect who never designed a Courthouse.

**(The Court conferring with the Clerk)**

THE COURT:  We have an issue.  I'm glad I stayed here.  I'll say it quickly because she may be here.  Juror #1 doesn't want to come back tomorrow because she has anxiety. I'm going to bring her in here.

MR. BERNSTEIN:  Can you release the --

THE COURT:  Juror #1 is Saldibar, Saldibar, I think.

192

Yes, okay.  Yes.  Would you take, Ms. Saldibar, your appointed seat?  You can sit right there.  That's okay.  Any seat's fine, okay?  Ms. -- you may be seated.  Ms. Saldibar, you have been attendance throughout the trial and paying attention.  And it's very important that you participate in the deliberations because that is, you know, the ultimate part of the case.  I've been informed that you don't want to come back tomorrow.

JUROR NUMBER 1:  Yeah.  So I just want to share what happened yesterday.  One of the people said "hey" to me yesterday outside the building before I come in.  So I reported that --

THE COURT:  Who was that?

JUROR NUMBER 1:  Should I point?

THE COURT:  Yes.

JUROR NUMBER 1:  Yeah, this guy.  He just said "hey." But it made me -- the one in the --

THE COURT:  But I did address that.  And I can assure you I actually was aware of that outside your presence.  I called him to the lectern, and I told him about the incident, and I told him, in no unclear words, that he was not to have any contact whatsoever, even "have a nice day."  And I made it clear to everyone here, and that won't happen again.  That will not happen.  You will be protected, and it won't even -- it won't happen.  And if by chance it does, you let me know immediately through the bailiff.  But I want you to come back

193

and deliberate.  If that's your reason, I want you to come back.

JUROR NUMBER 1:  Okay, I got it.  I will.

THE COURT:  All right?

JUROR NUMBER 1:  Yeah.

THE COURT:  Be sure that you will be protected.  And if any of these people here or anywhere contact you in any way, let me know, and they will be dealt with severely, understood?

JUROR NUMBER 1:  Yes.  Thank you, Your Honor.

THE COURT:  All right.  Thank you, and come back tomorrow.

MS. CHOI:  Your Honor, I'm so sorry.  Would the Court mind inquiring just if this will affect her ability to --

THE COURT:  One minute.  Hold it.

MS. CHOI:  Excuse me.

THE COURT:  Okay.  Okay.  Beyond what you said, there was nothing else that he said to you, correct?

JUROR NUMBER 1:  No, just "hey."

THE COURT:  All right.  So do you -- you can continue, if you come back tomorrow, with the other jurors and decide the case, correct?

JUROR NUMBER 1:  Yes, I will go.

THE COURT:  All right.  Go ahead.  Thank you.

MR. BERNSTEIN:  And, Judge, just if -- ask if it

194

would affect her ability to be fair and impartial.

THE COURT:  I mean, would -- I've sort of asked you. But would this contact affect your ability to be fair and impartial and do what you have to do?

JUROR NUMBER 1:  I will be fair.

THE COURT:  All right, thank you.

JUROR NUMBER 1:  Thank you.

THE CLERK:  Court is adjourned.

**(Proceeding adjourned at 5:14 p.m.)**

195

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____

**Signed**

**March 16, 2026**

**Dated**

*TONI HUDSON, TRANSCRIBER*

EXCEPTIONAL REPORTING SERVICES, INC