CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ERICA CHOI (Bar No. 302351)
(E-Mail: erica_choi@fd.org)
SHANNON COIT (Bar No. 298694)
(E-Mail: shannon_coit@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
ASHLEIGH BROWN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. 2:25-CR-780-SVW-2 |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT ASHLEIGH BROWN'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL, OR FOR A NEW TRIAL** |
| ASHLEIGH BROWN, | |
| Defendant. | **Hearing: May 18, 2026, at 11:00 a.m.** |

The defendant Ashleigh Brown, by and through her attorneys, Erica Choi and Shannon Coit, submits her Reply In Support of her Motion for Judgment of Acquittal, Or For a New Trial.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: April 24, 2026     By  /s/ Erica Choi
ERICA CHOI
SHANNON COIT
Deputy Federal Public Defenders
Attorney for ASHLEIGH BROWN

## TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................1

II. ARGUMENT ......................................................................................................2

    A.    Ms. Brown is Entitled to a Judgment of Acquittal .....................................2

        1.    Ms. Brown's Actions Were Protected by the First Amendment .......2

            a.    *Snyder v. Phelps* Requires a Judgment of Acquittal ..............4

            b.    Ms. Brown's Actions Related to a Matter of Public Concern: Widespread ICE Operations in Los Angeles ...........6

            c.    Ms. Brown's Actions Do Not Fall Within the Narrow Exception for Speech Incident to Independent Criminal Conduct ...................................................................................9

            d.    *Osinger* Did Not Hold Otherwise ........................................13

        2.    The Government Failed to Prove a "Course of Conduct," which Requires "A Pattern of Conduct . . . Evidencing a Continuity of Purpose" ....................................................................................15

        3.    The Government's Brief Relies on Non-Admitted Evidence and Erroneous Assertions About the Court's Prior Rulings .................17

    B.    Alternatively, Ms. Brown is Entitled to a New Trial ................................20

        1.    The Cyberstalking Jury Instruction Misstated the Law .................20

            a.    The Instruction Allowed the Jury to Convict for First Amendment Protected Activity ...........................................20

            b.    The Instruction Incorrectly Stated That "Each Communication Constituted a Separate Act" .......................22

            c.    The Instruction Failed to Distinguish Between Ordinary Emotional Distress and Substantial Emotional Distress .......24

        2.    The Government Repeatedly Misstated the Law During Closing Argument .......................................................................................25

III. CONCLUSION ..................................................................................................26

i

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Adams v. Ford Motor Co.*,
653 F.3d 299 (3d Cir. 2011) ............................................................... 21

*Am. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ......................................................................... 3

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) .......................................................... 11

*Askins v. U.S. Dep't of Homeland Sec.*,
899 F.3d 1035 (9th Cir. 2018) ................................................. 8, 10, 11

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .............................................................. *passim*

*City of San Diego v. Roe*,
543 U.S. 77 (2004) (per curiam) ........................................................ 7

*Cohen v. California*,
403 U.S. 15 (1971) .................................................................... 10, 11

*Dun & Bradstreet, Inc. v. Greenmoss Builders,*
Inc., 472 U.S. 749 (1985) ................................................................. 6

*Frisby v. Schultz*
U.S. 474 (1988) ............................................................................ 8

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) ..................................................................... 10

*Hernandez v. City of Phoenix*,
43 F.4th 966 (9th Cir. 2022) .............................................................. 6

Holder v. Humanitarian Law Project
561 U.S. 1, 16, 21-22 (2010) ...................................................... 10, 15

*Hunter v. Hughes*,
794 F. App'x 654 (9th Cir. 2020) .................................................. 7-8, 10

*Imperial Sovereign Court of Mont. v. Knudsen*,
170 F.th 820, 832, 842-55 (9th Cir. 2026) ............................................ 4

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) (en banc) ......................................... 14, 15

*Obsidian Fin. Grp., LLC v. Cox*,
740 F.3d 1284 (9th Cir. 2014) ..................................................... 6, 7, 8

*Snyder v. Phelps*,
562 U.S. 443 (2011) ................................................................ *passim*

*United States v. Ackell*,
907 F.3d 67 (1st Cir. 2018) ......................................................... 13, 23

ii

## TABLE OF AUTHORITIES

Page(s)

*United States v. Bell*,
303 F.3d 1187 (9th Cir. 2002) ................................................................ 16

*United States v. Boylan*,
167 F.4th 1266 (9th Cir. 2026) ........................................................ 18, 19

*United States v. Davis*,
5:14-CR-240 (E.D.N.C. 2014) ................................................................ 23

*United States v. Enriquez*,
131 F.4th 940 (9th Cir. 2025) ................................................................ 20

*United States v. Fanyo-Patchou*,
2020 WL 4816296 (W.D. Wash. Aug. 19, 2020) ..................................... 15

*United States v. Freeman*,
761 F.2d 549 (9th Cir. 1985) ................................................................. 21

*United States v. Jubert*,
139 F.4th 484 (5th Cir. 2025) .......................................................... 16, 17

*United States v. Nukida*,
8 F.3d 665 (9th Cir. 1993) ..................................................................... 20

*United States v. Olano*,
507 U.S. 725 (1993) .......................................................................... 24, 25

*United States v. Osinger*,
753 F.3d 939 (9th Cir. 2014) ......................................................... *passim*

United States v. Pantchev,
2:21-CR-50-JFW (C.D. Cal. 2021) ......................................................... 23

*United States v. Sryniawski*,
48 F.4th 583 (8th Cir. 2022) .................................................................. 14

*United States v. Yung*,
37 F.4th 70 (3d Cir. 2022) ........................................................................ 9

*Vazquez v. R&L Carriers Shared Servs., LLC*,
2025 WL 1109009 (C.D. Cal. Mar. 7, 2025) ......................................... 16

*Veile v. Martinson*,
258 F.3d 1180 (10th Cir. 2001) ............................................................. 21

**Federal Statutes**

18 U.S.C. § 2266(2) ............................................................................. 15, 16

18 U.S.C. § 2261A ..................................................................................... 21

Fed. R. Crim. P. 29 ................................................................................... 20

**Other Authorities**

ABA Model Rule 3.5(c) .............................................................................. 21

iii

# TABLE OF AUTHORITIES

Page(s)

Geoff Bennett & Winston Wilde, *Homan Vows 'Massive Changes' and ICE Drawdown if Minnesota Officials Cooperate* (PBS Jan. 29, 2026), https://www.pbs.org/newshour/show/homan-vows-massive-changes-and-ice-drawdown-if-minnesota-officials-cooperate ................................................................. 3

USAO Press Release, *Court of Appeals Confirms Conviction of Massachusetts Man Sentenced to 33 Months in Prison for Stalking* (Nov. 5, 2018), https://www.justice.gov/usao-nh/pr/court-appeals-affirms-conviction-massachusetts-man-sentenced-33-months-prison-stalking ................................................................. 24

USAO Press Release, *Virginia Man Sentenced to 12 Years for Cyberstalking and Communicating Interstate Threats* (Mar. 22, 2018), https://www.justice.gov/usao-ednc/pr/virginia-man-sentenced-12-years-cyberstalking-and-communicating-interstate-threats ................................................................. 23

## I. INTRODUCTION

The government does not dispute that it has never charged cyberstalking under circumstances anything like those presented in this case. That is because until now, the government recognized that an hour-long public interaction between two strangers could not conceivably be considered *stalking*. Its brief provides no sound basis for upholding this unprecedented conviction. Indeed, the flaws in this prosecution are even clearer than when Ms. Brown's motion was filed.

