**GREGORY NICOLAYSEN (CA 98544)**
**27240 Turnberry Lane, Suite 200**
**Valencia, CA 91355**
**Phone: (818) 970-7247**
**Fax: (661) 252-6023**
**Email: gregnicolaysen@aol.com**

**Attorney For Defendant,**
**Cynthia Raygoza**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) **2:25-CR-00780-SVW-1** |
| | ) |
| | ) **REPLY BY DEFENDANT CYNTHIA** |
| **Plaintiff,** | ) **RAYGOZA TO GOVERNMENT** |
| | ) **OPPOSITION TO MOTION FOR** |
| | ) **POST-VERDICT JUDGMENT OF** |
| **v.** | ) **ACQUITTAL AND ALTERNATIVE** |
| | ) **REQUEST FOR NEW TRIAL** |
| | ) |
| **CYNTHIA RAYGOZA, et al.,** | ) **DATE: May 18, 2026** |
| | ) **TIME: 11:00 a.m.** |
| **Defendants** | ) **CTRM: Hon. Stephen V. Wilson** |
| | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |

Defendant Cynthia Raygoza, through her CJA counsel of record, Gregory Nicolaysen, submits her reply to the government's opposition (Pacer #219) to her post-verdict motion for judgment of acquittal on Count Two of the First Superseding Indictment, pursuant to Federal Rule of Criminal Procedure 29(c), with an alternative request for a new trial pursuant to Rule 33 (Pacer #188).

DATED:  April 24, 2026                   Respectfully Submitted,


_____/S/_____
GREGORY NICOLAYSEN
Attorney for Defendant,
Cynthia Raygoza

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## THE GOVERNMENT'S OPPOSITION IS BASED ON REPEATED DISTORTIONS OF THE TRIAL RECORD

The government's opposition repeatedly misrepresents the trial record, specifically as set forth below:

**Gov. Opposition (example 1):**

". . .screamed at him in front of his wife and young children. . ."  (page 1, ln. 9-10)

**Objection:**

A distortion of the trial record.  The children were always inside the family vehicle.  Raygoza never went up to the vehicle.  And she never screamed at R.H. or his wife.  The videos show Raygoza walking up the street shouting in Spanish that an ICE agent lives on the street.  She did not scream at anyone specifically.  When R.H. exited the family vehicle to confront Raygoza, the two of them proceeded to have a verbal confrontation on the sidewalk with the wife standing quietly alongside R.H.  It was a verbal confrontation between the two of them, plain and simple.  The children remained in the vehicle in the background.  The government's

3

assertion here is yet another distortion of the trial record.

**Gov. Opposition (example 2):**

". . . and live-streamed their address to hundreds, if not thousands, of social media followers, . . ."  (page 1, ln 11-12; page 10, ln 15-18).

**Objection:**

Pure speculation with no support in the trial record.  The defendants did live-stream the event, but there is no evidence as to how many people were observing the live-stream.  Once again, the government is distorting the trial record in an attempt to convey the impression of stalking.

**Gov. Opposition (example 3):**

". . . the defendants . . . followed R.H. in his vehicle from a federal building in downtown Los Angeles to his personal residence miles away in Baldwin Park." "They followed R.H. home from work. . ." (page 2, ln. 2-5; page 10, ln 11-12).

**Objection:**

The defendants did not follow R.H.  They followed a van they believed to be an ICE vehicle.  The trial record is clear that they did not know who R.H. was until

the van pulled into the residential street, and R.H. parked the van and exited.

Stalking is an offense that is specific to an individual.  *See,* United States v. Shrader, 675 F.3d 300, 311 (4th Cir. 2012) ["(i)t is an element of the crime that (the defendant) have intended harm to a particular victim."]. The government is improperly seeking to stretch the facts by claiming that the defendants were following R.H. himself when in fact they were following the van.

**Gov. Opposition (example 4):**

"The defendants livestreamed on their Instagram accounts their pursuit of R.H. in his government vehicle(.)"  (page 2, ln. 6-7).

**Objection:**

The defendants did not pursue R.H. individually.  They pursued an ICE vehicle.  This distinction is critical in a stalking analysis.

**Gov. Opposition (example 5):**

". . . later identified as defendant Raygoza and Sandra Samame, approach R.H. in his personal car . . ." (page 2, ln 15-16)

**Objection:**

Wrong.  The videos clearly show that the defendants did not approach the family vehicle.  Rather, it was R.H. who exited the vehicle and approached defendant Raygoza and they proceeded to have a face to face verbal exchange which each recorded (Gov exhibits 8 and 24).

**Gov. Opposition (example 6):**

"Defendants began to verbally attack R.H and his family."  (page 3, ln. 1).

**Objection:**

The defendants did not verbally attack R.H. or his family.  The word "attack" is a gross distortion.  The video recording at trial shows Cynthia Raygoza walking up the residential street alerting residents in Spanish that an ICE agent lives on their street.  R.H. proceeded to exit his family vehicle, walk up to  Ms. Raygoza and confronted her.  Both R.H. and Raygoza recorded each other during their verbal exchange.  No defendant verbally attacked either the wife or the children, the latter remaining inside the vehicle at all times.

**Gov. Opposition (example 7):**

". . . threatened to 'pop' him, which R.H. understood to mean 'shoot' him." (page 3, line 6-7)

**Objection:**

This testimony was pure exaggeration.   The trial record is clear that in the 911 call, R.H.'s wife told the 911 operator that she did not see any weapons. Moreover, the videos show clearly that the agent was not at all afraid of the defendants and knew that these three young ladies did not have weapons. Moreover, he acknowledged that he had his firearm on his person, so he did not feel threatened at all.  If R.H. felt at the time that the word "pop" really meant to shoot, he would have reacted as a police officer would, particularly given that he was carrying his firearm.

**Gov. Opposition (example 8):**

"Raygoza also accosted R.H.'s wife, J.H.(.)"  (page 3, ln. 7-8).