A few weeks ago, the Supreme Court reiterated that the government cannot do what it has tried to do here: punish First Amendment protected activity by attempting to re-label it as unprotected "conduct." *Chiles v. Salazar*, 146 S. Ct. 1010 (2026). That holding is fatal to the government's theory of this case. As the government does not meaningfully dispute, Ms. Brown did nothing beyond speak and passively film on public streets—activities that are squarely protected by the First Amendment.

The government's contrary arguments are unpersuasive. The government has no convincing answer for the Supreme Court's decision in *Snyder v. Phelps*, which held that actions much more extreme than Ms. Brown's were constitutionally protected. The government's claim that Ms. Brown's activities centering around ICE's operations in Los Angeles somehow did not pertain to a matter of public concern is plainly incorrect. And its concession that the rights to film and protest extend to residential neighborhoods dooms its "conduct" theory. If the First Amendment protects the right to film and protest on residential streets, it must also protect the act of *driving to* that street to film and protest. The government's theory that the act of driving can be separated out as unprotected "conduct" would render the underlying rights meaningless.

The government's course-of-conduct arguments fare no better. It ignores the ordinary meaning of the statute, which requires a "pattern of conduct" evidencing a "continuity of purpose"—something that self-evidently cannot be formed in seconds or minutes. Instead, its primary response is to fault Ms. Brown for not identifying any case

1

setting a minimum time limit. *Of course* there is no case, because the government has never previously tried to charge cyberstalking based on conduct that lasted less than an hour. But now that the government has aggressively challenged the boundaries of the statute, the Court must enforce its limits. Both the text and common sense make clear that a less-than-hour long interaction between two strangers who never met again cannot possibly supply the persistent course of conduct necessary to commit stalking.

Each of these reasons independently requires a judgment of acquittal. But at the very least, Ms. Brown is entitled to a new trial. The government does not persuasively defend the instructional errors and misstatements of law made in its closing argument. The cases it cites to support the challenged jury instructions are inapt. Each involved repeated harassing communications, threats, and in-person contacts occurring on numerous dates over extended periods of time. By contrast here, Ms. Brown did not speak directly to Officer Huitzilin, distanced herself from the situation, left the scene at the first opportunity, and never contacted him or his family again. At a minimum, the instructional errors and repeated misstatements of law in the government's closing warrant a new trial.

## II. ARGUMENT

### A.    Ms. Brown is Entitled to a Judgment of Acquittal

#### 1.    Ms. Brown's Actions Were Protected by the First Amendment

Before diving into the doctrine, it is worth appreciating the First Amendment interests at stake. There is no dispute that Ms. Brown did not intend to follow Officer Huitzilin to his home—she believed she was documenting an ICE raid and ended up on Chelsfield Street by accident. Once there, she did very little beyond passively filming. She did not confront Officer Huitzilin, she did not yell insults or threats at him, and she did not attempt to invade his property. Instead, she reacted as anyone in that unexpected situation might: she remained in a public area, intentionally kept her distance, intermittently filmed, and tried to leave within minutes, which she would have done had she not been blocked in by Officer Huitzilin's wife.

2

If that could be prosecuted as "cyberstalking," the chilling effects would be enormous. Across this country, ordinary citizens have mobilized to follow and film ICE vehicles to document ICE's activities. These citizen-created videos allowed the public to see firsthand the circumstances of the fatal shootings of American citizens and many other instances of ICE misconduct. They have also been widely credited with persuading the government to change its approach to immigration enforcement— exactly the type of persuasion the First Amendment was designed to protect.[1]

But if unintentionally ending up at an ICE agent's home while filming could result in a felony conviction and up to five years in prison, who would take the risk? It is in precisely these circumstances that the Constitution steps in to provide the "breathing space" that "First Amendment freedoms need . . . to survive." *Am. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021). And it is in precisely these circumstances that the Court's intervention is most needed. Though the jury system has many virtues, when emotionally charged speech is at issue, "a jury is unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the expression of vehement, caustic, and sometimes unpleasant expression." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (cleaned up). It is the role of the Court to guard against this "unacceptable" risk. *Id.*

The government purports to agree that the First Amendment robustly protects the right to speak and film on matters of public concern, including in residential neighborhoods. Opp. 11. But its arguments for upholding Ms. Brown's conviction would render that right nearly impossible to exercise without risking criminal prosecution. Because established First Amendment law makes clear that everything

---

[1] *See, e.g.,* Geoff Bennett & Winston Wilde, *Homan Vows 'Massive Changes' and ICE Drawdown if Minnesota Officials Cooperate* (PBS Jan. 29, 2026), https://www.pbs.org/newshour/show/homan-vows-massive-changes-and-ice-drawdown-if-minnesota-officials-cooperate.

3

Ms. Brown said and did was constitutionally protected, the Court should enter a judgment of acquittal.[2]

### a.  *Snyder v. Phelps* Requires a Judgment of Acquittal

As the Motion explained, the Supreme Court's decision in *Snyder v. Phelps* controls this case. Mot. 10-12 (discussing *Snyder v. Phelps*, 562 U.S. 443 (2011)). In *Snyder*, the Supreme Court held that the First Amendment protected the actions of a group that intentionally targeted a private funeral with extraordinarily offensive messages—including "Thank God for Dead Soldiers" and "You're Going to Hell"— resulting in severe emotional distress to the father of the deceased. 562 U.S. at 448-50. The conduct of the defendants in *Snyder* was much more extreme than anything Ms. Brown did. As the government does not meaningfully dispute, Ms. Brown kept her distance from Officer Huitzilin and did little more than passively film. The Court's holding that the conduct in *Snyder* was constitutionally protected necessarily means that Ms. Brown's was too.

The government has no meaningful response to *Snyder*. It nods at the fact that *Snyder* was a civil case but does not explain how that could matter. Opp. 13. If the First Amendment protects a person from liability for tort damages in a suit by a private party, it certainly protects them from the much-harsher penalty of criminal punishment by the federal government. *See, e.g.*, *Imperial Sovereign Court of Mont. v. Knudsen*, 170 F.th 820, 832, 842-55 (9th Cir. 2026) (applying the same First Amendment analysis to a statute that carried both civil and criminal penalties).