**Objection:**

The trial evidence shows the wife standing alongside her husband silently while he and Raygoza engage in a verbal confrontation which was recorded by

Raygoza.  The word "accosted" is an exaggeration.  The incident involved a confrontation between R.H. and the three defendants, primarily Raygoza, with the wife in the background.  (Gov exh 8, 24).  During this confrontation, Raygoza directed her comments to R.H. only.

**Gov. Opposition (example 9)**:

"R.H.'s two young boys who witnessed the incident became distressed in the back of the car and can be heard audibly crying on video."  (page 3, ln. 11-13)

**Objection:**

The trial record does not show the children witnessing anything.  Moreover, the record established that one of the children is autistic, which accounts for his emotional reaction.  His reaction could easily have been due to being left alone in the vehicle with his sibling once the mother got out and joined R.H. who was confronting Raygoza on the sidewalk.

**Gov. Opposition (example 10)**:

". . . attempted to console him by asking him to look away from the people surrounding their car, . . ." (page 3, ln. 17-18).

**Objection:**

The trial record does not show the defendants surrounding the car. Moreover, R.H. and his wife were outside the vehicle and were not present to observe the children's behavior.

**Gov. Opposition (example 11):**

"Although Raygoza and Brown could have got into Brown's car and drove away, they continued to harass R.H. and his family."  (page 3, ln. 21-22).

**Objection:**

The videos clearly contradict this assertion by showing that R.H.'s wife deliberately backed up the family vehicle to block the defendants' vehicle from leaving, and R.H. himself stood in front of the defendants' vehicle until the Baldwin Park police arrived. See RT 2-26-2026, at pages 112-113: RT testifying: "I believe I got out of the car and I stood at my neighbor's driveway to prevent them from leave."

**Gov. Opposition (example 12):**

"In response to Brown's livestream, four or five masked individuals gathered outside the victim's home(.)"  (page 4, ln. 13-14).

9

**Objection:**

Like the defendants, the individuals who arrived later gathered at a residence several addresses away from R.H.'s residence. The jury acquitted all three defendants on Count One which charged "doxing," which confirms that the government failed to prove that R.H.'s residential address was known to the defendants or any other attendees at the scene.

**Gov. Opposition (example 13):**

". . .where certain Instagram users reposted Brown's live-streamed video with captions. . ." (page 4, ln. 18-20)

**Objection:**

This has nothing to do with any conduct by the defendants. The record is clear that after the date in question (August 28, 2025), the defendants never returned to the location or attempted to make any contact with R.H. or his wife. The government is using actions by unknown individuals to try and establish repetition and persistence, which are key ingredients of the crime of stalking; but in fact, this case is a one-time event within an hour and a half of a single day, which falls far short of stalking.

10

**Gov. Opposition (example 14):**

**"They did not know if defendants had weapons . . ." (page 4, ln. 26-28)**

**Objection:**

**The trial record does not support this claim.  R.H. knew perfectly well the defendants did not have weapons.  All they were doing was recording on their cell phones and protesting the presence of an ICE agent.  As stated above, the videos show clearly that the agent was not at all afraid of the defendants and knew that these three young ladies did not have weapons.  Moreover, he acknowledged that he had his firearm on his person, so he did not feel threatened at all.**

**Gov. Opposition (example 15):**

**"But the impact of defendants' actions did not end on August 28." (page 5, ln. 1-2).**

**Objection:**

**The government is trying to stretch the defendant's actions beyond a single date to show repetition and persistence.  But no such evidence was presented at trial.  On cross examination, R.H. acknowledged that he and his wife did not encounter any of the defendants after August 28, 2025, the date in question.  The case agent also acknowledged that the government did not have any evidence that**

the defendants attempted to contact R.H. or his wife, or posted anything online about them, after this date. RH testified that after August 28, 2025, there was a lot more vehicle traffic consisting of unidentified vehicles. This is pure speculation as to what any such traffic consisted of. Bottom line: the trial record is clear that the stalking charge is based on the events of a single date. Any suspicions that R.H. and his wife might have had afterwards is not proof of any actual conduct. The trial was all about a one-day event.

**Gov. Opposition (example 16):**

"Increased car traffic from onlookers in their neighborhood in the ensuing weeks. . ." (page 5, ln. 2-3).

**Objection:**

The testimony by R.H. and his wife about so-called onlookers subsequent to August 28 is not only speculation, but is irrelevant to stalking, which is an offense specific to the defendant being charged. As stated above, R.H. and the case agent acknowledged that they had no evidence the defendants returned to the residential street on an occasion subsequent to August 28. If, for the sake of argument, there were an onlookers on later dates, Raygoza is not responsible for such conduct. First, such onlookers were not alleged to be unindicted co-conspirators, and the

stalking charge in Count Two was charged only as a substantive offense occurring on the single day - August 28, 2025, which makes subsequent dates irrelevant.

**Gov. Opposition (example 17):**

"The forced relocation. . ." (page 5, ln. 5)

**Objection:**

Again, the government uses hyperbole. There was no forced relocation. It was entirely by choice. The defendants, by the exercise of their First Amendment rights, had exposed R.H. as an ICE agent to his neighbors; and as a consequence, R.H. and his wife elected to leave. Apparently, this was something that R.H. and his wife wanted to keep secret, and now the neighbors know he's with ICE -- precisely what the defendants were exposing through their protest activity on the street. Under these circumstances, the decision to relocate is not "forced" by the defendants' actions.

Moreover, the behavior of R.H. on the videos contradicts any notion of his being forced to relocate. Most of the time period on the videos shows R.H.'s confrontation of Raygoza and his interaction with the co-defendants when his wife backed up the family vehicle to block the defendants from driving away to keep them there until the Baldwin Park police arrived. His demeanor is relaxed,

particularly where he stands alongside the defendants' vehicle with his back to the defendants, which in itself shows that he is not afraid of them. He knows they are physically harmless, even if they are protesting loudly. Thus, the trial record is clear that the decision by R.H. and his wife to relocate was entirely voluntary, not forced. This is yet again an example of the government stretching the trial record.