The government also claims that *Snyder* was different because that case involved "pure speech" while Ms. Brown engaged in "conduct." Opp. 13. But any "conduct" Ms. Brown engaged in is materially indistinguishable from what the defendants did in

---

[2] To the extent the government suggests that the jury rejected Ms. Brown's First Amendment arguments, that is simply wrong. The jury was never instructed on the requirements of the First Amendment and was never asked to decide whether Ms. Brown's conduct was constitutionally protected. Indeed, the failure to instruct the jury on that point requires at least a new trial. Mot. 18-24; Section II.B.1, *infra*.

*Snyder*. Like the defendants in *Snyder*, she traveled to a location on a public street—a place the government now concedes is the archetype of a traditional public forum. *See Snyder*, 562 U.S. at 448-49 (noting that the defendants congregated on "public land" next to the private funeral, necessarily meaning that they must have traveled there); *see* Opp. 11 (conceding that residential streets are public forums). And she filmed and narrated what she observed to share it with a larger audience, just as the defendants in *Snyder* took their own steps to attract publicity. *See Snyder*, 562 U.S. at 455 (noting that there was "no doubt" the defendants chose the location of their protest "to increase publicity for [their] views").

The Supreme Court had little trouble concluding that the "conduct" of exploiting a private funeral did not strip away the protections of the First Amendment. *Id.* That was true even though the *Snyder* defendants *intentionally* targeted the funeral, while Ms. Brown ended up on Officer Huitzilin's street only by accident. If the actions of the defendants in *Snyder* fell within the scope of the First Amendment, the same must be true for Ms. Brown's much milder conduct.

The government also claims that Ms. Brown's speech "did not touch upon a matter of concern as the speech in *Snyder* did." Opp. 13. As explained in more detail below, that is obviously wrong. Section II.A.1.b, *infra*. It was undisputed that Ms. Brown ended up on Chelsfield Street while trying to document ICE's operations— something that was the subject of widespread public discourse in Los Angeles at the time. Her speech and filming had a clearer connection to matters of public concern than the defendants in *Snyder* directing messages like "Thank God for Dead Soldiers" and "You're Going to Hell" toward family members attending their dead son's funeral. *Snyder*, 562 U.S. at 448-50. The Supreme Court concluded that these actions deserved the strongest First Amendment protection, and the same must be true for Ms. Brown's.

In short, there is no world in which the defendants' actions in *Snyder* were protected by the First Amendment, but Ms. Brown's much-tamer actions were not. *Snyder*'s reasoning therefore requires a judgment of acquittal.

**b.      Ms. Brown's Actions Related to a Matter of Public Concern: Widespread ICE Operations in Los Angeles**

Although *Snyder* is enough to resolve this case, the government's specific arguments also fail on the merits.

The government first claims that Ms. Brown was not "engaged in politically protected speech about a matter of public concern." Opp. 11. That is a difficult argument for the government to make. Matters of public sweep extremely broadly, encompassing *anything* that "can be fairly considered as relating to *any* matter of political, social, or other concern to the community" or that would be "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453 (cleaned up and emphasis added). The "arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Id.* (cleaned up).

Matters of private concern, by contrast, are limited to those that "concern[] no public issue"—for example, the contents of a private individual's credit report. *Id.* (discussing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985)).

Ms. Brown's activities, which centered around ICE's operations, plainly related to a matter of public concern. ICE's activities in Los Angeles in the summer of 2025 were the subject of widespread news coverage and arguably *the* preeminent topic of public interest. *See Hernandez v. City of Phoenix*, 43 F.4th 966, 978 (9th Cir. 2022) ("Subjects that receive media coverage almost by definition involve matters of public concern." (cleaned up)). Indeed, the fact that hundreds of people evidently watched Ms. Brown's videos itself makes clear that they concerned matters of broad public interest. Mot. Ex. A at 25:16; Mot. Ex. H at 00:38-00:40; *Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1292 (9th Cir. 2014) (blog post was on a matter of public concern when it was "published to the public at large," rather than being "solely in the individual interest of the speaker and its specific business audience").

In resisting this conclusion, the government asks the Court to compare the Supreme Court's decisions in *Snyder v. Phelps* and *City of San Diego v. Roe*. Opp. 12. Ms. Brown welcomes the comparison. As the motion detailed, *Snyder* held that the defendants' activities related to matters of public concern even though they chose a private funeral for their protest and used extraordinarily offensive slogans like "Thank God for Dead Soldiers" and "You're Going to Hell." Mot. 10; *Snyder*, 562 U.S. at 448, 454. *Doe*, by contrast, held only that the First Amendment did not protect a police officer from being fired for making a video of himself "stripping off a police uniform and masturbating." *City of San Diego v. Roe*, 543 U.S. 77, 78, 84 (2004) (per curiam) (noting that the pornographic video "did nothing to inform the public about any aspect of the [police department's] functioning or operation"). Ms. Brown's activities were obviously closer to the protestors in *Snyder* than the rogue police officer in *Roe*—they centered around documenting ICE's operations in Los Angeles. They easily cleared the low bar of being related to a matter of public concern. *See Snyder*, 562 U.S. at 453.[3]

At bottom, the government's position appears to be that because Officer Huitzilin was off duty, the incident necessarily involved only private matters. *See* Opp. 11. That is simply wrong. For one thing, regardless of whether Officer Huitzilin was off duty (something Ms. Brown did not know at the time), the incident began when Ms. Brown observed him driving an official ICE vehicle without license plates, in violation of California law. The government does not—and cannot—dispute that filming a government vehicle, particularly one engaged in unlawful conduct, is a matter of public concern. *Obsidian*, 740 F.3d at 1292 ("Public allegations that someone is involved in crime generally are speech on a matter of public concern."); *Hunter v.*

---

[3] *Roe* is also far off point because it involved a government entity's authority to act against its own employee. As *Roe* explained, "a government employer may impose certain restrictions on the speech of its employees" even though those restraints "would be unconstitutional if applied to the general public." 543 U.S. at 80. *Roe*'s holding that a police officer's public employment could be terminated for making pornographic videos says nothing about whether civilians like Ms. Brown can be criminally prosecuted for very different expressive activity.

7

*Hughes*, 794 F. App'x 654, 654 (9th Cir. 2020) ("Matters of public concern include allegations of wrongdoing, misconduct, or illegal activity by government employees . . . .").

For another, even the government conceded at trial that Ms. Brown reasonably believed that she was documenting an ICE raid in progress—again, something that qualifies as a matter of public concern. Brown Ex. C at 171:20-23; *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018). Once Ms. Brown learned there was no raid, she did not continue returning to Chelsfield Street to harass Officer Huitzilin because of some purely personal motivation; she attempted to leave within minutes and never tried to contact him or his family again. Nothing about the incident on Chelsfield Street suggested that Ms. Brown's activities centering around ICE were "intended to mask an attack on [Officer Huitzilin] over a private matter." *Snyder*, 562 U.S. at 445.