**Gov. Opposition (example 18):**

". . . significantly disrupted the education of the victim's children: R.H.'s daughters now have to commute over an hour to school each way (whereas before they simply walked down the street), and the victim's 15-year-old-son has decided to be homeschooled rather than attend high school." (page 5, ln. 6)

**Objection:**

Once again, the government exaggerates the trial record. In addition to the fact that the decision to relocate was entirely voluntary and not based on any persistent or repetitive conduct by any defendant, the idea that the daughters have to commute over an hour each way is a reflection of parental judgment in regard to why they enrolled the daughters at a public school so far away, and has nothing to do with the defendants' actions. Same with regard to the son's decision to be home schooled.

14

**Gov. Opposition (example 19):**

**"The three-year-old, who has autism, became overstimulated and began kicking his
legs and covering his ears and face." (page 3, ln. 14-16)**

**Objection:**

**Any reaction by the child was due to his autism, when he was left alone
without his mother, who had left the vehicle, which means she was not there to
witness anything.  The government is distorting the trial record in an effort to
attribute the child's reaction to the conduct of the defendants, rather than to his
condition and his mother's decision to leave him alone.**

**Gov. Opposition (example 20):**

**"Far from a matter of public concern, defendants instead recorded the mundane
intimacies of R.H's life." (page 12, ln 2-3)**

**Objection:**

**This is nonsense.  What defendants recorded is set forth in the trial exhibits.
They recorded events on the street on August 28, 2025.**

As shown, the government has manipulated the trial record in an effort to take this case outside the framework of First Amendment freedoms and to convey an impression that the defendants' conduct was repetitive and persistent to establish stalking.  The evidence at trial, however, was quite different from the distorted narrative presented by the government and does in fact support a dismissal on First Amendment grounds and an acquittal on the stalking charge.

## II.

### THE TRIAL RECORD SUPPORTS AN ACQUITTAL ON FIRST AMENDMENT GROUNDS

"[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S. Ct. 684 (1949). While speech integral to criminal conduct is now recognized as a "long-established category of  unprotected speech," United States v. Stevens, 559 U.S. 460, 471, 130 S. Ct. 1577 (2010), "[t]he interstate stalking statute, which prohibits a course of conduct done with 'intent to kill, injure, harass, or place under surveillance with intent to kill, injure, harass, or intimidate, or cause substantial  emotional distress,' clearly targets conduct performed with serious criminal intent, *not just speech that*

16

*happens to cause annoyance or insult.*" **United States v. Sayer, 748 F.3d 425, 435 (1st Cir. 2014). [Italics and Underling Added].**

The trial record falls squarely within the framework of First Amendment protection. The defendants engaged in protest behavior on the residential street in Baldwin Park. It is true that Ms. Raygoza shouted as she walked up the street alerting neighbors about the presence of an ICE agent on their street; and some of her comments were insulting. All of this, however, falls well within the First Amendment framework which protects speech that is annoying or insulting. Likewise, much of the August 28 incident was comprised of the street confrontation between R.H. and Ms. Raygoza, which clearly falls within the First Amendment.

Of particular importance in the First Amendment analysis is the fact that when the Baldwin Park police arrived, they did not arrest anyone for the live streaming or other protest activity. The only arrest was made on Ms. Raygoza due to the fallacious accusation by R.H. that she had pushed him, a claim for which she was never prosecuted.

Accordingly, this Court should find that the trial record warrants a dismissal of Count Two of the First Superseding Indictment on First Amendment grounds.

17

### III.

### THE GOVERNMENT ASSERTS THE "UNIQUE" NATURE OF THIS CASE TO INVENT AN UNPRECEDENTED STALKING CASE THAT CONTRADICTS LEGISLATIVE INTENT AND PRIOR DEPT. OF JUSTICE PRACTICES

The Dept of Justice under the Trump administration has ushered in a wave of unprecedented prosecutions that have turned legal standards on their head, as illustrated by now-dismissed indictments against former government officials and ICE enforcement actions that have resulted in countless injunctions issued by federal courts nationwide.  It is hardly surprising, and yet deeply concerning, that in this case the government has elected to re-invent the federal stalking statute by weaponizing it against ICE protestors.

In a dismissive tone that cavalierly claims  "this case is factually unique," (gov at page 15, ln 8), the government conspicuously avoids addressing Raygoza's detailed discussion in the moving papers that the stalking charge in Count Two departs radically from historical charging practices in this district; and likewise contradicts Congress's intent to target only repetitive predatory behavior (original papers at pages 10 - 17).

The trial record is devoid of evidence from which a rational jury could conclude that the defendants engaged in predatory behavior—the gravamen of a stalking offense. Because stalking is inherently a crime of predation, the absence of

such conduct is fatal to the prosecution's case. The original moving papers demonstrate that in all prior stalking prosecutions in this district, the defendant's conduct was predatory, consisting of persistent and repetitive behavior over a period of time that caused the victim substantial emotional distress.  The consistency with which prior government prosecutions for stalking targeted predatory conduct coincided squarely with Congress' intent.  Here, the record fails to establish any predatory behavior, which is the foundational element of the offense.  The government's opposition takes the dismissive approach of simply calling this case "unique."  The Court should reject the government's position.

## IV.

### THE GOVERNMENT'S ATTEMPT TO JUSTIFY THE "COURSE OF CONDUCT" JURY INSTRUCTION IS UNPERSUASIVE

At the heart of the unjust outcome of this trial is the jury instruction on the "course of conduct" element, which contains the following language:[1]

---

[1]     The entire instruction on course of conduct read: "A 'course of conduct' is a pattern of conduct composed of two or more acts, evidencing a continuity of purpose. You may consider each communication between the defendant and R.H. or his family members as a separate act. You are not required to agree unanimously on which two or more acts constitute the course of conduct. Not all acts that constitute part of a course of conduct must involve the use of an interactive computer service, an electronic communication system of interstate commerce, interstate wires, the internet, or any other facility of interstate or

(continued...)