Finally, matters of public concern are not limited to on-duty conduct—indeed, they do not require the involvement of the government at all. *See, e.g.*, *Obsidian*, 740 F.3d at 1292 (a "claim that a mobile home park operator charged excessive rent" was a matter of public concern). They instead encompass anything that would interest the public, as Ms. Brown's videos plainly did. *Snyder*, 562 U.S. at 453.

In short, the First Amendment does not operate on a strict liability basis. If a person intending to document official activity accidentally stumbles upon an officer's residence, the Constitution does not suddenly evaporate. As long as the person remains in public spaces (as Ms. Brown did) and does not engage in independent criminal conduct (as Ms. Brown did not), they may continue to film, or even protest, without risking criminal prosecution. The First Amendment protects their "right to be where they were."[4] *Snyder*, 562 U.S. at 457.

---

[4] Although purporting to agree that the right to assemble and protest applies to residential streets, the government cites *Frisby* to suggest that it was somehow unlawful

8

Because Ms. Brown's activities related to matters of public concern, they "occupie[d] the highest rung of the hierarchy of First Amendment values" and were "entitled to special protection." *Id.* at 452. They cannot be the basis of criminal charges, even assuming they were "upsetting or arouse[d] contempt." *Id.* at 458. And the claim that they caused emotional distress likewise provides no basis for stripping them of First Amendment protection. *Snyder*, 562 U.S. at 450 (overturning a jury verdict despite undisputed evidence that the defendants caused severe emotional distress); *United States v. Yung*, 37 F.4th 70, 77 (3d Cir. 2022) ("The First Amendment protects lots of speech that is substantially emotionally distressing."). Everything Ms. Brown said and did was fully protected by the First Amendment.

    **c.**  **Ms. Brown's Actions Do Not Fall Within the Narrow Exception for Speech Incident to Independent Criminal Conduct**

The government also argues that Ms. Brown's actions fall within the exception to the First Amendment for speech incident to independent criminal conduct. *See* Opp. 9 (citing *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014)). But the government fundamentally misunderstands the scope of that narrow exception.

As the Supreme Court reiterated just a few weeks ago, the question under the speech-incident-to conduct exception "is not whether a law mostly addresses conduct and only sometimes sweeps in speech." *Chiles v. Salazar*, 146 S. Ct. 1010, 1026 (2026).[5] Instead, the exception applies only when the activity at issue "bears a close

---

for Ms. Brown to be on Chelsfield Street. Opp. 11 (citing *Frisby v. Schultz*, 487 U.S. 474, 487 (1988)). But *Frisby* made clear that the restriction it upheld was limited to protests directed **at a single residence**. 487 U.S. at 483. It took pains to distinguish that narrow restriction from a broader ban on "marching through residential neighborhoods" or "walking a route in front of an entire block of houses." *Id.* The government's suggestion that *Frisby* governs activities that undisputedly were not directed at Officer Huitzilin's specific house—indeed, there was no evidence Ms. Brown even knew which house was his—significantly mischaracterizes the limited holding of that case.

  [5] The decision in *Chiles* was issued after Ms. Brown filed her motion (though before the government filed its opposition). She therefore properly addresses it for the first time here.

causal connection to some separately unlawful conduct like a traditional crime"—for example the "sale of contraband." *Id.*; *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) (speech incident to a violation of antitrust laws).

The requirement that the conduct be similar to a traditional crime ensures that the government cannot "recast" protected activity by re-labeling it as conduct. *Chiles*, 146 S. Ct. at 1024-25. For example, in *Cohen v. California*, the Court rejected California's claim that it could prosecute the defendant for the disorderly *conduct* of wearing a "Fuck the Draft" jacket in a municipal courthouse. 403 U.S. 15 (1971); *see Chiles*, 146 S. Ct. at 1022-23 (discussing *Cohen*). And in *Holder v. Humanitarian Law Project*, the Court held that the protected act of providing advice to certain groups could not be recast as the *conduct* of providing material support to terrorism. 561 U.S. 1, 16, 21-22 (2010); *see Chiles*, 146 S. Ct. at 1022 (discussing *Holder*). Similarly, the defendants in *Snyder* could also be seen as engaging in conduct: they sought out and intentionally targeted a private funeral, created inflammatory signs, and then traveled across several states to the protest site. *See* 562 U.S. at 448-49. But because these non-speech acts were inseparable from the defendants' protected activity, it was obvious to the Supreme Court that they could not be penalized. *Id.* at 455-56.

The same result is required here. The government is trying to do precisely what *Cohen*, *Chiles*, and the other Supreme Court cases forbid: recast physical acts that were inextricably bound up with Ms. Brown's protected First Amendment activity as unprotected "conduct." For example, the government identifies the act of following Officer Huitzilin home from work as "conduct" it believes it can prosecute. Opp. 10. But as the government has conceded, Ms. Brown reasonably believed she was documenting an ICE raid. Mot. Ex. C at 171:20-23. And there is no dispute that she actually documented an official ICE vehicle illegally driving without a license plate. Mot. Ex. G at 00:30-00:36. Her acts of documenting these events were not unprotected conduct—they were protected First Amendment activity. *Askins*, 899 F.3d at 1044; *Hunter*, 794 F. App'x at 654.

10

The government's position also cannot be reconciled with its own concession that the First Amendment protects the right to speak and film on matters of public concern, including in residential neighborhoods. Opp. 11. The First Amendment protects not only expressive activity itself but also acts attendant to engaging in that activity. *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-63 (9th Cir. 2010); *see Askins*, 899 F.3d at 1044 ("[T]he process of creating pure speech is entitled to the same First Amendment protection as the product of that process."). The rights to film and protest in a neighborhood would be meaningless if—as the government's brief suggests—it could treat the "conduct" of traveling to the neighborhood as an independent crime. *See Askins*, 899 F.3d at 1044; *Cohen*, 403 U.S. at 16 (state could not charge the defendant for the "conduct" of wearing an inflammatory jacket in a courthouse).

Nor can the government re-label the constitutionally protected acts of filming and protesting in a neighborhood as "in person harassment." *See* Opp. 12. No doubt many individuals who are the target of a protest feel as if they are being harassed—the servicemember's father in *Snyder* did. *See* 562 U.S. at 449-50. But whether protest activity is protected by the First Amendment does not turn on the target's subjective reaction or whether they were physically present. Indeed, the right to protest in a neighborhood—a right the government does not dispute—would be useless if it could be exercised only when no one was around. Instead, the question is whether Ms. Brown had "the right to be where [she was]." *Id.* at 457. Because she remained on public streets and sidewalks—archetypical public forums where she had the right to be—and did nothing but speak and film, her mere presence cannot be punished as criminal "harassment."