> You may consider each communication between the defendant and R.H. or his family members as a separate act.

As discussed in the original moving papers, this language reduces the course of conduct standard to an absurdity by allowing the "two or more acts" to be accomplished in a matter of seconds, based on the rapid back-and-forth verbal confrontation on the sidewalk between Ms. Raygoza and R.H.  (original moving papers at 20 - 21).  The government's opposition fails to recognize that the repetitive and persistent conduct by a stalker, which underscores the predatory nature of the offense, produces a cumulative effect constituting the substantial emotional distress suffered by the victim.

Courts addressing 18 U.S.C. 2261A have acknowledged Congress's intent to address the cumulative harm caused by persistent stalking behavior.  For example, in United States v. Shrader, 675 F.3d 300 (4th Cir. 2012), a stalking prosecution in which the defendant repeatedly pursued a former girlfriend with a violent outcome, the Court observed that the cumulative effects of the "two or more acts" over time establish the requisite "continuity of purpose":

> The statute defines the required "course of conduct" as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2). This latter part of the definition is significant. While the

---

[1](...continued)
foreign commerce."

20

> statute does not impose a requirement that the government prove that each act was intended in isolation to cause serious distress or fear of bodily injury to the victim, the government is required to show that the totality of the defendant's conduct "evidenc[ed] a continuity of purpose" to achieve the criminal end. The specific intent requirement thus modifies the cumulative course of conduct as a whole.

Shrader, 675 F.3d at 311.

Other circuits are in accord.  "The focus is not on the individual acts as separate, distinct events, but instead on the purpose and scope of the defendants' pattern of stalking conduct as a whole."  *See,* United States v. Gonzalez, 905 F.3d 165, 186 (3d Cir. 2018), citing United States v. Conlan, 786 F.3d 380, 386 (5th Cir. 2015) ("[T]he statute's intent requirement 'modifies the cumulative course of conduct as a whole,'" and avoids criminalizing otherwise innocent acts), and Shrader, 675 F.3d at 311-12.

The terms, "cumulative course of conduct as a whole" and "totality of the defendant's conduct" bring to bear persistent and repetitive behavior that comprise the predatory conduct that is fundamental to the crime of stalking.  In sharp contrast, the trial record shows that the conduct of the defendants occurred within the span of 1 - 1.5 hours on a single day and consisted of live streaming of ICE protests and verbal exchanges with the agent, R.H., on his  residential street.  These circumstances fall far short of demonstrating a cumulative course of conduct as a

21

whole that would establish continuity of purpose, as required in the definition of "course of conduct."  No rational jury, therefore, could have found defendant Raygoza guilty of stalking.

The cases cited by the government do not support its position.  The opposition cites United States v. Pantchev, 2:21-CR-00050-JFW (C.D. Cal.), Dkt. 218 at 20, where the jury instruction on Course of Conduct included the same language as the instruction in this case: "You may consider each communication between the defendant and the victims as a separate act." (Gov opp. at page 21, ln 7-9).  It just so happens that CJA counsel for defendant Raygoza was also CJA counsel for defendant Pantchev in the jury trial before Judge Walter in June 2022, so the facts of that case are well known to counsel.

In Pantchev, the defendant, who was a former combat U.S. Marine who had suffered traumatic brain injury while serving in Iraq,  sent a large volume of emails to multiple female psychiatrists at VA hospitals.  Pantchev also distributed flyers on the VA hospital campus containing intimidating language, and on at least one occasion, he went to one of the victims' residence in the middle of the night to drop off a flyer. Prior to his federal prosecution, he had been prosecuted and convicted in state court for the same conduct in approximately 2011-2012, and after being released from state custody, he resumed the same conduct in approximately 2019-2021, for which he was prosecuted federally.  The indictment, which is attached

22

hereto as Exhibit A, clearly shows that the "two or more acts" were distinct behaviors spaced apart over an extended period of time that exemplified the type of predatory behavior that is underscored by persistent and repetitive conduct, causing a cumulative effect of terrorizing the female psychiatrists who testified at the trial.

For these reasons, the jury instruction in Pantchev that allowed the jury to treat each communication as a separate act made perfect sense. But in this case, the communications were entirely different, consisting of direct verbal interactions between Raygoza and R.H. Under these circumstances, the adoption by this Court of the same language used in the Pantchev instruction allowed the jury to find "two or more acts" in a matter of seconds – the antithesis of the circumstances at issue in Pantchev.

The government's reliance on the Davis case [5:14-CR-00240-D (E.D.N.C.)] is likewise misplaced. The indictment from that case, a stalking prosecution in North Carolina, is attached as Exhibit B. There, the defendant was charged with sending multiple threatening emails to one or more victims over a period of more than two years covering February 2012 to October 2014. As in Pantchev, the acts were distinct and separated by time, thus making it appropriate to include in the jury instruction the language that the jury may consider each communication as a separate act.

23

The government also misplaces reliance on the Ackell case [1:15-CR-123-JL (D.N.H.)].  The indictment from that case, a stalking prosecution in New Hampshire, is attached as Exhibit C.  As the indictment does not allege specific conduct by the defendant, the government's bill of particulars is attached as Exhibit D, which shows that the defendant's conduct included numerous electronic and telephone communications between the defendant and victim R.R. as reflected in the screen shots covering BATES stamped 14_232-000092 to 000118 and 14_232000119 to 000191, as well as electronic communications between defendant Ackell and a third party D. Hendricks to whom Ackell sent images of R.R.  The indictment alleges a two year time period of October 2012 to February 2014.  Like the Davis case, the Ackell case is highly distinguishable from the prosecution of the defendants here.