The only "conduct" Ms. Brown engaged in was following and filming an official ICE vehicle on public thoroughfares and standing and filming on public streets and sidewalks. She did not confront, threaten violence, or use profanity toward Officer Huitzilin. And within minutes, she tried to leave. The government has not—and

11

cannot—identified any "traditional crime" these protected activities were similar to. *But see Chiles*, 146 S. Ct. at 1026 (emphasizing this requirement). Because everything Ms. Brown did either consisted of First Amendment protected activity or was a necessary component of engaging in that activity, her conduct cannot serve as the basis for a cyberstalking charge.

Finally, the government's claim that this case was only about "conduct" cannot be reconciled with both the cyberstalking jury instruction and the government's repeated statements during closing argument, which informed that the jury that "each *communication*" between Ms. Brown and Officer Huitzilin or his family could be treated "as a separate act" establishing a conviction. ECF 209 (Instruction 12) (emphasis added); Mot. Ex. C at 173:18-20, 174:8-9, 174:12-13 ("You may consider each communication between the Defendant and Mr. Reyes or his family members as a separate act. There are several communications between each Defendant and Mr. Reyes. . . . Defendant Brown: Immigration on your street. Defendant Brown: Immigration, immigration in the neighborhood. . . . Each of those is a separate act. And you only need to find that there were two acts by each of these Defendants that intimidated or harassed during that course of conduct."). Both the instruction and the government itself invited the jury to convict Ms. Brown *only* for her speech—there was no requirement that the jury find separate unprotected non-speech conduct. That the government explicitly prosecuted "speech as speech" makes abundantly clear that this prosecution infringed Ms. Brown's First Amendment rights.[6] *Chiles*, 146 U.S. at 1026 (the First Amendment applies when the government "regulates 'speech as speech'").

---

[6] At one point in its brief, the government claims that "the jury did not convict Brown based solely on her speech." But how could the government know? The government explicitly argued in closing that statements by Ms. Brown—*i.e.*, her speech—were all the jury needed to find in order to convict, a theory that the jury instructions supported. Mot. Ex. C at 173:18-20, 174:8-9, 174:12-13; ECF 209 (Instruction 12). As the Motion noted, the defense requested an instruction specifically to avoid the possibility that Ms. Brown could be convicted only for protected speech, but the Court declined to give it. *See* Mot. 19:16-22 (discussing the defense's objections to the government's proposed instructions).

12

#### d.   *Osinger* Did Not Hold Otherwise

Nothing in the Ninth Circuit's decision in *Osinger* is to the contrary. For one thing, the government appears to misunderstand *Osinger*'s reasoning addressing the facial challenge. Contrary to what the government suggests, *Osinger*'s rejection of a facial challenge does not mean that the cyberstalking statute is constitutional in *every* application. Opp. 23-24 (wrongly characterizing *Osinger* as holding that the statute was "facially constitutional"). Quite the opposite: to defeat the facial challenge, the government had to show only that the statute could be constitutionally applied in *some* situations, leaving the specific boundaries to be set through as-applied challenges in individual cases. *See Osinger*, 753 F.3d at 944 (holding only that the statute was "not facially *invalid*" (emphasis added)). Indeed, as one of the government's own cases recognized, the cyberstalking statute *can* reach "highly expressive conduct," and in those cases, an as-applied challenge is warranted "to properly safeguard the rights that the First Amendment enshrines." *United States v. Ackell*, 907 F.3d 67, 77-78 (1st Cir. 2018). This is such a case.

Nor is *Osinger*'s as-applied reasoning helpful, because the fact-pattern there was dramatically different. As the motion explained, the defendant in *Osinger* committed several acts that constituted traditional crimes: creating a fake Facebook page in his ex-girlfriend's name and using it to post sexually explicit photos, knocking on her doors and windows at early hours of the morning, visiting her place of employment, and sending nude photos of her to co-workers. Mot. 21. The defendant's as-applied challenge failed because, in *Osinger*'s words, he "intended to harass and intimidate a private individual by circulating sexually explicit publications that were never in the public domain." *Osinger*, 753 F.3d at 984.

This case is the opposite of *Osinger* in nearly every respect. Ms. Brown's actions were limited to filming and speaking about the conduct of a *public* official on *public* streets involving only *publicly observable* information. *Contrast id.* And everything she

13

did centered around a matter of public concern—a situation in which the First Amendment's protections are at their apex. *Snyder*, 562 U.S. at 452.

The government's attempt to characterize both cases as involving "in-person harassment," Opp. 10, 12, operates at "far too high a level of generality." *Chiles*, 146 S. Ct. at 1027. There are obvious differences between banging on an ex-girlfriend's doors and windows at "1, 2 in the morning," *Osinger*, 753 F.3d at 941, and passively filming a public official from a public sidewalk in the middle of the day—the first constitutes the traditional crime of trespass; the second is constitutionally protected. Because Ms. Brown engaged only in activity protected by the First Amendment—indeed, the government explicitly asked the jury at trial to convict Ms. Brown for her speech, Mot. Ex. C at 173:18-174:15—the cyberstalking statute cannot be constitutionally applied to her. *United States v. Sryniawski*, 48 F.4th 583, 588-89 (8th Cir. 2022) (cyberstalking statute cannot be applied to someone who engages only in First Amendment protected activity); *Osinger*, 753 F.3d at 954 (Watford, J., concurring) (explaining the problems with such a prosecution).

Finally, although Ms. Brown is entitled to a judgment of acquittal even under *Osinger* as it stands, *Osinger*'s reasoning is clearly irreconcilable with the Supreme Court's recent decision in *Chiles* and therefore no longer good law. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc) (Ninth Circuit opinions are no longer binding when their "reasoning or theory" is "clearly irreconcilable with the reasoning or theory of intervening higher authority"). As *Chiles* made clear, in applying the exception for speech incident to criminal conduct, courts cannot simply ask "whether a law mostly addresses conduct and only sometimes sweeps in speech." 146 S. Ct. at 1026. But that is exactly what *Osinger* did: it upheld the constitutionality of the cyberstalking statute because the "proscribed acts [were] tethered to . . . underlying criminal conduct," and it found it hard to imagine that it could reach constitutionally protected speech. 753 F.3d at 944.

*Chiles* makes clear that this reasoning was wrong.[7] As *Chiles* explained, the mere fact that a statute is written in terms of conduct does not mean that it cannot threaten protected speech—indeed, the Supreme Court's earlier decisions in *Cohen* and *Holder* made clear that conduct-oriented statutes can pose grave threats to speech. *See Chiles*, 146 S. Ct. at 1025. And there is no question that *Osinger* did not address the questions *Chiles* made clear must be asked instead: "whether the law in question restricts speech only because it is integrally related to unlawful conduct" or "whether the law restricts expressive conduct only for reasons unrelated to its content." *Id.* at 1026. Because *Osinger*'s reasoning is irreconcilable with *Chiles*, it no longer governs and does not support the government's position. *Miller*, 335 F.3d at 893.