The acts committed by the defendants in Pantchev, Davis, and Ackell were all distinct and separated by time.  Thus, it was appropriate in those cases to instruct the jury that each communication with the victim could be treated as a separate act.  In this case, however, as stated above, the jury was allowed to treat each statement made by Raygoza to R.H. during their verbal confrontation on the sidewalk as a separate act, which meant the "two or more acts" requirement was satisfied within a matter of seconds.

The government here applied a one-size-fits-all approach to the "two or more

24

acts" standard, by which the government simply copy-pasted the language from the above-referenced cases into the jury instructions in this case, which resulted in a miscarriage of justice. The Court should therefore grant the motion and either grant an acquittal or a new trial.

## V.

## <u>CONCLUSION</u>

For the reasons discussed herein and in the original moving papers, defendant Cynthia Raygoza respectfully requests that the Court issue an order under Rule 29(d) that sets aside the guilty verdict on Count Two of the First Superseding Indictment and make the conditional determination under Rule 29(d). Alternatively, Ms. Raygoza respectfully requests that the Court grant a new trial under Rule 33.

DATED:   April 24, 2026            Respectfully Submitted,


_____/S_____
**GREGORY NICOLAYSEN**
**Attorney for Defendant,**
**Cynthia Raygoza**

# EXHIBIT A

CLERK, U.S. DISTRICT COURT

02/16/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ____DM____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 2:21-cr-00050-JFW |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. §§ 2261A(2)(B), 2261(b)(5): Stalking] |
| GUEORGUI HRISTOV PANTCHEV, | |
| Defendant. | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. §§ 2261A(2)(B), 2261(b)(5)]

1. Beginning on or about July 26, 2019, and continuing to at least on or about January 22, 2021, in San Bernardino County, within the Central District of California, and elsewhere, defendant GUEORGUI HRISTOV PANTCHEV ("PANTCHEV"), with the intent to harass and intimidate Victim A, used the mail, an interactive computer service, an electronic communication service, an electronic communication system of interstate commerce, and other facilities of interstate and foreign commerce, namely email, interstate wires, and the Internet, to engage in a course of conduct, described in paragraph 2 below,

that caused, attempted to cause, and would reasonably be expected to cause substantial emotional distress to Victim A.

2. Defendant PANTCHEV's course of conduct included, among other things, the following:

a. On or about July 26, 2019, defendant PANTCHEV sent Victim A an email containing insults about Victim A and requested that the email be forwarded to her co-workers.

b. On or about January 31, 2020, defendant PANTCHEV sent Victim A an email in which defendant PANTCHEV accused Victim A and others of manipulating government rules to deny him healthcare.

c. On or about March 23, 2020, defendant PANTCHEV sent Victim A harassing emails that accused Victim A of wrongdoing.

d. On or about July 16, 2020, defendant PANTCHEV posted signs bearing Victim A's name, a Loma Linda Veterans Administration phone number, and advertising sexual acts for money.

e. On or about August 11, 2020, defendant PANTCHEV sent Victim A a lengthy and harassing email containing disparaging allegations about Victim A's co-workers, including Victim C and Victim D.

f. On or about August 25, 2020, defendant PANTCHEV sent an email to Victim A's co-workers, including Victim B, in which defendant PANTCHEV attached a pornographic image and wrote that Victim A was "consumed with desire for fucking with me."

g. On or about October 6, 2020, defendant PANTCHEV gave a physician at the Loma Linda Veterans Affairs Hospital a four-page letter that claimed that Victim A was a "Worthless Cunt." The document also included derogatory statements about Victim C, Victim D, and Victim E.

2

h.   On or about November 14, 2020, defendant PANTCHEV mailed documents to a member of Veterans Administration leadership in which defendant PANTCHEV wrote that Victim A "is a firm believer that sucking men's dicks and acting tougher than men when put in a man's position is the way to act as a woman in a man's position," included a pornographic image, and made derogatory statements about Victim B, Victim C, Victim D, and Victim E.

COUNT TWO

[18 U.S.C. §§ 2261A(2)(B), 2261(b)(5)]

1.    Beginning on or about May 3, 2020, and continuing to at least on or about January 22, 2021, in San Bernardino County, within the Central District of California, and elsewhere, defendant GUEORGUI HRISTOV PANTCHEV ("PANTCHEV"), with the intent to harass and intimidate Victim B, used the mail, an interactive computer service, an electronic communication service, an electronic communication system of interstate commerce, and other facilities of interstate and foreign commerce, namely email, interstate wires, and the Internet, to engage in a course of conduct, described in paragraph 2 below, that caused, attempted to cause, and would reasonably be expected to cause substantial emotional distress to Victim B.

2.    Defendant PANTCHEV's course of conduct included, among other things, the following:

a.    Between May 3, 2020, and November 1, 2020, defendant PANTCHEV sent Victim B numerous harassing emails.

b.    On or about May 4, 2020, defendant PANTCHEV sent Victim B an email referring to her as a "Tormentrix" and asking her to have coffee with him.

c.    On or about May 21, 2020, defendant PANTCHEV sent Victim B an email containing, among other things, a link to a photograph of a nurse wearing a see-through gown.

d.    On or about June 15, 2020, defendant PANTCHEV sent Victim B an email disparaging and making vulgar statements about Victim B's co-workers, including Victim C and Victim D.

e.    On or about August 25, 2020, defendant PANTCHEV sent Victim B an email disparaging Victim A, Victim C, and Victim D.

4

f.     On or about November 1, 2020, defendant PANTCHEV came to the emergency room at the Loma Linda Veterans Administration, where Victim B was working at the time, and gave a nurse a printout of a harassing message to give to Victim B.

g.     On or about November 1, 2020, defendant PANTCHEV sent Victim B an email disparaging Victim B, Victim C, Victim D, and Victim E.

h.     On or about November 1, 2020, defendant PANTCHEV sent Victim B three additional harassing emails.

i.     On or about November 14, 2020, defendant PANTCHEV mailed documents to a member of Veterans Administration leadership in which defendant PANTCHEV wrote that Victim B was a "piece of shit," and included three photographs of her, and made derogatory statements about Victim A, Victim C, Victim D, and Victim E.