**2.      The Government Failed to Prove a "Course of Conduct," which Requires "A Pattern of Conduct . . . Evidencing a Continuity of Purpose"**

Ms. Brown is independently entitled to a judgment of acquittal because the government failed to prove the course-of-conduct element of cyberstalking.

The cyberstalking statute defines "course of conduct" to mean "a pattern of conduct composed of 2 or more acts, evidencing continuity of purpose." 18 U.S.C. § 2266(2). As the motion explained, the ordinary meaning of "pattern" requires "frequent or widespread incidence"—a pattern is something that happens in a "regular and repeated way." Mot. 12:23-28 (quoting *Pattern*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pattern). And the ordinary meaning of the phrase "continuity of purpose" is a *consistent* purpose that "does not change or stop as time passes." Mot. 12:28-13:4 (quoting *Continuity*, The Brittanica Dictionary, https://www.britannica.com/dictionary/continuity). The plain text of the cyberstalking statute therefore requires that the conduct persist over an appreciable period of time.

---

[7] Even before *Chiles*, courts questioned the soundness of *Osinger*'s reasoning. *See United States v. Fanyo-Patchou*, 2020 WL 4816296, at *3 n.3 (W.D. Wash. Aug. 19, 2020) ("The Court admits that it is skeptical of how *Osinger* construed § 2261A.").

The government ignores the ordinary meanings of "pattern" and "continuity of purpose" because it has no answer for them. It does not address the definitions provided in Ms. Brown's motion, nor does it try to provide alternative definitions of its own. The closest it comes to offering its own interpretation is the bizarre suggestion that only the passage of *too much* time could defeat a continuity of purpose. Opp. 15. But courts have held exactly the opposite. *United States v. Jubert*, 139 F.4th 484, 494 (5th Cir. 2025) (explaining that the course-of-conduct definition "narrows" the statute by "exlud[ing] isolated statements" and instead focusing on "persistent behavior"). And the government's brief cites no authority to support its claim that the shortness of the period of time is completely irrelevant. Opp. 15:1-16:3 (citing no cases, dictionary definitions, treatises, law review articles, or anything else).

If the government were correct that actions over minutes, or even seconds, could satisfy the course-of-conduct requirement, the Ninth Circuit's decision in *Bell* would have been decided differently. As the Motion explained, *Bell* rejected the claim that preparing to send a fax, and sending a fax, could be subdivided into the separate acts necessary to constitute cyberstalking. *United States v. Bell*, 303 F.3d 1187, 1192 (9th Cir. 2002). The government's brief does not even mention *Bell* because, again, it has no answer for that case. *See Vazquez v. R&L Carriers Shared Servs., LLC*, 2025 WL 1109009, at *5 (C.D. Cal. Mar. 7, 2025) ("Arguments to which no response is supplied are deemed conceded.").

Contrary to the government's claim that "[n]either the statute nor case law impose any specific timeline," Opp. 15, the timing requirement comes straight from the statutory text: there must be a "pattern of conduct" that persists long enough to "evidence[] a continuity of purpose." 18 U.S.C. § 2266(2). And the government's complaints about line-drawing are misplaced, because wherever the line is drawn, this case is firmly on the wrong side of it. *See* Opp. 16 (questioning how the requirement would apply to a defendant "who commits 40 acts over 23 hours"—a fact-pattern nowhere close to the facts of this case). An hour-long interaction between individuals

16

who had never previously met and would never meet again simply cannot be enough to establish a continuous purpose that "does not change or stop *as time passes*." *Continuity*, The Brittanica Dictionary (emphasis added).

Without any authority affirmatively supporting its position, the government attempts to point the finger at *Ms. Brown* for failing to identify a case imposing a minimum duration requirement. Opp. 15. But the government has never previously *charged* cyberstalking based on events lasting less than an hour. As the government does not dispute, *every* cyberstalking case charged in this district since 2009 has involved conduct that persisted for days, months, or even years. *See* Ex. A to Raygoza Mot. It is therefore unsurprising that no court has addressed whether conduct over minutes or seconds could constitute cyberstalking. Before today, no court has confronted that extreme fact-pattern.

Contrary to what the government claims, holding that Ms. Brown's actions did not establish the required course of conduct would not "reward the most efficient stalkers." Opp. 16. Rather, it would uphold Congress's judgment—expressed in the "pattern of conduct" and "continuity of purpose" requirements—that an hour-long interaction between strangers is *simply not stalking*. *See Jubert*, 139 F.4th at 494. Because the government failed to prove that Ms. Brown engaged in a "pattern of conduct" evidencing a "continuity of purpose," a judgment of acquittal is required.

### 3. The Government's Brief Relies on Non-Admitted Evidence and Erroneous Assertions About the Court's Prior Rulings

Apart from the specific issues addressed above, Ms. Brown notes a series of overarching errors repeated throughout the government's brief.

*First*, the government's brief fails to distinguish between the separate defendants, repeatedly asserting that actions were taken by "the defendants" (collectively), when those actions were only taken by Ms. Raygoza or Ms. Samane—not by Ms. Brown. For example, the government's brief claims that the "defendants" screamed at Officer Huitzilin and "verbally attack[ed] him and his family." Opp. 1-2 (detailing statements

17

that the brief itself concedes were made only by Ms. Raygoza). But there is no dispute that Ms. Brown *never* verbally attacked anyone. As the motion explained (and the government does not dispute), Ms. Brown intentionally kept her distance from the confrontation on the sidewalk, and her conduct was mostly limited to passively filming. Mot. 2-3. Similar mislabeling occurs throughout the government's brief. *See, e.g.*, Opp. 14 (listing actions purportedly taken by "the defendants" when many were done only by Ms. Raygoza).

Each defendant must be considered individually. *See* ECF 209 (Instruction 9) (instructing the jury on this point). Whether Ms. Brown's actions were protected by the First Amendment or whether the government proved that she committed the elements of cyberstalking turns on what she did *herself*. The government cannot muddle the clear distinctions between the defendants by attempting to treat Ms. Brown as guilty-by-association with Ms. Raygoza.[8]

*Second*, the government's brief cites evidence that was never admitted at trial. It discusses pretrial release conditions from a separate criminal case against Ms. Brown, even though those were never introduced here. Opp. 2, 14. And it relies on Trial Exhibit 3 (Exhibit A to the government's brief), *see, e.g.*, Opp. 4, even though the government never moved to admit that exhibit into evidence, so it is not part of the evidentiary record.[9] Questions of the sufficiency of the evidence turn on the evidence

---

[8] In a cursory footnote, the government suggests that Ms. Brown's conviction could be upheld on an aiding-and-abetting theory. Opp. 10 n.5. But the government never mentioned aiding and abetting during closing argument, rendering it extraordinarily unlikely that the jury considered it. Brown Ex. C 104-181; *see United States v. Boylan*, 167 F.4th 1266, 1272 (9th Cir. 2026) (rejecting claim that a verdict rested on a theory in the jury instructions that the government never argued). And regardless, even on an aiding-and-abetting theory, it is not enough to "merely associate[] with the person committing the crime," be "present at the scene," or "unknowingly or unintentionally [do] things that were helpful to that person." ECF 209, Instruction 13. The government does not try to specify which (unprotected) actions by Ms. Brown it believes intentionally facilitated specific (unprotected) unlawful conduct by Ms. Raygoza. It does not because it cannot.