COUNT THREE

[18 U.S.C. §§ 2261A(2)(B), 2261(b)(5)]

1. Beginning on or about June 15, 2020, and continuing to at least on or about January 22, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant GUEORGUI HRISTOV PANTCHEV ("PANTCHEV"), with the intent to harass and intimidate Victim C, used the mail, an interactive computer service, an electronic communication service, an electronic communication system of interstate commerce, and other facilities of interstate and foreign commerce, namely email, interstate wires, and the Internet, to engage in a course of conduct, described in paragraph 2 below, that caused, attempted to cause, and would reasonably be expected to cause substantial emotional distress to Victim C.

2. Defendant PANTCHEV's course of conduct included, among other things, the following:

a. On or about June 15, 2020, defendant PANTCHEV sent an email to Victim C's co-workers, including Victim B, disparaging and making vulgar statements about Victim C, Victim D, and others.

b. On or about August 5, 2020, defendant PANTCHEV sent an email to at least two of Victim C's co-workers attaching photographs of Victim C and Victim D and making disparaging and vulgar statements about Victim C, Victim D, and others.

c. On or about August 11, 2020, defendant PANTCHEV sent an email to 144 of Victim C's co-workers disparaging and making vulgar statements about Victim C and others.

d. On or about August 25, 2020, defendant PANTCHEV sent an email to Victim C's co-workers that included lengthy attachments

6

that disparaged and made vulgar statements about Victim C, Victim A, and others.

e. On or about October 6, 2020, defendant PANTCHEV gave a physician at the Loma Linda Veterans Affairs Hospital a four-page letter that claimed that Victim C was "The Piece of Shit LAPD Cop's Fishwife." The document also included derogatory statements about Victim A, Victim D, and Victim E.

f. On or about November 14, 2020, defendant PANTCHEV mailed documents to a member of Veterans Administration leadership in which defendant PANTCHEV made derogatory statements about Victim A, Victim B, Victim C, Victim D, and Victim E.

g. On or about December 15, 2020, defendant PANTCHEV distributed, at the West Los Angeles Veterans Administration, flyers bearing Victim C's name, a large photograph of Victim C, and disparaging statements about Victim C.

h. On or about December 18, 2020, defendant PANTCHEV distributed, at the Long Beach Veterans Administration, flyers bearing Victim C's name, a large photograph of Victim C, and disparaging statements about Victim C.

i. On or about December 21, 2020, defendant PANTCHEV distributed, at the West Los Angeles Veterans Administration, flyers bearing Victim C's name, a large photograph of Victim C, and disparaging statements about Victim C.

j. On or about December 31, 2020, defendant PANTCHEV distributed, at Pepperdine University and a nearby shopping center, flyers bearing Victim C's name, contact information, a large photograph of Victim C, and disparaging statements about Victim C.

7

k.   On or about January 4 and 5, 2021, defendant PANTCHEV distributed, at the West Los Angeles Veterans Administration, flyers bearing Victim C's name, contact information, a large photograph of Victim C, and disparaging statements about Victim C.

l.   On or about January 8 and 9, 2021, defendant PANTCHEV distributed, at the West Los Angeles Veterans Administration, flyers bearing Victim C's name, contact information, a large photograph of Victim C, and disparaging statements about Victim C.

m.   On or about January 15, 2021, defendant PANTCHEV distributed, at a co-worker's residence, flyers bearing Victim C's name, contact information, a large photograph of Victim C, and disparaging statements about Victim C.

n.   On or about January 19, 2021, defendant PANTCHEV distributed, at a co-worker's residence, and elsewhere, flyers bearing Victim C's name, contact information, a large photograph of Victim C, and disparaging statements about Victim C.

COUNT FOUR

[18 U.S.C. §§ 2261A(2)(B), 2261(b)(5)]

1.   Beginning on or about June 15, 2020, and continuing to at least on or about January 22, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant GUEORGUI HRISTOV PANTCHEV ("PANTCHEV"), with the intent to harass and intimidate Victim D, used the mail, an interactive computer service, an electronic communication service, an electronic communication system of interstate commerce, and other facilities of interstate and foreign commerce, namely email, interstate wires, and the Internet, to engage in a course of conduct, described in paragraph 2 below, that caused, attempted to cause, and would reasonably be expected to cause substantial emotional distress to Victim D.

2.   Defendant PANTCHEV's course of conduct included, among other things, the following:

        a.   On or about June 15, 2020, defendant PANTCHEV sent an email to Victim D's co-workers, including Victim B, disparaging and making vulgar statements about Victim D and others.

        b.   On or about August 5, 2020, defendant PANTCHEV sent an email to at least two of Victim D's co-workers attaching photographs of Victim D and Victim C and making disparaging and vulgar statements about Victim D, Victim C, and others.

        c.   On or about August 11, 2020, defendant PANTCHEV sent an email to 144 of Victim D's co-workers disparaging and making vulgar statements about Victim D, Victim C, and others.

        d.   On or about August 25, 2020, defendant PANTCHEV sent two emails to Victim D's co-workers disparaging and making vulgar statements about Victim D and others.