[9] The government played one clip from Exhibit 3 at trial, but it never sought to move the exhibit into evidence, apparently because it incorrectly believed it had already

that was actually admitted. The government's discussion of non-admitted evidence must be disregarded.

*Third*, the government claims it "proved each of the eleven acts listed in Count Two of the superseding indictment that constitute defendants' course of conduct." Opp. 14. That is false. The government did not prove all eleven acts listed in Count Two.[10] There was no evidence at trial that "defendants provided directions as they were following R.H. to his personal residence" (ECF 103 at 5 (¶2(c))); and no evidence that "[o]n or about August 28, 2025, BROWN, while livestreaming on social media, zoomed in on R.H. and stated, 'there's the ICE agent - this is where he lives apparently,' and 'now the entire block knows they have an ICE agent living on their street'" (*id.* at ¶2(f)). The remaining "acts" in Count Two describe the defendants following Huitzilin home *by accident* (¶2(a), (b)), Ms. Brown's livestreamed disclosure of her location while detained by Baldwin Park Police (¶2(g)), and statements made by Samame and Raygoza (¶2(e), (h), (i), (j), (k)). Nothing in these facts suggests that Ms. Brown *cyberstalked* Huitzilin, and only underscore why the government did not prove its case.

*Fourth*, the government falsely claims "four or five masked individuals gathered outside the victim's home." Opp. 4. No one gathered outside of Officer Huitzilin's home at 12847 Chelsfield Street. After Ms. Brown announced her location, other masked individuals approached the Baldwin Park Police, filmed the Baldwin Park officers, and yelled at them on the street. Mot. Ex. C at 42:16-21. Then they left. No one "gathered outside the victim's home."

*Fifth*, the government claims Ms. Brown "could have got into Brown's car and drove away," and that she "linger[ed]" to harass Officer Huitzilin and his family. Opp. 3, 23. That is false. As the trial evidence showed, Ms. Brown was quickly blocked in by

---

been admitted. Brown Ex. C at 37:21-24 (AUSA incorrectly describing Exhibit 3 as "admitted" the first time it was mentioned). But Exhibit 3 was never admitted at trial. *See* Mot. Ex. A-C.

[10] *See* Exhibit P, Jury Tr. Day 4, 4-7.

Jessica Herrera's car and also by Officer Huitzilin's body. After BPPD arrived, she was detained and not free to leave. Ms. Brown wanted to leave, but was physically and legally unable to.

*Finally,* the government is wrong to claim that the Court already rejected the arguments here in its ruling on the motions to dismiss the superseding indictment. In deciding the motions to dismiss, the Court was limited to the allegations in the superseding indictment, which it was required to accept as true. *United States v. Enriquez*, 131 F.4th 940, 943 (9th Cir. 2025). It could not have considered the sufficiency of the evidence because no evidence had been presented yet. *United States v. Nukida*, 8 F.3d 665, 679 (9th Cir. 1993) (factual arguments must be raised through a Rule 29 motion, not a pretrial motion to dismiss). At trial, the government failed to prove all of the indictment's allegations, particularly as to Ms. Brown. Mot. 7-10. The Court's pretrial rulings therefore do not control her arguments about the evidence introduced *at* trial.

**B.      Alternatively, Ms. Brown is Entitled to a New Trial**

The government does not convincingly defend against the instructional errors at trial, nor its misstatements of law in its closing argument.

    **1.      The Cyberstalking Jury Instruction Misstated the Law**

        **a.      The Instruction Allowed the Jury to Convict for First Amendment Protected Activity**

The government does not dispute that the plain language of the cyberstalking instruction allowed the jury to convict Ms. Brown for merely "annoy[ing]" Officer Huitzilin with speech that caused him to feel "disappointment," "embarrassment," "dejection," or "shame." And it does not appear to dispute that "annoying" a government official into feeling "shame" could describe all manner of protected protest. Yet it still argues that the instruction did not permit the jury to convict Ms. Brown for First Amendment protected activity. It is impossible to bridge that logical gap.

"Where there is some evidence . . . that the purpose of the speaker or the tendency of his words are directed to ideas or consequences remote from the commission of the criminal act, a defense based on the First Amendment is a legitimate matter for the jury's consideration." *United States v. Freeman*, 761 F.2d 549, 551 (9th Cir. 1985). Ms. Brown requested two jury instructions: one instruction that set forth the essential elements of § 2261A(2), ECF 142 at 16 (Fifth Circuit Model Instruction 2.68(B)), and another that instructed the jury that acts constituting the "course of conduct" cannot consisted solely of speech protected by the First Amendment. ECF 143 at 1, 5-8. The instruction in this case not only quashed her First Amendment defense, it allowed the jury to convict for conduct protected by the First Amendment.

To oppose a new trial, the government argues the jury instruction for "harass" is the same definition used by the Ninth Circuit in *Osinger*. Opp. 19. But *Osinger* does not control. Beyond the fact that *Osinger* involved very different facts and has since been abrogated by the Supreme Court's decision in *Chiles*, *Osinger* was not a case about jury instructions.

*Osinger* involved (1) the defendant's facial and as-applied challenge to § 2261A, and (2) appeal of his sentence. 753 F.3d at 944-45, 948. In his facial challenge, Osinger argued the statute was unconstitutionally *vague* because it did not define "harassment" or "substantial emotional distress. 753 F.3d at 944-45. In rejecting that argument, the Ninth Circuit explained "harass" and "substantial emotional distress" were not *vague*-- that is, they were "not esoteric or complicated terms devoid of common understanding." *Id.* at 945 (citing *Adams v. Ford Motor Co.*, 653 F.3d 299, 307 (3d Cir. 2011) (examining whether an attorney "harassed" a juror in violation of ABA Model Rule 3.5(c)) and *Veile v. Martinson*, 258 F.3d 1180, 1188 (10th Cir. 2001) (examining sufficiency of evidence under Wisconsin's stalking statute)). In parenthetical citations, *Osinger* briefly referenced dictionary definitions citing commonly understood meanings of those terms.

21

The Ninth Circuit did not say that courts should provide those definitions to juries wholesale. To the contrary, since "harass" and "substantial emotional distress" "are not esoteric or complicated terms devoid of common understanding," *Osinger*, 753 F.3d at 944-45, no definitions were needed. Presumably for that reason, the Fifth Circuit model instruction (which the defense requested) left the terms undefined.