9

e.    On or about October 6, 2020, defendant PANTCHEV gave a physician at the Loma Linda Veterans Affairs Hospital a four-page letter that claimed that Victim D was a "shrew."  The document also included derogatory statements about Victim A, Victim C, and Victim E.

f.    On or about November 14, 2020, defendant PANTCHEV mailed documents to a member of Veterans Administration leadership in which defendant PANTCHEV wrote that Victim D is a "Devil's Worshiper Witch [who] engages in Satanic Rituals," included multiple photographs of her, and made derogatory statements about Victim A, Victim B, Victim C, and Victim E.

g.    On or about December 15, 2020, defendant PANTCHEV distributed, at the West Los Angeles Veterans Administration, flyers bearing Victim D's name, a large photograph of Victim D, and disparaging statements about Victim D.

h.    On or about December 18, 2020, defendant PANTCHEV distributed, at the Long Beach Veterans Administration, flyers bearing Victim D's name, a large photograph of Victim D, and disparaging statements about Victim D.

i.    On or about December 21, 2020, defendant PANTCHEV distributed, at the West Los Angeles Veterans Administration, flyers bearing Victim D's name, a large photograph of Victim D, and disparaging statements about Victim D.

j.    On or about December 24, 2020, defendant PANTCHEV distributed, near Victim D's parents' residence in Brentwood, California, flyers bearing Victim D's name, contact information, a large photograph of Victim D, and disparaging statements about Victim D.

10

k.     On or about December 31, 2020, defendant PANTCHEV distributed, at Pepperdine University and a nearby shopping center, flyers bearing Victim D's name, contact information, a large photograph of Victim D, and disparaging statements about Victim D.

l.     On or about January 3, 2021, defendant PANTCHEV distributed, in and around Manhattan Beach, California, flyers bearing Victim D's name, contact information, and disparaging statements about Victim D.

m.     On or about January 4 and 5, 2021, defendant PANTCHEV distributed, at the West Los Angeles Veterans Administration, flyers bearing Victim D's name, contact information, a large photograph of Victim D, and disparaging statements about Victim D.

n.     On or about January 8 and 9, defendant PANTCHEV distributed, at the West Los Angeles Veterans Administration, flyers bearing Victim D's name, contact information, a large photograph of Victim D, and disparaging statements about Victim D.

o.     On or about January 15, 2021, defendant PANTCHEV distributed, at a co-worker's residence, flyers bearing Victim D's name, contact information, a large photograph of Victim D, and disparaging statements about Victim D.

p.     On or about January 19, 2021, defendant PANTCHEV distributed, at a co-worker's residence, and elsewhere, flyers bearing Victim D's name, contact information, a large photograph of Victim D, and disparaging statements about Victim D.

q.     On or about January 22, 2021, defendant PANTCHEV distributed, at Victim D's home, flyers bearing Victim D's name, contact information, a large photograph of Victim D, and disparaging statements about Victim D.

11

r.    On or about January 22, 2021, defendant PANTCHEV distributed, at a school attended by Victim D's child, flyers bearing Victim D's name, contact information, a large photograph of Victim D, and disparaging statements about Victim D.

12

                            COUNT FIVE

              [18 U.S.C. §§ 2261A(2)(B), 2261(b)(5)]

    1.   Beginning on or about September 18, 2020, and continuing to at least on or about January 22, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant GUEORGUI HRISTOV PANTCHEV ("PANTCHEV"), with the intent to harass and intimidate Victim E, used the mail, an interactive computer service, an electronic communication service, an electronic communication system of interstate commerce, and other facilities of interstate and foreign commerce, namely email, interstate wires, and the Internet, to engage in a course of conduct, described in paragraph 2 below, that caused, attempted to cause, and would reasonably be expected to cause substantial emotional distress to Victim E.

    2.   Defendant PANTCHEV's course of conduct included, among other things, the following:

         a.   On or about September 18, 2020, defendant PANTCHEV sent an email to Victim E disparaging Victim A and welcoming Victim E to "the PANTCHEV's Hateresses Club."

         b.   On or about September 25, 2020, defendant PANTCHEV sent an email to Victim E including disparaging statements about other victims and stating, "What the fuck is wrong with you????"

         c.   On or about October 6, 2020, defendant PANTCHEV gave a physician at the Loma Linda Veterans Affairs Hospital a four-page letter that included a photograph of Victim E, claimed that she treated defendant PANTCHEV with contempt, and that "Red-Hairs Indeed have NO soul."  The document also included derogatory statements about Victim A, Victim C, and Victim D.

                                13

d.    On or about October 9, 2020, defendant PANTCHEV sent an email to Victim E disparaging Victim E and Victim D.

e.    On or about November 14, 2020, defendant PANTCHEV mailed documents to a member of Veterans Administration leadership in which defendant PANTCHEV wrote that Victim E was "redolent of an OLD Porn Star Witch auditioned for a Hallowing Commercial for an Anti-Depressant Sleaping Pill" and made derogatory statements about Victim A, Victim B, Victim C, and Victim D.

f.    On or about January 10, 2021, defendant PANTCHEV distributed flyers throughout the Loma Linda area, including the Loma Linda Veterans Administration and Loma Linda University, that made disparaging statements about Victim E and included her photograph and her contact information.

A TRUE BILL

/S/

Foreperson

TRACY L. WILKISON
Acting United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division

CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, Cyber & Intellectual
  Property Crimes Section

KHALDOUN SHOBAKI
DEVON MYERS
Assistant United States Attorneys
Cyber & Intellectual Property
  Crimes Section

14

# EXHIBIT B

FILED IN OPEN COURT
ON 10-15-2014
Julie A. Richards, Clerk
US District Court
Eastern District of NC
Ann

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:14-CR-240-1F(4)

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | I N D I C T M E N T |
| | ) | |
| WILLIAM SCOTT DAVIS, JR. | ) | |

The Grand Jury charges that:

## COUNT ONE

Beginning in or about February 2012, and continuing through the present, in the Eastern District of North Carolina and elsewhere, the defendant, WILLIAM SCOTT DAVIS, JR., with the intent to kill, injure, harass, and intimidate M.A.S., a person known to the Grand Jury, did use an interactive computer service, electronic communication service, electronic communication system of interstate commerce, and other facility of interstate and foreign commerce, to wit: e-mail, to engage in a course of conduct that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to M.A.S., a person known to the Grand Jury, in violation of Title 18, United States Code, Section 2261A(2)(B).