At least in this case, it was erroneous to give instructions that permitted the jury to convict Ms. Brown for First Amendment protected activity. For example, the government claims it "presented substantial evidence at trial that Brown harassed [Rogelio Huitzilin] and his family in-person on August 28, 2025," Opp. 20, but tellingly fails to state what that harassment was. Standing on the sidewalk? Recording on her phone in public (which Huitzilin and his wife were also doing)? Honking her horn while trying to leave? Under the instruction, the jury could easily have found that this conduct "annoy[ed]" Office Huitzilin. But there is no question that this conduct was protected by the First Amendment. Because the plain language of the instruction allowed the jury to convict Ms. Brown for actions protected by the Constitution, a new trial is required.

### b.     The Instruction Incorrectly Stated That "Each Communication Constituted a Separate Act"

The government argues "courts across the country" have instructed that juries "may consider each communication between the defendant and [the victim] as a separate act" in stalking cases. Opp. 21. But the cases cited by the government involved numerous emails, threats, and in-person contacts occurring across several dates. There is no dispute there was only one interaction between Ms. Brown and Officer Huitzilin.

The government says there is "no reason why in-person communications should be treated any differently than . . . letters or electronic communications." Opp. 21:21-23. But that only underscores the problem with the instruction here. One letter or telephone call would be *one* communication. Even the government does not claim that it could treat every sentence in a letter or phone call as a separate act, such that writing

22

or speaking two sentences would be enough to satisfy the course-of-conduct requirement. But that is exactly what the instruction did in this case with Officer Huitzilin's *single* face-to-face interaction with the defendants. Because there was only one conversation in this case, the instruction wrongly suggested to the jury that each *sentence* of that conversation could be a separate act. That is especially true because the government explicitly argued that point in closing--claiming that essentially every single phrase each defendant spoke could be treated as an individual act. Mot. Ex. C at 173:18-20, 174:8-9, 174:12-13. The instruction was misleading and grossly prejudicial under the facts of this case.

The cases cited by the government involved significantly repeated contacts between the defendant and victim over months and years. In *United States v. Pantchev*, 2:21-CR-50-JFW (C.D. Cal.), the defendant sent Victim A harassing emails on five different dates, appeared at her workplace to deliver a harassing letter, mailed documents to her work leadership calling the victim disparaging names and including a pornographic image. ECF 23 (Indictment). In *United States v. Davis*, 5:14-CR-240 (E.D.N.C.), the defendant "initiated a relentless campaign of harassment and intimidation" against victim S.B., later sent "email communications . . . which contained detailed threats of violence and rape," and "stalked [S.B.] by threatening her life and the lives of her family, as well as impersonating an FBI agent."[11] And in *United States v. Ackell*, 1:15-CR-123-JL (D.N.H.), between October 2012 and February 2014, the defendant "sen[t] text messages, digital images, and other electronic communications" to a minor victim (ECF 27 (Indictment)), then "threaten[ed] to send

---

[11] USAO Press Release, Virginia Man Sentenced to 12 Years for Cyberstalking and Communicating Interstate Threats (Mar. 22, 2018), https://www.justice.gov/usao-ednc/pr/virginia-man-sentenced-12-years-cyberstalking-and-communicating-interstate-threats.

the victim's [partially nude photographs to her family and friends" and "told the victim that if she ended their relationship, a 14-year-old girl would be raped."[12]

Again, in cases involving phone calls made on different days, it may make sense to tell the jury that each can be considered a separate act. But the instruction almost certainly misled the jury into thinking it could subdivide Officer Huitzilin's single conversation with the defendants into an untold number of separate "acts." Because the government grounded its entire course-of-conduct argument on this erroneous instruction and misstatement of law, a new trial is required.

### c. The Instruction Failed to Distinguish Between Ordinary Emotional Distress and Substantial Emotional Distress

The government argues that because the word "substantial" is part of "substantial emotional distress," it was "built into the legal standard." Opp. 19. That makes no sense. The instruction *defined* "substantial emotional distress" to mean things that are not typically understood as substantial. The jury was specifically instructed to convict if Huitzilin or his wife felt "embarrassment" or "nervousness." Embarrassment and nervousness are everyday human feelings, not substantial emotional distress warranting criminal liability.

When a term is defined in jury instructions, the jury is presumed to follow the definition. The government's theory that the jury would have somehow ignored the definition and applied its own standard of what substantial emotional distress meant has no basis in law or logic. *United States v. Olano*, 507 U.S. 725, 740 (1993) ("[We] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.").

---

[12] USAO Press Release, Court of Appeals Confirms Conviction of Massachusetts Man Sentenced to 33 Months in Prison for Stalking (Nov. 5, 2018), https://www.justice.gov/usao-nh/pr/court-appeals-affirms-conviction-massachusetts-man-sentenced-33-months-prison-stalking

### 2.  The Government Repeatedly Misstated the Law During Closing Argument

The government did not merely repeat the jury instructions in its closing argument. In its arguments, the government told the jury that a course of conduct could occur in five minutes, and that all it needed to do was show that Ms. Brown spoke multiple phrases aloud, regardless of whether those statements constituted a "pattern" or evidenced a "continuity of purpose" as required by the statute. Mot. 25 (citing Ex. C at 105:12-19, 150:2-151:8, 162:9-24, 174:16-20). The government does not meaningfully defend again these points.

The government also should never have broached the topic of "correct" ways to protest. Yet it repeatedly told the jury that the sidewalk on Chelsfield Street is not a "public forum," and that by protesting there, Ms. Brown was engaging in illegal harassment and intimidation. Mot. Ex. C at 180:22-24 ("There are forums for this, public forums. The sidewalk two doors down from someone's house isn't that forum. That's harassment. That's intimidation."); *id.* at 178:23-179:6 (AUSA: "[T]he word protest has come up a lot. Use your common sense. What protest involves three people targeting a wife, a husband, and his two children on a neighborhood where no one else is? No signs, no picketing, no bullhorns, no parade. Three women, two parents, and their two children. You heard about some of the good work Defendants do in expressing their speech . . . . But this wasn't that."). The government's claim that it did not say the sidewalk the Chelsfield Street was not a public forum is flatly contradicted by the transcript of its own argument.

The government's repeated misstatements of law prejudiced Ms. Brown by inviting the jury to conclude she was acting unlawfully by being where she was when in reality, the First Amendment protected her right to free speech on the sidewalk on Chelsfield Street. A new trial free of these misstatements of law is required.

25

## III. CONCLUSION

For the foregoing reasons, the Court should enter a judgment of acquittal on Count Two. In the alternative, the Court should grant a new trial.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  April 24, 2026          By  */s/ Erica Choi*
_____
ERICA CHOI
SHANNON COIT
Deputy Federal Public Defenders
Attorney for ASHLEIGH BROWN

26