## COUNT TWO

Beginning in or about February 2012, and continuing through the present, in the Eastern District of North Carolina and

1

elsewhere, the defendant, WILLIAM SCOTT DAVIS, JR., with the intent to kill, injure, harass, and intimidate M.W.S., a person known to the Grand Jury, did use an interactive computer service, electronic communication service, electronic communication system of interstate commerce, and other facility of interstate and foreign commerce, to wit: e-mail, to engage in a course of conduct that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to M.W.S., a person known to the Grand Jury, in violation of Title 18, United States Code, Section 2261A(2)(B).

## COUNT THREE

Beginning in or about February 2012, and continuing through the present, in the Eastern District of North Carolina and elsewhere, the defendant, WILLIAM SCOTT DAVIS, JR., with the intent to kill, injure, harass, and intimidate S.B., a person known to the Grand Jury, did use an interactive computer service, electronic communication service, electronic communication system of interstate commerce, and other facility of interstate and foreign commerce, to wit: e-mail, to engage in a course of conduct that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to S.B., a person known to the Grand Jury, in violation of Title 18, United States Code, Section 2261A(2)(B).

2

COUNTS FOUR THROUGH SIX

On or about each of the dates reflected below for each of Counts Two through Four, in the Eastern District of North Carolina and elsewhere, the defendant, WILLIAM SCOTT DAVIS, JR., then in Virginia, knowingly and willfully did transmit in interstate and foreign commerce, a communication, to wit: an email, to a person known to the Grand Jury and who was then located in North Carolina, and the communication contained a threat to kidnap and injure a person known to the Grand Jury as specifically indicated below:

| COUNT | DATE | VICTIM | THREAT MADE |
|-------|------|--------|-------------|
| FOUR | 7/17/2014 | MAS | "I am going to wearing [sic] her mother fucking prejudicial white ASS out she will never be able to walk again or practice law. . . I'm going to be the only one doing the fucking around her, with big ten mile long Black Dick, and 30 miles Wide. . . " |
| FIVE | 8/6/2014 | MWS; MAS | ". . .my foot up you MF ass.  Bit_h !!!!!!!!!!!!!!!! Now who is your Daddy. Bend over and spread um wide" |

3

| SIX | 8/17/2014 | SB | "There is no where [sic] you, your family, your husband is going to be able to run and hide, and there is no damn thing that you are going to be able to do to stop what's coming to your family, your husband [sic] way.  GOD HELP you" |
|-----|-----------|-----|---|

Each    count    in    the    above    table    constituting    a    separate violation of Title 18, United States Code, Section 875(c).

A TRUE BILL

**REDACTED VERSION**

Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.

FOREPERSON

DATE: _October 14, 2014_

THOMAS G. WALKER
United States Attorney

BY: BARBARA D. KOCHER
Assistant United States Attorney

4

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Cr. No.:   1:15-cr-123-JL** |
| | ) | |
| **DAVID ACKELL** | ) | |

## SUPERSEDING INDICTMENT

The Grand Jury charges:

## COUNT I

### [18 U.S.C. §2261A(2)(B) - Stalking ]

From on or about October 2012 to on or about February 2014, in the Districts of New

Hampshire, and elsewhere, the defendant,

## DAVID ACKELL,

with the intent to injure, harass, intimidate, and to place under surveillance with the intent to

injure, harass and intimidate another person, namely, R.R., used facilities of interstate and

foreign commerce, including electronic cellular telephone networks, to engage in a course of

conduct, to wit, the sending of text messages, digital images and other electronic

communications to R.R. and another, that caused, attempted to cause, or would be reasonably

expected to cause, substantial emotional distress to R.R.

All in violation of Title 18, United States Code, §§2261A (2)(B).

A TRUE BILL

/s/ Grand Jury Foreperson
Date: July 27, 2016 Grand Jury Foreperson


EMILY GRAY RICE
United States Attorney


By: /s/ Helen White Fitzgibbon
Helen White Fitzgibbon
Assistant U.S. Attorney

# EXHIBIT D

Case 2:25-cr-00780-SVW    Document 223    Filed 04/24/26    Page 49 of 51   Page ID
#:2795

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| **v.** ) | **No. 1:15-cr-123-JL** |
| ) | |
| DAVID ACKELL ) | |

## UNITED STATES' BILL OF PARTICULARS

The United States of America, by and through its attorney, Emily Gray Rice, United States Attorney for the District of New Hampshire, in response to this Court's order of September 7, 2016, lists the following evidence which will be offered to prove the course of conduct the defendant engaged in as alleged in the superseding indictment:

1. Screen shots of electronic communications between the defendant and R.R., previously provided to the defendant, BATES stamped 14_232-000092 to 000118 and 14_232-000119 to 000191;

2. Testimony by R.R. with regard to electronic and telephone communications with the defendant, the substance of which is summarized in FBI 302s provided in discovery;

3. Testimony by D. Hendrick with regard to digital images of R.R. which were sent to Hendrick's phone by the defendant;

4. Testimony by D. Hendrick with regard to telephone communications with the defendant regarding defendant's relationship with R.R.;

-1-

5. Testimony by D. Hendrick with regard to threats made by the defendant against D. Hendrick.

Respectfully submitted,

EMILY GRAY RICE
United States Attorney

Date: September 20, 2016

By: /s/ Helen White Fitzgibbon
Helen White Fitzgibbon
N.H. Bar No. 6833
Assistant U.S. Attorney
53 Pleasant St., 5th Floor
Concord, NH 03301
603-225-1552
helen.fitzgibbon@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading has been served this day, via ECF, on William E. Christie, Esq., counsel for the defense, 107 Storrs Street, Concord, NH 03301.

/s/ Helen White Fitzgibbon
Helen White Fitzgibbon
Assistant U.S. Attorney
